JOHN M. NEUKOM (SBN 275887)
ANDREW M. HOLMES (SBN 260475)
WILLIAM O. COOPER (SBN 279385)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Tel: 415-875-6600
Fax: 415-875-6700
johnneukom@quinnemanuel.com
drewholmes@quinnemanuel.com
willcooper@quinnemanuel.com

Attorneys for Defendant
FORTINET, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| NETWORK PROTECTION SCIENCES, LLC<br><br>Plaintiff,<br><br>v.<br><br>FORTINET, INC.<br><br>Defendant. | No.   3:12-CV-01106-WHA<br><br>**FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR (i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT**<br><br>Hearing Date: July 18, 2013<br>Time: 8:00 a.m.<br>Judge:  William H. Alsup |

1

## NOTICE OF MOTION

2     PLEASE TAKE NOTICE THAT Defendant Fortinet, Inc. ("Fortinet") hereby moves to

3 dismiss this case with prejudice for lack of standing and for litigation misconduct by Plaintiff

4 Network Protection Sciences, LLC ("NPS"). NPS lacks standing to assert the patent-in-suit ("the

5 '601 patent") against Fortinet because NPS did not own the '601 patent when it filed this lawsuit

6 on July 6, 2010, nor does NPS own the '601 patent even today. Furthermore, NPS has engaged in

7 misconduct in this case for almost three years, including (i) presenting an untrue "Texas story" by

8 alleging, arguing and swearing that it has headquarters and an employee in Texas, which fake

9 employee supposedly executed the document transferring the '601 patent to NPS ("Alleged

10 Assignment"); (ii) serving incomplete interrogatory answers on the issue of standing; (iii) failing

11 to produce the Alleged Assignment until over two years after filing suit; and (iv) imposing a

12 "bone-crushing" burden on Fortinet with impermissibly broad infringement contentions for a

13 patent that NPS does not own. NPS's lack of standing and litigation misconduct each, separately,

14 provides sufficient basis for dismissing this case.

15     This motion is set for hearing on July 18, 2013, at 8:00 a.m. It is based upon the following

16 Memorandum of Points and Authorities, the supporting Declaration of John M. Neukom, exhibits

17 to that declaration, and such other matters as may be presented at the time of the hearing and

18 allowed by the Court.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................................. 1

II.  Background ................................................................................................................. 2

    A.   Procedural Summary of This Case ................................................................... 2

    B.   The Plaintiff: NPS, Rakesh Ramde and Wilfred Lam .................................... 2

    C.   The Defendant: Fortinet .................................................................................. 3

    D.   Pre-Litigation History of the '601 Patent: From Commercial Failure… to Bankruptcy… to Lapsed PTO Fees… to Ramde and Lam ................................. 4

    E.   Ramde and Lam Filed Suit in East Texas Using a Longview, Texas Address and Under the Name "Network Protection Sciences, LLC" ............................... 5

    F.   In April 2011, NPS Explained How It Became the Assignee of the '601 Patent With a Single, Misleading Sentence ..................................................... 5

    G.   In August 2012—Over Two Years After Filing Suit—NPS Finally Produced the Alleged Assignment .................................................................. 6

    H.   In January 2013, Fortinet Requested the Deposition of Gregory Cuke, the Suspected NPS Signatory on the Alleged Assignment .................................... 6

    I.   In March 2013, NPS Explained How It Became the Assignee of the '601 Patent (Again) With a Single, Misleading Sentence ........................................ 7

    J.   June 7, 2013: Fortinet Took Cuke's Deposition ............................................. 8

        1.   Cuke is Not an NPS Employee ............................................................. 8

        2.   Cuke Does Not Help Run the "Day-to-Day Activities" of NPS .................. 9

        3.   NPS Does Not Have "Headquarters" in Longview, Texas ......................... 10

        4.   Cuke Has No Authority to do Anything for NPS, Let Alone to Enter Into Agreements for NPS ..................................................................... 11

        5.   Cuke Testified that He Signed the Alleged Assignment 22 Days After This Case Was Filed ................................................................... 12

        6.   Cuke Does Not Remember Who Authorized Him to Sign the Alleged Assignment; Does Not Know Its Terms nor Understand Its Terminology; and Had No Idea It Contained a Misrepresentation When He Signed It ............................................................................. 12

III. ARGUMENT ............................................................................................................. 14

    A.   This Case Should Be Dismissed Because NPS Did Not Own the '601 Patent on July 6, 2010 ............................................................................. 14

B.  This Case Should Be Dismissed Because NPS Has <u>Never</u> Owned the '601 Patent .......................................................................................... 17

C.  This Case Should Be Dismissed for Litigation Misconduct ................... 19

    1.  This Court Has the Power to Dismiss for Litigation Misconduct ............... 19

    2.  NPS Has Engaged In Multi-Year Misconduct ........................................... 20

        (a)  NPS Has Filed False Complaint Allegations and Motion Papers ..................................................................................... 20

        (b)  NPS and Ramde Filed an Untrue Declaration ............................... 21

        (c)  The Fake Title: "Director of Business Development" .................... 21

        (d)  NPS Served Incomplete, Misleading Interrogatory Answers on Standing Issues .................................................................... 21

        (e)  NPS Strategically Delayed Fact Discovery on Standing Issues ........................................................................................... 22

        (f)  For Almost Three Years of Litigation, NPS Has Put Unreasonable Burdens on Fortinet Through Unwieldy and Insufficient Infringement Contentions ........................................... 22

IV.  CONCLUSION ................................................................................................. 23

04880.52079/5364616.6

-ii-              Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Abbott Point of Care Inc. v. Epocal, Inc.*,
   666 F.3d 1299 (Fed. Cir. 2012) ...................................................................................17

*Abraxis Bioscience, Inc. v. Navinta LLC*,
   625 F.3d 1359 (Fed. Cir. 2010) ...................................................................................14

*Alpert v. Riley*,
   274 S.W.3d 277 (Tex. App. 2008) ...............................................................................16

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
   69 F.3d 337 (9th Cir. 1995) ...................................................................................19, 20

*Aptix Corp. v. Quickturn Design Sys., Inc.*,
   269 F.3d 1369 (Fed. Cir. 2001) ...................................................................................19

*Englebrick v. Worthington Indus., Inc.*,
   No. 8:08-cv-01296-CJC, 2013 WL 2007025 (C.D. Cal. May 13, 2013) .....................19

*Gaia Techs., Inc., v. Reconversion Techs., Inc.*,
   93 F.3d 774 (Fed. Cir. 1996) ..................................................................................14, 17

*Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*,
   426 F.3d 330 (5th Cir. 2005) .......................................................................................16

*Omni USA, Inc. v. Parker-Hannifin Corp.*,
   798 F. Supp. 2d 831 (S.D. Tex. 2011) .........................................................................18

*Quantum Corp. v. Riverbed Tech., Inc.*,
   No. 07-04161, 2008 WL 314490 (N.D. Cal. Feb. 4, 2008) ....................................15, 17

*R & R Marine, Inc. v. Max Access, Inc.*,
   377 S.W.3d 780 (Tex. App. 2012) ...........................................................................17, 18

*Stanwood Boom Works, LLC v. BP Exploration & Production, Inc.*,
   476 Fed. App'x 572 (5th Cir. 2012) .............................................................................16

*Summers v. Mills*,
   21 Tex. 77 (1858) ........................................................................................................15

### **Statutes**

35 U.S.C. § 261 ................................................................................................................14

35 U.S.C. § 285 ................................................................................................................23

Fed. R. Civ. P. 21 ..............................................................................................................2

-iii-     Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

# I.    INTRODUCTION

Defendant Fortinet, Inc.'s motion to dismiss has a short explanation and a long explanation.  The short explanation is that Plaintiff ("NPS") filed this lawsuit asserting just one patent ("the '601 patent") on July 6, 2010, and yet did not become the owner of the '601 patent—if ever—until 22 days later, on July 28, 2010.  NPS therefore lacked standing to assert the '601 patent when it filed this suit.  Under Federal Circuit precedent, that lack of standing cannot be remedied after-the-fact, and requires dismissal.

The long explanation is more colorful and entails almost three years of litigation misconduct by NPS.  The long explanation also shows why this case should be dismissed with prejudice, and forms the basis for Fortinet's request for attorneys' fees.

NPS is owned by two Californians named Rakesh Ramde and Wilfred Lam.  Ramde and Lam used to practice the law, although in recent years they have dedicated themselves to buying and then asserting patents against operating companies like Fortinet.  As far as Fortinet can tell, since 2010 Ramde and Lam have used 17 law firms to assert patents in a dozen or more lawsuits against 40 or more operating companies.

While Fortinet cannot speak to Ramde and Lam's litigation conduct in all of those other proceedings, in this case they have filed false statements in motion papers, filed a false declaration, and withheld production of a crucial document for over two years.  As to the crucial document: Although Ramde and Lam filed this case on July 6, 2010, they failed to produce the document that supposedly shows their ownership of the '601 patent ("Alleged Assignment") until August 31, 2012.  Even then, Ramde and Lam twice provided evasive interrogatory answers on the standing issue that forms the basis of this motion, and then tried to delay and then cancel the deposition of Gregory Cuke.  Cuke is the individual NPS previously identified as (i) a Texas "employee," (ii) NPS's "Director of Business Development," and (iii) the signatory on the Alleged Assignment.  But Cuke testified six days ago that he is not an employee; the "Director" title is a litigation sham; and he did not sign the Alleged Assignment until 22 days after suit was filed.

FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

## II.   BACKGROUND

### A.   Procedural Summary of This Case

NPS filed this case on July 6, 2010, in the Eastern District of Texas.  Docket No. 1.  NPS asserted a single patent, the '601 patent, against Fortinet and five other defendants.  *Id.*  The defendants moved to transfer the case to this District in January 2011, Docket No. 54, and the Honorable Rodney Gilstrap granted that motion in January 2012, Docket No. 121.

Shortly after the case was transferred to this District, this Court cited the misjoinder provisions of Fed. R. Civ. P. 21 and dismissed all defendants from the case, without prejudice, except for Fortinet.  Docket No. 150.

The Court heard arguments on claim construction in December 2012, and entered a final claim construction ruling on January 14, 2013.  Docket No. 189.  Fortinet filed an opposed motion for leave to amend invalidity contentions on April 4, 2013, which the Court granted in an order dated May 9, 2013.  Docket No. 197.

In the Court's order granting Fortinet leave to amend invalidity contentions, it cited litigation misconduct by NPS, finding that NPS had put a "bone-crushing burden" on Fortinet by asserting too many patent claims and that "NPS has behaved unreasonably in imposing unnecessary cost on its opponent."  *Id.* at 3.

### B.   The Plaintiff: NPS, Rakesh Ramde and Wilfred Lam

NPS is owned and controlled by two individuals, Rakesh Ramde and Wilfred Lam.  Exh. 1 (NPS's initial disclosures, identifying Ramde as the "President and principal shareholder" of NPS's parent corporation; identifying Lam as a "shareholder" of the same).[1]

Ramde was admitted to the California Bar in 1998 and remains admitted today (SBN 196390).  Lam was admitted to the California Bar in 1996 and also remains admitted (SBN 184388).  It appears that Ramde and Lam met while practicing law at the firm Pennie & Edmonds in 2001-02.  Exh. 2 at ¶ 2 (Ramde's sworn declaration).  Shortly thereafter, in 2002, they both

---

[1]   All citations to "Exh." refer to exhibits to the Declaration of John M. Neukom, filed herewith.

1    stopped practicing law and formed a patent business together called "IMSciences." *Id.*  Ramde

2    and Lam maintain their office in Mountain View, California.  Exh. 3.

3           The business of IMSciences is not patent ownership but rather patent brokering; it is an

4    "advisory firm that helps . . . companies leverage and monetize . . . patented technologies."  Exh.

5    3.  Ramde and Lam do not just advise third parties who own patents, however.  They also buy and

6    attempt to "monetize" patents for their own benefit.  Ramde and Lam do this through a dizzying

7    array of legal entities.  The extent of Ramde and Lam's ownership of legal entities and patents is

8    not fully known to Fortinet, but it appears to include at least ten different LLCs, one of which is

9    Mount Hamilton Partners LLC ("Mount Hamilton") and another of which is the plaintiff in this

10   case, NPS.[2]

11          Likewise, the extent of Ramde and Lam's litigation conduct is not known to Fortinet, but it

12   appears they are binging on patent litigation.  "Courtlink" and public court records indicate that,

13   through a handful of their legal entities, just since 2010 Ramde and Lam have asserted patent

14   claims in a dozen or more different lawsuits against 40 or more different defendants in six

15   different federal courts, using 17 different law firms.[3]

16   **C.      The Defendant: Fortinet**

17          Fortinet was founded in 2000, and manufacturers and sells network security products.

18   Fortinet is a publicly-traded company based in Sunnyvale, California that employs over 2,000

19   people.  Exh. 5.

20

21

22

23   _____

24        [2]    Other patent-holding companies owned and controlled by Ramde and Lam appear to
     include Unifi Scientific Advances, Unifi Scientific Batteries, UniStar Technologies, i2Z
25   Technology, Network Directory Sciences, Divan Industries, Search Light Advances, and
     Mainstream Scientific.  Neukom Decl. at ¶ 5.
26        [3]    Fortinet has pulled "Courtlink" profiles for various legal entities owned by Ramde and Lam,
27   including i2Z Technology, Mount Hamilton, NPS and Unifi Scientific Batteries.  Exh. 4; *see also*
     Neukom Decl. at ¶ 6.

28

-3-           Case No. 3:12-CV-01106-WHA
                                                     FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
                                                       (i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

**D.    Pre-Litigation History of the '601 Patent: From Commercial Failure… to Bankruptcy… to Lapsed PTO Fees… to Ramde and Lam**

A Canadian individual named Hung Vu is listed as the sole inventor of the '601 patent. Exh. 6.  When the '601 patent's application was pending, in 1994, Vu assigned his ownership of the application to an upstart Canadian company he had recently founded called Milkyway Networks.  Exh. 7.  Milkyway Networks apparently became the assignee of the '601 patent application in exchange for paying Vu one dollar.  *Id.*

About three years later, in 1997, the U.S. Patent & Trademark Office ("PTO") issued the '601 patent to Milkyway Networks.  Exh. 6.  Although Milkyway Networks grew rapidly from 1994 to 1997, within a year of the '601 patent's issuance, the company had become a commercial failure.  It is clear that Milkyway Networks and its efforts to practice the '601 patent resulted in commercial failure because, in 1998, Milkyway Networks was sold to another Canadian company called SLM Networks.  At that time, the trading price of Milkyway Networks on the Toronto Stock Exchange was less than the value of cash available to shareholders.  *Viz.*, Milkyway Networks was valued by the public trading market to be worth less than the amount of money in its bank account.  Exh. 8 at FORT-NPS 147015 (disclosing net "Cash available to shareholders" of $1.25 per share, and an average closing price for the 20 preceding days of $1.22 per share).  SLM Networks apparently became the assignee of the '601 patent pursuant to its 1998 acquisition of Milkyway Networks.  Exh. 9.

SLM Networks fared even worse than Milkyway Networks, and declared bankruptcy.  As an asset of a bankrupt Canadian company, the '601 patent was handled by a receiver, and with Canadian judicial approval was sold out of bankruptcy in 2004 for the modest sum of two dollars. According to the assignment documents, the company that chose to pay two dollars to acquire the '601 patent out of bankruptcy was another Canadian company, Bevertec CST Inc.  Exh. 10.

Once Bevertec became the owner of the '601 patent, it promptly failed to pay maintenance fees with the PTO.  Exh. 11.  The '601 patent therefore lapsed, and remained lapsed for over a year.  During that year, however, the two individuals behind this lawsuit—Ramde and Lam—

FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

1    bought the lapsed '601 patent from Bevertec.  To purchase the '601 patent, Ramde and Lam chose

2    to use one of their patent-holding entities, Mount Hamilton Partners, LLC.  Exh. 12.

**E.      Ramde and Lam Filed Suit in East Texas Using a Longview, Texas Address and Under the Name "Network Protection Sciences, LLC"**

4

5         Ramde and Lam filed this lawsuit against Fortinet and others on July 6, 2010, under the

6    name "Network Protection Sciences, LLC" in the U.S. District Court for the Eastern District of

7    Texas.  Docket No. 1.  In filing suit—and many times since—Ramde, Lam, NPS and NPS's

8    counsel have told a "Texas story."  They have represented that NPS has "headquarters" in

9    Longview, Texas.  *See, e.g.*, Docket No. 65 at p. 8.  They have represented that NPS has a

10   "Director of Business Development" who is an "employee" in Longview, Texas.  *See, e.g.*, Exh. 1

11   ("Director of Business Development"); Docket No. 65 at p. 1 ("Texas employee").  And NPS has

12   more recently attempted to support its claim to be the owner of the '601 patent by producing a

13   document bearing the signature of NPS's supposed "Director of Business Development" in Texas.

14   Exh. 13.

15        As shown below, this "Texas story" is a fraud.  NPS has no headquarters in Texas.  NPS

16   has no employee in Texas.  And the document that NPS has produced to show ownership of the

17   '601 patent—signed by the fake employee in Texas—is deficient to show standing on July 6,

     2010, or ever.

18

**F.      In April 2011, NPS Explained How It Became the Assignee of the '601 Patent With a Single, Misleading Sentence**

19

20        In 2011—when this case was still pending in Texas and contained multiple defendants—

21   NPS answered an interrogatory that asked for the "history of ownership" of the '601 patent, as

22   well as "the circumstances . . . surrounding the negotiation and execution of any transfer of

23   ownership."  Exh. 14 at p. 4.  NPS provided a two-paragraph response.  But on the issue that is

24   crucial to this motion—how, if at all, the '601 patent was transferred from Mount Hamilton to

25   NPS—NPS provided only a single sentence:

26             Mount Hamilton Partners, LLC signed an Assignment of Patent
               Rights on April 30, 2010 transferring the patent rights to Network
27             Protection Sciences, LLC which owns all right title and interest in
               the patent-in-suit including the right to sue for past damages.

28

Exh. 14 at p. 5.  Ramde "verified" that answer on April 8, 2011.  *Id.* at p. 11.

**G.      In August 2012—Over Two Years After Filing Suit—NPS Finally Produced the Alleged Assignment**

Although NPS filed this case on July 6, 2010, Ramde and Lam filed no paperwork with the PTO asserting ownership of the patent by NPS until over a year later.  And NPS waited to produce any documentation in this litigation showing that it was—supposedly—the owner of the '601 patent until August 31, 2012.  Exh. 30 at p. 8 (indicating the Bates range including the Alleged Assignment); *id.* at p. 9 (indicating that the document was being produced that evening, August 31, 2012).  On that date, NPS produced the Alleged Assignment that purports to "sell" and "assign" the '601 patent from Mount Hamilton to NPS.  Exh. 13.  That document purports to have been signed by a Mount Hamilton representative on April 30, 2010.  *Id.*  But it was not signed by a purported NPS representative until July 28, 2010—22 days after this suit was filed by NPS.  *Id.*

**H.      In January 2013, Fortinet Requested the Deposition of Gregory Cuke, the Suspected NPS Signatory on the Alleged Assignment**

Fortinet's first batch of deposition requests in this case included a subpoena for the testimony of Gregory Cuke.  Fortinet served the Cuke subpoena on January 24, 2013.  Exh. 15.  Fortinet asked for Cuke's deposition in part because Fortinet suspected that he was the NPS signatory on the Alleged Assignment.  The NPS signature on that document is illegible, and there is no individual's name typed or written on the NPS signature block.  However, the NPS signatory wrote his title as "Director of Business Development," which matches NPS's description of Cuke.  *Compare* Exh. 13, *with* Exh. 1 at p. 2.

In response to Fortinet's January 24, 2013, subpoena for Cuke's testimony, NPS began a multi-month game of delay.  For about ten days, NPS would not confirm that it would even accept service of a subpoena for Cuke.  Exh. 16 (email from NPS's counsel on January 29, 2013, stating that NPS would "respond to the request to accept service in the next few days").  NPS counsel would not initially accept service of the Cuke subpoena even though Cuke was listed in NPS's own initial disclosures as a relevant witness who "can be reached through counsel for NPS."  Exh. 1 at p. 2.

04880.52079/5364616.6

-6-                    Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

On February 5, 2013, NPS counsel confirmed they would accept service of the Cuke subpoena, although at that point failed to offer a deposition date: "[W]e are in the process of clarifying schedules on our end and hope to have reasonable timeframes to propose in the next day or so."  Exh. 17.  But NPS did not propose any deposition date for Cuke "in the next day or so." Neukom Decl. at ¶ 21.

Instead, on February 19, 2013, NPS counsel served objections to the Cuke subpoena.  NPS "object[ed] to the noticed date and location to testify as unduly burdensome," and proposed no alternative dates.  Exh. 18.

Over a month passed, and NPS still failed even to propose a date for the Cuke deposition. So Fortinet wrote to NPS on March 26, 2013, and asked for dates for a Cuke deposition.  Exh. 19. Fortinet wrote to NPS again on March 28, 2013, and asked for dates for a Cuke deposition.  Exh. 20.  Counsel for the parties conducted a meet-and-confer on March 29, 2013, to discuss—*inter alia*—Fortinet's request for a Cuke deposition.  NPS counsel still provided no date for the Cuke deposition.  Neukom Decl. at ¶ 25.

In early May 2013—over three months after Fortinet served a subpoena—NPS finally offered dates for a Cuke deposition.  Thereafter, counsel agreed to June 7, 2013.

## I.   In March 2013, NPS Explained How It Became the Assignee of the '601 Patent (Again) With a Single, Misleading Sentence

In 2013, Fortinet served a more detailed interrogatory on NPS, asking NPS to provide "the history of ownership" of the patent; the "terms" of any ownership transfers, including dollar amounts; and "the circumstances (including dates) surrounding the negotiation and execution of any transfer of ownership."  Exh. 21 at p. 5.  In response to that more detailed interrogatory, NPS provided no additional information.  Instead, NPS repeated verbatim its 2011 interrogatory answer: "Mount Hamilton Partners, LLC signed an Assignment of Patent Rights on April 30, 2010 . . ."  *Id.* at p. 7.  Ramde "verified" that interrogatory answer as well.  Exh. 22.

On May 14, 2013, in writing, Fortinet explained to NPS that its interrogatory answer regarding how it supposedly became the assignee of the '601 patent was incomplete.  Exh. 23 at p. 4 (regarding "Interrogatory No. 2").  In an email dated May 28, 2013, NPS stated it "would

investigate and provide a [supplemented] response [to Interrogatory No. 2] from Wednesday, May 29th to Friday, May 31st." Exh. 24. But May 31, 2013, has come and gone, and NPS has still failed to provide any additional information about how it became the owner of the '601 patent. Neukom Decl. ¶ 30.

### J.    June 7, 2013: Fortinet Took Cuke's Deposition

Eight days before the scheduled Cuke deposition on June 7, 2013, NPS tried to remove him from the case altogether. On May 30, 2013, NPS counsel wrote:

> I write to inform you that **NPS is removing Gregory Cuke as an individual that may have information that NPS may use to support its claims** or defenses as identified in NPS' initial disclosures. Please let us know if Fortinet still plans on going forward with Mr. Cuke's deposition.

Exh. 25 (emphasis added). Fortinet declined NPS's invitation to drop the Cuke deposition.

Cuke appeared for his deposition at a hotel in Shreveport, Louisiana. Fortinet's lead counsel made the trip from San Francisco and questioned the witness. The attorney that NPS chose to send to defend Cuke's testimony has not filed an appearance in this case, is not admitted in California, and is not admitted (*pro hac vice* or otherwise) in this District. Neukom Decl. at ¶¶ 32-34. Fortinet's examination of Cuke lasted only 133 minutes on the record.

### 1.    Cuke is not an NPS employee

NPS has stated that Cuke is a "Texas employee" of the company. Docket No. 65 at 1. But Cuke testified that is not true. Exh. 26 at 9:15-17 ("**Q.** Do you consider yourself an employee of Network Protection Sciences? **A.** No, sir."); 11:3-5 ("**Q.** And from sometime in 2010 until today, have you been an employee of NPS? **A.** No, sir, I've never been an employee of NPS."); 34:4-6 ("**Q.** [Y]ou don't consider yourself even an employee of NPS. Is that correct? **A.** No, I'm not an employee."); 37:25-38:2 ("**Q.** So far as you know, NPS has not a single employee in the state of Texas. Is that correct? **A.** I don't know of any.").

In addition to contradicting NPS's repeated claims in this litigation, that he is an "employee," Cuke also testified that he has spent only "four or five hours" providing litigation support for NPS in 2013. *Id.* at 20:23-21:4. Asked how many hours he performed services for NPS in all of 2012, Cuke testified: "I have no earthly idea. Not too many." *Id.* at 21:11-13. Cuke

04880.52079/5364616.6

-8-    Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

even testified that he cannot remember the last time he asked NPS for payment for **any** hourly services he performed for them: "I can't remember the last time I submitted an invoice."  *Id.* at 23:1-6.

Finally, while NPS has filed numerous papers in this litigation that identified Cuke as the "Director of Business Development," Cuke admitted that title is a litigation sham:

> **Q.** As you sit here today, you acknowledge that there are numerous documents identifying you as the director of business development for NPS, which documents were created for and filed in this litigation. Correct?
>
> **A.** Yes.
>
> **Q.** And you can't think of a single other document identifying you as the director of business development for NPS that was created for any other purpose other than this litigation?
>
> **A.** No, not specifically. No.  (*Id.* at 56:21-57:6.)

### 2. Cuke does not help run the "day-to-day activities" of NPS

NPS has stated that Cuke was engaged "to help run the day-to-day activities" of NPS. Docket No. 65 at p. 5.  Ramde has sworn the same in a declaration.  Exh. 2 at ¶ 8.  Ramde has also sworn that "[i]n the business judgment of Network Protection Sciences . . . its relationship with Greg Cuke [is an] important asset[] of the company." *Id.* at ¶ 10.

Cuke's testimony shows those statements to be false.  He explained that it would be impossible for him to help run the day-to-day activities of NPS given that he does not even know what NPS's daily activities are:

> **Q.** Is it accurate to say that you help run the 'day-to-day' business of NPS?
>
> **A.** I don't know what the day-to-day business of NPS is, so I don't know that it's fair to say that.
>
> **Q.** You don't believe that's an accurate statement?
>
> **A.** No, I don't.
>
> **Q.** Have you ever helped run the day-to-day business of NPS?
>
> **A.** Again, I don't know what the day-to-day business of NPS is. I don't know what they do on a day-to-day basis.
>
> **Q.** So that would be a no?
>
> **A.** That would be a no.  (Exh. 26 at 38:24-39:12.)

Cuke is not an NPS employee, nor does he help "run the day-to-day" activities of NPS, nor is he an "important asset" to NPS. Cuke is a real estate broker. On his own and through a business that he owns with his wife, Cuke owns, sells, rents and manages commercial properties in east Texas. Exh. 27 (Cuke's "LinkedIn" profile, listing real estate businesses and nothing about NPS); Exh. 28 (Cuke's Twitter account, showing recent "tweets" such as "Closed the sale of the Longview Lanes Bowling Alley today" and "Leasing activity is up significantly and I finalized a contract on my listed truck wash in Kilgore"). One of the office properties that Cuke owns with his wife is "Suite 302" in Longview, Texas, the supposed site of NPS's Texas "headquarters." Exh. 26 at 31:9-12 ("It's actually owned by a company that is owned by my wife and myself, yes.").

### 3. NPS does not have "headquarters" in Longview, Texas

When NPS filed this case, it alleged to have an "address" at 3301 W. Marshall Ave., Suite 302, Longview, Texas ("Suite 302"). Docket No. 1 at ¶ 1. Shortly thereafter, NPS elaborated on this allegation, and represented that Suite 302 was in fact its "headquarters." Docket No. 65 at p. 8 ("headquarters in Longview, TX"). NPS has even argued that its "headquarters" in Longview establishes that NPS is a "legitimate company" in east Texas and "its presence [in Longview] should be counted as a local interest" for the Eastern District of Texas. *Id.* at p. 15.

Cuke's testimony shows that these representations by NPS are just plain lies. Suite 302 is no "headquarters." Suite 302 is a small room that measures about 10 feet wide. Exh. 29 (containing a floor-plan for Suite 302). It is a file-cabinet room and—befitting a file-cabinet room—it does not even have a window. *Id.*; *see also* Exh. 26. at 66:18-24. Inside this windowless file-cabinet room—NPS's supposed "headquarters"—there is not even a phone. Exh. 26 at 62:3-7 ("**Q.** There's no telephone inside Suite 302? **A.** There's not a telephone inside Suite 302."). The room contains a computer, although Cuke has never seen it turned on or used by anyone. *Id.* at 62:18-23 ("**Q.** Have you ever seen anybody ever use that computer inside Suite 302? **A.** I have not. **Q.** So far as you know, that computer's never even been turned on. Is that accurate? **A.** I've never seen it turned on."). There is no fax machine. *Id.* at 62:8-9. There is no printer. *Id.* at 64:7-

8.  NPS's supposed "headquarters" does not even contain a **single chair**.  *Id.* at 64:3-6 ("**Q.** Are there chairs inside Suite 302?  **A.** There's—no, there's not.  **Q.** No chairs?  **A.** No chairs.").

Even more astounding: The windowless file-cabinet room in Longview, Texas, that NPS rents from Cuke and his wife, and that NPS has falsely claimed as its "headquarters" in this litigation is also claimed as the physical address for at least five other companies owned by Ramde and Lam.  *Id.* at 66:25-69:1.  According to public documents, three of those "Suite 302" companies are asserting (or have asserted) patents in over a dozen lawsuits against 35 or more defendants.  Not surprisingly, most of those cases have been filed in east Texas.  Exh. 4; Neukom Decl. at ¶ 6.  Suite 302 is a litigation charade.

### 4. Cuke has no authority to do <u>anything</u> for NPS, let alone to enter into agreements for NPS

Given that Cuke is NPS's landlord for a windowless room in east Texas, and given that he is not an employee of NPS, it makes sense that he is not authorized to conduct any business for the company.  He is not authorized to sign checks for NPS.  Exh. 26 at 28:4-7 ("**Q.** Are you authorized to sign checks . . . on behalf of NPS?  **A.** No, sir.").  He is not authorized to convey any assets for NPS.  *Id.* at 28:23-24 ("I don't have the authority to dispose of their assets, no.").  And he testified that he has no authority to execute a contract for NPS unless specifically instructed to do so by Ramde, Lam or their assistant:

> **Q.** Is it true that you do not have any authority to enter into a contract on behalf of NPS unless you are specifically instructed to enter into that agreement by some other agent or representative of NPS?
>
> **A.** That's probably a fair—yes.
>
> **Q.** When you say that's probably fair, your testimony is yes?
>
> **A.** Yes.  (*Id.* at 29:11-18.)

Even more troubling, Cuke was asked whether he was authorized to do **anything** on behalf of NPS without a specific, prior instruction from Ramde, Lam or their assistant.  He could not think of a thing:

> **Q.** Can you think of any—any conduct that you are authorized to take on behalf of NPS without getting prior approval from some other NPS representative?

**A.** No, I can't.  (*Id.* at 34:7-10.)

**5.    Cuke testified that he signed the Alleged Assignment 22 days <u>after</u> this case was filed**

Fortinet put the Alleged Assignment before Cuke.  He confirmed that it bears his signature in the space for NPS, and is dated in his hand-writing for July 28, 2010.  Exh. 13; Exh. 26 at 86:13-17 ("**Q.** Whose signature is that? **A.** That would be mine. **Q.** On what date did you sign this document, [the Alleged Assignment]? **A.** It looks like 7/28/10.").

**6.    Cuke does not remember who authorized him to sign the Alleged Assignment; does not know its terms nor understand its terminology; and had no idea it contained a misrepresentation when he signed it**

Although Cuke confirmed that the Alleged Assignment bears his signature and that it is dated 22 days after this lawsuit was filed, that was about the full extent of what he did know.  He did not remember whether he read the document before signing it.  Exh. 26 at 87:2-4 ("**Q.** Do you remember whether you read [the Alleged Assignment] before you signed it on July 28, 2010?  **A.** I don't recall specifically, no, sir.").

Cuke did not remember who told him to sign the Alleged Assignment, an especially damaging admission for NPS given that Cuke also testified he lacked any authority to execute a contract for NPS on his own:

**Q.** Who told you to sign this patent assignment?

**A.** I don't recall specifically. (*Id.* at 87:5-6.)

Cuke was unable to identify any "consideration" at all that was provided by NPS in exchange for becoming the supposed assignee of the '601 patent, even though the Alleged Assignment requires an exchange of consideration in its opening sentence:

**Q.** Do you know how much money NPS paid to become the assignee of the '601 patent?

**A.** I do not. I have no idea.

**Q.** Do you have any understanding of whether NPS paid or conveyed anything of value other than money to become the assignee of the '601 patent?

**A.** If I know that, it's long forgotten. I don't recall anything specific about that, no. (*Id.* at 73:6-13.)

\* \* \*

> **Q.** What was the good and valuable consideration that NPS provided to Mount Hamilton in exchange for a patent assignment?
>
> **A.** I'm not privy to those things, so I don't know. If it's not in [the Alleged Assignment], I don't know. . . .
>
> **Q.** Are you aware—can you tell me what consideration NPS provided to Mount Hamilton in exchange for in patent assignment?
>
> **A.** No, I told you I'm not aware what it was. (*Id.* at 87:10-89:8.)

Cuke as NPS's signatory was asked whether he understood certain terms in the Alleged Assignment, and admitted he did not.  *Id.* at 89:17-18 (no understanding of a "utility model"); 89:19-25 (no understanding of the "Paris Convention"); 90:1-3 (no understanding of the "International Patent Cooperation Treat"); 94:4-12 (no understanding of "choice of law principles").

At his deposition, Cuke was also directed to the following language contained in the Alleged Assignment: "There are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the patent rights." Exh. 13 at ¶ 2. That representation was untrue when Cuke signed the Alleged Assignment on July 28, 2010, because this case was filed 22 days earlier.  But Cuke did not know that:

> **Q.** Was that accurate as of July 28, 2010, when you signed this patent assignment?
>
> **A.** I have no earthly idea.
>
> **Q.** If I told you that this lawsuit was filed on July 10 [sic], 2010, does that sound right to you?
>
> **A.** I don't know when it was filed, so if you say so, I have no reason not to believe you. (Exh. 26 at 92:1-8.)

Cuke did not know that he was signing a legal instrument that contained a false statement because NPS never even told him that it had already filed suit on the '601 patent before Cuke signed it:

> **Q.** Okay. Were you aware when you were told to sign this document on July 28, 2010, that as of the date you were signing it, it contained at least one misrepresentation?
>
> **A.** No, sir.

**Q.** Nobody told you that?

**A.** No, sir.

**Q.** By the time you signed this assignment . . . had anybody from NPS told you that 18 [sic] days earlier they had filed a lawsuit on the '601 patent?

**A.** I—I have no way of knowing that. I don't really know.

**Q.** You don't remember anybody from NPS telling you when they asked you to sign this on July 28th that they had already filed a lawsuit 18 [sic] days earlier?

**A.** No, I'm sure they wouldn't have called me that to tell me that. . . .

**Q.** So your testimony is you don't remember them telling you that they filed suit prior to July 28th?

**A.** I don't believe that they would have.

**Q.** And you have no memory of them telling you that before July 28th?

**A.** No, sir. (*Id.* at 92:9-93:8.)

## III.   ARGUMENT

### A.   This Case Should Be Dismissed Because NPS Did Not Own the '601 Patent on July 6, 2010

The case law is clear that a patent case must be dismissed if the plaintiff cannot meet its burden to show that it owned the asserted patent, according to a complete and executed written instrument that satisfies 35 U.S.C. § 261, as of the date on which the case was filed. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (dismissing case for lack of standing in absence of written assignment to plaintiff, despite corporate affiliate's prior ownership of patent).  In dismissing a patent case on these grounds in 2008, this Court explained the importance of the doctrine:

> In light of the proliferation of patent-infringement actions, it is not too much to ask sophisticated patent litigants to be careful when it comes to the threshold issue of standing. It is a simple task to execute express license agreements that satisfy the Federal Circuit standard. Among affiliated companies, it should be even simpler. It is true that patent litigants sometimes rush to stake out venue in a preferred forum. **A rush to sue, however, cannot excuse the stern necessity of perfecting the required title before suit**. District judges cannot overlook a defect in the chain of title, for the entirety of massive litigation might wind up being vacated years later, for lack of threshold standing. *See Gaia Techs., Inc., v. Reconversion Techs., Inc.*, 93 F.3d 774 (Fed. Cir. 1996) (vacating a final judgment after a full trial on the merits because of a deficiency in standing). As carpenters say, it is wise to "measure twice and cut once."

FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

1 | *Quantum Corp. v. Riverbed Tech., Inc.*, No. C 07-04161-WHA, 2008 WL 314490, at *3 (N.D.
2 | Cal. Feb. 4, 2008) (emphasis added).

3 |     In this case, NPS filed suit on July 6, 2010.  Docket No. 1.  But NPS did not execute the
4 | Alleged Assignment until 22 days later, on July 28, 2010.  Exh. 13 (indicating that NPS
5 | "accepted" the patent assignment on July 28, 2010); Exh. 26 at 86:13-17.  NPS therefore did not
6 | "accept" or own the '601 patent by July 6, 2010, and lacks standing.

7 |     Fortinet anticipates that NPS will argue that the Alleged Assignment was effective on an
8 | earlier date, as of April 30, 2010, when a supposed representative of Mount Hamilton as the
9 | supposed transferor appears to have executed the document.  Exh. 13 (including the signature of
10 | "Mark Figuereido" as an "authorized agent" for Mount Hamilton, dated April 30, 2010).  This
11 | argument is wrong—and the Alleged Assignment had no effect until NPS "accepted" it on July
12 | 28, 2010, if ever—for two reasons.

13 |     **First**, the Alleged Assignment could be effective with a signature from Mount Hamilton,
14 | and no signature from NPS, only if the document commemorates a gift or a unilateral conveyance
15 | from Mount Hamilton.  But the text of the Alleged Assignment disproves that argument a few
16 | times over.  For example, the Alleged Assignment states explicitly that it is not a gift but rather an
17 | agreement to "sell" the '601 patent in exchange "[f]or good and valuable consideration."   Ex. 13
18 | at p. 1.  A sale is not a gift or a unilateral conveyance; it is a mutual exchange of consideration that
19 | cannot be completed without mutual assent.  *Summers v. Mills*, 21 Tex. 77, 87 (1858) (explaining
20 | that a contract for sale requires offer and acceptance)[4]; *see also* Restatement (Second) of Contracts
21 | § 332(5)(a) (providing that "[a]n assignment is [not] gratuitous [if] given or taken (a) in exchange
22 | for a performance . . . that would be consideration").

23 |     Because the Alleged Assignment is an agreement for a sale, the assignment was no gift,
24 | and the assignment requires delivery by Mount Hamilton and a signature for acceptance by NPS.

25 |

26 | 
27 |   [4] Fortinet cites to Texas contract law, in discussing the Alleged Assignment, because the document states it should be construed according to the laws of Texas.   Exh. 13 at p. 3 (NPS0050201).
28 |

-15-    Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

1  *Stanwood Boom Works, LLC v. BP Exploration & Production, Inc.*, No. 11-20511, 476 Fed.

2  App'x 572, 574-75 (5th Cir. 2012) (explaining that signature and delivery are typically required to

3  prove assent to an agreement.  The only evidence available to this Court indicates that NPS

4  accepted (if at all) 22 days after suit was filed.

5       For further example, the Alleged Assignment **requires** a dated signature from, and

6  acceptance by, NPS right on the face of the document.  Exh. 13 at p. 4.  This is not a case in which

7  the disputed document called for a signature from Mount Hamilton, only, and then NPS just

8  happened to scribble a signature somewhere on the page at a later and irrelevant date.  In this case,

9  the disputed document was prepared to include a type-faced signature block that reads

10  "ACCEPTED BY," includes the name "Network Protection Sciences, LLC" and furthermore

11  requires a date to be filled in by NPS.  *Id.*  Either the Alleged Assignment required a dated

12  signature by NPS to be complete—which did not happen until after this suit was filed—or Ramde

13  and Lam prepared a document with a meaningless signature block.

14       But NPS cannot ask this Court to consider the Alleged Assignment complete as of Mount

15  Hamilton's signature on April 30, 2010, by ignoring the express contents of the Alleged

16  Assignment that indicate it was not complete on that date.  All terms in the Alleged Assignment

17  must be given effect, and no terms—including the type-faced signature block for NPS—can be

18  considered superfluous.  *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee*

19  *Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005) (applying Texas law and determining

20  whether an assignment occurred by "examin[ing] and consider[ing] the entire writing and giv[ing]

21  effect to all provisions such that none are rendered meaningless") (citation omitted); *Alpert v.*

22  *Riley*, 274 S.W.3d 277, 288 (Tex. App. 2008) (explaining that courts should construe a contract so

23  as not to render terms superfluous).  The Alleged Assignment's terms—the reference to NPS

24  paying "good and valuable consideration" for the patent, the use of the term "sale," and the

25  inclusion of a signature block for NPS—all indicate that it required acceptance by NPS before

26  becoming valid.  This Court should not let NPS argue otherwise.

27       **Second**, NPS cannot argue that the post-suit execution of the document by NPS was

28  unnecessary to complete the patent transfer because this Court has already heard an argument

1    similar to this, and rejected it.  In *Quantum*, the plaintiff presented one patent assignment

2    document dated pre-suit, and another document dated post-suit.  The plaintiff argued that the pre-

3    suit document was sufficient to pass title, and that the post-suit document was executed just "to

4    avoid any questions."  2008 WL 314490, at *3.  Not only did this Court rightly reject that

5    argument, the Court furthermore found that the existence of the post-suit document "suggests that

6    plaintiff realized that the [earlier] agreement needed fixing."  *Id.*  The same holds true here: even

7    supposing that Cuke was authorized to sign the Alleged Assignment on July 28, 2010, if he was,

8    that indicates that Ramde and Lam were aware that no transfer was completed until that signature

9    occurred.  Otherwise, there would have been no reason for Cuke to sign the document.

10       **B.    This Case Should Be Dismissed Because NPS Has <u>Never</u> Owned the '601
              Patent**

11           Standing defects at the time of filing cannot be cured by *nunc pro tunc* assignments.  *Gaia*

12   *Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779 *amended on reh'g in part*, 104 F.3d

13   1296 (Fed. Cir. 1996) (holding that a *nunc pro tunc* assignment was "not sufficient to confer

14   standing . . . retroactively").  Even if such assignments were effective, though, NPS cannot show

15   that it owns the patent today.  NPS can make no such showing because the Alleged Assignment

16   appears invalid for a few reasons.

17           **First**, the Alleged Assignment fails because NPS cannot prove that it was signed by an

18   authorized signatory for **either** Mount Hamilton or NPS.  It is NPS's burden to prove that it has

19   standing.  *Abbott Point of Care Inc. v. Epocal, Inc.*, 666 F.3d 1299, 1302 (Fed. Cir. 2012)

20   ("Abbott [the plaintiff] has the burden to show necessary ownership rights to support standing to

21   sue.").  And in order to prove that the purported assignment of the '601 patent was valid under the

22   document's governing law, NPS must prove that its signatories were authorized agents of the

23   contracting parties.  *R & R Marine, Inc. v. Max Access, Inc.*, 377 S.W.3d 780, 787 (Tex. App.

24   2012).  But NPS has made no such showing for either signatory to the agreement.

25           For Mount Hamilton, the signatory is listed as "Mark Figueireido."  His title is listed simply

26   as "Authorized Agent."  But Figuereido is a stranger to this litigation.  NPS did not identify him in

27   initial disclosures.  Exh. 1.  There is no evidence in this case that he is a principal, or even an

28

FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

employee, of Mount Hamilton.  And NPS has failed on numerous occasions to explain in interrogatory answers who he is, or even whether he was authorized to transfer the '601 patent on behalf of Mount Hamilton.  Exhs. 14 & 21 (NPS's interrogatory answers on patent transfers, silent as to "Mark Figuereido").

For NPS, Cuke signed the Alleged Assignment.  But Cuke is a real estate broker in east Texas who NPS has falsely described in this litigation as an NPS "employee."  Last week, Cuke testified that he has never been an employee of NPS.  Exh. 26 at 11:3-5 ("I've never been an employee of NPS.").  He lacks any authority to sign any contract for NPS unless specifically instructed to do so.  *Id.* at 29:11-18.  He signed the Alleged Assignment using a fake title that was apparently invented for litigation.  *Id.* at 56:21-57.  And he cannot remember who instructed him to sign the Alleged Assignment.  *Id.* at 87:5-6.

NPS has had multiple opportunities to explain how the '601 patent was transferred from Mount Hamilton to NPS, including the circumstances of the execution of the supposed transfer document, and has failed to do so.  Exhs. 14 & 21.  NPS cannot show (now) that it was signed with authorization on either side.  The Assignment was therefore never executed by either side, and NPS lacks standing.

**Second**, the Alleged Assignment fails for a lack of consideration.  Texas law requires that any valid contract must entail mutual consideration.  *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 846 (S.D. Tex. 2011) ("To prove the existence of an enforceable contract, a party must demonstrate . . . consideration or mutuality of obligations.").  The Alleged Assignment recognizes this—and confirms that it is not simply a unilateral assignment—by stating that NPS has provided "good and valuable consideration" for the '601 patent.  Exh. 13 at p. 1.

But the Assignment does not state what "consideration" NPS in fact provided to Mount Hamilton in exchange for the patent.  Cuke, as NPS's signatory for the Alleged Assignment, testified numerous times that he has no idea what if any consideration was provided by NPS to Mount Hamilton for the '601 patent.  Exh. 26 at 73:6-13; 87:10-89:8.  For its part, NPS has failed to identify any consideration at all in interrogatory answers that NPS served and verified in 2011, and in separate interrogatory answers that NPS served and verified in 2013.  Exhs. 14 & 21.  NPS

has even been asked to supplement those interrogatory answers, and yet has failed to do so.  Exhs. 23 & 24.  Given the record before the Court, it appears that NPS actually gave no consideration to Mount Hamilton in exchange for the '601 patent, despite Texas law requiring such consideration, and despite the Alleged Assignment recognizing that requirement.  The Alleged Assignment is therefore invalid; NPS does not own the patent even today and dismissal is required.

### C.   This Case Should Be Dismissed for Litigation Misconduct
#### 1.   This Court has the power to dismiss for litigation misconduct

This Court has the power to dismiss a case, for prejudice, based on litigation misconduct by a party.  Normally when deciding whether to dismiss a case for litigation misconduct, courts consider a five-factor test.[5]  Numerous courts, however, have found that filing false or misleading statements with the court, and providing untrue or incomplete information in discovery, satisfies that test and justifies dismissal:

> It is well settled that dismissal is warranted where, as here, a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995); *see also Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369 (Fed. Cir. 2001) (affirming this Court's dismissal and award of fees where plaintiff submitted falsified documents into evidence); *Englebrick v. Worthington Indus., Inc.*, No. 8:08–cv–01296–CJC, 2013 WL 2007025, at *8 (C.D. Cal. May 13, 2013) (collecting cases); *id.* ("Providing false or incomplete information during a deposition or in response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal.").

---

[5]   *Anheuser-Busch*, 69 F.3d at 348 ("(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.").

2. **NPS has engaged in multi-year misconduct**

NPS has engaged in ongoing misconduct, including false statements to the Court. The misconduct began with the bogus "Texas story"—that NPS has "headquarters" and an "employee" in Texas, which fake employee supposedly executed the Alleged Assignment, more than three weeks after this case was filed. The misconduct then continued as NPS has sought to mislead and delay Fortinet's fact discovery into the standing issues at the heart of this motion; and to assert 50+ patent claims against 70+ Fortinet products for almost three years, imposing an unreasonable burden on Fortinet. This "pattern of deception and discovery abuse," described in greater detail below, justifies dismissal. *Anheuser-Busch*, 69 F.3d at 349.

(a) **NPS Has Filed False Complaint Allegations and Motion Papers**

After NPS filed this lawsuit in Texas, it represented that it "is a Longview, Texas based business." Docket No. 65 at 1. When opposing a transfer motion, NPS argued that it maintains "headquarters in Longview." *Id.* at 8. NPS even argued that its supposed headquarters in Texas constitute a "presence [that] should be counted as a local interest." *Id.* at p. 15. Filing those false statements in litigation constitutes misconduct. NPS is owned and run by attorneys Ramde and Lam, here in Mountain View, California, and NPS's only presence in Longview, Texas, is a small file-cabinet room with no window, telephone, printer or even a chair; with a computer that has never been turned on, according to the landlord; and is also claimed as headquarters for five other legal entities which collectively have asserted patent claims in over a dozen different lawsuits against 35 different defendants. *See* II(J)(3), above.

Also while seeking to keep this case in Texas, NPS argued that it had "a Texas employee" who was hired "to help run the day-to-day activities" of the company. Docket No. 65 at pp. 1, 5. But the "employee" testified four different times that he is not an employee, and that he performs hourly services for NPS so infrequently that he cannot remember the last time he even submitted an invoice to be paid. *See* II(J)(1), above. Likewise, he denied that he "help[s] run the day-to-day activities" of NPS, explaining that he does not even know what NPS does on a day-to-day basis. Exh. 26 at 38:24-39:12.

04880.52079/5364616.6

-20-               Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT

**(b)     NPS and Ramde Filed an Untrue Declaration**

Ramde was even more detailed in his false statements about the "Texas story."  He declared that NPS has "offices in Texas"; that he "set up [the] offices in Longview"; that he personally "engaged Greg Cuke to help run the day-to-day activities" of NPS; and that Cuke has in fact been helping to run the day-to-day operations since March 2010.  Exh. 2 at ¶¶ 1 & 8. Seemingly desperate to keep this case in Texas, Ramde even declared that: "In the business judgment of Network Protection Sciences . . . its relationship[] with Greg Cuke . . . [is an] important asset[] of the company."  *Id.* at ¶ 10.  These are the false, sworn statements of NPS's President and principal shareholder in describing (i) a small file-cabinet room without windows or a phone, and (ii) a Texas real estate broker who refuses to be called an NPS "employee."

**(c)     The Fake Title: "Director of Business Development"**

Throughout this litigation, NPS has insisted that Cuke is the company's "Director of Business Development."  Exh. 1 at p. 2.  Fittingly, NPS has also produced a supposed patent assignment signed by Cuke—the document at the heart of this motion—in which he wrote his title as "Director of Business Development."  Exh. 13 at p. 4.  But Cuke has now admitted under oath that this title was fabricated for litigation.  He could not think of a single document, ever, listing him with that title except for documents created specifically for this lawsuit.  Exh. 26 at 56:21-57:6.

**(d)     NPS Served Incomplete, Misleading Interrogatory Answers on Standing Issues**

NPS has been asked in two interrogatories to explain the transfers of the '601 patent, including whether and if so how NPS became the patent's owner.  In both instances, NPS provided a cryptic response, stating only that Mount Hamilton "signed" an assignment.  Exh. 14 at p. 5; Exh. 21 at p. 7.  NPS refused to disclose any negotiations, "terms," "circumstances" of or individuals who executed the transfer.  *Id.*  NPS has failed to provide any update to those interrogatory answers, despite promising to "investigate" the issue and to supplement as necessary.  Exhs. 23 & 24.  NPS's refusal to provide any substantive information in interrogatory

1   answers about how it acquired the '601 patent is especially troublesome given the standing

2   problems that Fortinet has since discovered.

3                     **(e)**      **NPS Strategically Delayed Fact Discovery on Standing Issues**

4           Especially in hindsight, it is clear that NPS has been intentionally dragging its feet on fact

5   discovery relevant to standing issues.  The Alleged Assignment was signed by Cuke on July 28,

6   2010—22 days after this lawsuit was filed.  Exh. 13.  But NPS did not produce the document to

7   Fortinet until August 31, 2012—more than **two years later**.  Exh. 30 at p. 8 (indicating the Bates

8   range including the Alleged Assignment); *id.* at p. 9 (indicating that the document was being

9   produced that evening, August 31, 2012).

10           Fortinet served a subpoena for Gregory Cuke—whose listed title in NPS's initial

11   disclosures matched the title written next to an illegible signature on the Alleged Assignment—in

12   January 2013.  Exh. 15.  Counsel for NPS delayed accepting service of the subpoena, even though

13   NPS had listed Cuke in its initial disclosures with "counsel for NPS" as his point of contact.  Exh.

14   16.  NPS next served objections to the Cuke subpoena, complaining that Fortinet's requested time

15   and location was "burdensome," and yet offering no alternative.  Exh. 18.

16           Thereafter, for months, NPS counsel refused to provide a date for Cuke's deposition

17   despite repeated requests from Fortinet.  Exhs. 15-20.  Even after NPS agreed to present Cuke for

18   deposition, in June 2013, NPS invited Fortinet to cancel deposition eight days before it was

19   scheduled by promising not to use any Cuke testimony.   Exh. 25.

20                     **(f)**      **For Almost Three Years of Litigation, NPS Has Put**
21                                   **Unreasonable Burdens on Fortinet Through Unwieldy and**
                                **Insufficient Infringement Contentions**

22           This Court has already found that NPS—by asserting 40+ and then 50+ patent claims

23   against Fortinet for most of the litigation—has "behaved unreasonably in imposing unnecessary

24   cost on its opponent."  Docket No. 197 at p. 3.  NPS has multiplied that burden by asserting the

25   '601 patent claims against **over 70 Fortinet products**.

26           NPS has not provided a claim chart for the 70+ Fortinet products that NPS insists are part

27   of this case, which is required under Patent L.R. 3-1(b).  Instead, NPS has provided a claim chart

28   for FortiOS, an operating system for which Fortinet customers are not charged, and on which

Fortinet customers may operate certain Fortinet applications.  Exh. 30 at 3 and Exhibit A (NPS updated infringement contentions and chart).  Even for FortiOS, NPS has not provided a complete claim chart, but rather has disclosed a theory under which "imd and http" proxies in the FortiOS product infringe the '601 patent.  *Id.*

Based on this incomplete claim-charting for two specific proxy functions in FortiOS, NPS has then contended in conclusory fashion that its claim chart applies to **all** proxy functions in FortiOS in addition to the imd and http proxies, "including ftp, imap, pop3, smtp, nntp, and ssl" functions.  *Id.* at p. 3 and Exhibit A.  NPS then contends—again without explanation—that its partial claim chart for FortiOS "applies to all products identified in Exhibit B."  *Id.* at p. 3.  Exhibit B, in turn, lists 73 different Fortinet devices.  *Id.* at Exhibit B.  NPS does not identify how the proxy functions it charts for FortiOS allegedly are used by these applications.  In fact, some of the devices listed on Exhibit B—such as FortiAP—do not run FortiOS or any proxies at all.

Fortinet brought some of these and other deficiencies to NPS's attention in a letter dated March 18, 2013.  Exh. 31 at p. 2–4 (observing that NPS provided very few pin-cites to source code; addressed no FortiOS proxies other than "imd" and "http" despite claiming that all proxies infringe; referred to "Fortinet documents" without specifying what documents; and "identif[ied] no evidence that any of the 73 'Accused Instrumentalities' listed in Exhibit B infringe the '601 patent").  At the same time, on March 18, 2013, Fortinet offered to let NPS update its infringement contentions to remedy these deficiencies.  *Id.* at 1–2.  NPS refused.  NPS has spent almost three years asserting 40+, then 50+, then 15, and now 5 patent claims against a list of 70+ Fortinet products, without ever disclosing infringement contentions that satisfy the Patent Local Rules.

## IV.    CONCLUSION

Because NPS did not own the '601 patent when it filed suit, Fortinet respectfully requests that this case be dismissed for lack of standing.  Because NPS has committed widespread litigation misconduct in attempting to manufacture standing, manipulate venue, obstruct discovery and deceive the parties and the Court, Fortinet respectfully requests that this case be dismissed with prejudice.  And because NPS's litigation misconduct makes this case "exceptional" under 35 U.S.C. § 285, Fortinet respectfully requests that it be awarded its fees, costs and expenses.

1 | DATED: June 13, 2013

Respectfully submitted,

2

*/s/ John M. Neukom*

3

John M. Neukom (SBN 275887)
QUINN EMANUEL URQUHART &
4

SULLIVAN, LLP
50 California Street, 22nd Floor
5

San Francisco, CA  94111
Tel: 415-875-6600
6

Fax: 415-875-6700
johnneukom@quinnemanuel.com
7

8

*Attorneys for Defendant FORTINET, INC.*

-24-        Case No. 3:12-CV-01106-WHA
FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR
(i) LACK OF STANDING AND (ii) LITIGATION MISCONDUCT