IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NETWORK PROTECTION SCIENCES,
LLC, a corporation,

    Plaintiff,

  v.

FORTINET, INC., a corporation.

    Defendant.

No. C 12-01106 WHA

**ORDER DENYING MOTION TO DISMISS**

## INTRODUCTION

In a recent op-ed, Federal Circuit Chief Judge Randall Rader along with Professors Colleen Chien and David Hricik stated:

> FROM an early age we are taught the importance of fighting fairly. But as the vast number of frivolous patent lawsuits have shown, too many people are rewarded for doing just the opposite.
>
> The onslaught of litigation brought by "patent trolls" — who typically buy up a slew of patents, then sue anyone and everyone who might be using or selling the claimed inventions — has slowed the development of new products, increased costs for businesses and consumers, and clogged our judicial system.
>
>       *        *        *
>
> With huge advantages in cost and risk, trolls can afford to file patent-infringement lawsuits that have just a slim chance of success. When they lose a case, after all, they are typically out little more than their own court-filing fees. Defendants, on the other hand, have much more to lose from a protracted legal fight and so they often end up settling.

> Lost in the debate, however, is that judges already have the authority to curtail these practices: they can make trolls pay for abusive litigation.
>
> Section 285 of the Patent Act, as well as Rule 11 of the Federal Rules of Civil Procedure, give judges the authority they need to shift the cost burden of litigation abuse from the defendant to the troll. . . . [E]ven though many cases settle, the prospect of paying fees will discourage aggressive suits and frivolous demands.
>
> \*      \*      \*
>
> Judges know the routine all too well, and the law gives them the authority to stop it. We urge them to do so.

Randall R. Rader, Colleen V. Chien & David Hricik, *Make Trolls Pay in Court*, N.Y. TIMES, June 5, 2013, at A5.

Seeking to take advantage of this sentiment, defendant Fortinet, Inc. now moves to dismiss this patent-infringement action on the grounds that Network Protection Sciences, LLC ("NPS") did not own the asserted patent at the time it filed suit, has attempted to conceal this defect in standing, and has engaged in other litigation misconduct. Fortinet also moves for an award of attorney's fees. For the reasons stated below, Fortinet's motion to dismiss is **DENIED**. The issue of NPS's standing will be determined at trial. The issue of attorney's fees will be **HELD IN ABEYANCE**.

## STATEMENT

### 1.   THE PARTIES.

Defendant Fortinet manufactures and sells network security products. Fortinet was founded in 2000 and is headquartered in Sunnyvale. Fortinet employs over 2000 people, is publicly traded, and caters to enterprises and government entities worldwide.

Plaintiff NPS is one of 22 companies set up by Innovation Management Sciences, LLC ("IMS"). NPS appears to have virtually no assets apart from the '601 patent and conducts minimal, if any, business activities aside from asserting the '601 patent against firms engaged in designing, manufacturing, and selling software products. NPS advertises that "[a]ll of [its] patents are available for licensing" (Ramde Decl. Exh. 4).

2

1    NPS and IMS were founded by Rakesh Ramde and Wilfred Lam, the architects of a web
2 of LLCs of which NPS is but a single specimen.  Both Ramde and Lam are active-status
3 attorneys in California.  The pair left private practice in 2002, however, to become intellectual
4 property brokers (Opp. 3).  Since 2010, Ramde and Lam (via various entities they control) have
5 been involved in at least a dozen patent lawsuits against at least 40 defendants (*see* Neukom
6 Decl. Exh. 4).

7    NPS has repeatedly represented to the Court that it has a single employee, Gregory Cuke,
8 its "director of business development" (*see, e.g.*, Dkt. No. 65 at 1).  The record, however, shows
9 that this individual has no actual involvement with NPS's day-to-day business, even assuming
10 that any such business takes place.  Although Cuke agrees he has performed a few token hours
11 of work for NPS, he denies being its "director of business development," denies having any
12 knowledge of what NPS's day-to-day business is, and denies being an NPS employee (Cuke
13 Dep. 11, 20–21, 38, 56–57).  Aside from his alleged employment, Cuke is simply NPS's
14 landlord:  Cuke is a real estate broker for commercial properties in east Texas and runs a
15 company that subleases a one-room office to NPS (Cuke Dep. 31).

16    NPS has repeatedly represented that it is "headquartered" in Suite 302 at 3301 West
17 Marshall Avenue in  Longview, Texas.  According to Cuke, however, this "headquarters" office
18 is a tiny, windowless, file-cabinet room, without a phone or even chairs (Cuke Dep. 62, 66).
19 There are no on-site employees.  The rent for the office space is $325 per month; NPS subleases
20 the space for $100 per month from another entity owned by Ramde and Lam that appears to
21 share the same address (*id*. at 64; Ramde Decl. Exh. 2).  The office contains a single computer
22 which Cuke has never seen turned on (Cuke Dep. at 62).

23    **2.    PROCEDURAL HISTORY.**

24    NPS initially filed this patent infringement suit against Fortinet and four unaffiliated
25 defendants in the Eastern District of Texas on July 6, 2010.  The other four defendants were also
26 manufacturers of network security products.  In January 2012, Judge Rodney Gilstrap granted
27 defendants' motion to transfer venue, unconvinced that NPS's Texas presence, after being
28 scrutinized, should be given much weight (Dkt. No. 121 at 7).  Despite NPS's alleged

3

headquarters and Texas-based director of business development, Mr. Cuke, that order held that "the Northern District of California is clearly more convenient than the Eastern District of Texas" as a venue for the present action (*id*. at 6–7, 12).

### 3. THE ASSIGNMENT AND SALE OF THE '601 PATENT.

The crux of the present motion is the alleged sale-and-assignment of the '601 patent to NPS. Before this suit, the patent was owned by Mount Hamilton Partners, LLC ("MHP"), another entity controlled by Ramde and Lam. MHP eventually transferred it to plaintiff NPS, but the question is whether it was transferred by the time this action was commenced, as required by the standing law of the Federal Circuit.

NPS alleges that it was assigned the patent by MHP on April 30, 2010 (Opp. 4). This allegation is supported by a document entitled "Assignment of Patent Rights" that purportedly demonstrates the sale and assignment of the patent from MHP to NPS (Neukom Decl. Exh. 13). The sale-and-assignment agreement was signed on behalf of MHP by Mark Figureiredo on April 30, 2010 (*id.* at 4). The signature page bears the stamp of a notary public who notarized Figureiredo's signature on that same day.

Significantly, however, the signature page also contains the words "Accepted By" followed by a signature block for NPS. On behalf of NPS, the sale-and-assignment agreement was signed by alleged director Cuke on July 28, 2010. Cuke thus signed on behalf of NPS 22 days *after* NPS originally filed suit against Fortinet on July 6, 2010.

In the NPS signature block, Cuke's title lists him as NPS's director of business development. As noted above, Cuke now denies that he genuinely occupied such a role but agreed at his deposition that the signature was his own (Cuke Dep. 56–57, 86).

### 4. ATTEMPTS TO CONCEAL THE DEFICIENT TRANSFER AND OTHER LITIGATION MISCONDUCT.

Fortinet contends that NPS has stonewalled during discovery in an attempt to obscure the deficiencies of the sale-and-assignment contract. In 2011, NPS misleadingly answered an interrogatory that asked for the history of ownership of the '601 patent by omitting in its pithy response the date that NPS signed the contract. This was a significant omission.

4

Fortinet contends that NPS also unduly delayed the deposition of alleged director Cuke. NPS initially refused to confirm whether it would accept service of a subpoena for Cuke — even though Cuke was listed as a relevant witness in NPS's initial disclosures who could "be reached through counsel for NPS" (Neukom Decl. Exhs. 1 at 2, 16). After eventually accepting service, NPS stalled in confirming a date for the deposition. This raises particular suspicion in light of Cuke's dubious ties to NPS.

Fortinet further contends that NPS engaged in other litigation misconduct, staging a litigation charade from Day One. NPS has misleadingly depicted itself as a going concern "headquartered" in Texas with a "director of business development," although in reality it is simply a file closet used to feign venue in Texas. The director of business development is a real estate broker landlord unauthorized to do any business for NPS unless by explicit instruction.

Two prior orders in this action have held that NPS has engaged in unreasonable and improper conduct. *First*, a May 2013 order held that NPS imposed upon Fortinet a "bone-crushing burden of conducting a prior art search for more than fifty patent claims" (Dkt. No. 197 at 3). *Second*, a June 2013 order found that an attorney from Gibbons, P.C. who is not admitted to practice in this district appeared on behalf of NPS in three depositions in this action and notably defended the deposition of Cuke, in clear violation of our local rules (Dkt. No. 211).

Fortinet advances four alternative bases for dismissing the action: (1) the sale and assignment of the '601 patent was not yet effective on the date that NPS originally filed suit; (2) Cuke lacked authority to sign the sale-and-assignment agreement on behalf of NPS; (3) the alleged sale and assignment of the '601 patent lacked consideration; and (4) NPS has engaged in extensive litigation misconduct and attempted to mislead the Court. For the reasons explained below, and on the record thus far, Fortinet's motion to dismiss is **DENIED**. Fortinet also requests attorney's fees, which will be **HELD IN ABEYANCE** pending the outcome of the trial. The extent to which an adverse inference instruction will be given to the jury will be considered at the final pretrial conference.

This order follows full briefing and oral argument, as well as supplemental submissions.

5

**ANALYSIS**

**1. THE DATE OF CUKE'S SIGNATURE.**

Fortinet contends that NPS lacked standing when it filed suit on July 6, 2010, because the sale-and-assignment agreement was not signed and accepted by Cuke on behalf of NPS until 22 days later. NPS argues that even though it had not signed the agreement on the day it filed suit, its actions consistent with ownership demonstrated its acceptance of the assignment. This order finds this dispute dependent on a predicate issue of material fact, to be decided at trial.

Standing is a question of law and it must exist at the inception of the lawsuit. *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009). The general rule (outside of narrow exceptions not applicable here) is that a patentee must have legal title to the patent in order to have standing. *Arachnid v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991). Deficient standing cannot be remedied retroactively. *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779 (Fed. Cir. 1996), *amended on reh'g in part*, 104 F.3d 1296 (Fed. Cir. 1996) (Transfer of title after suit was filed "is not sufficient to confer standing . . . retroactively"). Patentees have to get it right the first time around:

> In light of the proliferation of patent-infringement actions, it is not too much to ask sophisticated patent litigants to be careful when it comes to the threshold issue of standing. It is a simple task to execute express license agreements that satisfy the Federal Circuit standard. Among affiliated companies, it should be even simpler. It is true that patent litigants sometimes rush to stake out venue in a preferred forum. A rush to sue, however, cannot excuse the stern necessity of perfecting the required title before suit. District judges cannot overlook a defect in the chain of title, for the entirety of massive litigation might wind up being vacated years later, for lack of threshold standing. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774 (Fed. Cir.1996) (vacating a final judgment after a full trial on the merits because of a deficiency in standing). As carpenters say, it is wise to "measure twice and cut once."

*Quantum Corp. v. Riverbed Tech., Inc.*, No. C 07-04161-WHA, 2008 WL 314490, at *3 (N.D. Cal. Feb. 4, 2008).

There is no right to a jury trial on the issue of standing. *DDB Techs., LLC v. MLB Advanced Media, LP*, 517 F.3d 1284 (Fed. Cir. 2008). The district court must decide issues of

6

fact necessary to make the standing determination. *In re ATM Fee Antitrust Litigation*, 686 F.3d 741, 747 (9th Cir. 2012) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978)). Disputed issues of fact that influence the determination of standing in this case will therefore be decided at trial.

### A. The Assignment Required Acceptance.

The parties disagree over whether the sale-and-assignment agreement should be interpreted under federal or state law. Fortinet contends that Texas state law applies due to the Texas choice-of-law provision. NPS responds that it need only show that the assignment agreement comported with 35 U.S.C. 261, which makes patents assignable in writing and provides that notarization constitutes *prima facie* evidence of a valid assignment. NPS points out the sale-and-assignment agreement used the word "assignment" in various places and the signature on behalf of MHP was notarized on April 30, 2010 — prior to NPS filing suit. NPS contends that "the analysis ends there" (Opp. 9). Not so.

The Federal Circuit has explained that "[u]sually, federal law is used to determine the validity and terms of an assignment," but patent *ownership* is determined by state law. *Sky Techs*, 576 F.3d at 1379. Here, the assignment by MHP is only half of the story. The plain language of the agreement demonstrates that it was not a simple, unilateral transfer of rights from one corporate entity to another. Rather, the agreement expressly stated that it embodied a *sale* supported by "good and valuable consideration," and recited a mutual exchange of promises (Neukom Decl. Exh. 13 at 1, 3). The agreement included a Texas choice-of-law provision and stated that the "Assignee irrevocably consents to the jurisdiction and venue of the [Texas] courts . . . in connection with any action . . . or claim arising . . . by reason of this Assignment" (*id.* at 3).

Under general principles of property law, if an owner of property attempts to assign it to someone new, the latter must accept the transfer for it to become effective, for otherwise any owner could offload problematic assets by assigning them to third parties who may not wish to be saddled with ownership. For example, an unwitting or reluctant assignee of a patent might wind up being embroiled in a lawsuit to establish true ownership. Acceptance must be shown

even for bare assignments, but here the case is even more clear cut, for the assignment document included promises by the assignee and, of course, no one can be bound by such promises until it accepts.

Under Texas law, which governs here, a contract for sale requires both offer and acceptance. *Summers v. Mills*, 21 Tex. 77, 87 (1858). Here, the agreement specifically provided for acceptance by the recipient with the plain language "accepted by" above the NPS signature block. The agreement also expressly stated that the recipient relinquished certain rights. Fortinet contends that if the agreement were operative in the absence of acceptance by NPS, then MHP (the entity selling the patent) would have unilaterally forced NPS to "irrevocably" accept Texas law, jurisdiction, and venue merely by signing the document. It would also render the signature block superfluous. Thus, the agreement cannot be reasonably construed as a unilateral assignment. The notarization does not alter that conclusion as it merely confirms MHP's signing date. It cannot substitute for NPS's signature. NPS argues, however, that in lieu of signing the agreement it accepted the assignment by its conduct, namely its conduct in commencing this very action.

### B. Whether NPS Accepted the Assignment By Commencing this Action.

At oral argument, the issue arose whether, regardless of when Cuke signed, NPS must be deemed to have accepted the agreement by suing on the patent in this very action. Supplemental briefing on this issue was then allowed.

Texas law does not require a contract to be signed by both parties if they unconditionally assent to it. *Mid-Continent Cas. Co. v. Global Enercom Management, Inc.*, 323 S.W.3d 151, 157 (Tex. 2010). The question of whether a written contract must be signed to be binding is a question of the parties' intent. *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App. El Paso, 2004). NPS contends that "there is no ambiguity that the *parties* intended the Assignment to be effective on April 30, 2010" (Opp. 14 (emphasis added)). There is no evidence within the four corners of the agreement that *both* parties intended the transfer to be complete on that date. Asserting ownership of the patent by filing suit, however, may be an indicator of such intent.

8

1    Fortinet advances two arguments in response.  *First*, in its supplemental briefing, Fortinet
2  argues that since counsel represented at the hearing that NPS had not accepted the choice-of-law
3  provision in the agreement, it had not agreed to *all* terms of the contract.  It is true that Texas law
4  requires parties to agree on all of the essential terms of the contract to show mutual execution.
5  *Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App. Dallas, 2011).  But if filing suit is to be
6  interpreted as acceptance of the assignment by conduct, NPS would have been bound by the
7  choice-of-law provision on the date it filed suit, regardless of counsel's waffling at the hearing.
8  The representation of counsel for NPS at the hearing that the choice-of-law issue is "confusing"
9  and "could have been rejected or changed" does not alter that history (Tr. 18).  The relevant
10 inquiry is whether by its conduct in suing on the patent NPS accepted the assignment in lieu of a
11 signature.

12   *Second*, Fortinet takes issue with the mixed assignment of domestic and foreign patents
13 that the agreement allegedly effectuates.  According to the agreement, it governs the transfer
14 of a Japanese and a European patent in addition to the transfer of the U.S. patent.  During oral
15 argument, counsel for NPS represented that the signature block was included in the agreement
16 because foreign jurisdictions require a signature to record a patent assignment (Tr. 49).
17 Fortinet argues that the assignment cannot be construed in a manner whereby the US patent
18 is transferred by NPS's conduct, but the foreign patents — transferred in the same agreement —
19 are transferred only on the date of NPS's signature.  But Fortinet cites no authority that would
20 prohibit assignment of both domestic and foreign patents with a single agreement in a piecemeal
21 fashion.  Moreover, even if such piecemeal assignment were prohibited, counsel for NPS merely
22 represented that foreign jurisdictions require a signature to *record* the assignment (Tr. 49).
23 Counsel did not say whether the signature was needed to effectuate the *assignment itself*.

24   There is thus a predicate question of fact as to the acceptance of the patent assignment
25 by NPS.  The signature block on the assignment suggests that such acceptance was required to
26 effectuate the assignment.  On the other hand, there is some evidence indicating that NPS must
27 be deemed to have accepted the assignment of the '601 patent merely by filing suit on the patent.
28 For this reason, the question whether NPS accepted the assignment poses a predicate issue of

9

material fact and will not be decided on a motion to dismiss. Therefore, Fortinet's motion to dismiss as to this argument is **DENIED**. The issue will be decided at trial.

### 2. CUKE'S AUTHORITY TO SIGN THE AGREEMENT.

The second ground for dismissal put forth by Fortinet is that Cuke lacked the authority to sign the assignment agreement, putting aside the lateness of the signature. NPS argues that even if Cuke's signature was required to effectuate the assignment, he was instructed to sign the agreement by Hannah Tran, the assistant of Ramde and Lam. Cuke testified at his deposition that he had the authority to enter into contracts on behalf of NPS if "specifically instructed to enter into that agreement by some other agent or representative of NPS" (Cuke Dep. 29). In her affidavit, Assistant Tran states that she "asked Mr. Greg Cuke to sign [the agreement]" (Tran Decl. ¶ 5). On the other hand, there is no clear evidence that Cuke indeed received such instructions from a person authorized to give them. Absent such instructions, he would not have had the authority to sign the agreement on behalf of NPS.

Given that this order finds that (1) the assignment required acceptance, and (2) standing is required at the inception of the action and cannot be remedied retroactively, this issue is largely moot. If it becomes clear at trial that NPS accepted the assignment by commencing this action, it is irrelevant whether Cuke had authority to sign the agreement. NPS would have standing. On the other hand, if a signature were required to accept the assignment, Cuke's authority to sign is also irrelevant because it is undisputed that he signed after the action was filed. In that scenario, NPS would lack standing because Cuke signed too late. Cuke's alleged lack of authority to sign the agreement on behalf of NPS therefore cannot be a basis to dismiss the action. Fortinet's motion to dismiss as to this argument is **DENIED**.

This issue remains relevant in a more limited regard. It bears on the extent to which NPS engaged in litigation misconduct. If it turns out that Cuke lacked the authority to sign the assignment despite NPS's numerous representations to the contrary, that would cast additional dark shadows on NPS's behavior in this action and could influence the sanctions that may be imposed. The issue of Cuke's authority to sign will therefore be revisited at trial in the context of NPS's litigation misconduct.

10

### 3.  CONSIDERATION.

The third arrow in Fortinet's quiver is the alleged lack of consideration for the assignment. According to Fortinet, the assignment is invalid because it is beyond dispute that NPS never paid any consideration for the '601 patent (Supp. Br. 1). This order disagrees.

Under Texas law, an assignment is void in the absence of adequate consideration. *Texas Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970). But the assignment agreement itself acknowledges the receipt of good and valuable consideration, stating that MHP assigns the patents to NPS "[f]or good and valuable consideration, the receipt of which is hereby acknowledged" (Neukom Decl. Exh. 13 at 1). This recital is conclusive. Even if no actual consideration were paid, moreover, NPS's agreement to be bound by the choice-of-law provision would be deemed adequate consideration. Fortinet loses on this issue.

### 4.  LITIGATION MISCONDUCT.

Lastly, Fortinet moves for dismissal on the basis of litigation misconduct. Fortinet also requests an award of attorney's fees and costs under Section 285, the provision cited by Chief Judge Rader. NPS did not brief the issue of Fortinet's entitlement to fees in its opposition. Instead, it devoted its attention to whether the action should be dismissed on the basis of the "optically prejudicial but irrelevant" evidence of litigation misconduct (*see* Opp. 14–24). This order finds that NPS has engaged in litigation misconduct in this action.

*First*, this order finds that Ramde and Lam (and thus NPS) were aware that NPS might not own the '601 patent back in 2010. NPS attempted to conceal evidence of the incomplete transfer through discovery stonewalling and obfuscation. NPS knew that it had signed the acceptance only 22 days after it filed suit against Fortinet. Ramde was individually aware of these facts because he directed Cuke to sign the agreement through his assistant. Instead of coming clean on this issue, NPS, Ramde and Lam tried to conceal it.

Although the local rules in Texas called for disclosure of the sale-and-assignment agreement at the beginning of the litigation, NPS did not produce it until two years later (when production was again required under this district's Patent Local Rules 3-1 and 3-2). NPS also provided a cleverly-worded interrogatory response that obscured the standing problem. When

1 pressed by Fortinet with a more detailed interrogatory, NPS first produced a verbatim,
2 misleading response, and then later stonewalled. NPS also resisted service of a deposition
3 subpoena on its own alleged director, Cuke, a critical fact witness who signed the agreement.
4 Then, NPS attempted to delay the deposition. When pressed to the wall, NPS's counsel sent a
5 misleading email to Fortinet that suggested that director Cuke lacked relevant knowledge. Taken
6 in its entirety, NPS, Ramde and Lam engaged in an extensive cover-up.

*Second*, this order finds that NPS manufactured venue in Texas via a sham. Ramde and Lam rented a windowless file-cabinet room with no employees in Texas and held it out as an ongoing business concern to the Texas judge. They also held out Cuke as its "director of business development" but this too was a sham, a contrivance to manufacture venue in the Eastern District of Texas.

To create the impression that NPS is something other than a patent troll, NPS and its principals have repeatedly made misleading statements to Fortinet and to the Court. For example, in an (unsworn) declaration filed while the action was still in Texas, Ramde stated that "[i]n the business judgment of Network Protection Sciences . . . its relationship with Greg Cuke [is an] important asset[] of the company . . . [that is] facilitated by its presence in Texas" (Dkt. No. 65-36 ¶ 10). Yet alleged director Cuke later admitted in his deposition that he was only NPS's "director of business development" for litigation purposes and had no knowledge of the day-to-day activities of the entity (Cuke Dep. 38–39, 56–57). No such "important asset" ever existed. It was a sham.

There is nothing wrong with the Eastern District of Texas. It is well known that the judges there are hard-working and receptive to processing patent cases. The undersigned judge admires the effort those judges have made to try to make our patent system work better. But no litigant should be allowed to manufacture sham venue in that district in order to take advantage of that district's receptiveness to processing patent cases.[*]

---

[*] "A motion to transfer venue should be granted upon a showing that the transferee venue is clearly more convenient than the venue chosen by plaintiff." *In re Genentech, Inc.*, 566 F.3d 1338 (Fed. Cir. 2009) (quotations omitted). There is thus an incentive for plaintiffs to resort to shams to contrive venue, such as the sham at issue here.

12

1 *Third*, two prior orders herein have already found that NPS has engaged in unreasonable
2 and improper litigation behavior. One found that NPS asserted an unreasonable number of
3 patent claims with the effect of multiplying the burden of litigation. It held that asserting more
4 than fifty patent claims against Fortinet was "an unreasonable burden for NPS to place on its
5 adversary" (Dkt. No. 197 at 3). Despite this admonition, this behavior by NPS has continued
6 in the form of sandbagging with newly-produced documents and infringement contentions that
7 attack over 70 Fortinet products without supplying claim charts. The other order found that
8 NPS's counsel have played fast and loose with the rules for being admitted to practice *pro hac*
9 *vice* in this district. It held that an attorney for NPS had violated our local rules 11-1 and 11-3
10 by appearing in three depositions prior to filing his *pro hac vice* application and denied his
11 application (Dkt. No. 211).

12 A dismissal for litigation misconduct is a severe sanction. As a lesser sanction, a district
13 court may award attorney's fees. Another available remedy is instructing the jury that they may
14 draw an adverse inference from such misconduct. The litigation misconduct is most troubling.
15 But does it warrant outright dismissal? This is a close case. At this stage, the Court is unwilling
16 to impose a terminating sanction but may be willing to do so if the abuse continues. Attorney's
17 fees caused by and traceable to the misconduct are likely to be imposed but that remedy will be
18 **HELD IN ABEYANCE** to see how well *both* sides behave from here on out. With respect to an
19 adverse inference instruction to the jury, both sides may make their proposals to be heard at the
20 final pretrial conference. The latter issue seems bound up in the extent to which the jury hears
21 evidence concerning sham venue, sham employees, and the cover-up, as, for example, may be
22 the case if an advisory verdict is requested on the standing issue.

## CONCLUSION

24 For the reasons stated above and on the record to date, Fortinet's motion to dismiss is
25 **DENIED**. The disputed issues of fact will be decided at trial. At the final pretrial conference, it

will be determined which issues will be decided by the Court and which issues will be decided by the jury.

**IT IS SO ORDERED.**

Dated: August 20, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE