1  JOHN M. NEUKOM (SBN 275887)
   ANDREW M. HOLMES (SBN 260475)
2  WILLIAM O. COOPER (SBN 279385)
   QUINN EMANUEL URQUHART & SULLIVAN, LLP
3  50 California Street, 22nd Floor
   San Francisco, California 94111
4  Tel: 415-875-6600
   Fax: 415-875-6700
5  johnneukom@quinnemanuel.com
   drewholmes@quinnemanuel.com
6  willcooper@quinnemanuel.com

7  Attorneys for
   FORTINET, INC.

8

9                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA
10                      SAN FRANCISCO DIVISION

11

12  NETWORK PROTECTION SCIENCES,        CASE NO. 3:12-CV-01106-WHA
    LLC,
13                                      **FORTINET, INC.'S NOTICE OF**
                  Plaintiff,            **MOTION AND MOTION TO STRIKE**
14                                      **EXPERT REPORT AND EXCLUDE**
              vs.                       **TESTIMONY OF JOHN JAROSZ**
15
    FORTINET, INC.,                     Judge: Honorable William H. Alsup
16                                      Hearing Date: September 26, 2013
                  Defendant.            Hearing Time: 8:00 a.m.
17

18

19

20

21

22

23

24

25

26

27

28
04880.52079/5484044.8

                                             Case No. 3:12-CV-01106-WHA
                  FORTINET, INC.'S NOTICE OF MOTION AND MOTION TO STRIKE
              EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 26, 2013, at 8:00 a.m., or as soon thereafter as the matter may be heard by the Honorable William H. Alsup in Courtroom 8, United States District Court for the Northern District of California, 450 Golden Gate Avenue, 19th Floor, San Francisco, CA, 94102, Defendant Fortinet, Inc. ("Fortinet") shall and hereby does move the Court for an order striking written reports and excluding testimony of Plaintiff Network Production Sciences, LLC's ("NPS") damages expert John Jarosz.

PLEASE TAKE FURTHER NOTICE that Fortinet requests an evidentiary hearing pursuant to Federal Rule of Evidence 104 on the admissibility of the testimony of each of the experts prior to any testimony by that expert at trial.

This Motion is made pursuant to the Federal Rules of Evidence 403 and 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), on the grounds that the testimony NPS seeks to elicit from its damages expert is not relevant to any issue in this matter and is otherwise unreliable, incorrect, and unhelpful.

This Motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities in support thereof, the Declaration of William O. Cooper dated August 22, 2013, all pleadings and papers on file in this action, such other evidence or arguments as may be presented to the Court, and such other matters of which this Court may take judicial notice.

DATED: August 22, 2013

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ John M. Neukom*
John M. Neukom
*Attorneys for Defendant FORTINET, INC.*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................ 1

II. BACKGROUND ................................................................................................................ 2

    A.  The '601 Patent's Market Value ............................................................................ 2

    B.  Mr. Jarosz's Valuation ........................................................................................... 4

III. LEGAL STANDARD ....................................................................................................... 5

IV. MR. JAROSZ'S OPINIONS ............................................................................................. 6

    A.  Mr. Jarosz Calculates a Royalty Based on the Entire Revenue Base of the
        Accused Products but Fails to Establish That the Accused Features Drive
        Consumer Demand. ................................................................................................. 6

    B.  Mr. Jarosz Relies on the Noncomparable Trend Micro Litigation Settlement
        Agreement to Derive His ▮ Royalty Rate ............................................................ 12

    C.  Mr. Jarosz Impermissibly Ignores or Discounts Highly Probative Evidence
        Relating to the Market Value of the '601 Patent .................................................. 16

    D.  Mr. Jarosz Chooses the Wrong Date for the Hypothetical Negotiation, Does
        Not Justify It, and Fails to Do the Required Claim-by-Claim Analysis ................ 20

V.  CONCLUSION ................................................................................................................ 23

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

### **Cases**

4

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    435 F.3d 1356 (Fed. Cir. 2006) .................................................................................20

*AVM Technologies, LLC v. Intel Corp.*,
    WL 656745, 2 (D.Del. 2013) ....................................................................................13

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) ........................................................................6

*DSU Med. Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006) ..........................................................................16, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................................................5, 19

*Endress Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*,
    892 F. Supp. 1123 (S.D. Ind. 1995), *aff'd sub nom. Endress + Hauser, Inc. v. Hawk
    Measurement Sys. Pty. Ltd.*, 122 F.3d 1040 (Fed. Cir. 1997) ....................................17

*Garretson v. Clark*,
    111 U.S. 120 (1884) ..............................................................................................6, 8

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................................................18

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pacific Corp. v. U.S.
    Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971) ...........................11, 12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) .................................................................................16

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ....................................................................................8

*IP Innovation L.L.C. v. Red Hat, Inc.*,
    705 F. Supp. 2d 687 (E.D. Tex. 2010) .......................................................................16

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
    331 F.3d 860 (Fed. Cir. 2003), *rev'd on other grounds*,
    545 U.S. 193 (2005) .................................................................................................21

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................................................5

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) .............................................6, 9, 10, 11, 12, 14, 16, 18

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

*Lucent Technologies, Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ..................................................................6, 12, 15, 18

*Minks v. Polaris Indus., Inc.,*
  546 F.3d 1364 (Fed. Cir. 2008) .................................................................................20

*Nobell, Inc. v. Sharper Image Corp.,*
  C-89-1133-D 1993 WL 195281 (N.D. Cal. May 25, 1993) ......................................13

*Norian Corp. v. Stryker Corp.,*
  252 F. Supp. 2d 945 (N.D. Cal. 2002) ......................................................................20

*Norian Corp. v. Stryker Corp.,*
  363 F.3d 1321 (Fed. Cir. 2004) .................................................................................20

*Oracle Am., Inc. v. Google Inc.,*
  798 F. Supp. 2d 1111 (N.D. Cal. 2011) ...............................................................20, 21

*Oracle America, Inc. v. Google Inc.,*
  2011 WL 6055505 (N.D.Cal. 2011) ..........................................................................11

*ResQNet, Inc. v. Lansa, Inc.,*
  594 F.3d 860 (Fed.Cir.2010) .....................................................................................12

*Sundance, Inc. v. DeMonte Fabricating Ltd.,*
  550 F.3d 1356 (Fed. Cir. 2008) ...................................................................................5

*Uniloc USA, Inc. v. Microsoft Corp.,*
  632 F.3d 1292 (Fed. Cir. 2011) .......................................................6, 8, 11, 19, 20, 21

*WI-LAN, Inc. v. Alcatel-Lucent USA, Inc.,*
  No. 6:10-CV-521 (E.D. Tex. June 28, 2013) ..............................................11, 13, 22

## **Statutes**

Fed. R. Evid. 104(a) ...........................................................................................................5

Fed. R. Evid. 702 ...............................................................................................................5

Fed. R. Evid. 702(c) .........................................................................................................19

Fed. R. Evid. 702(d) .........................................................................................................19

## **Canadian Authorities**

*Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461 .................16

*Bankruptcy and Insolvency Act*, R.S.C., 1985, C.B.-3, s. 30(1)(a), 116 .......................17

*Canadian Business Corporations Act*, R.S.C**.**, 1985, c. C-44, s. 120, 122(1)............16, 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-iii-                                  Case No. 3:12-CV-01106-WHA
FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

I.      **INTRODUCTION**

Defendant Fortinet moves to strike the written report of John Jarosz—a damages expert hired by Plaintiff NPS—and to exclude his testimony at trial.  Mr. Jarosz's expert opinions suffer numerous flaws.

First, Mr. Jarosz fails to perform an apportionment analysis.  He admits that Fortinet's products offer at least 12 categories of benefits to users.  He admits that the asserted patent covers at most only five of those 12 categories.  He even admits that Fortinet's products can be used without providing any of the five specific categories of benefits supposedly covered by the asserted patent.  And yet, Mr. Jarosz relies on 100% of all revenues from all accused products to calculate a damages figure for this case.  This is a blatant failure—or refusal—to perform the kind of "apportionment" analysis required by the Federal Circuit.  Under that precedent, a patentee cannot lay claim to 100% of revenues for accused products; the patentee must distinguish between revenues or profits attributable to infringing vs. non-infringing uses of the accused products.  Mr. Jarosz failed to do that here—just has he recently failed to do in a patent case in East Texas, resulting in a June 2013 order from that district forbidding his testimony on a non-apportioned basis.

Second, while Mr. Jarosz discusses a variety of evidence and methodologies to justify his damages opinion, his calculation is quite simple.  He takes 100% of all revenues for all Fortinet accused products, plus 100% of all revenues for follow-on services for such products, and applies a ■ royalty.  Mr. Jarosz justifies that ■ royalty by relying heavily—if not exclusively—on a separate license that Fortinet took on a separate patent, from a separate counter-party, in 2006.  This appears to be an attempt to "borrow" the terms of another license.  Federal Circuit precedent does not permit a damages expert to borrow the terms of a separate license in this fashion, especially given the differences in parties, patents, products, dates and circumstances involved.

Third, Mr. Jarosz ignores a trove of data about the value of the asserted patent in this case, the '601 patent.  The '601 patent was valued by public trading markets at $0 in 1998.  It was valued at $0 in an arm's-length corporate acquisition in 1998.  It was valued at $2 (two dollars) in an arm's-length patent sale in 2004, which sale was approved by a Canadian court as a

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

1 maximization of value of the patent.  It was purchased by the principals of the plaintiff in this case,

2 in 2006, for less than $100,000.  It was valued at $0 by 34 different third-parties in the last few

3 years—all of whom refused even to make an offer on the patent.  And the two other third-parties

4 who chose to make an offer both offered $25,000.  In the face of this data—suggesting that the

5 valuation for an outright purchase of the '601 patent plus its international counterparts is between

6 $0 and $25,000—Mr. Jarosz has just stated that a **non-exclusive** license for domestic use only for

7 Fortinet only should be valued at over ▮▮▮▮▮▮.  That contrast boggles the mind.  Apparently

8 Mr. Jarosz is prepared to opine before a jury that NPS has hit the jackpot by buying a patent on the

9 cheap which has a "secret" value of dozens of millions of dollars never known before to public

10 trading markets, Canadian bankruptcy courts, sophisticated patent brokers, sophisticated patent-

11 assertion entities, and numerous firewall companies.  Fortinet begs this Court not to permit such

12 facially unreliable and greedy testimony.

13 **II.     BACKGROUND**

14      **A.     The '601 Patent's Market Value**

15      Since the '601 patent issued in 1997, it has been purchased at least four times and offered

16 for sale at least forty  times.  This history of consummated and non-consummated transactions

17 provides a rich supply of data regarding its value.

18      In 1997, sole inventor Hung Vu assigned the '601 patent to Canadian company Milkyway

19 Networks ("Milkyway"), of which he was the founder, for one dollar.  In 1998, SLM Networks

20 acquired all of the assets of Milkyway.  At the time of the sale, shares of Milkyway were trading

21 on the Toronto Stock Exchange for less than the value of Milkyway's net cash on hand.  Likewise,

22 SLM purchased Milkyway for an amount, after liquidation costs, of less than the value of

23 Milkyway's cash on hand.  Accordingly, the non-cash assets of Milkyway—including the '601

24 patent and its foreign counterparts—were valued by the public trading market and SLM at $0.

25      In 2004, while SLM was in bankruptcy, Canadian company Bevertec CST ("Bevertec")

26 acquired the '601 patent and its foreign counterparts for two dollars.  Both the bankruptcy trustee

27 and the bankruptcy court approved the sale.  In 2006, Mount Hamilton Partners ("Mount

28 Hamilton")—one of the twenty-plus patent-assertion entities created by NPS's principals—

1   purchased the '601 patent and its foreign counterparts for either $75,000 or $95,000. (NPS has

2   refused to confirm the actual purchase price.)  In 2010, Mount Hamilton purported to assign the

3   '601 patent and its foreign counterparts to NPS for zero dollars.

4        Numerous attempts to sell the '601 patent and its European counterparts resulted in similar

5   valuations. ███████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  █████████████████   Thus, a highly-incentivized, deeply-connected intellectual property broker

14  exhaustively auctioned the '601 patent to a group that included those with (1) the most knowledge

15  regarding the relevant technology, (2) the most knowledge regarding patent valuation, (3) the most

16  to gain by purchasing a network-security patent, and (4) the most to lose if the '601 patent was

17  asserted against them.

18       The result?  Of the 36 entities offered the '601 patent and its counterparts, 34 refused to

19  offer even one dollar. ████████████████████████████████████████

20  ████████████████████████████████████████████

21       Taken together, the combination of consummated and non-consummated transactions

22  amounts to at least forty independent, real-world valuations of the '601 patent and its foreign

23  counterparts.  The results are illustrated in the below table:

| Market Valuations of '601 Patent and Foreign Counterparts | | |
|---|---|---|
| **Year** | **Transaction** | **Dollar Amount** |
| 1998 | Milkyway to SLM | 0 dollars |
| 2002 | SLM to Bevertec | 2 dollars |

-3-    Case No. 3:12-CV-01106-WHA

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

| Market Valuations of '601 Patent and Foreign Counterparts | | |
|---|---|---|
| **Year** | **Transaction** | **Dollar Amount** |
| 2006 | Bevertec to Mount Hamilton | $75,000 or $95,000 |
| 2009 | ███████████████████ | ███████ |
| 2009 | ██████████ | ███████ |
| 2009 | ██████████████ | ███████ |
| 2010 | Mount Hamilton to NPS (putative assignment) | 0 dollars |

Over the span of 12 years, the '601 patent and its foreign counterparts had an average valuation of $3,625.05:

| Market Value of '601 Patent and Foreign Counterparts | |
|---|---|
| Sum of all valuations | $145,002 |
| Number of valuations | 40 |
| Average valuation | $3,625.05 |

### B.    Mr. Jarosz's Valuation

In this litigation, Mr. Jarosz's concludes that Fortinet owes NPS ███████ for a non-exclusive license for just the domestic '601 patent.  In other words, Mr. Jarosz concludes that a single player in the Unified Threat Management ("UTM") market owes NPS—for a non-exclusive license—an amount 4,965 times the average market valuation for the **entire** '601 patent **plus** its foreign counterparts.  Moreover, because Mr. Jarosz concludes that (1) Fortinet has a 20% market share in the UTM market and (2) there are no design-around alternatives (that is, all UTM offerings available in the market infringe), Mr. Jarosz's valuation of the entire '601 patent is necessarily nearly **$100 million**.  This amounts to roughly 25,000 times the average market-based valuation of the '601 patent and its foreign counterparts.

Mr. Jarosz arrives at these numbers by casting aside critical evidence and employing unreliable methodologies.  **First**, he uses the total revenue of the accused multi-feature products despite failing to perform an apportionment analysis, and to establish that the allegedly patented

1  features drive consumer demand. **Second**, he bases his opinion of a license value for the '601

2  patent almost entirely on a single, different license that Fortinet negotiated in different

3  circumstances for a different patent against a different counter-party—and even then, Mr. Jarosz

4  mis-construes the terms of that separate license. **Third,** he ignores important real-world evidence

5  regarding the value of the '601 patent. **Fourth**, he chooses the wrong date upon which the

6  hypothetical negotiation took place. Mr. Jarosz's proposed testimony should therefore be

7  excluded.

8  ### III.   LEGAL STANDARD

9       Federal Rule of Evidence 702 allows an expert to provide opinion testimony only if "(a)

10  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

11  understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

12  facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

13  has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

14  Expert testimony is inadmissible if it does not meet these requirements. *Daubert v. Merrell Dow*

15  *Pharmaceuticals, Inc.*, 509 U.S. 579, 589–91 (1993). The proponent of the expert testimony must

16  prove that the elements of Rule 702 have been met. *Id.* at 592 (citing Fed. R. Evid. 104(a)). Rule

17  702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a

18  reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 589; *Kumho*

19  *Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Thus, under *Daubert*, the district court is

20  the gatekeeper that ensures the expert is properly qualified to give the testimony and that the

21  proposed expert testimony is both reliable and relevant. 509 U.S. at 589–90. "This entails a

22  preliminary assessment of whether the reasoning or methodology is scientifically valid and of

23  whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

24  509 U.S. at 592–93; *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir.

25  1995) ("*Daubert II*").

26       In order to be deemed reliable, expert testimony must be based on sufficient facts or data,

27  and it must be the product of reliable principles and methods that are properly applied. *See* Fed.

28  R. Evid. 702; *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) ("Rule

1   702 demands that expert testimony . . . not include unsubstantiated speculation and subjective

2   beliefs.").  *Daubert* sets forth the following non-exclusive list of guideposts for determining

3   reliability: (1) whether the proffered theory can be and has been tested; (2) whether the theory has

4   been subject to peer review and publication; (3) whether the theory has been evaluated in light of

5   potential rates of error; and (4) whether the theory has been accepted in the relevant academic

6   community.  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007).  In essence, the court's

7   task is to "make certain that an expert, whether basing testimony upon professional studies or

8   personal experience, employs in the courtroom the same level of intellectual rigor that

9   characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.

10

11  ## IV.    MR. JAROSZ'S OPINIONS

12          The principles and methods upon which Mr. Jarosz bases his opinions violate common

13  sense, the Federal Rules of Evidence, and Federal Circuit precedent.  His proposed testimony

14  should therefore be excluded.

15          ### A.    Mr. Jarosz Calculates a Royalty Based on the Entire Revenue Base of
           the Accused Products but Fails to Establish That the Accused Features
16         Drive Consumer Demand.

17          An expert opining on patent damages "must in every case give evidence tending to

18  separate or apportion the defendant's profits and the patentee's damages between the patented

19  feature and the unpatented features."  *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67

20  (Fed. Cir. 2012) (*citing Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  The evidence tending to

21  apportion profits and damages between the patented and unpatented features "must be reliable and

22  tangible, and not conjectural or speculative."  *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d

23  1301, 1337 (Fed. Cir. 2009) (*citing Garretson*, 111 U.S. at 121).

24          In cases like this one, "[w]here small elements of multi-component products are accused of

25  infringement," using the entire market value of the accused products as a royalty base "carries a

26  considerable risk that the patentee will be improperly compensated for non-infringing components

27  of that product."  *LaserDynamics,* 694 F.3d at 67 (striking damages expert's use of the entire

28  market value of the accused products as royalty base).  Royalties must therefore generally "be

1    based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Id.*;

2    *see also Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-288 (N.D.N.Y.

3    2009) (Rader, C.J., sitting by designation) (precluding use of the accused product's entire market

4    value to calculate royalty).  Indeed, an expert is permitted to "assess damages based on the entire

5    market value of the accused product **only where** the patented feature creates the 'basis for

6    customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc.*

7    *v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)  (quoting *Lucent*, 580 F.3d at 1336)

8    (emphasis added).

9         Mr. Jarosz bases his royalty on **all revenues** generated by the accused, multi-function

10   products—and, additionally, follow-on support services—despite  failing to establish that features

11   covered by the '601 patent create the basis for customer demand or substantially create the value

12   of the accused products.  Mr. Jarosz readily concedes that the accused products have numerous

13   non-patented features and non-accused alternative uses.  According to Mr. Jarosz, UTM products,

14   like Fortinet's, contain at least twelve features.[1] Exh. 1, Expert Report of John Jarosz ("Jarosz

15   Report") at 8-9.[2]  Mr. Jarosz concludes that one feature, the firewall, infringes the patent, while

16   antivirus, antispam, DLP, and SSL-encrypted inspection are also associated with the '601 patent.

17   *Id.* But even according to Mr. Jarosz, seven of the twelve features in Fortinet products are **not**

18   covered by the '601 patent.  *Id.*

19        Mr. Jarosz, moreover, does not dispute that Fortinet products have non-accused alternative

20   uses.  *Id*. at 24 ‑ 25.  And he does not dispute that the accused products can be configured so as

21   not to infringe.  *Id*. at 11, 62.  Indeed, NPS's infringement and validity expert, Dr. Keromytis,

---

[1]  These features are (1) firewalls, (2) intrusion prevention services ("IPS"), (3) application control, (4) virtual private network, (5) content filtering, (6) IPv6 support, (7) support for virtualized environments 49 UTMs, (8) data loss prevention ("DLP"), (9) anti-virus and anti-spam protection, (10) endpoint control, (11) integrated wireless local area networks ("WLAN"), and (12) secure socket layer ("SSL")-encrypted traffic inspection.

[2]  All references to "Exh." or "Exhs." herein refer to the exhibits attached to the concurrently filed Declaration of William O. Cooper in support of Fortinet's Notice of Motion and Motion to Exclude Expert Testimony of John Jarosz ("Cooper Decl.").

1   admitted in his report—and confirmed in his deposition—that the accused products have non-

2   infringing uses:



9   Exh. 2, Dep. Tr. of Dr. Keromytis at 136:11-137:3.  Dr. Keromytis, like Mr. Jarosz, also ignores

10  other evidence of non-infringing uses of the product.  *See, e.g.*, *id*. at 137:20-23 ▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

13          After conceding that the accused products contain non-patented features and non-accused

14  alternative uses—and in light of his election to use the entire revenue base to calculate his

15  royalty—Mr. Jarosz was **required** to establish that the patented features create the "basis for

16  customer demand" or "substantially create the value of the component parts."  *Uniloc*, 632 F.3d at

17  1318.  He did not do so.

18          Mr. Jarosz provides two scant—and wholly insufficient—bases for using the entire

19  revenue base in calculating his royalty.  The first basis is a 2006 **litigation** settlement agreement

20  between Fortinet and Trend Micro—covering a different patent and entered into only after the ITC

21  issued an exclusion order banning all of Fortinet's existing products from entering the US.  It

22  appears that Mr. Jarosz has chosen not to perform an apportionment analysis for this case—for

23  this patent—but rather has surmised that the 2006 Trend Micro license must have had some sort of

24  apportionment analysis baked into it, and he then attempts to borrow his interpretation of the terms

25  of that license.  Mr. Jarosz explains his attempt to "borrow" an apportionment analysis from the

26  Trend Micro license despite admitting that no such analysis is evidence—he just says it is likely:

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

1 ████████████████████████████████████████████████████

2 ███████████████████████

3       This hardly suffices.  Using the entire revenue base in calculating a royalty requires

4 "reliable and tangible" evidence.  *Garretson*, 111 U.S. at 121.  And an expert may not rely on

5 evidence that is "conjectural or speculative."  *Id.; see also Hebert v. Lisle Corp.*, 99 F.3d 1109,

6 1119 (Fed. Cir. 1996) ("Damage awards can not [sic] be based upon speculation or optimism, but

7 must be established by evidence.").  Mr. Jarosz nevertheless speculates that under a different

8 license, for a different patent, entered into at a different time, with a different party, under different

9 circumstances, ██████████████████████████████████████████████

10 ████████████████████████  Jarosz Report at 76.

11       Worse, Mr. Jarosz further justifies reliance on the Trend Micro license by stating that the

12 patent in that litigation, like the '601 patent, covered only "a portion" of Fortinet's products.

13 Jarosz Report at 76.  But simply because both the Trend Micro patent and the '601 patent cover "a

14 portion" of Fortinet products does not mean that they cover the **same** portion or portions—or that

15 those specific portion(s) drive consumers to purchase Fortinet products.  Mr. Jarosz also cites to

16 the infringement report of NPS's expert to conclude that the Trend Micro patent "█████████████

17 ██████████████████████████████████████████████████████

18 ██████"  *Id.* at 53.  But being "██████████████████" does not mean that the exact same

19 features in Fortinet's products are enabled by both patents.  A patentee must "**in every case**" give

20 evidence sufficient to meet the Federal Circuit's exacting standards for apportionment.

21 *LaserDynamics,* 694 F.3d at 67 (emphasis added).  Mr. Jarosz cannot "outsource" this analysis to

22 different parties negotiating a license to a different patent, under different circumstances.

23       The second basis that Mr. Jarosz relies on in justifying his use of the accused products'

24 entire revenue base is deposition testimony from Fortinet's founder and Chief Technology Officer

25 Michael Xie.  Mr. Jarosz transforms Mr. Xie's testimony about **application processes** into a

26 conclusion that half the purchasers of Fortinet products would not have made a purchase absent

27 **application layer proxies**:  From Mr. Jarosz: ██████████████████████████████

28 ████████████████████████████████████████████████



1

2

3

4

5

6 Jarosz Report at 19 (emphasis added).

7

8

9

10

11

12

13

14

15

16

17

18 Mr. Xie was making a simple point—one

19 radically different from Mr. Jarosz's mischaracterization—that any computer system consisting of

20 hardware and an operating system, but not applications, would be of little use to users.  *See Id.*

21 Even if Mr. Xie had testified that application layer proxies, instead of application

22 processes, were "            ,"[3] however, that would still be insufficient justification for use of

23 the entire market value of the accused products: "It is not enough merely to show that [the

24 _____

25

26

27

28

patented feature] is viewed as valuable, important, or even essential to the use of the [accused product]." *LaserDynamics,* 694 F.3d at 68.  In *LaserDynamics,* the plaintiff asserted a patent covering a disc discrimination method.  The Federal Circuit ruled that its use of the entire market value rule was "impermissible" because it "failed to present evidence showing that the patented disc discrimination method **drove demand** for the laptop computers." *Id.* (emphasis added).  The court explained that even if the plaintiff had shown that a laptop computer that did not practice the patented method "would be commercially unviable," this, alone, did not justify application of the entire market value rule:

> Were this sufficient, a plethora of features of a laptop computer could be deemed to drive demand for the entire product. To name a few, a high resolution screen, responsive keyboard, fast wireless network receiver, and extended-life battery are all in a sense important or essential features to a laptop computer; take away one of these features and consumers are unlikely to select such a laptop computer in the marketplace. But proof that consumers would not want a laptop computer without such features is not tantamount to proof that any one of those features alone drives the market for laptop computers.

*Id.* In the same vein, Mr. Jarosz had to show in this case not just that users would choose the patented functionality over an alternative, but that this functionality is what would motivate the user to purchase the Fortinet product.  "[I]f given a choice between two otherwise equivalent laptop computers, only one of which practices optical disc discrimination, proof that consumers would choose the laptop computer having the disc discrimination functionality says nothing as to whether the presence of that functionality is what motivates consumers to buy a laptop computer in the first place. It is this latter and higher degree of proof that must exist to support an entire market value rule theory." *Id.*

As an Eastern District of Texas court recently noted while striking Mr. Jarosz's testimony, experts are required to carefully apportion alleged infringers' profits based on those features that are patented versus those that are not:  "Mr. Jarosz's consideration of all the evidence is a poor substitute for the required analysis that parses an alleged infringer's profits for patented versus unpatented features." *WI-LAN, Inc. v. Alcatel-Lucent USA, Inc.,* No. 6:10-CV-521 at 7 (E.D. Tex. June 28, 2013) (order granting in part *Daubert* motion to exclude report and testimony of John C. Jarosz regarding issues related to damages).  Mr. Jarosz has, again, failed to adequately apportion

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

and to justify his use of the entire revenue base of the accused products.  His opinions should therefore be excluded.

**B.**     **Mr. Jarosz Relies on the Noncomparable Trend Micro Litigation Settlement Agreement to Derive His ▇ Royalty Rate**

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Jarosz Report at 48.

The *Georgia-Pacific* factors, in general, "frame the reasonable royalty inquiry" and "properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue."  *Uniloc*, 632 F.3d at 1317-18.  Mr. Jarosz analyzes the Trend Micro litigation settlement agreement under the rubric of *Georgia-Pacific* factor number two, which considers "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).  Under this *Georgia-Pacific* factor, comparability is the touchstone:  **"When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice**." *LaserDynamics,* 694 F.3d at 79 (emphasis added);  *see also Oracle America, Inc. v. Google Inc.*, 2011 WL 6055505, 8 (N.D. Cal. 2011) (Alsup, J.) ("Damages experts cannot use noncomparable licenses, with little relationship to the claimed invention or parties-in-suit, as a basis for calculating reasonable royalties.") (citing *ResQNet, Inc. v. Lansa, Inc.,* 594 F.3d 860, 870 (Fed. Cir. 2010)); *Lucent*, 580 F.3d at 1325-26 ("This factor examines whether the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit.").  The burden is on the plaintiff to show that the license agreements are sufficiently comparable.  *Lucent*, 580 F.3d at 1329.

1     The Trend Micro litigation settlement agreement is a noncomparable license. Mr. Jarosz's

2 reliance on it to derive his royalty has at least five fundamental problems. **First**, the Trend Micro

3 license was entered into after the ITC barred Fortinet from importing all of its existing products

4 into the United States.  In the hypothetical negotiation, by contrast, Fortinet is unburdened by the

5 distortive effects of litigation—let alone the dramatic consequences of being on the wrong side of

6 an ITC exclusion order.  The Federal Circuit has noted that "[t]he propriety of using prior

7 settlement agreements to prove the amount of a reasonable royalty is questionable."

8 *LaserDynamics,* 694 F.3d at 77–79.  Indeed, the court has stated that license fees entered into

9 during litigation are "unsuitable" to establish a royalty rate: "[t]he notion that license fees are

10 tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable

11 royalty is a logical extension of *Georgia–Pacific,* the premise of which assumes a voluntary

12 agreement will be reached between a willing licensee, with validity and infringement of the patent

13 not being disputed."  *Id.*  This logic is multiplied here because the Trend Micro license was

14 entered into after the ITC entered an exclusion order banning Fortinet's existing products from

15 entering the US.

16     **Second**, compounding the problem of relying on the litigation-generated Trend Micro

17 license is the fact that Mr. Jarosz does not actually analyze the specifics of the Trend Micro

18 litigation: "[t]o say that one litigation settlement agreement relating to a different patent and

19 executed five years after the hypothetical negotiation would have taken place—even assuming the

20 ['601 patent is comparable to the [Trend Micro] patent—is the basis for an opinion is completely

21 speculative without, at a minimum, some analysis of the litigation that led to the settlement."

22 *AVM Technologies, LLC v. Intel Corp.*, WL 656745, at 2 -4 (D. Del. 2013)  (striking damages

23 opinion in its entirety for failing to analyze "factors that might affect the value of the settlement"

24 such as "the defenses available to [the defendant] at trial or the strength of those defenses.").

25     The **third** problem with Mr. Jarosz's reliance on the Trend Micro litigation settlement

26 agreement is the rate.  Mr. Jarosz not only cherry picks the highest rate in the tiered licensing

27 structure ████████████████████████████████████████████████████

28 ██████████████████████████████████████████████████████████

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████. Mr. Jarosz's opinion was recently excluded in the Eastern District of Texas for

4 similarly failing to take into account the distinction between US and international rights and

5 revenues: "Mr. Jarosz does no apportionment to account for the differences between the

6 worldwide portfolio licenses and a license to the patents-in-suit for U.S. sales of Defendants'

7 accused products." *WI-LAN, Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:10-CV-521 at 7 (E.D. Tex.

8 June 28, 2013) (order granting in part *Daubert* motion to exclude report and testimony of John C.

9 Jarosz regarding issues related to damages).

10 **Fourth**, Mr. Jarosz does not take into account the radically different bargaining positions

11 between Fortinet and Trend Micro as compared to Fortinet and SLM Networks in the hypothetical

12 negotiation. "The jury could consider a number of factors in determining the royalty

13 amount…[including] the relative bargaining power each party would have had at the hypothetical

14 negotiation." *Nobell, Inc. v. Sharper Image Corp.*, C-89-1133-DLJ, 1993 WL 195281 (N.D. Cal.

15 May 25, 1993).  In the hypothetical negotiation for this case, which Mr. Jarosz pegs as being in

16 2002, Fortinet was a relatively young company (two years after its founding) with corresponding

17 flexibility in its design choices.  SLM, for its part, was a financially distressed company teetering

18 on the brink of bankruptcy (which it declared one year later).  SLM's line of business was

19 electronic-payment-systems, not firewalls or network security.  Four years later, when Fortinet and

20 Trend Micro entered into their litigation settlement agreement, Fortinet was a larger, more mature

21 company, with greater revenues and less flexibility with its design alternatives.  And Trend Micro,

22 a global computer security company, was earning over $700 million in revenue annually and

23 turning a profit in excess of $150 million. Furthermore, of course, Trend Micro had just secured an

24 ITC exclusion order against Fortinet.  Thus, the hypothetical negotiation in this case would have

25 been between two non-competitors, neither of whom had deep pockets, and would have been

26 entered into free from "coercive environment of patent litigation." *LaserDynamics,* 694 F.3d at

27 77–79.  The Trend Micro litigation settlement agreement, on the other hand, was entered into

28 between two larger companies operating in the same general industry and under the backdrop of

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

an ITC exclusion order preventing the importation of Fortinet's products into the US.  As Fortinet's expert on damages, Dr. James Kearl, puts it, "█████████████████████████."  Exh. 4, Fortinet's Expert Report of James R Kearl ("Kearl Report") at 18.

**Fifth**, Mr. Jarosz concedes that the UTM market did not emerge until 2004, which is two years after the hypothetical negotiation between Fortinet and SLM Networks and two years before the Trend Micro litigation settlement agreement.  "████████████████████████ ███████████████████."  Jarosz Report at 6.  Thus, the technology allegedly covered by the patent was much more valuable in 2006 than in 2002.

As the below table illustrates, the problems with Mr. Jarosz's reliance on the Trend Micro license agreement are numerous and fundamental:

|  | **Hypothetical Negotiation** | **Trend Micro License** |
|---|---|---|
| **Year** | 2002 | 2006 |
| **Parties** | Fortinet: two years after founding. | Fortinet: six years after founding. |
|  | SLM Networks: a financially distressed electronic-payment-systems company. | Trend Micro: A global computer security company with over $700 million in annual revenue. |
| **Legal Backdrop** | The parties are not engaged in litigation and have no legal relationship. | Fortinet is subject to ITC exclusion order preventing the importation of all of its existing products into the US. |
| **Patent** | The patent-in-suit. | A patent unrelated to this litigation. |
| **UTM industry** | Yet to emerge. | Two years post-emergence. |
| **Geographic Scope** | United States. | Worldwide. |

The distinctions between the hypothetical negotiation in this case and the Trend Micro ███████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████

|  | **Hypothetical Negotiation** | **Trend Micro Negotiation** |
|---|---|---|
| **Royalty Rate** | ████████████████ | █████████████ |

In *Lucent*, the Federal Circuit rejected the patentee's reliance on licenses because "some of the license agreements [were] radically different from the hypothetical agreement under

1  consideration." *Lucent*, 580 F.3d at 1327–28.  The same is true here.  Because Mr. Jarosz relies

2  on a license entered into under "radically different" circumstances from the hypothetical

3  negotiation, his royalty rate is deeply flawed and his testimony supporting it should be excluded.

4      **C.**    **Mr. Jarosz Impermissibly Ignores or Discounts Highly Probative**

5                      **Evidence Relating to the Market Value of the '601 Patent**

6       While Mr. Jarosz relies almost exclusively on a patent litigation settlement agreement—

7  unrelated to this litigation—to derive his royalty rate, there is plenty of highly probative evidence

8  relating to the '601 patent itself that he did not consider in a meaningful way.  As noted above,

9  there are over 40 real-world data points reflecting the '601 patent's value:  a 1998 assignment for

10  0 dollars; a 2002 purchase for 2 dollars; a 2006 purchase for either 75,000 dollars or 95,000

11  dollars; a 2008-2009 failed campaign to sell the patent to at least 36 entities[4] resulting in ▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and a 2010 putative

13  assignment for 0 dollars.

14       In concluding that Fortinet owes NPS an ▮▮▮▮▮▮ non-exclusive license for the '601

15  patent—and that the '601 patent is valued at nearly $100 million—Mr. Jarosz either completely

16  ignores or impermissibly discounts this critical market evidence.  This violates Federal Rule of

17  Evidence 702, Federal Circuit precedent, common sense, and accepted practices by economists.

18  An expert's opinion on patent damages must be based on "sufficient facts or data" while "reliably"

19  applying "reliable principles and methods."  Fed. R. Evid. 702.  Accordingly, evidence of the

20  actual nature of the relevant marketplace is critical in the reasonable royalty analysis.  *DSU Med.*

21  *Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006).  Indeed, "[t]o prevent the

22  hypothetical from lapsing into pure speculation," the Federal Circuit requires "sound economic

23  proof of the nature of the market and likely outcomes with infringement out of the picture."  *Id.*;

24  _____

25  ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮

1   *see also Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

2   An expert's patent damages theory must therefore be based on "sound economic and factual

3   predicates." *LaserDynamics,* 694 F.3d at 67; *see also IP Innovation L.L.C. v. Red Hat, Inc.*, 705

4   F. Supp. 2d 687, 689 (E.D. Tex. 2010) (where "sound economic and factual predicates are absent

5   from a reasonable royalty analysis, Rule 702 requires [the] court to exclude that unreliable

6   proffered evidence.").

7        It is hard to imagine "economic and factual predicates" more sound than the consummated

8   and non-consummated transactions relating to the '601 patent in particular.  Yet Mr. Jarosz casts

9   them aside.  He first dismisses the transaction between Milkyway and SLM—in which SLM

10   purchased all the assets of Milkyway for a price less than Milkyway's cash on hand—because the

11   president of Milkyway was also the president of SLM.  Jarosz Report at  46.  According to Mr.

12   Jarosz, this transaction was therefore not at arm's length, and for this reason, he sets it aside.  His

13   decision does not comport with the facts or the law.  Milkyway was a publicly traded company

14   and Mr. Jarosz presents no evidence that the president of both companies breached his fiduciary

15   duties by selling the patents at an unfair price.  Under the Canada Business Corporations Act

16   ("CBCA"), directors and officers owe fiduciary duties to the corporation, requiring them to  "act

17   honestly and in good faith with a view to the best interests of the corporation" and "exercise the

18   care, diligence and skill that a reasonably prudent person would exercise in comparable

19   circumstances." *CBCA*, R.S.C.**,** 1985, c. C-44, s. 122(1).  The Supreme Court of Canada held in

20   *Peoples v. Wise* that under the CBCA statutory duties, "the 'best interests of the corporation'

21   means the maximization of the value of the corporation." *Peoples Department Stores Inc.*

22   *(Trustee of) v. Wise*, [2004] 3 S.C.R. 461 at par. 42.  Further, the CBCA does not invalidate

23   transactions involving the corporation and an interested director or officer, so long as certain

24   procedures are followed.  *See CBCA*, R.S.C.**,** 1985, c. C-44, s. 120 (requiring initial disclosure by

25   interested director or officer and abstention from voting; otherwise, shareholder vote can ratify

26   lack of initial disclosure or other defects).  Mr. Jarosz offers no evidence that the proper

27   procedures for an interested director or officer transaction were not followed here, nor that the

28   directors or officers involved breached their duties to the corporation, which specifically include

1  the goal of maximizing the value of the corporation. *See* Exh. 5, Milkyway Director's Circular,

2  Schedule A—Fairness Opinion.

3  Mr. Jarosz next dismisses the two dollar sale of the '601 patent and its foreign counterparts

4  from SLM to Bevertec because it took place during SLM's bankruptcy proceedings.  Jarosz

5  Report at 46.  But this sale was approved by both the bankruptcy trustee and the Canadian

6  bankruptcy court.  Moreover, under Canada law, a trustee may sell assets only with the approval

7  of an inspector, who is usually a creditor appointed by the creditors with every incentive to

8  maximize the value of asset sales. *Bankruptcy and Insolvency Act*,  R.S.C., 1985, c. B-3, s.

9  30(1)(a), 116.  Thus, there is no reason for Mr. Jarosz to dismiss this sale simply because it was

10  made as part of a bankruptcy proceeding.

11  Regarding the $75,000 or $95,000 sale of the '601 patent and its foreign counterparts from

12  Bevertec to Mount Hamilton, Mr. Jarosz argues that because neither entity was in the UTM

13  market this transaction is not reflective of the patents' value.  Jarosz Report at 46.  But the value of

14  a patent does not depend upon whether the buyer or seller of the patent is providing goods or

15  services in a commercial activity where the patent potentially applies.  Patents are, indeed, bought

16  and sold by both "practicing" and "non-practicing" entities—and Mr. Jarosz presents no evidence

17  ███████████████████████████████████████

18  ███████████████████████████████████

19  ████████████████████████████████

20  ████████████████████  ███████████████

21  ████████████████████████████████████████

22  ████████████████  Exh. 7, IMS Sciences Patent Sales Summary.

23  Further, the sale from Bevertec to Mount Hamilton has particular relevance to the

24  reasonable royalty analysis because the purchaser was the current owner of the patent-in-suit.  *See*

25  *Endress Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 892 F. Supp. 1123, 1131-32 (S.D. Ind.

26  1995), *aff'd sub nom. Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040

27  (Fed. Cir. 1997) ("Where, as here, the current patent owner purchased the patent, the value of the

28  consideration given in exchange for the patent may be relevant to the determination of a

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

1  reasonable royalty because it may bear on the amount that might have been accepted by a prudent

2  patentee who was engaging in a hypothetical licensing negotiation.")

3      Mr. Jarosz's conclusory arguments that actual sales of the '601 patent and its foreign

4  counterparts have no bearing on the value of a royalty for the '601 patent is neither logically sound

5  nor economically viable.  He offers no reasons supporting his conclusions that are rooted in fact or

6  law, as he must.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either

7  *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

8  connected to existing data only by the *ipse dixit* of the expert"); *Lucent,* 580 F.3d at 1329 (jurors

9  cannot rely on "superficial testimony" with "no analysis").

10      With a similar absence of "sound economic and factual predicates,"  Mr. Jarosz discounts

11 the non-consummated transactions relating to the '601 patent—all 36 of them.  *LaserDynamics,*

12 694 F.3d at 67.  His reason?  Because they did not result in an actual sale, they are not relevant

13 ███████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████

17 ████████████████  ██████████████████████████████

18   █████████████████████████████████████████████████████

19 ███████████████████████████████████████████████

20 ██████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ███████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ███

27      Mr. Jarosz's analysis regarding non-consummated transactions—like his analysis

28 regarding consummated transactions—is untethered to the facts of this case.  But, to be

admissible, it must be. *Uniloc*, 632 F.3d at 1315 (citing *Daubert*, 509 U.S. at 589). And while

damages analysis "invariably involves hypothetical reconstruction of a 'but for' marketplace, that

reconstruction must"—unlike in Mr. Jarosz's analysis—"include some footing in economic

principle." *DSU Med. Corp.* 471 F.3d at 1309.

█████████████████████████████████████████████████████████████

████████████████████████████ Because he asserts that there are no design arounds and that

Fortinet has a 20% market share, he also necessarily concludes that the patent is valued at nearly

$100 million. Yet the average market-based valuation for the patent over the course of a dozen

years was $3,625. Mr. Jarosz tries to explain how a long and informative real-world transaction

history involving sophisticated buyers and sellers should be set aside in place of an artificial

damages theory that values the patent at roughly 25,000 times its market value. His effort falls

flat. The court must make sure that an expert "employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Mr.

Jarosz ignores or discounts critical evidence an economist would rely on in determining the value

of the '601 patent and, correspondingly, the amount of a reasonable royalty. This step in his

analysis renders his conclusions unreliable and they should therefore be excluded. "[A]ny step

that renders the analysis unreliable…renders the expert's testimony inadmissible. This is true

whether the step completely changes a reliable methodology or merely misapplies that

methodology." Fed. R. Evid. 702(c), (d).

### D. Mr. Jarosz Chooses the Wrong Date for the Hypothetical Negotiation, Does Not Justify It, and Fails to Do the Required Claim-by-Claim Analysis

There are three flaws with the date chosen by Mr. Jarosz for the hypothetical negotiation.

**First**, ███████████████████████████████████████████████████

█████████████████████████████████████████████████

████████ There is, accordingly, no basis for him to conclude that any infringing products existed

until 2004. The date of first infringement, however, must be supported by evidence. It must be

"tied to the relevant facts and circumstances of the particular case at issue and the hypothetical

negotiations that would have taken place in light of those facts and circumstances at the relevant

time." *Uniloc* 632 F.3d at 1317-18; *see also Norian Corp. v. Stryker Corp.*, 252 F. Supp. 2d 945, 961 (N.D. Cal. 2002) aff'd in part, rev'd on other grounds in part and remanded, 363 F.3d 1321 (Fed. Cir. 2004) (Alsup, J.) (denying plaintiff's request for a new trial on the issue of damages and stating that "[t]he burden of proof was on [the plaintiff] on the damages issue" and plaintiff's expert "based his study on a flawed first date of infringement").

**Second**, even if Mr. Jarosz did present evidence that Fortinet products infringed in 2002, his hypothetical negotiation nevertheless takes place at the wrong point in time. "A reasonable royalty is derived by 'envision[ing] the terms of a licensing agreement reached as the result of a supposed [bargain] between the patentee and the infringer *at the time infringement began*.'" *Minks v. Polaris Indus., Inc.,* 546 F.3d 1364, 1372 (Fed. Cir. 2008) (emphasis added); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) ("We are required to identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation *at the time that infringement began*, not an earlier one.") (emphasis added).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ This date is "incorrect because it ignored alleged infringement that would have taken place *bringing* [Fortinet's products] to market." *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1116 (N.D. Cal. 2011) (Alsup, J.) (granting *Daubert* motion excluding damages testimony because, in part, the expert made an error regarding the date of infringement for purposes of the hypothetical negotiation) (emphasis in original). In *Oracle v. Google*, Oracle's expert timed the hypothetical negotiation "just before the launch" of Google's accused Android source code. *Id.* "Oracle argue[d] that 'the date of the hypothetical negotiation is the date that the infringing product was first offered for sale in the United States.'" *Id.* Mr. Jarosz does the same. Jarosz Report at 31 ("█████████████████████████████████████████████████████████

███████████████████████████████████████████.") But "[t]his is not the law." *Oracle v. Google*, 798 F. Supp. 2d at 1116. "The hypothetical negotiation must be scheduled as of

FORTINET'S NOTICE OF MOTION AND MOTION TO STRIKE
EXPERT REPORT AND EXCLUDE EXPERT TESTIMONY OF JOHN JAROSZ

*the time infringement began.* Yes, in some cases, such as where a foreign defendant expands its sales of an accused product into the United States market, the date the product is first offered for sale in the United States may in fact be the date infringement began. *Where an accused product is developed and tested here in the United States, however, "use " and therefore infringement will almost always begin well before the first sale.* Here, neither [NPS] nor its expert has provided support for any negotiation at the unlikely time of the first sale of [a Fortinet product]. [Mr. Jarosz] was simply resorting to wishful thinking." *Id.* (citing *Uniloc,* 632 F.3d at 1312) (emphasis in original).

This wishful thinking renders Mr. Jarosz entire reasonable royalty analysis inadmissible. *See, e.g., Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003) rev'd on other grounds, 545 U.S. 193, 125 S. Ct. 2372, 162 L. Ed. 2d 160 (2005) ("[t]he first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred. The correct determination of this date is **essential** for properly assessing damages.") (emphasis added).

**Finally**, Mr. Jarosz failed to determine the date of first infringement on a claim-by-claim basis.  This analysis is required:  "[D]etermining the date of first infringement requires a claim-by-claim analysis. The jury may well find that infringement of some patent claims began at earlier dates while infringement of other patent claims began at later dates. These variations must be taken into account." *Oracle v. Google*, 798 F. Supp. 2d at 1116.  Indeed, NPS's failure to engage in a claim-by claim analysis relating to the date of first infringement rendered it off by an **entire decade** for claims 43 and 57, which did not issue until May of 2012.

The burden was on Mr. Jarosz to choose the correct date for the hypothetical negotiation, to present evidence justifying it, and to employ a claim-by-claim analysis.  He did none of these things.  His testimony relating to a reasonable royalty is therefore unreliable and should be excluded.

1    **V.**       **CONCLUSION**

2           For the foregoing reasons, Fortinet respectfully requests that this Court preclude Mr. Jarosz

3    from testifying at trial.

4    DATED:  August 22, 2013                           Respectfully submitted,

5

6                                                      */s/ John M. Neukom*
                                                       John M. Neukom (SBN 275887)
7                                                      Andrew M. Holmes (SBN 260475)
                                                       QUINN EMANUEL URQUHART &
8                                                      SULLIVAN, LLP
                                                       50 California Street, 22nd Floor
9                                                      San Francisco, California 94111
                                                       Tel: 415-875-6600
10                                                     Fax: 415-875-6700
                                                       johnneukom@quinnemanuel.com
11                                                     drewholmes@quinnemanuel.com

12                                                     *Attorneys for Defendant FORTINET, INC.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28