# EXHIBIT 20
## Redacted-Public Version

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

NETWORK PROTECTION SCIENCES,
LLC,

       Plaintiff,

       vs.           Case No. 3:12-CV-01106-WHA

FORTINET, INC.,

       Defendant.
_____/

30(b)(6) AND INDIVIDUAL

DEPOSITION OF TODD NELSON

Wednesday, June 26, 2013

REPORTED BY:

HOLLY MOOSE, CSR NO. 6438
RPR-RMR-RDR-CRR-CCRR-CLR

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        GIBBONS P.C.
          BY:  MICHAEL CUKOR, ESQ.
 5        One Pennsylvania Plaza, 37th Floor
          New York, New York 10119
 6        (212)613-2013
          mcukor@gibbonslaw.com
 7

 8   FOR THE DEFENDANT:

 9        QUINN, EMANUEL, URQUHART & SULLIVAN
          BY:  WILLIAM COOPER, ESQ.
10        50 California Street, 22nd Floor
          San Francisco, CA  94111
11        (415)986-5700
          willcooper@quinnemanuel.com
12

13   ALSO PRESENT:  Gary Brewer, Videographer

14
     TAKEN AT:
15
          QUINN, EMANUEL, URQUHART & SULLIVAN
16        50 California Street, 22nd Floor
          San Francisco, CA  94111
17        (415)986-5700

18

19                      ---o0o---

20

21

22

23

24

25
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 3

1                       I N D E X

2

3    DEPOSITION OF TODD NELSON

4

5    EXAMINATION BY:                              PAGE

6        MR. CUKOR                                  7
         AFTERNOON SESSION                        108

7

8    PLAINTIFF'S EXHIBITS

9    Exhibit 168    Notice Of First Rule 30(b)(6)
                    Deposition To Defendant
10                  Fortinet, Inc., 7 pages          199

11   Exhibit 169    Notice Of Second Rule
                    30(b)(6) Deposition To
12                  Defendant Fortinet, Inc.,
                    6 pages                          200
13
     Exhibit 170    Fortinet, Inc.'s Responses
14                  And Objections To Plaintiff
                    Network Protection Sciences,
15                  LLC's Third Set Of
                    Interrogatories, 11 pages        208
16
     Exhibit 171    Final Settlement Agreement,
17                  FORT-NPS 149316-63,
                    48 pages                         246
18
     Exhibit 172    Assignment Agreement,
19                  FORT-NPS 149971-85,
                    15 pages                         267
20
     Exhibit 173    Patent Assignment Abstract
21                  Of Title, NPS0050942-51 and
                    53-58, 16 pages                  267
22
     Exhibit 174    Declaration Of Todd Nelson
23                  In Support Of Defendants'
                    Motion To Transfer Venue
24                  To The Northern District Of
                    California, 2 pages              276
25   ///

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 4

```
 1   PLAINTIFF'S EXHIBITS CONTINUED              PAGE

 2   Exhibit 175    Supplemental Declaration Of
                    Todd Nelson In Support Of
 3                  Defendants' Motion To
                    Transfer Venue To The
 4                  Northern District Of
                    California, 2 pages              284
 5

 6                       ---o0o---

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 5

1            BE IT REMEMBERED that, pursuant to Notice

2    and on Wednesday, June 26, 2013, commencing at the

3    hour of 10:06 a.m., before me, HOLLY MOOSE, CSR No.

4    6438, a Certified Shorthand Reporter in the State of

5    California, there personally appeared

6

7                      TODD NELSON,

8

9    called as a witness by the Plaintiff, who, having

10   been first duly sworn, was examined and testified as

11   hereinafter set forth:

12

13

14

15                      ---o0o---

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 6

1    June 26, 2013                        10:06 A.M.

2                    P R O C E E D I N G S

3                        ---o0o---

4          THE VIDEOGRAPHER:  Good morning.  We are

5    going on the record.

6          My name is Gary Brewer, certified legal

7    specialist, in association with the court reporter,

8    Holly Moose.  I am the videographer on June 26th,

9    2013, for the recording of the deposition of

10   Todd Nelson, being taken at 50 California Street,

11   San Francisco, California, at the time of

12   10:06 a.m., in the matter of Network Protection

13   Sciences, LLC versus Fortinet, Inc.

14         Will counsel please identify themselves for

15   the record, beginning with the plaintiff's counsel.

16         MR. CUKOR:  I am Michael Cukor, from

17   Gibbons PC, for the plaintiff, Network Protection

18   Sciences.

19         MR. COOPER:  Will Cooper, with Quinn

20   Emanuel, representing the defendant, Fortinet.

21         THE VIDEOGRAPHER:  Will the reporter please

22   identify herself and swear in the witness.

23         (Witness sworn.)

24         THE VIDEOGRAPHER:  Please begin.

25   ///

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 7

1                    TODD NELSON,

2    having been first duly sworn, testified as follows:

3                 EXAMINATION BY MR. CUKOR

4           MR. CUKOR:  Q.  Good morning.

5       A.   Good morning.

6       Q.   Please state your name for the record.

7       A.   Todd Nelson.

8       Q.   And what is your address?

9       A.   Home or work?

10      Q.   Home, please.

11      A.   ███████████████████████████

12   ████████████████

13      Q.   And how long have you lived there?

14      A.   About ten years or 11 years, 12 years.

15   Something like that.

16      Q.   And are you currently employed?

17      A.   Yes.

18      Q.   Who are you employed by?

19      A.   Fortinet, Inc.

20      Q.   Just Fortinet, Inc.?

21      A.   Yes.

22      Q.   Okay.  Does Fortinet, Inc. have

23   subsidiaries?

24      A.   Yes.

25      Q.   But you are only employed by Fortinet,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 8

1    Inc., right?

2         A.   Correct.

3         Q.   And how long have you been employed by

4    Fortinet, Inc.?

5         A.   Eight years.

6         Q.   What subsidiaries does Fortinet, Inc. have?

7         A.   The -- I'm not sure of the complete list.

8    I think it's a relatively long list.  I could list a

9    few.

10        Q.   But you're not sure?

11        A.   Correct.

12        Q.   Why does it have so many subsidiaries?

13        A.   I don't understand the question.

14        Q.   What part?  Why does Fortinet, Inc. have so

15   many subsidiaries?

16        A.   I -- I -- you know, I don't know the answer

17   to that question.

18        Q.   Okay.  And in what capacity are you

19   employed?

20        A.   I am -- my title is VP legal.  Fairly

21   generically.

22        Q.   And how long has that been your title?

23        A.   Since the beginning, though I had a longer

24   title in the beginning.

25        Q.   What was your longer title?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 9

1      A.   I was also general counsel, and I believe I

2  was corporate secretary as well.

3      Q.   And are you still general counsel?

4      A.   No.

5      Q.   What did you do before you were employed by

6  Fortinet?

7      A.   I was a lawyer at a law firm.

8      Q.   Was that Wilson Sonsini?

9      A.   Yes.

10     Q.   And how long were you with Wilson Sonsini?

11     A.   Since the time I graduated from law school

12  in '97, with a short leave of absence in '98-'99

13  time frame.

14     Q.   And what, generally, did you do at Wilson

15  Sonsini?

16     A.   I -- it moved around during the time that I

17  was there.  I was in different departments.

18     Q.   What departments?

19     A.   I started out -- when I first started,

20  working in the litigation department and splitting

21  my time between intellectual property litigation,

22  commercial litigation and some securities

23  litigation.

24          After I got back from my LLM studies, I

25  started in a corporate group.  And I was there for a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 10

1    number of years, until the -- sort of the dot-com

2    burst -- bubble burst, whatever you -- I've

3    forgotten the exact timing of that.  Maybe around

4    2000, 2001.

5           Then I began to split my time back with the

6    litigation department.  The IP litigation department

7    specifically.

8           And then at some point, I don't recall the

9    exact date, I shifted back to the IP litigation

10   department full-time.

11       Q.   You completed your LLM at Yale?

12       A.   Yes.

13       Q.   And what was that in?

14       A.   There's no specific topic.  At Yale you --

15   you essentially write your own proposal, write your

16   own -- you know, propose your own thesis, create

17   your course load.

18       Q.   What was your thesis?

19       A.   It's a -- I actually don't call it a

20   thesis.  You call it -- that was back to Ph.D. time.

21   It's more of a -- sort of a graduate paper, but

22   similar in -- to a thesis.

23           It was -- it was a paper on Internet

24   value -- value -- company valuations during the

25   Internet boom and the -- questioning the valuation

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 11

1   methodologies that were -- the unique new method --

2   valuation methodologies that were being employed

3   during the run-up, during the dot-com boom.

4        Q.   Did it deal with valuation of intellectual

5   property?

6        A.   Not directly, no.

7        Q.   Do you have a Ph.D.?

8        A.   No.

9        Q.   Did you study for one?

10       A.   I -- I started a -- in a Ph.D. program at

11  University of Chicago and then fairly quickly took a

12  leave of absence -- you know, began to take leave of

13  absences.

14            We had -- my wife was in school, and we had

15  run out of money.  And I began consulting as an

16  engineer and took a series of leave of absences for

17  a number of years and didn't end up completing the

18  Ph.D.

19       Q.   What program was it in?

20       A.   Computer science.

21       Q.   Are you trained in your undergraduate

22  studies as a computer science engineer?

23       A.   In undergrad, my major was -- agricultural

24  managerial economics, I think, was the exact title.

25  And I had sort of a minor -- you know, a focus on

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 12

1    mathematics and computer science.

2       Q.   Any more formal training in computer

3    science?

4       A.   I did a master's in computer science at San

5    Jose State -- University of -- no, Cal State

6    University, San Jose.

7       Q.   Any other computer science formal training?

8       A.   No.

9       Q.   Ever do any patent prosecution?

10      A.   I run the patent program.  I set up the

11   patent program and run the patent program at

12   Fortinet, but I don't -- so I'm responsible for the

13   prosecution of patents, but I don't draft patents

14   myself.  I review applications and lead the effort.

15      Q.   Do you have a patent registration number?

16      A.   No.

17      Q.   Did you ever take the Patent Bar?

18      A.   No.

19      Q.   How come?

20      A.   I thought about it a number of times,

21   particularly during the downturn, but I -- I don't

22   think that patent prosecution is -- I never

23   thought -- felt that that was sort of what I wanted

24   to do long-term.

25      Q.   Okay.  I think you mentioned that you set

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 13

1   up the patent program at Fortinet.  Is that

2   accurate?

3        A.   I believe that's what I said.

4        Q.   Is it -- is it true that you set up the

5   patent program at Fortinet?

6        A.   Yeah.  I mean, depending on what you mean

7   by "set up."

8             When I started at Fortinet, there were no

9   issued patents.  And there were a handful, I can't

10  remember how many, of patent applications that had

11  been filed that were scattered around with a number

12  of different prosecution firms.  There was no patent

13  committee.  So it was -- there was the beginnings,

14  but it was a fairly random, unstructured effort.

15            I set up the patent committee and

16  structured the effort and have led that effort since

17  that time.

18       Q.   Has that been successful?

19       A.   It depends on how you would -- what the

20  threshold for determining success would be, I

21  suppose.

22       Q.   Do you consider it successful?

23       A.   I do consider it successful.

24       Q.   And what is the threshold for success

25  you're using?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 14

1      A.    Just my own personal pride in -- in the --

2    the -- the -- the -- you know, sort of my own

3    personal qualitative analysis of the -- of the

4    patents and the -- the interaction with the

5    inventors and the -- the ideas that have come out of

6    the patent program.

7      Q.    I think you said -- or used the expression

8    or term, "patent committee."  Is that the right

9    term?

10     A.    Yeah, yes.

11     Q.    Who was on the patent committee at

12   Fortinet?

13     A.    That moves around.  I believe I'm formally

14   on it, though more as sort of an oversight.  It's --

15   it's really largely driven by engineering.  The head

16   for many years was Andrew "Kreveniek."  I can't

17   possibly spell that last name.

18          There was a change a couple years ago, and

19   the new head, I believe, is -- I believe it's

20   "Diyung" -- I can't recall the pronunciation or the

21   spelling of the last name.

22     Q.    And what is the charge of the patent

23   committee?

24          MR. COOPER:  I'm going to just caution the

25   witness not to reveal any attorney/client-privileged

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 15

1  information.

2          THE WITNESS:  So -- so "charge," you mean

3  charter, just the general set of goals or --

4          MR. CUKOR:  Yes.

5          THE WITNESS:  I mean, the patent committee,

6  it's fairly standard patent committee for -- for

7  companies.  But the -- the charter is to solicit

8  from the engineering staff and the broader audience

9  at Fortinet -- to solicit ideas, invention

10  disclosures, to grade the invention disclosures and

11  to recommend prosecution for -- for invention

12  disclosures that the patent committee believes

13  rises -- rises to the level of something that should

14  be prosecuted.

15          MR. CUKOR:  Q.  Did anyone at Fortinet

16  invent the first transparent application layer

17  firewall?

18      A.   I don't believe that's the case, but I

19  couldn't say.  I don't know the entirety --

20  that's -- I think that's incredibly ambiguous as to

21  what that means and who would have invented it.  I

22  think that's a little like saying did anyone at

23  Fortinet invent the Internet.  I -- you know, who

24  invented the Internet?

25      Q.   Do you know who the first person to invent

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 16

1   the first transparent application layer firewall

2   was?

3       A.   What do you -- what do you mean by trans --

4   actually, what's the term you used again?  I'm

5   sorry.

6       Q.   Transparent application layer firewall.

7       A.   I mean, what do you mean?  I mean, that --

8   we could -- you could ask ten different engineers

9   what a transparent application layer firewall, and

10  you'd probably get ten -- ten different answers.

11  And if you asked a marketing person, you'd probably

12  get another answer.  So I'm not sure exactly what

13  that is, so --

14      Q.   Do you have a definition you can offer for

15  what a transparent application layer firewall is?

16      A.   What do you mean, that I can offer?

17      Q.   Do you -- do you have a understanding in

18  your head of -- well, you know what a firewall is?

19      A.   Personally.  I have my own concept of what

20  a firewall is.

21      Q.   Okay.  And do you have a concept of a

22  transparent firewall?

23      A.   You know, I don't hear and I don't use

24  those terms together, "transparent firewall."  I

25  think of a firewall as a firewall.  I don't think of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 17

1    it in connection with the term "transparent."

2         Q.   So do you have no understanding of what

3    that means?

4         A.   I have a general concept in computer

5    science, when you refer to something as

6    "transparent," what that would mean.

7         Q.   Okay.

8         A.   So I could -- I could add that to a -- you

9    know, a firewall is -- you know, to -- sort of my --

10   you know, my personal concept of what I think a

11   firewall is.

12        Q.   Okay.  So doing that, and do you have a

13   concept of what a firewall that operates at the

14   application layer is?

15        A.   Again, I -- I'm not trying to be -- you

16   know, avoid the question, but what does it mean to

17   be operating at the -- at the application level?

18   Does it not operate at any other level?  Is it

19   something that is capable of operating?  And -- and

20   what functionality would -- would qualify as

21   operating?

22        Q.   Capable of operating at the application

23   layer.

24        A.   So -- so a -- a firewall which included

25   functionality that exists, that operates, that runs

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 18

1    at an application layer?

2        Q.    Correct.

3        A.    And so do you want -- would I have a

4    concept of -- can I put those concepts together in

5    my head?

6        Q.    Yes.

7        A.    Certainly I can.

8        Q.    Okay.  So with those concepts in your head

9    as we've just discussed them, who do you believe is

10   the first person to invent a transparent application

11   layer firewall?

12       A.    I -- I do not know.

13       Q.    Okay.  Do you know if it was Hung Vu?

14       A.    I do not know.  I'm relatively certain it

15   is not.

16       Q.    Why?

17       A.    And I'm pausing just because -- and I think

18   we'll have this during the day.  It's -- you know, I

19   want to -- I just want to carefully -- I don't want

20   to sort of inadvertently disclose privileged

21   material, so it's a little bit tricky.

22             Again, I -- I guess I've been deposed --

23   I'm being deposed as a 30(b)(6) witness and as a --

24   in my individual capacity.  And certainly this

25   isn't, to my memory, the set of -- to be within the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 19

1  set of topics that I prepared for.

2       So -- so on these, I'll take a -- you know,

3  personal topics, I'll take a little more time.  And

4  then stuff where I'm trying to understand the

5  privilege issue, I need to take a little extra time.

6       MR. COOPER:  I'll step in real quick and

7  caution the witness not to reveal any

8  attorney/client-privileged information or

9  communications in response to Mr. Cukor's last

10  question.

11       THE WITNESS:  So when I -- when I said that

12  I don't think that Mr. Vu -- just to be clear who

13  Mr. Vu is, I think you're referring to the named

14  inventor on the '601 patent, which is at issue in

15  this case.

16       Just from personal experience, if you had

17  asked me that question before this case began, I

18  think I would have answered in the same way.  It's

19  as if you're -- you're -- these are concepts that

20  vastly predated his -- his work, as I understand his

21  work.

22       And trying to nail down a person, an

23  individual, who invented that I think would be

24  similar to nailing down the concept of who invented

25  the Internet.  I think -- didn't Al Gore at some

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 20

1  point claim to have invented the Internet?  I --

2  I'm -- I'm -- I don't believe that that is in fact

3  the case.

4       MR. CUKOR:  Q.  So why do you believe that

5  Hung Vu did not invent the first transparent

6  application layer firewall?

7       MR. COOPER:  Caution the witness not to

8  reveal any attorney/client-privileged

9  communications.

10       THE WITNESS:  And at the same time, I think

11  I just answered that question.

12       MR. CUKOR:  Q.  It was a very long answer.

13  Is there a short version of it?

14     A.  I can't identify anyone that -- I don't --

15  I believe I've indicated I -- I can't identify

16  anybody that I believe invented the transparent

17  application level firewall, as I would define it

18  personally.  And I -- Mr. Vu would not be in the set

19  of that -- people that I'm unable to define.

20     Q.  Fair enough.

21       I think in -- in your first answer you said

22  that the concept of transparent application layer

23  firewall vastly predated the work that was done by

24  Mr. Vu.  Is that accurate?

25     A.  I don't know.  I mean, if we can read back

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 21

1    my answer to -- it's hard for me to remember exactly

2    what I said.  So when you ask me if I just said

3    this, I would just as soon hear the record.

4         Q.   I meant is it -- is it an accurate

5    reflection of your understanding of the facts as

6    they are?

7         A.   That I -- that I believe be.

8         Q.   Let me ask it differently.

9              Do you believe that the concept of

10   transparent application firewall was -- vastly

11   predated the work done by Mr. Vu on the '601 patent?

12        A.   The -- again, I told you I think those

13   terms are ambiguous as to what they mean.  Obviously

14   for this case, we have a definition that we're

15   operating under, at least a piecemeal of those

16   terms.

17             If I go back to my background in computer

18   science, I graduated with my -- my bachelor.  So

19   again, it wasn't computer science, but I had quite a

20   bit of background in the '83 time frame, and I began

21   working in 1983.  I believe that, you know, the

22   concept of a -- you know, firewalls existed in

23   the -- I think '70s and '80s.

24             I think transparent network facilities of

25   one sort or another existed quite early on.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 22

1  Application layer code existed very early on.  So --

2  and -- and numerous permutations of those --

3  those -- those concepts existed, you know, early on.

4       So I -- I don't -- again, without trying to

5  get into privileged issues, but -- but looking at

6  the -- the date on the '601 patent, if that's the

7  date you're referring -- you're referring to, I

8  personally believe that the concepts -- that those

9  concepts and the combination of those concepts

10 predated that date.

11    Q.   And what is the date that you're referring

12 to?

13    A.   I -- I don't have the patent in front of

14 me.  I believe -- I really should know this, but

15 the -- the application date that's listed on the

16 face of the patent.  But somewhere around -- what

17 was it -- October '95 perhaps.

18    Q.   I'm sure the patent's been marked already.

19 I'll just give you a copy to look at so you feel

20 more comfortable.

21         MR. COOPER:  Can I have a copy?

22         MR. CUKOR:  Q.  So I've given you a copy of

23 the '601 patent.

24    A.   It was filed -- it says here it was filed

25 November 21, 1994.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 23

1      Q.   That seem accurate to you?

2      A.   Yes.

3      Q.   Okay.

4      A.   I think I was referring to a -- a different

5   patent when I said October '95.

6      Q.   Okay.  So having looked at the patent, do

7   you think that Hung Vu was the first person to

8   invent the transparent application layer firewall?

9           MR. COOPER:  I'm going to caution the

10   witness not to reveal any attorney/client-privileged

11   information.

12          THE WITNESS:  This -- it gets very tricky

13   in trying to differentiate.  I'm trying to answer

14   based on nonprivileged information of my -- sort of

15   my background and my knowledge.  I was an engineer

16   through '97, actually.

17          This patent issued in April of '97, and I

18   graduated from law school -- I was still working as

19   an engineer at the time -- in, what, May or June of

20   '97.  And based on my engineering experience and the

21   date '94, and if what you're asserting is that -- I

22   mean, again, it's a very complex question.

23          You seem to be saying that this patent

24   discloses the concepts that you're talking about,

25   and '94 would be the application date.  So thinking

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 24

1    back to my engineering experience, I -- I am

2    relatively certain that if you had asked me at that

3    time, I would have been more than highly skeptical.

4            MR. CUKOR:  Q.  So do you think, having

5    looked at the date, that the concept of transparent

6    application firewall vastly predates the

7    November 1994 date listed on the patent?

8            MR. COOPER:  I'm going to caution the

9    witness not to reveal any attorney/client-privileged

10   information.

11           THE WITNESS:  Right.  I think I've answered

12   the questions and sort of the line of questions that

13   you're -- that you're approaching sort of

14   repeatedly, and it's just putting me in a difficult

15   position.

16           I don't want to -- to the extent that

17   I've -- since this suit has been instituted in some

18   of the work that I've done, I really -- I believe

19   that work is privileged, and my work and my -- my

20   conclusions would be would be privileged.

21           So I'm not sure that it's -- you know, and

22   I'm not being offered up as an expert in this case,

23   so I'm not sure why you're going down this line of

24   questioning.

25           MR. CUKOR:  Q.  Okay.  But can you answer

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 25

1   that last question?  I'm only asking it again

2   because I think you had the date in your head off by

3   a year the first time you said "vastly predated."

4       A.   But I think I clarified that and said '94

5   and said that I believe it predates that.  And

6   again, when we're talking about vastly, we might --

7   you know, what does "vastly" mean.  So I probably

8   used that term loosely.

9            I think the concepts began for firewall,

10  for transparency and network, for application-level

11  layer code, and then various combinations and

12  permutations of that existed well before

13  November 21st, 1994.

14      Q.   What are those that you can identify?

15           MR. COOPER:  I'm going to object to the

16  line of questioning as calling for

17  attorney/client-privileged information and caution

18  the witness not to reveal any such information.

19           THE WITNESS:  Again, this is not

20  something -- this is not a topic that I prepared for

21  today.  I stopped working as an engineer in 1997.

22  That's been -- it's been a very long time.

23           To the extent that I have knowledge,

24  specific, you know, recollections about systems, I

25  believe that would have been gained in the context

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 26

1   of this litigation.

2           MR. CUKOR:  Q.  So you have no personal

3   knowledge about any transparent application layer

4   firewall that predated Hung Vu's?

5           MR. COOPER:  Same objection; same caution.

6           THE WITNESS:  And I don't think that's what

7   I said.  I think what I said is that given that was

8   a long time ago, '97 -- what is that, about 14 --

9   13, 14 years ago, have I got that right?  Fifteen,

10  16.  However many years that is.

11          Given that I've done a lot of privileged

12  work recently on this specific issue, it's very hard

13  for me to -- to distinguish those systems that --

14  that I was aware of and predated.  I -- it's

15  essentially masked by the recent privileged work

16  that I've done, and so I'm not comfortable answering

17  that question.

18          MR. CUKOR:  Q.  So in the -- in the

19  invalidity contentions that Fortinet has prepared,

20  are there any pieces of prior art that disclose a

21  transparent application layer firewall that vastly

22  predate Hung Vu's invention?

23          MR. COOPER:  I object to the question as

24  calling for attorney/client-privileged information

25  and instruct the witness not to answer the question

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 27

1    to the extent it would reveal such information.

2           THE WITNESS:  I think -- I think the

3    question is inappropriate.  I think you're looking

4    for expert testimony from here -- from me here

5    today.  I'm not -- I'm not prepared to do -- you

6    know, to offer expert testimony.

7           I think you're using vague and ambiguous

8    terms that are being thrown about in this litigation

9    and used in various contexts.  So I'm -- and again,

10   since so much of my work has been -- you know, the

11   recent work on this is privileged, it's very hard

12   for me, other than in general concepts, to put --

13   you know, sort of to go back and sort of put myself

14   back in time that long ago.

15          MR. CUKOR:  Q.  I'm not asking for -- for

16   anything that's privileged.  I'm asking for what's

17   been disclosed already to Network Protection

18   Sciences.  And I'm asking what is the earliest

19   transparent application layer firewall that Fortinet

20   has disclosed to Network Protection Sciences?

21          MR. COOPER:  Same objection; same

22   instruction.

23          THE WITNESS:  I believe -- again, I believe

24   that you're asking material that's appropriate for

25   expert testimony.  And I think that that will be --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 28

1   whether it's the earliest or whether it's the -- you

2   know, the most compelling, I believe we're trying to

3   winnow that list down substantially.

4           But I believe that that -- you know, that

5   that would be reserved for the expert reports which

6   are coming up, and I think it's more appropriately

7   answered in that context.

8           MR. CUKOR:  Q.  I'm not asking for expert

9   testimony.  I'm just -- of the -- of the transparent

10  application layer firewalls that Fortinet has found,

11  which one is the earliest?

12      A.  Well, I --

13          MR. COOPER:  Same objection; same

14  instruction.

15          THE WITNESS:  Right.  I do think you're

16  asking for expert testimony.  I'm not -- you know,

17  I'm not acting as an expert witness in this case.

18  I've been acting as -- as a lawyer in this case.

19  And the work's largely privileged, so I think the

20  line of questioning is inappropriate.  I'm not

21  comfortable answering it.

22          MR. CUKOR:  Q.  Based on a privilege issue?

23      A.  Yes.  And based on a -- a lack of memory,

24  based on -- in trying to -- I think the privileged

25  work has essentially screened and -- the -- the -- I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 29

1  can't differentiate -- sort of put myself in -- back

2  in my 19- -- you know, the pre-case mind-set and go

3  through that exercise.  And it would -- it would

4  take me some time.  And again, I didn't prepare for

5  that -- that mental exercise before.

6      Q.   Let me ask it differently.

7           Are you generally aware of the prior art

8  that has been disclosed by Fortinet to Network

9  Protection Sciences in this case?

10          MR. COOPER:  I'm going to caution the

11  witness not to --

12          THE WITNESS:  I have seen the -- I have

13  seen the various disclosures during the course -- on

14  the prior art during the course of this litigation.

15          MR. CUKOR:  Q.  And have you been

16  personally involved with the collection of that

17  prior art?

18          MR. COOPER:  I object to the line of

19  questioning as calling for

20  attorney/client-privileged information.  Instruct

21  the witness not to reveal any such communications in

22  his answer.

23          THE WITNESS:  So was I involved with the --

24  the collection of prior art.  I would say I -- I was

25  involved.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 30

1           MR. CUKOR:  Q.  Did you supervise it, at

2    least some of it?

3           MR. COOPER:  Same objection; same

4    instruction.

5           THE WITNESS:  I was involved.  I would not

6    categor- -- characterize it as supervising.

7           MR. CUKOR:  Q.  Okay.  So without

8    disclosing any prior art that has not been disclosed

9    to Network Protection Sciences, just the prior art

10   that was disclosed, which is the earliest piece of

11   prior art that discloses a transparent application

12   layer firewall?

13          MR. COOPER:  Same objection; same

14   instruction.

15          THE WITNESS:  The -- the prior art that has

16   been disclosed is voluminous.  I -- again, I haven't

17   prepared for this.  This would be an exercise -- I

18   would have to go through the list.  I would have to

19   look at -- this would be a long -- you know, a

20   significant exercise, including under- -- you know,

21   creating a set of assumptions as to what those terms

22   mean.  So I'm not -- I do not know --

23          MR. CUKOR:  Q.  Can't answer that?

24      A.   -- the answer to that right now.

25      Q.   Okay.  Does Fortinet sell products that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 31

1    include transparent application layer firewalls?

2              MR. COOPER:  Same objection; same

3    instruction.

4              THE WITNESS:  Again, this is not part --

5    this was not part of the materials that I prepared

6    for the 30(b)(6) part of this case, and I think what

7    you're asking for -- actually, I'm not sure what

8    you're asking for.

9              You seem to be asking -- actually -- I'm

10   wearing a number of hats here, so it -- it's a

11   little bit cumbersome to -- to answer that.  But I

12   don't understand what you mean by those terms.  I

13   think they're ambiguous.  And when you group them

14   all together, there is a certain meaning.

15             And I think that you're asking for a set of

16   legal conclusions that will -- and legal reason- --

17   supporting legal reasoning that will come out in

18   expert reports.

19             MR. CUKOR:  Q.  Can you answer the

20   question?

21        A.   I just did answer the question.

22        Q.   Does Fortinet sell transparent application

23   layer firewalls?

24             MR. COOPER:  Same objection; same

25   instructions.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 32

1          THE WITNESS:  I can say that Fortinet sells

2     firewalls.  I can say that Fortinet's firewalls

3     include code that operates at the application layer.

4     Again, I haven't written any of the code, and I'm

5     not a developer at Fortinet.  But I think that those

6     are relatively obvious conclusions.

7          And I forget; the other terms that you were

8     grouping together were ...

9          MR. CUKOR:  Transparency.

10          THE WITNESS:  Transparency.  And that is

11     a -- I believe that's sort of an overused term as

12     to -- as far as what that means and what context.

13     So what does it mean?

14          Are -- are you saying is the entire

15     firewall completely transparent in -- in -- you

16     know, I'm not sure what you mean by that.

17          MR. CUKOR:  Q.  You mentioned that Fortinet

18     sells firewalls that operate at the application

19     layer, correct?

20     A.   No.  I said that Fortinet sells firewalls,

21     and then I said that the firewalls had code that ran

22     at an application layer.

23     Q.   Okay.  And do those firewalls also have the

24     capacity to operate in a transparent mode?

25          MR. COOPER:  Same objection; same

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 33

1   instruction.

2          THE WITNESS:  I know that there is a mode

3   that when you first -- actually, I'm not a user

4   of -- of -- of -- of FortiGate, and so I'm going

5   to -- anecdotally, I believe there is a -- some sort

6   of a transparent mode, I think, where the firewall

7   sort of is sort of off-line, is kind of completely

8   transparent, is sort of doing nothing.

9          But again, I'm not an operator.  I've never

10  used this feature.  It's just sort of anecdotally in

11  my existence at Fortinet.  I -- you know, I've heard

12  this; I've heard that.  Again, I've never used a

13  FortiGate firewall.  I've never operated the

14  interface.  I've never set one up.  And I haven't

15  designed any of the code that runs on the -- any of

16  our firewalls or any of our products.

17         MR. CUKOR:  Q.  Do you have a computer in

18  your office?

19      A.   Right now, I don't.

20      Q.   Because you have a laptop?

21      A.   And it's with -- I think it might be --

22  yeah, it's -- yeah, it's not in my office right now.

23      Q.   When you're in your office, do you have

24  access to the Internet?

25      A.   Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 34

1      Q.   And do you in fact go on the Internet

2   sometimes?

3      A.   Yes.

4      Q.   Do you go on Facebook ever?

5      A.   Yes.

6      Q.   And you do that from work?

7      A.   I have.

8      Q.   And when you do that, do you go through a

9   FortiGate firewall?

10      A.   I don't know the configuration of our -- of

11   our network, frankly.

12      Q.   Do you think your network is protected by a

13   FortiGate firewall?

14      A.   I would -- given who Fortinet is and the

15   fact that Fortinet sells firewalls, I would

16   speculate that, indeed, we likely deploy our own

17   devices.

18      Q.   And is it possible the reason you don't

19   know for sure is because the firewall is transparent

20   to you as a user?

21           MR. COOPER:   I'm going to object to the

22   question as calling for attorney/client-privileged

23   communications and instruct the witness not to

24   answer to the extent it would reveal such

25   communications.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 35

1           MR. CUKOR:  Before you answer ...

2           I think that your repeated instructions are

3    inappropriate and in violation of the Court's rules.

4    I'm going to let you continue to do that, but you

5    act as you see fit and at your own peril.

6           MR. COOPER:  Duly noted.

7           THE WITNESS:  So -- so again, I told you

8    I'm speculating.  I do see various icons and things

9    that show up.  I know my system is running

10   FortiClient, which is a Fortinet product.  So I do

11   see FortiClient.  I don't know about, and I don't

12   inquire into, the underlying network topology.

13          MR. CUKOR:  Q.  Before, you testified you

14   never used a FortiGate product, right?

15     A.   Yes.

16     Q.   But you do think you have traversed a

17   FortiGate product while you used the Internet at

18   work, right?

19     A.   I was speculating.  I don't know.  I don't

20   know the configuration.

21     Q.   But you believe so?

22     A.   I don't have a belief one way or the other.

23     Q.   Really?

24     A.   Correct.

25     Q.   Do you think it's -- it's possible that the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 36

1    network that you use at work is not protected by a

2    FortiGate firewall?

3        A.   I -- I told you, I don't know anything

4    about the configuration of our network.  I -- for

5    a -- my wife comments frequently about what -- how

6    incredibly non-techie I am for a person that has

7    studied computer science as much as I have.  I

8    don't -- I -- you know, I can barely operate my

9    phone.  I'm not a techie person.

10       Q.   This is not really a techie question.  This

11   is more of a policy question.

12            Do you think it would be Fortinet's policy

13   to have their internal network not protected by a

14   FortiGate product?

15       A.   I don't know.  I'm -- that's not --

16   that's the MIS department.  Again, it's not a topic

17   I prepared for today, is what our topology looks

18   like and, you know, the operations of our -- of our

19   network.

20       Q.   Have you reviewed the '601 patent?

21            MR. COOPER:  Same objection; same

22   instruction.

23            THE WITNESS:  I have read the '601 patent.

24            MR. CUKOR:  Q.  How many times?

25            MR. COOPER:  Same objection; same

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 37

1    instruction.

2            THE WITNESS:  I -- I can't say how many

3    times.

4            MR. CUKOR:  Q.  Approximately.

5        A.   I would be just guessing.

6        Q.   Approximately how much time have you spent

7    looking at the '601 patent?

8            MR. COOPER:  Same objection; same

9    instruction.

10            THE WITNESS:  The -- this case has been

11   going on for about three years maybe.  I would just

12   hes- -- I don't know.  I would hesitate to guess

13   obviously because this is the asserted patent.

14   There would be a substantial amount of time

15   aggregated over that -- the pendency of the cases.

16            MR. CUKOR:  Q.  When we were talking before

17   about Fortinet products that are firewalls that have

18   the capacity of operating at the application layer

19   and also have the capacity of operating in a

20   transparent mode, which products specifically were

21   you referring to?

22            MR. COOPER:  Same objection; same

23   instruction.

24            THE WITNESS:  No specific products.  You

25   simply asked if Fortinet -- I mean, I had said they

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 38

1  sold -- we definitely have products that would be

2  considered firewalls.  And we definitely have

3  products that include application layer code.

4        MR. CUKOR:  Q.  Which products are those?

5     A.   Okay.  You would have to get into the

6  definition of what -- what is a firewall.  And --

7  and again, it gets a little bit complicated.  And

8  I'm sure various people would -- would offer

9  different definitions for what that is.

10        But I -- I believe that our FortiGate

11  family of products would be considered a firewall.

12     Q.   And do all of the FortiGate family of

13  products have code that allow it to operate at the

14  application layer?

15        MR. COOPER:  Same objection; same

16  instruction.

17        THE WITNESS:  Again, I said I'm not a

18  developer.  I've never run it.  But anecdotally and

19  just from my experience as an engineer, I would

20  anticipate that there is code running on the

21  FortiGate family of appliances that would run at an

22  application layer.

23        MR. CUKOR:  Q.  Does Fortinet sell any

24  firewall that does not operate -- or is not capable

25  of operating at the application layer?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 39

1      A.   I don't know.  Again, I -- I -- I couldn't

2  even -- we have a large list of products, and I

3  can't even name them.  I haven't worked on any of

4  them.

5      Q.   Does Fortinet sell any routers?

6      A.   It -- it depends on what you mean by a

7  "router."  It depends on what you mean by a

8  "router."

9      Q.   Does Fortinet sell any hardware that is

10  able to route packets but does not have firewall

11  capacity?

12      A.   Are you speaking about current products or

13  historical products?

14      Q.   If there's a distinction, you can make it.

15      A.   Because I don't know the full list of

16  current products.  I prepared for the 30(b)(6)

17  topics on -- which distinctly called out for the

18  accused products, so I sort of focused my

19  investigation on those topics and those products.

20           Again, I'm -- the term "firewall" is

21  relatively undefined and fairly loosely used, but I

22  believe there was a FortiSwitch product at least at

23  some point historically.  I don't know if that would

24  be considered to have firewall capabilities.

25      Q.   What was the FortiSwitch product; do you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 40

1  remember?

2      A.   I've never operated it, but my

3  understanding, it was -- it operated as a switch.

4  And I -- I sort of get that from the naming

5  convention.

6      Q.   Do you know if it could perform packet

7  filtering?

8      A.   I -- no.  Forti- -- you've exhausted my

9  information.  FortiSwitch is the name, and I believe

10  it was a switching product.  That's the extent of my

11  knowledge about that product.

12      Q.   Okay.  Have you ever taken a patent license

13  from a third party on a Fortinet product that

14  included a transparent application layer firewall?

15          MR. COOPER:  I object to this question as

16  calling for attorney/client-privileged

17  communications and instruct the witness not to

18  answer it to the extent it would reveal such

19  communications.

20          MR. CUKOR:  I want you to read my question

21  back on your screen that you have in front of you

22  and see if you maintain your objection.

23          MR. COOPER:  I maintain my objection.

24          MR. CUKOR:  Q.  Are you following your

25  attorney's direction?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 41

```
 1          MR. COOPER:  I did not instruct the witness
 2   not to answer the question.  I instructed the
 3   witness not to answer the question to the extent it
 4   would reveal attorney/client-privileged
 5   communications.  That's all I've done so far today.
 6          THE WITNESS:  So I believe the question was
 7   whether Fortinet had taken a license -- actually, it
 8   was a fairly compound question.  So could you break
 9   it down for me just a little bit.
10          MR. CUKOR:  Ms. Moose, would you read back
11   the question.
12          And if you need further clarification, I
13   will give it to you.
14          (Record read as follows:
15          QUESTION:  Have you ever taken a patent
16      license from a third party on a Fortinet
17      product that included a transparent
18      application layer firewall?)
19          THE WITNESS:  So -- so that's assuming I
20   have -- the question assumes that I -- I know
21   what -- or we know what a transparent application
22   layer firewall is, which I've told you I -- I don't
23   understand the -- you know, I -- I -- I believe that
24   that term would be ambiguous and it would be
25   construed differently by different people.
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 42

1           So if I answer the question, you know, has

2    Fortinet taking -- taken a patent license, we have

3    taken -- we have a select set of patent licenses

4    that have come out of litigation.  But I -- but I --

5    but I don't think that any specific product was

6    licensed.  I would have to sort of think about that

7    and review that, by license.

8           MR. CUKOR:  Q.  So the licenses that

9    Fortinet has taken are not by product, they're just

10   by -- they're for all products?

11          MR. COOPER:  Same objection; same

12   instruction.

13          THE WITNESS:  I believe that patent

14   licenses that we've entered into have been only in

15   connection with litigation.  And I -- and I don't

16   believe they are specific to products.  I would have

17   to review the licenses to be certain.

18          MR. CUKOR:  Q.  So Fortinet has never taken

19   a patent license from a third party when it wasn't

20   sued first?

21          MR. COOPER:  Same instruction.

22          THE WITNESS:  This is within the 30(b)(6)

23   topics, and I did diligently prepare.  I did review

24   a list of the patent licenses that we provided to

25   NPS.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 43

1            Can I -- can you repeat the question back

2     for me again.  I'm trying to remember through --

3     answer the question, sort of wading in my mind

4     through all of the, you know, different licenses

5     that we've gone through and the different

6     litigations and the different contexts, so it's ...

7            (Record read as follows:

8            QUESTION:  So Fortinet has never taken

9         a patent license from a third party when it

10        wasn't sued first?)

11           THE WITNESS:  I believe that may be

12    correct.

13           MR. CUKOR:  Q.  How come?

14     A.   How come what?

15     Q.   How come Fortinet has never taken a license

16    from a third party without being sued first?

17           MR. COOPER:  Same objection; same

18    instruction.

19           THE WITNESS:  I -- I don't think the

20    occasion has arisen where the business case was made

21    that a -- a license was desirable, from a -- from a

22    business perspective.

23           MR. CUKOR:  Q.  What do you mean by

24    "business case"?

25     A.   When you say "take a license," I think

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 44

1    you're referring -- that would be like a purchase.

2    It's a business decision to enter into a license.

3    And I -- you say why haven't we, and I suspect the

4    reason is there hasn't been a -- a business case

5    that -- that -- that compelled that result.

6        Q.   When you are evaluating the business case

7    for taking a license, do you compare the cost of

8    litigation versus the cost of a license?

9             MR. COOPER:  Same objection; same

10   instruction.

11            THE WITNESS:  I think that you're assuming

12   that -- you're assuming that -- let me think.

13            I'm sorry; I'm just not that smart, I

14   guess.  The -- trying to think.

15            So the question was -- can I have that read

16   back again.  I'm sorry.

17            MR. CUKOR:  Ms. Moose, please.

18            (Record read as follows:

19            QUESTION:  When you are evaluating the

20        business case for taking a license, do you

21        compare the cost of litigation versus the

22        cost of a license?)

23            THE WITNESS:  So when I compare the

24   business case for taking license -- you're saying

25   in -- in general?  Is that the question?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 45

```
1              MR. CUKOR:  Yes.

2              THE WITNESS:  You -- so you appear to be

3    assuming that patent license proposals, business

4    proposals, license proposals have been made to

5    Fortinet, and you're asking about our process in

6    evaluating whether to take a license or not, and

7    then you're further adding the question as to

8    whether, in that scenario, we would compare the cost

9    of litigation to the proposed cost of the license?

10             MR. CUKOR:  I realize that you are a very

11   smart man and that you are capable of thinking a lot

12   of ways down the road on my questions.  But I think

13   this is a more simple question --

14             THE WITNESS:  I think all those aspects

15   were in there.

16             MR. CUKOR:  -- than you've made -- let me

17   ask it again and see if you can just answer this

18   question:

19        Q.   You mentioned before that no business case

20   has been made for taking a license outside of

21   litigation.  And that is, I believe, accurate

22   testimony, right?

23        A.   I don't -- I don't think that's accurate.

24   You asked me why haven't we taken a license.  And

25   that's sort of why -- the absence of a -- of an
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 46

1    event, why hasn't an event occurred.  And I'm saying

2    it just hasn't, you know.

3           And so I was speculating that the reason

4    that would cause that event to occur hasn't

5    occurred.  So I'm not -- I wasn't referring to any

6    specific -- you know, you seem to assume that there

7    are specific instances and decisions and stuff.  And

8    I'm just saying it hasn't occurred, that I'm aware

9    of.

10          Again, I'd like to review the -- you know,

11   to be completely accurate, I'd like to review the

12   licenses.  But I believe each one was a -- was --

13   was -- was initiated by a lawsuit.

14      Q.   Well, let me ask you in this case.  In the

15   NPS case, when Fortinet was first sued by NPS and

16   since then, Fortinet has made a decision not to take

17   a license on the patent in suit from NPS, correct?

18          MR. COOPER:  I'm going to object to that

19   question as calling for attorney/client-privileged

20   information and instruct the witness not to answer

21   it to the extent it would reveal such

22   communications.

23          THE WITNESS:  And it seems to me you're

24   asking for communications that would have been had

25   during -- during settlement discussions, so I'm not

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 47

1   sure that that makes sense.  I don't think that --

2   as I -- as I think back, I don't believe that NPS

3   reached out to Fortinet and offered a license.  I

4   believe NPS simply sued Fortinet.

5           MR. CUKOR:  Q.  Well, let me -- let me ask

6   it differently.

7           Fortinet has not taken a license under the

8   '601 patent, correct?

9       A.   We do not have a license, that I'm aware

10  of, to the '601 patent.

11      Q.   And in making the decision not to take a

12  license under the '601 patent, did Fortinet evaluate

13  the cost of the license versus the cost of the

14  litigation?

15          MR. COOPER:  Same objection; same

16  instruction.

17          THE WITNESS:  Again, I would say NPS sued

18  us.  They did not offer a license.  And to the

19  extent that you're asking about our thought process

20  during the course of the litigation, I think it's

21  inappropriate.

22          I also think that the -- you're asking

23  about our thought process during settlement

24  negotiations and what went into the -- sort of our

25  thinking during the settlement negotiations.  I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 48

1    don't think that that's appropriate.

2          MR. CUKOR:  It's okay.  That's my question.

3    If you refuse to answer, that's okay.  I think it's

4    an appropriate question.  I don't think I'm getting

5    at a privileged communication.  But if you feel

6    differently, you have counsel here, and he can

7    direct you.  And you're an attorney.

8          (Cell phone interruption.)

9          THE VIDEOGRAPHER:  I'm sorry.

10         MR. CUKOR:  So let me ask the question

11   again.  And if you feel it's objectionable, you can

12   object or your counsel can object or you both can

13   object.

14       Q.   In the course of determining whether

15   Fortinet would take a license from NPS under the

16   '601 patent, has Fortinet evaluated the cost of the

17   license versus the cost of the litigation?

18         MR. COOPER:  Same objection; same

19   instruction.

20         THE WITNESS:  Again, I think you're asking

21   for the internal thought processes during the course

22   of litigation.  I would -- I would -- and I don't

23   think that's appropriate.

24         I obviously -- I believe I can answer the

25   question as to in the general case, during the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 49

1  course of a litigation, is cost of defense

2  considered when determining whether to resolve a

3  litigation or not.  I believe that would be a

4  reasonable practice, you know, a reasonable

5  consideration to -- factor to include in a

6  consideration.

7       MR. CUKOR:  Q.  And is exposure similarly a

8  reasonable factor to consider?

9       A.   So generically speaking, exposure.  I'm not

10 sure exactly what you mean by -- by "exposure."  I

11 mean, it's --

12      Q.   Potential loss in a lawsuit if a jury finds

13 against you; if a jury finds that the patent that's

14 being asserted is valid and infringed by Fortinet.

15      A.   Speaking in the abstract and assuming a

16 patent that -- a patent had the hallmarks of

17 validity and had -- and -- and there was a -- a

18 compelling infringement case, exposure would appear

19 to be a reasonable factor to include in that

20 consideration.

21      MR. COOPER:  Sorry to interject.

22      Holly, could you tell us how long we've

23 been on the record, please.

24      THE REPORTER:  Do you have an easier way to

25 do that?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 50

1            THE VIDEOGRAPHER:  One hour even.

2            THE REPORTER:  One hour.

3            MR. COOPER:  Thank you.

4            MR. CUKOR:  Q.  If a jury finds that the

5    '601 patent is valid and infringed by Fortinet, is

6    Network Protection Sciences entitled to a reasonable

7    royalty?

8            MR. COOPER:  Same objection; same

9    instruction.

10            THE WITNESS:  I'm -- you're straying off

11    topics that -- that I prepared for and asking for --

12    for legal conclusions that seem, you know,

13    inappropriate in this context.

14            I'm sorry, I just -- I'm struggling with

15    the line of questioning.  It's not what I sort of

16    had prepared for specifically and that I thought I

17    was coming to testify about.

18            Actually, it's been an hour, and it would

19    be -- I could use a bathroom break, please.

20            MR. CUKOR:  Could you answer the question

21    and then we'll take a break.

22            THE WITNESS:  Oh, I thought I did.  I

23    thought I did.  What was -- what was the pending

24    question?  Sorry.

25            MR. CUKOR:  Ms. Moose.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 51

1          (Record read as follows:

2          QUESTION:  If a jury finds that the

3      '601 patent is valid and infringed by

4      Fortinet, is Network Protection Sciences

5      entitled to a reasonable royalty?)

6          THE WITNESS:  Oh, okay.  I think I answered

7   in a nonanswer way.  I think you're asking for legal

8   conclusions and that -- I don't -- that I think are

9   inappropriate line of questioning for -- for me.

10         MR. CUKOR:  Q.  Can you just do the best

11  you can to answer.  If you don't know, you can say,

12  "I don't know."

13     A.   I'm not comfortable answering the question.

14  I'm having difficulty with the line of questioning,

15  parsing between -- it seems like you're spending the

16  bulk of your time trying to either make up the

17  substantive case from an engineering perspective,

18  when I am not an engineer and haven't worked on the

19  products, or trying to figure out sort of the -- the

20  legal thinking and the going on behind the scenes

21  during -- during the course of our defense, which I

22  believe would be privileged.  So I'm struggling with

23  this.

24         I'm not trying to be disingenuous.  I'm

25  just -- I thought there were a set of topics, and I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 52

1    think we've had exactly one question so far that's

2    been directed to one of the topics I prepared for.

3        Q.   Let me maybe --

4        A.   I would like to take a break if I could.

5    So I think the answer to that is, no, I think that

6    question is inappropriate.

7        Q.   So you are -- you don't know or you're

8    refusing to answer?

9        A.   I don't -- I'm unable to extract from my

10   set of opinions and legal opinions, particularly

11   regarding this case, nonprivileged communication

12   that I'm willing to offer, that I'm able to offer

13   up.

14       Q.   So you're taking the privilege?

15       A.   Yes.

16            MR. CUKOR:  Okay.  Sure.  Let's take a

17   break.

18            THE VIDEOGRAPHER:  Off the record.  The

19   time is 11:09 a.m.

20            (Recess taken.)

21            THE VIDEOGRAPHER:  We are back on the

22   record.  The time is 11:21 a.m.

23            MR. CUKOR:  Q.  Is it the case that

24   Fortinet employees have invented all of the

25   technology that's used in the FortiGate products?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 53

1    A.   No.

2    Q.   Is it the case that there are patents

3  invented by people that are not Fortinet employees

4  that are still in force today that cover the

5  FortiGate products?

6         MR. COOPER:  Caution the witness not to

7  reveal any attorney/client-privileged

8  communications.

9         THE WITNESS:  So you're asking if there are

10 patents that exist that are valid and enforceable

11 and being enforced today that cover Fortinet

12 products?

13        MR. CUKOR:  No.  Let me ask it again.

14        THE WITNESS:  Oh, okay.

15        MR. CUKOR:  Q.  Are there patents that

16 are -- exist that are valid that cover the Fortinet

17 products?

18        MR. COOPER:  Same caution.

19        THE WITNESS:  That's -- so you did change

20 the question.  So you're saying internal or external

21 patents by people inside of Fortinet or outside, any

22 patent in existence?

23        MR. CUKOR:  No, you're right.  Let me ask

24 it again.  Thank you.

25    Q.   I'm asking are there any live patents that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 54

1   are not assigned to Fortinet that cover the

2   FortiGate products?

3           MR. COOPER:  Object to the question as

4   calling for attorney/client-privileged

5   communications.  Instruct the witness not to answer

6   to the extent it would reveal such communications.

7           THE WITNESS:  To the extent that I would

8   know -- you know, the entirety of the basis for my

9   answer to that question would be all based on

10  privileged communications.  So I don't think I can

11  answer that question.

12          MR. CUKOR:  Q.  Well, some patents are

13  licensed for the Fortinet products, right?

14      A.   I don't believe that's the case.

15      Q.   None of the licenses produced in this

16  litigation cover the FortiGate products?

17      A.   I believe that's correct.

18      Q.   Okay.  So to the best of your knowledge,

19  the FortiGate products are not licensed under any

20  third party's patents?

21      A.   We have taken licenses in a number of

22  discrete situations where there has been litigation.

23  I'm not aware of any case -- any situation -- let's

24  say.  And again, the time frame is a little unclear

25  'cause patents have changed over time -- patents

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 55

1   that we've licensed have changed over time and, I

2   believe, have -- have expired as well.

3          But I don't think there was any -- you

4   know, I think each of the licenses that we've taken

5   has been in settlement of a litigation, without an

6   admission of validity or infringement.

7      Q.   But the license still covers FortiGate

8   products, right?

9          MR. COOPER:  Same objection; same

10  instruction.

11         THE WITNESS:  So when you say "covers

12  FortiGate products," I think we should -- I mean, we

13  should look at the licenses covers, as in regardless

14  of whether the patents, you know, read on the

15  products.  If they did and if they were valid, would

16  the Fortinet products be licensed.  And I -- that

17  would be the case.

18         MR. CUKOR:  Q.  I understand the

19  distinction that you're making now.

20         So some Fortinet -- FortiGate products may

21  be licensed, but you are saying that as far as you

22  know, no FortiGate products require a license from

23  any third party?

24     A.   Not that I'm aware of.

25     Q.   Okay.  So was my statement accurate?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 56

1     A.   Which statement?

2     Q.   Let me ask it again.

3          As far as you are aware of -- let me start

4     again.

5          As far as you know, no FortiGate products

6     require a patent license from any third party?

7     A.   Again, the entire -- the basis -- you've

8     now asked a much, much broader question, which would

9     encompass -- to the extent that I've looked into

10    that issue, the entirety of my knowledge base on

11    that issue would be -- would be privileged

12    communications, and -- and so I don't think that's

13    an appropriate question.  I think it calls for a --

14    an answer based on privilege.

15    Q.   Do the FortiGate products require a license

16    under the '601 patent?

17         MR. COOPER:  Same objection.

18         THE WITNESS:  This is --

19         MR. COOPER:  Same instruction.

20         THE WITNESS:  Again, this is -- my

21    knowledge of the '601 patent began with this

22    litigation.  And the entirety of my knowledge base

23    about this patent all is in the con- -- is all

24    privileged and in the context of -- of defending

25    this litigation.  So I don't think there's a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 57

1      nonprivileged answer to that question.

2             MR. CUKOR:  Fair enough.

3      Q.    Does Fortinet do any -- start again.

4             Does Fortinet make any attempts to

5      determine if its own products are covered by any

6      third-party patents before it launches those

7      products?

8             MR. COOPER:  Same objection; same

9      instruction.

10            THE WITNESS:  The -- I'm struggling with

11     the privilege issue on that.  But I think the

12     general question you're just asking is do we do a --

13     for each new feature that we add or each new product

14     that we add, do we do a patent search -- do we do a

15     patent search in advance of -- of developing a

16     feature.

17            MR. CUKOR:  You can answer that question.

18     My question was broader.

19            THE WITNESS:  The -- the answer -- that's

20     the way I interpreted the question.  And the answer

21     to that is no, not to my knowledge.

22            MR. CUKOR:  Q.  Does Fortinet do any

23     clearance work to determine if any third-party

24     patent licenses are required before launching any

25     product?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 58

 1          MR. COOPER:  Same objection; same
 2   instruction.
 3          THE WITNESS:  I think on the broader
 4   question, my -- my knowledge base, again, would be
 5   completely -- would be based on my interactions with
 6   outside counsel in designing our -- you know, doing
 7   risk -- risk analysis.  And I think that the -- the
 8   basis for the question would be privileged.
 9          MR. CUKOR:  So I'll tell you on the record
10   that I think that at trial, I would like to assert
11   that Fortinet does no clearance work at all before
12   launching any new products.  And if you have any
13   testimony to the contrary, I'd like you to give that
14   to me now.  If you're telling me it's privileged,
15   then that's your choice.
16          MR. COOPER:  Same objection; same
17   instruction.
18          THE WITNESS:  I'll stand by my prior
19   answer.
20          MR. CUKOR:  Okay.
21      Q.  Before the break, we were talking about a
22   reasonable royalty.  And I think that I asked the
23   question in a way that -- that you thought I was
24   getting at something other than what I was trying to
25   get at.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 59

1          What I want to know is, is there anything
2   particular to the plaintiff in this case that would
3   not entitle them to a reasonable royalty if they
4   held a patent that was valid and infringed?
5          MR. COOPER:  Same objection; same
6   instruction.
7          THE WITNESS:  And during the break, I did
8   use the rest room, and I did have a moment to
9   reflect about the privilege issues which I've been
10  struggling with 'cause I do want to be forthcoming.
11  And certainly I diligently prepared on the 30(b)(6)
12  topics that I thought would be the focus of this
13  deposition.
14          I think that when you're asking about that
15  question, you're asking -- the entirety of the basis
16  of any knowledge I would have would be based on
17  privileged communication and privileged work during
18  the pendency of this case.  And so I think the
19  question is -- is inappropriate.
20          I think it's counter to the judge's
21  standing orders in this -- in this case, and I think
22  it seeks a legal conclusion; it seeks sort of the
23  strategic considerations and the legal thinking
24  behind our defensive actions.
25          And I -- to the extent there is an answer,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 60

1    I believe it's privileged, and I don't think I need

2    to answer those.

3              MR. CUKOR:  Q.  Okay.  So I'm asking you in

4    your personal capacity, do you think that the fact

5    that NPS is a nonpracticing entity makes a

6    difference in terms of the damages they're entitled

7    to receive in a patent litigation?

8              MR. COOPER:  Same objection; same

9    instruction.

10             THE WITNESS:  I have no knowledge of NPS or

11   this patent in my personal capacity.  It's all been

12   in my professional capacity in defending this

13   litigation.

14             MR. CUKOR:  Q.  Okay.  So generally, not

15   with regard to NPS, in your personal capacity, do

16   you believe that a nonpracticing entity that owns a

17   patent is entitled to the -- a diminished damages

18   award if it's found to be valid and infringed?

19        A.   So you're asking if I have an opinion about

20   nonpracticing entities and whether damage -- damages

21   should be adjusted based on the fact that they're a

22   not practicing entity?

23        Q.   Yes.

24        A.   I -- I -- I don't have an opinion on that.

25        Q.   Okay.  Do you know who Steve Bellovin is?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 61

1      A.    Yes.

2      Q.    Who is he?

3      A.    I believe he is the expert that NPS

4   retained in this case, or an expert that NPS

5   retained in this case.

6      Q.    Why do you believe that he's been retained

7   by NPS?

8            MR. COOPER:  Same objection; same

9   instruction.

10           THE WITNESS:  I've seen an expert report

11   that he provided in connection with this case.

12           MR. CUKOR:  Q.  Had you heard his name

13   before?

14      A.    Before this case?

15      Q.    Mm-hm.

16      A.    Yes.

17      Q.    In what context?

18      A.    A litigation context.

19      Q.    What context was that?  Which litigation?

20      A.    The -- the Trend Micro litigation.

21      Q.    And was Professor Bellovin an expert in

22   that case?

23      A.    No.  And I don't know that he's a

24   professor.  I don't know his background.

25      Q.    Okay.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 62

1      A.   I don't -- I'm not saying that's not true.

2  I just -- you make assumptions into questions that

3  I -- I don't know the -- that I don't know.

4      Q.   I think it's legitimate for you to point

5  that out.  That's fine.

6           So what role did Steven Bellovin play in

7  the Trend Micro case?

8      A.   None.

9      Q.   So how did he -- how did his name come to

10  your attention?

11           MR. COOPER:  Caution the witness not to

12  reveal any attorney/client-privileged information.

13           THE WITNESS:  In the Trend litigation, a --

14  a book drafted by -- was -- there was a book

15  draft- -- that was written by Cheswick and Bellovin,

16  "Repelling the Wily Hacker," I believe, something

17  like that.  Something with "Repelling the Wily

18  Hacker."  And I -- I saw that reference.

19           MR. CUKOR:  Q.  Was it in connection with

20  prior art?

21      A.   Yes.

22      Q.   And was it in connection with prior art

23  that Fortinet used in that litigation?

24           MR. COOPER:  Same caution.

25           THE WITNESS:  I believe that prior art,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 63

1   that book, was relevant in that litigation.

2          MR. CUKOR:  Q.  Do you know anything else

3   about Steven Bellovin, besides authoring that book?

4      A.   I -- I saw the expert report he presumably

5   drafted in this case.

6      Q.   Do you know anything else?

7          MR. COOPER:  Same objection; same

8   instruction.

9          THE WITNESS:  Nothing that -- that wouldn't

10  be a privilege -- that I wouldn't have received in

11  the context of a privileged communication.

12         MR. CUKOR:  Q.  So you weren't aware of him

13  in your personal capacity before the Trend Micro

14  litigation?

15     A.   No, I was not.

16     Q.   Okay.  And do you know Bill Cheswick?

17     A.   Yes.

18     Q.   Have you met him?

19     A.   Yes.

20     Q.   In what context?

21     A.   In the context of this litigation.

22     Q.   When did you meet him?

23         MR. COOPER:  Same objection; same

24  instruction.

25         THE WITNESS:  It was a number of months

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 64

1   ago.

2            MR. CUKOR:  Q.  How many times did you meet

3   with him?

4            MR. COOPER:  Same objection; same

5   instruction.

6            THE WITNESS:  I believe once.

7            MR. CUKOR:  Q.  Who else was present?

8            MR. COOPER:  Same instruction.

9            THE WITNESS:  I believe two Quinn Emanuel

10   attorneys.

11            MR. CUKOR:  Q.  Where was this meeting?

12            MR. COOPER:  Same instruction --

13            THE WITNESS:  I --

14            MR. COOPER:  Same --

15            THE WITNESS:  In his offices.

16            Sorry.

17            MR. COOPER:  It's okay.

18            MR. CUKOR:  Q.  In these offices?

19   A.   Yes.

20   Q.   In Quinn Emanuel's offices?

21   A.   Yes.

22   Q.   Has Fortinet retained Bill Cheswick?

23            MR. COOPER:  Same instruction.

24            THE WITNESS:  I believe so.

25            MR. CUKOR:  Q.  In his capacity as a fact

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 65

1    witness or an expert witness?

2        A.   I'm not a hundred percent sure, but I

3    believe as an expert witness.

4        Q.   Did you review the deposition of Steven

5    Bellovin?

6            MR. COOPER:  Same objection; same

7    instruction.

8            THE WITNESS:  No.

9            MR. CUKOR:  Q.  Has Fortinet ever purchased

10   any patents?

11       A.   Yes.

12       Q.   Have any of those purchases been outside

13   the context a litigation?

14       A.   Yes.

15       Q.   Has Fortinet ever litigated any of the

16   patents it's purchased?

17       A.   And when you say "patents," do you mean

18   issued patents?

19       Q.   Has Fortinet litigated any of the

20   intellectual property that it has purchased from a

21   third party?

22       A.   Yes.

23       Q.   In what context?

24       A.   There were -- there was a suit against a

25   competitor, Palo Alto Networks, which included a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 66

1    number of claims.  But I believe it included patents

2    that were not purchased but resulted from

3    applications that had been purchased -- you know,

4    parent applications, at least applications -- or

5    related to applications that had been purchased

6    earlier.

7         Q.    Who were those applications purchased from?

8         A.    CoSine Communications.

9         Q.    Are they a company that's still in

10   business?

11        A.    I'm not sure.

12        Q.    Were they a firewall competitor?

13        A.    No.

14        Q.    Did Fortinet buy those patent applications

15   from CoSine Communications for the specific purpose

16   of litigating them against Palo Alto Networks?

17             MR. COOPER:  Same objection; same

18   instruction.

19             THE WITNESS:  No.

20             MR. CUKOR:  Q.  Why did Fortinet purchase

21   those patent applications from CoSine

22   Communications?

23             MR. COOPER:  Same objection; same

24   instruction.

25             THE WITNESS:  It was a -- a -- there was a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 67

1   compelling business case based on price and

2   valuation such that it made sense.

3          MR. CUKOR:  Q.  What was the compelling

4   business case?

5          MR. COOPER:  Same instruction.

6          THE WITNESS:  The -- it -- it was -- it was

7   worth doing.  I mean, it was a -- why do you make

8   any business decision?  The price was -- was, you

9   know, reasonable relative to the perceived value.

10         MR. CUKOR:  Q.  How did Fortinet expect to

11  actualize the perceived value?

12         MR. COOPER:  Same instruction.

13         THE WITNESS:  Is the question at the time

14  of the purchase?

15         MR. CUKOR:  Correct.

16         THE WITNESS:  And the question is how did

17  Fortinet expect to actualize the perceived value?

18         How did we expect to actualize ... I think

19  you're asking what was the perceived value.

20         MR. CUKOR:  (Nonverbal response.)

21         THE WITNESS:  No?  What does "actualized"

22  mean, then?  I mean, the -- a decision was made to

23  purchase them because there was perceived value.  So

24  do you want to know what that perceived value is?

25  And if not, if there's -- if "actualized" means

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 68

1    something different, I'd love -- an explanation

2    would be helpful.

3              MR. CUKOR:  Q.  What was the return on

4    investment that Fortinet expected for purchasing the

5    patent applications from CoSine Communications?

6              MR. COOPER:  Same instruction.

7              THE WITNESS:  There was no specific return

8    on investment.  The -- the patents -- they're just

9    simply holding the patents.

10             MR. CUKOR:  Q.  So how is that a compelling

11   business case?

12        A.   It's a -- Fortinet generally holds its

13   patents -- again, I struggle with the privilege

14   issue, but the -- generally holds its patents

15   defensively.  So there is a perceived value from a

16   defensive standpoint.

17        Q.   When you say "defensive," do you mean

18   potentially for litigation?

19             MR. COOPER:  Same objection; same

20   instruction.

21             THE WITNESS:  It -- that -- that would be a

22   portion of it.  But again, these were just

23   applications at the time.  I think the larger value

24   is just Fortinet was a private company and was

25   building assets to build the overall value of the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 69

1    business.

2           MR. CUKOR:  Q.  So the patent applications

3    that Fortinet purchased from CoSine Communications

4    were for inventions that were not invented by

5    Fortinet, correct?

6           MR. COOPER:  Same objection; same

7    instruction.

8           THE WITNESS:  The patent applications that

9    were purchased were filed by CoSine Communications,

10   and the named inventors were, I believe, CoSine

11   Communications employees or contractors.

12          MR. CUKOR:  Q.  And Fortinet subsequently

13   sued Palo Alto Networks on patents that came about

14   as a result of those patent applications, correct?

15     A.    The -- the suit is in a -- I believe that

16   it's all a public filing.  There were a number of

17   allegations and competitive issues that were

18   asserted between the two companies.

19     Q.    Did Fortinet allege in its litigation with

20   Palo Alto Networks that Palo Alto Networks infringed

21   the patents that arose out of the patent

22   applications that were purchased by Fortinet from

23   CoSine Communications?

24     A.    I believe there were allegations in there.

25   Again, I don't have that -- that wasn't part of my

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 70

1    prep for today, is to review the -- the -- the prior

2    litigation.

3          But in addition to the trade secrets and

4    the misappropriation and the various other unfair

5    comp claims that were asserted against Palo Alto

6    Networks, there were patents, and I believe those

7    included patents that would have, at least in part,

8    you know, had -- had parentage back -- I believe it

9    was a number of years later, so they would have

10   stemmed from that -- that small kernel of

11   applications that came from CoSine.

12       Q.   Was there anything unethical about that?

13       A.   Unethical about what?

14       Q.   About suing Palo Alto Networks on patents

15   that weren't invented by Fortinet.

16       A.   I'm -- I'm not sure what you mean by that.

17       Q.   Was there anything unethical about it?

18       A.   Are you asking if there -- if we -- if

19   anything in the Palo Alto Networks case was

20   unethical in the assertions?

21       Q.   No.  Was it unethical for Fortinet to sue

22   Palo Alto Networks on patents that it didn't invent,

23   that it just purchased?

24       A.   I don't -- I don't believe so.

25       Q.   Have you ever met the principals of Network

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 71

1    Protection Sciences?

2        A.    I believe I have.

3        Q.    You've met Wilford Lam?

4        A.    In -- I believe so.  I can't recall the

5    names of people who attended -- there were some

6    settlement conferences.  I can't recall the names of

7    people that -- that attended for Network Protection

8    Sciences.  I assume that at least one, maybe both,

9    of the principals.  I think there might be two.

10       Q.    Yes.  Do you think you met Rakesh Ramde

11   also?

12       A.    If they attended the settlement

13   negotiation, I -- I, at least in passing, would

14   have.

15       Q.    Besides the settlement negotiation, have

16   you met them in the hallways in court?

17       A.    I believe I've seen them in the hallways at

18   court.

19       Q.    And have either of them done anything to

20   personally insult you?

21       A.    Done anything -- I've met them in passing.

22   So I don't think any words have been exchanged in

23   any of those hallway passings, or any gestures.

24       Q.    Do you know whether either of them have

25   lied or been dishonest in any way?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 72

1         MR. COOPER:  Same objection; same

2    instruction.

3         THE WITNESS:  To the extent -- to the

4    extent -- to the extent that I know anything about

5    their acts or behaviors or statements, it would be

6    in the context of this litigation, and it would have

7    been received from counsel.  And I believe it would

8    be privileged.

9         Our public filings would not be privileged,

10   though.  And there is a -- a current motion to

11   dismiss that has been filed.  And that contains

12   facts that would suggest ...

13        MR. CUKOR:  Q.  Suggest what?

14    A.   Oh, I'm sorry.  Suggest -- I can't recall

15   the entirety of the filing, but there were --

16   there -- there were --

17        MR. COOPER:  Would you like to have the

18   question read?

19        THE WITNESS:  No, it ...

20        MR. CUKOR:  Please don't interrupt the

21   witness.  This is the second time I'm instructing

22   you.

23        THE WITNESS:  The -- I believe the question

24   is whether I'm aware of any sort of lying or

25   fraudulent behavior.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 73

1            MR. COOPER:  We can read it -- the question

2     if you'd like.

3            THE WITNESS:  Can I have the question,

4     please.

5            (Record read as follows:

6            QUESTION:  Do you know whether either

7        of them have lied or been dishonest in any

8        way?)

9            THE WITNESS:  Oh, that was -- whether they

10    have lied or been dishonest in any way.  So -- and

11    again, I -- I've had no interactions with them in

12    the court -- in the meetings.  I have had -- and

13    they're -- they're privileged communications,

14    certainly.

15            But there is a public filing that includes

16    specific facts that -- that are in the public filing

17    in the motion to dismiss.

18            MR. CUKOR:  Q.  And do you think that those

19    facts suggest that either Mr. Lam or Mr. Ramde have

20    lied?

21        A.   Yes.

22        Q.   What facts are those?

23        A.   We -- it's not something I've -- I've read

24    since it was filed.  I -- I recall generally some of

25    the allegations about the -- I think there were

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 74

1    verified filings.  I believe there were statements

2    in various court filings about a Texas entity.

3    There were statements about an employee, purported

4    employee of NPS.

5            Again, I think that -- I prefer to have the

6    document in front of me, and I can tell you.  I

7    mean, I can read it and tell you exactly what's in

8    it.

9        Q.   So what was the lie that you think -- that

10   you're recalling right now, and who made it?

11       A.   I'm just -- I'm -- I'm -- I'm remembering

12   the filing is what I meant, the public filing.  I

13   think that would be the nonprivileged basis for that

14   suggestion.  And I -- and I think that those facts

15   are -- are laid out in the motion to dismiss.

16       Q.   What is the specific lie that you can

17   recall, if any?

18       A.   I think I -- I think I've told you.  So

19   there's -- about the headquarters in Texas, about

20   the -- the -- the employee who apparently wasn't an

21   employee, the employee's title that wasn't in fact

22   the employee's title, the assignment being complete,

23   though I don't know that that would be a lie, but

24   rather, a sort of massaging or avoiding the truth,

25   you know.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 75

1          I think it's pretty well spelled out in the
2   motion to dismiss, which I have read.
3       Q.   So you're convinced -- let me ask you this
4   way:  Are you convinced that the motion to dismiss
5   supports the allegation that Mr. Ramde is a liar?
6       A.   I think what you're asking for is, again,
7   digging into my evaluation of the merits of sort of
8   the current -- you know, sort of our internal
9   thinking -- Fortinet's internal thinking on the
10  legal merits and the legal strategy.  And I -- I
11  think that would be -- the entire basis would be
12  privileged.  And I think that question's
13  inappropriate.
14      Q.   I'm asking in your personal capacity based
15  on the facts that you just identified as being
16  publicly available.  Do you consider Mr. Ramde to be
17  a liar?
18          MR. COOPER:  Same objection; same
19  instruction.
20          THE WITNESS:  You -- so you're doing the
21  same thing, where I -- most of the work that we're
22  talking about is the work that I've done in my
23  capacity as a lawyer in defending this litigation.
24          So you're essentially, as I understand the
25  question, saying in my personal capacity.  So taking

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 76

1   off my lawyer hat and reading that

2   publicly-available motion to dismiss, would it

3   convince me.

4            And I -- and I have a hard time -- I have a

5   hard time separating that and going through that

6   mental exercise.  And I don't -- I don't see how

7   that would be relevant.

8            MR. CUKOR:  Q.  Be that as it may, based on

9   the facts that are disclosed that you identified

10  before in the motion to dismiss, do you personally

11  consider Mr. Ramde to be a liar?

12           MR. COOPER:  Same objection; same

13  instruction.

14           THE WITNESS:  If I -- okay.  So you want me

15  to go through the exercise of pretend- -- you know,

16  excluding from my mind all facts and all

17  circumstances and all communications that I believe

18  are privileged in this case and put -- pretend that

19  I was reading that motion to dismiss as an objective

20  third party, would it convince me.  I -- I find it

21  compelling.

22           MR. CUKOR:  Q.  Compelling that he is a

23  liar?

24       A.   I -- with the conclusion that -- with

25  the -- the -- the factual assertions made in it and

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 77

1   the present -- the present -- basically, I find it

2   well written and compelling in what it says.

3       Q.   Okay.  Are you avoiding saying it?  I mean,

4   you're calling the man a liar, so own it.

5       A.   I believe that that word, "liar,"

6   "fabrication" -- I can't recall the exact words.  I

7   believe the words are right there in that paper.

8   And I -- again, this is an artificial exercise that

9   you're asking me to go through.

10          Do I find the motion to dismiss compelling?

11  Yes.

12      Q.   Do you believe Mr. Ramde is a liar?

13          MR. COOPER:  Same objection; same

14  instruction.

15          THE WITNESS:  Again, the only interaction I

16  have with Mr. Ramde that I can recall -- 'cause I

17  don't recall ever speaking to him, even in the

18  context of the earlier settlement negotiation, if

19  indeed he was present -- passing in the hall,

20  without saying a word, on one or two or three,

21  however many occasions it was, at court.

22          So the entirety of my basis for answering

23  that question is, having read this motion to dismiss

24  and pretending I -- I know nothing else, because

25  the -- all the other stuff is privileged, would I be

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 78

1  convinced that that person is a liar.  I'm saying

2  that I find the motion-to-dismiss papers compelling.

3          MR. CUKOR:  Q.  So you don't want to answer

4  the question?

5      A.  I'm -- I'm answering it to the best of my

6  ability.

7      Q.  Okay.  You don't think that the best of

8  your ability includes the ability to give me a "yes"

9  or "no" answer on whether you believe Mr. Ramde is a

10 liar?

11     A.  No, that's a much broader conclusion that

12 you're asking -- you're asking for.  You're asking

13 for a personal statement against a person based on

14 reading one -- you know, based on reading a motion

15 to dismiss and making that general -- I think it's

16 fact-specific that -- so -- so again, we're only --

17 the only interaction that you're asking me to base

18 my conclusion on is that paper.

19         So reading that paper is context-specific

20 and it says what it says, and I find it compelling

21 for what it says.

22         And limited to what it says, do I want to

23 draw, you know, broader conclusions about the people

24 involved?  You know, I don't think that's right.

25     Q.  Okay.  What role do you -- let me -- let me

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 79

1    start again.

2           What roles do you have at Fortinet --

3    that's not a great way of asking it.

4           What are your job responsibilities at

5    Fortinet?

6       A.   Currently?

7       Q.   Currently.

8       A.   I -- I am spread pretty thin and have a

9    variety of job responsibilities.  Litigation is one

10   of the responsibilities.  I work on litigation

11   matters.

12          As I mentioned earlier, I supervise the

13   patent program.  And I'm also involved in a number

14   of general commercial legal issues as they -- as

15   they come up.

16          I assist, you know, as -- as I'm called

17   upon on an as-needed basis to assist with public

18   filings, and I work on corporate development.

19      Q.   Is your work primarily intellectual

20   property focused?

21      A.   My work -- I mean, my expertise, my

22   personal background, is intellectual property and

23   tech -- technology focused.  I think technology

24   focused is a better way of putting it.

25      Q.   Okay.  Are you involved with all of the --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 80

1      let me start again.

2              Have you been involved with all of the

3      intellectual property licenses or purchases that

4      Fortinet has been involved with?

5          A.   Yes.  Some to a larger extent; some to a

6      lesser extent.  I'm thinking there might be -- but

7      I've -- I've been there for all of them.

8          Q.   And does your -- do your job

9      responsibilities at Fortinet cause you to be

10     involved in reexamination proceedings at all?

11         A.   So you're asking if I have been involved

12     with reexamination proceedings before the PTO during

13     my tenure at Fortinet?

14         Q.   We can ask it that way.  It's a general

15     lead-up question.

16         A.   I have been involved with reexamine- --

17     patent reexamination proceedings before the PTO.

18         Q.   You have been involved with patent

19     reexamination proceedings before the PTO, correct?

20         A.   Yes.

21         Q.   How many?

22         A.   I don't know the exact number.

23         Q.   Approximately.

24         A.   Maybe around ten.

25         Q.   Do you feel that you have an expertise in

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 81

1    patent reexamination procedures?

2        A.    Expertise.  I -- I have been involved with

3    a number of patent reexaminations.  I do have a

4    certain amount of expertise with technology based on

5    my technology background, and I believe I had some

6    value on -- personally -- on the -- in that -- the

7    reexamination context.

8        Q.    Is that one of your strongest suits?

9        A.    I'm not -- I'm not -- I'm not sure what

10   you -- what do you mean by "strongest suits"?  Is it

11   something I'm particularly proud of or -- you know,

12   technology -- I mean, I have a lot --

13       Q.    Are patent reexaminations something you're

14   particularly good at?

15       A.    I'm sure there'd be a variety of opinions

16   on -- on that question.

17       Q.    Do you consider yourself particularly good

18   at patent reexaminations?

19       A.    Other people -- I -- I retain counsel to

20   assist me with reexamining -- reexamination

21   proceedings, and I have been involved with a number

22   of reexamination proceedings, and that has given me,

23   I believe, some experience with reexamination

24   proceedings.

25       Q.    Is there any objective evidence that you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 82

1    have that other people consider you particularly

2    good at reexamination proceedings?

3        A.   Have I received objective evidence from

4    other people?  I've had some successes with

5    reexamination proceedings, if that's what you mean

6    by "objective evidence."  And I have received

7    compliments on some reexamine- -- some of my

8    reexaminations.

9        Q.   Do you ever receive any job offers to do

10   reexamination proceedings or supervise them?

11       A.   Not formal job offers, no.

12       Q.   Has anyone indicated to you that they would

13   like you to consider working for them in connection

14   with supervising reexamination proceedings?

15       A.   I've chatted -- I've spoken with a number

16   of attorneys in the ordinary course of being a

17   lawyer over the last so many years, and various

18   lawyers have -- have mentioned that I would be an

19   asset to a litigation department based on my

20   reexamination proceedings, other litigation work and

21   technical background, if that's what you're asking.

22            MR. CUKOR:  Let's change the tape now.

23            THE VIDEOGRAPHER:  We are going off the

24   record.  The time is 12:06 p.m.  Here marks the end

25   of videotape number 1 in the deposition of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 83

 1    Todd Nelson.

 2              (Recess taken.)

 3              THE VIDEOGRAPHER:  We are back on the

 4    record.  The time is 12:12 p.m.  Here marks the

 5    beginning of videotape number 2 in the deposition of

 6    Todd Nelson.

 7              MR. CUKOR:  Q.  After Network Protection

 8    Sciences filed the complaint in this action against

 9    Fortinet, did Fortinet obtain an opinion of counsel

10    that it did not require a license under the '601

11    patent?

12              MR. COOPER:  I'm going to object to the

13    question as calling for attorney/client-privileged

14    communications and instruct the witness not to

15    answer to the extent it would reveal such

16    communications.

17              MR. CUKOR:  Well, it will reveal such

18    communications.

19        Q.   So I'm asking you are you choosing to waive

20    that privilege or not?  So I'm being clear about it.

21    If you -- if you take the privilege, then you won't

22    be able to rely on the opinion of counsel at trial,

23    or your counsel can direct you at that -- about

24    that.  But it is -- it is directed to a privileged

25    issue that you can either choose to waive or not

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 84

1    waive.

2          MR. COOPER:  I'm going to instruct the

3    witness not to answer the question.

4          THE WITNESS:  I'm not going to answer the

5    question.

6          MR. CUKOR:  Okay.

7      Q.   So there is no opinion of counsel that

8    Fortinet intends to rely on at trial to support its

9    position that it does not require a license under

10   the '601 patent?

11         MR. COOPER:  Going to instruct the witness

12   not to answer the question based on attorney/client

13   privilege.

14         THE WITNESS:  I believe the answer's

15   privileged.

16         MR. CUKOR:  Q.  Okay.  With regard to the

17   issue of willfulness, did Fortinet do anything to

18   determine whether it was required to take a license

19   under the '601 patent before it continued to sell

20   the accused products?

21         MR. COOPER:  Object.  Going to instruct the

22   witness not to answer the question to the extent

23   that it would reveal any attorney/client-privileged

24   communications.

25         MR. CUKOR:  Are you letting him answer the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 85

1  question or not?

2       MR. COOPER:  I'm letting him answer the

3  question to the extent that he can, if he can,

4  without revealing attorney/client-privileged

5  communications.

6       THE WITNESS:  I'm thinking about this one.

7       Can -- can I have the question read back,

8  please.

9       (Record read as follows:

10      QUESTION:  With regard to the issue of

11      willfulness, did Fortinet do anything to

12      determine whether it was required to take a

13      license under the '601 patent before it

14      continued to sell the accused products?)

15      THE WITNESS:  I mean, I think you're

16  asking -- the equivalent question is did we get an

17  opinion of counsel, and what's the -- with respect

18  to the -- the issue of willfulness.  I'm having a

19  little bit trouble parsing how this is different

20  than the question did we obtain an opinion of

21  counsel, which I believe is -- is privileged.

22      MR. CUKOR:  Q.  So Network Protection

23  Sciences sued Fortinet in this case, right?

24      A.   Yes.

25      Q.   And the complaint alleges that Fortinet's

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 86

1    products infringe the '601 patent, correct?

2        A.   Yes.

3        Q.   And Fortinet has not in any way ceased

4    manufacturing, distributing or selling any of its

5    products based on the complaint, correct?

6            MR. COOPER:  I'm going to instruct the

7    witness not to answer that question to the extent

8    that it would reveal any attorney/client-privileged

9    communications.

10           THE WITNESS:  Fortinet still sells the --

11   you know, at least certain of the products on the

12   accused products list today, yes.

13           MR. CUKOR:  Q.  Have any of the accused

14   products been removed from -- from Fortinet's

15   product list as a result of this litigation?

16           MR. COOPER:  Same instruction.

17           THE WITNESS:  No.

18           MR. CUKOR:  Q.  Did Fortinet reevaluate its

19   decision to continue to sell its accused products

20   after the reexam was concluded?

21           MR. COOPER:  Same objection; same

22   instruction.

23           THE WITNESS:  I think you're asking whether

24   we considered the results of the reexam and the

25   implication of -- of those results after they came

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 87

1   in.

2           Certainly I looked at the results of the

3   reexam.  And then to the extent that, you know, I

4   acted upon them or we did further analysis, I

5   believe that would be privileged, all entirely

6   privileged communications.

7           MR. CUKOR:  Q.  But after you looked at the

8   results of the reexam, did Fortinet withdraw any of

9   its -- any of the accused products from market?

10          MR. COOPER:  Same objection; same

11  instruction.

12          THE WITNESS:  Fortinet has a -- a regular

13  life cycle of end-of-lifing products.  And I don't

14  know of this for a fact, but I would be surprised to

15  learn that products on the accused list hadn't been

16  end-of-lifed during that time period.

17          MR. CUKOR:  Q.  Were any of the products

18  that were on the accused product list end-of-lifed

19  as a result of the results of the reexam?

20          MR. COOPER:  Same objection; same

21  instruction.

22          THE WITNESS:  No.

23          MR. CUKOR:  Q.  Do you have a personal

24  belief about the validity of the '601 patent?

25          MR. COOPER:  Same objection; same

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 88

1    instruction.

2           THE WITNESS:  I think we've -- we've

3    already explored this, and -- and I've -- I've said

4    that I was unaware of the existence of Mr. Vu, of

5    the '601 patent, prior to being sued.  And the

6    entirety of my knowledge about Mr. Vu and the '601

7    patent and all related facts are specific to this

8    litigation, and thus, I think, privileged.

9           MR. CUKOR:  Q.  So you don't have a

10   personal belief?

11          MR. COOPER:  Same objection; same

12   instruction.

13          THE WITNESS:  To the extent I have a

14   personal belief, it's entirely based on -- on my --

15   my work in the context of this litigation.

16          MR. CUKOR:  Q.  Okay.  So let me get my

17   questions out.  And it may be that you'll just say

18   "privileged," and that's fine.

19          Do you have a personal belief about the

20   validity of the '601 patent?

21          MR. COOPER:  Same objection; same

22   instruction.

23          MR. CUKOR:  That's a "yes" or "no"

24   question.  I don't think it would reveal any

25   privilege.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 89

1          THE WITNESS:  I think it's not a "yes" or

2     "no" question.  I think the -- to the extent I have

3     a belief about the validity of the '601 patent, it

4     would be entirely based on facts gleaned during --

5     during the course of this litigation and actively

6     pursuing this litigation and in active communication

7     with outside counsel.

8          MR. CUKOR:  Q.  Okay.  But based on all

9     that, just have you formed a personal belief about

10    the validity of the '601 patent?

11         MR. COOPER:  Same objection; same

12    instruction.

13         THE WITNESS:  Again, I've -- I've -- I've

14    said to the extent that there -- one has been

15    formed, it's entirely based on that.  Do I have a

16    belief about the validity of the patent?  Yes.

17         MR. CUKOR:  Q.  Okay.  And did that belief

18    change in any way after you considered the results

19    of the reexam?

20         MR. COOPER:  Same objection; same

21    instruction.

22         THE WITNESS:  Again, I -- the -- the

23    reexam, the consideration of the reexam, the

24    consideration of this patent, all of that is

25    entirely during the context of this litigation and

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 90

1   in communication with outside counsel, whether it be

2   patent counsel, litigation counsel.

3            MR. CUKOR:  Q.  Did your personal belief

4   about the validity of the '601 patent change in any

5   way as a result of the results of the reexam?

6            MR. COOPER:  Same objection; same

7   instruction.

8            THE WITNESS:  That's the question you just

9   asked word for word, isn't it?

10           MR. CUKOR:  It's the same idea I'm trying

11  to get across.  I think you -- you've said some

12  things before, but you didn't say "I'm not answering

13  because of privilege" or --

14           THE WITNESS:  And these are ones where we

15  get -- where it gets a little bit tricky because

16  you're asking about, you know, sort of what's going

17  on behind, you know, the curtain, behind our

18  litigation.

19           MR. CUKOR:  I'm not asking what the -- what

20  your beliefs were.  I haven't asked that.  I'm just

21  asking if your belief changed in any way -- your

22  personal belief about the validity of the '601

23  patent changed in any way as a result of the reexam.

24           MR. COOPER:  Same objection; same

25  instruction.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 91

1          THE WITNESS:  I believe you're asking me

2    for -- for privileged communications and -- and --

3    and privileged work product and -- and sort of

4    litigation assessment, evaluations and strategies,

5    which I don't think are appropriate and I think are

6    privileged.

7          MR. CUKOR:  Q.  So you're not answering

8    based on privilege?

9          A.   Correct.

10         Q.   Okay.  How did the reexamination results

11   affect the value of the '601 patent?

12         MR. COOPER:  Same objection; same

13   instruction.

14         THE WITNESS:  I have -- I have no opinion

15   about that.

16         MR. CUKOR:  Q.  In the course of your

17   career in dealing with intellectual property

18   licensing, do you believe that a patent that has

19   survived the reexamination is more valuable than a

20   patent that has not?

21         A.   It depends on the patent and it depends on

22   the reexamination.

23         Q.   In what situation would a patent surviving

24   a reexamination with all of its claims intact make

25   the patent more valuable?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 92

1     A.   If -- if there was a patent that had a

2  sub- -- you know, a substantial -- substantive -- I

3  think that's sort of duplicative -- a substantial

4  reexamination -- again, it's very -- it's very hard

5  to answer that in a fact-specific way.

6          But if you had a very substantial

7  reexamination that considered a -- that -- where the

8  examiner considered a broad range of art and reached

9  a conclusion based on a broad range of the -- the

10  applicable art, and there wasn't -- you know, there

11  was the absence of -- of any sort of disclaimer

12  during the prosecution -- so it's complicated -- I

13  believe -- I believe that at least some people

14  would -- would -- would -- would find the value to

15  be increased.

16     Q.   And the '601 patent went through

17  reexamination, correct?

18     A.   Yes.

19     Q.   And it was a reexamination that you

20  supervised?

21     A.   Yes.

22     Q.   And all of the claims were confirmed,

23  correct?

24     A.   The reexam certificate issued, and I do not

25  believe any of the claims were cancelled.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 93

1      Q.   And in fact, new claims were added,

2    correct?

3      A.   The -- new claims were added during

4    pros- -- during the reexamination, yes.

5      Q.   So the '601 patent came out of

6    reexamination with more claims rather than less

7    claims, correct?

8      A.   Numerically, yes.

9      Q.   And during the '601 patent reexamination,

10   all of Fortinet's invalidity contentions were

11   disclosed to the Patent & Trademark Office, correct?

12         MR. COOPER:  Objection -- excuse me.  Same

13   objection; same instruction.

14         THE WITNESS:  The -- the patent

15   reexamination is a public record.  I do not know the

16   answer to the question that you're asking.  I -- I

17   know certain art was disclosed, but I don't think it

18   was considered in any way by the examiner.  That's

19   my memory of it.

20         MR. CUKOR:  Q.  Is it your memory that all

21   of Fortinet's invalidity contentions were disclosed

22   to the Patent & Trademark Office during the

23   reexamination?

24         MR. COOPER:  Same objection; same

25   instruction.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 94

1          THE WITNESS:  I said I -- I don't know the

2     answer to that.

3          MR. CUKOR:  Q.  Okay.  And is it true that

4     Network Protection Sciences did not disclaim any

5     scope of the patent during the reexamination?

6          MR. COOPER:  Same objection; same

7     instruction.

8          THE WITNESS:  I don't believe that that's

9     accurate.

10          MR. CUKOR:  Q.  You believe there was a

11     disclaimer of scope?

12     A.   It's a more complicated question of law.

13     But I know that there were arguments made during the

14     reexamination proceedings with respect to a very

15     discrete set of art.

16     Q.   Did Network Protection Sciences file any

17     disclaimer?

18     A.   Not that I'm aware of.

19     Q.   Based on all of that, do you consider the

20     '601 patent to be more valuable for having survived

21     the reexamination?

22     A.   So I think we're back to the privilege

23     issue, but if we go into the abstract, which is

24     where you -- and take myself out of this litigation,

25     and if I was not in this litigation, say before this

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 95

1   litigation started -- I'm trying to help you to --

2   in answering this in a nonprivileged way.

3           If I was looking at this reexamination in

4   the abstract -- that's just hard to -- to --

5   Q.   No, keep it -- if you can't answer because

6   of privilege, that's fine.

7   A.   Yeah, I -- it's too bound up with work

8   that's -- that's privileged.

9   Q.   Okay.  Do you agree that the reexam did not

10  go as planned for Fortinet?

11          MR. COOPER:  Same objection; same

12  instruction.

13          THE WITNESS:  The -- the -- I think most of

14  that's privileged.  But there's never a plan

15  necessarily.  I mean, I don't -- go as planned.

16          MR. CUKOR:  Q.  Well, wasn't the plan of

17  the reexam to invalidate at least certain claims of

18  the '601 patent?

19          MR. COOPER:  Same objection; same

20  instruction.

21          THE WITNESS:  I -- I think, again, we're --

22  it's very difficult to answer -- much as I would

23  love to have this discussion, you know, off the

24  record, I think that to the extent there's a -- that

25  there's any knowledge, any basis, all of it's

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 96

1   privileged.

2          All of it is asking me about litigation

3   strategy, litigation communications with outside

4   attorneys, evaluations of the -- what was -- what

5   was reexamined, evaluations of the scope of the art

6   that was presented.  And I don't think it's

7   appropriate and I think it's privileged.

8          MR. CUKOR:  Q.  Okay.  Has Fortinet entered

9   into any joint defense agreement with any other

10  party under which it can share information about the

11  '601 patent?

12         MR. COOPER:  Same objection; same

13  instruction.

14         THE WITNESS:  I believe there was a joint

15  defense agreement early in the case in Texas.

16         MR. CUKOR:  Q.  And who were the parties?

17  Was Juniper a party to it?

18     A.   I believe it would be.  I believe it was

19  the set of defendants named by NPS.  But there was

20  some movement amongst defendants.  DeepNines may not

21  have been a party or they were a party, they got

22  broke or got bought by somebody.  There's a

23  little -- something went on there.

24     Q.   So let me ask you in a easier, broken-down

25  way.  There was a joint defense agreement that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 97

1   Fortinet was a part of in connection with this

2   litigation, correct?

3        A.   I believe that's correct.  It's been a long

4   time.

5        Q.   And Juniper was a part of it?

6        A.   I believe that's the case.

7        Q.   And WatchGuard was a part of it?

8        A.   I believe that's the case.

9        Q.   And SonicWALL was a part of it?

10       A.   Yes, I believe they were also named

11   defendants.

12       Q.   And these defendants were able to share

13   information with each other about the validity of

14   the '601 patent, correct?

15       A.   Able to share?

16       Q.   Under the joint defense agreement, Juniper,

17   SonicWALL and WatchGuard shared information with

18   Fortinet about the potential invalidity of the '601

19   patent, correct?

20            MR. COOPER:  Same objection; same

21   instruction.

22            THE WITNESS:  I believe you're -- you're

23   asking for privileged communications to the extent

24   that the privilege, you know, is extended to -- to

25   joint defense groups, which I believe it is.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 98

1              So I mean, there was a joint agreement.

2    And the defendants did communicate with each other

3    pursuant to that defense agreement.

4              MR. CUKOR:  Q.  So is it accurate to say

5    that in preparing the reexamination of the '601

6    patent, Fortinet had access to the work product of

7    Juniper, WatchGuard and SonicWALLl?

8              MR. COOPER:  Same objection; same

9    instruction.

10             THE WITNESS:  What do you mean by "work

11   product"?

12             MR. CUKOR:  Q.  In preparing the

13   reexamination proceeding that Fortinet prepared

14   against the '601 patent, Fortinet had access to the

15   prior art identified by Juniper, SonicWALL and

16   WatchGuard.

17             MR. COOPER:  Same objection; same

18   instruction.

19             THE WITNESS:  I'm not sure that's true.

20             MR. CUKOR:  Q.  Did Juniper, SonicWALL or

21   WatchGuard share any prior art information with you?

22             MR. COOPER:  Same objection; same

23   instruction.

24             THE WITNESS:  During the entire pendency

25   the case or --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 99

1          MR. CUKOR:  Yes.

2          THE WITNESS:  -- prior to the reexam?

3          MR. CUKOR:  Q.  During the entire pendency

4  of the case, has Juniper WatchGuard or SonicWALL

5  shared any prior art information with you?

6          MR. COOPER:  Same objection; same

7  instruction.

8          THE WITNESS:  I think now you're asking for

9  substance of -- can I have another -- I didn't

10  realize we'd be going down this line of questions

11  and going into the reexamination and the joint

12  defense group, so I -- it's not an issue I've

13  carefully researched.  I should probably know that,

14  but I believe the substance of those communications

15  are privileged, and I wouldn't want to -- you know,

16  and there's no intent to the extent that I -- to

17  inadvertently waive a privilege.

18          MR. CUKOR:  Yes, I understand that.  And I

19  wouldn't suggest that this would be a waiver of

20  privilege because I think I'm asking you the

21  question that is at a level of just was information

22  shared, not what the specific information was.

23          And I wouldn't ask you or I don't plan to

24  ask you what information was shared.  So I just want

25  to ask you at a high level.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 100

1      Q.   Did Juniper, SonicWALL or WatchGuard share

2   prior art information with Fortinet?

3           MR. COOPER:  Same objection.

4           THE WITNESS:  Again, I --

5           MR. COOPER:  Same instruction.

6           THE WITNESS:  -- I think you're -- you're

7   asking about the substance of the -- did we have

8   communications during the pendency of the suit?

9   Yes.  I probably sort of overstepped the bounds to

10  say was there communication in advance of the

11  reexam.  I -- I thought, you know, perhaps no, but

12  I'm not sure.

13          But again, I think now you're getting into

14  the substance of what was shared and when was it

15  shared.  And I -- and I think that that would be

16  privileged.  But I'm -- again, on the joint defense

17  privilege, I'm -- I'm fuzzy at best.  And I'd be

18  happy to take a break and consult with outside

19  counsel so I can understand the scope of it and

20  fully answer.

21          MR. CUKOR:  Okay.  You can do that if you

22  want on the break, but I don't plan to ask you any

23  more questions about that.

24          THE WITNESS:  Okay.

25          MR. CUKOR:  Q.  What was your personal role

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 101

1    in collecting prior art in this case?

2           MR. COOPER:  Same objection; same

3    instruction.

4           THE WITNESS:  So again, this is funny.

5    I've never been deposed in this way, where I'm being

6    asked about what did I do as a lawyer during the

7    pendency of a litigation by the plaintiff, you know,

8    on the other side of the litigation.

9           MR. CUKOR:  So --

10          THE WITNESS:  It seems to be all very much

11   asking what I did, how I did it, why I did it.

12          MR. CUKOR:  Q.  For example, did you -- if

13   you told me "I directed counsel to handle the prior

14   art issue," then I think that's fine.

15          But did you personally do any research to

16   find prior art?

17          MR. COOPER:  Same objection; same

18   instruction.

19          MR. CUKOR:  Q.  Did you search the

20   Internet?

21   A.    So again, you're asking me about during the

22   pendency of defending this case and in my active

23   involvement of defending this case and working with

24   my outside counsel and in working with the joint --

25   you know, potentially with the joint defense groups,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 102

1   what -- what did I actually do?

2          You know, the -- maybe during the lunch

3   break I could take -- I could confer a little bit

4   'cause I actually get a little fuzzy on this, on

5   exactly what I can answer and can't answer.

6   Privilege is not one of -- sort of my areas of

7   expertise.

8          And again, I thought I was preparing

9   primarily for 30(b)(6) topics, none of which

10  we've -- and we've hardly -- barely glanced at in

11  the couple of hours that we've been going.

12         So I'm -- I'm -- I'm just a little bit

13  surprised and not -- not necessarily prepared to --

14  to answer it as artful -- you know, as gracefully as

15  I could.

16         MR. CUKOR:  Q.  Did you ever get on a plane

17  and travel to find prior art?

18         MR. COOPER:  Same objection; same

19  instruction.

20         THE WITNESS:  It's -- it's -- what did I do

21  to -- did I collect prior art?  Did -- what did I do

22  to collect prior art?  Did I get on a plane to

23  collect prior art?  To me it's the same line of

24  question.

25         I'd love to clarify that and make sure that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 103

1    I -- I mean, if I -- if that's okay to answer, I'm

2    happy to answer the questions.

3           MR. CUKOR:  Q.  Let me ask it this way:

4    Have you been to Canada recently?

5        A.   No.

6        Q.   When was the last time you were in Canada?

7        A.   Oh, a year ago.

8        Q.   Where did you go?

9        A.   I went to -- I -- I flew into -- where did

10   I go.  I flew into a U.S. city near the border to --

11   I can't recall the name of the city.  I flew into a

12   U.S. city, rented a car and drove over into Canada.

13   And it might have been Ottawa.  Is that a city?

14   Sorry.  I don't know my geography in Canada very

15   well, and I mix up -- we have -- we have a number of

16   offices in Canada, and so I mix up the cities, to

17   my -- you know, to the amusement of my coworkers.

18       Q.   Did you ever meet with any people from

19   Janus?

20       A.   Have I ever met with people from Janus.

21   And what do you mean by "Janus"?

22       Q.   Are you familiar with the Janus firewall

23   product?

24       A.   Yes.

25       Q.   Have you ever met with any of the people

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 104

1    that were involved with that -- development of that

2    product?

3         A.   Yes.

4         Q.   When was that?

5         A.   That was during the trip that I -- I don't

6    remember the exact date.

7         Q.   Who was with you?

8         A.   There were -- there was -- there were two

9    attorneys from one of the joint defendants.

10        Q.   Who were -- what were their names?

11        A.   David Benny and -- I can't recall the other

12   person's name.

13        Q.   Someone from Juniper?

14        A.   No.  Also -- also from --

15        Q.   WatchGuard?

16        A.   They represented WatchGuard, I believe.

17        Q.   And was anybody from your law firm or a law

18   firm representing Fortinet present?

19        A.   No.

20        Q.   And who did you meet with?

21        A.   I have met with John Alsup, Glen

22   Mackintosh.  I'm not good with names.  There were

23   probably four or five other people, but I can't -- I

24   can't recall the names.

25        Q.   Where did you meet with them?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 105

1      A.    I met with John Alsup in the WatchGuard

2   offices.  And I met with the other people, Glen

3   Mackintosh and others -- I just can't recall the

4   names -- at a restaurant.

5      Q.    Everybody at the same time?

6      A.    Some people arrived late.

7      Q.    Has Fortinet ever offered to compensate

8   those people for their time?

9           MR. COOPER:  Same objection; same

10   instruction.

11          THE WITNESS:  I don't know for sure.  I

12   know that -- I believe that John Alsup has been

13   retained by Fortinet.

14          MR. CUKOR:  Q.  Has Fortinet offered to

15   compensate any of the other individuals you met

16   with?

17          MR. COOPER:  Same objection; same

18   instruction.

19          MR. CUKOR:  Are you instructing him that

20   it's privileged whether he paid or offered to pay a

21   fact witness?

22          MR. COOPER:  I'm repeating the same

23   objection that I've made numerous times, and that is

24   that he may answer to the extent that he is not

25   revealing attorney/client-privileged communications.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 106

1            MR. CUKOR:  And you think that there's

2    potential attorney/client privilege in this?

3            MR. COOPER:  I think that there is the

4    potential for the witness to answer the question and

5    divulge attorney/client privilege, yes.

6            THE WITNESS:  I do not -- it -- it's

7    possible, but it also might -- that was at a time

8    when we were part of a joint defense group, so I'm

9    not sure if Fortinet would have made an offer or

10   suggested that or whether a different member of the

11   joint defense group could have.  I just don't know.

12           MR. CUKOR:  Q.  But your recollection is

13   that somebody made an offer for -- to compensate the

14   people that you met with in Canada?

15           MR. COOPER:  Same objection; same

16   instruction.

17           THE WITNESS:  I don't think an offer

18   ever -- there was a suggestion of that potential,

19   but I don't think an offer ever was made.

20           MR. CUKOR:  Okay.  How are you holding out?

21           THE WITNESS:  I'm okay.  I actually -- in

22   not too long, I -- rest room and lunch would be

23   great.

24           MR. CUKOR:  It's --

25           THE WITNESS:  And I could check on some of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 107

1   the privilege issues to try to get a little bit of

2   clarity in my own mind about it.  It might help us

3   move faster.

4            MR. CUKOR:  You're welcome to do that.

5   It's 12:45.  Do you want to keep going for

6   another -- I'm at the -- kind of close of the

7   section.

8            MR. COOPER:  It's been about a half-hour

9   since we --

10           THE WITNESS:  Why don't we -- why don't

11  we -- why don't we take a -- how long do you think

12  lunch will take?

13           MR. COOPER:  Forty-five minutes is what we

14  took yesterday.

15           MR. CUKOR:  It's really up to you.

16           THE WITNESS:  No.  That would be fine.  I'm

17  just trying, in the -- I'm just trying to

18  accommodate everybody and yet move relatively

19  quickly.

20           MR. CUKOR:  Let's take a break.

21           THE WITNESS:  Okay.

22           THE VIDEOGRAPHER:  Going off the record.

23  The time is 12:45.

24           (Lunch recess from 12:45 to 1:44.)

25  ///

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 108

1   AFTERNOON SESSION                        1:44 P.M.

2          THE VIDEOGRAPHER:  We are back on the

3   record.  The time is 1:44 p.m.

4            EXAMINATION RESUMED BY MR. CUKOR

5          MR. CUKOR:  Q.  What is the compensation

6   you receive from your job at Fortinet?

7      A.   Currently or historically?

8      Q.   You can answer both.

9      A.   I'm right in the middle of a -- I think

10  I -- I've got a midyear adjustment.  I assumed it

11  kicked -- kicked in or it's kicking in within days.

12  I think it's a combination of cash and equity

13  incentives.

14          I think my base salary is 240.  I'm on a

15  bonus -- MBO, management by objective, bonus plan

16  that would cap out at 60.  And I get -- I have some

17  options in restricted stock.

18          MR. COOPER:  Pardon the interruption.  I

19  apologize, but I'd like to take this opportunity to

20  mark the transcript highly confidential, attorneys'

21  eyes only.  Thank you.

22          MR. CUKOR:  Q.  What is your estimate of

23  what your stock compensation portion of your package

24  is worth?

25      A.   It's fairly random.  It varies.  So you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 109

1    can't really -- I vest.  And annually there will be

2    a refresh -- refresh grant generally.  And so then

3    each refresh grant vests periodically.

4         Q.   Is there a rough number?  Is it between

5    50,000 and a hundred thousand?

6         A.   Are you talking dollars or shares or ...

7         Q.   Dollars, in terms of value.

8         A.   Current -- I mean, currently -- it's

9    actually fairly complicated.  So right now, I mean,

10   I've got grants that have long since expired and

11   been exercised and are gone.  I think I've got maybe

12   two option grants with some residual on them.  I

13   think they're fairly near the end of life, of the

14   four-year vesting period.  And I have two, maybe

15   three -- maybe it's just two -- restricted stock

16   grants that have yet to begin vesting.

17        Q.   So do you have any kind of estimate for

18   what the stock component of your compensation

19   package is roughly worth?

20        A.   I mean, no.  I mean, it really changes very

21   dramatically with the stock price.

22        Q.   Could it be hundreds of thousands of

23   dollars?

24        A.   No.  On an annual basis with my current set

25   of grants, that would be -- the stock price would

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 110

1  have to go through the roof for that to -- for it to

2  be that level.

3       I mean, the last -- at today's value, if

4  you add up -- I think I get a report -- the total --

5  I think of the total, sort of potential value -- and

6  again, that would be over all of these overlapping

7  four-year periods.  But the total value of

8  everything, as if everything had accelerated and

9  vested right now, would -- it hasn't, and it

10  wouldn't -- was something like -- the last time I

11  checked, probably 300,000.

12       Q.   Okay.

13       A.   So you can divide that by four to get some

14  sort of an idea, but that's not really accurate

15  since the vesting periods are all different.

16       Q.   Okay.  Do you know what Michael Xie's

17  compensation is?

18       A.   No.  It might be publicly disclosed in

19  our -- in our public filings.  I think the named

20  executive officers have a certain amount of

21  disclosure there, but it's not something I've looked

22  at.

23       Q.   Okay.  Same for Ken Xie?

24       A.   Correct.

25       Q.   Does Fortinet -- Fortinet make sales of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

1    products to the United States government?

2        A.    I believe -- I mean, we have a U.S.-fed

3    sales arm.  And I -- I believe it at least attempts

4    to sell into various federal agencies.

5        Q.    Do you know if it's been successful?

6        A.    I mean, that's a qualitative assessment,

7    but I -- overall, I know that it hasn't been.  It's

8    not a major component or -- I don't think it's

9    been -- as successful as hoped.

10        Q.    I didn't mean successful qualitatively.  I

11    meant have they made any sales.

12        A.    There are sales.  The -- there's a quota

13    and there are sales that I'm aware of.  I don't know

14    the exact quotas.  I know it's a relatively minor,

15    you know, part of that Fortinet business.  It's not

16    a -- it hasn't been a historical focus, and it's not

17    an area that we have been particularly successful

18    in.  But, I mean, they're there.

19        Q.    I don't think that that information's been

20    produced in this litigation.  Do you know if that

21    was done purposefully?

22        A.    No.  No.  What's -- what -- I think it

23    would be included -- the -- in this -- I've been

24    responsible for that, largely, the collection of

25    documents in this -- during the entire pendency of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 112

1    this litigation.  I think we've been, you know, very

2    transparent and very cooperative in producing

3    documents.

4         I don't recall anything specific to the

5    federal sales.  I know that we've given overall

6    sales figures, but I -- those would include the

7    sales that were going into -- I don't think we've

8    broken those out separately, but they would be

9    included in the sales figures that we reported.

10   Q.   Okay.  Did you disclose the sales made to

11   Canada and South America also?

12   A.   The -- we have produced all of our public

13   filings, which break out our revenue by region, by

14   years.  And those -- we've been public since -- I

15   believe it was October 2009.  And so all of those

16   are publicly available.

17        And I believe they've also been collected

18   and produced in this litigation.

19        That breaks it out by U.S. -- by U.S.

20   revenue, I think, by region.  And U.S. revenue I

21   believe is specifically broken out.  Canada and

22   Latin America might be grouped as the remainder of

23   the Americas revenue.  I'm not sure.  I haven't

24   really carefully studied those, but I believe it's

25   all there.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 113

1    Q.   So have you produced the sales information

2    for the accused products for Canada and -- and Latin

3    America?

4    A.   I think that's the question you just asked

5    and I just answered.

6    Q.   Well, I thought that what you said -- and I

7    appreciate you trying to answer, but -- or

8    answering.  I thought what you were saying was that

9    you produced publicly available information.  But as

10   I understand it, you've been producing information

11   specific to the accused products in this case and

12   that you produced information about that -- the

13   accused products in connection with United States

14   sales.

15        And I'm asking if you produced information

16   in connection with the accused products for Canada

17   and South America.

18   A.   I think you're referring to the report that

19   was the subject matter of Jim Bray's deposition.

20   Q.   I think it was discussed at Mr. Bray's

21   deposition.

22   A.   Right.  And he -- Jim Bray is in our

23   finance department and is largely responsible for

24   that.  I think that was -- I attended a good portion

25   of Jim's deposition, and I believe it was fairly

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 114

1    extensively discussed.  And Jim is the person in

2    finance that I've -- that I've largely relied on to

3    collect information for this case.

4         So I think this is -- this has been

5    discussed in Jim Bray's deposition.  I think he

6    broke out and specifically provided U.S. sales.  And

7    that report -- I think it's on the face of the

8    report -- does it say "excluding Canada and Latin

9    America."

10   Q.   It, I'm sorry, does not say or does say?

11   A.   I think it specifically says that it

12   excludes, I think, on the report.

13   Q.   Okay.

14   A.   Again, I haven't looked at that report

15   carefully except to collect it and produce it.

16   Q.   Did you ask him to exclude Canada and --

17   and South America from that report?

18        MR. COOPER:  Objection.  The question calls

19   for attorney/client-privileged communications, and

20   the witness is instructed not to answer to the

21   extent that the answer would reveal such

22   communications.

23        THE WITNESS:  You know, I mean, we -- I

24   collected and produced data in response to their

25   requests by NPS and tasked various people with

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 115

1    helping me produce that data.  I think on its face

2    it's fairly transparent and specifically says that

3    it's -- that it includes the -- in fact, I think

4    it's broken out by product and specifically says

5    it's -- it reflects U.S. sales by product.

6           MR. CUKOR:  Q.  So has any such information

7    like that been produced for sales made in Canada or

8    in South America?

9      A.  A specific report of that -- equivalent to

10   that?  I do not believe that an equivalent report to

11   that for Canada or for Latin America has been

12   produced in this case.

13     Q.  Okay.  Why not?

14     A.  I -- I'm not sure that it's -- that it

15   would be relevant or -- or that it's -- again, the

16   case has been going on for a number of years.

17   Discovery's been open for a long time.  So I can't,

18   off the top of my head -- without sort of looking at

19   a specific request for documents, I can't -- I can't

20   recall the exact scope of my -- you know, I've been

21   tasked with diligently collecting and producing that

22   stuff and generating reports reflecting data that

23   was requested by NPS.

24           And I think we've -- we've been responsive

25   to those.  I'd have to look and see what -- what

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 116

1   was -- you know, what was requested and then take a

2   look at the scope of what we responded with.

3       Q.   Do you have a feel for what the percentage

4   of Fortinet, Inc.'s revenue comes from sales in

5   Canada?

6       A.   That issue was specifically mentioned in

7   Jim Bray's deposition, was -- that exact question, I

8   believe, was asked and answered in Jim Bray's

9   deposition.  I certainly wouldn't want to conflict

10  with anything Jim said.

11           And to the extent that I've collected

12  information on revenue and sales, I would have

13  collected it from Jim.  So he is the much more

14  definitive source.

15           And obviously the documents themselves

16  would be the more definitive source.  I can't recall

17  Jim's specific answer on that, but I think it was

18  fairly -- Canada sales are a fairly modest

19  percentage of -- of worldwide sales.

20      Q.   How are Canada sales made?

21      A.   We -- I mean, there's a Canadian sales team

22  responsible for selling to Canadian customers.

23      Q.   And then what happens when a Canadian

24  customer purchases a FortiGate product?

25      A.   What happens.  It depends on what product

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 117

1    it is.  The -- and I -- again, on a revenue

2    perspective and the invoicing and the financial --

3    the financial aspects and the financial data, I'm

4    not as expert as -- as -- as Jim Bray would be.

5          On the cost side, I wouldn't be as -- as --

6    as expert as Keith Andre, who you deposed recently,

7    as well would be.  So I don't understand the

8    mechanics.

9          We do have offices in Canada.  Fortinet was

10   originally formed in Canada.  Our largest -- we do

11   have an entity in Canada.  The original entity was a

12   Canadian entity, I believe.  Our largest office is

13   in Vancouver.  Actually, it's a suburb of Vancouver

14   called Burnaby.  That, I believe, is still

15   Fortinet's largest office.  We have an office in

16   Ottawa as well, that's a fairly substantial -- one

17   of our largest offices.

18         I don't know the exact reporting -- I think

19   org charts have been collected and produced.  I

20   don't know the exact reporting structure and

21   compensation structure for the sales team, but I do

22   know there is a Canadian sales team.

23   Q.   Does Fortinet have an inventory

24   distribution center in Canada?

25   A.   Currently -- currently, I'm not -- I'm not

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 118

1    sure of the answer to that.  Traditionally there has

2    been product distributed, and I believe that would

3    depend on which product you're talking about.

4    Certain products are manufactured in different

5    places of the world, and it depends on where it's

6    being distributed from.

7        Q.   So if a Canadian customer were to purchase

8    a FortiGate product, would that be shipped from the

9    United States?

10       A.   The -- all of the -- the accused products,

11   which is the ones -- I went through the list of

12   accused products to -- in preparation for the depo

13   today, all -- they're -- they're made by various

14   contract manufacturers.

15            One of the large contract manufacturers is

16   in Burnaby.  Kenda Creation, I believe it's called.

17   The -- there are a selection -- a number, five to

18   ten additional manufacturers, that are all in either

19   China or Taiwan.  And they will package and ship the

20   finished closed box.

21            It may be -- I believe that for sales that

22   are ultimately destined to a customer and

23   distributor that would be in Canada, that those

24   would likely hit the U.S. and then be forwarded on

25   to the customer in -- they might actually hit -- so

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 119

1   we -- our fulfillment center is in Taiwan.  I've

2   forgotten the name of the exact town in Taiwan.  But

3   it -- we have a -- our main fulfillment center is in

4   Taiwan.

5          And so again, kind of depending on where

6   the contract manufacturer is.  But I -- but

7   certainly the product that comes from -- which is

8   the bulk of the product that comes from the contract

9   manufacturers in China and Taiwan, it would go

10  through the Taiwan center potentially.  And it might

11  pass through the U.S.

12         It's -- you've -- you've accused a lot of

13  products, so there's a lot of different -- even just

14  within that FortiGate family, there are a good

15  selection of contract manufacturers.  But none are

16  in the U.S.

17     Q.   So when a Canadian customer purchases an

18  accused product, it is shipped through the U.S. to

19  the customer?

20     A.   Not in every case, but certainly I would

21  think in the majority of cases, it would -- from a

22  logistics perspective, I believe it would hit a

23  warehouse in the U.S. on its way.

24     Q.   Is the same true for customers in South

25  America?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 120

1    A.    I think South America is a little less

2    clear and there -- and again, there's corner cases

3    depending on the customer and the relationship and

4    the distributor, depending on the time of the

5    quarter.  In last -- last-minute things, you get

6    corner cases.

7          But I believe Latin America is generally --

8    those would touch the United States.  But there

9    could be a case where it's shipped directly from the

10   Taiwan center.

11   Q.    Aside from Canada and Latin America, are

12   there any other countries outside of the U.S. that

13   are shipped product from the United States?

14   A.    There could be corner cases.  Generally,

15   no.  Generally, everything would go through a

16   Jvan-An, J-V-A-N dash A-N, Jvan-An fulfillment --

17   our fulfillment center in Taiwan which, you know,

18   collects and distributes product.

19   Q.    Where is the FortiOS software maintained?

20   A.    That is maintained in Vancouver -- I mean

21   Burnaby, suburb of -- if I say "Vancouver," I mean

22   Burnaby.

23         It's maintained on a server, and I believe

24   there's a redundant backup also in Burnaby.  So it's

25   maintained, I think, maybe in two different images

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 121

1    in our change management, or CM, system in -- in

2    Burnaby.

3         Q.    Anywhere else?

4         A.    No.

5         Q.    Where is the FortiOS system software

6    developed?

7         A.    The -- now, when you say "FortiOS," that

8    that's sort of an overloaded ambiguous term, so I

9    want to be clear about that.

10             If you're talking about the operating --

11    well, the entire -- some -- you know, I'll answer

12    that with respect to the source code and the

13    operating system that's loaded on the accused --

14    well, that's not even -- sorry.  That's not even all

15    the same on the accused products.

16             So -- okay.  What do you mean by "FortiOS"?

17    If I could get you to clarify the question.  Letting

18    you know that "FortiOS" means different things to

19    different people and in different contexts.

20        Q.    What are the different things it can mean?

21        A.    It -- I've -- it has been referred to as

22    the executable loadable image that's loaded on the

23    FortiGate family of platforms.

24             It's been FortiGate -- FortiOS has also

25    been used to refer to -- I think in engineering in

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 122

1    Canada in particular, is -- is used to refer to the

2    source tree, the build tree that's -- that's used to

3    build the image.

4            It's been referred to as the kernel, you

5    know, the operating system, the -- the level of a

6    kernel that -- that is on the Fortinet products.

7            It's been used -- where the source tree

8    would include -- and also the source tree, which

9    would include the application-level code as well.

10           FortiOS has also been used -- I think it

11   was actually used by one of the NPS attorneys to

12   refer to -- and I've heard that used commonly,

13   Fortinet's OS, FortiOS, Fortinet's OS generically,

14   without reference to a product.

15           And we have -- Fortinet has, you know, a

16   myriad of -- a large number of distinct operating

17   systems.  FortiOS has been referred to as the

18   operating system that runs on other products, such

19   as FortiMail or FortiWeb, and those have distinctly

20   different operating systems.

21           And other products.  People use the term

22   loosely.  So I don't want to answer sort of more

23   broadly or ambiguously.

24       Q.   FortiMail and FortiWeb, do they contain a

25   software image called FortiOS?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 123

1     A.    People have referred to their operating

2    system as running FortiOS.

3     Q.    But Fortinet doesn't refer to it that way?

4     A.    Well, I mean some people will.  I mean, you

5    get people in marketing that don't know -- that

6    aren't -- I mean, again, it's -- if you're talking

7    to the team that's building the operating system in

8    Vancouver that's specifically loaded on FortiGates,

9    they think of themselves as the FortiOS team.

10          They will think of the FortiMail group over

11   in Ottawa.  And they both use a different variant of

12   the Linux kernel, so they're both -- you know,

13   there's some commonality they're built off, but they

14   are distinct systems.

15    Q.    Okay.  So the internal Fortinet developers

16   think of FortiOS as the software for the FortiGate

17   systems?

18    A.    That team within -- that's my impression.

19   Again, I'm not a member of that team, but I've

20   spoken to them.  They -- in my understanding, they

21   think of themselves -- this is the team in Vancouver

22   working on FortiOS for FortiGates.  And again, it

23   went through build -- the build tree itself creates

24   an overlapping set.

25          So even within FortiGates, the operating

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 124

1    system by FortiGate is -- each FortiGate model is

2    different, and that's all over -- overlaid on top of

3    each other.

4            But if you group all those together, but

5    exclusively to the FortiGate system, I believe they

6    would refer to that as the overall source

7    treed [sic] -- tree.

8            The -- I don't know -- I've heard people

9    refer to the FortiMail OS or the FortiWeb or the

10   FortiCache or one of these other Fortinet products

11   running an operating system -- as they all do -- as

12   running FortiOS.  I think they're using the term

13   loosely and more broadly to refer to a Fortinet

14   operating system.

15       Q.   Okay.  And I think before you said that --

16   that FortiOS source tree includes the

17   application-level code.  Is that accurate?

18       A.   If we look at the CM -- change management

19   system, which is the source code control system for

20   FortiGate's operating system, which is resident in

21   Vancouver, that source tree, which -- which has been

22   provided I think multiple times now to NPS, would

23   include what's considered kernel-level code and

24   would include what's considered application-level

25   code.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 125

1      Q.   Is that kernel-level code and

2   application-level code available in any other form,

3   outside from buying all of FortiOS, to a customer?

4      A.   I'm not sure exactly what you mean.

5      Q.   Can a -- is the -- is there a smaller

6   saleable unit of the FortiOS system that would just

7   include the application layer code or the kernel

8   code?

9      A.   So are you asking if we sell -- well, we

10   don't sell FortiOS, and we don't sell it in pieces.

11   There's no SKU associated with FortiOS.

12      Q.   It comes with the -- the FortiGuard

13   products?  I'm sorry, the FortiGate products?

14      A.   So when we sell an appliance, a FortiGate

15   appliance, some appliance within the FortiGate

16   family of appliances, it would come loaded with an

17   executable image.  So that image would depend on the

18   model of FortiGate that we're talking -- of the

19   family that we're talking about.

20      Q.   Is there any FortiGate product sold that

21   does not come with a FortiOS image at all?

22      A.   Yes.

23      Q.   How so?  Which one?

24      A.   Well, on the -- for example, on the accused

25   list -- and again, even when you say "FortiGate,"

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 126

1    the terms are used a little bit loosely.  So is a

2    FortiWiFi a FortiGate?  You know, I mean, is a

3    FortiAP a FortiGate?  So -- so it gets a little

4    bit -- a little bit loose.

5            I think one of the accused products is

6    the -- I don't have the exact name designation, but

7    it's a -- one of the accused products is a -- is a

8    chassis.  It's -- it's a hardware chassis.  It

9    doesn't have -- it doesn't have any executable image

10   in it.  Doesn't have any software.

11       Q.   Doesn't have any computer parts; it's just

12   a piece of metal?

13       A.   Yes.

14       Q.   Okay.  But I'm talking -- do you call that

15   a FortiGate product?

16       A.   Yeah.  I mean, that's a FortiGate -- it's a

17   FortiGate -- essentially a rack.

18       Q.   Okay.  It's kind of like an accessory to

19   the FortiGate product, right?

20       A.   Well, you accused it as -- and so when we

21   say "the FortiGate family of products" or "the

22   accused products," I mean it's -- it's included.

23            You also accused the FortiGate 5000, and

24   there's no SKU named the FortiGate 5000, so it's

25   unclear what you're referring to.  But --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 127

1      Q.   Well, just focusing on the FortiGate

2   firewall products, are there any FortiGate firewall

3   products that are -- that do not include a FortiOS

4   image?

5      A.   The chassis, I think, would be considered a

6   firewall -- it's in the family of the firewall

7   products.  What do you mean by "the firewall

8   products"?

9           In fact, Fortinet's general -- you know, I

10  think we sort of strenuously, from a marketing

11  perspective, sort of avoid calling it a firewall.

12  That's sort of an old term.

13          I think when I say -- when I call it a

14  firewall, I think -- you know, I'm just -- I'm

15  speaking in more general terms about what is a

16  firewall.  Most people refer to FortiGate products

17  as UTMs.

18     Q.   Okay.  So UTM stands for unified threat

19  management?

20     A.   Right.  Which is -- which I think of

21  personally as a -- sort of a -- get myself in

22  trouble with marketing, but sort of a -- you know,

23  kind of a -- you know, a glorified -- a firewall.

24  You know, it's something -- call it what it is, a

25  gateway device, a network device with added threat

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 128

1  functionality.

2      Q.   It's a better firewall?

3      A.   I don't know.  And so when we start getting

4  into the technical bits, we're going to overlap with

5  Jeff Crawford's testimony.  And Jeff Crawford,

6  you've already deposed him.  You're going to -- I

7  believe you'll be deposing Michael Xie.

8          Obviously those -- I would say the number

9  one definitive source for information about any

10  given product, any given model of Fortinet would be

11  the -- the source code, what it actually -- the

12  actual stuff that it does.

13          And then to the extent that there's people

14  giving testimony, to the extent they're able to

15  remember the hundreds of thousands of lines of code

16  that are included in the product, that -- you know,

17  it's a little hard to -- you know, no one person

18  knows it, but Jeff is pretty darn knowledgeable.

19      Q.   Okay.  So I'm just trying to get at some

20  foundation questions before I get to the real

21  questions.

22      A.   Okay.

23      Q.   So FortiGate UTM products all include a

24  copy of the FortiOS operating system; is that

25  correct?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 129

1     A.   Well, again, I said -- you said the

2   FortiGate operating system, or do you call it

3   FortiOS?

4     Q.   FortiOS -- I'll ask it again.

5     A.   I've already said the FortiOS is a -- is a

6   sort of an ambiguous term.  So that if we're talking

7   about the -- the source tree that we've provided to

8   you, which is -- is referred to -- has been referred

9   to, along with a bunch of other stuff, as "FortiOS,"

10   the general term of the appliance -- and also I'll

11   note you've accused things that aren't appliances as

12   well -- those would be loaded with an image that --

13   you know, that would be customized for the relevant

14   hardware or lack of hardware.

15     Q.   Okay.  You don't have to focus on accused

16   product for this question, just on -- on the words

17   of my question.

18          The FortiGate products that are UTM

19   appliances, so with respect to the FortiGate

20   products that are UTM appliances, do each one of

21   them contain a executable version of the FortiOS

22   source tree?

23     A.   So I prefer to focus on the accused

24   products 'cause it's a very broad list, and that's

25   the list that I -- I was instructed to prepare --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 130

1   you know, that I understood from your request per

2   my --

3        Q.   This a narrower question than that.

4        A.   Oh, is it?  Oh, I was thinking it was

5   broader.  So I did prepare on that list of accused

6   products.  There are a wide, wide range -- a very

7   large number of FortiGate appliances on that accused

8   list.  Each one of those appliance -- well, there's

9   also -- you've -- you've listed FortiAPs.

10            Are you including that in the definition of

11   the FortiGate products?

12       Q.   I'm asking you with regard to FortiGate UTM

13   appliances.

14       A.   Okay.  I'm trying to go back to that.

15   So -- so -- so excluding the FortiAPs?

16       Q.   I don't know.  Would you include them as

17   UTM -- UTM appliances?

18       A.   Some people would.

19       Q.   Do you?

20       A.   That's a -- the UTM appliance -- again,

21   it's a marketing term.  Are they a Fortinet product?

22   Do some people refer to them as the FortiGate?  Are

23   they accused?  Yes.

24       Q.   Are they a branded "FortiGate"?

25       A.   FortiGate, the term, the exact term, no.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 131

1      Q.    Okay.  So let's focus --

2      A.    I don't think so.

3      Q.    Let's focus on the products that are

4   branded "FortiGate".

5      A.    Okay.  So the --

6      Q.    The UTM appliances that are branded

7   "FortiGate" is what I'm focusing you on.

8            My question is, with regard to the UTM

9   appliances that are branded "FortiGate," do each of

10   them contain an executable version of the source

11   tree called FortiOS?

12      A.    Okay.  And -- okay.  Looking at -- I'm

13   going to go back, just to be precise, to the accused

14   product list, which is what I prepared for.

15            There's a selection of FortiAPs.  We'll

16   exclude those.  They have their own operating system

17   which is distinct from the operating system that's

18   developed for the FortiGate family and resides on

19   servers or in our change management system in

20   Vancouver.

21            Excluding chassis and other parts that

22   don't have them, but if we're asking that general

23   question across the accused products, which is

24   primarily the "Forti," represents the breadth of the

25   FortiGate family, those would be loaded with an

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 132

1    executable image that would be generated out of that

2    change management system in Vancouver.

3        Q.   And that executable image would be of the

4    FortiOS source code?

5        A.   Well, I've already said FortiOS is -- has

6    been referred to as even that OS that's loaded on

7    the FortiAPs, and that's totally distinct.  So then

8    it's certainly not -- they're different.  And -- and

9    it's not loaded with a FortiMail operating system or

10   FortiWeb operating system.

11            So there is a specific operating system

12   that's loaded on FortiGate family, so it's very,

13   very variably built.

14       Q.   What is the name of the specific operating

15   system that is loaded on the FortiGate family UTM

16   appliances?

17       A.   As I've said, it has been referred to and

18   it's very commonly referred to as FortiOS.  But that

19   term also ends up encompassing other operating

20   systems and other products.

21            So I'm trying to be precise and say the

22   FortiOS -- what is commonly referred to as FortiOS

23   that's -- that's in our Vancouver change management

24   system for the FortiGate products, that -- from

25   that -- and it'll be different for each -- for each

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 133

1   different appliance, obviously, an executable image

2   can be or would be generated and loaded by the

3   contract manufacturer prior to shipping, I guess.

4       Q.   And for all of the FortiGate appliances

5   that do get a FortiOS image loaded on them, do they

6   all include application-level code?

7       A.   I don't know the -- I don't know the

8   definitive answer to that question, but I -- I

9   believe that in the general case, at least in the

10  vast majority -- there could be some corner case --

11  some -- there could be a corner case where it's not

12  the case.

13          I believe there was a project recently that

14  was a -- sort of a firewall-only special packet

15  filtering project.  I -- I don't know if that was

16  released.  I don't know what it was named.  But --

17  so there could be something like that that's a

18  corner case.

19          But I think in general -- again, not being

20  engineering, not working in change management -- I'm

21  a lawyer -- that the image that's -- that's

22  generated at the change management team in Vancouver

23  would be loaded and would include what I would

24  consider a kernel and would consider stuff that I

25  would consider application-level code.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 134

 1    Q.   Okay.  So that was the background.  And now
 2  the question is, is there any way for a customer to
 3  get the kernel and the application-level code that
 4  you just referenced, other than buying a FortiGuard
 5  product?
 6    A.   There's no SKU -- I don't -- I don't -- I
 7  don't think -- there's no SKU.  There's no --
 8  without a SKU, I don't think we can sell anything.
 9  There's no SKU for -- unless you're talking about
10  virtual appliances, which you've also accused.
11        So you have virtual appliances.  That's a
12  software only.  Is that what you're referring to?
13    Q.   No.  I'm asking you is it possible for the
14  customer to buy just a smaller subsection of the --
15  of a FortiGate product and just get the kernel and
16  the application-level code without buying the rest
17  of the stuff?
18    A.   I don't -- there -- I don't think there is.
19  I hate to make general statements 'cause there's --
20  there seem to always be corner cases, but I don't
21  think there's a SKU for any FortiOS or, you know,
22  software-only product other than, let's say, the VM,
23  which is intended to run, as you know, on generic
24  hardware without a -- an -- you know, a Fortinet
25  specific appliance.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 135

1          I don't think that -- there is no SKU that

2     we would sell -- that you would buy -- that you

3     would just purchase FortiOS separately.  And I think

4     I think we've -- actually, this has been the subject

5     of some of our Rog responses, I think.

6          Q.   Can you buy the -- any of the FortiGate

7     products without the FortiOS?

8          A.   Well, certainly the chassis.  But

9     generally, I think -- and we're talking about that

10    accused list of products, excluding the chassis,

11    excluding the things that aren't products and

12    excluding the FortiAPs, that would -- any one of

13    those products in the -- at least in the normal

14    case, absent some sort of custom request or

15    something which I have no knowledge of, but that --

16    generally that's going to be loaded with an

17    executable image out of the change management team.

18         Q.   An executable image of the FortiOS system?

19         A.   Out of the -- what's frequently called

20    FortiOS that runs the operating system, the

21    executable -- the entire executable image that runs

22    on the applicable FortiGate.

23         Q.   And that executable image that you referred

24    to, that resides in -- in Vancouver, Canada, or a

25    city near it?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 136

1      A.    Yeah, yes.

2      Q.    And not in California?

3      A.    Correct.

4      Q.    And the source code for that image also

5      resides in Vancouver, Canada?

6      A.    I thought that was what you just asked and

7      I said "correct" to.

8      Q.    Okay.  I meant the executable image, but --

9      A.    So the change control management -- the

10     change is a source code control system, which is a

11     source -- a source tree, which is able to generate,

12     you know, sort of overlaid plus historically

13     overlaid versions.  And from that, you can trigger a

14     build of an executable image.  So it's the same

15     source tree.

16     Q.    Okay.

17     A.    And you wouldn't -- you would load it with

18     obviously the generated executable image.

19     Q.    Thank you.  So let me ask it again just --

20     A.    Okay.  I must have misunderstood your

21     question.

22     Q.    No, I misunderstood.  When I was saying

23     "thank you," I was being sincere.

24     A.    Oh, okay.

25     Q.    I meant thank you, you've enlightened me

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 137

1    and I understand it better.

2            So the -- the source tree and the source

3    code for the FortiOS operating system reside

4    exclusively in Vancouver, Canada?

5        A.    When you're referring to the FortiOS that

6    runs on the FortiGate appliances, yes.

7        Q.    And it does not reside in northern

8    California?

9        A.    I do not believe so.

10       Q.    And how long has that been the case for?

11       A.    As long -- many, many, many years.

12       Q.    And the same is true for the executable

13   version of the FortiOS code that we've been talking

14   about, that it resides --

15       A.    It's built out of that change management

16   system, so -- and that -- so change so code is

17   changing all the time.  And there's -- you know,

18   there's the primary build and there are special

19   builds.

20            And so when a -- when -- and actually it --

21   it's shipped to the contract manufacturers, right.

22   So a build -- so the source code is held in the

23   change management system in Vancouver/Burnaby, and

24   when we -- and then copies of that are generated and

25   sent to China, Taiwan, or right there in Burnaby for

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 138

1    the appliances that are built there in Burnaby, to

2    the -- to the site of the contract manufacturer that

3    then would populate that into -- you know, into the

4    appliance to be shipped to a customer.

5         Q.   Does that ever occur in the U.S.?

6         A.   I do not believe -- if I go through that

7    accused list of products, no, there's no single U.S.

8    contract manufacturer on any product in the entire

9    list.

10        Q.   And -- and that manufacturing process never

11   occurs at your Sunnyvale headquarters?

12        A.   Correct.

13        Q.   Okay.  And how long has that been true for?

14        A.   I don't know.  But a long time.

15        Q.   Since you've been with Fortinet?

16        A.   I mean, things change over time and

17   there -- there's always -- with each new -- products

18   come in, products go out and end of life, contracts

19   with different contract manufacturers.

20             There has been -- there may have been

21   historically a contract manufacturer or two in the

22   United States.  Nothing that I can come [sic] to

23   mind, but I would hate to say never.

24        Q.   I was focusing on the manufacturing at

25   Sunnyvale and at Fortinet's headquarters.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 139

1      A.   Well, no, we wouldn't do the contract

2    manufacture for any -- for -- for any of the accused

3    products.

4      Q.   Okay.

5      A.   Or I don't think ever have.

6      Q.   Okay.  Has anyone at Fortinet ever been

7    accused of fraud?

8           MR. COOPER:  I object that the question

9    calls for attorney/client-privileged communications,

10   and I instruct the witness not to answer to the

11   extent that it would reveal such communications.

12          THE WITNESS:  So when you say "anyone at

13   Fortinet," any person that is employed or ever has

14   been employed by Fortinet worldwide ever had any

15   accusation of fraud?

16          MR. CUKOR:  That you are aware of.

17          THE WITNESS:  That I'm aware of.

18          MR. COOPER:  Same objection and

19   instruction.

20          THE WITNESS:  And -- and I know that this

21   is the subject of a current dispute with respect to

22   some Rog answers.

23          So you say "accused of."  What -- what --

24   what do we mean?  Is this in a formal capacity in a

25   legal proceeding, which helps define what we mean

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 140

1   by, you know, an accusation of fraud, in which -- in

2   which case, as I'm sitting here, depending on sort

3   of what you mean by that, I'm not aware of anything.

4            MR. CUKOR:  Q.  You seem very up-to-date on

5   the discovery disputes.

6        A.  Well, I mean, this is going back and forth

7   right now, and I -- I think that, you know, as you

8   know, I've been intimately involved with collecting,

9   you know, and updating duties and document requests

10  and the like.

11           So obviously to the extent that there's a

12  demand to collect data, I'm usually the point person

13  for doing that collection.  So I need to know the

14  exact scope of what I'm -- of what I'm collecting.

15       Q.  Over the course of the last year, what

16  would you estimate the percentage of your time you

17  spent on this litigation is?

18       A.  The percent of my overall time at Fortinet

19  that's dedicated to this litigation?  Is that the

20  question you're asking?

21       Q.  Yes.

22       A.  I -- I -- it -- I would -- that would be --

23  I would be guessing at what it would be.  I mean,

24  right now it seems like a lot in the last couple

25  weeks of discovery, but there are also periods that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 141

1    have been relatively -- you know, that have been

2    relatively quiet or largely handled by -- by outside

3    counsel and not so much my time.  It's difficult to

4    say.

5        Q.   Okay.  So what I wanted to know about the

6    fraud question before, to get you back to that, is

7    not whether there have been any legal proceedings

8    necessarily instituted or not, but has anyone made

9    any accusations against a Fortinet employee of fraud

10   that you are aware of?

11           MR. COOPER:  Same objection; same

12   instruction.

13           THE WITNESS:  And sort of -- I mean, I --

14   thinking -- thinking more broadly 'cause I -- you

15   know, I don't want to say no if -- if there's

16   something that you would -- you would think would be

17   captured under that definition.

18           I don't know of any formal allegations.

19   There was a -- there was a shareholder derivative

20   suit that was filed some time ago that I had no

21   involvement with.  Those usually have -- have

22   allegations of at least -- and I don't know what the

23   allegations were there, but -- so I'm not aware

24   that -- I know that that suit was filed and was

25   resolved.  I don't know what the allegations were

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 142

1    specifically.

2           MR. CUKOR:  Okay.

3           THE WITNESS:  Nothing else jumps to mind.

4    I do -- I do actually participate in the

5    whistle-blower program for Fortinet.  I'm on -- I'm

6    on that whistle-blower hotline.

7           I think over the eight years that I've been

8    there, there have been maybe less than five --

9    somewhere -- somewhere in the three to eight,

10   somewhere in that range, of -- of -- of complaints.

11          But those would have captured like sexual

12   harassment, you know, employee complaints, you know,

13   improper -- you know, sort of sales relationships.

14   I'm not sure that -- that would -- if you would

15   capture that under the allegations.

16          MR. CUKOR:  Q.  No, I appreciate the

17   completeness of your answer.  Let me focus the

18   question to allegations that you are aware of

19   misappropriation or misuse of intellectual property.

20          MR. COOPER:  Same objection; same

21   instruction.

22          THE WITNESS:  So my -- my immediate

23   reaction is not that I'm aware of, but I'm trying to

24   think more broadly.  I mean I think the -- the

25   litigation that we've been a party to are all of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 143

1    public record.

2          I don't think there's been -- included in

3    those allegations -- again, I didn't -- in

4    preparation for this I didn't review all of the

5    complaints.  They're all publicly filed.  I didn't

6    review those to see if -- I mean a lot of times

7    there's a whole lot of -- as you know, there'll be a

8    lot of and this and this and this and this.

9    Additional allegations.

10          I -- I can't say that -- that there's -- I

11    don't -- I don't think there's any -- anything

12    substantive, anything that rose to -- to the

13    attention that I'm acutely -- that I'm aware of it.

14          MR. CUKOR:  Q.  Okay.  Are you aware of any

15    allegations of theft of trade secrets?

16          MR. COOPER:  Same objection; same

17    instruction.

18          THE WITNESS:  I -- I don't -- I do not

19    think so.  There was a case that predated me.  So in

20    the early 2000s, I think there was a case that had

21    some unfair comp elements to it, if we're thinking

22    that broadly.  It's not something I was -- it was,

23    you know, resolved amicably before I joined the

24    company.

25          MR. CUKOR:  Q.  What was that case?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 144

1      A.    I think it was -- it was originally brought

2   by NetScreen against Fortinet for hiring NetScreen

3   individuals.

4      Q.    Do you know which individuals?

5      A.    Were hired?

6      Q.    (Nonverbal response.)

7      A.    Okay.  No.  Again, the case predates me.

8   And I think there was just a number -- it's similar

9   to the case that -- a competitor case that we

10   brought against Palo Alto Networks, where there's a

11   pattern of -- a pattern of hiring which raises

12   concerns about protections of intellectual property.

13          I think that this comes within the scope of

14   what you're looking for, so I'm trying to think

15   broadly about that.

16          In -- I don't think there's been any --

17   like the Trend suit I don't think had any such

18   allegations.  The countersuit by PAN, I don't --

19   Palo Alto Networks -- I don't think had any such

20   allegations.  We asserted them against Palo Alto

21   Networks, and I believe we've asserted them in the

22   other case against FireEye that's currently pending.

23          But I don't think anyone, other than that

24   early suit, have made such allegations against

25   Fortinet.  Not that I -- that come to mind.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 145

1      Q.   And how was that NetScreen dispute

2   resolved.

3      A.   NetScreen was purchased by -- again, this

4   is -- predates me so I don't know the circumstance

5   around it, but my understanding is that NetScreen

6   was purchased by Juniper, and that diffused some of

7   the competitive personality -- you know -- I don't

8   know.  That somehow diffused the situation.  It

9   was -- it was largely resolved.

10     Q.   Just by the acquisition by Juniper?

11     A.   I think some of the people controlling the

12  litigation changed.  But again, I -- I'm

13  speculating.  So I should -- probably shouldn't be

14  saying.  It's before my time.

15     Q.   So then as far as you know, was any payment

16  made to NetScreen to resolve that?

17     A.   I think a reasonably nominal amount.

18          I think the -- I think the -- the piece

19  that I'm aware of was a duty, you know, for some

20  period of time to -- to provide education to

21  incoming employees, if they came from Juniper or

22  NetScreen, to train them on their obligations around

23  preserving the confidences of their prior employer.

24     Q.   So -- but did Fortinet pay money to

25  NetScreen or Juniper in connection with resolving

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 146

1    that dispute?

2            MR. COOPER:  Same objection; same

3    instruction.

4            THE WITNESS:  I -- I -- I -- I believe

5    there was some payment, but I believe it was --

6    again, that predated me, but I think it was not

7    significant.

8            MR. CUKOR:  Q.  Do you remember -- do you

9    have an idea what the number was?

10       A.   I'd be guessing, but I would guess a

11   hundred thousand dollars.

12       Q.   Why are you guessing a hundred thousand

13   dollars?

14       A.   Well, because it was something -- I believe

15   it was something along those lines.  So I cannot

16   guess.  I cannot guess, in which case I would say

17   nothing.  But I -- I mean not nominal as in you and

18   I would think was nominal.  If someone asked you to

19   pay a hundred thousand dollars, that would not be

20   nominal to you.

21           But in the larger context of litigation, I

22   remember it not being that -- that significant an

23   amount.

24       Q.   Okay.  Is there an agreement that

25   memorializes that transaction?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 147

1       A.    I believe there was a settlement agreement.

2       Q.    Was that produced in this litigation?

3       A.    I'm not -- I'm not sure that it was.  I'm

4   not sure that if I remember back to looking at the

5   various document requests -- also this would -- I

6   think predates most of the document request date

7   ranges.  I'm not sure that it would be -- you know,

8   we'd have to find it 'cause it's very old, but

9   certainly could be produced.

10       MR. CUKOR:  I'm asking now then if you

11   could find it.  And if you're able to find it, would

12   you please produce it?  You can discuss it with your

13   counsel.

14       THE WITNESS:  Oh, no.  I mean we can.

15   Usually -- I know that in other the other

16   depositions, to the extent that there's document

17   requests that come out of it, that we ask that you

18   memorialize them separately in writing so that we

19   can track them appropriately.

20       MR. COOPER:  So I'll just say, consistent

21   with the practice in previous depositions, we'll

22   take your question under advisement and ask that it

23   be communicated in writing to us so there's no

24   miscommunication about what you're asking for.

25       MR. CUKOR:  Q.  Has Fortinet or its

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 148

1    employees ever been accused of copyright violation?

2         MR. COOPER:  Same objection; same

3    instruction.

4         THE WITNESS:  Not that I'm aware of.

5         MR. CUKOR:  Q.  How about license agreement

6    violations?

7         MR. COOPER:  Same instruction; same

8    objection.

9         THE WITNESS:  Yes.

10         MR. CUKOR:  Q.  Which ones?

11    A.    The Trend Micro license.

12    Q.    Any others?

13    A.    I don't -- I don't think so.  Not -- not

14    that comes to mind.

15    Q.    How about in connection with the open

16    source community?

17    A.    Oh, what was the original question again?

18    Q.    Has Fortinet or its employees ever been

19    accused of license violations?

20         MR. COOPER:  Same instruction; same

21    objection.

22         THE WITNESS:  Okay.  So then I neglected to

23    recall -- there was -- that predated me.  There was

24    a -- an accusation that Fortinet was not in

25    compliance with the -- with the license -- and the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 149

1    GPL license applicable to, you know, some -- two or

2    three discrete code modules.

3              MR. CUKOR:  Q.  That was an accusation?

4        A.   Yes.

5        Q.   And who made that accusation?

6        A.   It was an organization called

7    GPLviolations.org.

8        Q.   And who did they make that accusation to?

9              MR. COOPER:  Same objection; same

10   instruction.

11             THE WITNESS:  Again, this -- this predates

12   me so I wasn't involved, so I don't know who they

13   contacted and how that -- how that played out.

14             MR. CUKOR:  Q.  Do you know how that issue

15   was resolved?

16       A.   I believe there was a -- a -- an

17   agreed-upon settlement which required compliance

18   with the GPL license.

19       Q.   So there wasn't a finding by a Court made

20   in that case?

21       A.   I don't -- I don't -- I don't believe so.

22   Again, this is -- this predates me, and it was

23   resolved before I was there.  I believe there was

24   a -- there's a process in the German courts -- it

25   was somewhere in Germany it was brought, where

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 150

1  without making a finding, I think you can -- you can

2  make an accusation and get some sort of a

3  restraining order in advance of any sort of formal

4  finding.

5          But again, I'm -- this is not my area of

6  law.  I've never practiced in Germany, and I wasn't

7  involved with that case.  I only know about it sort

8  of anecdotally.

9          And that's another one of the things that

10 is under my area of responsibility, is open source

11 compliance, which is something that was sort of

12 actively beginning as a result of this -- you know,

13 being this -- this -- the accusation.

14     Q.   Are there any open source code in FortiOS?

15     A.   Yes.  And I believe it has been requested

16 and disclosed to -- at least to the extent that we

17 had it available to, NPS.

18     Q.   Is there open source code in the kernel

19 portion of the FortiOS operating system?

20     A.   As I mentioned earlier, the -- the FortiOS

21 system is built on a very early version of the Linux

22 kernel, and the Linux kernel is comprised of a

23 number of open source licensed modules.

24     Q.   And what are the consequences of that in

25 terms of maintaining the secrecy of the FortiOS

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 151

1    kernel?

2         A.   I don't understand your question.

3         Q.   Does Fortinet have an obligation to

4    disclose any of the source code for the kernel --

5         A.   So you're --

6         Q.   -- to the public?

7         A.   So you're asking me about my interpretation

8    of the obligations of the -- of the GPL license

9    or -- a variety of open source licenses?

10        Q.   Well, you mentioned you were the head of

11   the open source team, so, yes.

12        A.   But it's a -- it's a complicated -- it's a

13   complicated question.  There's -- there's -- within

14   the -- I mean the Linux kernel is not a single

15   discrete module under a single discrete licensing

16   scheme, so it's a -- it's a -- you know, there's an

17   entire cottage industry that has sprung up around

18   understanding the licenses and complying with the

19   licenses.

20             So, yes, within Fortinet I'm charged with

21   running our annual audit and understanding the

22   various components and -- and running our compliance

23   program, which, again, that bit and the legal

24   conclusions around it and what I -- and how I

25   structure that program would be -- would be attorney

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 152

1    work product and privileged information.

2        Q.    Let me ask you a different way.   Has

3    Fortinet made any portion of the FortiOS kernel

4    generally available to the public?

5        A.    Our EULA, end user license agreement, which

6    has been produced, I'm sure, in various copies to

7    NPS, includes disclosure about the open source

8    obligations about the included open source.

9            And that EULA includes and I haven't looked

10   at it.  It's not my -- updating the EULA is not my

11   area.  Our commercial agreements is not something

12   I'm directly responsible for, but I believe it still

13   has -- and we periodically update the -- that

14   obligation.

15           And the fact that a -- you know, a user can

16   request a copy of the code that would be licensed

17   under the GPL or the LGPL.

18       Q.    Has anyone ever requested that?

19       A.    To date, during the -- I think I've been

20   running that system -- I mean I -- I instituted the

21   annual audits, and I've been running the open source

22   compliance program pretty much from the start.

23           I believe we've had at least one, maybe

24   two, if I include your request for the open source

25   license, so I think you went -- you didn't go

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 153

1    through the normal channels for requesting it.

2            I think we've had one sort of normal

3    request, and that was probably back in the 2006 time

4    frame.

5        Q.    And what was provided?

6        A.    I believe what we provided collected and

7    provided to NPS is what we provided.

8        Q.    To the other party that requested the

9    disclosure under the open source agreement?

10       A.    Yes.

11       Q.    Okay.  In your expertise as a -- let me

12   start again.

13           In your experience as a licensor and a

14   licensee of intellectual property, does the fact

15   that an assignment of the '601 patent recites

16   consideration of one dollar relate to the value of

17   the '601 patent?

18           MR. COOPER:  Caution the witness not to

19   reveal any attorney/client-privileged information.

20           THE WITNESS:  And I'd ask you to clarify

21   the question.  You've completely lost me.

22           MR. CUKOR:  Q.  Okay.  Do you think hearing

23   it one more time before you --

24       A.    It might.

25       Q.    Okay.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 154

1      A.   I just -- one dollar -- so one dollar's

2   mentioned where and based on my experience doing

3   what?

4      Q.   Okay.

5      A.   I'm just -- I -- I didn't get the question.

6      Q.   I'll break it down, then.

7           Did you know that there was an assignment

8   in the assignment chain of the '601 patent that

9   recited a dollar for consideration?

10      A.   I have -- this is not documents that I --

11   in documents that I've collected internally and that

12   I'm aware of internally.  I've seen -- I've seen

13   internal discussions that would be privileged from

14   communications from outside counsel that I -- that

15   I'm worried about.  I --

16      Q.   Let me ask --

17      A.   Did it -- it may have been mentioned in the

18   background section of the motion to dismiss, but I

19   can't recall.  I can't recall that -- the entire

20   scope of what was in that motion to dismiss.

21      Q.   Let me -- let me ask it hypothetically --

22   not hypothetically, on a general level.

23           In your experience as a licensor and a

24   licensee of intellectual property, does the fact

25   that an assignment recites one dollar as the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 155

1  consideration in it affect the value of that

2  intellectual property?

3      A.   If I understand the question correctly --

4  affect -- I -- I'm not sure I do understand the

5  question.  But if I purchase a patent for a dollar,

6  and I -- we draft an agreement memorializing that

7  purchase for a dollar, the dollar's at least

8  relevant -- I mean has something to do with the

9  value of patent, but it kind of depends.

10         I mean we also do a number of transactions

11 that involve other -- you know, that are part of a

12 larger transaction.  So I'm -- I'm not sure exactly

13 what you're getting at.

14         If I buy some -- you know, if I buy

15 something for a dollar, you know presumably it's

16 worth a dollar.

17     Q.   Does -- are -- are patent assignments -- do

18 patent assignments ever recite one dollar for the

19 consideration as a matter of form when the actual

20 value of the patent has nothing to do with that

21 dollar?

22     A.   If I think of the patent assignments that

23 I've recorded, I don't think that any of them are

24 structured in that way.  I think the value that we

25 put on the assignments -- and there have been a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 156

1    number of them -- actually reflect the value paid

2    and negotiated.

3        Q.   So you think that the -- at least the way

4    Fortinet would handle it would be that the value

5    identified in the assignment is the value of --

6    reflective of the intellectual property that's being

7    assigned?

8        A.   Again I'd -- I did go back and review -- I

9    usually ask for help from outside counsel to do that

10   'cause there's the PTO assignment, there's the

11   purchase agreement, so there's a number of different

12   agreements, some being -- some that are sort of

13   subject to disclosure and publicly filed, some that

14   are not.

15            So -- but thinking back to the

16   transactional documents that I've reviewed for this

17   deposition -- in preparation for this deposition,

18   and I looked at -- because there's a category of

19   documents where we did purchase intellectual

20   property either independently or as a piece of a

21   larger transaction, if I think about those

22   documents, in each case the consideration paid is

23   the actual negotiated consideration paid.

24       Q.   So just your own personal policy as -- as

25   Todd Nelson, you would not record an assignment for

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 157

1  a dollar when the actual amount paid was different

2  than that?

3      A.   I don't record any of the assignments, so I

4  negotiate -- I'm involved with negotiating the

5  actual substantive deal, the purchase transaction,

6  the license transaction.  So that's the piece of it

7  that I'm thinking of.

8           If I think you're referring to maybe

9  something -- something different, so I'm -- I'm a

10  little unclear.

11     Q.   Would you sign an assignment that recited a

12  dollar for consideration when the actual purchase

13  price was much more than a dollar?

14     A.   I don't -- I don't know.  It would be

15  fact-specific.  And I'm trying to go through my head

16  on the list of assignments that I've been involved

17  with, and I think I've comprehensively listed each

18  and every assignment that I've done.

19           And -- and prior to this, my -- you know,

20  working at Fortinet, I was working as an outside

21  counsel.  I didn't sign any such documents.  So that

22  what you've got represents my entire history of --

23  of -- of assignments of patent purchases, sales,

24  either alone or in -- or as part of a transaction.

25  So I think you've got my -- you've got my -- you've

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 158

1   got the -- my entire dataset you have access to.

2       Q.   Okay.  Thank you.  But is it your policy as

3   a Fortinet employee that you would insist that the

4   value of the -- that is recorded in the assignment

5   that you sign would be the value of the patent?

6       A.   Again, we don't have such a policy.  And

7   I've -- I've given you the -- every single patent

8   assignment that Fortinet's done.  And I've -- I've

9   had my -- you know, I basically have been involved.

10  I probably signed all of them.

11          Again, I didn't check my signature in each

12  of those.  I mean our GC could have signed them

13  instead of me or maybe our CTO or CEO.

14          But for the most part, I've been involved

15  in each and every one of those.  You have every

16  single data point.  So to the extent there is a

17  policy or was a policy, I think it would be

18  reflected in documents that we've produced to you.

19      Q.   Okay.  So is your belief that the

20  consideration that is recited in the assignments

21  that you've signed reflective of the value of the

22  intellectual property that's being assigned for

23  those assignments?

24      A.   Going -- it gets complicated going through

25  each.  I'd rather just step through each one and

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 159

1    sort of answer the specific question again about

2    each one.

3              And when you talk about reflective of the

4    value, if we're talking about just a patent -- you

5    know, just -- I'm purchasing patents from you and

6    we're -- you know, it is an agreed-to price.  You

7    might have -- the seller might have a different

8    value than the buyer might have.  And it -- you

9    know, I'm -- I'm struggling here.

10             I'd rather just go through the specific

11   documents, and I can tell you, you know, what our

12   value -- obviously we -- if we did the transaction,

13   then, you know, I was able to get the budget to do

14   the transaction, and we -- you know, I was able to

15   justify the value relative to that, those assets.

16        Q.   Could it be that the value of consideration

17   that is recited in an assignment document has no

18   bearing at all on the value of the intellectual

19   property that's being assigned?

20        A.   I -- I'm not sure -- you seem to be asking

21   for an abstract question.  I've given you the

22   entirety of my -- of my experience in -- with -- in

23   signing and negotiating IP -- you know, deals that

24   include IP.  So you've got my entire dataset.

25        Q.   I am asking you a general question.  Is

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 160

1    it --

2         A.   I don't know.

3         Q.   -- is it --

4         A.   You have my entire dataset.

5         Q.   I understand.  But is it your belief that,

6    in general, companies record assignments that recite

7    consideration that bears no value at all in

8    understanding the value of the IP that's being

9    assigned?

10        A.   It -- it hasn't been my practice.  I

11   haven't been involved in any of those transactions,

12   so I can't really speak to what -- I would be

13   speculating as to what other companies do, other

14   lawyers do, and what you mean by "recording."

15        Q.   Okay.  You mentioned before that you get a

16   bonus based on -- and you used an acronym like BDO.

17   Is that --

18        A.   MBO.

19        Q.   MBO.  What does that stand for?

20        A.   Management by objectives.

21        Q.   What does that mean?

22        A.   I think it's a fairly common term in

23   employment these days, at least in industry in the

24   Valley here, where you have a variable bonus based

25   on a set of largely unattainable goals.  I'm

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 161

1    kidding.  I mean hopefully they're attainable, but

2    it depends on your -- your boss and how about

3    reasonable they are.

4        Q.   What are -- do any of your management-based

5    objectives relate to litigation?

6        A.   Yes.

7        Q.   What are those?

8        A.   This is -- this is new, so it's -- it's not

9    something I've paid a lot -- it just was instituted.

10            But I believe that I have -- and I haven't

11   spent a lot of time thinking about it.  My policy is

12   to try to do a good job, and if I earn the bonus I

13   earn the bonus.  I'm not going to -- you know, I

14   just -- I'm not going to use that as a -- as a

15   guidepost for how to operate on a day-to-day basis.

16            But a small percentage, maybe it's a

17   quarter of my bonus is based on not exceeding

18   budget.

19       Q.   And --

20       A.   The litigation budget, sorry.

21       Q.   Not exceeding the litigation budget.

22            And if you were to pay a settlement in this

23   case, would that be a part of your litigation

24   budget?

25       A.   No.  I think it's just -- I mean, as I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 162

1   understand my -- it's newly instituted, but as I

2   understand it -- we'll see in practice -- we have a

3   quarterly, we have an annual budget we project.  And

4   I am tasked with managing outside counsel and

5   working with finance and -- and -- and staying on

6   track and operating within a budget.

7          MR. CUKOR:  Okay.  I think we need to

8   change the tape now.  Let's go off the record.

9          THE VIDEOGRAPHER:  We are going off the

10  record.  The time is 3:01 p.m.  Here marks the end

11  of videotape number 2 in the deposition of

12  Todd Nelson.

13          (Recess taken.)

14          THE VIDEOGRAPHER:  We are back on the

15  record.  The time is 3:19 p.m.  Here marks the

16  beginning of videotape number 3 in the deposition of

17  Todd Nelson.

18          MR. CUKOR:  Q.  Before the break you

19  mentioned the Fortinet budget and the forecast.  Is

20  there a certain amount that is budgeted for paying

21  intellectual property patent licenses to third

22  parties?

23     A.   No.

24     Q.   Nothing is budgeted for that?

25     A.   Oh, no.  Now, I think it's loaded -- a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 163

1    loaded question.  What do you mean by "budgeting"?

2    I mean -- yeah, what do you -- what do you mean by

3    "budgeting"?

4         Q.   You mentioned a budget that you have for

5    litigation.

6         A.   Right.  We have a -- we have a -- a budget.

7    I mean with each litigation we have outside counsel

8    retained, and maybe there's experts and additional

9    costs.  I mean, so there's a budget for the ongoing

10   litigation.

11             And we look forward and try to -- you know,

12   we -- we have an obligation -- again, because, as

13   you know, we're a public reporting company.  There

14   is -- we -- we project -- as part of our -- our

15   normal financial reporting process, we project, you

16   know, revenue to the best of our ability and we

17   project costs.

18             And part of costs -- I mean, the -- we're a

19   cost center, the legal department, and so we try to

20   budget out what those ongoing costs would be.  I

21   don't believe -- again, I'm not involved in the

22   financial reporting aspects, but I don't believe --

23   'cause there's different aspects of that, but I

24   don't believe as part of our -- you know, our normal

25   budgeting process that I'm referring to that there's

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 164

1   any -- there's any element of -- of an estimated or

2   guesstimated or approximated settlement.

3       Q.   Okay.  So there's a -- there is a document

4   that's a annual budget for Fortinet?

5       A.   I don't know if it's a document.  It's --

6   it's more of a process.  I don't think I've ever

7   seen a document.

8       Q.   Okay.  There's a Fortinet budget process

9   and each year a certain amount is allocated for

10  litigation, correct?

11      A.   Yes, it's broken out by litigation.  So ...

12      Q.   But each year there's a certain amount of

13  money that is in the budget process identified or

14  earmarked for litigation, correct?

15      A.   Yeah.  I'm not sure about the earmark.  So

16  I mean -- and I don't know the exact timing.  It

17  seems to vary each year depending on how busy we

18  are.

19           But let's say at the end of

20  October/November, as we're going into next year, we

21  would look at the various litigation matters that

22  are ongoing.  You can't predict those that -- you

23  know, you don't know what might come up, but you

24  look at those that are ongoing, and we -- we project

25  out whether we -- whether we think they would run

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 165

1    the entire year.

2         We look at this case schedule.  We -- we

3    ask for a budget from our outside counsel, you know,

4    based on their experience in -- in -- in -- in

5    represent -- you know, in -- in similar cases during

6    similar life cycles, and we -- and we create a

7    budget.

8      Q.   And is any part of that litigation budget

9    based on expectation of litigations that had not yet

10   been filed?

11     A.   I -- I -- I don't believe that's the -- you

12   know, I don't believe so.

13     Q.   So it's just based on existing litigations?

14     A.   I believe that's the case.

15     Q.   And is there any money identified in that

16   budget for paying third-party patent licenses?

17     A.   In the litigation budget?

18     Q.   No.  In the budget in general.

19     A.   I -- I don't believe so.

20     Q.   Okay.  Fortinet has sued other companies

21   for patent infringement, correct?

22     A.   Patent infringement claims have been -- or

23   counterclaims have been included in various lawsuits

24   that we've been involved with.

25     Q.   Is suing other companies for patent

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 166

1    infringement sometimes a business necessity?

2         A.   I'm not sure what you mean by that.

3         Q.   Is it sometimes part of Fortinet's business

4    to sue other companies for infringing Fortinet's

5    patents?

6         A.   To the extent I understand the question, I

7    don't -- necessity.  I'm not sure what you mean,

8    but -- or are part of our regular practice.  I -- I

9    would say no.

10             But we have been -- so there was a -- I

11   don't think there actually -- there were no

12   counterclaims in the Trend suit.

13             In the Palo Alto Networks suit, that was

14   a -- an unfair competition, a employee raiding, a

15   breach of contract, a -- it was a multifaceted

16   litigation which included some patent claims and

17   some patent counterclaims.

18        Q.   Okay.

19        A.   And I think it's a reasonably sort of -- I

20   don't know if you'd call it a necessity, but I think

21   it's -- it -- it is an occasional part of business

22   practice, a business practice.  It happens.

23        Q.   Does being a plaintiff in a patent action

24   in any way make Fortinet a bad company?

25        A.   I'm not sure what you -- I'm not sure what

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 167

1    you're asking.  This -- this feels like -- there was

2    an earlier question that sounded similar.

3           I think I've described -- we've had -- we

4    had a trade secret case that we filed against a

5    company called Encheva.  But I don't believe there

6    were any patents.  That was -- we alleged that

7    they -- we actually caught them red-handed.  They

8    had stolen chunks of Fortinet code and baked it into

9    a competing product.  So that -- so we were -- we

10   were bringing that litigation to stop that activity.

11      Q.   So they were improperly using your

12   intellectual property?

13      A.   Well, they had -- they had taken -- or they

14   claimed it was a third-party contract and they were

15   unaware of it.  They had taken code that they had

16   reverse-engineered or taken through higher -- and

17   that one also had employee raiding, some employer

18   hiring.  And then upon investigation, code --

19   Fortinet code showed up on their device.  So we

20   brought suit to -- you know, to stop that activity.

21          So I'm not sure there's any bad company.  I

22   don't think there's a -- I don't -- I'm not sure I

23   would -- I would question our motives in bringing

24   that suit.

25          The other suit that we brought was against

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 168

1    Palo Alto Networks, a competitor.  And I would say

2    that's more similar, more akin to the

3    NetScreen/Juniper case.  And I think those are

4    multi -- multifaceted competitor cases.

5        Q.   If a third party infringed the patent

6    rights of Fortinet and refused to take a license,

7    would it be appropriate for Fortinet to sue that

8    party?

9        A.   Fortinet doesn't have a licensing program.

10   We don't look for -- as a -- you know, as a -- as a

11   practice, we don't look for infringement.  We -- and

12   we don't seek to demand license fees from other

13   companies.

14       Q.   But you have sued other companies for

15   patent infringement, right?

16       A.   We have had competitor suits that are

17   multifaceted and have had patents that were -- that

18   were in the mix of -- of, you know, alleged

19   offenses.

20       Q.   Is there anything inappropriate about that?

21       A.   About including those?  I'm not sure -- I'm

22   not -- I'm not sure that -- it sounds like you want

23   me to comment personally on this.  I -- you know, I

24   just -- I'm not sure that's really appropriate.

25            Is this within a 30(b)(6) topic?  If so,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 169

1 could we figure out which one it is and whether I'm

2 speaking for Fortinet or just me?

3          But -- but personally I don't -- I don't

4 think I'm -- would want to offer an opinion about

5 that.  I mean, we can't -- I mean -- you know.

6     Q.   So I'm asking you, in whatever capacity you

7 feel comfortable answering, is there anything

8 inappropriate about Fortinet being a plaintiff in a

9 patent infringement action?

10    A.   So you're asking me -- so it sounds like

11 you're asking me sort of theoretically or in the

12 abstract whether -- whether there would be

13 anything -- I mean, certainly I can envision a

14 scenario, and there certainly are scenarios that I

15 personally believe there -- that the patent

16 infringement action is -- lacks merit, and -- and

17 certainly you would attribute some negative

18 connotation to prosecuting -- improperly prosecuting

19 that action.

20    Q.   And has Fortinet ever been involved in one

21 of those?

22    A.   I -- I don't believe so.

23    Q.   Okay.  Does Fortinet have a policy or a

24 business strategy about settling cases with

25 companies like Network Protection Sciences?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 170

1           MR. COOPER:  I object that the question

2    calls for attorney/client-privileged communications

3    and instruct the witness not to answer to the extent

4    that it would reveal such communications.

5           THE WITNESS:  I think to the extent that

6    there is a policy about settling, I -- I think that

7    would be privileged.  I think, once again, you're

8    sort of asking for the -- you know, what we're

9    thinking about in -- in reaching -- you know, in

10   reaching a settlement.

11          MR. CUKOR:  Q.  I'm asking for the business

12   policy.  And I'm saying does Fortinet have a

13   business policy about not settling with

14   nonpracticing entities?

15          MR. COOPER:  Same objection; same

16   instruction.

17          THE WITNESS:  There's -- certainly there's

18   no published policy that exists describing settling

19   or not settling any patent lawsuit or a patent

20   lawsuit with a nonpracticing entity.

21          MR. CUKOR:  Q.  Is there any informal

22   policy?

23          MR. COOPER:  Same objection; same

24   instruction.

25          THE WITNESS:  There is no such policy that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 171

1    I'm aware of.

2          MR. CUKOR:  Q.  Does Fortinet have any

3    formal or informal business policy about licensing

4    patents from nonpracticing entities?

5          MR. COOPER:  Same objection; same

6    instruction.

7          THE WITNESS:  Again, there's no published

8    policy, there's no informal policy.  Every business

9    situation would be -- and I think is appropriately

10   dealt with on a case-by-case basis.

11         And the -- the consideration of those cases

12   would be essentially a largely privileged discussion

13   between a client and the attorneys looking at the --

14   the -- the situation.

15         MR. CUKOR:  Q.  So does Fortinet have any

16   business policy at all that relates to nonpracticing

17   entities?

18         MR. COOPER:  Same objection; same

19   instruction.

20         THE WITNESS:  So you're saying a Fortinet

21   policy, a company policy about litigations.

22         MR. CUKOR:  Q.  I don't know if it's a --

23   it's a company policy or a policy of the officers or

24   the executives, but does -- does that trickle down

25   to any kind of business policy that's implemented by

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 172

1    Fortinet that relates to nonpracticing entities?

2            MR. COOPER:  Same objection; same

3    instruction.

4            THE WITNESS:  I don't -- I can't speak for

5    each of the directors or officers of the company as

6    to what their feelings are about settling cases or

7    taking licenses with nonpracticing entities.

8            I am -- and to the extent that there have

9    been conversations about taking licenses or

10   defending a litigation against a nonpracticing

11   entity, I think that would be in the privileged

12   context.

13           In the nonprivileged context, I think

14   during -- during settlement negotiations in fact

15   with NPS, I think we may have -- we may have said

16   that our CEO is -- is upset by the practices of

17   nonpracticing entities, and he -- our CEO, Ken Xie,

18   is -- is dubious of the merits of a number of those

19   cases and those types of case, and he is also very

20   budget conscious.

21           So I -- I don't know if that rises to the

22   level of this.  But to the extent that it's

23   something that's not privileged -- it's probably

24   something that we may have mentioned to you in

25   passing, just about some general personality

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 173

1   qualities of -- of -- you know, of our CEO.

2          So you would know it as well as I do 'cause

3   we would have expressed it to you.  If I have -- if

4   we haven't, then -- I think -- and I think we may

5   have mentioned that.  But if not, then -- then I'm

6   misremembering.

7          MR. CUKOR:  Q.  So is it your understanding

8   that it's Ken Xie's policy not to settle with

9   nonpracticing entities?

10         MR. COOPER:  Same objection; same

11  instruction.

12         THE WITNESS:  No, that -- that's not what

13  I'm saying.  I -- I think I mentioned he -- Ken is a

14  person, and he has a number of attributes.  He is

15  very -- budget conscious being one of the very

16  prominent attributes of -- of Mr. Xie.

17         I don't think, you know, the sum of the

18  personality traits necessarily rises to the level of

19  a policy.  It's just he has a personality.  He

20  doesn't like the non -- the activities of the

21  nonpracticing entities, and he is budget-minded.  I

22  think that's, you know, as far as I can go.

23         MR. CUKOR:  Q.  When you say he's

24  budget-minded, how does that relate to Fortinet's

25  decision to take or not take a license from a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 174

1  nonpracticing entity?

2        MR. COOPER:  Same objection; same

3  instruction.

4        THE WITNESS:  Well, in this case, we've had

5  settlement negotiations, so trying to avoid the

6  privileged communications.  But the negotiations

7  that we have had with you, you've made demands.

8  They're -- they're, you know, for a lot of money.

9  And that would -- that would be -- conflict with a

10 budget-minded CEO and what he would necessarily --

11 what he would be likely to agree to.

12        MR. CUKOR:  Q.  But how does that

13 budget-mindedness relate specifically to the fact

14 that the plaintiff in this case is a nonpracticing

15 entity?

16        MR. COOPER:  Same objection; same

17 instruction.

18        THE WITNESS:  I think I've -- I've

19 mentioned that, you know, more than -- on top of

20 budget-mindedness, you know, our CEO -- and many

21 technology CEOs, you know, in my under- -- you know,

22 industry exposure, look -- are unhappy about the

23 activities of the nonpracticing entities.

24        So does that rise to the level of a policy?

25 No.  But I'm just -- I'm trying to -- you know, I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 175

1   think these are things that we've expressed during

2   settlement negotiations, is that -- that there are

3   challenges our management -- there are challenges,

4   regardless of what we think and regardless of what

5   the privileged communications, which I'm -- you

6   know, which I'm trying very carefully to avoid --

7   but I -- but, again, I think you have this data, so

8   I'm not -- I'm not trying to give you anything more

9   than what we've already expressed to you, I think,

10  fairly clearly during the settlement negotiations.

11          MR. CUKOR:  Q.  So Fortinet does not like

12  being sued by nonpracticing entities?

13          MR. COOPER:  Same objection; same

14  instruction.

15          THE WITNESS:  I think that would be a fair

16  statement.

17          MR. CUKOR:  Q.  Does Fortinet dislike it

18  more than being sued by a practicing entity?

19          MR. COOPER:  Same objection; same

20  instruction.

21          THE WITNESS:  I'm not sure how this is

22  relevant or -- and I notice it has nothing to do

23  with our topic, our notice -- our 30(b)(6) topics.

24  Or if you can alert me to where it relates to it,

25  I -- that would be helpful.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 176

1          But -- so we're -- we're digressing into a

2     general question and answer about nonpracticing

3     entities.

4          I -- Fortinet does not like being sued by

5     nonpracticing entities.  I don't think Fortinet, as

6     a company, likes to be sued by competitors and tries

7     to get along with competitors and to compete in the

8     marketplace based on qualities of products.

9          MR. CUKOR:  Q.  Would Fortinet sell any of

10    its patents to a nonpracticing entity?

11      A.   Fortinet has -- I've disclosed all the

12    patent sales that we've done.  So if we want to

13    ask -- maybe we should direct focus on each specific

14    patent sale.

15         MR. CUKOR:  I'm going to ask Ms. Moose to

16    reread the question and you see if you can answer

17    it.

18         (Record read as follows:

19         QUESTION:  Would Fortinet sell any of

20       its patents to a nonpracticing entity?)

21         THE WITNESS:  It -- it depends on how you

22    define a "nonpracticing entity."  So since you don't

23    want to go through specific agreements, let me try

24    to remember them.

25            We -- we made a patent -- two different

DEPOLINK COURT REPORTING & LITIGATION SERVICES   (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 177

1  patent sales to Cisco.  And I don't think they would

2  qualify as a nonpracticing entity.

3          We made a patent sale to -- through an

4  intermed- -- intermediary -- intermediate entity to

5  Google, and I don't think they would be considered a

6  nonpracticing entity.

7          We did a -- sort of a strange hybrid

8  transaction with a company called WhiteCell, but

9  that one's a little bit -- definitely there was -- a

10  very unique situation there.  They were a practicing

11  entity, and that was in the context of potentially

12  buying their assets.  I don't -- they had very

13  limited operations at the time that we did the

14  transaction.

15          And then we -- and subsequently sold a -- a

16  small group of applications, not patents, which was

17  following up on that.  It was following up on that

18  hybrid trade transaction.  And that was to Colorado

19  Remediation.

20          And that -- ultimately those -- I believe

21  there was an intention for that to be a practicing

22  entity from that core WhiteCell group, but I think

23  that ultimately those -- not the patents -- not the

24  applications that we transferred, but one of those

25  patents that we -- one of those patents that we

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 178

1    traded was asserted in two different litigations, I
2    believe.
3           So that one might be categorized as -- you
4    might look at that as a sale to -- it wasn't a sale
5    to an active practicing entity, but it ultimately
6    ended up resulting in some litigation.
7           MR. CUKOR:  Q.  So Fortinet sold a patent
8    to a nonpracticing entity and that nonpracticing
9    entity sued a third party on that patent?
10        A.   No.
11        Q.   Okay.  What was -- I thought that's what
12   you just described.
13        A.   No.  It was -- it was much more complicated
14   than that.  We traded two patents that we had
15   acquired -- it was a complex set of transactions.
16   There was a company that was a practicing company in
17   the white listing space.
18          They -- they offered to sell us the
19   entirety of the business, patents, including the
20   assets.  I was -- I was interested in those assets.
21   They were still an operating company at that time.
22          Subsequently, they ended up motivated to --
23   to do that transaction, and we -- we paid cash plus
24   one or two -- I can't recall, one or two patents we
25   traded, sort of did -- traded that transaction to

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 179

1    them.

2          I think they then were still a practicing

3    entity and a group of engineers.  I think they

4    transferred those patents to another entity, which

5    sometime later, a year or so later, I don't remember

6    the exact time frame, I'd have to look at the

7    agreements, they traded -- or not traded, but

8    transferred those patents to another entity which

9    then sued two companies.

10     Q.   And was that entity that they transferred

11   the patents to wholly-owned by them?

12     A.   No, I think it was unrelated to them.

13     Q.   Unrelated to them.  And that was Colorado

14   Remediation?

15     A.   That was Colorado Remediation.

16     Q.   Which party was Colorado Remediation, the

17   one that received the patents, that did the suing?

18     A.   Yes.

19     Q.   Okay.  So Fortinet never transferred

20   patents to Colorado Remediation?

21     A.   They asked us to transfer a -- a couple of

22   pending applications to them, which we -- which we

23   agreed to do.

24     Q.   You sold them?

25     A.   Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 180

1      Q.    And at that time, Colorado Remediation was

2    a nonpracticing entity?

3      A.    That was not my understanding at the time.

4      Q.    Did you understand that Colorado

5    Remediation would be bringing suit on behalf of the

6    intellectual property that it was purchasing from

7    Fortinet?

8      A.    No, it wasn't our understanding at the

9    time.  They -- they -- I believe some of the

10   principals who were operating -- who had the

11   operating company were involved.  I can't -- I don't

12   know their exact involvement.

13          My understanding, there was some intent to,

14   you know, operate a business in that space related

15   to the patents that they had received from

16   WhiteCell.

17          And -- but there was certainly a

18   possibility, which was baked into the agreement,

19   that they could fail, they could sell the patents,

20   they could license the patents.  And that was that

21   was -- those provisions were included in that short

22   agreement.

23     Q.    And in that agreement, if Colorado

24   Remediation did bring a lawsuit against a third

25   party and recovered revenue as a result of that,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 181

1    would Fortinet be entitled to a share of that?

2        A.   It was structured as a sale, I believe, for

3    ███████.  But if they -- but if they did -- I --

4    I -- I'd have to look at the agreement.  I'm just --

5    from memory, it was structured as a sale for

6    ███████.

7              But there was a -- there was a -- if they

8    failed to pay us, the patents would come back.  Or

9    if they licensed them as part of -- 'cause they were

10   somewhat up in the air on their business practice

11   and still hadn't received funding, that they

12   could -- they could send a share back of the

13   proceeds.

14       Q.   So Fortinet did not have a problem selling

15   intellectual property to a nonpracticing entity?

16       A.   I'm not -- Fortinet generally -- and I'm

17   not sure that it rises to the level of a policy, but

18   Fortinet has been, you know, quite hesitant to --

19   you know, to enter into a transaction with a

20   nonpracticing entity.

21       Q.   But it did in the Colorado Remediation

22   case?

23       A.   That was, as I've described, a little bit

24   of a complicated scenario, where we were trying to

25   purchase some assets from a practicing entity and

DEPOLINK COURT REPORTING & LITIGATION SERVICES   (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 182

1    traded some patents and then later downstream were

2    approached to -- you know, to sell some outstanding,

3    unrelated applications.  So a very discrete set

4    of -- of applications, not issued patents.  So it

5    was a little bit of a special case.

6        Q.   In that special case, Fortinet specifically

7    reserved the right to share in the rewards of any

8    litigation that that nonpracticing entity

9    instituted?

10       A.   The --

11            MR. COOPER:  Same objection; same

12   instruction.

13            THE WITNESS:  Well, just -- and again, I'm

14   doing this without the benefit -- it would be much

15   years if we put the agreement -- it's a short

16   agreement -- in front of us, and I don't think a lot

17   of time was spent on it.  That was drafted by the

18   entity.  And they -- it was drafted as a purchase

19   for 200,000, but they -- we were trying to

20   accommodate them.  They didn't have the money to pay

21   for it.

22            It wasn't clear that they would get it.  If

23   they did, it would be just simply a sale.  The -- or

24   it would be returned.  And I think those were

25   protective provisions baked in.  To say that if you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 183

1   do end up selling these, you know -- you need to

2   pay, you need to pay.  You can't sell the patents

3   without paying us.  So there's a little bit of a

4   complicated issue.

5           I mean, I will say we have had offers from

6   nonpracticing entities for patents, and we have --

7   we have turned them down.

8           MR. CUKOR:  Q.  Which nonpracticing entity

9   made you an offer for a patent?

10          MR. COOPER:  Same objection; same

11   instruction.

12          THE WITNESS:  I've forgotten the name of

13   the -- MOSAID.  It was through a broker.  I believe

14   MOSAID made one or more offers on some patents.

15          And there was a broker representing an

16   unnamed nonpracticing entity that -- it was --

17   didn't make a formal offer but asked -- but -- but

18   had an indication of interest that exceeded the --

19   that they said exceeded what was paid -- what was

20   being offered by Google.  And we elected to sell to

21   Google for less.

22          MR. CUKOR:  Q.  But they didn't make an

23   offer?

24   A.   It was a -- it was -- it was an informal.

25   Q.   Okay.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 184

1      A.   We believe an offer in this range, which is

2   more than what you're -- you know, you can do with

3   Google -- we believe we can get that.

4      Q.   And in the other situation, you did receive

5   a formal offer from a nonpracticing entity?

6      A.   It wasn't in writing.  It was through a

7   broker.  But I -- two different offers.

8      Q.   And how much were they for?

9      A.   Oh, I -- I can't recall the specific

10  amount.  This is -- this is two or three years ago.

11     Q.   Was it a lot of money or a little bit of

12  money?

13     A.   Again, I'm -- I'm guessing somewhat.  I

14  think both offers -- one might have been slightly

15  less than a million.  One might have been slightly

16  more.  Or maybe both were more than a million, but,

17  you know, a million-two and a million-four,

18  somewhere in that range.  Between 800,000 and a

19  million-four or -five would be my best

20  recollection -- recollection as to what they were.

21     Q.   And for which patents?

22     A.   It -- I -- I don't recall that -- the

23  numbers right off the top of my head.

24     Q.   What did they cover, which technology?

25          MR. COOPER:  Same objection; same

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 185

1    instruction.

2         THE WITNESS:  It was routing -- routing --

3    general -- I mean generally if I -- again, I don't

4    recall the specific patents, but I believe it was

5    routing and -- and provisioning of routers.  I

6    believe that those were at least -- there was some

7    overlap with the patents that were sold to Google.

8         MR. CUKOR:  Q.  How much were the patents

9    sold to Google for?

10        A.   That -- that's ████████████████████

    ███  ██████████████████████  and I can't remember right

12   off the top of my head.  If we -- I mean, if you've

13   got the agreement --

14        Q.   We'll go through the agreement.  It's more

15   than  ████████  dollars, though, right?

16        A.   It was.  It was.  I can't recall -- it was

17   more than  ████████ , I think.

18        Q.   So the offer from the nonpracticing entity

19   was less than the offer that you received from

20   Google?

21        A.   That's correct.

22        Q.   Okay.

23        A.   I don't -- I don't remember what it was,

24   but it was less.

25        Q.   Fortinet is a Delaware corporation,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 186

1  correct?

2      A.   I believe that's the case, yes.

3      Q.   Does it have offices there?

4      A.   I don't -- not that I'm aware of, but it

5  might.  A small sales office, at most, if there's

6  anything.

7      Q.   Does it have any employees there?

8      A.   I don't think so, but we -- we could have a

9  salesperson -- we end up with salespeople that live

10  and maybe work from home in various places.  So it's

11  not totally obvious to me.

12     Q.   Does Fortinet own any real property in

13  Delaware?

14     A.   Not that I'm aware of.

15     Q.   Does it own any desks in Delaware?

16     A.   Not that I'm aware of.

17     Q.   Any filing cabinets?

18     A.   No, I don't -- I don't think we have an

19  office in Delaware.  I mean, we might, but I -- I

20  just don't know.

21     Q.   Any chairs?

22     A.   Again, I -- I'm answering a question --

23  I've said I don't know about our offices.  I -- I

24  would be -- I'd be surprised if there isn't

25  something in Delaware, but it's -- it's not going to

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 187

1    be a big deal.  But there could be a sales office.

2    I just don't know.

3            We have a number of East Coast offices, so

4    I don't want to say we don't have -- we don't have

5    when indeed we do have.  I just don't know.

6        Q.   Does the fact that Fortinet does not have a

7    Delaware office make its Delaware incorporation a

8    sham?

9        A.   Delaware is a very common jurisdiction for

10   incorporating copies, if not the most common

11   jurisdiction for incorporating companies.  So I'm

12   not understand -- I'm not sure that I understand the

13   question.

14       Q.   Well, your headquarters is in California,

15   right?

16       A.   The -- yeah, technically our headquarters

17   is in California.

18       Q.   Cisco is a competitor of yours?

19       A.   I'm sorry, I was still speaking.

20       Q.   I'm sorry.

21       A.   So I was saying -- on my last -- I said --

22   I think our largest office, as I've said, was in

23   Vancouver.  I mean, we have a number of offices all

24   around the world, so I'm -- I'm -- now I've lost the

25   question.  I'm sorry.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 188

1      Q.   I asked you if your headquarters are in

2    California.

3      A.   Okay.  Yes, depending what you mean by

4    "headquarters."  I think we advertise our

5    headquarters.  That's where our CEO and CTO

6    currently sit.

7      Q.   Okay.  And Cisco is a competitor of yours,

8    right?

9      A.   Cisco competes in the security space.  They

10   have a broader market presence than we do.

11     Q.   And they also headquartered in California,

12   correct?

13     A.   I don't know technically.  I know where

14   Cisco's buildings are here, but I -- I don't know

15   whether that is technically their -- whether they

16   technically consider that their headquarters.

17   But -- I may have seen that in public filings.

18     Q.   They are -- and Cisco is incorporated in

19   California, correct?

20     A.   I don't know that.

21     Q.   So let me ask again, does the fact that

22   Fortinet does not have an office in Delaware make

23   its Delaware incorporation a sham?

24     A.   No.  It's -- to me what you're -- as I said

25   before, Delaware's an extreme -- I think it's the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 189

1   most common jurisdiction for incorporating companies

2   that exists.  And there's a host of reasons for

3   that.

4          I'm actually surprised that Cisco is a

5   California corporation.  My expectation, if I was

6   guessing, would be that they were a Delaware

7   corporation.

8      Q.   Is one of the reasons that Fortinet is

9   incorporated in Delaware tax reasons?

10     A.   I think -- I mean there's a host of reasons

11  that companies incorporate in Delaware.  That --

12  that was before my time, so I wasn't involved with

13  the decision.

14         And I believe you.  You know, I don't know

15  the serious of events.  The original incorporation

16  might have been in Vancouver, Canada.  I think the

17  earliest entity, it wasn't called Fortinet at the

18  time.  It was a Vancouver entity.

19     Q.   So why is Fortinet incorporated in Delaware

20  if it has no employees or offices there?

21     A.   I've said I don't know what our presence in

22  Delaware looks like.  It's -- it's not -- we have --

23  we have offices and employees all over the world, in

24  places that I -- I'm always highly surprised about.

25     Q.   Why is Fortinet incorporated in Delaware if

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 190

1   there are no offices or employees of Fortinet that

2   you are aware of?

3       A.   What I've said is I'm not aware of the -- I

4   know our major offices, but I don't know the -- the

5   I don't know the full extent of our offices.  We

6   have -- we have many offices.

7            I've given you the major offices.  I've

8   also told you that Delaware is a very, very

9   common -- the most common, to my knowledge, place to

10  incorporate a U.S. corporation.

11      Q.   So there's no major Fortinet office in

12  Delaware, correct?

13      A.   Not -- I mean not that I'm aware of.

14      Q.   Okay.  And there's no major employee

15  presence of Fortinet in Delaware, correct?

16      A.   I -- I just don't know -- and I don't know

17  what you mean by -- by "major."  So -- I mean, we

18  have a fairly significant presence back East.  We

19  have a -- and I don't know the exact location.

20           I know we have an office in D.C.  I think

21  we're -- or Virginia.  I just -- again, I don't --

22  it's not -- I'm not in HR.  I don't map out our

23  offices.  And in my -- to the extent I have

24  knowledge, it's -- it's from back when I was GC in

25  the 2005/2006 time frame.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 191

1      Q.   What are the reasons Fortinet is

2   incorporated in Delaware?

3      A.   Again, that predates my tenure at Fortinet,

4   so I -- I don't know the reasoning behind the

5   decision to incorporate there.  I general -- I've

6   taken corporate law, and I gen- -- I understand some

7   of the reasons that companies generally incorporate

8   in Delaware.

9      Q.   What are those?

10     A.   Law school was a long time ago, but sort of

11  the -- the stability of the -- of the -- the

12  corporate regulatory scheme in Delaware and --

13  and -- basically the -- the -- I think they're

14  primarily focused around the -- you know, the stable

15  practice of law in Delaware.

16     Q.   Has to do with the legal system?

17     A.   I -- again, we're getting this -- I don't

18  recall this off the 30(b)(6) topic, and I graduated

19  in '97, so -- I took corporate law a long time ago.

20  I -- I know I've studied this, as to why -- there's

21  a -- there's a why.  And I know I've studied it, but

22  I can't remember the exact reasons.

23          And I -- and I certainly didn't -- didn't

24  participate in the incorporation.

25     Q.   So you don't know why Fortinet is

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 192

1   incorporated in Delaware?

2        A.   It -- it's not -- it predated me, as I've

3   said.  It doesn't surprise me because it's so darn

4   common, and I haven't had -- I don't have anything

5   to do with the -- the establishment of corporate

6   entities for Fortinet since I was GC, which I

7   stopped being in the 2006 time frame.  So it's been

8   quite some time.  I'm really speaking out of turn.

9        Q.   It's okay.  I just want to make sure I

10  understand your answer.  Your answer is that you

11  don't know why Fortinet is incorporated in Delaware?

12       A.   I am not the right person to ask that

13  question of, is what I --

14       Q.   I think you are the right person to ask do

15  you know why --

16       A.   No.

17       Q.   -- Fortinet is incorporated in Delaware?

18       A.   Can we -- can we look at the 30(b)(6)

19  topics that I was put up for to speak today?

20       Q.   We will do that, but I'm just --

21       A.   That would -- that would help me, 'cause I

22  did prepare diligently for the 30(b)(6) that I was

23  put up.  I have --

24       Q.   You will have an opportunity to answer

25  those.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 193

1      A.   But I don't think that our -- the location

2   of our subsidiaries and -- and the establishment of

3   our subsidiaries and why -- 'cause they're -- why

4   those were established in certain jurisdictions, I

5   don't recall that as being part of the topics, so I

6   must have missed that.

7      Q.   No.  I'm asking you just a personal

8   question.

9           Do you know why Fortinet is incorporated --

10     A.   And I've --

11     Q.   -- in Delaware?

12     A.   And I've told you that I started at

13  Fortinet in June of 2005.

14     Q.   Does that mean you know or you don't know?

15     A.   What I'm saying is it predates my tenure at

16  Fortinet.

17     Q.   So you don't know?

18     A.   I have no reason to know.

19     Q.   Okay.  Are you familiar with the

20  FortiCarrier product?

21     A.   I have heard the name.

22     Q.   And are they FortiGate products?

23     A.   I do not -- I do not know -- again, the

24  FortiGate products -- I don't -- I don't know.

25  Those are marketing names.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 194

1      Q.   Are the FortiCarrier products loaded with

2   an image of the FortiOS operating system?

3      A.   I believe the FortiCarrier products are a

4   variant of the FortiGate products.  I'm not a

5   hundred percent certain, but I believe they are.

6   And as such, they would be loaded with the operating

7   system that we spoke about earlier, which has -- you

8   know, has been referred to as FortiOS and would be

9   built out of the CM system in Vancouver.

10     Q.   I think you mentioned FortiAP products

11  before.  Did you?

12     A.   Yes.

13     Q.   What are the FortiAP products?

14     A.   They're, I think, the first three or four

15  products on the list of accused products that I

16  was -- that's an Exhibit B to the infringement

17  contention served by NPS.

18     Q.   Okay.  But what are they; what kind of

19  products are they?

20     A.   My understanding of the -- is that the

21  FortiAP products are a wireless product.  And I

22  believe that you guys have deposed Koroush Saraf --

23  I've forgotten his last name -- previously in this

24  litigation, and he is the product manager for the

25  FortiAP and FortiWiFi products.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 195

1      Q.   Are they firewall products?

2      A.   The FortiAP I do not believe you would

3   refer to as a firewall.

4      Q.   So the FortiAP would not contain an image

5   of the FortiOS operating system that we discussed

6   previously?

7      A.   No, the -- it would not contain -- the

8   FortiAP product would -- it does run, I believe, a

9   Linux-based operating system, but obviously it

10  has -- it is a device.  There may be a virtual

11  version -- virtual version.  I'm not sure.  I don't

12  think so.

13          It is an appliance, and it necessarily has

14  an operating system.  But it is distinct from the

15  FortiOS -- what's referred to as the FortiOS

16  operating system that runs on the FortiGate that's

17  built out of our contract management -- our change

18  management system in Vancouver.

19     Q.   Okay.  And is it the case that the FortiAP

20  product does not contain application-level

21  functionality?

22     A.   I don't -- I don't know the FortiAP product

23  enough to answer that question.

24     Q.   Okay.  Do you know a product called the

25  SG5020?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 196

1      A.   Is that it, just SG?

2      Q.   I think so.

3      A.   No "FortiGate" or anything else in front of

4   it, just SG5 ...

5      Q.   5020.

6      A.   No, I don't know that -- that product.  Was

7   that on the accused product list?

8      Q.   I can't answer that.  I don't know.

9      A.   It's not -- I don't recall that.  I mean,

10  I've gone through the entire accused product list

11  and mapped that out.  I do not recall -- I don't

12  recall that -- that individualized product

13  designation.

14           There are a lot of -- of FortiGate blah,

15  blah, blah, blah, blah, you know, lots and lots of

16  numbers and digits and -- you know, and -- and

17  characters and stuff, but that -- that doesn't --

18  it's a long list of products that are the accused

19  products, and I -- and I -- that one doesn't jump

20  out at me.

21     Q.   Aside from the FortiAP product and the

22  chassis product that you mentioned earlier, are

23  there any other products on the accused product list

24  that are not UTM firewalls?

25     A.   I don't -- I don't know.  It's not

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 197

1    something -- I -- what I researched was the list of

2    products and where they were manufactured for

3    overseas sales, and so I was drilling into contract

4    manufacturers and locations and the like.

5              I have some general understanding about

6    the -- you know, I understand where the source tree

7    resides in Vancouver.  And I understand the general

8    application of that onto the specific FortiGate

9    submodels, family submodels.

10             But comprehensively going through that

11   list, other than the really obvious examples, such

12   as the chassis and the FortiAPs, I didn't -- I

13   didn't research that question in preparation for

14   today.

15        Q.   And nothing else jumped out at you?

16        A.   I think there was a nonproduct, the 5000

17   series, which is not a SKU.  There was the chassis.

18   And the -- and then there were the APs, and then I

19   think there were some virtual appliances which are,

20   again, you know, a little bit different since they

21   don't -- aren't -- that obviously isn't an image

22   loaded on -- that isn't an image that's loaded on an

23   appliance.

24        Q.   Where are -- where are those virtual

25   appliances, where do they reside?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 198

1      A.    In -- in Vancouver.

2      Q.    So they're -- they're on a server in

3   Vancouver?

4      A.    Yeah, yes.

5      Q.    So is it -- customers can buy access to

6   that virtual appliance, is that what -- how it's

7   sold?

8      A.    No.  I believe it's sold as a software

9   module.  Again, I don't know the specific details,

10  but I believe it's sold as a software module.

11     Q.    Like a -- like a disk?

12     A.    I -- I believe it may be shipped as a disk.

13     Q.    Which products are those?

14     A.    The virtual products?

15     Q.    Correct.

16     A.    I -- I would need to -- I'm -- I'm not an

17  expert in our -- in our -- our price list.  I mean,

18  I could look and try to guess.

19     Q.    Do you know the name of the product,

20  though?

21     A.    It probably has a VM in the naming

22  convention.

23     Q.    Okay.

24           All right.  You've been waiting all day.

25  What 30(b)(6) topics are you prepared to talk about?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 199

1      A.   I believe I've been designated on four or

2  five topics or portions of topics.  But at the same

3  time, I think they're somewhat overlapping and

4  duplicative with prior deponents.  And that -- so --

5  so a part of those already may have been covered.

6      Q.   So which topics do you think you've been

7  designated on?

8      A.   I don't have the list in front of me.  I

9  think there were two different deposition notices

10  and I think --

11          MR. COOPER:  I can help with the numbers if

12  you'd like.

13          MR. CUKOR:  No.  Please don't talk during

14  my deposition.

15      Q.   So you don't -- you can't tell me which

16  ones?

17      A.   I've been shown two different exhibits.  I

18  don't know the numbers right off the top of my head,

19  but if you show me the list of topics, I can likely

20  identify those.

21          MR. CUKOR:  Okay.  I will mark -- I'll ask

22  the court reporter to mark as Exhibit 168 the first

23  Rule 30(b)(6) deposition notice to Fortinet.

24          (Plaintiff's Exhibit 168

25           marked for identification.)

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 200

1          MR. CUKOR:  And as Exhibit 169 the second

2    Rule 30(b)(6) deposition notice to defendant

3    Fortinet.

4          And when she's done that, she'll give them

5    to you.

6          (Plaintiff's Exhibit 169

7          marked for identification.)

8          THE WITNESS:  So on this first deposition

9    notice marked Exhibit 168, on page 3, topics --

10   topic 1, identify -- identification, collection and

11   production of documents and things by Fortinet in

12   this case.  I believe I've been designated on that

13   topic, and I'm prepared on that topic.

14         And then topic number 5, all licenses

15   identified in response to NPS's Interrogatory No. 8,

16   I believe I've been designated and on that topic and

17   I have prepared on that topic.

18         And topic No. 8, the factual basis for

19   Fortinet's Affirmative Defenses 4, 5 and 6, docket

20   number 37.  I believe I was identified on that

21   topic.  However, I have not -- I believe that the

22   topic is inappropriate and did not prepare on that

23   topic.

24         MR. COOPER:  And I'll take this time to

25   object to topic No. 8 as in violation of paragraph

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 201

1    23 of Judge Alsup's supplemental order to order

2    setting initial case management conference in civil

3    cases before Judge William.

4              Also, in particular, the paragraph states

5    select portions as follows:

6              "With respect to depositions under

7         Federal Rule of Civil Procedure 30(b)(6),

8         the fundamental purpose is to allow a party

9         to notice a deposition by subject matter,

10        thereby requiring the respondent to

11        designate and to produce one or more

12        organization witnesses knowledgeable on a

13        designated topic, a useful procedure when

14        the roles of percipient witnesses

15        controlled by an adverse party are unknown.

16        In some cases, however, counsel routinely

17        appear to notice 30(b)(6) depositions on

18        numerous and wide-ranging topics, including

19        even the basis for contentions made by

20        adverse parties.  To obviate" -- "to

21        obviate disputes and to give guidance,

22        these guidelines will be observed.  In

23        framing the subjects, it is normally

24        improper to ask for Rule 30(b)(6) deponents

25        to testify concerning the entire basis of a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 202

```
 1      claim or defense, and the notice should be

 2      directed at discovering percipient facts in

 3      possession of the adverse party, not in

 4      forcing a supposed fact witness to appear

 5      and defend the entire thesis of a claim or

 6      defense.  If a notice includes an overbroad

 7      topic, the overbroad topic shall be

 8      unenforceable and may not later be replaced

 9      with a proper topic."

10          THE WITNESS:  So moving on to the second --

11          MR. CUKOR:  Q.  So, Mr. Nelson, you have

12  not prepared to give the factual basis for the

13  affirmative defenses that are identified in topic 8?

14      A.  I have not fully prepared, as -- as -- you

15  know, I tried to diligently tried to prepare on the

16  other topics.  That one I have some limited

17  knowledge.  But no, I did not prepare.

18      Q.  You prepared a little bit but not as much

19  as the other ones?

20      A.  I have some very limited sort of

21  understanding, but I didn't do what I normally would

22  do in a 30(b)(6) deposition preparation, which is

23  study the topic, interview various people with

24  knowledge, reflect on the knowledge that I have,

25  collect -- you know, collect and review materials
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 203

1  sufficient to be able to -- to testify competently,

2  at least as competently as -- as sort of anyone else

3  at Fortinet.

4      Q.  Okay.

5      A.  No, I did not do that on that topic.

6          Did -- did you want me to further identify

7  the other ...

8      Q.  Yes, please.

9      A.  So then on Exhibit 169, which is the Notice

10  of Second Rule 30(b)(6) Deposition, on page 2, the

11  listed topics, both of these topics, No. 9 and No.

12  10 -- 9, the sale -- sales and fulfillment process

13  for sales outside the United States, and 10, the

14  relationship between sales of the accused product

15  and sales -- and sales of Fortinet services, I

16  believe I've been designated, and I've prepared on

17  both of those topics.

18          Though I will note, as I have before, the

19  overlap between -- of these topics and earlier

20  depositions.

21      Q.  Okay.  You can hold on to these if you

22  want.  If you feel like you want to refer to them

23  later at any time, you're welcome to.

24          I believe this has been previously marked

25  as Exhibit 161.  It's got a Bates label of FORT-NPS

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 204

1    053074.

2        A.    Where did my glasses go?  Maybe in the

3    other room.  I'll have to -- I'll try to work

4    without them.  But I might have to break and get

5    them if -- but -- okay.  Sorry.  They were sitting

6    right there.

7        Q.    Yeah.  I saw them, but maybe not since the

8    last break.

9            MR. COOPER:  We can do a two-minute break

10   and I can sprint down.

11           THE WITNESS:  Well, I can -- I can read

12   this.

13           MR. CUKOR:  Okay.

14           THE WITNESS:  It's short and there's only a

15   few lines.

16           MR. CUKOR:  Q.  Do you know who prepared

17   this document?

18       A.    No.

19       Q.    Have you ever seen it before?

20       A.    I don't think so.

21       Q.    Do you recognize the Bates label?

22       A.    No.

23       Q.    I mean do you recognize it as being

24   produced from Fortinet?

25       A.    I mean, it has a Bates label that says

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 205

1    FORT-NPS 053074, but no, I -- I haven't seen this

2    document as it's been produced before.

3        Q.   Do you recognize the prefix of the Bates

4    label?

5        A.   It just has a Bates label.

6        Q.   Do you recognize it as indicating that it

7    was produced by Fortinet?

8        A.   I should know that.  It -- it looks

9    reasonable.  I don't recognize that.  I have not

10   reviewed -- if -- I haven't reviewed production that

11   have gone out.  I -- I've collected documents and

12   provided them to outside attorneys, so I haven't --

13   I'm not part of the outside litigation team that's

14   marking and producing documents.

15       Q.   I understand.  So you -- you don't think

16   you've seen this document before?

17       A.   No.

18       Q.   Okay.

19            MR. CUKOR:  Why don't we -- we're going to

20   look at a bunch of documents now.  Why don't we take

21   a break and -- you can take a break and then get

22   your glasses.

23            THE VIDEOGRAPHER:  Off the record.  The

24   time is 4:22 p.m.

25            (Recess taken.)

Page 206

1          THE VIDEOGRAPHER:  We are back on the

2    record.  The time is 4:53 p.m.

3          MR. CUKOR:  Q.  Do you have your glasses

4    now?

5      A.    I've got glasses.

6      Q.    Great.  In a minute I want to go through

7    some assignment documents with you and have you look

8    at those, and so I'm glad you have your glasses.

9          But before that, I wanted to go over your

10   Interrogatory responses for Interrogatory No. 8.

11   I'll give it to you in front of you.

12          But I believe you told me earlier that in

13   all of the licenses that you entered, none of -- in

14   no case did Fortinet admit validity and infringement

15   of the asserted patents, right?

16     A.    I can't recall exactly what I said, but I'm

17   sure I would have said -- would have qualified it to

18   the ones that were -- you know off the top of my

19   head, it's hard to, you know, go back.  The

20   original --

21     Q.    I don't have one that's --

22     A.    Okay.  'Cause there's just a few of them,

23   and it goes -- they stretch back many years, so I'm

24   trying to -- in my head, that's my memory of it.

25   But I -- I really -- and I have reviewed them in

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 207

1   preparation for today, but still there's a lot of --

2   a lot of history there and a lot of -- a lot to try

3   to remember.

4       Q.   Right.  I'm not -- I'm not trying to trick

5   you on -- on that.  And -- and you also, I think,

6   said that -- that to the best of your knowledge,

7   these -- the patents that were identified in these

8   licenses did not necessarily cover the accused

9   products in this case; is that correct?

10          MR. COOPER:  Caution the witness not to

11  reveal any attorney/client-privileged

12  communications.

13          THE WITNESS:  I -- I can't recall the

14  exactly what I -- what I said.  And that sounds like

15  a broader statement than I made.

16          I think what I said was that there was no

17  admission of validity or infringement that I could

18  recall.  I don't think I made the substantive

19  representation about the scope of the patent and

20  whether -- whether it covered the -- you know, any

21  Fortinet products.

22          MR. CUKOR:  Well, let's go through it,

23  then.

24          What are we up to, Exhibit 170?

25          I'm going to mark as Exhibit 170 Fortinet's

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 208

1   Responses and Objections to Plaintiff's Third Set of

2   Interrogatories.

3          (Plaintiff's Exhibit 170

4          marked for identification.)

5          MR. CUKOR:  Q.  And I believe Exhibit 170,

6   which has been placed in front of you, which has in

7   it Fortinet's Response to Interrogatory No. 8, for

8   which you have been designated a 30(b)(6) designee,

9   correct?

10     A.  So under -- I've been designated under --

11  with respect to all licenses identified in this Rog

12  response.  And so it would be the -- the licenses

13  listed here in these various, what, three tables?

14  Two tables?  One, two -- looks like three separate

15  tables of documents, is how they're organized.

16     Q.  So let's take a look at those.  Starting on

17  page 6 of the Interrogatory at the top, the

18  transaction with CoSine Communications.  That was a

19  purchase of patents by Fortinet, correct?

20     A.  No.  It -- or application.  So there was no

21  issued patents.

22     Q.  No issued patents?

23     A.  Not trying to be clever, but just -- I

24  don't -- there was no issued patents.

25     Q.  Okay.  Were -- at the time, did any of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 209

1    those applications cover the accused products?

2         A.   Oh --

3              MR. COOPER:  I object to the question as

4    calling for attorney/client-privileged information

5    and instruct the witness not to answer to the extent

6    the answer would reveal such communications.

7              THE WITNESS:  The -- this is back in --

8    this license that's disclosed here in the first row,

9    it was dated 2006.  The accused product list is

10   generated in, what, 2010 or -- I don't know,

11   whenever -- during the course of this litigation.

12             So I'm sure there's a timing mismatch

13   between these applications and the accused products,

14   which very likely only predecessor products would

15   have existed at the time.

16             But no analysis of these applications

17   relative to the Fortinet products was done at the

18   time of the -- or prior to the time of the purchase.

19             MR. CUKOR:  Q.  Okay.  Is the same thing

20   true for UTStarcom further down, the UTStarcom

21   transaction?

22             MR. COOPER:  Same objection; same

23   instruction.

24             MR. CUKOR:  Line 21.

25             THE WITNESS:  Line 21.  Well, in this case

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 210

1   there are two patents that were purchased, and it is

2   correct that there was no analysis relative to

3   the -- of these patents relative to any Fortinet

4   products or services.

5          MR. CUKOR:  Q.  Do you believe that these

6   patents have claims that cover the accused products?

7      A.   I -- I do not know.  I've never done any

8   analysis of these patents relative to any Fortinet

9   products.

10     Q.   Why did Fortinet purchase these patents?

11         MR. COOPER:  Same objection; same

12  instruction.

13         THE WITNESS:  It was a somewhat unique

14  opportunity -- opportunity that was presented to

15  Fortinet, and -- and that created sort of a -- kind

16  of a compelling value proposition.

17         MR. CUKOR:  Q.  What was the value

18  proposition?

19     A.   Essentially, at that time what I was able

20  to do, because there was a -- there was a contact.

21  I can't recall the exact nature of the contact, but

22  there was a contact with UTStarcom, and through that

23  contact I was able to -- I was able to review a very

24  large number of patents and essentially pick -- make

25  a selection of patents that I thought were --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 211

1  were -- were -- were interesting or complementary

2  and -- and -- and -- and negotiate for their

3  purchase.  Sort of a unique -- just kind of a unique

4  opportunity.

5      Q.   Do those patents cover transparent

6  application layer firewalls?

7           MR. COOPER:  Same objection; same

8  instruction.

9           THE WITNESS:  And again, I -- I don't know

10  what you mean when you say "transparent application

11  level firewall."  I think that's an ambiguous term.

12           I can't recall exactly what these patents

13  refer to.  I -- but I -- to the best of my

14  recollection, I -- I -- as -- as amorphous as that

15  transparent application of a firewall concept is, I

16  don't think that there's a relationship here, but I

17  I'm guessing.

18           MR. CUKOR:  Okay.

19           THE WITNESS:  I'd have to look at them.

20           MR. CUKOR:  Q.  How about going back to the

21  Cosign Communications transaction; did any of those

22  application -- what was the technology that those

23  applications related to?

24      A.   I think we talked about this earlier.

25  CoSine Communications was in somewhat adjacent space

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 212

1    to Fortinet.  They were in the -- more in the

2    routing space, not -- not in the security space.

3         Q.   So they were not competitors?

4         A.   No.  No.  And I think this opportunity

5    arose out of a -- you know, a potential -- you know,

6    sort of long-running, but ultimately unsuccessful,

7    partnership discussion.  So they were in an adjacent

8    space, so the applications were complementary,

9    but in -- but adjacent.

10        Q.   Okay.  Was Fortinet able -- ever able to

11   procure a dollar return on investment for the

12   investment made with CoSine Communications?

13        A.   A dollar -- what do you -- what do you mean

14   by "a dollar return on the investment"?

15        Q.   Money.  Let me ask it again.

16             Did Fortinet ever have a return on the

17   investment made with CoSine Communications in the

18   purchase of these patent applications?

19        A.   I --

20        Q.   Should I ask it more specifically?  I mean,

21   if you're struggling with the question, is -- does

22   Fortinet still own those patent applications and the

23   patents that have resulted from them?

24        A.   We -- we largely own the CoSine

25   Communications portfolio, but I'm -- we're

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 213

1  blending -- when you say "dollar return," again with

2  each one of these -- you know, with most of these

3  transactions, it's -- it's not a simple -- a simple

4  buy/sell.  UTStarcom was about as clean as they get.

5          You'll notice that there's two

6  additional -- on page 7 there's two additional

7  CoSine Communications purchases.  So ultimately what

8  we did was we purchased, in a series of three

9  transactions, all of the operating assets of CoSine

10  Communications.

11          And starting with the patent applications,

12  the second transaction involved, you know, the

13  technology and the source code, and the third was

14  the support contracts, inventory and a -- an

15  outsourced arrangement with a company in India.  And

16  between those three transactions, they -- they ended

17  up being very beneficial to Fortinet.

18      Q.   How so?

19      A.   The -- immediately after completing the

20  December 6, 2006, transaction for the support -- for

21  the support contracts, CoSine Communications was

22  largely cycling down its operations.

23          So we picked up the support contract -- you

24  know, I picked up the support facility, but

25  immediately after that, we own -- we had the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 214

1    technology in-house.

2            Immediately after that, AT&T came back to

3    us, indirectly through CoSine, and needed a support

4    contract written.  And another company, L --

5    ALP/ILP, something like that, in Spain also needed a

6    support contract written.  So we did write them a

7    support contract.

8            So we basically stepped in to a renewed

9    support contract, along with the agreement that they

10   would swap out the CoSine equipment and replace it

11   with -- in their labs and replace it with Fortinet

12   equipment.

13           And that was the beginning of a

14   long-running AT&T relationship, which I like to take

15   credit for and others within Fortinet like to -- to

16   say that I didn't.  So I -- I think it was -- I

17   personally am proud of this -- this series of

18   transactions, and I think it was very beneficial to

19   Fortinet.

20      Q.   Okay.  But has Fortinet ever sold any of

21   the patents that issued from the CoSine patent

22   applications that were purchased?

23      A.   Yes.  The -- I can't map it directly

24   without looking at it, but I believe that at least

25   some of the patents that were sold to Google and at

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 215

1   least some of the patents that were sold to Cisco in

2   those three transactions were at least -- you know,

3   it's quite a bit down the line.  But I'm sure

4   there -- there was a relationship, that maybe a --

5   you know, an ancestry going back to one or more of

6   the CoSine applications.

7        Q.   So is it accurate to say that at least part

8   of Fortinet's business is the buying and selling of

9   intellectual property?

10       A.   I don't think that's fair to say.  This has

11  been a subject of conversation in our public reports

12  and our quarterly discussions with -- our CFO's

13  quarterly discussions with analysts.  That question

14  has been asked and answered.

15            And -- and the answer, which is correct, is

16  that we're not in the business of buying and

17  selling, but we have had -- and we have not put

18  patents out on the market, but we have had a lot of

19  attention and unsolicited offers for some of the

20  assets.

21            And generally we turn those offers down

22  because that's not our business model.  But

23  occasionally, I guess three times now, if you don't

24  include sort of the trade, the WhiteCell sort of

25  hybrid trade transaction, three different times,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 216

1    what a prospective buyer has looked for has been

2    something that was considered redundant or

3    overweight in the Fortinet portfolio.

4            And so -- and it may -- it appeared to make

5    sense to do the deal, but sort of in a nonregular

6    course of business fashion.

7            The CFO said it in a much more concise way.

8        Q.   Did you tell me what the technology for the

9    UTStarcom patents was?

10       A.   I said I couldn't recall.  I can't --

11   UTStarcom is in a -- is in a even further adjacent

12   space.  It's somewhat -- and they're obviously a

13   technology company, if I remember right.  They're

14   more in wireless.

15       Q.   Are they a cell phone company?

16       A.   Well, I'm not even sure if they have active

17   operations in the United States now.  There was

18   something having to do with cell phone technology

19   and some interface, ground/air interface.

20           You know, everyone has a -- the different

21   players in the space will have very different

22   focuses.  I can't recall their specific focus, but I

23   believe it is in, you know, the cellular space.

24       Q.   So the UT -- UTStarcom was not a competitor

25   to Fortinet?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 217

1      A.   Not at the time that they were active.  You

2   know, and not -- not that I would have -- that rose

3   to the level of attention that I -- that I was aware

4   of it.

5      Q.   And is it accurate that -- to say that

6   the -- to the best of your recollection, the patents

7   that you purchased from UTStarcom did not cover the

8   Fortinet core technology?

9           MR. COOPER:  Same objection; same

10  instruction.

11          THE WITNESS:  And again, the way -- what I

12  said was we did not do an analysis.  That wasn't --

13  we weren't -- I wasn't attempt -- it was a unique

14  situation.  I was not -- it was, again, fairly

15  opportunistic.  And I was not actively looking for

16  patents that covered our technology.  I didn't do

17  any analysis relative to it, so I -- I simply don't

18  know.

19          MR. CUKOR:  Q.  Okay.  Let's look at -- on

20  page 7, line 15, the IPLocks communication -- I mean

21  transaction.

22      A.   Okay.

23      Q.   Were there patents purchased from IPLocks?

24      A.   That's a somewhat interesting question.

25  There was -- there's an asset purchase agreement

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 218

1   which I think has been provided.  The -- there was a

2   whole list -- it was primarily operating assets.

3   And, you know, essentially all of the U.S.

4   operations and the U.S. employee base came over to

5   Fortinet.

6           IPLocks had one patent and one abandoned

7   patent application, I believe.  Those did not

8   transfer.  But then interest -- interestingly, when

9   we reviewed the asset purchase agreement and the

10  section drafted actually by IPLocks' attorneys, it

11  was ambiguous, you know, at best, but it appeared

12  that it actually encompassed the -- the patents.

13          So we did start a conversation with IPLocks

14  about whether that should -- those should have come

15  over.

16      Q.   But they never did?

17      A.   The -- we resolved it by IPLocks keeping

18  the issued patent, and we took the unintentionally

19  abandoned pending application.

20      Q.   Did you revive it?

21      A.   I think it has been revived and may still

22  be a pending application.

23      Q.   So you took possession of a abandoned

24  patent application?

25      A.   I believe that's right.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 219

1     Q.   And at the time, you believed it was

2     unintentionally abandoned?

3     A.   That's the representation that I -- that

4     was made to us.

5     Q.   And is that -- do you have any reason to

6     disbelieve that?

7     A.   No.

8     Q.   Is that something that happens commonly in

9     the industry?

10     A.   Trying to think.  I don't think I've ever,

11     with any of ours, intentionally abandoned one.  And

12     I'm trying to think whether we've -- in companies --

13     I think that might be -- no, I -- you know, I --

14     I -- there may have been one, CoSine Communications.

15     So I think application -- yeah, it's a long time

16     ago.

17          The CoSine Communications, it may have been

18     during the course of the transaction that a date was

19     missed while we were negotiating that transaction.

20     So there could have been an unintentional

21     abandonment during the course of that transaction,

22     and I think it would slip between the cracks.

23          On IPLocks, I can't recall the exact

24     circumstances of that abandonment.  I don't think I

25     have ever -- I have any exposure to an

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 220

1    unintentionally abandoned patent application, except

2    for the -- the '601 patent that's at issue in this

3    case.

4        Q.    But the -- in the IPLocks case, Fortinet

5    revived the unintentionally abandoned application?

6        A.    I don't know, but I believe that's the

7    case.  I haven't heard anything about the

8    prosecution of that application since.

9        Q.    Is this -- I'm sorry.

10            Is the same thing true for the CoSine

11    application?

12       A.    During -- that case, yes.  That was during

13    the tran- -- the actual transaction.  I think it was

14    as part of the transaction.  It -- it -- it -- that

15    date that was missed needed to get whatever --

16    whatever -- an office action, whatever was missed,

17    needed to get.

18            So it wasn't a patent that was

19    unintentionally abandoned.  Both of these -- in both

20    of these cases, these are applications, and so

21    there's a date -- you know, a date missed where some

22    sort of a technical response is due.

23       Q.    So -- but the applications needed to be

24    revived?

25       A.    Again, I'm not a patent -- you know, a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 221

1    licensed patent attorney, so -- and I don't do that.

2    But I remember the -- I believe there was a date

3    missed on CoSine during the -- during that

4    transaction.  I -- and there might be -- there

5    probably is a rep in the agreement which we can look

6    at.  I'd have to talk to my patent counsel at the

7    time to see -- to understand the specifics of that.

8            IPLocks, I believe that there's

9    something -- something similar.  And -- and I

10   believe there's some sort of a revival.  It's not

11   something I've done, but outside counsel does.

12       Q.   And was IPLocks a competitor?

13       A.   No.

14       Q.   Secure Elements, on the next line.

15   Fortinet purchased all of the Secure Elements

16   assets, correct?

17       A.   Yes.

18       Q.   And that included patents and patent

19   applications?

20       A.   Secure Elements did have a port -- a

21   portfolio.  I can't recall how many.  But there was

22   at least -- I think there was at least one issued

23   patent.  There might have been more than one.  I

24   can't -- I think there was at least one patent.

25            It would be in the -- I mean it would be

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 222

1   listed in a schedule on that -- on that asset

2   purchase agreement which would have been provided.

3       Q.   Was Secure Elements a competitor?

4       A.   Again -- similar to IPLocks.  I mean

5   IPLocks was in the security space but -- but was

6   sort of complementary.  The IPLocks is a -- a -- I

7   think it's a database security product.  And so we

8   might have had something that was at least

9   tangentially competitive, but I think it was

10  rounding out the security offering.

11           Secure Elements, I think has become -- I

12  think IPLocks has become FortiDB.  Secure Elements

13  has become FortiScan.  So it rounded out -- it

14  rounded out -- oh -- Secure Elements was in -- I

15  think that -- well, that's that invulnerability --

16  sort of sort of vulnerability scanning.

17      Q.   So FortiDB and FortiScan, neither of those

18  are accused products, right?

19      A.   Correct.

20      Q.   And the next -- the next transaction down

21  is Woven Systems.  Was Woven Systems a competitor of

22  Fortinet?

23      A.   Probably in a similar way to -- you know,

24  sort of tangential way to IPLocks and Secure

25  Elements.  May be a bit -- just depending on how you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 223

1   look at it.

2          Woven Systems had sort of a load

3   balancing -- was a load balancing product.  Fortinet

4   had load -- had and has load balancing functionality

5   and -- but -- but -- but these -- Woven Systems was

6   more focused in that area.

7      Q.   Did Woven Systems sell a unified threat

8   management firewall?

9      A.   No.  They were -- they were a load

10  balancing WAN optimization or at least related to

11  those spaces.

12     Q.   So they were not a firewall company?

13     A.   I don't think that they had any products

14  that you would classify as a firewall necessarily.

15  I mean, given that they had, you know, a network

16  product.

17          I mean I wouldn't be surprised to know that

18  there -- there were, you know, scanning capabilities

19  or something that would be some sort of

20  protective -- you know, limited protective

21  capabilities.  But whether they were a dedicated,

22  focused firewall product in the classic sense, the

23  broader sense, I don't -- I don't believe so.

24          What?

25     Q.   I just forgot my question.  I'm sorry.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 224

1          Let's go to the next one, to WhiteCell.

2     Oh, no I remembered my question.

3          In the other ones, IPLocks and Secure

4     Elements, I think you were able to identify Fortinet

5     products that these acquired companies became.

6          Did Woven Systems become a Fortinet

7     product?

8     A.   This one is a little more attenuated, so I

9     can definitely be incorrect.  I've asked this

10    question a number of times internally.  I believe --

11    we had the FortiSwitch product before we purchased

12    Woven Systems.  I believe that initially we may have

13    rebadged one of the Woven Systems as a FortiSwitch

14    product.  I believe that's been end-of-lifed.

15         At the same time, I think certain pieces of

16    the Woven Systems technology has -- you know, has

17    found its way into other -- into other Fortinet

18    products.

19    Q.   How about the WhiteCell one?

20    A.   What about WhiteCell?

21    Q.   Was WhiteCell a competitor?

22    A.   WhiteCell was very, very small.  It was --

23    I don't recall the exact -- I had conversations

24    with, I think, two people at WhiteCell.  It was a

25    small -- very small group of four or five people.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 225

1    So some entrepreneurs.  So it's hard to picture

2    them -- you know, to view them as competitors.

3            But the WhiteCell technology was in -- was

4    in Fortinet space.

5        Q.   Did the WhiteCell technology become a

6    Fortinet product?

7        A.   We -- we did not -- we were unsuccessful

8    in -- I was unsuccessful in purchasing the WhiteCell

9    technology.  I believe I mentioned that before.

10           When they first approached us and pitched

11   the sale of the business to us, I believe there was

12   one pending patent application.  And the main

13   purchase was a -- was a -- was a sort of a

14   technology, some source code.  So it was a product.

15   A relatively early stage -- a relatively early stage

16   product.

17           I was unsuccessful in getting the budget --

18   I did -- I did -- try to purchase, but I was

19   unsuccessful initially.  And then later we entered

20   into this transaction, just picking up what was then

21   an issued patent and a pending application in

22   exchange for two -- I couldn't remember if it was

23   one or two -- Secure -- patents that were acquired

24   from Secure Elements.

25       Q.   And did these WhiteCell patents or patent

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 226

1  applications become a Fortinet technology?

2      A.   Well, they were just -- it's just a -- a

3  patent application.  It's -- it's a patent family is

4  all it is.  So it -- we didn't purchase the

5  technology from them.

6      Q.   But did you develop any Fortinet technology

7  that was based on these patents or patent

8  applications?

9           MR. COOPER:  Same objection; same

10 instruction.

11          THE WITNESS:  So if you're asking whether

12 we looked at this -- you know, anyone at Fortinet

13 looked at the patent application, the filed patent

14 application and developed technology based on that,

15 the answer would be no.

16          MR. CUKOR:  Q.  None of the -- the acquired

17 patents were -- that we've talked about were

18 acquired because Fortinet believed that the Fortinet

19 products were covered by those technologies, right,

20 those patents?

21          MR. COOPER:  Same objection; same

22 instruction.

23          THE WITNESS:  I think you're asking about

24 sort of the nonexistence of a factor.  So -- and

25 I -- and I think that's right.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 227

1          So Secure Elements -- I mean, it was an

2   asset purchase primarily.  It was a complementary

3   asset purchase.  So their patent portfolio largely

4   was in line with, you know, their products.  And it

5   came with a series of -- you know, a set of -- of

6   patents and patent applications.

7          The Woven Systems, again, was an asset

8   purchase, where we're buying assets.  And they

9   had -- I think it was just -- there might have been

10  an issued patent or two, but it was mostly just

11  applications that came with the assets, the primary

12  focus being the assets.

13         IPLocks obviously initially was just an

14  asset purchase, so these are -- these are business

15  purchases, and there was never a -- an analysis of

16  the -- in any one of this -- in any one of these

17  cases, there never was an analysis of the patents

18  relative to Fortinet products.

19         MR. CUKOR:  Q.  Is that true for all of the

20  transactions identified in the table of category 2?

21         MR. COOPER:  Same objection; same

22  instruction.

23         THE WITNESS:  Yes.

24         MR. CUKOR:  Q.  Okay.  With regard to

25  TalkSwitch, what was the TalkSwitch technology?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 228

1    A.    TalkSwitch is a -- and this is currently --

2    I believe is our FortiVoice product.  TalkSwitch is

3    a -- they sell a telephone system and a VoIP PBX.

4          (Discussion off the record.)

5          MR. CUKOR:  Q.  And going back to

6    category -- the category 1 table for a minute, were

7    any of the licenses or acquisitions done by Fortinet

8    that are identified in category -- in the category 1

9    table done because of Fortinet's belief that those

10   patents or applications covered Fortinet technology?

11   A.    So I think we've covered them.  The -- for

12   the CoSine Communications, it's an adjacent and

13   complementary space.  We didn't do the analysis

14   whether it covered our products.

15          The F-Secure license was a license out.

16          Color- -- Colorado Remediation we've

17   discussed, is a -- is a sale.

18          AST is a sale.

19          UTStarcom was a purchase.  And I mentioned

20   I did not do a -- I did not do an analysis of

21   whether those patents covered Fortinet products.

22          The next two are to Cisco and are sales.

23   And that's -- and that's it.  So I think we've

24   talked about the two purchases.

25   Q.    Okay.  Let's go to the IntruGuard on page

Page 229

1   7, line 28.  What technology was IntruGuard

2   technology?

3        A.   IntruGuard is a small -- was a small

4   DDoS -- what is that -- denial of service --

5   something -- DDoS company with a purchase of assets.

6   And I -- it wasn't my deal, so it's one of the ones

7   I'm least -- it's probably the -- one of the ones

8   I'm least familiar with, but I note that I'm a -- it

9   doesn't -- didn't seem to have come with any IP

10  assets, other than just the technology and the

11  people.

12       Q.   Okay.  How about XDN; what technology was

13  involved with XDN?

14       A.   XDN is an adjacent product related to

15  network acceleration through redirection and

16  caching, so not directly competitive or competitive

17  only with certain features, but -- but

18  complementary.

19       Q.   And did XDN become a Fortinet product?

20       A.   I believe -- yes, we are -- Fortinet

21  continues to sell the XDN -- it's -- the redirector

22  service.  I don't know how it's been named.  I think

23  it's XDN Redirector and XDN Cache or something.

24  I -- Crowd -- CrowdDirector and CrowdCache I think

25  were their names when they were at XDN.  And I don't

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 230

1    know -- there was some discussion about naming

2    within marketing.  I don't -- I don't know how it's

3    been named.

4        Q.   Are those XDN products that are now

5    Fortinet products part of the accused products in

6    this case?

7        A.   I don't believe so, no.

8        Q.   Okay.  And the Coyote Point Systems what

9    technology was that?

10       A.   Coyote Point Systems sells a series of load

11   balancing appliances.

12       Q.   And did -- it didn't have any IP in the

13   transaction.  Did the Coyote Point Systems

14   acquisition read to any Fortinet products?

15       A.   This was a -- whoops.  Yes, it says, "Asset

16   purchase agreement/merger."  This was a merger, not

17   an asset purchase.

18            So Coyote Point Systems still exists as a

19   Fortinet subsidiary, and there was a reverse

20   triangular merger.  And Coyote Points [sic] is still

21   selling the Coyote Point Systems.  There -- Fortinet

22   also sells its own and some OEM load balancing

23   systems.  And there -- there is a road map for

24   rebranding the Coyote Point system appliances as

25   Fortinet appliances.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 231

1      Q.    But none of those Coyote Point Systems

2    appliances are accused products in this case,

3    correct?

4      A.    That -- that is correct.

5      Q.    And are any of the licensors/sellers in

6    either category 1 table or category 2 table

7    companies that you would have considered competitors

8    in the firewall market space?

9      A.    What I'm -- can you repeat that question or

10   read that question back.

11         MR. CUKOR:  Ms. Moose.

12         (Record read as follows:

13         QUESTION:  And are any of the

14         licensors/sellers in either category 1 table

15         or category 2 table companies that you would

16         have considered competitors in the firewall

17         market space?)

18         THE WITNESS:  Again, we've gone through

19   these one by one, and I think they are adjacent

20   space.  There are overlap with certain features that

21   exist on our firewall products.

22         But I -- looking at these companies --

23   CoSine Communications, UTStarcom, IPLocks, Secure

24   Elements, Woven Systems, TalkSwitch, WhiteCell,

25   IntruGuard, XDN, Coyote Point -- I don't think under

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 232

1   a sort of a classic definition, sort of a broadly,

2   you know, classic -- none of these would be focused

3   on producing or selling a firewall.

4          MR. CUKOR:  Okay.  I'm going to ask you

5   questions in a minute about the category 3 table,

6   but we're out of tape.  So we'll change the tape.

7          THE WITNESS:  Okay.

8          MR. CUKOR:  We'll go off the record.  And

9   if you need to take a break, we can do that, but if

10  not, we can just keep going.

11         THE VIDEOGRAPHER:  Going off the record,

12  the time is 5:39 p.m., and we're at the end of

13  videotape number 3 in the deposition of Todd Nelson.

14         (Recess taken.)

15         THE VIDEOGRAPHER:  We are going back on the

16  record.  Here marks the beginning of videotape

17  number 4 in the deposition of Todd Nelson.  The time

18  is 5:51 p.m.

19         MR. CUKOR:  Q.  Let me turn your attention

20  to the table listed in category 3 of page 8 of

21  Fortinet's responses and objections to NPS's third

22  set of Interrogatories, what's been marked as

23  Exhibit 170.  Do you see the table?

24     A.   Yes.

25     Q.   Were any of the patents or applications

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 233

1    identified in that table found to be valid and

2    infringed?

3        A.   In what -- it's a little bit of a tricky

4    question.  In what setting?  I mean, to answer it,

5    the Trend Micro case, which is the second line down,

6    which was settled in January 27th, 2006.  So this

7    case -- there was an ITC case and a parallel

8    district court case that was stayed.

9             And in this case at this time, the ITC

10   determination was that there were claims that were

11   not invalid, which I would differentiate from valid

12   and infringed.  But --

13       Q.   Okay.

14       A.   -- it goes on.

15       Q.   Any of the other ones?

16       A.   No.

17       Q.   Okay.  Well, we'll come back to the Trend

18   Micro one in a minute.

19            What was the ClearSwift technology?

20       A.   ClearSwift was an early license --

21   licensee -- licensee of the Trend Micro '600 patent

22   which had an ability to create a -- essentially a

23   sublicense.

24       Q.   Oh, right.  You tried to get a license

25   through ClearSwift to avoid the Trend Micro

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 234

1    litigation?

2        A.   So -- I mean --

3            MR. COOPER:  Same objection; same

4    instruction.

5            THE WITNESS:  So clarify -- I mean just

6    clarifying the -- on the -- the original question on

7    Trend Micro.  So I think that the ITC -- and I can't

8    recall the exact claims, but the ITC found

9    certain -- a certain subset of the claims to be

10   invalid.  They found a certain -- but it's an ITC

11   action, which is not really binding.

12           I -- I -- the ITC found certain -- at that

13   time, based on the presented art, not invalid, but

14   later I believe most, if not all, of those were in

15   fact invalidated, so it's a little bit difficult to

16   answer -- you know, to be accurate about that prior

17   question you asked.

18           The ClearSwift sublicense, we didn't

19   attempt to get a license.  We did -- we did enter

20   into an agreement with ClearSwift.  And we -- this

21   was after -- this is during my time.  The Trend

22   Micro -- Trend Micro ITC issue or litigation

23   finished before -- the original ITC litigation or

24   action term- -- you know, ended before I -- you

25   know, that -- that -- I came in right at the very

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 235

1    tail end of that.

2          I sought out and negotiated the Clear --

3    the ClearSwift sublicense because the ITC order, you

4    know, says, you know, stop shipping products or get

5    a license.  So that was a license in response to

6    that order.

7          MR. CUKOR:  Q.  Which products did the ITC

8    require you to stop shipping?

9      A.   I -- I think it was -- you know, it was

10   essentially the -- the FortiGate products were --

11   the FortiGate products -- product family.

12     Q.   Those are the same products that are

13   accused in this litigation?

14     A.   No.  Because that was 2000 -- you know,

15   almost, you know, what, eight years earlier.  So

16   given the rapid product cycles, you know, I don't

17   think that there would be any products that were

18   around at that time that would be still available

19   today.

20     Q.   But they're the same product families,

21   right?

22     A.   The name is the same.  I mean the product

23   family -- I mean Fortinet has been Fortinet since

24   2002 and has named its firewall products or UTM

25   products FortiGate -- I mean common naming

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 236

1   convention consistently.

2       Q.   So the FortiGate products that were

3   excluded by the ITC in the Trend Micro case were UTM

4   firewalls?

5       A.   Yes, I believe the UTM -- I think Fortinet

6   was using the UTM marketing, whatever you -- UTM --

7   I mean, you know, sort of a marketing phrase.  They

8   were using that back in that time frame.

9       Q.   And was -- were the entire FortiGate

10  products excluded or just a portion of the FortiGate

11  products excluded by the ITC in the Trend Micro

12  case?

13      A.   I haven't reviewed the -- there was a, you

14  know, exclusion order that issued.  I haven't

15  reviewed that in many, many years.  I mean probably

16  since, you know, on or around these dates in the

17  mid-2000s.

18      Q.   Okay.

19      A.   So I can't recall specifically.

20      Q.   Okay.  What about the WorldCheck [sic]

21  technology?  Actually, before that, was Trend Micro

22  a competitor with Fortinet?

23      A.   Trend Micro is -- was and I believe still

24  is in the security space.  There's overlap in some

25  of the products.  Very little.  I don't think we

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 237

1    compete with Trend Micro -- I don't think I've ever

2    seen a competitive report comparing us to Trend

3    Micro.  I think they're more in the endpoint

4    security space.

5         Q.   Do they sell firewalls?

6         A.   I -- I'm not sure.  I don't think -- I

7    don't think they do.  I think at -- at one time or

8    another -- and again I'm -- I'm -- I'm kind of sort

9    of remembering sort of anecdotal, you know, things

10   that I've heard.

11              I think they have at one time or another

12   either OEM'ed or sold some sort of an appliance, but

13   I don't know if they have in many years.

14        Q.   Was that at the time that the license

15   that's identified in category 3 was executed?

16        A.   I don't -- my impression -- again, I was --

17   it was -- I came in after the case.  The ITC case

18   had largely terminated and the exclusion order was

19   issuing.

20              I don't -- I've never done an analysis of

21   the Trend Micro products or product line.  But I

22   believe they've consistently been more in the

23   antivirus sort of endpoint security market as

24   opposed to network security market.  But I -- but I

25   don't have direct knowledge about -- about the Trend

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 238

1    Micro products.

2        Q.   Okay.  What's the WorldCheck technology?

3        A.   Oh, yes.  WordCheck was a lawsuit -- a

4    nonpracticing entity lawsuit, I believe filed in

5    Texas a few years back, naming -- I believe it was

6    the second -- it was the second law -- sort of

7    lawsuit.  The first lawsuit -- it was the second

8    lawsuit on that patent and named some -- maybe some

9    huge number of defendants.  We were -- we were one

10   of them.

11       Q.   Was it for a firewall technology?

12       A.   No.

13       Q.   What did the technology relate to?

14       A.   I believe it was -- as WordCheck suggests,

15   it was some sort of a word-checking method patent.

16       Q.   Okay.

17       A.   I mean really, it was -- I think it was

18   from some sort of word processor origins -- based

19   origins.

20       Q.   Okay.  How about Brandy -- excuse me.

21            So I -- I guess WordCheck -- you don't

22   consider WordCheck to be a competitor?

23       A.   No.  I think it's just a nonpracticing

24   entity.

25       Q.   Okay.  And how about Brandywine

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 239

1    Communications?

2        A.    Brandywine Communications is another

3    nonpracticing entity.  If I remember correctly, I

4    believe this case was also brought in Texas.  Oh,

5    no.  I think this case was brought in Florida,

6    against a -- I can't remember exactly.

7             I think it might have been in one of the

8    districts in Florida against either a large number

9    of defendants or a number of individual cases or

10   some defendants -- same patent grouped with --

11   groupings of defendants in separately filed cases.

12   I can't remember the exact context of the

13   litigation, but I believe it was Florida.

14       Q.    Did the patent have to do with firewall

15   technology?

16       A.    No, I do not believe it did.

17       Q.    And do you consider Brandywine to be a

18   competitor of Fortinet?

19       A.    No.

20       Q.    I'm sorry?

21       A.    No.  I'm sorry.

22       Q.    Let's discuss the -- or actually, can you

23   tell me how the dispute with Trend Micro began.  It

24   was a complicated litigation history, I think.

25   Maybe you could generally walk me through what

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 240

1    happened in the litigation dispute between Fortinet

2    and Trend Micro.

3              MR. COOPER:  Same objection; same

4    instruction.

5              THE WITNESS:  Trend Micro sued Fortinet --

6    I -- this is before my time.  I don't recall the

7    exact date.  Probably would have been in either late

8    2003, early 2004, and sued them both in the ITC and

9    in Federal District Court.

10             I think the -- the district court

11   litigation was stayed pending the ITC outcome, and

12   the ITC ID issued in May of 2005.  I joined Fortinet

13   in late June 2005.

14             MR. CUKOR:  Q.  Then there was some

15   disagreement about whether there was a payment made

16   or -- I mean, I see that there's -- Trend Micro's

17   listed twice in the table in category 3.

18             Did they claim that you failed to make a

19   license payment or violated your license agreement

20   in some way?

21             MR. COOPER:  Same objection; same

22   instruction.

23             THE WITNESS:  In -- and I can't recall the

24   exact dates, but we settled the Trend Micro

25   litigation after asserting the ClearSwift

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 241

1    sublicense.  We settled that on January --

2    January 27th, 2006.

3              Then -- I can't recall the exact date, but

4    Fortinet -- there was some change in the law.  I

5    think the case was MedImmune, which allowed

6    licensers to challenge the validity -- you know, to

7    challenge -- challenge the validity of a patent

8    notwithstanding the fact that -- that they were

9    licensed and I think under one -- well, I -- I

10   don't -- you know, I don't want to go into the legal

11   analysis behind it.

12             But essentially this was Fortinet

13   challenged the validity of the patent -- actually

14   the two patents in the family and -- and stopped

15   making payments to Trend Micro.

16             MR. CUKOR:  Okay.  I understand.

17        Q.   So in 2006, Fortinet did pay Trend Micro

18   ██████████████████

19        A.   Yes.

20        Q.   Okay.  And then in 2011, did Fortinet

21   terminate its license agreement with Trend Micro so

22   that it could challenge the validity -- the validity

23   of the '600 patent?

24        A.   What was the date you just -- the date you

25   just said?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 242

1     Q.   2011.

2     A.   No, that was --

3          MR. COOPER:  Same.

4          THE WITNESS:  -- the final settlement date.

5          MR. CUKOR:  Q.  Oh.  But 2010 or '9?

6     A.   Maybe '9.

7     Q.   Okay.

8     A.   It ran -- this was a series of -- a series

9  of litigations in federal court, federal appeals

10 court and state court.

11    Q.   So at -- sometime in 2009, or around there,

12 Fortinet terminated the license agreement with Trend

13 Micro so that it could challenge the validity of the

14 '600 patent, correct?

15         MR. COOPER:  Same objection; same

16 instruction.

17         THE WITNESS:  I don't think it's accurate

18 to say that we terminated the license agreement.

19         MR. CUKOR:  Q.  So you continued paying

20 the -- okay.  So then why -- let me ask it this way:

21 In December 2011, did Fortinet make a ▮▮▮▮▮▮▮▮

22 payment to Trend Micro?

23    A.   In 2011, December 21 -- I don't know if the

24 payment happened in 2011.  I note that it's at the

25 very end of the year.  It might have happened in --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 243

1    the payment might have happened in Q1 2012.  I can't

2    recall the exact timing.

3        Q.   But another ███████ was paid to Trend

4    Micro?

5        A.   Correct.

6        Q.   And why did Fortinet have to pay another

7    ███████ when it already had a license under the

8    '600 patent from 2006?

9        A.   The ███████ payment is a -- was the

10   settlement of all the outstanding litigation.  There

11   was a -- there was a federal court action which was

12   dismissed and then another -- an appeal and a second

13   federal court action filed.

14            I can't remember -- there was a series

15   of -- of litigation maneuvers.  Fortinet disputed

16   its -- it's obligation to pay royalties on what it

17   considered to be an invalid patent.  The law had

18   changed, and new evidence of invalid -- validity had

19   come out.

20            Trend Micro asserted that regardless of

21   validity, the -- and I'm trying to characterize

22   this.  I believe the filings are -- most of the

23   filings are public.  So -- so the more accurate

24   picture would probably be gained from the actual

25   public filings.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 244

1          Trend Micro disputed obviously wanted to be

2     continued to be paid and disputed whether --

3     basically took the position that even if the -- if I

4     if I'm characterizing this correctly, even if the

5     patent was invalid, Fortinet still needed to pay.

6          At some point in the litigation, a decision

7     was made to -- to -- you know, to settle all of the

8     outstanding litigation, and -- and -- and that was

9     the settlement amount, a single fully -- fully done.

10         And it included -- and the license -- I

11    believe you have a copy of this, and it includes a

12    covenant not to sue for some period.  It -- you

13    know, it's -- it's -- a little bit complicated.  It

14    lists the various litigations that are resolved.

15    I'm -- I'm going to misspeak if I try to

16    characterize them.

17    Q.   So how much money in total did Fortinet pay

18    to Trend Micro in connection with the patent

19    5,623,600?

20    A.   I'm not aware of the total.  Obviously

21    there's a ███████████ initial payment back in 2006,

22    and there's a ██████████ final settlement payment.

23    So ██████████ plus, you know, the -- the -- the

24    variable royalties, which ran for some time before

25    the -- before Fortinet stopped paying and challenged

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 245

1    the -- the -- its -- its obligation to continue

2    paying.

3         Q.   And were the variable royalties based on

4    all of Fortinet's sales or just sales of some

5    products?

6         A.   Sales of some products.

7         Q.   Which products?

8         A.   I would -- I don't recall the -- it would

9    be in the language of the -- the agreement.  I don't

10   recall the exact products and the -- but I believe

11   it was U.S. -- you know, U.S. sales.  It was very

12   craft -- very carefully crafted language.  I'd --

13   I'd hesitate to characterize here.

14        Q.   Was it the FortiGate products?

15        A.   It -- it -- it is, but it's -- it's -- a --

16   you know, it's -- and I -- I mean it's crafted

17   having to do with the language of the patent so it's

18   a -- it's sort of a carefully crafted language that

19   carefully includes and excludes certain products.

20   It's been many years since I've looked at it, so ...

21        Q.   What was the approximate dollar amount of

22   the variable royalties over the years?

23        A.   I do not know.  There were a set of

24   minimums and -- a set of minimum payments which are

25   in the license agreement.  I believe the payments

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 246

1    stayed largely under the limit -- maybe the entire

2    time were under the minimums up to the point that we

3    challenged it.

4        Q.   So you just paid the minimums?

5        A.   Yes.

6        Q.   Okay.

7             MR. CUKOR:  Let's mark as Exhibit 171 the

8    final settlement agreement between Trend Micro and

9    Fortinet, Inc.

10            (Plaintiff's Exhibit 171

11            marked for identification.)

12            MR. CUKOR:  Q.  Exhibit 171 is in front of

13   you, correct?

14       A.   Yes.

15       Q.   And is this the 2011 settlement agreement?

16       A.   It appears to be.

17       Q.   And how is the ███████ number paid to

18   Trend Micro under this agreement calculated?

19       A.   On page 2 it's listed expressly.  So it --

20   it's not calculated.

21       Q.   Where did it come from?

22       A.   It's on the -- the second line of -- of

23   category of -- of 4, subcategory A.

24       Q.   Was it just a number that the parties

25   agreed to, or was it based on some relation to sales

Page 247

1   of Fortinet products?

2       A.   I believe it was basically a negotiated

3   number largely divorced from any product sales or

4   royalty.  But I can't speak for what -- the

5   reasoning behind trends -- what their thinking was.

6   It was a negotiated number.

7       Q.   Okay.  And nobody told you -- or during the

8   course of the negotiations, Trend Micro never told

9   Fortinet that it was -- their calculation was based

10  on a percentage of Fortinet's sales?

11            MR. COOPER:  Same objection; same

12  instruction.

13            THE WITNESS:  The Trend Micro, during the

14  course of negotiations, made a number of arguments,

15  presenting justifications, large numbers to

16  encourage -- to encourage Fortinet to increase their

17  number.

18            MR. CUKOR:  Q.  Did Trend Micro suggest a

19  specific royalty rate that was appropriate to be

20  paid for this license?

21            MR. COOPER:  Same objection; same

22  instruction.

23            THE WITNESS:  No, this isn't about a

24  royalty rate.  This -- this -- the royal -- there

25  was a royalty rate -- or a variable set of royalty

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 248

1    rates in the earlier license.  This is -- this was

2    purely a -- you know sort of an artificial

3    settlement number based on -- based on litigation

4    risk and cost to defense and a number of other

5    categories.

6         MR. CUKOR:  Q.  Okay.  If you flip a couple

7    of pages in to Exhibit A, is that the 2006

8    settlement that's attached to this exhibit?

9         A.   Can I take just a moment -- a few moments

10   and just read -- I haven't looked at that this in

11   quite some time.

12        Q.   Yes, absolutely.  You didn't look at this

13   to prepare for your deposition?

14        A.   I -- this one I took a quick glance, but I

15   don't -- I thought I would be very familiar with it.

16   I want to look at the document that's in front of me

17   just to make sure that it's what I think it is.

18        So your question was about Exhibit A?

19        Q.   Well, are you done flipping through the

20   document to --

21        A.   Yes, this -- this appears to be the

22   settlement agreement and --

23        Q.   Okay.  And when you said before that you

24   hadn't seen this in quite some time, was that a

25   mistake?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 249

1    A.   I'm thinking about it substantively.  I did

2  review the license agreements that were listed in

3  preparation for this deposition.  But now we're --

4  we're asking sort of much more in-depth questions

5  about the litigation background, the motivation,

6  whether there was royalties, so we're expanding way

7  beyond this.

8         So I actually wanted to refresh my

9  recollection, thinking about some of the

10  negotiations that occurred.  I'm -- I'm familiar

11  with this document, and I did read the documents in

12  prep -- at least quickly -- in preparation for this.

13  But I was intimately involved with the negotiations

14  on both of these agreements.

15    Q.   Okay.  So -- but when you said you hadn't

16  seen this document in quite some time that was a

17  mistake, right?

18    A.   Essentially, I'm -- I'm -- yes.  I meant

19  substantively.  I mean, it's been a long time since

20  I -- since I negotiated this is what I -- is what I

21  believe I, sort of, meant to say.

22    Q.   Okay.

23    A.   So I wanted to refresh the -- my

24  recollection of the negotiations since that's where

25  the questioning was going.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 250

1    Q.   Okay.  So now focusing your attention on

2  Exhibit A, what was the royalty rate that was paid

3  under the '600 patent?

4    A.   Which license are you referring to now?

5  I'm sorry.

6    Q.   Exhibit A to what's been marked as Exhibit

7  171.  And that's the 2006 settlement and patent

8  license agreement?

9    A.   So Exhibit A to Exhibit A -- so the Exhibit

10 A to the 2006 -- the January 27, 2006, settlement

11 agreement -- Exhibit A to that, which is on --

12    Q.   What's the page number?

13    A.   It's on page 15.  But that numbering is

14 from the 2000- --

15         MR. COOPER:  Is there a Bates number?

16         THE WITNESS:  Yeah.  There's a Bates number

17 that I -- of the royalty table that's 149340.

18         MR. CUKOR:  Okay.

19         THE WITNESS:  And there's a schedule of

20 annual minimum payments, quarterly minimum payments

21 and royal percentages listed there.

22         MR. CUKOR:  Q.  And the -- the royalty

23 percentages range from four percent to two and a

24 half percent, correct?

25    A.   This table sets forth royalty percentages

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 251

1    in the final column to the right that begin -- begin

2    at four percent and drop down to 2.5 percent.

3         Q.   And why did they decrease over time?

4         A.   Again, I see -- I see this in front of me.

5    I'm trying to remember the negotiations, which is

6    the background that I believe you're asking me for

7    again.

8              This was a negotiated settlement.  I -- I

9    can't -- I can't recall the exact discussions

10   around -- or justifications for the royalty

11   percentages that are listed here.

12        Q.   And the percentages there, they applied to

13   the sale of the Fortinet hardware, the software and

14   the services associated with the FortiGate products,

15   correct?

16        A.   They apply to U.S. revenue as it's defined

17   here on this page 15, Bates number 149340.  Revenue

18   recognized by Fortinet.  So U.S. revenue being --

19   means:

20             "Revenue recognized by Fortinet and

21             its subsidiaries in the United States in

22             accordance with GAAP that is attributable

23             to the manufacture for export use,

24             distribution, sale or license of licensed

25             products in the United States in an arm's

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 252

1          length, bona fide transaction between

2          Fortinet and the subsidiary as the first

3          party and a" -- "and a third party other

4          than Fortinet and its subsidiaries as a

5          second party after the effective date net

6          of returns, rebates, credits, commodities,

7          taxes, value-added taxes, sales and use

8          taxes and provision for bad debt.  In no

9          event shall the revenue for any product,

10         whether hardware or software or

11         subscription service be included in the

12         calculation of U.S. revenue more than a

13         single time."

14         Q.   Stop there for a second.  Or you can keep

15    reading to yourself.

16         A.   I'm sorry?

17         Q.   I'm sorry.  If you want to keep reading to

18    yourself, I don't want to stop you.

19         A.    It's very complicated.  And this was

20    heavily negotiated, so I --

21         Q.   Let me ask you the question again --

22         A.   Yes.

23         Q.   -- while you're -- while you're reading,

24    and you can look at it.

25              Is it true that the royalty base for the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 253

1    2006 Trend Micro license agreement includes

2    hardware, software and services associated with the

3    FortiGate products?

4        A.   I want to be precise in answering 'cause

5    this was very carefully crafted.

6             License -- so licensed products, which --

7    which applies to the license revenue, which had some

8    carve-outs and returns and stuff, so I just don't

9    want to speak in broad generalizations about this.

10            So hardware/software products and -- or --

11   or systems containing or providing computer virus

12   detection and/or elimination functionality to

13   protect the network.  So this network antivirus

14   functionality.  So it doesn't specifically refer to

15   the -- the FortiGate products.

16            The essential components that are

17   especially made or adopted for use in the network

18   antivirus functionality and not suitable for

19   substantial use other than for the network

20   anticipate virus functionality, and then services

21   for licensed products which services include but are

22   not limited to software subscription, renewal and

23   maintenance relating to the detection and limitation

24   of computer viruses to protect the network provided

25   that such products or services are deployed by or

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 254

1    for Fortinet, so based on specifications provided

2    for or subsidiary or products -- sorry.  So it's --

3    it's a long and -- and convoluted.

4            But there was -- there was a set of

5    licensed products that was defined in a way that was

6    abstracted, and there was a set of services that was

7    equivalently abstracted because the services were

8    specific to that -- this network virus detection

9    elimination functionality.  So it's -- it's not

10   just -- you know, I don't -- let me see if I've

11   got --

12       Q.   It's in Exhibit C you might want to turn

13   to.

14       A.   Yeah.  Yeah.  Let me look for the exhibits.

15       Q.   It's page 149345?

16       A.   Whoops.

17       Q.   And just so the court reporter has a little

18   bit easier time, if you want to read out loud,

19   that's fine --

20       A.   I'm sorry.  I blurred it.  Yes, I know.  I

21   know.  That's not very nice.

22            So then currently licensed products,

23   FortiGate insist -- FortiGate systems, including the

24   following families, so we list the families, which

25   as of the effective date include FortiOS 2.8 or 3.0

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 255

1    with antivirus software, FortiMail, FortiMail,

2    FortiWifi, FortiGuard antivirus subscription

3    services for the licensed products and FortiCare for

4    the licensed products.

5        Q.   Okay.  Having reviewed what you've just

6    reviewed, is it accurate to say that the royalty

7    base for the 2006 Trend Micro license agreement

8    included hardware, software and services?

9        A.   It had elements of -- of each of those

10   included if they had -- if they were related to

11   that -- the antivirus functionality.

12       Q.   Okay.  How was the ███████████ for past use

13   calculated?

14       A.   I think -- I think you already asked that

15   question, where we -- where was that -- did that --

16   that number come from.  Or was that about the █?

17       Q.   I asked that -- it was about the █.

18       A.   About the █.  So, again, I think it was a

19   negotiated number, a fairly abstract negotiated

20   number.

21       Q.   Okay.  And the -- so it -- let me -- sorry.

22            Did that ███████████ come about based on a

23   particular royalty rate?

24       A.   I think in the same way that I answered the

25   previous question, I believe that each sides [sic]

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 256

1   were presenting various scenarios to justify one

2   number or another.  I think both sides also may have

3   had just an abstract number, minimum payment number,

4   that's fairly divorced from any sort of unit sales

5   or -- or royalty.

6         And it was finding a number that -- that

7   was a common -- that was a common ground and also

8   finding a -- it was a process of finding a -- you

9   know, and included -- you know, the factors

10  included, you know, the cost of litigation, the --

11  the threat of a continued prosecution and exclusion,

12  leveraging the -- the IT -- the existing ITC

13  exclusion order.

14     Q.   What was the royalty rate that Trend Micro

15  wanted?

16     A.   There was -- I don't recall a -- you know,

17  a demand for -- there was -- there were many demands

18  over time -- or back and forth -- it took --

19     Q.   What's the lowest royalty rate that you can

20  remember that Trend Micro said would be appropriate?

21     A.   I don't -- I don't --

22         MR. COOPER:  Same objection; same

23  instruction.

24         THE WITNESS:  I don't -- so we're back in

25  the 2006 settlement.  This is executed on

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 257

1   January 27th, 2006.  I believe we signed the

2   ClearSwift license and asserted it, that we were

3   licensed, maybe as early as October, sort of

4   October/November time frame.

5           And there was a fairly continuous

6   back-and-forth of negotiations between that date and

7   the final settlement date.  So there were a lot of

8   proposals back and forth.

9           MR. CUKOR:  Q.  Do you remember what Trend

10  Micro's lowest royalty rate proposal was?

11      A.   If you're asking if there was just a

12  royalty, a single royalty rate, I don't recall ever

13  receiving a -- a proposal from Trend for a single --

14  a single royalty rate.

15      Q.   Do you recall receiving any proposal from

16  Trend with a royalty rate in it?

17          MR. COOPER:  Same objection; same

18  instruction.

19          THE WITNESS:  I think the royalty rates

20  that are reflected in the agreement are largely a

21  concession to what Trend was looking for.  I think

22  the -- the dispute centered around the up-front

23  payment.

24          MR. CUKOR:  Q.  And did Fortinet consider

25  the royalties that are reflected in the 2006

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 258

1   agreement to be reasonable?

2          MR. COOPER:  Same objection; same

3   instruction.

4          THE WITNESS:  I don't think -- again, I

5   don't want to disclose any privileged

6   communications.  I don't think -- and I'm not sure

7   that I understand the question.

8          If you were -- if you're asking whether, in

9   the abstract, that would be considered a reasonable

10  royalty rate for that patent in the absence of the

11  litigation, in the absence of the -- you know, the

12  exclusion order, that's one -- one question.

13         But this was negotiated settlement, and

14  Fortinet entered into this negotiated settlement, so

15  it, at that time, agreed to this negotiated

16  settlement.

17         MR. CUKOR:  Q.  Okay.  Can you turn to page

18  FORT-NPS 149340.  You were looking at that page

19  before.  It's the Exhibit A, royalties.

20     A.  What was that number again?  I'm sorry.

21     Q.  149340.

22     A.  Okay.

23     Q.  And I want to direct your attention to the

24  paragraph that you were reading before.  It's titled

25  "U.S. Revenue."

Page 259

1      A.   Okay.

2      Q.   But you stopped reading right where I want

3  to direct your attention to.  It's the middle of the

4  paragraph.  The first word of the line is "The

5  parties agree that because it is too difficult to

6  track."

7      A.   Yes.

8      Q.   Do you want to just read that to yourself

9  for a minute.

10     A.   Yes.

11     Q.   Do you see the language that talks about an

12  overall reduced royalty rate?

13     A.   I do.

14     Q.   What was the overall reduced royalty rate,

15  or how much of a reduction was the -- was the rate?

16     A.   There was no reduction.

17     Q.   Then why does it say there was?

18     A.   This is language -- and this was -- this

19  was -- this was -- this specific issue was

20  litigated.  So this was language that was inserted

21  by -- by Trend during the final stages.  I think

22  it's largely prophylactic language to support --

23  I've forgotten the exact legal, you know, reasoning

24  behind why they insisted on inserting this language.

25     Q.   Okay.  But you were aware of it when it was

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 260

1    being inserted?

2         A.    I read the agreement.

3         Q.    You didn't assert in the litigation that it

4    was slipped in on you and nobody noticed?

5         A.    No.  It was -- it was in -- it was -- no,

6    I -- no.

7         Q.    Okay.  Stepping away first from the

8    document for a second, does Fortinet have a

9    preference, when it takes a license to other

10   parties' intellectual property, to take a paid-up

11   license versus a running royalty license?

12             MR. COOPER:  Same objection; same

13   instruction.

14             THE WITNESS:  So this sounds like a -- so a

15   Fortinet and a preference sounds like a -- similar

16   to the policy question.  We -- we've only entered

17   a -- a number -- a very discrete number of

18   settlements.  In this case, Fortinet preferred a

19   fully paid license.

20             MR. CUKOR:  Q.  In -- in the Trend Micro

21   case?

22        A.    Yes.

23        Q.    In the Trend Micro case, there was a

24   running royalty being paid?

25        A.    Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 261

1      Q.   Oh, you would have preferred that you

2   didn't have to pay that?

3      A.   Yes.

4      Q.   Okay.  Now I understand.

5           Is there any situation where Fortinet did

6   prefer to pay a running royalty as opposed to a

7   paid-up license?

8           MR. COOPER:  Same objection; same

9   instruction.

10          THE WITNESS:  I can't recall any situation

11   where -- where Fortinet proposed paying a running

12   royalty for any patent license.

13          MR. CUKOR:  Okay.

14          MR. COOPER:  Can we get a quick number on

15   how much time we've got left -- how much time we've

16   been on the record.

17          MR. CUKOR:  Let's go off the record if you

18   want to do that.

19          THE VIDEOGRAPHER:  Going off the record,

20   the time is 6:41 p.m.

21          (Recess taken.)

22          THE VIDEOGRAPHER:  We are back on the

23   record.  The time is 6:52 p.m.

24          MR. CUKOR:  Q.  How many times have you

25   been deposed before?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 262

1    A.   I don't -- I don't recall the exact number.

2    Three or four times.

3    Q.   Are you planning on coming to trial?

4    A.   In the NPS case, if it goes -- assuming

5    that we -- there is a trial, I would at least attend

6    and watch.

7    Q.   Okay.  So you would be available to be

8    called as a witness if I wanted to call you as a

9    witness?

10   A.   I'm planning to be in the area at that --

11   at that time.

12   Q.   Okay.  I put in front of you during the

13   break Exhibit 170, and I wanted to go back over page

14   6 of that with you.

15   A.   Oh, okay.

16   Q.   And I wanted to direct your attention to

17   the sale by Fortinet to Cisco of several patents and

18   applications listed on the bottom of page 6 and

19   continuing on to the top of page 7.

20         What was the technology that was generally

21   sold to Cisco?

22   A.   I mean, it's -- it's the -- it's just

23   patents and patent applications, one or -- a couple

24   families here and a couple families there.  I'd have

25   to open them up and look at them to say.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 263

1      Q.    You don't recall what the technology

2   related to?

3      A.    I can't recall the titles.  I mean,

4   generally speaking, it was routing -- you know,

5   virtual routing technology, I would say.

6      Q.    Okay.  And why would Fortinet sell its

7   patents to a competitor?

8             MR. COOPER:  Same objection; same

9   instruction.

10             THE WITNESS:  You -- you previous --

11   previously asked if Cisco was a competitor, and I

12   indicated that -- you know, that there is overlap,

13   but it's limited.  Cisco has a much broader business

14   base than Fortinet.  But in the security space, we

15   do -- we do compete with Cisco.  So I'm not sure

16   that they -- the characterization of Cisco -- just

17   the broad characterization of Cisco as a competitor

18   is accurate.

19             The question was why would we sell to a

20   competitor.  But I guess the -- the -- the better

21   question would be why would we sell to Cisco.

22             And again, this was a fairly opportunistic

23   sale, that a broker identified a set of patents and

24   asked if -- if we would be willing to sell them, and

25   it ended up being a -- a set of patents that we

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 264

1  looked at and determined that they were somewhat --

2  we were somewhat either overweight in that area

3  or -- you know, we were somewhat overweight.  And so

4  they weren't patents that we necessarily needed to

5  hang on to.  So it seemed like an opportune -- an

6  opportune sale.

7          MR. CUKOR:  Q.  They were not patents

8  related to your core technology?

9      A.  In each case, we do have a license-back, I

10 believe, baked into the license agreement.  But in

11 each case, whether it's the AST sale or the two

12 Cisco sales, I -- I did not do a review of the

13 patents relative to any Fortinet products.

14     Q.  Did -- with regard to the AST sale or the

15 two Cisco sales, did those patents relate to UTM

16 firewalls?

17     A.  Not specifically and obvious -- and sort of

18 overtly.  I would need to look -- to answer

19 accurately, I would need to review each of -- each

20 of these.  But they are more related, if I recall

21 correctly, to -- I mean, it's hard to make --

22 there's a lot -- there's a number of patents here.

23 There's a discrete number of families, but a number

24 of patents here.

25          So -- in -- in each case -- I -- there --

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 265

1   none of these had -- were titled, you know, "UTM" or

2   "Firewall," would be my memory.  I can't recall the

3   exact titles.  I can actually -- yeah, I can't.  I

4   mean, I just -- it's --

5       Q.   It's okay.

6       A.   Provisioning virtual routers are -- you

7   know, titles -- "Service Processing Switch" might

8   have been one title.  I mean, I'm familiar with the

9   patents, and I would recognize if -- if I read them

10  fairly quickly, but I -- I can't recall the titles

11  just looking at the numbers.

12      Q.   Okay.  I noticed in the Cisco agreement

13  that there was a time of the essence clause when the

14  payment had to be paid by a certain time.  Was that

15  in there because Fortinet needed the money?

16          MR. COOPER:  Same objection; same

17  instruction.

18          THE WITNESS:  What does it mean, to need

19  the money?

20          MR. CUKOR:  Q.  Did Fortinet have some need

21  to raise cash to cover expenses?

22      A.   No.

23      Q.   Did Fortinet want the money to use for a

24  specific purpose?

25      A.   What -- can you remind me which one you're

Page 266

1    asking about.

2         Q.    The Cisco agreements.

3         A.    Which Cisco -- ah, darn.

4               You writing down when I say "blah"?

5               Which Cisco agreement?  You said -- or did

6    you say agreements?

7         Q.    The December 17, 2012, one.

8         A.    There was no specific -- there was no

9    specific need for the money.  I think I did

10   communicate to Cisco that we might be more amenable

11   to, you know, a deal -- and again, we were

12   negotiating a price -- if it happened before the end

13   of the year.  And -- but I think that was more akin

14   to simply, you know, end-of-quarter/end-of-year

15   revenue.

16        Q.    Was F-Secure a firewall competitor?

17        A.    I do not know the F-Secure product or

18   services line.  My -- my understanding is that

19   they -- F-Secure is in, you know, the -- the

20   security space.  I don't know the specifics of their

21   products.

22        Q.    And were the patents that were sold or

23   licensed to F-Secure related to firewall technology?

24        A.    The -- not specifically.

25        Q.    Okay.  Is Tuttle Lane on this -- on this

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 267

1    chart?

2       A.   Yes.

3       Q.   Where is it?

4       A.   AST.

5       Q.   Oh, AST is Tuttle Lane?  Okay.  Thanks.

6       A.   Is Google.  So AST, you know -- you

7    probably know AST.  Tuttle Lane, I believe, was an

8    entity that they had take assignment.  And my

9    understanding is the ultimate assignment, if you

10   look at the assignment records, is Google.

11      Q.   Okay.

12           MR. CUKOR:  What's the next exhibit number?

13           THE REPORTER:  172.

14           MR. CUKOR:  I'm going to mark as Exhibit

15   172 the assignment agreement between Fortinet and

16   Tuttle Lane.

17           (Plaintiff's Exhibit 172

18           marked for identification.)

19           MR. CUKOR:  And I'll mark as 173 the U.S.

20   PTO assignment that's been Bates-labeled NPS 0050942

21   through 50958.

22           (Plaintiff's Exhibit 173

23           marked for identification.)

24           MR. CUKOR:  Q.  What's the date of the

25   assignment in Exhibit 172?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 268

1      A.    It appears to be August 19, 2011.

2      Q.    What's the title of the document?

3      A.    "Assignment Agreement."

4      Q.    And is it executed?

5      A.    This agreement -- this copy of this

6   agreement appears to be a copy I received from the

7   assignee.

8      Q.    So what was the effective date of this

9   assignment?

10      A.    This -- the effective date is defined on

11   page 1 as August 19, 2011.

12      Q.    Okay.  I'm giving you Exhibit 173 now.  And

13   can you confirm that Exhibit 173 is the assignment

14   documents that were recorded with the U.S. PTO?

15      A.    I -- I've never seen these documents.

16      Q.    Can you turn to NPS 0050955.  Have you seen

17   that document before?

18      A.    Well, it appears to be signed by me, so

19   presumably I've seen it before.

20      Q.    And what was the date that you signed it?

21      A.    I'm -- I'm not sure I can read the date.

22      Q.    Could it be August 24th, 2011?

23      A.    It could be.  I -- I -- the -- the 4 is --

24   is not clear.

25      Q.    Do you see the notary portion underneath

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 269

1    your signature?

2        A.   Yes.  That is notarized on August 24th.

3        Q.   Okay.  And do you recall going before a

4    notary on August 24th?

5        A.   No.

6        Q.   Okay.  And what is the title of this

7    document on page NPS 0050955?

8        A.   This is Exhibit B, a Confirmatory Patent

9    Assignment Form in the United States Patent &

10   Trademark Office.

11       Q.   And the next line?

12       A.   Assignment.

13       Q.   And is this a patent assignment?

14       A.   I'm -- I'm not -- I can't recall this exact

15   document, even though I sent it.  So -- and it's out

16   of context.  You seem to have pulled it from the --

17   it seems to be connected to and pulled from this --

18   what appears to be a UT -- a U.S. PTO assignments on

19   the Web.

20            And for the technical patent assignments

21   with a PTO, I -- I generally just -- you know, I

22   leave that to outside counsel, and I just -- I --

23   you know, to the extent that I need to execute

24   documents, they instruct me.

25       Q.   Well, you did sign this document, right?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 270

1      A.   This is my signature, and this is

2   Joyce's -- I think this is Joyce, who is our person

3   in the office who does note -- notary services.

4      Q.   Okay.  And do you see in the second

5   paragraph or second full -- third full paragraph of

6   the document on page NPS 0050955, "Now, therefore,

7   in consideration"?

8      A.   Oh, I do see that.

9      Q.   Can you read that first line.

10      A.   "Now, therefore, in consideration of the

11   sum of one dollar and other good and valuable

12   consideration."

13      Q.   You can keep going.  Finish that whole

14   sentence.  Actually just the next line.

15      A.   "Paid" -- "paid by assignee to assignor the

16   receipt and sufficiency of which is hereby

17   acknowledged."

18      Q.   Does that refresh your recollection about

19   whether you've ever executed an assignment that

20   recited one dollar as consideration?

21      A.   It -- it does.  So I don't recall this

22   exact assignment, and I think I said previously that

23   the substantive agreement, which would be this type

24   of agreement, the substantive negotiated agreement,

25   would be the -- the -- the documents that I look at

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 271

1   and negotiate and review and what I would speak to.

2   But the things that are filed with the U.S. PTO,

3   those technical formalities I largely leave to

4   outside counsel.

5           So I -- I -- I don't look at those, and I

6   don't understand how they're filed and recorded, so

7   I -- I don't recall this.

8       Q.   Okay.

9       A.   But I read it.  I see it.

10      Q.   And that dollar that's referenced in

11  Exhibit B that you've been reading of what's been

12  marked in this case as Exhibit 173, that bears no

13  relation on the value of the patents that were

14  assigned to Cisco, correct?

15      A.   That's this one.  I'm sorry.  We're on

16  Tuttle Lane, aren't we?  Is it -- do -- are you --

17  are you switching me back and forth?

18      Q.   I'm sorry.  No.  I made a mistake.  My

19  question was wrong.  Thank you for catching it.  Let

20  me ask it again.

21          The one dollar consideration that was

22  recited on NPS 0050955 does not relate in any way to

23  the value of the patents that were transferred by

24  Fortinet to Tuttle Lane, correct?

25      A.   In this case, this is -- this is not my

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 272

1    document and this confirmatory -- I don't know what

2    a confirmatory patent assignment form is.  I suspect

3    this is a Tuttle Lane form that -- that I -- that we

4    were asked -- asked to execute.  I -- I don't know

5    where this came from.

6            This I would call the substant- --

7    substant- -- the substantive agreement effecting the

8    transfer.  And this agreement -- this is Tuttle

9    Lane, and I -- again, I note -- I mean, this appears

10   to be a Fortinet production, but it also appears to

11   be missing a page.  The -- the second signature page

12   appears to be missing.

13       Q.   The transfer to Tuttle Lane or AST was for

14   a sale price of about ███████████, correct?

15       A.   Yes.  Here it is on 149972, payment and

16   right of first refusal, consideration via assignment

17   of rights granted.  Pursuant to Section 1, assignee

18   will pay to assignor ████████.

19       Q.   And that -- you're reading from Exhibit

20   172, correct?

21       A.   I am reading that from Exhibit 172.

22       Q.   So the document that you signed in Exhibit

23   173 that recites one dollar of consideration has

24   nothing to do with the value of the patents that

25   were transferred to AST or Tuttle Lane, correct?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 273

1      A.   Well, let me just -- again, I -- I've said

2  I don't recognize this document even though I -- I

3  see my signature on it.  Let me just compare.  I --

4  I trust that you are correct.

5           Yeah.  Yes, this seems to be related to --

6  this seems to be sort of the technical patent

7  assignment that would be filed -- I presume filed

8  with the U.S. PTO.

9      Q.   So the one dollar that's recited in Exhibit

10 173 has no relation to the value of the patents that

11 were transferred to AST or Tuttle Lane, correct?

12     A.   I would agree with that.

13     Q.   And looking at page 2 of Exhibit 173, do

14 you see that there's an execution date section?

15     A.   Page -- page 2?

16     Q.   I'm sorry, the second page of Exhibit 173.

17     A.   So this form, patent assignment.  Again,

18 this is something I'm not familiar with, but I'm --

19 looking at this page, I see a row about six or eight

20 rows down that says, "Execution date."

21     Q.   Right.  And that is the -- what is the date

22 that's listed there?

23     A.   The document says 8/19/2011.

24     Q.   And is that the same date that's identified

25 as the effective date of Exhibit 172?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 274

1    A.   The effective date of Exhibit 72 [sic] is

2    August 19, 2011.

3    Q.   And if you flip back in Exhibit 173 to the

4    patent assignment that you signed, that was dated

5    August 24, 2011, correct?

6    A.   This NPS 0050955, I see the notary date of

7    August 24, 2011.

8    Q.   And the fact that you signed a patent

9    assignment on August 24, 2011, did not change the

10   fact that the patent was already assigned as of

11   August 19th, 2011, correct?

12   A.   I mean, I think it depends on how you

13   interpret that.  I mean, if I look at the agreement

14   that was filed -- I mean, there's a technical filing

15   I see with the U.S. PTO.  Again, it's not something

16   I understand or have ever done.  I just fill out

17   forms to complete the technicalities as I'm asked to

18   do so.

19        The agreement with an effective date of

20   August 19 is -- you know, is an agreement to assign.

21   Q.   It is in fact an assignment, correct?  It's

22   not an agreement to assign; it is an assignment?

23   A.   This is an assignment agreement.  I mean,

24   the agreement is what it is.  I -- I don't want to

25   get into -- this was the agreement -- when was

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 275

1    the -- I think we're just getting into the mechanics

2    of closing the transaction and payment of the

3    consideration and filing of the assignment.

4        Q.   What was the date the patents were assigned

5    to Tuttle Lane?

6        A.   I think it depends on what you mean.  The

7    date that we signed this agreement here is

8    August 19th, 2011.  And however you characterize

9    this agreement --

10       Q.   Sure.  Can you refer to the agreements by

11   their exhibit numbers so that the record is clear.

12       A.   So Exhibit 172 is an assignment agreement,

13   and its effective date -- it is -- it appears to

14   be incomplete, and the signature date is not --

15   there's no signature by the date.  I assume these

16   were exchanged -- signatures were exchanged, so

17   there's a page missing, you know, on that date.  But

18   it does appear to be dated August 19, 2011.  So this

19   assignment agreement was assigned at that date.

20            It provides that money will be transferred.

21   I don't recall the exact timing on the time that the

22   money will be transferred.

23       Q.   Let me ask you this question:  Could Tuttle

24   Lane have brought suit on the patents that were

25   assigned to it by Fortinet on August 19th, 2011?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 276

1    A.   I think you're asking for a legal

2    conclusion.  I suspect not until they perfected -- I

3    mean, again, you're asking for a legal conclusion.

4    Let me -- if I look at this -- I want to look at

5    some of the timing on how the -- when the

6    payments -- appointment, payment ...

7             Again, this -- this wasn't my form.  This

8    is a -- an AST form agreement.  There seems to be

9    additional obligations and further assistance in

10   effecting transfer of rights, so that this agreement

11   seems to envision a -- you know, a transfer rights

12   subsequent to this agreement and potentially further

13   assistance -- on the effective date -- there's an

14   obligation, on page 5 of Exhibit 172 ...

15            So I mean, the mechanics of completing the

16   assignment are baked in.  Again, it's not my form.

17   You know, I think the agreement says what it says,

18   and I -- I don't know that I'd necessarily want to

19   go through the legal -- you know, sort of

20   instantaneous legal analysis on -- on this to say

21   what rights they had at what time.

22            (Plaintiff's Exhibit 174

23            marked for identification.)

24   MR. CUKOR:  Q.  Okay.  Let me put in front

25   of you what's been marked as Exhibit 174.  It's the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 277

1    Declaration of Todd Nelson in Support of Defendant's

2    Motion to Transfer Venue to the Northern District of

3    California.

4           Have you seen this document before?

5       A.   Yes.

6       Q.   And it concludes with your declaration

7    under penalty of perjury that it was true and

8    correct, correct?

9       A.   Correct.

10      Q.   Read into the record paragraph 4, please.

11      A.   Paragraph 4 on the second page says:

12           "Fortinet maintains its source code

13      for the accused products under very tight

14      security at its headquarters in Sunnyvale,

15      California, and its offices in Vancouver,

16      British Columbia, Canada."

17      Q.   Is that statement true?

18      A.   I think it -- it -- it -- it could be true,

19   yes.

20      Q.   It could be true is different than true.

21   So I'm asking you is it true?

22      A.   So when you say its source code, earlier

23   today you were saying that -- we were asking this

24   FortiOS software that built the image, where was

25   that located, and that's located in British

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 278

1   Columbia.

2          Fortinet in Sunnyvale is generally focused

3   on the -- the hardware side of the -- of the

4   FortiGate products, so something like our ASIC code

5   I believe is maintained in Sunnyvale, California.

6          So I think this is a little bit of a -- a

7   broad characterization of where -- depending on what

8   source code or design code that you're looking for,

9   where that would be.  And it would be in either

10  California or Vancouver, British Columbia.

11     Q.   The source code for the FortiGate products

12  is not kept in Sunnyvale, California, is it?

13     A.   So I'm not sure what you're saying.  So

14  when you say "the source code," I'm saying if I

15  interpret this to mean the -- the hardware designs,

16  the ASIC designs, those would be maintained in

17  California.

18     Q.   And do you think that the -- that this

19  paragraph accurately represented to the Court where

20  the source code for the accused products was kept?

21     A.   You know, I would -- I would need to go

22  back and ask -- I think, if I recall, at that time,

23  when I was doing -- when I was -- when I was filling

24  out this declaration in support of the motion to

25  dismiss, I was looking at the maintenance of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 279

1    databases relative to the accused products.

2            The questions earlier today were about our

3    FortiOS software source.  The hardware -- the ha- --

4    ha- -- blah -- the hardware designs, the Verilog

5    code and the like I believe are largely maintained

6    in -- I think -- you know, that one -- the hardware

7    gets a little fuzzier, but I think that that's

8    primarily maintained in -- in -- in -- in Sunnyvale.

9        Q.   Do you stand behind what you wrote to the

10   Court in paragraph 4?

11       A.   Yeah, I -- I do.  I do.  I think that --

12   and on the software side -- on the software side, I

13   believe our IPS code -- I think our IPS code may be

14   maintained in Sunnyvale or it may be, like, an NFS

15   mount to a server in Vancouver.

16           So -- so the Sunnyvale develop- -- there

17   are some software developers.  The -- the -- the

18   software -- the software -- it's -- it's a difficult

19   split.  So in Sunnyvale, we have the developers for

20   the -- most of the non-FortiGate products, such --

21   such as the FortiDB and the FortiScan and the

22   Forti -- the -- the -- the FortiAuthenticator,

23   FortiCache, or whatever -- the other non-FortiGate

24   products are developed and maintained in Sunnyvale.

25       Q.   But those are not accused products, right?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 280

1    A.   Those are not accused products.  The

2  FortiAP very well may be.  I think the FortiAP,

3  that -- that group is in Sunnyvale, and those are

4  accused products.  That's not FortiOS, so that -- I

5  believe that software would be in Sunnyvale.

6         And then the ASIC design -- so the products

7  come together in different places.  The ASIC

8  designs, which are included in the bulk of the

9  FortiOS product -- the FortiGate family of products,

10 those -- those designs -- the ASIC design team I

11 believe is in Sunnyvale.

12        The IPS code design team at one point was

13 in Sunnyvale.  I believe it's still in Sunnyvale.

14 There may be a split on that piece.

15    Q.   Was it appropriate for you to tell the

16 Texas Court in support of your motion to transfer

17 this case to the Northern District of California

18 that the source code for the accused products was

19 maintained in Sunnyvale, California?

20    A.   Yes.

21    Q.   Okay.  Take a look at paragraph 7.  Is that

22 true?

23    A.   "In addition, substantially all of

24      the testing, manufacturing" -- (reading

25      inaudibly) -- "and shipping of the accused

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 281

1        product for the America" --

2            THE REPORTER:  Okay.  I can't take that

3    down.

4            THE WITNESS:  Oh, I'm sorry.

5            THE REPORTER:  Just letting you know.

6            THE WITNESS:  "In addition

7        substantially all of the testing,

8        manufacturing, to the extent manufacturing

9        is performed in the Americas, and shipping

10       of the accused products for Americas region

11       occurs at Fortinet's Sunnyvale

12       headquarters."

13           Yes.

14           MR. CUKOR:  Q.  Does any manufacturing

15    occur in Sunnyvale?

16       A.   Of the accused products?  No.  No

17    manufacturing of the accused products -- and I say

18    "to the extent manufacturing is performed in the

19    Americas" ...

20       Q.   Is paragraph 7 true?

21       A.   "Substantially all of the testing" --

22       (reading inaudibly) -- "performed in the

23       Americas, and shipping of the accused

24       products for the Americas regions" --

25           Yes, I believe this is true.  Because when

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 282

1    we're talking about -- I mean, as I said, the

2    contract manufacturers for the accused products are

3    all overseas, but for the Americas, they -- they do

4    hit and are shipped out of the America -- Americas

5    facilities.

6           So manufacturing -- there's -- there --

7    occasionally there's some spot-checking that's done.

8    I think that's actually handled in the Trend

9    license, and I think we actually carved it out as

10   sort of incidental manufacturing.  There'll be sort

11   of spot-testing.  It's very -- it's very limited,

12   where you open a box and do spot-testing.

13          For the most part, for the Americas, if

14   stuff comes from a contract manufacturer destined

15   for a U.S. distributor, to the extent that a box is

16   opened and power cables are inserted or

17   spot-testing -- functionality testing is done, that

18   would happen in making sure, in the U.S., prior to

19   shipping.

20       Q.   But there's no manufacturing done in

21   Sunnyvale, correct?

22       A.   The manufacturing of the -- the ancillary

23   products is done in the U.S.

24       Q.   There's no manufacturing of the accused

25   products in Sunnyvale, correct?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 283

1     A.   The accused products are contract

2  manufactured in China, Taiwan, Canada, and I think

3  one is in Germany.

4     Q.   So there is no manufacturing of the accused

5  products in Sunnyvale, California, right?

6     A.   No, it depends on how you define this.  And

7  this is something we argued very carefully over

8  during the -- and I was probably -- and I was

9  sensitized to this issue during the Trend litigation

10  because we specifically sort of carved this out.

11        We said, you know, what do you -- at what

12  point does it rise to the threshold of doing

13  manufacturing.  The accused products, as I

14  understand, them, you know, they are shipped through

15  the U.S., and the -- the products for the U.S. would

16  come through the -- the U.S. manufacturing

17  department.

18        I did talk to our person in manufacturing

19  at -- in preparation for this deposition today to

20  find out exactly what products were manufactured in

21  Sunnyvale and to confirm that the contract

22  manufacturers were all overseas and to understand

23  sort of the incidental sort of testing and

24  repackaging that -- that was done in -- in the

25  Americas.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 284

1    Q.   Okay.  Can you look at paragraph 8.  You

2  wrote to the Court that Fortinet did not maintain

3  any facilities, employees or documents in the

4  Eastern District of Texas, correct?

5    A.   I see that, yes.

6    Q.   Did it later turn out that Fortinet did

7  have employees in the Eastern District of Texas?

8    A.   I don't know.

9    Q.   Do you remember submitting a supplemental

10  declaration?

11    A.   No.

12        MR. CUKOR:  This will be the last document

13  I show you.  Let's mark as Exhibit 175 the

14  Supplemental Declaration of Todd Nelson in Support

15  of Defendant's Motion to Transfer Venue to the

16  Northern District of California.

17            (Plaintiff's Exhibit 175

18            marked for identification.)

19        MR. CUKOR:  Q.  Look at paragraph 3 of

20  Exhibit 175, please.

21    A.   Can I -- I want to -- this has been a

22  while, so I -- I'd like to sort of review briefly

23  just to refresh my recollection.

24        Okay.

25    Q.   Looking at paragraph 3 of the document

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 285

1   that's been marked as Exhibit 175 in this case, do

2   you see you wrote:

3          "As stated in my previous declaration,

4      Fortinet does not maintain any facilities

5      or documents in the Eastern District of

6      Texas."

7          Do you see that?

8      A.   I do.

9      Q.   Do you see absent from that sentence is

10  "employees"?

11     A.   Yes.

12     Q.   And I want to refer you back to paragraph 8

13  of Exhibit 174.

14     A.   Okay.

15     Q.   In that paragraph you told the Court that

16  Fortinet did not maintain any employees in the

17  Eastern District of Texas, correct?

18     A.   Yes.

19     Q.   Did that turn out to be not true?

20     A.   You know, I can't recall the circumstances

21  at the time.  I believe that when I investigated at

22  this time, I was not able to locate any employees.

23  I don't know if we have new employees.  We're

24  growing quite quickly.  But apparently there were a

25  few employees that did show up, I believe working

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 286

1    from home, if I -- if I remember the facts.  I

2    haven't read all of this.

3          Two -- so I have reviewed plaintiff's

4    opposition motion.  This is on page 2 of Exhibit

5    175.  So I've reviewed plaintiff's opposition to

6    defendant's motion to transfer venue.

7    Q.   You can read to yourself whatever you need

8    to read to -- in order to answer my question.

9    A.   In particular, the section which plaintiff

10   claims to have identified four current and two

11   former employees located in the Dallas area.

12         So -- so it looks like there are two

13   employees that I missed in my prior search for

14   employees that I found when we filed this

15   supplement, and this was providing some detail

16   around the two that I found and then I guess two

17   that I was unable to find.

18   Q.   Okay.  Turning your attention back to

19   Exhibit 174.  As an officer of the court, do you

20   think it was appropriate to tell the Court in Texas

21   that Fortinet maintains its source code for the

22   accused products in Sunnyvale, California?

23   A.   I do.

24   Q.   And as an officer of the court, did you

25   think it was appropriate -- or do you think it was

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 287

1   appropriate for you to tell the Court in Texas that

2   all of the manufacturing -- substantially all of the

3   manufacturing of the accused products for the

4   Americas occurs at Fortinet's Sunnyvale

5   headquarters?

6       A.   Well, that's not what I say.  And I think

7   the qualification I put in here was to -- was to

8   essentially say that to the extent -- to the extent

9   manufacturing is performed, and I was specifically

10  referring to sort of the limited testing and

11  manufacturing that -- that does occasionally occur.

12      Q.   So you completely stand behind your

13  statement in paragraph 7 and believe that it was

14  appropriate to tell the Court that?

15      A.   I believe I do.  Again, I'm not in

16  manufacturing.  So when I'm asked to -- when I'm

17  asked questions and I'm asked, I -- I -- I do an

18  investigation.  I talk to manufacturing people.  I

19  try to understand the -- the activities that are

20  being performed, and I try to, you know, accurately

21  characterize those.

22      Q.   You didn't have any trouble explaining that

23  there was no manufacturing done in Sunnyvale when I

24  asked you earlier about that today, did you?

25      A.   Well, I prepared for this deposition in the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 288

1    same way.  Will my preparation be perfect?  I

2    don't -- you know, I doubt it.  I kept saying, you

3    know, on revenue Jim Bray would be much more

4    authoritative than me.  On engineering, some of the

5    engineering resources would be more authoritative

6    than me.  And the source code itself would

7    absolutely be the absolute authority.

8        Q.   But you didn't make any such qualifications

9    when I asked you if there was any manufacturing done

10   in Sunnyvale, did you?

11       A.   I went to -- I went to multiple people in

12   operations and manufacturing, both in Vancouver and

13   Sunnyvale, went specifically through the entire list

14   of accused products and asked them where the

15   contract manufacturers are.

16            I obtained a list of all of the accused

17   products with the location of the -- of the contract

18   manufacturers.  And that's the current contract

19   manufacturers.  That changes rapidly.

20            And those -- and if you look through that

21   list, it's China and Taiwan and Canada and in one

22   case Germany.

23       Q.   Do you think --

24            MR. COOPER:  Excuse me.  Real quick.  I

25   believe we're getting very close to the seven-hour

Page 289

1    mark.

2            THE VIDEOGRAPHER:  We're over by eight

3    minutes.

4            MR. COOPER:  We're over by eight minutes?

5            Okay.  I'm going to instruct the witness

6    not to --

7            MR. CUKOR:  I have --

8            MR. COOPER:  -- answer any more questions

9    pursuant to our agreement for now.  We can go off

10   the record.  I'll come back, and we can talk about

11   whether the witness will continue to answer

12   questions.  We're over the seven-hour limit which

13   the parties agreed to.

14           THE VIDEOGRAPHER:  Off the record.  The

15   time is 7:41 p.m.

16           (Recess taken.)

17           THE VIDEOGRAPHER:  Back on the record.  The

18   time is 7:48 p.m.

19           MR. COOPER:  Just noting that the

20   deposition's now over.

21           THE VIDEOGRAPHER:  Okay.

22           MR. CUKOR:  You're not going to allow the

23   witness to answer any more questions, correct?

24           MR. COOPER:  Pardon me?

25           MR. CUKOR:  You're not allowing the witness

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 290

1    to answer any more questions?

2            MR. COOPER:  We have exceeded the

3    seven-hour limit and the deposition is now over.

4            MR. CUKOR:  Okay.

5            THE VIDEOGRAPHER:  Okay.  So this concludes

6    the deposition of Todd Nelson.  The number of tapes

7    used is four.  We are off the record.  The time is

8    7:48 p.m.

9            (Deposition concluded at 7:48 p.m.)

10

11                    ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 291

                    REPORTER CERTIFICATE

1          I hereby certify that TODD NELSON was by

2    me duly sworn to testify to the truth, the whole

3    truth and nothing but the truth in the

4    within-entitled cause; that said deposition was

5    taken at the time and place herein named; that the

6    deposition is a true record of the witness's

7    testimony as reported to the best of my ability by

8    me, a duly certified shorthand reporter and a

9    disinterested person, and was thereafter transcribed

10   under my direction into typewriting by computer;

11   that request [ ] was/ [X] was not made to read and

12   correct said deposition.

13         I further certify that I am not interested

14   in the outcome of said action, nor connected with,

15   nor related to any of the parties in said action,

16   nor to their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my

18   hand this 28th day of June, 2013

19

20

21   _____

22                HOLLY MOOSE, CSR NO. 6438

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**A**

**$15**
241:18 244:21 255:12,22
**$2,600,000**
272:18
**$2.6**
272:14
**$200,000**
181:3
**$9**
242:21 243:3,7,9 244:22 246:17
**A-N**
120:16
**a.m**
5:3 6:1,12 52:19,22
**abandoned**
218:6,19,23 219:2,11 220:1,5
   220:19
**abandonment**
219:21,24
**ability**
78:6,8,8 163:16 233:22 291:8
**able**
39:10 52:12 83:22 97:12,15
   128:14 136:11 147:11 159:13
   159:14 203:1 210:19,23,23
   212:10,10 224:4 285:22
**absence**
9:12 11:12 45:25 92:11 258:10
   258:11
**absences**
11:13,16
**absent**
135:14 285:9
**absolute**
288:7
**absolutely**
248:12 288:7
**abstract**
3:20 49:15 94:23 95:4 159:21
   169:12 255:19 256:3 258:9
**abstracted**
254:6,7
**accelerated**
110:8
**acceleration**

229:15
**access**
33:24 98:6,14 158:1 198:5
**accessory**
126:18
**accommodate**
107:18 182:20
**accurate**
13:2 20:24 21:4 23:1 45:21,23
   46:11 55:25 94:9 98:4 110:14
   124:17 215:7 217:5 234:16
   242:17 243:23 255:6 263:18
**accurately**
264:19 278:19 287:20
**accusation**
139:15 140:1 148:24 149:3,5,8
   150:2,13
**accusations**
141:9
**accused**
39:18 84:20 85:14 86:12,13,19
   87:9,15,18 113:2,11,13,16
   118:10,12 119:12,18 121:13
   121:15 125:24 126:5,7,20,22
   126:23 129:11,15,23 130:5,7
   130:23 131:13,23 134:10
   135:10 138:7 139:2,7,23 148:1
   148:19 194:15 196:7,10,18,23
   203:14 207:8 209:1,9,13 210:6
   222:18 230:5 231:2 235:13
   277:13 278:20 279:1,25 280:1
   280:4,18,25 281:10,16,17,23
   282:2,24 283:1,4,13 286:22
   287:3 288:14,16
**acknowledged**
270:17
**acquired**
178:15 224:5 225:23 226:16,18
**acquisition**
145:10 230:14
**acquisitions**
228:7
**acronym**
160:16
**act**
35:5

**acted**
87:4
**acting**
28:17,18
**action**
83:8 166:23 169:9,16,19 220:16
   234:11,24 243:11,13 291:15
   291:16
**actions**
59:24
**active**
89:6 101:22 178:5 216:16 217:1
**actively**
89:5 150:12 217:15
**activities**
173:20 174:23 287:19
**activity**
167:10,20
**acts**
72:5
**actual**
128:12 155:19 156:23 157:1,5
   157:12 220:13 243:24
**actualize**
67:11,17,18
**actualized**
67:21,25
**acutely**
143:13
**add**
17:8 57:13,14 110:4
**added**
93:1,3 127:25
**adding**
45:7
**addition**
70:3 280:23 281:6
**additional**
118:18 143:9 163:8 213:6,6
   276:9
**address**
7:8
**adjacent**
211:25 212:7,9 216:11 228:12
   229:14 231:19
**adjusted**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

60:21
**adjustment**
108:10
**admission**
55:6 207:17
**admit**
206:14
**adopted**
253:17
**advance**
57:15 100:10 150:3
**adverse**
201:15,20 202:3
**advertise**
188:4
**advisement**
147:22
**affect**
91:11 155:1,4
**affirmative**
200:19 202:13
**AFTERNOON**
3:6 108:1
**agencies**
111:4
**aggregated**
37:15
**ago**
14:18 26:8,9 27:14 64:1 103:7
  141:20 184:10 191:10,19
  219:16
**agree**
95:9 174:11 259:5 273:12
**agreed**
179:23 246:25 258:15 289:13
**agreed-to**
159:6
**agreed-upon**
149:17
**agreement**
3:16,18 96:9,15,25 97:16 98:1,3
  146:24 147:1 148:5 152:5
  153:9 155:6 156:11 180:18,22
  180:23 181:4 182:15,16
  185:13,14 214:9 217:25 218:9
  221:5 222:2 234:20 240:19

241:21 242:12,18 245:9,25
  246:8,15,18 248:22 250:8,11
  253:1 255:7 257:20 258:1
  260:2 264:10 265:12 266:5
  267:15 268:3,5,6 270:23,24,24
  272:7,8 274:13,19,20,22,23,24
  274:25 275:7,9,12,19 276:8,10
  276:12,17 289:9
**agreement/merger**
230:16
**agreements**
152:11 156:12 176:23 179:7
  249:2,14 266:2,6 275:10
**agricultural**
11:23
**ah**
266:3
**air**
181:10
**akin**
168:2 266:13
**Al**
19:25
**alert**
175:24
**allegation**
75:5
**allegations**
69:17,24 73:25 141:18,22,23,25
  142:15,18 143:3,9,15 144:18
  144:20,24
**allege**
69:19
**alleged**
167:6 168:18
**alleges**
85:25
**allocated**
164:9
**allow**
38:13 201:8 289:22
**allowed**
241:5
**allowing**
289:25
**ALP/ILP**

214:5
**Alsup**
104:21 105:1,12
**Alsup's**
201:1
**Alto**
65:25 66:16 69:13,20,20 70:5
  70:14,19,22 144:10,19,20
  166:13 168:1
**Altos**
7:11
**ambiguous**
15:20 21:13 27:7 31:13 41:24
  121:8 129:6 211:11 218:11
**ambiguously**
122:23
**amenable**
266:10
**America**
112:11,22 113:3,17 114:9,17
  115:8,11 119:25 120:1,7,11
  281:1 282:4
**Americas**
112:23 281:9,10,19,23,24 282:3
  282:4,13 283:25 287:4
**amicably**
143:23
**amorphous**
211:14
**amount**
37:14 81:4 110:20 145:17
  146:23 157:1 162:20 164:9,12
  184:10 244:9 245:21
**amusement**
103:17
**analysis**
14:3 58:7 87:4 209:16 210:2,8
  217:12,17 227:15,17 228:13
  228:20 237:20 241:11 276:20
**analysts**
215:13
**ancestry**
215:5
**ancillary**
282:22
**and/or**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 294

253:12
**Andre**
117:6
**Andrew**
14:16
**anecdotal**
237:9
**anecdotally**
33:5,10 38:18 150:8
**annual**
109:24 151:21 152:21 162:3
   164:4 250:20
**annually**
109:1
**answer**
8:16 16:12 20:12,21 21:1 23:13
   24:25 26:25 29:22 30:23,24
   31:11,19,21 34:24 35:1 40:18
   41:2,3 42:1 43:3 45:17 46:20
   48:3,24 50:20 51:11 52:5,8
   54:5,9,11 56:14 57:1,17,19,20
   58:19 59:25 60:2 78:3,9 83:15
   84:3,4,12,22,25 85:2 86:7 92:5
   93:16 94:2 95:5,22 100:20
   102:5,5,14 103:1,2 105:24
   106:4 108:8 113:7 114:20,21
   116:17 118:1 121:11 122:22
   133:8 139:10 142:17 159:1
   170:3 176:2,16 192:10,10,24
   195:23 196:8 209:5,6 215:15
   226:15 233:4 234:16 264:18
   286:8 289:8,11,23 290:1
**answer's**
84:14
**answered**
19:18 20:11 24:11 28:7 51:6
   113:5 116:8 215:14 255:24
**answering**
26:16 28:21 51:13 77:22 78:5
   90:12 91:7 95:2 113:8 169:7
   186:22 253:4
**answers**
16:10 139:22
**anticipate**
38:20 253:20
**antivirus**

237:23 253:13,18 255:1,2,11
**anybody**
20:16 104:17
**apologize**
108:19
**apparently**
74:20 285:24
**appeal**
243:12
**appeals**
242:9
**appear**
45:2 49:18 201:17 202:4 275:18
**appeared**
5:5 216:4 218:11
**appears**
246:16 248:21 268:1,6,18
   269:18 272:9,10,12 275:13
**appliance**
125:14,15,15 129:10 130:8,20
   133:1 134:25 138:4 195:13
   197:23 198:6 237:12
**appliances**
38:21 125:16 129:11,19,20
   130:7,13,17 131:6,9 132:16
   133:4 134:10,11 137:6 138:1
   197:19,25 230:11,24,25 231:2
**applicable**
92:10 135:22 149:1
**application**
15:16 16:1,6,9,15 17:14,17,22
   18:1,10 20:6,17,22 21:10 22:1
   22:15 23:8,25 24:6 26:3,21
   27:19 28:10 30:11 31:1,22
   32:3,18,22 37:18 38:3,14,22
   38:25 40:14 41:18,21 125:7
   197:8 208:20 211:6,10,15,22
   218:7,19,22,24 219:15 220:1,5
   220:8,11 225:12,21 226:3,13
   226:14
**application-level**
25:10 122:9 124:17,24 125:2
   133:6,25 134:3,16 195:20
**applications**
12:14 13:10 66:3,4,4,5,7,14,21
   68:5,23 69:2,8,14,22 70:11

177:16,24 179:22 182:3,4
209:1,13,16 211:23 212:8,18
212:22 213:11 214:22 215:6
220:20,23 221:19 226:1,8
227:6,11 228:10 232:25
262:18,23
**applied**
251:12
**applies**
253:7
**apply**
251:16
**appointment**
276:6
**appreciate**
113:7 142:16
**approached**
182:2 225:10
**approaching**
24:13
**appropriate**
27:24 48:1,4,23 56:13 91:5 96:7
   168:7,24 247:19 256:20
   280:15 286:20,25 287:1,14
**appropriately**
28:6 147:19 171:9
**approximate**
245:21
**approximated**
164:2
**Approximately**
37:4,6 80:23
**April**
23:17
**APs**
197:18
**area**
111:17 150:5,10 152:11 223:6
   262:10 264:2 286:11
**areas**
102:6
**argued**
283:7
**arguments**
94:13 247:14
**arisen**

43:20
**arm**
111:3
**arm's**
251:25
**arose**
69:21 212:5
**arrangement**
213:15
**arrived**
105:6
**art**
26:20 29:7,14,17,24 30:8,9,11
30:15 62:20,22,25 92:8,10
93:17 94:15 96:5 98:15,21
99:5 100:2 101:1,14,16 102:17
102:21,22,23 234:13
**artful**
102:14
**artificial**
77:8 248:2
**as-needed**
79:17
**ASIC**
278:4,16 280:6,7,10
**Aside**
120:11 196:21
**asked**
16:11 19:17 24:2 37:25 45:24
56:8 58:22 90:9,20 101:6
113:4 116:8 136:6 146:18
179:21 183:17 188:1 215:14
224:9 234:17 255:14,17
263:11,24 272:4,4 274:17
287:16,17,17,24 288:9,14
**asking**
25:1 27:15,16,18,24 28:8,16
31:7,8,9,15 45:5 46:24 47:19
47:22 48:20 50:11 51:7 53:9
53:25 57:12 59:14,15 60:3,19
67:19 70:18 75:6,14 77:9
78:12,12,12,17 79:3 80:11
82:21 83:19 85:16 86:23 90:16
90:19,21 91:1 93:16 96:2
97:23 99:8,20 100:7 101:11,21
113:15 125:9 130:12 131:22

134:13 140:20 147:10,24
151:7 159:20,25 167:1 169:6
169:10,11 170:8,11 193:7
226:11,23 249:4 251:6 257:11
258:8 266:1 276:1,3 277:21,23
**aspects**
45:14 117:3 163:22,23
**assert**
58:10 260:3
**asserted**
37:13 49:14 69:18 70:5 144:20
144:21 178:1 206:15 243:20
257:2
**asserting**
23:21 240:25
**assertions**
70:20 76:25
**assessment**
91:4 111:6
**asset**
82:19 217:25 218:9 222:1 227:2
227:3,7,14 230:15,17
**assets**
68:25 159:15 177:12 178:20,20
181:25 213:9 215:20 218:2
221:16 227:8,11,12 229:5,10
**assign**
274:20,22
**assigned**
54:1 156:7 158:22 159:19 160:9
271:14 274:10 275:4,19,25
**assignee**
268:7 270:15 272:17
**assignment**
3:18,20 74:22 153:15 154:7,8
154:25 156:5,10,25 157:11,18
158:4,8 159:17 206:7 267:8,9
267:10,15,20,25 268:3,9,13
269:9,12,13 270:19,22 272:2
272:16 273:7,17 274:4,9,21,22
274:23 275:3,12,19 276:16
**assignments**
155:17,18,22,25 157:3,16,23
158:20,23 160:6 269:18,20
**assignor**
270:15 272:18

**assist**
79:16,17 81:20
**assistance**
276:9,13
**associated**
125:11 251:14 253:2
**association**
6:7
**assume**
46:6 71:8 275:15
**assumed**
108:10
**assumes**
41:20
**assuming**
41:19 44:11,12 45:3 49:15
262:4
**assumptions**
30:21 62:2
**AST**
228:18 264:11,14 267:4,5,6,7
272:13,25 273:11 276:8
**AT&T**
214:2,14
**attached**
248:8
**attainable**
161:1
**attempt**
217:13 234:19
**attempts**
57:4 111:3
**attend**
262:5
**attended**
71:5,7,12 113:24
**attention**
62:10 143:13 215:19 217:3
232:19 250:1 258:23 259:3
262:16 286:18
**attenuated**
224:8
**attorney**
48:7 151:25 221:1
**attorney's**
40:25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

attorney/client
84:12 106:2,5
attorney/client-privileged
14:25 19:8 20:8 23:10 24:9
    25:17 26:24 29:20 34:22 40:16
    41:4 46:19 53:7 54:4 62:12
    83:13 84:23 85:4 86:8 105:25
    114:19 139:9 153:19 170:2
    207:11 209:4
attorneys
64:10 82:16 96:4 104:9 108:20
    122:11 171:13 205:12 218:10
attributable
251:22
attribute
169:17
attributes
173:14,16
audience
15:8
audit
151:21
audits
152:21
August
268:1,11,22 269:2,4 274:2,5,7,9
    274:11,20 275:8,18,25
authoring
63:3
authoritative
288:4,5
authority
288:7
available
75:16 112:16 113:9 125:2
    150:17 152:4 235:18 262:7
avoid
17:16 127:11 174:5 175:6
    233:25
avoiding
74:24 77:3
award
60:18
aware
26:14 29:7 46:8 47:9 54:23
    55:24 56:3 63:12 72:24 94:18

111:13 139:16,17 140:3
141:10,23 142:18,23 143:13
143:14 145:19 148:4 154:12
171:1 186:4,14,16 190:2,3,13
217:3 244:20 259:25

────────────────

B

B
194:16 269:8 271:11
bachelor
21:18
back
9:24 10:5,9,20 20:25 21:17 24:1
    27:13,14 29:1 40:21 41:10
    43:1 44:16 47:2 52:21 70:8
    83:3 85:7 94:22 108:2 130:14
    131:13 140:6 141:6 147:4
    153:3 156:8,15 162:14 181:8
    181:12 190:18,24 206:1,19,23
    209:7 211:20 214:2 215:5
    228:5 231:10 232:15 233:17
    236:8 238:5 244:21 256:18,24
    257:8 261:22 262:13 271:17
    274:3 278:22 285:12 286:18
    289:10,17
back-and-forth
257:6
background
21:17,20 23:15 61:24 79:22
    81:5 82:21 134:1 154:18 249:5
    251:6
backup
120:24
bad
166:24 167:21 252:8
baked
167:8 180:18 182:25 264:10
    276:16
balancing
223:3,3,4,10 230:11,22
Bar
12:17
barely
36:8 102:10
base
56:10,22 58:4 78:17 108:14

218:4 252:25 255:7 263:14
based
23:14,20 28:22,23,24 54:9
    56:14 58:5 59:16 60:21 67:1
    75:14 76:8 78:13,14 81:4
    82:19 84:12 86:5 88:14 89:4,8
    89:15 91:8 92:9 94:19 154:2
    160:16,24 161:17 165:4,9,13
    176:8 226:7,14 234:13 238:18
    245:3 246:25 247:9 248:3,3
    254:1 255:22
basically
77:1 158:9 191:13 214:8 244:3
    247:2
basis
54:8 56:7 58:8 59:15 74:13
    75:11 77:22 79:17 95:25
    109:24 161:15 171:10 200:18
    201:19,25 202:12
Bates
203:25 204:21,25 205:3,5
    250:15,16 251:17
Bates-labeled
267:20
bathroom
50:19
BDO
160:16
bearing
159:18
bears
160:7 271:12
began
10:5 11:12,15 19:17 21:20 25:9
    56:21 239:23
beginning
6:15 8:23,24 83:5 150:12
    162:16 214:13 232:16
beginnings
13:13
behalf
180:5
behavior
72:25
behaviors
72:5

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**belief**
35:22 87:24 88:10,14,19 89:3,9
89:16,17 90:3,21,22 158:19
160:5 228:9
**beliefs**
90:20
**believe**
9:1 13:3 14:13,19,19 15:18 18:9
20:2,4,15,16 21:7,9,21 22:8,14
24:18 25:5,25 27:23,23 28:2,4
32:11 33:5 35:21 38:10 39:22
40:9 41:6,23 42:13,16 43:11
45:21 46:12 47:2,4 48:24 49:3
51:22 54:14,17 55:2 60:1,16
61:3,6 62:16,25 64:6,9,24 65:3
66:1 69:10,15,24 70:6,8,24
71:2,4,17 72:7,23 74:1 76:17
77:5,7,12 78:9 81:5,23 84:14
85:21 87:5 91:1,18 92:13,13
92:25 94:8,10 96:14,18,18
97:3,6,8,10,22,25 99:14
104:16 105:12 111:2,3 112:15
112:17,21,24 113:25 115:10
116:8 117:12,14 118:2,16,21
119:22 120:7,23 124:5 128:7
133:9,13 137:9 138:6 144:21
146:4,5,14 147:1 149:16,21,23
150:15 152:12,23 153:6
161:10 163:21,22,24 165:11
165:12,14,19 167:5 169:15,22
177:20 178:2 180:9 181:2
183:13 184:1,3 185:4,6 186:2
189:14 194:3,5,22 195:2,8
198:8,10,12 199:1 200:12,16
200:20,21 203:16,24 206:12
208:5 210:5 214:24 216:23
218:7,25 220:6 221:2,8,10
223:23 224:10,12,14 225:9,11
228:2 229:20 230:7 234:14
236:5,23 237:22 238:4,5,14
239:4,13,16 243:22 244:11
245:10,25 247:2 249:21 251:6
255:25 257:1 264:10 267:7
278:5 279:5,13 280:5,11,13
281:25 285:21,25 287:13,15
288:25

**believed**
219:1 226:18
**believes**
15:12
**Bellovin**
60:25 61:21 62:6,15 63:3 65:5
**beneficial**
213:17 214:18
**benefit**
182:14
**Benny**
104:11
**best**
51:10 54:18 78:5,7 100:17
163:16 184:19 207:6 211:13
217:6 218:11 291:8
**better**
79:24 128:2 137:1 263:20
**beyond**
249:7
**big**
187:1
**Bill**
63:16 64:22
**binding**
234:11
**bit**
18:21 21:20 31:11 38:7 41:9
85:19 91:5 102:3,12 107:1
126:1,4,4 151:23 177:9 181:23
182:5 183:3 184:11 197:20
202:18 215:3 222:25 233:3
234:15 244:13 254:18 278:6
**bits**
128:4
**blah**
196:14,15,15,15,15 266:4 279:4
**blending**
213:1
**blurred**
254:20
**bona**
252:1
**bonus**
108:15,15 160:16,24 161:12,13
161:17

**book**
62:14,14 63:1,3
**boom**
10:25 11:3
**border**
103:10
**boss**
161:2
**bottom**
262:18
**bought**
96:22
**bound**
95:7
**bounds**
100:9
**box**
118:20 282:12,15
**branded**
130:24 131:4,6,9
**Brandy**
238:20
**Brandywine**
238:25 239:2,17
**Bray**
113:22 117:4 288:3
**Bray's**
113:19,20 114:5 116:7,8
**breach**
166:15
**breadth**
131:24
**break**
41:8 50:19,21 52:4,17 58:21
59:7 100:18,22 102:3 107:20
112:13 154:6 162:18 204:4,8,9
205:21,21 232:9 262:13
**breaks**
112:19
**Brewer**
2:13 6:6
**briefly**
284:22
**bring**
180:24
**bringing**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

167:10,23 180:5
**British**
277:16,25 278:10
**broad**
92:8,9 129:24 253:9 263:17
  278:7
**broader**
15:8 56:8 57:18 58:3 78:11,23
  130:5 188:10 207:15 223:23
  263:13
**broadly**
122:23 124:13 141:14 142:24
  143:22 144:15 232:1
**broke**
96:22 114:6
**broken**
112:8,21 115:4 164:11
**broken-down**
96:24
**broker**
183:13,15 184:7 263:23
**brought**
144:1,10 149:25 167:20,25
  239:4,5 275:24
**bubble**
10:2
**budget**
159:13 161:18,20,21,24 162:3,6
  162:19 163:4,6,9,20 164:4,8
  164:13 165:3,7,8,16,17,18
  172:20 173:15 225:17
**budget-minded**
173:21,24 174:10
**budget-mindedness**
174:13,20
**budgeted**
162:20,24
**budgeting**
163:1,3,25
**build**
68:25 122:2,3 123:23,23 136:14
  137:18,22
**building**
68:25 123:7
**buildings**
188:14

**builds**
137:19
**built**
123:13 132:13 137:15 138:1
  150:21 194:9 195:17 277:24
**bulk**
51:16 119:8 280:8
**bunch**
129:9 205:20
**Burnaby**
117:14 118:16 120:21,22,24
  121:2 137:25 138:1
**burst**
10:2,2
**business**
43:20,22,24 44:2,4,6,20,24 45:3
  45:19 66:10 67:1,4,8 68:11
  69:1 111:15 166:1,3,21,22
  169:24 170:11,13 171:3,8,16
  171:25 178:19 180:14 181:10
  215:8,16,22 216:6 225:11
  227:24 263:13
**busy**
164:17
**buy**
66:14 134:14 135:2,6 155:14,14
  198:5
**buy/sell**
213:4
**buyer**
159:8 216:1
**buying**
125:3 134:4,16 177:12 215:8,16
  227:8

---

**C**

**C**
2:1 6:2 254:12
**CA**
2:10,16
**cabinets**
186:17
**cables**
282:16
**Cache**
229:23

**caching**
229:16
**Cal**
12:5
**calculated**
246:18,20 255:13
**calculation**
247:9 252:12
**California**
1:2 2:10,16 3:24 4:4 5:5 6:10,11
  7:12 136:2 137:8 187:14,17
  188:2,11,19 189:5 277:3,15
  278:5,10,12,17 280:17,19
  283:5 284:16 286:22
**call**
10:19,20 126:14 127:13,24
  129:2 166:20 262:8 272:6
**called**
5:9 39:17 79:16 117:14 118:16
  122:25 131:11 135:19 149:6
  167:5 177:8 189:17 195:24
  262:8
**calling**
25:16 26:24 29:19 34:22 40:16
  46:19 54:4 77:4 83:13 127:11
  209:4
**calls**
56:13 114:18 139:9 170:2
**Canada**
103:4,6,12,14,16 106:14 112:11
  112:21 113:2,16 114:8,16
  115:7,11 116:5,18,20 117:9,10
  117:11,24 118:23 120:11
  122:1 135:24 136:5 137:4
  189:16 277:16 283:2 288:21
**Canadian**
116:21,22,23 117:12,22 118:7
  119:17
**cancelled**
92:25
**cap**
108:16
**capabilities**
39:24 223:18,21
**capable**
17:19,22 38:24 45:11

**capacity**
8:18 18:24 32:24 37:18,19
   39:11 60:4,11,12,15 63:13
   64:25 75:14,23,25 139:24
   169:6
**capture**
142:15
**captured**
141:17 142:11
**car**
103:12
**career**
91:17
**carefully**
18:19 99:13 112:24 114:15
   175:6 245:12,18,19 253:5
   283:7
**carve-outs**
253:8
**carved**
282:9 283:10
**case**
1:7 15:18 19:15,17 20:3 21:14
   24:22 28:17,18 29:9 31:6
   37:10 43:20,24 44:4,6,20,24
   45:19 46:14,15 48:25 49:18
   51:17 52:11,23 53:2 54:14,23
   55:17 59:2,18,21 61:4,5,11,14
   61:22 62:7 63:5 67:1,4 68:11
   70:19 76:18 85:23 96:15 97:6
   97:8 98:25 99:4 101:1,22,23
   113:11 114:3 115:12,16
   119:20 120:9 133:9,10,11,12
   133:18 135:14 137:10 140:2
   143:19,20,25 144:7,9,9,22
   146:16 149:20 150:7 156:22
   161:23 165:2,14 167:4 168:3
   172:19 174:4,14 181:22 182:5
   182:6 186:2 195:19 200:12
   201:2 206:14 207:9 209:25
   220:3,4,7,12 230:6 231:2
   233:5,7,7,8,9 236:3,12 237:17
   237:17 239:4,5 241:5 260:18
   260:21,23 262:4 264:9,11,25
   271:12,25 280:17 285:1
   288:22

**case-by-case**
171:10
**cases**
37:15 119:21 120:2,6,14 134:20
   165:5 168:4 169:24 171:11
   172:6,19 201:3,16 220:20
   227:17 239:9,11
**cash**
108:12 178:23 265:21
**catching**
271:19
**categor**
30:6
**categories**
248:5
**categorized**
178:3
**category**
156:18 227:20 228:6,6,8,8
   231:6,6,14,15 232:5,20 237:15
   240:17 246:23
**caught**
167:7
**cause**
46:4 54:25 59:10 77:16 80:9
   102:4 129:24 134:19 141:14
   147:8 156:10 163:23 173:2
   181:9 192:21 193:3 206:22
   253:4 291:5
**caution**
14:24 19:7 20:7 23:9 24:8 25:17
   26:5 29:10 53:6,18 62:11,24
   153:18 207:10
**ceased**
86:3
**cell**
48:8 216:15,18
**cellular**
216:23
**center**
117:24 119:1,3,10 120:10,17
   163:19
**centered**
257:22
**CEO**
158:13 172:16,17 173:1 174:10

174:20 188:5
**CEOs**
174:21
**certain**
18:14 24:2 31:14 42:17 81:4
   86:11 93:17 95:17 110:20
   118:4 162:20 164:9,12 193:4
   194:5 224:15 229:17 231:20
   234:9,9,10,12 245:19 265:14
**certainly**
18:7,24 59:11 73:14 87:2 116:9
   119:7,20 132:8 135:8 147:9
   169:13,14,17 170:17 180:17
   191:23
**certificate**
92:24 291:1
**certified**
5:4 6:6 291:9
**certify**
291:2,14
**CFO**
216:7
**CFO's**
215:12
**chain**
154:8
**chairs**
186:21
**challenge**
241:6,7,7,22 242:13
**challenged**
241:13 244:25 246:3
**challenges**
175:3,3
**change**
14:18 53:19 82:22 89:18 90:4
   121:1 124:18 131:19 132:2,23
   133:20,22 135:17 136:9,10
   137:15,16,23 138:16 162:8
   195:17 232:6 241:4 274:9
**changed**
54:25 55:1 90:21,23 145:12
   243:18
**changes**
109:20 288:19
**changing**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

137:17
**channels**
153:1
**characterization**
263:16,17 278:7
**characterize**
30:6 243:21 244:16 245:13
  275:8 287:21
**characterizing**
244:4
**characters**
196:17
**charge**
14:22 15:2
**charged**
151:20
**chart**
267:1
**charter**
15:3,7
**charts**
117:19
**chassis**
126:8,8 127:5 131:21 135:8,10
  196:22 197:12,17
**chatted**
82:15
**check**
106:25 158:11
**checked**
110:11
**Cheswick**
62:15 63:16 64:22
**Chicago**
11:11
**China**
118:19 119:9 137:25 283:2
  288:21
**choice**
58:15
**choose**
83:25
**choosing**
83:19
**chunks**
167:8

**circumstance**
145:4
**circumstances**
76:17 219:24 285:20
**Cisco**
177:1 187:18 188:7,9,18 189:4
  215:1 228:22 262:17,21
  263:11,13,15,16,17,21 264:12
  264:15 265:12 266:2,3,5,10
  271:14
**Cisco's**
188:14
**cities**
103:16
**city**
103:10,11,12,13 135:25
**civil**
201:2,7
**claim**
20:1 202:1,5 240:18
**claimed**
167:14
**claims**
66:1 70:5 91:24 92:22,25 93:1,3
  93:6,7 95:17 165:22 166:16
  210:6 233:10 234:8,9 286:10
**clarification**
41:12
**clarified**
25:4
**clarify**
102:25 121:17 153:20 234:5
**clarifying**
234:6
**clarity**
107:2
**classic**
223:22 232:1,2
**classify**
223:14
**clause**
265:13
**clean**
213:4
**clear**
19:12 83:20 120:2 121:9 182:22

235:2 268:24 275:11
**clearance**
57:23 58:11
**clearly**
175:10
**ClearSwift**
233:19,20,25 234:18,20 235:3
  240:25 257:2
**clever**
208:23
**client**
171:13
**close**
107:6 288:25
**closed**
118:20
**closing**
275:2
**CM**
121:1 124:18 194:9
**Coast**
187:3
**code**
22:1 25:11 32:3,4,21 33:15 38:3
  38:13,20 121:12 122:9 124:17
  124:19,23,25 125:1,2,7,8
  128:11,15 132:4 133:6,25
  134:3,16 136:4,10 137:3,13,16
  137:22 149:2 150:14,18 151:4
  152:16 167:8,15,18,19 213:13
  225:14 277:12,22 278:4,8,8,11
  278:14,20 279:5,13,13 280:12
  280:18 286:21 288:6
**collect**
102:21,22,23 114:3,15 140:12
  202:25,25
**collected**
112:17 114:24 116:11,13
  117:19 153:6 154:11 185:11
  205:11
**collecting**
101:1 115:21 140:8,14
**collection**
29:16,24 111:24 140:13 200:10
**collects**
120:18

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Color
228:16
Colorado
177:18 179:13,15,16,20 180:1,4
180:23 181:21 228:16
Columbia
277:16 278:1,10
column
251:1
combination
22:9 108:12
combinations
25:11
come
12:19 14:5 31:17 42:4 43:13,14
43:15 62:9 79:15 125:16,21
138:18,22 144:25 147:17
164:23 181:8 218:14 229:9
233:17 243:19 246:21 255:16
255:22 280:7 283:16 289:10
comes
116:4 119:7,8 125:12 144:13
148:14 282:14
comfortable
22:20 26:16 28:21 51:13 169:7
coming
28:6 50:17 262:3
commencing
5:2
comment
168:23
comments
36:5
commercial
9:22 79:14 152:11
committee
13:13,15 14:8,11,23 15:5,6,12
commodities
252:6
common
160:22 187:9,10 189:1 190:9,9
192:4 235:25 256:7,7
commonality
123:13
commonly
122:12 132:18,22 219:8

communicate
98:2 266:10
communicated
147:23
communication
48:5 52:11 59:17 63:11 89:6
90:1 100:10 217:20
communications
19:9 20:9 29:21 34:23,25 40:17
40:19 41:5 46:22,24 53:8 54:5
54:6,10 56:12 66:8,15,22 68:5
69:3,9,11,23 73:13 76:17
83:14,16,18 84:24 85:5 86:9
87:6 91:2 96:3 97:23 99:14
100:8 105:25 114:19,22 139:9
139:11 154:14 170:2,4 174:6
175:5 207:12 208:18 209:6
211:21,25 212:12,17,25 213:7
213:10,21 219:14,17 228:12
231:23 239:1,2 258:6
community
148:16
comp
70:5 143:21
companies
15:7 69:18 160:6,13 165:20,25
166:4 168:13,14 169:25 179:9
187:11 189:1,11 191:7 219:12
224:5 231:7,15,22
company
10:24 66:9 68:24 143:24 163:13
166:24 167:5,21 171:21,23
172:5 176:6 177:8 178:16,16
178:21 180:11 213:15 214:4
216:13,15 223:12 229:5
compare
44:7,21,23 45:8 273:3
comparing
237:2
compelled
44:5
compelling
28:2 49:18 67:1,3 68:10 76:21
76:22 77:2,10 78:2,20 210:16
compensate
105:7,15 106:13

compensation
108:5,23 109:18 110:17 117:21
compete
176:7 237:1 263:15
competently
203:1,2
competes
188:9
competing
167:9
competition
166:14
competitive
69:17 145:7 222:9 229:16,16
237:2
competitor
65:25 66:12 144:9 168:1,4,16
187:18 188:7 216:24 221:12
222:3,21 224:21 236:22
238:22 239:18 263:7,11,17,20
266:16
competitors
176:6,7 212:3 225:2 231:7,16
complaint
83:8 85:25 86:5
complaints
142:10,12 143:5
complementary
211:1 212:8 222:6 227:2 228:13
229:18
complete
8:7 74:22 274:17
completed
10:11
completely
32:15 33:7 46:11 58:5 153:21
287:12
completeness
142:17
completing
11:17 213:19 276:15
complex
23:22 178:15
compliance
148:25 149:17 150:11 151:22
152:22

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**complicated**
38:7 92:12 94:12 109:9 151:12
   151:13 158:24 178:13 181:24
   183:4 239:24 244:13 252:19
**compliments**
82:7
**complying**
151:18
**component**
109:18 111:8
**components**
151:22 253:16
**compound**
41:8
**comprehensively**
157:17 197:10
**comprised**
150:22
**computer**
11:20,22 12:1,2,4,7 17:4 21:17
   21:19 33:17 36:7 126:11
   253:11,24 291:11
**con**
56:23
**concept**
16:19,21 17:4,10,13 18:4 19:24
   20:22 21:9,22 24:5 211:15
**concepts**
18:4,8 19:19 22:3,8,9,9 23:24
   25:9 27:12
**concerning**
201:25
**concerns**
144:12
**concession**
257:21
**concise**
216:7
**concluded**
86:20 290:9
**concludes**
277:6 290:5
**conclusion**
59:22 76:24 78:11,18 92:9
   276:2,3
**conclusions**

24:20 31:16 32:6 50:12 51:8
   78:23 151:24
**confer**
102:3
**conference**
201:2
**conferences**
71:6
**confidences**
145:23
**confidential**
108:20
**configuration**
34:10 35:20 36:4
**confirm**
268:13 283:21
**confirmatory**
269:8 272:1,2
**confirmed**
92:22
**conflict**
116:9 174:9
**connected**
269:17 291:15
**connection**
17:1 42:15 61:11 62:19,22
   82:13 97:1 113:13,16 145:25
   148:15 244:18
**connotation**
169:18
**conscious**
172:20 173:15
**consequences**
150:24
**consider**
13:22,23 49:8 75:16 76:11
   81:17 82:1,13 94:19 133:24,24
   133:25 188:16 238:22 239:17
   257:24
**consideration**
49:5,6,20 89:23,24 153:16
   154:9 155:1,19 156:22,23
   157:12 158:20 159:16 160:7
   171:11 270:7,10,12,20 271:21
   272:16,23 275:3
**considerations**

59:23
**considered**
38:2,11 39:24 49:2 86:24 89:18
   92:7,8 93:18 124:23,24 127:5
   177:5 216:2 231:7,16 243:17
   258:9
**consistent**
147:20
**consistently**
236:1 237:22
**construed**
41:25
**consult**
100:18
**consulting**
11:15
**contact**
210:20,21,22,23
**contacted**
149:13
**contain**
122:24 129:21 131:10 195:4,7
   195:20
**containing**
253:11
**contains**
72:11
**contention**
194:17
**contentions**
26:19 93:10,21 201:19
**context**
25:25 28:7 32:12 50:13 56:24
   61:17,18,19 63:11,20,21 65:13
   65:23 72:6 77:18 81:7 88:15
   89:25 146:21 172:12,13
   177:11 239:12 269:16
**context-specific**
78:19
**contexts**
27:9 43:6 121:19
**continue**
35:4 86:19 245:1 289:11
**continued**
4:1 84:19 85:14 242:19 244:2
   256:11

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**continues**
229:21
**continuing**
262:19
**continuous**
257:5
**contract**
118:14,15 119:6,8,15 133:3
137:21 138:2,8,19,21 139:1
166:15 167:14 195:17 197:3
213:23 214:4,6,7,9 282:2,14
283:1,21 288:15,17,18
**contractors**
69:11
**contracts**
138:18 213:14,21
**contrary**
58:13
**control**
124:19 136:9,10
**controlled**
201:15
**controlling**
145:11
**convention**
40:5 198:22 236:1
**conversation**
215:11 218:13
**conversations**
172:9 224:23
**convince**
76:3,20
**convinced**
75:3,4 78:1
**convoluted**
254:3
**Cooper**
2:9 6:19,19 14:24 19:6 20:7
22:21 23:9 24:8 25:15 26:5,23
27:21 28:13 29:10,18 30:3,13
31:2,24 32:25 34:21 35:6
36:21,25 37:8,22 38:15 40:15
40:23 41:1 42:11,21 43:17
44:9 46:18 47:15 48:18 49:21
50:3,8 53:6,18 54:3 55:9 56:17
56:19 57:8 58:1,16 59:5 60:8

61:8 62:11,24 63:7,23 64:4,8
64:12,14,17,23 65:6 66:17,23
67:5,12 68:6,19 69:6 72:1,17
73:1 75:18 76:12 77:13 83:12
84:2,11,21 85:2 86:6,16,21
87:10,20,25 88:11,21 89:11,20
90:6,24 91:12 93:12,24 94:6
95:11,19 96:12 97:20 98:8,17
98:22 99:6 100:3,5 101:2,17
102:18 105:9,17,22 106:3,15
107:8,13 108:18 114:18 139:8
139:18 141:11 142:20 143:16
146:2 147:20 148:2,7,20 149:9
153:18 170:1,15,23 171:5,18
172:2 173:10 174:2,16 175:13
175:19 182:11 183:10 184:25
199:11 200:24 204:9 207:10
209:3,22 210:11 211:7 217:9
226:9,21 227:21 234:3 240:3
240:21 242:3,15 247:11,21
250:15 256:22 257:17 258:2
260:12 261:8,14 263:8 265:16
288:24 289:4,8,19,24 290:2
**cooperative**
112:2
**copies**
137:24 152:6 187:10
**copy**
22:19,21,22 128:24 152:16
244:11 268:5,6
**copyright**
148:1
**core**
177:22 217:8 264:8
**corner**
120:2,6,14 133:10,11,18 134:20
**corporate**
9:2,25 79:18 191:6,12,19 192:5
**corporation**
185:25 189:5,7 190:10
**correct**
8:2,11 18:2 32:19 35:24 43:12
46:17 47:8 54:17 67:15 69:5
69:14 80:19 86:1,5 91:9 92:17
92:23 93:2,7,11 97:2,3,14,19
110:24 128:25 136:3,7 138:12

164:10,14 165:21 185:21
186:1 188:12,19 190:12,15
198:15 207:9 208:9,19 210:2
215:15 221:16 222:19 231:3,4
242:14 243:5 246:13 250:24
251:15 271:14,24 272:14,20
272:25 273:4,11 274:5,11,21
277:8,8,9 282:21,25 284:4
285:17 289:23 291:13
**correctly**
155:3 239:3 244:4 264:21
**Cosign**
211:21
**CoSine**
66:8,15,21 68:5 69:3,9,10,23
70:11 208:18 211:25 212:12
212:17,24 213:7,9,21 214:3,10
214:21 215:6 219:14,17
220:10 221:3 228:12 231:23
**cost**
44:7,8,21,22 45:8,9 47:13,13
48:16,17 49:1 117:5 163:19
248:4 256:10
**costs**
163:9,17,18,20
**cottage**
151:17
**counsel**
6:14,15 9:1,3 48:6,12 58:6 72:7
81:19 83:9,22,23 84:7 85:17
85:21 89:7 90:1,2,2 100:19
101:13,24 141:3 147:13
154:14 156:9 157:21 162:4
163:7 165:3 201:16 221:6,11
269:22 271:4 291:17
**counter**
59:20
**counterclaims**
165:23 166:12,17
**countersuit**
144:18
**countries**
120:12
**couple**
14:18 102:11 140:24 179:21
248:6 262:23,24

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**course**
10:17 29:13,14 47:20 48:14,21
  49:1 51:21 82:16 89:5 91:16
  140:15 209:11 216:6 219:18
  219:21 247:8,14
**court**
1:1 6:7 71:16,18 73:12 74:2
  77:21 149:19 199:22 233:8
  240:9,10 242:9,10,10 243:11
  243:13 254:17 278:19 279:10
  280:16 284:2 285:15 286:19
  286:20,24 287:1,14
**Court's**
35:3
**courts**
149:24
**covenant**
244:12
**cover**
53:4,11,16 54:1,16 184:24
  207:8 209:1 210:6 211:5 217:7
  265:21
**covered**
57:5 199:5 207:20 217:16
  226:19 228:10,11,14,21
**covers**
55:7,11,13
**coworkers**
103:17
**Coyote**
230:8,10,13,18,20,21,24 231:1
  231:25
**cracks**
219:22
**craft**
245:12
**crafted**
245:12,16,18 253:5
**Crawford**
128:5
**Crawford's**
128:5
**create**
10:16 165:6 233:22
**created**
210:15

**creates**
123:23
**creating**
30:21
**Creation**
118:16
**credit**
214:15
**credits**
252:6
**Crowd**
229:24
**CrowdCache**
229:24
**CrowdDirector**
229:24
**CSR**
1:20 5:3 291:22
**CTO**
158:13 188:5
**Cukor**
2:4 3:6 6:16,16 7:3,4 15:4,15
  20:4,12 22:22 24:4,25 26:2,18
  27:15 28:8,22 29:15 30:1,7,23
  31:19 32:9,17 33:17 35:1,13
  36:24 37:4,16 38:4,23 40:20
  40:24 41:10 42:8,18 43:13,23
  44:17 45:1,10,16 47:5 48:2,10
  49:7 50:4,20,25 51:10 52:16
  52:23 53:13,15,23 54:12 55:18
  57:2,17,22 58:9,20 60:3,14
  61:12 62:19 63:2,12 64:2,7,11
  64:18,25 65:9 66:20 67:3,10
  67:15,20 68:3,10 69:2,12
  72:13,20 73:18 76:8,22 78:3
  82:22 83:7,17 84:6,16,25
  85:22 86:13,18 87:7,17,23
  88:9,16,23 89:8,17 90:3,10,19
  91:7,16 93:20 94:3,10 95:16
  96:8,16 98:4,12,20 99:1,3,18
  100:21,25 101:9,12,19 102:16
  103:3 105:14,19 106:1,12,20
  106:24 107:4,15,20 108:4,5,22
  115:6 139:16 140:4 142:2,16
  143:14,25 146:8 147:10,25
  148:5,10 149:3,14 153:22

162:7,18 170:11,21 171:2,15
  171:22 173:7,23 174:12
  175:11,17 176:9,15 178:7
  183:8,22 185:8 199:13,21
  200:1 202:11 204:13,16
  205:19 206:3 207:22 208:5
  209:19,24 210:5,17 211:18,20
  217:19 226:16 227:19,24
  228:5 231:11 232:4,8,19 235:7
  240:14 241:16 242:5,19 246:7
  246:12 247:18 248:6 250:18
  250:22 257:9,24 258:17
  260:20 261:13,17,24 264:7
  265:20 267:12,14,19,24
  276:24 281:14 284:12,19
  289:7,22,25 290:4
**Cukor's**
19:9
**cumbersome**
31:11
**current**
39:12,16 72:10 75:8 109:8,24
  139:21 286:10 288:18
**currently**
7:16 79:6,7 108:7 109:8 117:25
  117:25 144:22 188:6 228:1
  254:22
**curtain**
90:17
**custom**
135:14
**customer**
116:24 118:7,22,25 119:17,19
  120:15 125:3 134:2,14 138:4
**customers**
116:22 119:24 198:5
**customized**
129:13
**cycle**
87:13
**cycles**
165:6 235:16
**cycling**
213:22

---
**D**
---

**D**
3:1 6:2
**D.C**
190:20
**Dallas**
286:11
**damage**
60:20
**damages**
60:6,17,20
**darn**
128:18 192:3 266:3
**dash**
120:16
**data**
114:24 115:1,22 117:3 140:12
158:16 175:7
**database**
222:7
**databases**
279:1
**dataset**
158:1 159:24 160:4
**date**
10:9 22:6,7,10,11,15 23:21,25
24:5,7 25:2 104:6 147:6
152:19 219:18 220:15,21,21
221:2 240:7 241:3,24,24 242:4
252:5 254:25 257:6,7 267:24
268:8,10,20,21 273:14,20,21
273:24,25 274:1,6,19 275:4,7
275:13,14,15,17,19 276:13
**dated**
209:9 274:4 275:18
**dates**
236:16 240:24
**David**
104:11
**day**
18:18 198:24 291:19
**day-to-day**
161:15
**days**
108:11 160:23
**DDoS**
229:4,5

**deal**
11:4 157:5 187:1 216:5 229:6
266:11
**dealing**
91:17
**deals**
159:23
**dealt**
171:10
**debt**
252:8
**December**
213:20 242:21,23 266:7
**decision**
44:2 46:16 47:11 67:8,22 86:19
173:25 189:13 191:5 244:6
**decisions**
46:7
**declaration**
3:22 4:2 277:1,6 278:24 284:10
284:14 285:3
**decrease**
251:3
**dedicated**
140:19 223:21
**DeepNines**
96:20
**defend**
202:5
**defendant**
1:9 2:8 3:9,12 6:20 200:2
**defendant's**
277:1 284:15 286:6
**defendants**
3:23 4:3 96:19,20 97:11,12 98:2
104:9 238:9 239:9,10,11
**defending**
56:24 60:12 75:23 101:22,23
172:10
**defense**
49:1 51:21 96:9,15,25 97:16,25
98:3 99:12 100:16 101:25
106:8,11 202:1,6 248:4
**defenses**
200:19 202:13
**defensive**

59:24 68:16,17
**defensively**
68:15
**define**
20:17,19 139:25 176:22 283:6
**defined**
251:16 254:5 268:10
**definitely**
38:1,2 177:9 224:9
**definition**
16:14 21:14 38:6 130:10 141:17
232:1
**definitions**
38:9
**definitive**
116:14,16 128:9 133:8
**Delaware**
185:25 186:13,15,19,25 187:7,7
187:9 188:22,23 189:6,9,11,19
189:22,25 190:8,12,15 191:2,8
191:12,15 192:1,11,17 193:11
**Delaware's**
188:25
**demand**
140:12 168:12 256:17
**demands**
174:7 256:17
**denial**
229:4
**department**
9:20 10:6,6,10 36:16 82:19
113:23 163:19 283:17
**departments**
9:17,18
**depend**
118:3 125:17
**depending**
13:6 119:5 120:3,4 140:2
164:17 188:3 222:25 278:7
**depends**
13:19 39:6,7 91:21,21 116:25
118:5 155:9 161:2 176:21
274:12 275:6 283:6
**deploy**
34:16
**deployed**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

253:25
**depo**
118:12
**deponents**
199:4 201:24
**deposed**
18:22,23 101:5 117:6 128:6
 194:22 261:25
**deposing**
128:7
**deposition**
1:14 3:3,9,11 6:9 59:13 65:4
 82:25 83:5 113:19,21,25 114:5
 116:7,9 156:17,17 162:11,16
 199:9,14,23 200:2,8 201:9
 202:22 203:10 232:13,17
 248:13 249:3 283:19 287:25
 290:3,6,9 291:5,7,13
**deposition's**
289:20
**depositions**
147:16,21 201:6,17 203:20
**derivative**
141:19
**described**
167:3 178:12 181:23
**describing**
170:18
**design**
278:8 280:6,10,12
**designate**
201:11
**designated**
199:1,7 200:12,16 201:13
 203:16 208:8,10
**designation**
126:6 196:13
**designed**
33:15
**designee**
208:8
**designing**
58:6
**designs**
278:15,16 279:4 280:8,10
**desirable**

43:21
**desks**
186:15
**destined**
118:22 282:14
**detail**
286:15
**details**
198:9
**detection**
253:12,23 254:8
**determination**
233:10
**determine**
57:5,23 84:18 85:12
**determined**
264:1
**determining**
13:20 48:14 49:2
**develop**
226:9 279:16
**developed**
121:6 131:18 226:14 279:24
**developer**
32:5 38:18
**developers**
123:15 279:17,19
**developing**
57:15
**development**
79:18 104:1
**device**
127:25,25 167:19 195:10
**devices**
34:17
**difference**
60:6
**different**
9:17 13:12 16:8,10 23:4 38:9
 41:25 43:4,5,6 68:1 85:19
 106:10 110:15 118:4 119:13
 120:25 121:18,19,20
 122:20 123:11 124:2 132:8,25
 133:1 138:19 152:2 156:11
 157:1,9 159:7 163:23 176:25
 178:1 184:7 197:20 199:9,17

215:25 216:20,21 277:20
 280:7
**differentiate**
23:13 29:1 233:11
**differently**
21:8 29:6 41:25 47:6 48:6
**difficult**
24:14 95:22 141:3 234:15 259:5
 279:18
**difficulty**
51:14
**diffused**
145:6,8
**digging**
75:7
**digits**
196:16
**digressing**
176:1
**diligently**
42:23 59:11 115:21 192:22
 202:15
**diminished**
60:17
**direct**
48:7 83:23 176:13 237:25
 258:23 259:3 262:16
**directed**
52:2 83:24 101:13 202:2
**direction**
40:25 291:11
**directly**
11:6 120:9 152:12 214:23
 229:16
**directors**
172:5
**disagreement**
240:15
**disbelieve**
219:6
**disclaim**
94:4
**disclaimer**
92:11 94:11,17
**disclose**
18:20 26:20 112:10 151:4 258:5

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**disclosed**
27:17,20 29:8 30:8,10,16 76:9
 93:11,17,21 110:18 150:16
 176:11 185:11 209:8
**discloses**
23:24 30:11
**disclosing**
30:8
**disclosure**
110:21 152:7 153:9 156:13
**disclosures**
15:10,10,12 29:13
**discovering**
202:2
**discovery**
140:5,25
**Discovery's**
115:17
**discrete**
54:22 94:15 149:2 151:15,15
 182:3 260:17 264:23
**discuss**
147:12 239:22
**discussed**
18:9 113:20 114:1,5 195:5
 228:17
**discussion**
95:23 171:12 212:7 228:4 230:1
**discussions**
46:25 154:13 215:12,13 251:9
**dishonest**
71:25 73:7,10
**disingenuous**
51:24
**disinterested**
291:10
**disk**
198:11,12
**dislike**
175:17
**dismiss**
72:11 73:17 74:15 75:2,4 76:2
 76:10,19 77:10,23 78:15
 154:18,20 278:25
**dismissed**
243:12

**dispute**
139:21 145:1 146:1 239:23
 240:1 257:22
**disputed**
243:15 244:1,2
**disputes**
140:5 201:21
**distinct**
122:16 123:14 131:17 132:7
 195:14
**distinction**
39:14 55:19
**distinctly**
39:17 122:19
**distinguish**
26:13
**distributed**
118:2,6
**distributes**
120:18
**distributing**
86:4
**distribution**
117:24 251:24
**distributor**
118:23 120:4 282:15
**district**
1:1,2 3:24 4:4 233:8 240:9,10
 277:2 280:17 284:4,7,16 285:5
 285:17
**districts**
239:8
**divide**
110:13
**DIVISION**
1:3
**divorced**
247:3 256:4
**divulge**
106:5
**Diyung**
14:20
**docket**
200:19
**document**
74:6 140:9 147:5,6,16 159:17

164:3,5,7 204:17 205:2,16
 248:16,20 249:11,16 260:8
 268:2,17 269:7,15,25 270:6
 272:1,22 273:2,23 277:4
 284:12,25
**documents**
111:25 112:3 115:19 116:15
 154:10,11 156:16,19,22
 157:21 158:18 159:11 200:11
 205:11,14,20 206:7 208:15
 249:11 268:14,15 269:24
 270:25 284:3 285:5
**doing**
17:12 33:8 58:6 67:7 75:20
 140:13 154:2 182:14 278:23
 283:12
**dollar**
153:16 154:1,9,25 155:5,7,15
 155:16,18,21 157:1,12,13
 212:11,13,14 213:1 245:21
 270:11,20 271:10,21 272:23
 273:9
**dollar's**
154:1 155:7
**dollars**
109:6,7,23 146:11,13,19 185:15
**dot-com**
10:1 11:3
**doubt**
288:2
**downstream**
182:1
**downturn**
12:21
**draft**
12:13 62:15 155:6
**drafted**
62:14 63:5 182:17,18 218:10
**dramatically**
109:21
**draw**
78:23
**drilling**
197:3
**driven**
14:15

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**drop**
251:2
**drove**
103:12
**dubious**
172:18
**due**
220:22
**duly**
5:10 7:2 35:6 291:3,9
**duplicative**
92:3 199:4
**duties**
140:9
**duty**
145:19

**E**

**E**
2:1,1 3:1 6:2,2
**earlier**
66:6 77:18 79:12 150:20 167:2
   194:7 196:22 203:19 206:12
   211:24 235:15 248:1 277:22
   279:2 287:24
**earliest**
27:18 28:1,11 30:10 189:17
**early**
21:25 22:1,3 96:15 143:20
   144:24 150:21 225:15,15
   233:20 240:8 257:3
**earmark**
164:15
**earmarked**
164:14
**earn**
161:12,13
**easier**
49:24 96:24 254:18
**East**
187:3 190:18
**Eastern**
284:4,7 285:5,17
**economics**
11:24
**education**

145:20
**effecting**
272:7 276:10
**effective**
252:5 254:25 268:8,10 273:25
   274:1,19 275:13 276:13
**effort**
12:14 13:14,16,16
**eight**
8:5 142:7,9 235:15 273:19
   289:2,4
**either**
51:16 71:19,24 73:6,19 83:25
   118:18 156:20 157:24 231:6
   231:14 237:12 239:8 240:7
   264:2 278:9
**elected**
183:20
**element**
164:1
**elements**
143:21 221:14,15,20 222:3,11
   222:12,14,25 224:4 225:24
   227:1 231:24 255:9
**elimination**
253:12 254:9
**Emanuel**
2:9,15 6:20 64:9
**Emanuel's**
64:20
**employed**
7:16,18,25 8:3,19 9:5 11:2
   139:13,14
**employee**
74:3,4,20,21 141:9 142:12
   158:3 166:14 167:17 190:14
   218:4
**employee's**
74:21,22
**employees**
52:24 53:3 69:11 145:21 148:1
   148:18 186:7 189:20,23 190:1
   284:3,7 285:10,16,22,23,25
   286:11,13,14
**employer**
145:23 167:17

**employment**
160:23
**Encheva**
167:5
**encompass**
56:9
**encompassed**
218:12
**encompassing**
132:19
**encourage**
247:16,16
**end-of-lifed**
87:16,18 224:14
**end-of-lifing**
87:13
**end-of-quarter/end-of-year**
266:14
**ended**
178:6,22 213:16 234:24 263:25
**endpoint**
237:3,23
**ends**
132:19
**enforceable**
53:10
**enforced**
53:11
**engineer**
11:16,22 23:15,19 25:21 38:19
   51:18
**engineering**
14:15 15:8 23:20 24:1 51:17
   121:25 133:20 288:4,5
**engineers**
16:8 179:3
**enlightened**
136:25
**enter**
44:2 181:19 234:19
**entered**
42:14 96:8 206:13 225:19
   258:14 260:16
**entire**
32:14 56:7 75:11 98:24 99:3
   111:25 121:11 135:21 138:8

151:17 154:19 157:22 158:1
159:24 160:4 165:1 196:10
201:25 202:5 236:9 246:1
288:13
**entirely**
87:5 88:14 89:4,15,25
**entirety**
15:19 54:8 56:10,22 59:15
72:15 77:22 88:6 159:22
178:19
**entities**
60:20 170:14 171:4,17 172:1,7
172:17 173:9,21 174:23
175:12 176:3,5 183:6 192:6
**entitle**
59:3
**entitled**
50:6 51:5 60:6,17 181:1
**entity**
60:5,16,22 74:2 117:11,11,12
170:20 172:11 174:1,15
175:18 176:10,20,22 177:2,4,6
177:11,22 178:5,8,9 179:3,4,8
179:10 180:2 181:15,20,25
182:8,18 183:8,16 184:5
185:18 189:17,18 238:4,24
239:3 267:8
**entrepreneurs**
225:1
**envision**
169:13 276:11
**equipment**
214:10,12
**equity**
108:12
**equivalent**
85:16 115:9,10
**equivalently**
254:7
**especially**
253:17
**ESQ**
2:4,9
**essence**
265:13
**essential**

253:16
**essentially**
10:15 26:15 28:25 75:24 126:17
171:12 210:19,24 218:3
233:22 235:10 241:12 249:18
287:8
**established**
193:4
**establishment**
192:5 193:2
**estimate**
108:22 109:17 140:16
**estimated**
164:1
**EULA**
152:5,9,10
**evaluate**
47:12
**evaluated**
48:16
**evaluating**
44:6,19 45:6
**evaluation**
75:7
**evaluations**
91:4 96:4,5
**event**
46:1,1,4 252:9
**events**
189:15
**everybody**
105:5 107:18
**evidence**
81:25 82:3,6 243:18
**exact**
10:3,9 11:24 77:6 80:22 104:6
111:14 115:20 116:7 117:18
117:20 119:2 126:6 130:25
140:14 164:16 179:6 180:12
190:19 191:22 210:21 219:23
224:23 234:8 239:12 240:7,24
241:3 243:2 245:10 251:9
259:23 262:1 265:3 269:14
270:22 275:21
**exactly**
16:12 21:1 49:10 52:1 74:7

102:5 125:4 155:12 206:16
207:14 211:12 239:6 283:20
**EXAMINATION**
3:5 7:3 108:4
**examined**
5:10
**examiner**
92:8 93:18
**example**
101:12 125:24
**examples**
197:11
**exceeded**
183:18,19 290:2
**exceeding**
161:17,21
**exchange**
225:22
**exchanged**
71:22 275:16,16
**exclude**
114:16 131:16
**excluded**
236:3,10,11
**excludes**
114:12 245:19
**excluding**
76:16 114:8 130:15 131:21
135:10,11,12
**exclusion**
236:14 237:18 256:11,13
258:12
**exclusively**
124:5 137:4
**excuse**
93:12 238:20 288:24
**executable**
121:22 125:17 126:9 129:21
131:10 132:1,3 133:1 135:17
135:18,21,21,23 136:8,14,18
137:12
**execute**
269:23 272:4
**executed**
237:15 256:25 268:4 270:19
**execution**

273:14,20
**executive**
110:20
**executives**
171:24
**exercise**
29:3,5 30:17,20 76:6,15 77:8
**exercised**
109:11
**exhausted**
40:8
**exhibit**
3:9,11,13,16,18,20,22 4:2
194:16 199:22,24 200:1,6,9
203:9,25 207:24,25 208:3,5
232:23 246:7,10,12 248:7,8,18
250:2,6,6,9,9,9,11 254:12
258:19 262:13 267:12,14,17
267:22,25 268:12,13 269:8
271:11,12 272:19,21,22 273:9
273:13,16,25 274:1,3 275:11
275:12 276:14,22,25 284:13
284:17,20 285:1,13 286:4,19
**exhibits**
3:8 4:1 199:17 254:14
**exist**
53:10,16 231:21
**existed**
21:22,25 22:1,3 25:12 209:15
**existence**
33:11 53:22 88:4
**existing**
165:13 256:12
**exists**
17:25 170:18 189:2 230:18
**expanding**
249:6
**expect**
67:10,17,18
**expectation**
165:9 189:5
**expected**
68:4
**expenses**
265:21
**experience**

19:16 23:20 24:1 38:19 81:23
153:13 154:2,23 159:22 165:4
**expert**
24:22 27:4,6,25 28:5,8,16,17
31:18 61:3,4,10,21 63:4 65:1,3
117:4,6 198:17
**expertise**
79:21 80:25 81:2,4 102:7
153:11
**experts**
163:8
**expired**
55:2 109:10
**explaining**
287:22
**explanation**
68:1
**explored**
88:3
**export**
251:23
**exposure**
49:7,9,10,18 174:22 219:25
**expressed**
173:3 175:1,9
**expression**
14:7
**expressly**
246:19
**extended**
97:24
**extensively**
114:1
**extent**
24:16 25:23 27:1 34:24 40:10
40:18 41:3 46:21 47:19 54:6,7
56:9 59:25 72:3,4,4 80:5,6
83:15 84:22 85:3 86:7 87:3
88:13 89:2,14 95:24 97:23
99:16 105:24 114:21 116:11
128:13,14 139:11 140:11
147:16 150:16 158:16 166:6
170:3,5 172:8,22 190:5,23
209:5 269:23 281:8,18 282:15
287:8,8
**external**

53:20
**extra**
19:5
**extract**
52:9
**extreme**
188:25
**eyes**
108:21

**F**

**F-Secure**
228:15 266:16,17,19,23
**fabrication**
77:6
**face**
22:16 114:7 115:1
**Facebook**
34:4
**facilities**
21:24 282:5 284:3 285:4
**facility**
213:24
**fact**
20:2 34:1,15 60:4,21 64:25
74:21 87:14 93:1 105:21 115:3
127:9 152:15 153:14 154:24
172:14 174:13 187:6 188:21
202:4 234:15 241:8 274:8,10
274:21
**fact-specific**
78:16 92:5 157:15
**factor**
49:5,8,19 226:24
**factors**
256:9
**facts**
21:5 72:12 73:16,19,22 74:14
75:15 76:9,16 88:7 89:4 202:2
286:1
**factual**
76:25 200:18 202:12
**fail**
180:19
**failed**
181:8 240:18

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

fair
20:20 57:2 175:15 215:10
fairly
8:20 11:11 13:14 15:6 39:21
41:8 108:25 109:9,13 113:25
115:2 116:18,18 117:16
160:22 175:10 190:18 217:14
255:19 256:4 257:5 263:22
265:10
Fallen
7:11
familiar
103:22 193:19 229:8 248:15
249:10 265:8 273:18
families
235:20 254:24,24 262:24,24
264:23
family
38:11,12,21 119:14 121:23
125:16,19 126:21 127:6
131:18,25 132:12,15 197:9
226:3 235:11,23 241:14 280:9
far
32:12 41:5 52:1 55:21 56:3,5
145:15 173:22
fashion
216:6
faster
107:3
feature
33:10 57:13,16
features
229:17 231:20
fed
111:2
federal
111:4 112:5 201:7 240:9 242:9
242:9 243:11,13
feel
22:19 48:5,11 80:25 116:3
169:7 203:22
feelings
172:6
feels
167:1
fees

168:12
felt
12:23
fide
252:1
Fifteen
26:9
figure
51:19 169:1
figures
112:6,9
file
94:16
filed
13:11 22:24,24 69:9 72:11
73:24 83:8 141:20,24 143:5
156:13 165:10 167:4 226:13
238:4 239:11 243:13 271:2,6
273:7,7 274:14 286:14
filing
69:16 72:15 73:15,16 74:12,12
186:17 274:14 275:3
filings
72:9 74:1,2 79:18 110:19
112:13 188:17 243:22,23,25
fill
274:16
filling
278:23
filtering
40:7 133:15
final
3:16 242:4 244:22 246:8 251:1
257:7 259:21
finance
113:23 114:2 162:5
financial
117:2,3,3 163:15,22
find
76:20 77:1,10 78:2,20 92:14
101:16 102:17 147:8,11,11
283:20 286:17
finding
149:19 150:1,4 256:6,8,8
finds
49:12,13 50:4 51:2

fine
62:5 88:18 95:6 101:14 107:16
254:19
Finish
270:13
finished
118:20 234:23
FireEye
144:22
firewall
15:17 16:1,6,9,15,18,20,22,24
16:25,25 17:9,11,13,24 18:11
20:6,17,23 21:10 23:8 24:6
25:9 26:4,21 27:19 30:12
32:15 33:6,13 34:9,13,19 36:2
38:6,11,24 39:10,20,24 40:14
41:18,22 66:12 103:22 127:2,2
127:6,6,7,11,14,16,23 128:2
195:1,3 211:11,15 223:8,12,14
223:22 231:8,16,21 232:3
235:24 238:11 239:14 265:2
266:16,23
firewall-only
133:14
firewalls
21:22 28:10 31:1,23 32:2,2,18
32:20,21,23 33:16 34:15 37:17
38:2 196:24 211:6 236:4 237:5
264:16
firm
9:7 104:17,18
firms
13:12
first
3:9 5:10 7:2 9:19 15:16,25 16:1
18:10 20:5,21 23:7 25:3 33:3
42:20 43:10,16 46:15 194:14
199:22 200:8 209:8 225:10
238:7 252:2 259:4 260:7 270:9
272:16
fit
35:5
five
104:23 118:17 142:8 184:19
199:2 224:25
flew

103:9,10,11
**flip**
248:6 274:3
**flipping**
248:19
**Floor**
2:5,10,16
**Florida**
239:5,8,13
**focus**
11:25 59:12 111:16 129:15,23
  131:1,3 142:17 176:13 216:22
  227:12
**focused**
39:18 79:20,23,24 191:14 223:6
  223:22 232:2 278:2
**focuses**
216:22
**focusing**
127:1 131:7 138:24 250:1
**following**
40:24 177:17,17 254:24
**follows**
7:2 41:14 43:7 44:18 51:1 73:5
  85:9 176:18 201:5 231:12
**force**
53:4
**forcing**
202:4
**forecast**
162:19
**forget**
32:7
**forgot**
223:25
**forgotten**
10:3 119:2 183:12 194:23
  259:23
**form**
125:2 155:19 269:9 272:2,3
  273:17 276:7,8,16
**formal**
12:2,7 82:11 139:24 141:18
  150:3 171:3 183:17 184:5
**formalities**
271:3

**formally**
14:13
**formed**
89:9,15 117:10
**former**
286:11
**forms**
274:17
**FORT-NPS**
3:17,19 203:25 205:1 258:18
**forth**
5:11 140:6 250:25 256:18 257:8
  271:17
**forthcoming**
59:10
**Forti**
40:8 131:24 279:22
**FortiAP**
126:3 194:10,13,21,25 195:2,4
  195:8,19,22 196:21 280:2,2
**FortiAPs**
130:9,15 131:15 132:7 135:12
  197:12
**FortiAuthenticator**
279:22
**FortiCache**
124:10 279:23
**FortiCare**
255:3
**FortiCarrier**
193:20 194:1,3
**FortiClient**
35:10,11
**FortiDB**
222:12,17 279:21
**FortiGate**
33:4,13 34:9,13 35:14,17 36:2
  36:14 38:10,12,21 52:25 53:5
  54:2,16,19 55:7,12,20,22 56:5
  56:15 116:24 118:8 119:14
  121:23,24 123:16 124:1,1,5
  125:13,14,15,18,20,25 126:2,3
  126:15,16,17,19,21,23,24
  127:1,2,16 128:23 129:2,18,19
  130:7,11,12,22,24,25 131:4,7
  131:9,18,25 132:12,15,24

133:4 134:15 135:6,22 137:6
  193:22,24 194:4 195:16 196:3
  196:14 197:8 235:10,11,25
  236:2,9,10 245:14 251:14
  253:3,15 254:23,23 278:4,11
  280:9
**FortiGate's**
124:20
**FortiGates**
123:8,22,25
**FortiGuard**
125:12 134:4 255:2
**FortiMail**
122:19,24 123:10 124:9 132:9
  255:1,1
**Fortinet**
1:8 3:10,12,13 6:13,20 7:19,20
  7:22,25 8:4,6,14 9:6 12:12
  13:1,5,8 14:12 15:9,15,23
  26:19 27:19 28:10 29:8 30:25
  31:22 32:1,5,17,20 33:11
  34:14,15 35:10 37:17,25 38:23
  39:5,9 40:13 41:7,16 42:2,9,18
  43:8,15 45:5 46:15,16 47:3,4,7
  47:12 48:15,16 49:14 50:5
  51:4 52:24 53:3,11,16,21 54:1
  54:13 55:16,20 57:3,4,22
  58:11 62:23 64:22 65:9,15,19
  66:14,20 67:10,17 68:4,12,24
  69:3,5,12,19,22 70:15,21 79:2
  79:5 80:4,9,13 83:9,9 84:8,17
  85:11,23 86:3,10,18 87:8,12
  95:10 96:8 97:1,18 98:6,13,14
  100:2 104:18 105:7,13,14
  106:9 108:6 110:25,25 111:15
  116:4 117:9,23 122:6,15 123:3
  123:15 124:10,13 128:10
  130:21 134:24 138:15 139:6
  139:13,14 140:18 141:9 142:5
  144:2,25 145:24 147:25
  148:18,24 151:3,20 152:3
  156:4 157:20 158:3 162:19
  164:4,8 165:20 166:24 167:8
  167:19 168:6,7,9 169:2,8,20
  169:23 170:12 171:2,15,20
  172:1 175:11,17 176:4,5,9,11

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 313

176:19 178:7 179:19 180:7
181:1,14,16,18 182:6 185:25
186:12 187:6 188:22 189:8,17
189:19,25 190:1,11,15 191:1,3
191:25 192:6,11,17 193:9,13
193:16 199:23 200:3,11 203:3
203:15 204:24 205:7 206:14
207:21 208:19 209:17 210:3,8
210:10,15 212:1,10,16,22
213:17 214:11,15,19,20 216:3
216:25 217:8 218:5 220:4
221:15 222:22 223:3 224:4,6
224:17 225:4,6 226:1,6,12,18
226:18 227:18 228:7,10,21
229:19,20 230:5,14,19,21,25
235:23,23 236:5,22 239:18
240:1,5,12 241:4,12,17,20
242:12,21 243:6,15 244:5,17
244:25 246:9 247:1,9,16
251:13,18,20 252:2,4 254:1
257:24 258:14 260:8,15,18
261:5,11 262:17 263:6,14
264:13 265:15,20,23 267:15
271:24 272:10 275:25 277:12
278:2 284:2,6 285:4,16 286:21
**Fortinet's**
32:2 36:12 75:9 85:25 86:14
93:10,21 117:15 122:13,13
127:9 138:25 158:8 166:3,4
173:24 200:19 207:25 208:7
215:8 228:9 232:21 245:4
247:10 281:11 287:4
**FortiOS**
120:19 121:5,7,16,18,24 122:10
122:13,17,25 123:2,9,16,22
124:12,16 125:3,6,10,11,21
127:3 128:24 129:3,4,5,9,21
131:11 132:4,5,18,22,22 133:5
134:21 135:3,7,18,20 137:3,5
137:13 150:14,19,20,25 152:3
194:2,8 195:5,15,15 254:25
277:24 279:3 280:4,9
**FortiScan**
222:13,17 279:21
**FortiSwitch**
39:22,25 40:9 224:11,13

**FortiVoice**
228:2
**FortiWeb**
122:14 124:9 132:10
**FortiWiFi**
126:2 194:25 255:2
**Forty-five**
107:13
**forward**
163:11
**forwarded**
118:24
**found**
28:10 60:18 224:17 233:1 234:8
234:10,12 286:14,16
**foundation**
128:20
**four**
104:23 110:13 194:14 199:1
224:25 250:23 251:2 262:2
286:10 290:7
**four-year**
109:14 110:7
**frame**
9:13 21:20 54:24 153:4 179:6
190:25 192:7 236:8 257:4
**framing**
201:23
**Francisco**
1:3 2:10,16 6:11
**frankly**
34:11
**fraud**
139:7,15 140:1 141:6,9
**fraudulent**
72:25
**frequently**
36:5 135:19
**front**
22:13 40:21 74:6 182:16 196:3
199:8 206:11 208:6 246:12
248:16 251:4 262:12 276:24
**fulfillment**
119:1,3 120:16,17 203:12
**full**
39:15 190:5 270:5,5

**full-time**
10:10
**fully**
100:20 202:14 244:9,9 260:19
**functionality**
17:20,25 128:1 195:21 223:4
253:12,14,18,20 254:9 255:11
282:17
**fundamental**
201:8
**funding**
181:11
**funny**
101:4
**further**
41:12 45:7 87:4 203:6 209:20
216:11 276:9,12 291:14
**fuzzier**
279:7
**fuzzy**
100:17 102:4

---

**G**

**G**
6:2
**GAAP**
251:22
**gained**
25:25 243:24
**Gary**
2:13 6:6
**gateway**
127:25
**GC**
158:12 190:24 192:6
**gen**
191:6
**general**
9:1,3 15:3 17:4 27:12 44:25
48:25 57:12 78:15 79:14 80:14
127:9,15 129:10 131:22 133:9
133:19 134:19 154:22 159:25
160:6 165:18 172:25 176:2
185:3 191:5 197:5,7
**generalizations**
253:9

**generally**
9:14 29:7 60:14 68:12,14 73:24
  109:2 120:7,14,15 135:9,16
  152:4 181:16 185:3 191:7
  215:21 239:25 262:20 263:4
  269:21 278:2
**generate**
136:11
**generated**
132:1 133:2,22 136:18 137:24
  209:10
**generating**
115:22
**generic**
134:23
**generically**
8:21 49:9 122:13
**geography**
103:14
**German**
149:24
**Germany**
149:25 150:6 283:3 288:22
**gestures**
71:23
**getting**
48:4 58:24 100:13 128:3 155:13
  191:17 225:17 275:1 288:25
**Gibbons**
2:4 6:17
**give**
22:19 41:13 58:13 78:8 175:8
  200:4 201:21 202:12 206:11
**given**
22:22 26:7,11 34:14 81:22
  112:5 128:10,10 158:7 159:21
  190:7 223:15 235:16
**giving**
128:14 268:12
**glad**
206:8
**glance**
248:14
**glanced**
102:10
**glasses**

204:2 205:22 206:3,5,8
**gleaned**
89:4
**Glen**
104:21 105:2
**glorified**
127:23
**go**
21:17 27:13 29:2 30:18 34:1,4,8
  76:15 77:9 94:23 95:10,15
  103:8,10 110:1 119:9 120:15
  130:14 131:13 138:6,18
  152:25 156:8 157:15 159:10
  162:8 173:22 176:23 185:14
  204:2 206:6,9,19 207:22 224:1
  228:25 232:8 241:10 261:17
  262:13 276:19 278:21 289:9
**goals**
15:3 160:25
**goes**
206:23 233:14 262:4
**going**
6:5 14:24 23:9 24:8,23 25:15
  29:10 33:4 34:21 35:4 37:11
  46:18 51:20 76:5 82:23 83:12
  84:2,4,11,21 86:6 90:16 99:10
  99:11 102:11 107:5,22 112:7
  115:16 128:4,6 131:13 135:16
  140:6 158:24,24 161:13,14
  162:9 164:20 176:15 186:25
  197:10 205:19 207:25 211:20
  215:5 228:5 232:4,10,11,15
  244:15 249:25 261:19 267:14
  269:3 270:13 289:5,22
**good**
6:4 7:4,5 81:14,17 82:2 104:22
  113:24 119:14 161:12 270:11
**Google**
177:5 183:20,21 184:3 185:7,9
  185:20 214:25 267:6,10
**Gore**
19:25
**government**
111:1
**GPL**
149:1,18 151:8 152:17

**GPLviolations.org**
149:7
**gracefully**
102:14
**grade**
15:10
**graduate**
10:21
**graduated**
9:11 21:18 23:18 191:18
**grant**
109:2,3
**granted**
272:17
**grants**
109:10,12,16,25
**great**
79:3 106:23 206:6
**ground**
256:7
**ground/air**
216:19
**group**
9:25 31:13 99:12 106:8,11
  123:10 124:4 177:16,22 179:3
  224:25 280:3
**grouped**
112:22 239:10
**grouping**
32:8
**groupings**
239:11
**groups**
97:25 101:25
**growing**
285:24
**guess**
18:22 37:12 44:14 133:3 146:10
  146:16,16 198:18 215:23
  238:21 263:20 286:16
**guessing**
37:5 140:23 146:10,12 184:13
  189:6 211:17
**guesstimated**
164:2
**guidance**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

201:21
**guidelines**
201:22
**guidepost**
161:15
**guys**
194:22

## H

**ha**
279:3,4
**Hacker**
62:16,18
**half**
250:24
**half-hour**
107:8
**hall**
77:19
**hallmarks**
49:16
**hallway**
71:23
**hallways**
71:16,17
**hand**
291:19
**handful**
13:9
**handle**
101:13 156:4
**handled**
141:2 282:8
**hang**
264:5
**happen**
282:18
**happened**
240:1 242:24,25 243:1 266:12
**happens**
116:23,25 166:22 219:8
**happy**
100:18 103:2
**harassment**
142:12
**hard**

21:1 26:12 27:11 76:4,5 92:4
95:4 128:17 206:19 225:1
264:21
**hardware**
39:9 126:8 129:14,14 134:24
251:13 252:10 253:2 255:8
278:3,15 279:3,4,6
**hardware/software**
253:10
**hat**
76:1
**hate**
134:19 138:23
**hats**
31:10
**head**
14:15,19 16:18 18:5,8 25:2
115:18 151:10 157:15 184:23
185:12 199:18 206:19,24
**headquartered**
188:11
**headquarters**
74:19 138:11,25 187:14,16
188:1,4,5,16 277:14 281:12
287:5
**hear**
16:23 21:3
**heard**
33:11,12 61:12 122:12 124:8
193:21 220:7 237:10
**hearing**
153:22
**heavily**
252:20
**held**
59:4 137:22
**help**
95:1 107:2 156:9 192:21 199:11
**helpful**
68:2 175:25
**helping**
115:1
**helps**
139:25
**hereinafter**
5:11

**hereunto**
291:18
**hes**
37:12
**hesitant**
181:18
**hesitate**
37:12 245:13
**high**
99:25
**higher**
167:16
**highly**
24:3 108:20 189:24
**hired**
144:5
**hiring**
144:2,11 167:18
**historical**
39:13 111:16
**historically**
39:23 108:7 136:12 138:21
**history**
157:22 207:2 239:24
**hit**
118:24,25 119:22 282:4
**hold**
203:21
**holding**
68:9 106:20
**holds**
68:12,14
**Holly**
1:20 5:3 6:8 49:22 291:22
**home**
7:9,10 186:10 286:1
**hoped**
111:9
**hopefully**
161:1
**host**
189:2,10
**hotline**
142:6
**hour**
5:3 50:1,2,18

**hours**
102:11
**HR**
190:22
**huge**
238:9
**hundred**
65:2 109:5 146:11,12,19 194:5
**hundreds**
109:22 128:15
**Hung**
18:13 20:5 23:7 26:4,22
**hybrid**
177:7,18 215:25
**hypothetically**
154:21,22

**I**

**icons**
35:8
**ID**
240:12
**idea**
90:10 110:14 146:9
**ideas**
14:5 15:9
**identification**
199:25 200:7,10 208:4 246:11
267:18,23 276:23 284:18
**identified**
75:15 76:9 98:15 156:5 164:13
165:15 200:15,20 202:13
207:7 208:11 227:20 228:8
233:1 237:15 263:23 273:24
286:10
**identify**
6:14,22 20:14,15 25:14 199:20
200:10 203:6 224:4
**image**
121:22 122:3,25 125:17,17,21
126:9 127:4 129:12 132:1,3
133:1,5,21 135:17,18,21,23
136:4,8,14,18 194:2 195:4
197:21,22 277:24
**images**
120:25

**immediate**
142:22
**immediately**
213:19,25 214:2
**implemented**
171:25
**implication**
86:25
**impression**
123:18 237:16
**improper**
142:13 201:24
**improperly**
167:11 169:18
**in-depth**
249:4
**in-house**
214:1
**inadvertently**
18:20 99:17
**inappropriate**
27:3 28:20 35:3 47:21 50:13
51:9 52:6 59:19 75:13 168:20
169:8 200:22
**inaudibly**
280:25 281:22
**incentives**
108:13
**incidental**
282:10 283:23
**include**
31:1 32:3 38:3 49:5,19 112:6
122:8,9 124:23,24 125:7 127:3
128:23 130:16 133:6,23
152:24 159:24 215:24 253:21
254:25
**included**
17:24 40:14 41:17 65:25 66:1
70:7 111:23 112:9 126:22
128:16 143:2 152:8 165:23
166:16 180:21 221:18 244:10
252:11 255:8,10 256:9,10
280:8
**includes**
73:15 78:8 115:3 124:16 152:7
152:9 202:6 244:11 245:19

253:1
**including**
30:20 130:10 168:21 178:19
201:18 254:23
**incoming**
145:21
**incomplete**
275:14
**incorporate**
189:11 190:10 191:5,7
**incorporated**
188:18 189:9,19,25 191:2 192:1
192:11,17 193:9
**incorporating**
187:10,11 189:1
**incorporation**
187:7 188:23 189:15 191:24
**incorrect**
224:9
**increase**
247:16
**increased**
92:15
**incredibly**
15:20 36:6
**independently**
156:20
**India**
213:15
**indicated**
20:15 82:12 263:12
**indicating**
205:6
**indication**
183:18
**indirectly**
214:3
**individual**
1:13 18:24 19:23 239:9
**individualized**
196:12
**individuals**
105:15 144:3,4
**industry**
151:17 160:23 174:22 219:9
**informal**

170:21 171:3,8 183:24
**information**
15:1 19:8 23:11,14 24:10 25:17
   25:18 26:24 27:1 29:20 40:9
   46:20 62:12 96:10 97:13,17
   98:21 99:5,21,22,24 100:2
   113:1,9,10,12,15 114:3 115:6
   116:12 128:9 152:1 153:19
   209:4
**information's**
111:19
**infringe**
86:1
**infringed**
49:14 50:5 51:3 59:4 60:18
   69:20 168:5 233:2,12
**infringement**
49:18 55:6 165:21,22 166:1
   168:11,15 169:9,16 194:16
   206:14 207:17
**infringing**
166:4
**initial**
201:2 244:21
**initially**
224:12 225:19 227:13
**initiated**
46:13
**inquire**
35:12
**inserted**
259:20 260:1 282:16
**inserting**
259:24
**inside**
53:21
**insist**
158:3 254:23
**insisted**
259:24
**instances**
46:7
**instantaneous**
276:20
**instituted**
24:17 141:8 152:20 161:9 162:1

182:9
**instruct**
26:25 29:20 34:23 40:17 41:1
   46:20 54:5 83:14 84:2,11,21
   86:6 139:10 170:3 209:5
   269:24 289:5
**instructed**
41:2 114:20 129:25
**instructing**
72:21 105:19
**instruction**
27:22 28:14 30:4,14 31:3 33:1
   36:22 37:1,9,23 38:16 42:12
   42:21 43:18 44:10 47:16 48:19
   50:9 55:10 56:19 57:9 58:2,17
   59:6 60:9 61:9 63:8,24 64:5,8
   64:12,23 65:7 66:18,24 67:5
   67:12 68:6,20 69:7 72:2 75:19
   76:13 77:14 86:16,22 87:11,21
   88:1,12,22 89:12,21 90:7,25
   91:13 93:13,25 94:7 95:12,20
   96:13 97:21 98:9,18,23 99:7
   100:5 101:3,18 102:19 105:10
   105:18 106:16 139:19 141:12
   142:21 143:17 146:3 148:3,7
   148:20 149:10 170:16,24
   171:6,19 172:3 173:11 174:3
   174:17 175:14,20 182:12
   183:11 185:1 209:23 210:12
   211:8 217:10 226:10,22
   227:22 234:4 240:4,22 242:16
   247:12,22 256:23 257:18
   258:3 260:13 261:9 263:9
   265:17
**instructions**
31:25 35:2
**insult**
71:20
**intact**
91:24
**intellectual**
9:21 11:4 65:20 79:19,22 80:3
   91:17 142:19 144:12 153:14
   154:24 155:2 156:6,19 158:22
   159:18 162:21 167:12 180:6
   181:15 215:9 260:10

**intended**
134:23
**intends**
84:8
**intent**
99:16 180:13
**intention**
177:21
**intentionally**
219:11
**interaction**
14:4 77:15 78:17
**interactions**
58:5 73:11
**interest**
183:18 218:8
**interested**
178:20 291:14
**interesting**
211:1 217:24
**interestingly**
218:8
**interface**
33:14 216:19,19
**interject**
49:21
**intermed**
177:4
**intermediary**
177:4
**intermediate**
177:4
**internal**
36:13 48:21 53:20 75:8,9
   123:15 154:13
**internally**
154:11,12 224:10
**Internet**
10:23,25 15:23,24 19:25 20:1
   33:24 34:1 35:17 101:20
**interpret**
274:13 278:15
**interpretation**
151:7
**interpreted**
57:20

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 318

**Interrogatories**
3:15 208:2 232:22
**Interrogatory**
200:15 206:10,10 208:7,17
**interrupt**
72:20
**interruption**
48:8 108:18
**interview**
202:23
**intimately**
140:8 249:13
**IntruGuard**
228:25 229:1,3 231:25
**invalid**
233:11 234:10,13 243:17,18
    244:5
**invalidate**
95:17
**invalidated**
234:15
**invalidity**
26:19 93:10,21 97:18
**invent**
15:16,23,25 18:10 20:5 23:8
    70:22
**invented**
15:21,24 19:23,24 20:1,16
    52:24 53:3 69:4 70:15
**invention**
15:9,10,11 26:22
**inventions**
69:4
**inventor**
19:14
**inventors**
14:5 69:10
**inventory**
117:23 213:14
**investigated**
285:21
**investigation**
39:19 167:18 287:18
**investment**
68:4,8 212:11,12,14,17
**invoicing**

117:2
**involve**
155:11
**involved**
29:16,23,25 30:5 78:24 79:13
    79:25 80:2,4,10,11,16,18 81:2
    81:21 104:1 140:8 149:12
    150:7 157:4,16 158:9,14
    160:11 163:21 165:24 169:20
    180:11 189:12 213:12 229:13
    249:13
**involvement**
101:23 141:21 180:12
**invulnerability**
222:15
**IP**
10:6,9 159:23,24 160:8 229:9
    230:12
**IPLocks**
217:20,23 218:6,10,13,17
    219:23 220:4 221:8,12 222:4,5
    222:6,12,24 224:3 227:13
    231:23
**IPS**
279:13,13 280:12
**issue**
19:5,14 26:12 28:22 56:10,11
    57:11 68:14 83:25 84:17 85:10
    85:18 94:23 99:12 101:14
    116:6 149:14 183:4 220:2
    234:22 259:19 283:9
**issued**
13:9 23:17 65:18 92:24 182:4
    208:21,22,24 214:21 218:18
    221:22 225:21 227:10 236:14
    240:12
**issues**
22:5 59:9 69:17 79:14 107:1
**issuing**
237:19
**it'll**
132:25
**ITC**
233:7,9 234:7,8,10,12,22,23
    235:3,7 236:3,11 237:17 240:8
    240:11,12 256:12

### J

**J-V-A-N**
120:16
**January**
233:6 241:1,2 250:10 257:1
**Janus**
103:19,20,21,22
**Jeff**
128:5,5,18
**Jim**
113:19,22 114:1,5 116:7,8,10
    116:13 117:4 288:3
**Jim's**
113:15 116:17
**job**
79:4,9 80:8 82:9,11 108:6
    161:12
**John**
104:21 105:1,12
**joined**
143:23 240:12
**joint**
96:9,14,25 97:16,25 98:1 99:11
    100:16 101:24,25 104:9 106:8
    106:11
**Jose**
12:5,6
**Joyce**
270:2
**Joyce's**
270:2
**Judge**
201:1,3
**judge's**
59:20
**jump**
196:19
**jumped**
197:15
**jumps**
142:3
**June**
1:15 5:2 6:1,8 23:19 193:13
    240:13 291:19
**Juniper**
96:17 97:5,16 98:7,15,20 99:4

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 319

100:1 104:13 145:6,10,21,25
**jurisdiction**
187:9,11 189:1
**jurisdictions**
193:4
**jury**
49:12,13 50:4 51:2
**justifications**
247:15 251:10
**justify**
159:15 256:1
**Jvan-An**
120:16,16

---

**K**

**keep**
95:5 107:5 232:10 252:14,17
270:13
**keeping**
218:17
**Keith**
117:6
**Ken**
110:23 172:17 173:8,13
**Kenda**
118:16
**kept**
278:12,20 288:2
**kernel**
70:10 122:4,6 123:12 125:7
133:24 134:3,15 150:18,22,22
151:1,4,14 152:3
**kernel-level**
124:23 125:1
**kicked**
108:11,11
**kicking**
108:11
**kidding**
161:1
**kind**
33:7 107:6 109:17 119:5 126:18
127:23 155:9 171:25 194:18
210:15 211:3 237:8
**know**
8:16,16 10:16 11:12,25 14:2

15:19,23,25 16:18,23 17:9,9
17:10,16 18:12,13,14,18 19:2
20:25 21:21,22 22:3,14 24:21
25:7,24 27:6,10,13 28:2,4,16
29:2 30:19,20,22 32:16 33:2
33:11 34:10,19 35:9,11,19,20
36:3,8,15,18 37:12 39:1,15,23
40:6 41:20,21,23 42:1 43:4
46:2,6,10 49:4 50:12 51:11,12
52:7 54:8,8 55:4,14,22 56:5
58:6 59:1 60:25 61:23,24 62:3
62:3 63:2,6,16 66:3 67:9,24
70:8 71:24 72:4 73:6 74:23,25
75:8 76:15 77:24 78:14,23,24
79:16 80:22 81:11 86:11 87:3
87:14 90:16,17 92:2,10 93:15
93:17 94:1,13 95:23 97:24
99:13,15 100:11 101:7,25
102:2,14 103:14,17 105:11,12
106:11 110:16 111:5,7,13,14
111:15,20 112:1,5 114:23
115:20 116:1 117:18,20,22
120:17 121:11,18 122:5,15
123:5,12 124:8 126:2 127:9,14
127:22,23,24 128:3,16,17
129:13 130:1,16 133:7,7,15,16
134:21,23,24 136:12 137:17
138:3,14 139:20 140:1,7,8,9
140:13 141:1,5,15,18,22,24,25
142:12,12,13 143:7,23 144:4
145:4,7,8,15,19 147:7,15
149:1,12,14 150:7,12 151:16
152:15 154:7 155:11,14,15
157:14,19 158:9 159:5,6,9,11
159:13,14,23 160:2 161:13
163:11,13,16,24 164:5,16,23
164:23 165:3,5,12 166:20
167:20 168:10,18,23 169:5
170:8,9 171:22 172:21 173:1,2
173:17,22 174:8,19,20,21,21
174:25 175:6 180:12,14
181:18,19 182:2 183:1 184:2
184:17 185:10 186:20,23
187:2,5 188:13,13,14,20
189:14,14,21 190:4,4,5,16,16
190:19,20 191:4,14,20,21,25

192:11,15 193:9,14,14,17,18
193:23,24 194:8 195:22,24
196:6,8,15,16,25 197:6,20
198:9,19 199:18 202:15,25
204:16 205:8 206:18,19
207:20 209:10 210:7 211:9
212:5,5 213:2,12,24 215:2,5
216:20,23 217:2,18 218:3,11
219:13 220:6,21,25 222:23
223:15,17,18,20 224:16 225:2
226:12 227:4,5 229:22 230:1,2
232:2 234:16,24,25 235:4,4,9
235:14,15,16 236:7,14,16
237:9,13 241:6,10 242:23
244:7,13,23 245:11,16,23
248:2 254:10,20,21 256:9,9,10
256:16 258:11 259:23 263:4
263:12 264:3 265:1,7 266:11
266:14,17,19,20 267:6,7
269:21,23 272:1,4 274:20
275:17 276:11,17,18,19
278:21 279:6 281:5 283:11,14
284:8 285:20,23 287:20 288:2
288:3
**knowledge**
23:15 25:23 26:3 40:11 54:18
56:10,21,22 57:21 58:4 59:16
60:10 88:6 95:25 135:15 190:9
190:24 202:17,24,24 207:6
237:25
**knowledgeable**
128:18 201:12
**knows**
128:18
**Koroush**
194:22
**Kreveniek**
14:16

---

**L**

**L**
214:4
**label**
203:25 204:21,25 205:4,5
**labs**
214:11

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**lack**
28:23 129:14
**lacks**
169:16
**laid**
74:15
**Lam**
71:3 73:19
**Lane**
7:11 266:25 267:5,7,16 271:16
   271:24 272:3,9,13,25 273:11
   275:5,24
**language**
245:9,12,17,18 259:11,18,20,22
   259:24
**laptop**
33:20
**large**
39:2 118:15 122:16 130:7
   210:24 239:8 247:15
**largely**
14:15 28:19 111:24 113:23
   114:2 141:2 145:9 160:25
   171:12 212:24 213:22 227:3
   237:18 246:1 247:3 257:20
   259:22 271:3 279:5
**larger**
68:23 80:5 146:21 155:12
   156:21
**largest**
117:10,12,15,17 187:22
**last-minute**
120:5
**late**
105:6 240:7,13
**Latin**
112:22 113:2 114:8 115:11
   120:7,11
**launches**
57:6
**launching**
57:24 58:12
**law**
9:7,11 23:18 94:12 104:17,17
   150:6 191:6,10,15,19 238:6
   241:4 243:17

**lawsuit**
46:13 49:12 170:19,20 180:24
   238:3,4,7,7,8
**lawsuits**
165:23
**lawyer**
9:7 28:18 75:23 76:1 82:17
   101:6 133:21
**lawyers**
82:18 160:14
**layer**
15:16 16:1,6,9,15 17:14,23 18:1
   18:11 20:6,22 22:1 23:8 25:11
   26:3,21 27:19 28:10 30:12
   31:1,23 32:3,19,22 37:18 38:3
   38:14,22,25 40:14 41:18,22
   125:7 211:6
**lead**
12:14
**lead-up**
80:15
**Leaf**
7:11
**learn**
87:15
**leave**
9:12 11:12,12,16 269:22 271:3
**led**
13:16
**left**
261:15
**legal**
6:6 8:20 31:16,16,17 50:12 51:7
   51:20 52:10 59:22,23 75:10,10
   79:14 139:25 141:7 151:23
   163:19 191:16 241:10 259:23
   276:1,3,19,20
**legitimate**
62:4
**length**
252:1
**lesser**
80:6
**let's**
52:16 54:23 82:22 107:20 131:1
   131:3 134:22 162:8 164:19

207:22 208:16 217:19 224:1
   228:25 239:22 246:7 261:17
   284:13
**letting**
84:25 85:2 121:17 281:5
**level**
15:13 17:17,18 20:17 99:21,25
   110:2 122:5 154:22 172:22
   173:18 174:24 181:17 211:11
   217:3
**leveraging**
256:12
**LGPL**
152:17
**liar**
75:5,17 76:11,23 77:4,5,12 78:1
   78:10
**license**
40:12 41:7,16 42:2,7,19 43:9,15
   43:21,25 44:2,7,8,20,22,24
   45:3,4,6,9,20,24 46:17 47:3,7
   47:9,12,13,18 48:15,17 55:7
   55:22 56:6,15 83:10 84:9,18
   85:13 148:5,11,19,25 149:1,18
   151:8 152:5,25 157:6 168:6,12
   173:25 180:20 209:8 228:15
   228:15 233:20,24 234:19
   235:5,5 237:14 240:19,19
   241:21 242:12,18 243:7
   244:10 245:25 247:20 248:1
   249:2 250:4,8 251:24 253:1,6
   253:7 255:7 257:2 260:9,11,11
   260:19 261:7,12 264:10 282:9
**license-back**
264:9
**licensed**
42:6 54:13,19 55:1,16,21
   150:23 152:16 181:9 221:1
   241:9 251:24 253:6,21 254:5
   254:22 255:3,4 257:3 266:23
**licensee**
153:14 154:24 233:21,21
**licensers**
241:6
**licenses**
42:3,8,14,17,24 43:4 46:12

54:15,21 55:4,13 57:24 80:3
151:9,18,19 162:21 165:16
172:7,9 200:14 206:13 207:8
208:11,12 228:7
**licensing**
91:18 151:15 168:9 171:3
**licensor**
153:13 154:23
**licensors/sellers**
231:5,14
**lie**
74:9,16,23
**lied**
71:25 73:7,10,20
**life**
87:13 109:13 138:18 165:6
**likes**
176:6
**limit**
246:1 289:12 290:3
**limitation**
253:23
**limited**
78:22 177:13 202:16,20 223:20
253:22 263:13 282:11 287:10
**line**
24:12,23 25:16 28:20 29:18
50:15 51:9,14 99:10 102:23
209:24,25 215:3 217:20
221:14 227:4 229:1 233:5
237:21 246:22 259:4 266:18
269:11 270:9,14
**lines**
128:15 146:15 204:15
**Linux**
123:12 150:21,22 151:14
**Linux-based**
195:9
**list**
8:7,8,8 28:3 30:18 39:2,15
42:24 86:12,15 87:15,18
118:11 125:25 129:24,25
130:5,8 131:14 135:10 138:7,9
157:16 194:15 196:7,10,18,23
197:1,11 198:17 199:8,19
209:9 218:2 254:24 288:13,16

288:21
**listed**
22:15 24:7 130:9 157:17 203:11
208:13 222:1 232:20 240:17
246:19 249:2 250:21 251:11
262:18 273:22
**listing**
178:17
**lists**
244:14
**litigated**
65:15,19 259:20
**litigating**
66:16
**litigation**
9:20,21,22,23 10:6,6,9 26:1
27:8 29:14 42:4,15 44:8,21
45:9,21 47:14,20 48:17,22
49:1,3 54:16,22 55:5 56:22,25
60:7,13 61:18,19,20 62:13,23
63:1,14,21 65:13 68:18 69:19
70:2 72:6 75:23 79:9,10 82:19
82:20 86:15 88:8,15 89:5,6,25
90:2,18 91:4 94:24,25 95:1
96:2,3 97:2 101:7,8 111:20
112:1,18 140:17,19 142:25
145:12 146:21 147:2 161:5,20
161:21,23 163:5,7,10 164:10
164:11,14,21 165:8,17 166:16
167:10 172:10 178:6 182:8
194:24 205:13 209:11 234:1
234:22,23 235:13 239:13,24
240:1,11,25 243:10,15 244:6,8
248:3 249:5 256:10 258:11
260:3 283:9
**litigations**
43:6 165:9,13 171:21 178:1
242:9 244:14
**little**
15:22 18:21 19:3,5 31:11 38:7
41:9 54:24 85:19 90:15 96:23
102:3,4,12 107:1 120:1 126:1
126:3,4 128:17 157:10 177:9
181:23 182:5 183:3 184:11
197:20 202:18 224:8 233:3
234:15 236:25 244:13 254:17

278:6 279:7
**live**
53:25 186:9
**lived**
7:13
**LLC**
1:5 6:13
**LLC's**
3:15
**LLM**
9:24 10:11
**load**
10:17 136:17 223:2,3,4,4,9
230:10,22
**loadable**
121:22
**loaded**
121:13,22 123:8 125:16 129:12
131:25 132:6,9,12,15 133:2,5
133:23 135:16 162:25 163:1
194:1,6 197:22,22
**locate**
285:22
**located**
277:25,25 286:11
**location**
190:19 193:1 288:17
**locations**
197:4
**logistics**
119:22
**long**
7:13 8:3,8,22 9:10 20:12 25:22
26:8 27:14 30:19 49:22 97:3
106:22 107:11 109:10 115:17
137:10,11 138:13,14 191:10
191:19 196:18 219:15 249:19
254:3
**long-running**
212:6 214:14
**long-term**
12:24
**longer**
8:23,25
**look**
22:19 30:19 55:13 115:25 116:2

124:18 163:11 164:21,24
165:2 168:10,11 174:22 178:4
179:6 181:4 192:18 198:18
205:20 206:7 208:16 211:19
217:19 221:5 223:1 248:12,16
252:24 254:14 262:25 264:18
267:10 270:25 271:5 274:13
276:4,4 280:21 284:1,19
288:20
**looked**
23:6 24:5 56:9 87:2,7 110:21
114:14 152:9 156:18 216:1
226:12,13 245:20 248:10
264:1
**looking**
22:5 27:3 37:7 95:3 115:18
131:12 144:14 147:4 171:13
214:24 217:15 231:22 257:21
258:18 265:11 273:13,19
278:8,25 284:25
**looks**
36:17 189:22 205:8 208:14
286:12
**loose**
126:4
**loosely**
25:8 39:21 122:22 124:13 126:1
**Los**
7:11
**loss**
49:12
**lost**
153:21 187:24
**lot**
26:11 45:11 81:12 119:12,13
140:24 143:6,7,8 161:9,11
174:8 182:16 184:11 196:14
207:1,2,2,2 215:18 257:7
264:22
**lots**
196:15,15
**loud**
254:18
**love**
68:1 95:23 102:25
**lowest**

256:19 257:10
**lunch**
102:2 106:22 107:12,24
**lying**
72:24

## M

**Mackintosh**
104:22 105:3
**main**
119:3 225:12
**maintain**
40:22,23 284:2 285:4,16
**maintained**
120:19,20,23,25 278:5,16 279:5
279:8,14,24 280:19
**maintaining**
150:25
**maintains**
277:12 286:21
**maintenance**
253:23 278:25
**major**
11:23 111:8 190:4,7,11,14,17
**majority**
119:21 133:10
**making**
47:11 55:19 78:15 150:1 241:15
282:18
**man**
45:11 77:4
**management**
108:15 121:1 124:18 127:19
131:19 132:2,23 133:20,22
135:17 136:9 137:15,23
160:20 175:3 195:17,18 201:2
223:8
**management-based**
161:4
**manager**
194:24
**managerial**
11:24
**managing**
162:4
**maneuvers**

243:15
**manufacture**
139:2 251:23
**manufactured**
118:4 197:2 283:2,20
**manufacturer**
119:6 133:3 138:2,8,21 282:14
**manufacturers**
118:14,15,18 119:9,15 137:21
138:19 197:4 282:2 283:22
288:15,18,19
**manufacturing**
86:4 138:10,24 280:24 281:8,8
281:14,17,18 282:6,10,20,22
282:24 283:4,13,16,18 287:2,3
287:9,11,16,18,23 288:9,12
**map**
190:22 214:23 230:23
**mapped**
196:11
**mark**
108:20 199:21,22 207:25 246:7
267:14,19 284:13 289:1
**marked**
22:18 199:25 200:7,9 203:24
208:4 232:22 246:11 250:6
267:18,23 271:12 276:23,25
284:18 285:1
**market**
87:9 188:10 215:18 231:8,17
237:23,24
**marketing**
16:11 123:5 127:10,22 130:21
193:25 230:2 236:6,7
**marketplace**
176:8
**marking**
205:14
**marks**
82:24 83:4 162:10,15 232:16
**masked**
26:15
**massaging**
74:24
**master's**
12:4

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**material**
18:21 27:24
**materials**
31:5 202:25
**mathematics**
12:1
**matter**
6:12 113:19 155:19 201:9
**matters**
79:11 164:21
**MBO**
108:15 160:18,19
**mcukor@gibbonslaw.com**
2:6
**mean**
13:6,6 15:2,5 16:3,7,7,7,16 17:6
    17:16 20:25 21:13 23:22 25:7
    30:22 31:12 32:13,16 37:25
    39:6,7 43:23 49:10,11 55:12
    65:17 67:7,22,22 68:17 70:16
    74:7 77:3 79:21 81:10,12 82:5
    85:15 95:15 98:1,10 103:1,21
    109:8,9,20,20 110:3 111:2,6
    111:10,18 114:23 116:21
    120:20,21 121:16,20 123:4,4,6
    125:4 126:2,16,22 127:7
    138:16 139:24,25 140:3,6,23
    141:13 142:24 143:6 146:17
    147:14 151:14 152:20 155:8
    155:10 158:12 160:14,21
    161:1,25 163:1,2,2,7,9,18
    164:16 166:2,7 169:5,5,13
    183:5 185:3,12 186:19 187:23
    188:3 189:10 190:13,17,17
    193:14 196:9 198:17 204:23
    204:25 211:10 212:13,20
    217:20 221:25 222:4 223:15
    223:17 227:1 233:4 234:2,5
    235:22,23,25 236:7,15 238:17
    240:16 245:16 249:19 262:22
    263:3 264:21 265:4,8,18 272:9
    274:12,13,14,23 275:6 276:3
    276:15 278:15 282:1
**meaning**
31:14
**means**

15:21 17:3 32:12 67:25 121:18
    251:19
**meant**
21:4 74:12 111:11 136:8,25
    249:18,21
**mechanics**
117:8 275:1 276:15
**MedImmune**
241:5
**meet**
63:22 64:2 103:18 104:20,25
**meeting**
64:11
**meetings**
73:12
**member**
106:10 123:19
**memorialize**
147:18
**memorializes**
146:25
**memorializing**
155:6
**memory**
18:25 28:23 93:19,20 181:5
    206:24 265:2
**mental**
29:5 76:6
**mentioned**
12:25 32:17 45:19 79:12 82:18
    116:6 150:20 151:10 154:2,17
    160:15 162:19 163:4 172:24
    173:5,13 174:19 194:10
    196:22 225:9 228:19
**merger**
230:16,20
**merit**
169:16
**merits**
75:7,10 172:18
**met**
63:18 70:25 71:3,10,16,21
    103:20,25 104:21 105:1,2,15
    106:14
**metal**
126:12

**method**
11:1 238:15
**methodologies**
11:1,2
**Michael**
2:4 6:16 110:16 128:7
**Micro**
61:20 62:7 63:13 148:11 233:5
    233:18,21,25 234:7,22,22
    236:3,11,21,23 237:1,3,21
    238:1 239:23 240:2,5,24
    241:15,17,21 242:13,22 243:4
    243:20 244:1,18 246:8,18
    247:8,13,18 253:1 255:7
    256:14,20 260:20,23
**Micro's**
240:16 257:10
**mid-2000s**
236:17
**middle**
108:9 259:3
**midyear**
108:10
**million**
184:15,16 185:15,17 241:18
    242:21 243:3,7,9 244:21,22,23
    246:17 255:12,22 272:14
**million-four**
184:17,19
**million-two**
184:17
**mind**
43:3 76:16 107:2 138:23 142:3
    144:25 148:14
**mind-set**
29:2
**minimum**
245:24 250:20,20 256:3
**minimums**
245:24 246:2,4
**minor**
11:25 111:14
**minute**
206:6 228:6 232:5 233:18 259:9
**minutes**
107:13 289:3,4

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**MIS**
36:16
**misappropriation**
70:4 142:19
**miscommunication**
147:24
**mismatch**
209:12
**misremembering**
173:6
**missed**
193:6 219:19 220:15,16,21
    221:3 286:13
**missing**
272:11,12 275:17
**misspeak**
244:15
**mistake**
248:25 249:17 271:18
**misunderstood**
136:20,22
**misuse**
142:19
**mix**
103:15,16 168:18
**Mm-hm**
61:15
**mode**
32:24 33:2,6 37:20
**model**
124:1 125:18 128:10 215:22
**modest**
116:18
**module**
151:15 198:9,10
**modules**
149:2 150:23
**moment**
59:8 248:9
**moments**
248:9
**money**
11:15 145:24 164:13 165:15
    174:8 182:20 184:11,12
    212:15 244:17 265:15,19,23
    266:9 275:20,22

**months**
63:25
**Moose**
1:20 5:3 6:8 41:10 44:17 50:25
    176:15 231:11 291:22
**morning**
6:4 7:4,5
**MOSAID**
183:13,14
**motion**
3:23 4:3 72:10 73:17 74:15 75:2
    75:4 76:2,10,19 77:10,23
    78:14 154:18,20 277:2 278:24
    280:16 284:15 286:4,6
**motion-to-dismiss**
78:2
**motivated**
178:22
**motivation**
249:5
**motives**
167:23
**mount**
279:15
**move**
107:3,18
**moved**
9:16
**movement**
96:20
**moves**
14:13
**moving**
202:10
**multi**
168:4
**multifaceted**
166:15 168:4,17
**multiple**
124:22 288:11
**myriad**
122:16

_____
**N**
_____
**N**
2:1 3:1 6:2

**nail**
19:22
**nailing**
19:24
**name**
6:6 7:6 14:17,21 39:3 40:9
    61:12 62:9 103:11 104:12
    119:2 126:6 132:14 183:12
    193:21 194:23 198:19 235:22
**named**
19:13 69:10 96:19 97:10 110:19
    126:24 133:16 229:22 230:3
    235:24 238:8 291:6
**names**
71:5,6 104:10,22,24 105:4
    193:25 229:25
**naming**
40:4 198:21 230:1 235:25 238:5
**narrower**
130:3
**nature**
210:21
**near**
103:10 109:13 135:25
**necessarily**
95:15 102:13 141:8 173:18
    174:10 195:13 207:8 223:14
    264:4 276:18
**necessity**
166:1,7,20
**need**
19:5 41:12 60:1 140:13 162:7
    183:1,2 198:16 232:9 264:18
    264:19 265:18,20 266:9
    269:23 278:21 286:7
**needed**
214:3,5 220:15,17,23 244:5
    264:4 265:15
**negative**
169:17
**neglected**
148:22
**negotiate**
157:4 211:2 271:1
**negotiated**
156:2,23 235:2 247:2,6 249:20

251:8 252:20 255:19,19
258:13,14,15 270:24
**negotiating**
157:4 159:23 219:19 266:12
**negotiation**
71:13,15 77:18
**negotiations**
47:24,25 172:14 174:5,6 175:2
175:10 247:8,14 249:10,13,24
251:5 257:6
**neither**
222:17
**Nelson**
1:14 3:3,22 4:2 5:7 6:10 7:1,7
83:1,6 156:25 162:12,17
202:11 232:13,17 277:1
284:14 290:6 291:2
**net**
252:5
**NetScreen**
144:2,2 145:1,3,5,16,22,25
**NetScreen/Juniper**
168:3
**network**
1:5 3:14 6:12,17 21:24 25:10
27:17,20 29:8 30:9 34:11,12
35:12 36:1,4,13,19 50:6 51:4
70:25 71:7 83:7 85:22 94:4,16
127:25 169:25 223:15 229:15
237:24 253:13,13,17,19,24
254:8
**Networks**
65:25 66:16 69:13,20,20 70:6
70:14,19,22 144:10,19,21
166:13 168:1
**never**
12:22 33:9,12,13,14 35:14
38:18 40:2 42:18 43:8,15
95:14 101:5 138:10,23 150:6
179:19 210:7 218:16 227:15
227:17 237:20 247:8 268:15
**new**
2:5,5 11:1 14:19 57:13,13 58:12
93:1,3 138:17 161:8 243:18
285:23
**newly**

162:1
**NFS**
279:14
**nice**
254:21
**nominal**
145:17 146:17,18,20
**non**
173:20
**non-FortiGate**
279:20,23
**non-techie**
36:6
**nonanswer**
51:7
**nonexistence**
226:24
**nonpracticing**
60:5,16,20 170:14,20 171:4,16
172:1,7,10,17 173:9,21 174:1
174:14,23 175:12 176:2,5,10
176:20,22 177:2,6 178:8,8
180:2 181:15,20 182:8 183:6,8
183:16 184:5 185:18 238:4,23
239:3
**nonprivileged**
23:14 52:11 57:1 74:13 95:2
172:13
**nonproduct**
197:16
**nonregular**
216:5
**Nonverbal**
67:20 144:6
**normal**
135:13 153:1,2 163:15,24
**normally**
201:23 202:21
**northern**
1:2 3:24 4:4 137:7 277:2 280:17
284:16
**notarized**
269:2
**notary**
268:25 269:4 270:3 274:6
**note**

129:11 203:18 229:8 242:24
270:3 272:9
**noted**
35:6
**notice**
3:9,11 5:1 175:22,23 199:23
200:2,9 201:9,17 202:1,6
203:9 213:5
**noticed**
260:4 265:12
**notices**
199:9
**noting**
289:19
**notwithstanding**
241:8
**November**
22:25 24:7 25:13
**NPS**
42:25 46:15,15,17 47:2,4,17
48:15 60:5,10,15 61:3,4,7 74:4
96:19 114:25 115:23 122:11
124:22 150:17 152:7 153:7
172:15 194:17 262:4 267:20
268:16 269:7 270:6 271:22
274:6
**NPS's**
200:15 232:21
**NPS0050942-51**
3:21
**number**
10:1 11:17 12:15,20 13:11
31:10 54:21 63:25 66:1 69:16
70:9 79:13 80:22 81:3,21
82:15,25 83:5 103:15 109:4
115:16 118:17 122:16 128:8
130:7 144:8 146:9 150:23
155:10 156:1,11 162:11,16
172:18 173:14 187:3,23
200:14,20 210:24 224:10
232:13,17 238:9 239:8,9
246:17,24 247:3,6,14,17 248:3
248:4 250:12,15,16 251:17
255:16,19,20 256:2,3,3,6
258:20 260:17,17 261:14
262:1 264:22,23,23 267:12

290:6
**numbering**
250:13
**numbers**
184:23 196:16 199:11,18
247:15 265:11 275:11
**Numerically**
93:8
**numerous**
22:2 105:23 201:18

---

**O**

**O**
6:2
**o0o**
1:4 2:19 4:6 5:15 6:3 290:11
**object**
25:15 26:23 29:18 34:21 40:15
46:18 48:12,12,13 54:3 83:12
84:21 139:8 170:1 200:25
209:3
**objection**
26:5 27:21 28:13 30:3,13 31:2
31:24 32:25 36:21,25 37:8,22
38:15 40:22,23 42:11 43:17
44:9 47:15 48:18 50:8 55:9
56:17 57:8 58:1,16 59:5 60:8
61:8 63:7,23 64:4 65:6 66:17
66:23 68:19 69:6 72:1 75:18
76:12 77:13 86:21 87:10,20,25
88:11,21 89:11,20 90:6,24
91:12 93:12,13,24 94:6 95:11
95:19 96:12 97:20 98:8,17,22
99:6 100:3 101:2,17 102:18
105:9,17,23 106:15 114:18
139:18 141:11 142:20 143:16
146:2 148:2,8,21 149:9 170:15
170:23 171:5,18 172:2 173:10
174:2,16 175:13,19 182:11
183:10 184:25 209:22 210:11
211:7 217:9 226:9,21 227:21
234:3 240:3,21 242:15 247:11
247:21 256:22 257:17 258:2
260:12 261:8 263:8 265:16
**objectionable**
48:11

**objections**
3:14 208:1 232:21
**objective**
76:19 81:25 82:3,6 108:15
**objectives**
160:20 161:5
**obligation**
151:3 152:14 163:12 243:16
245:1 276:14
**obligations**
145:22 151:8 152:8 276:9
**observed**
201:22
**obtain**
83:9 85:20
**obtained**
288:16
**obviate**
201:20,21
**obvious**
32:6 186:11 197:11 264:17
**obviously**
21:13 37:13 48:24 116:15 128:8
133:1 136:18 140:11 159:12
195:9 197:21 216:12 227:13
244:1,20
**occasion**
43:20
**occasional**
166:21
**occasionally**
215:23 282:7 287:11
**occasions**
77:21
**occur**
46:4 138:5 281:15 287:11
**occurred**
46:1,5,8 249:10
**occurs**
138:11 281:11 287:4
**October**
22:17 23:5 112:15 257:3
**October/November**
164:20 257:4
**OEM**
230:22

**OEM'ed**
237:12
**off-line**
33:7
**offenses**
168:19
**offer**
16:14,16 27:6 38:8 47:18 52:12
52:12 106:9,13,17,19 169:4
183:9,17,23 184:1,5 185:18,19
**offered**
24:22 47:3 105:7,14,20 178:18
183:20
**offering**
222:10
**offers**
82:9,11 183:5,14 184:7,14
215:19,21
**office**
33:18,22,23 93:11,22 117:12,15
117:15 186:5,19 187:1,7,22
188:22 190:11,20 220:16
269:10 270:3
**officer**
286:19,24
**officers**
110:20 171:23 172:5
**offices**
64:15,18,20 103:16 105:2 117:9
117:17 186:3,23 187:3,23
189:20,23 190:1,4,5,6,7,23
277:15
**oh**
50:22 51:6 53:14 72:14 73:9
103:7 130:4,4 136:24 147:14
148:17 162:25 184:9 209:2
222:14 224:2 233:24 238:3
239:4 242:5 261:1 262:15
267:5 270:8 281:4
**okay**
7:22 8:18 12:25 16:21 17:7,12
18:8,13 23:3,6 24:25 30:7,25
32:23 38:5 40:12 48:2,3 51:6
52:16 53:14 54:18 55:25 58:20
60:3,14,25 61:25 63:16 64:17
76:14 77:3 78:7,25 79:25 84:6

84:16 88:16 89:8,17 91:10
94:3 95:9 96:8 100:21,24
103:1 106:20,21 107:21
110:12,16,23 112:10 114:13
115:13 121:16 123:15 124:15
126:14,18 127:18 128:19,22
129:15 130:14 131:1,5,12,12
134:1 136:8,16,20,24 138:13
139:4,6 141:5 142:2 143:14
144:7 146:24 148:22 153:11
153:22,25 154:4 158:2,19
160:15 162:7 164:3,8 165:20
166:18 169:23 178:11 179:19
183:25 185:22 188:3,7 190:14
192:9 193:19 194:18 195:19
195:24 198:23 199:21 203:4
203:21 204:5,13 205:18
206:22 208:25 209:19 211:18
212:10 214:20 217:19,22
227:24 228:25 229:12 230:8
232:4,7 233:13,17 236:18,20
238:2,16,20,25 241:16,20
242:7,20 246:6 247:7 248:6,23
249:15,22 250:1,18 255:5,12
255:21 258:17,22 259:1,25
260:7 261:4,13 262:7,12,15
263:6 265:5,12 266:25 267:5
267:11 268:12 269:3,6 270:4
271:8 276:24 280:21 281:2
284:1,24 285:14 286:18 289:5
289:21 290:4,5
**old**
127:12 147:8
**once**
64:6 170:7
**one's**
177:9
**ones**
90:14 118:11 148:10 199:16
202:19 206:18 224:3 229:6,7
233:15
**ongoing**
163:9,20 164:22,24
**open**
115:17 148:15 150:10,14,18,23
151:9,11 152:7,8,21,24 153:9

262:25 282:12
**opened**
282:16
**operate**
17:18 32:18,24 36:8 38:13,24
161:15 180:14
**operated**
33:13 40:2,3
**operates**
17:13,25 32:3
**operating**
17:17,19,21,22 21:15 37:18,19
38:25 121:10,13 122:5,16,18
122:20 123:1,7,25 124:11,14
124:20 128:24 129:2 131:16
131:17 132:9,10,11,14,19
135:20 137:3 150:19 162:6
178:21 180:10,11 194:2,6
195:5,9,14,16 213:9 218:2
**operations**
36:18 177:13 213:22 216:17
218:4 288:12
**operator**
33:9
**opinion**
60:19,24 83:9,22 84:7 85:17,20
91:14 169:4
**opinions**
52:10,10 81:15
**opportune**
264:5,6
**opportunistic**
217:15 263:22
**opportunity**
108:19 192:24 210:14,14 211:4
212:4
**opposed**
237:24 261:6
**opposition**
286:4,5
**optimization**
223:10
**option**
109:12
**options**
108:17

**order**
150:3 201:1,1 235:3,6 236:14
237:18 256:13 258:12 286:8
**orders**
59:21
**ordinary**
82:16
**org**
117:19
**organization**
149:6 201:12
**organized**
208:15
**original**
117:11 148:17 189:15 206:20
234:6,23
**originally**
117:10 144:1
**origins**
238:18,19
**OS**
122:13,13 124:9 132:6
**Ottawa**
103:13 117:16 123:11
**outcome**
240:11 291:15
**outside**
45:20 53:21 58:6 65:12 89:7
90:1 96:3 100:18 101:24
120:12 125:3 141:2 154:14
156:9 157:20 162:4 163:7
165:3 203:13 205:12,13
221:11 269:22 271:4
**outsourced**
213:15
**outstanding**
182:2 243:10 244:8
**overall**
68:25 111:7 112:5 124:6 140:18
259:12,14
**overbroad**
202:6,7
**overlaid**
124:2 136:12,13
**overlap**
128:4 185:7 203:19 231:20

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

236:24 263:12
**overlapping**
110:6 123:24 199:3
**overloaded**
121:8
**overseas**
197:3 282:3 283:22
**oversight**
14:14
**overstepped**
100:9
**overtly**
264:18
**overused**
32:11
**overweight**
216:3 264:2,3
**owns**
60:16

**P**

**P**
2:1,1 6:2
**P.C**
2:4
**p.m**
82:24 83:4 108:1,3 162:10,15
   205:24 206:2 232:12,18
   261:20,23 289:15,18 290:8,9
**package**
108:23 109:19 118:19
**packet**
40:6 133:14
**packets**
39:10
**page**
3:5 4:1 200:9 203:10 208:17
   213:6 217:20 228:25 232:20
   246:19 250:12,13 251:17
   254:15 258:17,18 262:13,18
   262:19 268:11 269:7 270:6
   272:11,11 273:13,15,15,16,19
   275:17 276:14 277:11 286:4
**pages**
3:10,12,15,17,19,21,24 4:4
   248:7

**paid**
105:20 156:1,22,23 157:1 161:9
   178:23 183:19 243:3 244:2
   246:4,17 247:20 250:2 260:19
   260:24 265:14 270:15,15
**paid-up**
260:10 261:7
**Palo**
65:25 66:16 69:13,20,20 70:5
   70:14,19,22 144:10,19,20
   166:13 168:1
**PAN**
144:18
**paper**
10:21,23 77:7 78:18,19
**papers**
78:2
**paragraph**
200:25 201:4 258:24 259:4
   270:5,5 277:10,11 278:19
   279:10 280:21 281:20 284:1
   284:19,25 285:12,15 287:13
**parallel**
233:7
**Pardon**
108:18 289:24
**parent**
66:4
**parentage**
70:8
**parsing**
51:15 85:19
**part**
8:14 31:4,5,6 69:25 70:7 97:1,5
   97:7,9 106:8 111:15 155:11
   157:24 158:14 161:23 163:14
   163:18,24 165:8 166:3,8,21
   181:9 193:5 199:5 205:13
   215:7 220:14 230:5 282:13
**participate**
142:4 191:24
**particular**
59:2 122:1 201:4 255:23 286:9
**particularly**
12:21 52:10 81:11,14,17 82:1
   111:17

**parties**
96:16 162:22 201:20 246:24
   259:5 260:10 289:13 291:16
**partnership**
212:7
**parts**
126:11 131:21
**party**
40:13 41:16 42:19 43:9,16
   55:23 56:6 65:21 76:20 96:10
   96:17,21,21 142:25 153:8
   168:5,8 178:9 179:16 180:25
   201:8,15 202:3 252:3,3,5
**party's**
54:20
**pass**
119:11
**passing**
71:13,21 77:19 172:25
**passings**
71:23
**patent**
3:20 12:9,10,11,11,15,17,22
   13:1,5,10,12,15 14:6,8,11,22
   15:5,6,12 19:14 21:11 22:6,13
   22:16,23 23:5,6,17,23 24:7
   36:20,23 37:7,13 40:12 41:15
   42:2,3,13,19,24 43:9 45:3
   46:17 47:8,10,12 48:16 49:13
   49:16,16 50:5 51:3 53:22 56:6
   56:16,21,23 57:14,15,24 59:4
   60:7,11,17 66:14,21 68:5 69:2
   69:8,14,21 79:13 80:17,18
   81:1,3,13,18 83:11 84:10,19
   85:13 86:1 87:24 88:5,7,20
   89:3,10,16,24 90:2,4,23 91:11
   91:18,20,21,23,25 92:1,16
   93:5,9,11,14,22 94:5,20 95:18
   96:11 97:14,19 98:6,14 153:15
   153:17 154:8 155:5,9,17,18,20
   155:22 157:23 158:5,7 159:4
   162:21 165:16,21,22,25
   166:16,17,23 168:5,15 169:9
   169:15 170:19,19 176:12,14
   176:25 177:1,3 178:7,9 183:9
   207:19 212:18,22 213:11

214:21 218:6,7,18,24 220:1,2
220:18,25 221:1,6,18,23,24
225:12,21,25 226:3,3,7,13,13
227:3,6,10 233:21 238:8,15
239:10,14 241:7,13,23 242:14
243:8,17 244:5,18 245:17
250:3,7 258:10 261:12 262:23
269:8,9,13,20 272:2 273:6,17
274:4,8,10
**patent's**
22:18
**patents**
12:13,13 13:9 14:4 53:2,10,15
53:21,25 54:12,20,25,25 55:14
57:6 65:10,16,17,18 66:1 68:8
68:9,13,14 69:13,21 70:6,7,14
70:22 159:5 166:5 167:6
168:17 171:4 176:10,20
177:16,23,25,25 178:14,19,24
179:4,8,11,17,20 180:15,19,20
181:8 182:1,4 183:2,6,14
184:21 185:4,7,8 206:15 207:7
208:19,21,22,24 210:1,3,6,8
210:10,24,25 211:5,12 212:23
214:21,25 215:1,18 216:9
217:6,16,23 218:12 221:18
225:23,25 226:7,17,20 227:6
227:17 228:10,21 232:25
241:14 262:17,23 263:7,23,25
264:4,7,13,15,22,24 265:9
266:22 271:13,23 272:24
273:10 275:4,24
**pattern**
144:11,11
**pausing**
18:17
**pay**
105:20 145:24 146:19 161:22
181:8 182:20 183:2,2 241:17
243:6,16 244:5,17 261:2,6
272:18
**paying**
162:20 165:16 183:3 242:19
244:25 245:2 261:11
**payment**
145:15 146:5 240:15,19 242:22

242:24 243:1,9 244:21,22
256:3 257:23 265:14 272:15
275:2 276:6
**payments**
241:15 245:24,25 250:20,20
276:6
**PBX**
228:3
**PC**
6:17
**penalty**
277:7
**pendency**
37:15 59:18 98:24 99:3 100:8
101:7,22 111:25
**pending**
50:23 144:22 179:22 218:19,22
225:12,21 240:11
**Pennsylvania**
2:5
**people**
20:19 38:8 41:25 53:3,21 71:5,7
78:23 81:19 82:1,4 92:13
103:18,20,25 104:23 105:2,6,8
106:14 114:25 121:19 122:21
123:1,4,5 124:8 127:16 128:13
130:18,22 145:11 202:23
224:24,25 229:11 287:18
288:11
**perceived**
67:9,11,17,19,23,24 68:15
**percent**
65:2 140:18 194:5 250:23,24
251:2,2
**percentage**
116:3,19 140:16 161:16 247:10
**percentages**
250:21,23,25 251:11,12
**percipient**
201:14 202:2
**perfect**
288:1
**perfected**
276:2
**perform**
40:6

**performed**
281:9,18,22 287:9,20
**peril**
35:5
**period**
87:16 109:14 145:20 244:12
**periodically**
109:3 152:13
**periods**
110:7,15 140:25
**perjury**
277:7
**permutations**
22:2 25:12
**person**
15:25 16:11 18:10 19:22 23:7
36:6,9 78:1,13 114:1 128:17
139:13 140:12 173:14 192:12
192:14 270:2 283:18 291:10
**person's**
104:12
**personal**
14:1,3 17:10 19:3,16 26:2 60:4
60:11,15 63:13 75:14,25 78:13
79:22 87:23 88:10,14,19 89:9
90:3,22 100:25 156:24 193:7
**personality**
145:7 172:25 173:18,19
**personally**
5:5 16:19 20:18 22:8 29:16
71:20 76:10 81:6 101:15
127:21 168:23 169:3,15
214:17
**perspective**
43:22 51:17 117:2 119:22
127:11
**Ph.D**
10:20 11:7,10,18
**phone**
36:9 48:8 216:15,18
**phrase**
236:7
**pick**
210:24
**picked**
213:23,24

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

picking
225:20
picture
225:1 243:24
piece
30:10 126:12 145:18 156:20
   157:6 280:14
piecemeal
21:15
pieces
26:20 125:10 224:15
pitched
225:10
place
190:9 291:6
placed
208:6
places
118:5 186:10 189:24 280:7
plaintiff
1:6 2:3 3:14 5:9 6:17 59:2 101:7
   166:23 169:8 174:14 286:9
plaintiff's
3:8 4:1 6:15 199:24 200:6 208:1
   208:3 246:10 267:17,22
   276:22 284:17 286:3,5
plan
95:14,16 99:23 100:22 108:15
plane
102:16,22
planned
95:10,15
planning
262:3,10
platforms
121:23
play
62:6
played
149:13
players
216:21
Plaza
2:5
please
6:14,21,24 7:6,10 44:17 49:23

50:19 72:20 73:4 85:8 147:12
   199:13 203:8 277:10 284:20
plus
136:12 178:23 244:23
point
10:8 20:1 39:23 62:4 140:12
   158:16 230:8,10,13,18,21,24
   231:1,25 244:6 246:2 280:12
   283:12
Points
230:20
policy
36:11,12 156:24 158:2,6,17,17
   161:11 169:23 170:6,12,13,18
   170:22,25 171:3,8,8,16,21,21
   171:23,23,25 173:8,19 174:24
   181:17 260:16
populate
138:3
port
221:20
portfolio
212:25 216:3 221:21 227:3
portion
68:22 108:23 113:24 150:19
   152:3 236:10 268:25
portions
199:2 201:5
position
24:15 84:9 244:3
possession
202:3 218:23
possibility
180:18
possible
34:18 35:25 106:7 134:13
possibly
14:17
potential
49:12 97:18 106:2,4,18 110:5
   212:5
potentially
68:18 101:25 119:10 177:11
   276:12
power
282:16

practice
49:4 147:21 160:10 162:2 166:8
   166:22,22 168:11 181:10
   191:15
practiced
150:6
practices
172:16
practicing
60:22 175:18 177:10,21 178:5
   178:16 179:2 181:25
pre-case
29:2
precise
131:13 132:21 253:4
predate
26:22
predated
19:20 20:23 21:11 22:10 25:3
   26:4,14 143:19 146:6 148:23
   192:2
predates
24:6 25:5 144:7 145:4 147:6
   149:11,22 191:3 193:15
predecessor
209:14
predict
164:22
prefer
74:5 129:23 261:6
preference
260:9,15
preferred
260:18 261:1
prefix
205:3
prep
70:1 249:12
preparation
118:12 143:4 156:17 197:13
   202:22 207:1 249:3,12 283:19
   288:1
prepare
29:4 42:23 129:25 130:5 192:22
   200:22 202:15,17 248:13
prepared

19:1 25:20 26:19 27:5 30:17
31:5 36:17 39:16 50:11,16
52:2 59:11 98:13 102:13
131:14 198:25 200:13,17
202:12,14,18 203:16 204:16
287:25

**preparing**
98:5,12 102:8

**presence**
188:10 189:21 190:15,18

**present**
2:13 64:7 77:1,1,19 104:18

**presented**
96:6 210:14 234:13

**presenting**
247:15 256:1

**preserving**
145:23

**presumably**
63:4 155:15 268:19

**presume**
273:7

**pretend**
76:15,18

**pretending**
77:24

**pretty**
75:1 79:8 128:18 152:22

**previous**
147:21 255:25 263:10 285:3

**previously**
194:23 195:6 203:24 263:11
270:22

**price**
67:1,8 109:21,25 157:13 159:6
198:17 266:12 272:14

**pride**
14:1

**primarily**
79:19 102:9 131:24 191:14
218:2 227:2 279:8

**primary**
137:18 227:11

**principals**
70:25 71:9 180:10

**prior**

26:20 29:7,14,17,24 30:8,9,11
30:15 58:18 62:20,22,25 70:1
88:5 98:15,21 99:2,5 100:2
101:1,13,16 102:17,21,22,23
133:3 145:23 157:19 199:4
209:18 234:16 282:18 286:13

**private**
68:24

**privilege**
19:5 28:22 52:14 56:14 57:11
59:9 63:10 68:13 83:20,21
84:13 88:25 90:13 91:8 94:22
95:6 97:24 99:17,20 100:17
102:6 106:2,5 107:1

**privileged**
18:20 22:5 24:19,20 26:11,15
27:11,16 28:19,24 48:5 51:22
54:10 56:11,24 58:8,14 59:17
59:17 60:1 63:11 72:8,9 73:13
75:12 76:18 77:25 83:24 84:15
85:21 87:5,6 88:8,18 91:2,3,6
95:8,14 96:1,7 97:23 99:15
100:16 105:20 152:1 154:13
170:7 171:12 172:11,23 174:6
175:5 258:5

**probably**
16:10,11 25:7 99:13 100:9
104:23 110:11 145:13 153:3
158:10 172:23 198:21 221:5
222:23 229:7 236:15 240:7
243:24 267:7 283:8

**problem**
181:14

**procedure**
201:7,13

**procedures**
81:1

**proceeding**
98:13 139:25

**proceedings**
80:10,12,17,19 81:21,22,24
82:2,5,10,14,20 94:14 141:7

**proceeds**
181:13

**process**
45:5 47:19,23 138:10 149:24

163:15,25 164:6,8,13 203:12
256:8

**processes**
48:21

**Processing**
265:7

**processor**
238:18

**procure**
212:11

**produce**
114:15 115:1 147:12 201:11

**produced**
54:15 111:20 112:12,18 113:1,9
113:12,15 114:24 115:7,12
117:19 147:2,9 152:6 158:18
204:24 205:2,7

**producing**
112:2 113:10 115:21 205:14
232:3

**product**
35:10,14,17 36:14 39:22,25
40:10,11,13 41:17 42:5,9
57:13,25 86:15 87:18 91:3
98:6,11 103:23 104:2 115:4,5
116:24,25 118:2,3,8 119:7,8
119:18 120:13,18 122:14
125:20 126:15,19 128:10,16
129:16 130:21 131:14 134:5
134:15,22 138:8 152:1 167:9
193:20 194:21,24 195:8,20,22
195:24 196:6,7,10,12,21,22,23
198:19 203:14 209:9 222:7
223:3,16,22 224:7,11,14 225:6
225:14,16 228:2 229:14,19
235:11,16,20,22 237:21 247:3
252:9 266:17 280:9 281:1

**production**
200:11 205:10 272:10

**products**
30:25 33:16 37:17,20,24 38:1,3
38:4,11,13 39:2,12,13,16,18
39:19 42:10,16 51:19 52:25
53:5,12,17 54:2,13,16,19 55:8
55:12,15,16,20,22 56:5,15
57:5,7 58:12 84:20 85:14 86:1

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

86:5,11,12,14,19 87:9,13,15
87:17 111:1 113:2,11,13,16
118:4,10,12 119:13 121:15
122:6,18,21 124:10 125:13,13
126:5,7,21,22 127:2,3,7,8,16
128:23 129:18,20,24 130:6,11
131:3,23 132:20,24 135:7,10
135:11,13 138:7,17,18 139:3
176:8 193:22,24 194:1,3,4,10
194:13,15,15,19,21,25 195:1
196:18,19,23 197:2 198:13,14
207:9,21 209:1,13,14,17 210:4
210:6,9 222:18 223:13 224:5
224:18 226:19 227:4,18
228:14,21 230:4,5,5,14 231:2
231:21 235:4,7,10,11,12,17,24
235:25 236:2,10,11,25 237:21
238:1 245:5,6,7,10,14,19
247:1 251:14,25 253:3,6,10,15
253:21,25 254:2,5,22 255:3,4
264:13 266:21 277:13 278:4
278:11,20 279:1,20,24,25
280:1,4,6,9,18 281:10,16,17
281:24 282:2,23,25 283:1,5,13
283:15,20 286:22 287:3
288:14,17
**professional**
60:12
**professor**
61:21,24
**program**
11:10,19 12:10,11,11 13:1,5
14:6 79:13 142:5 151:23,25
152:22 168:9
**project**
133:13,15 162:3 163:14,15,17
164:24
**prominent**
173:16
**pronunciation**
14:20
**proper**
202:9
**property**
9:21 11:5 65:20 79:20,22 80:3
91:17 142:19 144:12 153:14

154:24 155:2 156:6,20 158:22
159:19 162:21 167:12 180:6
181:15 186:12 215:9 260:10
**prophylactic**
259:22
**proposal**
10:15 257:10,13,15
**proposals**
45:3,4,4 257:8
**propose**
10:16
**proposed**
45:9 261:11
**proposition**
210:16,18
**pros**
93:4
**prosecuted**
15:14
**prosecuting**
169:18,18
**prosecution**
12:9,13,22 13:12 15:11 92:12
220:8 256:11
**prospective**
216:1
**protect**
253:13,24
**protected**
34:12 36:1,13
**Protection**
1:5 3:14 6:12,17 27:17,20 29:9
30:9 50:6 51:4 71:1,7 83:7
85:22 94:4,16 169:25
**protections**
144:12
**protective**
182:25 223:20,20
**proud**
81:11 214:17
**provide**
145:20
**provided**
42:24 61:11 114:6 124:22 129:7
153:5,6,7,7 205:12 218:1
222:2 253:24 254:1

**provides**
275:20
**providing**
253:11 286:15
**provision**
252:8
**provisioning**
185:5 265:6
**provisions**
180:21 182:25
**PTO**
80:12,17,19 156:10 267:20
268:14 269:18,21 271:2 273:8
274:15
**public**
69:16 72:9 73:15,16 74:12
79:17 93:15 110:19 112:12,14
143:1 151:6 152:4 163:13
188:17 215:11 243:23,25
**publicly**
75:16 110:18 112:16 113:9
143:5 156:13
**publicly-available**
76:2
**published**
170:18 171:7
**pulled**
269:16,17
**purchase**
44:1 66:20 67:14,23 118:7
135:3 155:5,7 156:11,19 157:5
157:12 181:25 182:18 208:19
209:18 210:10 211:3 212:18
217:25 218:9 222:2 225:13,18
226:4 227:2,3,8,14 228:19
229:5 230:16,17
**purchased**
65:9,16,20 66:2,3,5,7 69:3,9,22
70:23 145:3,6 210:1 213:8
214:22 217:7,23 221:15
224:11
**purchases**
65:12 80:3 116:24 119:17
157:23 213:7 227:15 228:24
**purchasing**
68:4 159:5 180:6 225:8

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**purely**
248:2
**purported**
74:3
**purpose**
66:15 201:8 265:24
**purposefully**
111:21
**pursuant**
5:1 98:3 272:17 289:9
**pursuing**
89:6
**put**
18:4 27:12,13 29:1 76:18
155:25 182:15 192:19,23
215:17 262:12 276:24 287:7
**putting**
24:14 79:24

**Q**

**Q1**
243:1
**qualification**
287:7
**qualifications**
288:8
**qualified**
206:17
**qualify**
17:20 177:2
**qualitative**
14:3 111:6
**qualitatively**
111:10
**qualities**
173:1 176:8
**quarter**
120:5 161:17
**quarterly**
162:3 215:12,13 250:20
**question**
8:13,17 17:16 19:10,17 20:11
23:22 25:1 26:17,23,25 27:3
31:20,21 34:22 36:10,11 40:15
40:20 41:2,3,6,8,11,15,20 42:1
43:1,3,8 44:15,19,25 45:7,13

45:18 46:19 48:2,4,10,25
50:20,24 51:2,13 52:1,6 53:20
54:3,9,11 56:8,13 57:1,12,17
57:18,20 58:4,8,23 59:15,19
67:13,16 72:18,23 73:1,3,6
75:25 77:23 78:4 80:15 81:16
83:13 84:3,5,12,22 85:1,3,7,10
85:16,20 86:7 88:24 89:2 90:8
93:16 94:12 99:21 102:24
106:4 113:4 114:18 116:7
121:17 129:16,17 130:3 131:8
131:23 133:8 134:2 136:21
139:8 140:20 141:6 142:18
147:22 148:17 151:2,13
153:21 154:5 155:3,5 159:1,21
159:25 163:1 166:6 167:2,23
170:1 176:2,16,19 186:22
187:13,25 192:13 193:8
195:23 197:13 209:3 212:21
215:13 217:24 223:25 224:2
224:10 231:9,10,13 233:4
234:6,17 248:18 252:21
255:15,25 258:7,12 260:16
263:19,21 271:19 275:23
286:8
**question's**
75:12
**questioning**
10:25 24:24 25:16 28:20 29:19
50:15 51:9,14 249:25
**questions**
24:12,12 45:12 62:2 88:17
99:10 100:23 103:2 128:20,21
232:5 249:4 279:2 287:17
289:8,12,23 290:1
**quick**
19:6 248:14 261:14 288:24
**quickly**
11:11 107:19 249:12 265:10
285:24
**quiet**
141:2
**Quinn**
2:9,15 6:19 64:9,20
**quite**
21:19,25 181:18 192:8 215:3

248:11,24 249:16 285:24
**quota**
111:12
**quotas**
111:14

**R**

**R**
2:1 6:2
**rack**
126:17
**raiding**
166:14 167:17
**raise**
265:21
**raises**
144:11
**Rakesh**
71:10
**Ramde**
71:10 73:19 75:5,16 76:11
77:12,16 78:9
**ran**
32:21 242:8 244:24
**random**
13:14 108:25
**range**
92:8,9 130:6 142:10 184:1,18
250:23
**ranges**
147:7
**rapid**
235:16
**rapidly**
288:19
**rate**
247:19,24,25 250:2 255:23
256:14,19 257:10,12,14,16
258:10 259:12,14,15
**rates**
248:1 257:19
**reached**
47:3 92:8
**reaching**
170:9,10
**reaction**

142:23
**read**
20:25 36:23 40:20 41:10,14
43:7 44:15,18 51:1 55:14
72:18 73:1,5,23 74:7 75:2
77:23 85:7,9 176:18 204:11
230:14 231:10,12 248:10
249:11 254:18 259:8 260:2
265:9 268:21 270:9 271:9
277:10 286:2,7,8 291:12
**reading**
76:1,19 78:14,14,19 252:15,17
252:23 258:24 259:2 271:11
272:19,21 280:24 281:22
**real**
19:6 128:20 186:12 288:24
**realize**
45:10 99:10
**really**
14:15 22:14 24:18 35:23 36:10
107:15 109:1,20 110:14
112:24 160:12 168:24 192:8
197:11 206:25 234:11 238:17
**reason**
31:16 34:18 44:4 46:3 193:18
219:5
**reasonable**
49:4,4,8,19 50:6 51:5 58:22
59:3 67:9 161:3 205:9 258:1,9
**reasonably**
145:17 166:19
**reasoning**
31:17 191:4 247:5 259:23
**reasons**
189:2,8,9,10 191:1,7,22
**rebadged**
224:13
**rebates**
252:6
**rebranding**
230:24
**recall**
10:8 14:20 71:4,6 72:14 73:24
74:17 77:6,16,17 103:11
104:11,24 105:3 112:4 115:20
116:16 148:23 154:19,19

178:24 184:9,22 185:4,16
191:18 193:5 196:9,11,12
206:16 207:13,18 210:21
211:12 216:10,22 219:23
221:21 224:23 234:8 236:19
240:6,23 241:3 243:2 245:8,10
251:9 256:16 257:12,15
261:10 262:1 263:1,3 264:20
265:2,10 269:3,14 270:21
271:7 275:21 278:22 285:20
**recalling**
74:10
**receipt**
270:16
**receive**
60:7 82:9 108:6 184:4
**received**
63:10 72:7 82:3,6 179:17
180:15 181:11 185:19 268:6
**receiving**
257:13,15
**recess**
52:20 83:2 107:24 162:13
205:25 232:14 261:21 289:16
**recite**
155:18 160:6
**recited**
154:9 157:11 158:20 159:17
270:20 271:22 273:9
**recites**
153:15 154:25 272:23
**recognize**
204:21,23 205:3,6,9 265:9
273:2
**recognized**
251:18,20
**recollection**
106:12 184:20,20 211:14 217:6
249:9,24 270:18 284:23
**recollections**
25:24
**recommend**
15:11
**record**
6:5,15 7:6 21:3 41:14 43:7
44:18 49:23 51:1 52:18,22

58:9 73:5 82:24 83:4 85:9
93:15 95:24 107:22 108:3
143:1 156:25 157:3 160:6
162:8,10,15 176:18 205:23
206:2 228:4 231:12 232:8,11
232:16 261:16,17,19,23
275:11 277:10 289:10,14,17
290:7 291:7
**recorded**
155:23 158:4 268:14 271:6
**recording**
6:9 160:14
**records**
267:10
**recovered**
180:25
**red-handed**
167:7
**redirection**
229:15
**redirector**
229:21,23
**reduced**
259:12,14
**reduction**
259:15,16
**redundant**
120:24 216:2
**reevaluate**
86:18
**reexam**
86:20,24 87:3,8,19 89:19,23,23
90:5,23 92:24 95:9,17 99:2
100:11
**reexamination**
80:10,12,17,19 81:1,7,20,22,23
82:2,5,10,14,20 91:10,19,22
91:24 92:4,7,17,19 93:4,6,9,15
93:23 94:5,14,21 95:3 98:5,13
99:11
**reexaminations**
81:3,13,18 82:8
**reexamine**
80:16 82:7
**reexamined**
96:5

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**reexamining**
81:20
**refer**
17:5 121:25 122:1,12 123:3
124:6,9,13 127:16 130:22
195:3 203:22 211:13 253:14
275:10 285:12
**reference**
62:18 122:14
**referenced**
134:4 271:10
**referred**
121:21 122:4,17 123:1 129:8,8
132:6,17,18,22 135:23 194:8
195:15
**referring**
19:13 22:7,7,11 23:4 37:21 44:1
46:5 113:18 126:25 134:12
137:5 157:8 163:25 250:4
287:10
**reflect**
59:9 156:1 202:24
**reflected**
158:18 257:20,25
**reflecting**
115:22
**reflection**
21:5
**reflective**
156:6 158:21 159:3
**reflects**
115:5
**refresh**
109:2,2,3 249:8,23 270:18
284:23
**refusal**
272:16
**refuse**
48:3
**refused**
168:6
**refusing**
52:8
**regard**
60:15 84:16 85:10 130:12 131:8
227:24 264:14

**regarding**
52:11
**regardless**
55:13 175:4,4 243:20
**region**
112:13,20 281:10
**regions**
281:24
**registration**
12:15
**regular**
87:12 166:8
**regulatory**
191:12
**relate**
153:16 161:5 173:24 174:13
238:13 264:15 271:22
**related**
66:5 88:7 180:14 211:23 223:10
229:14 255:10 263:2 264:8,20
266:23 273:5 291:16
**relates**
171:16 172:1 175:24
**relating**
253:23
**relation**
246:25 271:13 273:10
**relationship**
120:3 203:14 211:16 214:14
215:4
**relationships**
142:13
**relative**
67:9 159:15 209:17 210:2,3,8
217:17 227:18 264:13 279:1
**relatively**
8:8 18:14 24:2 32:6 39:21
107:18 111:14 141:1,2 225:15
225:15
**released**
133:16
**relevant**
63:1 76:7 115:15 129:13 155:8
175:22
**relied**
114:2

**rely**
83:22 84:8
**remainder**
112:22
**Remediation**
177:19 179:14,15,16,20 180:1,5
180:24 181:21 228:16
**remember**
13:10 21:1 40:1 43:2 104:6
128:15 146:8,22 147:4 176:24
179:5 185:11,23 191:22 207:3
216:13 221:2 225:22 239:3,6
239:12 243:14 251:5 256:20
257:9 284:9 286:1
**remembered**
5:1 224:2
**remembering**
74:11 237:9
**remind**
265:25
**removed**
86:14
**renewal**
253:22
**renewed**
214:8
**rented**
103:12
**rep**
221:5
**repackaging**
283:24
**repeat**
43:1 231:9
**repeated**
35:2
**repeatedly**
24:14
**repeating**
105:22
**Repelling**
62:16,17
**replace**
214:10,11
**replaced**
202:8

**report**
61:10 63:4 110:4 113:18 114:7
  114:8,12,14,17 115:9,10 237:2
**reported**
1:19 112:9 291:8
**reporter**
5:4 6:7,21 49:24 50:2 199:22
  254:17 267:13 281:2,5 291:1,9
**reporting**
117:18,20 163:13,15,22
**reports**
28:5 31:18 115:22 215:11
**represent**
165:5
**representation**
207:19 219:3
**represented**
104:16 278:19
**representing**
6:20 104:18 183:15
**represents**
131:24 157:22
**request**
115:19 130:1 135:14 147:6
  152:16,24 153:3 291:12
**requested**
115:23 116:1 150:15 152:18
  153:8
**requesting**
153:1
**requests**
114:25 140:9 147:5,17
**require**
55:22 56:6,15 83:10 84:9 235:8
**required**
57:24 84:18 85:12 149:17
**requiring**
201:10
**reread**
176:16
**research**
101:15 197:13
**researched**
99:13 197:1
**reserved**
28:5 182:7

**reside**
137:3,7 197:25
**resident**
124:20
**resides**
131:18 135:24 136:5 137:14
  197:7
**residual**
109:12
**resolve**
49:2 145:16
**resolved**
141:25 143:23 145:2,9 149:15
  149:23 218:17 244:14
**resolving**
145:25
**resources**
288:5
**respect**
85:17 94:14 121:12 129:19
  139:21 201:6 208:11
**respective**
291:17
**responded**
116:2
**respondent**
201:10
**response**
19:9 67:20 114:24 144:6 200:15
  208:7,12 220:22 235:5
**responses**
3:13 135:5 206:10 208:1 232:21
**responsibilities**
79:4,9,10 80:9
**responsibility**
150:10
**responsible**
12:12 111:24 113:23 116:22
  152:12
**responsive**
115:24
**rest**
59:8 106:22 134:16
**restaurant**
105:4
**restraining**

150:3
**restricted**
108:17 109:15
**result**
44:5 69:14 86:15 87:19 90:5,23
  150:12 180:25
**resulted**
66:2 212:23
**resulting**
178:6
**results**
86:24,25 87:2,8,19 89:18 90:5
  91:10
**RESUMED**
108:4
**retain**
81:19
**retained**
61:4,5,6 64:22 105:13 163:8
**return**
68:3,7 212:11,14,16 213:1
**returned**
182:24
**returns**
252:6 253:8
**reveal**
14:25 19:7 20:8 23:10 24:9
  25:18 27:1 29:21 34:24 40:18
  41:4 46:21 53:7 54:6 62:12
  83:15,17 84:23 86:8 88:24
  114:21 139:11 153:19 170:4
  207:11 209:6
**revealing**
85:4 105:25
**revenue**
112:13,20,20,23 116:4,12 117:1
  163:16 180:25 251:16,17,18
  251:20 252:9,12 253:7 258:25
  266:15 288:3
**reverse**
230:19
**reverse-engineered**
167:16
**review**
12:14 42:7,17,23 46:10,11 65:4
  70:1 143:4,6 156:8 202:25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

210:23 249:2 264:12,19 271:1
284:22
**reviewed**
36:20 156:16 205:10,10 206:25
218:9 236:13,15 255:5,6 286:3
286:5
**revival**
221:10
**revive**
218:20
**revived**
218:21 220:5,24
**rewards**
182:7
**right**
8:1 14:8 24:11 26:9 28:15 30:24
33:19,22 35:14,18 45:22 53:23
54:13 55:8 74:10 77:7 78:24
85:23 108:9 109:9 110:9
113:22 126:19 127:20 137:21
137:25 140:7,24 163:6 168:15
182:7 184:23 185:11,15
187:15 188:8 192:12,14
198:24 199:18 204:6 206:15
207:4 216:13 218:25 222:18
226:19,25 233:24 234:25
235:21 249:17 251:1 259:2
269:25 272:16 273:21 279:25
283:5
**rights**
168:6 272:17 276:10,11,21
**rise**
174:24 283:12
**rises**
15:13,13 172:21 173:18 181:17
**risk**
58:7,7 248:4
**road**
45:12 230:23
**Rog**
135:5 139:22 208:11
**role**
62:6 78:25 100:25
**roles**
79:2 201:14
**roof**

110:1
**room**
59:8 106:22 204:3
**rose**
143:12 217:2
**rough**
109:4
**roughly**
109:19
**rounded**
222:13,14
**rounding**
222:10
**route**
39:10
**router**
39:7,8
**routers**
39:5 185:5 265:6
**routinely**
201:16
**routing**
185:2,2,5 212:2 263:4,5
**row**
209:8 273:19
**rows**
273:20
**royal**
247:24 250:21
**royalties**
243:16 244:24 245:3,22 249:6
257:25 258:19
**royalty**
50:7 51:5 58:22 59:3 247:4,19
247:24,25,25 250:2,17,22,25
251:10 252:25 255:6,23 256:5
256:14,19 257:10,12,12,14,16
257:19 258:10 259:12,14
260:11,24 261:6,12
**RPR-RMR-RDR-CRR-CCR...**
1:20
**Rule**
3:9,11 199:23 200:2 201:7,24
203:10
**rules**
35:3

**run**
11:15 12:10,11 38:18,21 134:23
164:25 195:8
**run-up**
11:3
**running**
35:9 38:20 123:2 124:11,12
151:21,22 152:20,21 260:11
260:24 261:6,11
**runs**
17:25 33:15 122:18 135:20,21
137:6 195:16

---

**S**

**s**
2:1 3:13 6:2 116:4
**salary**
108:14
**sale**
176:14 177:3 178:4,4 181:2,5
182:23 203:12 225:11 228:17
228:18 251:13,24 262:17
263:23 264:6,11,14 272:14
**saleable**
125:6
**sales**
110:25 111:3,11,12,13 112:5,6
112:7,9,10 113:1,14 114:6
115:5,7 116:4,12,18,19,20,21
117:21,22 118:21 142:13
157:23 176:12 177:1 186:5
187:1 197:3 203:12,13,14,15
203:15 228:22 245:4,4,6,11
246:25 247:3,10 252:7 256:4
264:12,15
**salespeople**
186:9
**salesperson**
186:9
**San**
1:3 2:10,16 6:11 12:4,6
**Saraf**
194:22
**saw**
62:18 63:4 204:7
**saying**

15:22 23:23 32:14 44:24 46:1
46:8 53:20 55:21 62:1 75:25
77:3,20 78:1 113:8 136:22
145:14 170:12 171:20 173:13
187:21 193:15 277:23 278:13
278:14 288:2
**says**
22:24 77:2 78:20,20,21,22
114:11 115:2,4 204:25 230:15
235:4 273:20,23 276:17,17
277:11
**scanning**
222:16 223:18
**scattered**
13:11
**scenario**
45:8 169:14 181:24
**scenarios**
169:14 256:1
**scenes**
51:20
**schedule**
165:2 222:1 250:19
**scheme**
151:16 191:12
**school**
9:11 11:14 23:18 191:10
**science**
11:20,22 12:1,3,4,7 17:5 21:18
21:19 36:7
**Sciences**
1:5 3:14 6:13,18 27:18,20 29:9
30:9 50:6 51:4 71:1,8 83:8
85:23 94:4,16 169:25
**scope**
94:5,11 96:5 100:19 115:20
116:2 140:14 144:13 154:20
207:19
**screen**
40:21
**screened**
28:25
**search**
57:14,15 101:19 286:13
**second**
3:11 72:21 200:1 202:10 203:10

213:12 233:5 238:6,6,7 243:12
246:22 252:5,14 260:8 270:4,5
272:11 273:16 277:11
**secrecy**
150:25
**secret**
167:4
**secretary**
9:2
**secrets**
70:3 143:15
**section**
107:7 154:18 218:10 272:17
273:14 286:9
**Secure**
221:14,15,20 222:3,11,12,14,24
224:3 225:23,24 227:1 231:23
**securities**
9:22
**security**
188:9 212:2 222:5,7,10 236:24
237:4,23,24 263:14 266:20
277:14
**see**
35:5,8,11 40:22 45:17 76:6
115:25 143:6 162:2 176:16
221:7 232:23 240:16 251:4,4
254:10 259:11 268:25 270:4,8
271:9 273:3,14,19 274:6,15
284:5 285:2,7,9
**seek**
168:12
**seeks**
59:22,22
**seen**
29:12,13 61:10 71:17 154:12,12
164:7 188:17 204:19 205:1,16
237:2 248:24 249:16 268:15
268:16,19 277:4
**select**
42:3 201:5
**selection**
118:17 119:15 131:15 210:25
**sell**
30:25 31:22 38:23 39:5,9 84:19
85:14 86:19 111:4 125:9,10,10

125:14 134:8 135:2 176:9,19
178:18 180:19 182:2 183:2,20
223:7 228:3 229:21 237:5
263:6,19,21,24
**seller**
159:7
**selling**
86:4 116:22 181:14 183:1 215:8
215:17 230:21 232:3
**sells**
32:1,18,20 34:15 86:10 230:10
230:22
**send**
181:12
**sense**
47:1 67:2 216:5 223:22,23
**sensitized**
283:9
**sent**
137:25 269:15
**sentence**
270:14 285:9
**separate**
208:14
**separately**
112:8 135:3 147:18 239:11
**separating**
76:5
**series**
11:16 197:17 213:8 214:17
227:5 230:10 242:8,8 243:14
**serious**
189:15
**served**
194:17
**server**
120:23 198:2 279:15
**servers**
131:19
**service**
229:4,22 252:11 265:7
**services**
203:15 210:4 251:14 253:2,20
253:21,25 254:6,7 255:3,8
266:18 270:3
**SESSION**

3:6 108:1
**set**
3:15 5:11 12:10,25 13:4,7,15
15:3 18:25 19:1 20:18 30:21
31:15 33:14 42:3 51:25 52:10
94:15 96:19 109:24 123:24
160:25 178:15 182:3 208:1
227:5 232:22 245:23,24
247:25 254:4,6 263:23,25
291:18
**sets**
250:25
**setting**
201:2 233:4
**settle**
173:8 244:7
**settled**
233:6 240:24 241:1
**settlement**
3:16 46:25 47:23,25 55:5 71:6
71:12,15 77:18 147:1 149:17
161:22 164:2 170:10 172:14
174:5 175:2,10 242:4 243:10
244:9,22 246:8,15 248:3,8,22
250:7,10 251:8 256:25 257:7
258:13,14,16
**settlements**
260:18
**settling**
169:24 170:6,13,18,19 172:6
**seven-hour**
288:25 289:12 290:3
**sexual**
142:11
**SG**
196:1
**SG5**
196:4
**SG5020**
195:25
**sham**
187:8 188:23
**share**
96:10 97:12,15 98:21 100:1
181:1,12 182:7
**shared**

97:17 99:5,22,24 100:14,15
**shareholder**
141:19
**shares**
109:6
**she'll**
200:4
**shifted**
10:9
**ship**
118:19
**shipped**
118:8 119:18 120:9,13 137:21
138:4 198:12 282:4 283:14
**shipping**
133:3 235:4,8 280:25 281:9,23
282:19
**short**
9:12 20:13 180:21 182:15
204:14
**shorthand**
5:4 291:9
**show**
35:9 199:19 284:13 285:25
**showed**
167:19
**shown**
199:17
**sic**
124:7 138:22 230:20 236:20
255:25 274:1
**side**
101:8 117:5 278:3 279:12,12
**sides**
255:25 256:2
**sign**
157:11,21 158:5 269:25
**signature**
158:11 269:1 270:1 272:11
273:3 275:14,15
**signatures**
275:16
**signed**
158:10,12,21 257:1 268:18,20
272:22 274:4,8 275:7
**significant**

30:20 146:7,22 190:18
**signing**
159:23
**similar**
10:22 19:24 144:8 165:5,6
167:2 168:2 221:9 222:4,23
260:15
**similarly**
49:7
**simple**
45:13 213:3,3
**simply**
37:25 47:4 68:9 182:23 217:17
266:14
**sincere**
136:23
**single**
138:7 151:14,15 158:7,16 244:9
252:13 257:12,13,14
**sit**
188:6
**site**
138:2
**sitting**
140:2 204:5
**situation**
54:23 91:23 145:8 171:9,14
177:10 184:4 217:14 261:5,10
**situations**
54:22
**six**
273:19
**skeptical**
24:3
**SKU**
125:11 126:24 134:6,7,8,9,21
135:1 197:17
**slightly**
184:14,15
**slip**
219:22
**slipped**
260:4
**small**
70:10 161:16 177:16 186:5
224:22,25,25 229:3,3

**smaller**
125:5 134:14
**smart**
44:13 45:11
**software**
120:19 121:5 122:25 123:16
    126:10 134:12 198:8,10
    251:13 252:10 253:2,22 255:1
    255:8 277:24 279:3,12,12,17
    279:18,18 280:5
**software-only**
134:22
**sold**
38:1 125:20 177:15 178:7
    179:24 185:7,9 198:7,8,10
    214:20,25 215:1 237:12
    262:21 266:22
**solicit**
15:7,9
**somebody**
96:22 106:13
**somewhat**
181:10 184:13 199:3 210:13
    211:25 216:12 217:24 264:1,2
    264:3
**SonicWALL**
97:9,17 98:15,20 99:4 100:1
**SonicWALLl**
98:7
**Sonsini**
9:8,10,15
**soon**
21:3
**sorry**
16:5 44:13,16 48:9 49:21 50:14
    50:24 64:16 72:14 103:14
    114:10 121:14 125:13 161:20
    187:19,20,25 204:5 220:9
    223:25 239:20,21 250:5
    252:16,17 254:2,20 255:21
    258:20 271:15,18 273:16
    281:4
**sort**
10:1,21 11:25 12:23 14:2,14
    17:9 18:20 21:25 23:14 24:12
    24:13 27:13,13 29:1 32:11

33:5,7,7,8,10 39:18 40:4 42:6
43:3 45:25 47:24 50:15 51:19
59:22 72:24 74:24 75:7,8
90:16 91:3 92:3,11 100:9
102:6 110:5,14 115:18 121:8
122:22 127:10,11,12,21,22
129:6 133:14 135:14 136:12
140:2 141:13 142:13 150:2,3,7
150:11 153:2 156:12 159:1
166:19 169:11 170:8 177:7
178:25 191:10 202:20 203:2
210:15 211:3 212:6 215:24,24
216:5 220:22 221:10 222:6,16
222:16,24 223:2,19 225:13
226:24 232:1,1 236:7 237:8,9
237:12,23 238:6,15,18 245:18
248:2 249:4,21 256:4 257:3
264:17 273:6 276:19 282:10
282:10 283:10,23,23 284:22
287:10
**sought**
235:2
**sounded**
167:2
**sounds**
168:22 169:10 207:14 260:14
260:15
**source**
116:14,16 121:12 122:2,7,8
124:6,16,19,21 128:9,11 129:7
129:22 131:10 132:4 136:4,10
136:11,11,15 137:2,2,22
148:16 150:10,14,18,23 151:4
151:9,11 152:7,8,21,24 153:9
197:6 213:13 225:14 277:12
277:22 278:8,11,14,20 279:3
280:18 286:21 288:6
**South**
112:11 113:17 114:17 115:8
119:24 120:1
**space**
178:17 180:14 188:9 211:25
212:2,2,8 216:12,21,23 222:5
225:4 228:13 231:8,17,20
236:24 237:4 263:14 266:20
**spaces**

223:11
**Spain**
214:5
**speak**
160:12 172:4 192:19 247:4
253:9 271:1
**speaking**
39:12 49:9,15 77:17 127:15
169:2 187:19 192:8 263:4
**special**
133:14 137:18 182:5,6
**specialist**
6:7
**specific**
10:14 25:24 26:12 37:24 42:5
42:16 46:6,7 66:15 68:7 73:16
74:16 88:7 99:22 112:4 113:11
115:9,19 116:17 132:11,14
134:25 159:1,10 176:13,23
184:9 185:4 197:8 198:9
216:22 247:19 254:8 259:19
265:24 266:8,9
**specifically**
10:7 37:20 50:16 112:21 114:6
114:11 115:2,4 116:6 123:8
142:1 174:13 182:6 212:20
236:19 253:14 264:17 266:24
283:10 287:9 288:13
**specifications**
254:1
**specifics**
221:7 266:20
**speculate**
34:16
**speculating**
35:8,19 46:3 145:13 160:13
**spell**
14:17
**spelled**
75:1
**spelling**
14:21
**spending**
51:15
**spent**
37:6 140:17 161:11 182:17

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**split**
10:5 279:19 280:14
**splitting**
9:20
**spoke**
194:7
**spoken**
82:15 123:20
**spot-checking**
282:7
**spot-testing**
282:11,12,17
**spread**
79:8
**sprint**
204:10
**sprung**
151:17
**stability**
191:11
**stable**
191:14
**staff**
15:8
**stage**
225:15,15
**stages**
259:21
**stand**
58:18 160:19 279:9 287:12
**standard**
15:6
**standing**
59:21
**standpoint**
68:16
**stands**
127:18
**start**
56:3 57:3 79:1 80:1 128:3
   152:22 153:12 218:13
**started**
9:19,19,25 11:10 13:8 95:1
   193:12
**starting**
208:16 213:11

**state**
5:4 7:6 12:5,5 242:10
**stated**
285:3
**statement**
55:25 56:1 78:13 175:16 207:15
   277:17 287:13
**statements**
72:5 74:1,3 134:19
**states**
1:1 111:1 113:13 118:9 120:8
   120:13 138:22 201:4 203:13
   216:17 251:21,25 269:9
**stayed**
233:8 240:11 246:1
**staying**
162:5
**stemmed**
70:10
**step**
19:6 158:25
**stepped**
214:8
**Stepping**
260:7
**Steve**
60:25
**Steven**
62:6 63:3 65:4
**stock**
108:17,23 109:15,18,21,25
**stolen**
167:8
**stop**
167:10,20 235:4,8 252:14,18
**stopped**
25:21 192:7 241:14 244:25
   259:2
**strange**
177:7
**strategic**
59:23
**strategies**
91:4
**strategy**
75:10 96:3 169:24

**straying**
50:10
**Street**
2:10,16 6:10
**strenuously**
127:10
**stretch**
206:23
**strongest**
81:8,10
**structure**
117:20,21 151:25
**structured**
13:16 155:24 181:2,5
**struggle**
68:13
**struggling**
50:14 51:22 57:10 59:10 159:9
   212:21
**studied**
36:7 112:24 191:20,21
**studies**
9:24 11:22
**study**
11:9 202:23
**stuff**
19:4 46:7 77:25 115:22 128:12
   129:9 133:24 134:17 196:17
   253:8 282:14
**sub**
92:2
**subcategory**
246:23
**subject**
113:19 135:4 139:21 156:13
   201:9 215:11
**subjects**
201:23
**sublicense**
233:23 234:18 235:3 241:1
**submitting**
284:9
**submodels**
197:9,9
**subscription**
252:11 253:22 255:2

subsection
134:14
subsequent
276:12
subsequently
69:12 177:15 178:22
subset
234:9
subsidiaries
7:23 8:6,12,15 193:2,3 251:21
  252:4
subsidiary
230:19 252:2 254:2
substance
99:9,14 100:7,14
substant
272:6,7
substantial
37:14 92:2,3,6 117:16 253:19
substantially
28:3 280:23 281:7,21 287:2
substantive
51:17 92:2 143:12 157:5 207:18
  270:23,24 272:7
substantively
249:1,19
suburb
117:13 120:21
success
13:20,24
successes
82:4
successful
13:18,22,23 111:5,9,10,17
sue
70:21 166:4 168:7 244:12
sued
42:20 43:10,16 46:15 47:4,17
  69:13 85:23 88:5 165:20
  168:14 175:12,18 176:4,6
  178:9 179:9 240:5,8
sufficiency
270:16
sufficient
203:1
suggest

72:12,13,14 73:19 99:19 247:18
suggested
106:10
suggestion
74:14 106:18
suggests
238:14
suing
70:14 165:25 179:17
suit
24:17 46:17 65:24 69:15 100:8
  141:20,24 144:17,24 166:12
  166:13 167:20,24,25 180:5
  275:24
suitable
253:18
suits
81:8,10 168:16
SULLIVAN
2:9,15
sum
173:17 270:11
Sunnyvale
138:11,25 277:14 278:2,5,12
  279:8,14,16,19,24 280:3,5,11
  280:13,13,19 281:11,15
  282:21,25 283:5,21 286:22
  287:4,23 288:10,13
supervise
30:1 79:12 82:10
supervised
92:20
supervising
30:6 82:14
supplement
286:15
supplemental
4:2 201:1 284:9,14
support
3:23 4:2 84:8 213:14,20,21,23
  213:24 214:3,6,7,9 259:22
  277:1 278:24 280:16 284:14
supporting
31:17
supports
75:5

suppose
13:21
supposed
202:4
sure
8:7,10 16:12 22:18 24:21,23
  31:7 32:16 34:19 38:8 47:1
  49:10 52:16 65:2 66:11 70:16
  81:9,15 98:19 100:12 102:25
  105:11 106:9 112:23 115:14
  118:1 125:4 142:14 147:3,4,7
  152:6 155:4,12 159:20 164:15
  166:2,7,25,25 167:21,22
  168:21,22,24 175:21 181:17
  187:12 192:9 195:11 206:17
  209:12 215:3 216:16 237:6
  248:17 258:6 263:15 268:21
  275:10 278:13 282:18
surprise
192:3
surprised
87:14 102:13 186:24 189:4,24
  223:17
survived
91:19 94:20
surviving
91:23
suspect
44:3 272:2 276:2
swap
214:10
swear
6:22
switch
40:3 265:7
switching
40:10 271:17
sworn
5:10 6:23 7:2 291:3
system
35:9 121:1,5,13 122:5,18 123:2
  123:7 124:1,5,11,14,19,19,20
  125:6 128:24 129:2 131:16,17
  131:19 132:2,9,10,11,15,24
  135:18,20 136:10 137:3,16,23
  150:19,21 152:20 191:16

194:2,7,9 195:5,9,14,16,18
  228:3 230:24
**systems**
25:24 26:13 122:17,20 123:14
  123:17 132:20 222:21,21
  223:2,5,7 224:6,12,13,16
  227:7 230:8,10,13,18,21,23
  231:1,24 253:11 254:23

**T**
**table**
227:20 228:6,9 231:6,6,14,15
  232:5,20,23 233:1 240:17
  250:17,25
**tables**
208:13,14,15
**tail**
235:1
**Taiwan**
118:19 119:1,2,4,9,10 120:10
  120:17 137:25 283:2 288:21
**take**
11:12 12:17 19:2,3,5 29:4 43:25
  45:6 46:16 47:11 48:15 50:21
  52:4,16 83:21 84:18 85:12
  94:24 100:18 102:3 107:11,12
  107:20 108:19 116:1 147:22
  168:6 173:25,25 200:24
  205:20,21 208:16 214:14
  232:9 248:9 260:10 267:8
  280:21 281:2
**taken**
2:14 6:10 40:12 41:7,15 42:2,3
  42:9,18 43:8,15 45:24 47:7
  52:20 54:21 55:4 83:2 162:13
  167:13,15,16 191:6 205:25
  232:14 261:21 289:16 291:6
**takes**
260:9
**talk**
159:3 198:25 199:13 221:6
  283:18 287:18 289:10
**talked**
211:24 226:17 228:24
**talking**
23:24 25:6 37:16 58:21 75:22

109:6 118:3 121:10 123:6
  125:18,19 126:14 129:6 134:9
  135:9 137:13 159:4 282:1
**talks**
259:11
**TalkSwitch**
227:25,25 228:1,2 231:24
**tangential**
222:24
**tangentially**
222:9
**tape**
82:22 162:8 232:6,6
**tapes**
290:6
**tasked**
114:25 115:21 162:4
**tax**
189:9
**taxes**
252:7,7,8
**team**
116:21 117:21,22 123:7,9,18,19
  123:21 133:22 135:17 151:11
  205:13 280:10,12
**tech**
79:23
**techie**
36:9,10
**technical**
82:21 128:4 220:22 269:20
  271:3 273:6 274:14
**technicalities**
274:17
**technically**
187:16 188:13,15,16
**technologies**
226:19
**technology**
52:25 79:23,23 81:4,5,12
  174:21 184:24 211:22 213:13
  214:1 216:8,13,18 217:8,16
  224:16 225:3,5,9,14 226:1,5,6
  226:14 227:25 228:10 229:1,2
  229:10,12 230:9 233:19
  236:21 238:2,11,13 239:15

262:20 263:1,5 264:8 266:23
**telephone**
228:3
**tell**
49:22 58:9 74:6,7 159:11
  199:15 216:8 239:23 280:15
  286:20 287:1,14
**telling**
58:14
**ten**
7:14 16:8,10,10 80:24 118:18
**tenure**
80:13 191:3 193:15
**term**
14:8,9 16:4 17:1 25:8 32:11
  39:20 41:24 121:8 122:21
  124:12 127:12 129:6,10
  130:21,25,25 132:19 160:22
  211:11 234:24
**terminate**
241:21
**terminated**
237:18 242:12,18
**terms**
16:24 21:13,16 27:8 30:21
  31:12 32:7 60:6 109:7 126:1
  127:15 150:25
**testified**
5:10 7:2 35:13
**testify**
50:17 201:25 203:1 291:3
**testimony**
27:4,6,25 28:9,16 45:22 58:13
  128:5,14 291:8
**testing**
280:24 281:7,21 282:17 283:23
  287:10
**Texas**
74:2,19 96:15 238:5 239:4
  280:16 284:4,7 285:6,17
  286:20 287:1
**thank**
50:3 53:24 108:21 136:19,23,25
  158:2 271:19
**Thanks**
267:5

**theft**
143:15
**theoretically**
169:11
**thesis**
10:16,18,20,22 202:5
**thin**
79:8
**thing**
75:21 209:19 220:10
**things**
35:8 90:12 120:5 121:18,20
129:11 135:11 138:16 150:9
175:1 200:11 237:9 271:2
**think**
8:8 11:24 12:22,25 14:7 15:20
15:22 16:25,25 17:10 18:17
19:12,13,18,23,25 20:10,21
21:12,23,24 23:4,7 24:4,11
25:2,4,9 26:6,7 27:2,2,3,7,25
28:6,15,19,24 31:6,13,15 32:5
33:6,21 34:12 35:2,16,25
36:12 42:5,6 43:19,25 44:11
44:12,14 45:12,14,23 47:1,2
47:20,22 48:1,3,4,20,23 51:6,7
51:8 52:1,5,5 54:10 55:3,4,12
56:12,13,25 57:11 58:3,7,10
58:22 59:14,18,20,21 60:1,4
62:4 67:18 68:23 71:9,10,22
73:18,25 74:5,9,13,14,18,18
75:1,6,11,12 78:7,15,24 79:23
85:15 86:23 88:2,8,24 89:1,2
90:11 91:5,5 92:3 93:17 94:22
95:13,21,24 96:6,7 99:8,20
100:6,13,15 101:14 106:1,3,17
106:19 107:11 108:9,12,14
109:11,13 110:4,5,19 111:8,19
111:22 112:1,7,20 113:4,18,20
113:24 114:4,5,7,11,12 115:1
115:3,24 116:17 117:18
119:21 120:1,25 121:25
122:10 123:9,10,16,21 124:12
124:15,22 126:5 127:5,10,13
127:14,20 131:2 133:19 134:7
134:8,18,21 135:1,3,4,5,9
139:5 140:7 141:16 142:7,24

142:24 143:2,11,19,20 144:1,8
144:13,14,16,17,19,23 145:11
145:17,18,18 146:6,18 147:6
148:13 150:1 152:19,25 153:2
153:22 155:22,23,24 156:3,21
157:8,17,25 158:17 160:22
161:25 162:7,25 164:6,25
166:11,19,20 167:3,22 168:3
169:4 170:5,6,7 171:9 172:11
172:13,15 173:4,4,13,17,22
174:18 175:1,4,7,9,15 176:5
177:1,5,22 179:2,3,12 182:16
182:24 184:14 185:17 186:8
186:18 187:22 188:4,25
189:10,16 190:20 191:13
192:14 193:1 194:10,14
195:12 196:2 197:16,19 199:3
199:6,9,10 204:20 205:15
207:5,16,18 211:11,16,24
212:4 214:16,18 215:10 218:1
218:21 219:10,10,12,13,15,22
219:24 220:13 221:22,24
222:7,9,11,12,15 223:13 224:4
224:15,24 226:23,25 227:9
228:11,23 229:22,24 231:19
231:25 234:7 235:9,17 236:5
236:25 237:1,3,6,7,7,11
238:17,23 239:5,7,24 240:10
241:5,9 242:17 248:17 255:14
255:14,18,24 256:2 257:19,21
258:4,6 259:21 266:9,13 270:2
270:22 274:12 275:1,6 276:1
276:17 277:18 278:6,18,22
279:6,7,11,13 280:2 282:8,9
283:2 286:20,25,25 287:6
288:23
**thinking**
23:25 45:11 47:25 51:20 59:23
75:9,9 80:6 85:6 130:4 141:14
141:14 143:21 156:15 157:7
161:11 170:9 247:5 249:1,9
**third**
3:15 40:13 41:16 42:19 43:9,16
54:20 55:23 56:6 65:21 76:20
162:21 168:5 178:9 180:24
208:1 213:13 232:21 252:3

270:5
**third-party**
57:6,23 165:16 167:14
**thought**
12:20,23 47:19,23 48:21 50:16
50:22,23 51:25 58:23 59:12
100:11 102:8 113:6,8 136:6
178:11 210:25 248:15
**thousand**
109:5 146:11,12,19
**thousands**
109:22 128:15
**threat**
127:18,25 223:7 256:11
**three**
37:11 77:20 109:15 142:9 149:2
184:10 194:14 208:13,14
213:8,16 215:2,23,25 262:2
**threshold**
13:20,24 283:12
**thrown**
27:8
**tight**
277:13
**time**
6:11 9:11,13,16,21 10:5,20
13:17 19:3,5 20:10 21:20
23:19 24:3 25:3,22 26:8 27:14
29:4 37:6,14 51:16 52:19,22
54:24,25 55:1 67:13 68:23
72:21 76:4,5 82:24 83:4 87:16
97:4 103:6 105:5,8 106:7
107:23 108:3 110:10 115:17
120:4 137:17 138:14,16
140:16,18 141:3,20 145:14,20
153:3,23 161:11 162:10,15
177:13 178:21 179:6 180:1,3,9
182:17 189:12,18 190:25
191:10,19 192:7,8 199:3
200:24 203:23 205:24 206:2
208:25 209:15,18,18 210:19
217:1 219:1,15 221:7 224:15
232:12,17 233:9 234:13,21
235:18 236:8 237:7,11,14
240:6 244:24 246:2 248:11,24
249:16,19 251:3 252:13

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

254:18 256:18 257:4 258:15
261:15,15,20,23 262:11
265:13,14 275:21 276:21
278:22 285:21,22 289:15,18
290:7 291:6
**times**
12:20 36:24 37:3 64:2 105:23
124:22 143:6 215:23,25
224:10 261:24 262:2
**timing**
10:3 164:16 209:12 243:2
275:21 276:5
**title**
3:21 8:20,22,24,25 11:24 74:21
74:22 265:8 268:2 269:6
**titled**
258:24 265:1
**titles**
263:3 265:3,7,10
**today**
25:21 27:5 36:17 41:5 53:4,11
70:1 86:12 118:13 192:19
197:14 207:1 235:19 277:23
279:2 283:19 287:24
**today's**
110:3
**Todd**
1:14 3:3,22 4:2 5:7 6:10 7:1,7
83:1,6 156:21 162:12,17
232:13,17 277:1 284:14 290:6
291:2
**told**
21:12 35:7 36:3 41:22 74:18
101:13 190:8 193:12 206:12
247:7,8 285:15
**top**
115:18 124:2 174:19 184:23
185:12 199:18 206:18 208:17
262:19
**topic**
10:14 25:20 36:16 168:25
175:23 191:18 200:10,13,13
200:14,16,17,18,21,22,23,25
201:13 202:7,7,9,13,23 203:5
**topics**
19:1,3 39:17,19 42:23 50:11

51:25 52:2 59:12 102:9 175:23
192:19 193:5 198:25 199:2,2,6
199:19 200:9 201:18 202:16
203:11,11,17,19
**topology**
35:12 36:17
**total**
110:4,5,7 244:17,20
**totally**
132:7 186:11
**touch**
120:8
**town**
119:2
**track**
147:19 162:6 259:6
**trade**
70:3 143:15 167:4 177:18
215:24,25
**traded**
178:1,14,25,25 179:7,7 182:1
**Trademark**
93:11,22 269:10
**Traditionally**
118:1
**train**
145:22
**trained**
11:21
**training**
12:2,7
**traits**
173:18
**tran**
220:13
**trans**
16:3
**transaction**
146:25 155:12 156:21 157:5,6
157:24 159:12,14 177:8,14,18
178:23,25 181:19 208:18
209:21 211:21 213:12,20
215:25 217:21 219:18,19,21
220:13,14 221:4 222:20
225:20 230:13 252:1 275:2
**transactional**

156:16
**transactions**
155:10 160:11 178:15 213:3,9
213:16 214:18 215:2 227:20
**transcribed**
291:10
**transcript**
108:20
**transfer**
3:23 4:3 179:21 218:8 272:8,13
276:10,11 277:2 280:16
284:15 286:6
**transferred**
177:24 179:4,8,10,19 271:23
272:25 273:11 275:20,22
**transparency**
25:10 32:9,10
**transparent**
15:16 16:1,6,9,15,22,24 17:1,6
18:10 20:5,16,22 21:10,24
23:8 24:5 26:3,21 27:19 28:9
30:11 31:1,22 32:15,24 33:6,8
34:19 37:20 40:14 41:17,21
112:2 115:2 211:5,10,15
**travel**
102:17
**traversed**
35:16
**tree**
122:2,2,7,8 123:23 124:7,16,21
129:7,22 131:11 136:11,15
137:2 197:6
**treed**
124:7
**Trend**
61:20 62:7,13 63:13 144:17
148:11 166:12 233:5,17,21,25
234:7,21,22 236:3,11,21,23
237:1,2,21,25 239:23 240:2,5
240:16,24 241:15,17,21
242:12,22 243:3,20 244:1,18
246:8,18 247:8,13,18 253:1
255:7 256:14,20 257:9,13,16
257:21 259:21 260:20,23
282:8 283:9
**trends**

247:5
**trial**
58:10 83:22 84:8 262:3,5
**triangular**
230:20
**trick**
207:4
**trickle**
171:24
**tricky**
18:21 23:12 90:15 233:3
**tried**
202:15,15 233:24
**tries**
176:6
**trigger**
136:13
**trip**
104:5
**trouble**
85:19 127:22 287:22
**true**
13:4 62:1 94:3 98:19 119:24
    137:12 138:13 209:20 220:10
    227:19 252:25 277:7,17,18,20
    277:20,21 280:22 281:20,25
    285:19 291:7
**trust**
273:4
**truth**
74:24 291:3,4,4
**try**
107:1 161:12 163:11,19 176:23
    198:18 204:3 207:2 225:18
    244:15 287:19,20
**trying**
17:15 19:4,22 22:4 23:13,13
    28:2,24 43:2 44:14 51:16,19
    51:24 58:24 90:10 95:1 107:17
    107:17 113:7 128:19 130:14
    132:21 142:23 144:14 157:15
    174:5,25 175:6,8 181:24
    182:19 206:24 207:4 208:23
    219:10,12 243:21 251:5
**turn**
192:8 215:21 232:19 254:12

258:17 268:16 284:6 285:19
**turned**
183:7
**Turning**
286:18
**Tuttle**
266:25 267:5,7,16 271:16,24
    272:3,8,13,25 273:11 275:5,23
**twice**
240:17
**two**
64:9 69:18 71:9 77:20 104:8
    109:12,14,15 120:25 138:21
    149:1 152:24 176:25 178:1,14
    178:24,24 179:9 184:7,10
    199:9,17 208:14,14 210:1
    213:5,6 224:24 225:22,23
    227:10 228:22,24 241:14
    250:23 264:11,15 286:3,10,12
    286:16,16
**two-minute**
204:9
**type**
270:23
**types**
172:19
**typewriting**
291:11

---

**U**

**U.S**
103:10,12 111:2 112:19,19,20
    114:6 115:5 118:24 119:11,16
    119:18,23 120:12 138:5,7
    190:10 218:3,4 245:11,11
    251:16,18 252:12 258:25
    267:19 268:14 269:18 271:2
    273:8 274:15 282:15,18,23
    283:15,15,16
**ultimate**
267:9
**ultimately**
118:22 177:20,23 178:5 212:6
    213:7
**unable**
20:19 52:9 286:17

**unattainable**
160:25
**unaware**
88:4 167:15
**unclear**
54:24 126:25 157:10
**undefined**
39:21
**undergrad**
11:23
**undergraduate**
11:21
**underlying**
35:12
**underneath**
268:25
**understand**
8:13 19:4,20 31:12 41:23 55:18
    75:24 99:18 100:19 113:10
    117:7 137:1 151:2 155:3,4
    160:5 162:1,2 166:6 180:4
    187:12,12 191:6 192:10 197:6
    197:7 205:15 221:7 241:16
    258:7 261:4 271:6 274:16
    283:14,22 287:19
**understanding**
16:17 17:2 21:5 40:3 123:20
    145:5 151:18,21 160:8 173:7
    180:3,8,13 194:20 197:5
    202:21 266:18 267:9
**understood**
130:1
**unenforceable**
202:8
**unethical**
70:12,13,17,20,21
**unfair**
70:4 143:21 166:14
**unhappy**
174:22
**unified**
127:18 223:7
**unintentional**
219:20
**unintentionally**
218:18 219:2 220:1,5,19

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**unique**
11:1 177:10 210:13 211:3,3
   217:13
**unit**
125:6 256:4
**United**
1:1 111:1 113:13 118:9 120:8
   120:13 138:22 203:13 216:17
   251:21,25 269:9
**University**
11:11 12:5,6
**unknown**
201:15
**unnamed**
183:16
**unrelated**
179:12,13 182:3
**unsolicited**
215:19
**unstructured**
13:14
**unsuccessful**
212:6 225:7,8,17,19
**up-front**
257:22
**up-to-date**
140:4
**update**
152:13
**updating**
140:9 152:10
**upset**
172:16
**URQUHART**
2:9,15
**use**
16:23 36:1 50:19 59:8 122:21
   123:11 161:14 251:23 252:7
   253:17,19 255:12 265:23
**useful**
201:13
**user**
33:3 34:20 152:5,15
**usually**
140:12 141:21 147:15 156:9
**UT**

216:24 269:18
**UTM**
127:18 128:23 129:18,20
   130:12,17,17,20 131:6,8
   132:15 196:24 235:24 236:3,5
   236:6,6 264:15 265:1
**UTMs**
127:17
**UTStarcom**
209:20,20 210:22 213:4 216:9
   216:11,24 217:7 228:19
   231:23

---

**V**

**vague**
27:7
**valid**
49:14 50:5 51:3 53:10,16 55:15
   59:4 60:18 233:1,11
**validity**
49:17 55:6 87:24 88:20 89:3,10
   89:16 90:4,22 97:13 206:14
   207:17 241:6,7,13,22,22
   242:13 243:18,21
**Valley**
160:24
**valuable**
91:19,25 94:20 270:11
**valuation**
10:25 11:2,4 67:2
**valuations**
10:24
**value**
10:24,24 67:9,11,17,19,23,24
   68:15,23,25 81:6 91:11 92:14
   109:7 110:3,5,7 153:16 155:1
   155:9,20,24 156:1,4,5 158:4,5
   158:21 159:4,8,12,15,16,18
   160:7,8 210:16,17 271:13,23
   272:24 273:10
**value-added**
252:7
**Vancouver**
117:13,13 120:20,21 123:8,21
   124:21 131:20 132:2,23
   133:22 135:24 136:5 137:4

187:23 189:16,18 194:9
   195:18 197:7 198:1,3 277:15
   278:10 279:15 288:12
**Vancouver/Burnaby**
137:23
**variable**
160:24 244:24 245:3,22 247:25
**variably**
132:13
**variant**
123:11 194:4
**varies**
108:25
**variety**
79:9 81:15 151:9
**various**
25:11 27:9 29:13 35:8 38:8 70:4
   74:2 82:17 111:4 114:25
   118:13 147:5 151:22 152:6
   164:21 165:23 186:10 202:23
   208:13 244:14 256:1
**vary**
164:17
**vast**
133:10
**vastly**
19:20 20:23 21:10 24:6 25:3,6,7
   26:21
**venue**
3:23 4:3 277:2 284:15 286:6
**verified**
74:1
**Verilog**
279:4
**version**
20:13 129:21 131:10 137:13
   150:21 195:11,11
**versions**
136:13
**versus**
6:13 44:8,21 47:13 48:17
   260:11
**vest**
109:1
**vested**
110:9

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**vesting**
109:14,16 110:15
**vests**
109:3
**videographer**
2:13 6:4,8,21,24 48:9 50:1
52:18,21 82:23 83:3 107:22
108:2 162:9,14 205:23 206:1
232:11,15 261:19,22 289:2,14
289:17,21 290:5
**videotape**
82:25 83:5 162:11,16 232:13,16
**view**
225:2
**violated**
240:19
**violation**
35:3 148:1 200:25
**violations**
148:6,19
**Virginia**
190:21
**virtual**
134:10,11 195:10,11 197:19,24
198:6,14 263:5 265:6
**virus**
253:11,20 254:8
**viruses**
253:24
**VM**
134:22 198:21
**VoIP**
228:3
**voluminous**
30:16
**VP**
8:20
**vs**
1:7
**Vu**
18:13 19:12,13 20:5,18,24
21:11 23:7 88:4,6
**Vu's**
26:4,22
**vulnerability**
222:16

---

**W**

**wading**
43:3
**waiting**
198:24
**waive**
83:19,25 84:1 99:17
**waiver**
99:19
**walk**
239:25
**WAN**
223:10
**want**
18:3,19,19,19 24:16 40:20 59:1
59:10 67:24 76:14 78:3,22
99:15,24 100:22 107:5 116:9
121:9 122:22 141:15 168:22
169:4 176:12,23 187:4 192:9
203:6,22,22 206:6 241:10
248:16 252:17,18 253:4,9
254:12,18 258:5,23 259:2,8
261:18 265:23 274:24 276:4
276:18 284:21 285:12
**wanted**
12:23 141:5 206:9 244:1 249:8
249:23 256:15 262:8,13,16
**warehouse**
119:23
**wasn't**
21:19 42:19 43:10 46:5 69:25
74:20,21 92:10 95:16 149:12
149:19 150:6 178:4 180:8
182:22 184:6 189:12,17
217:12,13 220:18 229:6 276:7
**watch**
262:6
**WatchGuard**
97:7,17 98:7,16,21 99:4 100:1
104:15,16 105:1
**way**
19:18 35:22 49:24 51:7 57:20
58:23 71:25 73:8,10 75:4 79:3
79:24 80:14 86:3 89:18 90:5
90:21,23 92:5 93:18 95:2
96:25 101:5 103:3 119:23

---

123:3 134:2 152:2 155:24
156:3 166:24 216:7 217:11
222:23,24 224:17 240:20
242:20 249:6 254:5 255:24
271:22 288:1
**ways**
45:12
**we'll**
18:18 50:21 131:15 147:21
162:2 185:14 232:6,8 233:17
**we're**
21:14 25:6 28:2 75:21 78:16
94:22 95:21 125:18,19 128:4
129:6 131:22 135:9 143:21
159:4,6 163:13,18 164:20
170:8 176:1,1 190:21 191:17
205:19 212:25 215:16 227:8
232:6,12 249:3,4,6 256:24
271:15 275:1 282:1 285:23
288:25 289:2,4,12
**we've**
18:9 42:14 43:5 49:22 52:1 55:1
55:4 88:2,2 102:10,10,11
112:1,5,7,14 115:24,24 129:7
135:4 137:13 142:25 144:21
152:23 153:2 158:18 165:24
167:3 174:4 175:1,9 176:12
219:12 226:17 228:11,16,23
231:18 260:16 261:15,15
**wearing**
31:10
**Web**
269:19
**Wednesday**
1:15 5:2
**weeks**
140:25
**welcome**
107:4 203:23
**went**
47:24 92:16 96:23 103:9 118:11
123:23 152:25 288:11,11,13
**weren't**
63:12 70:15 217:13 264:4
**WHEREOF**
291:18

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**whistle-blower**
142:5,6
**white**
178:17
**WhiteCell**
177:8,22 180:16 215:24 224:1
  224:19,20,21,22,24 225:3,5,8
  225:25 231:24
**wholly-owned**
179:11
**whoops**
230:15 254:16
**wide**
130:6,6
**wide-ranging**
201:18
**wife**
11:14 36:5
**Wilford**
71:3
**willcooper@quinnemanuel.c...**
2:11
**willfulness**
84:17 85:11,18
**William**
2:9 201:3
**willing**
52:12 263:24
**Wilson**
9:8,10,14
**Wily**
62:16,17
**winnow**
28:3
**wireless**
194:21 216:14
**withdraw**
87:8
**within-entitled**
291:5
**witness**
5:9 6:22,23 14:25 15:2,5 18:23
  19:7,11 20:7,10 23:10,12 24:9
  24:11 25:18,19 26:6,25 27:2
  27:23 28:15,17 29:11,12,21,23
  30:5,15 31:4 32:1,10 33:2

34:23 35:7 36:23 37:2,10,24
38:17 40:17 41:1,3,6,19 42:13
42:22 43:11,19 44:11,23 45:2
45:14 46:20,23 47:17 48:20
50:10,22 51:6 53:6,9,14,19
54:5,7 55:11 56:18,20 57:10
57:19 58:3,18 59:7 60:10
61:10 62:11,13,25 63:9,25
64:6,9,13,15,24 65:1,1,3,8
66:19,25 67:6,13,16,21 68:7
68:21 69:8 72:3,19,21,23 73:3
73:9 75:20 76:14 77:15 83:14
84:3,4,11,14,22 85:6,15 86:7
86:10,17,23 87:12,22 88:2,13
89:1,13,22 90:8,14 91:1,14
93:14 94:1,8 95:13,21 96:14
97:22 98:10,19,24 99:2,8
100:4,6,24 101:4,10 102:20
105:11,21 106:4,6,17,21,25
107:10,16,21 114:20,23
139:10,12,17,20 141:13 142:3
142:22 143:18 146:4 147:14
148:4,9,22 149:11 153:18,20
170:3,5,17,25 171:7,20 172:4
173:12 174:4,18 175:15,21
176:21 182:13 183:12 185:2
200:8 202:4,10 204:11,14
207:10,13 209:5,7,25 210:13
211:9,19 217:11 226:11,23
227:23 231:18 232:7 234:5
240:5,23 242:4,17 247:13,23
250:16,19 256:24 257:19
258:4 260:14 261:10 262:8,9
263:10 265:18 281:4,6 289:5
289:11,23,25 291:18
**witness's**
291:7
**witnesses**
201:12,14
**word**
77:5,20 90:9,9 238:18 259:4
**word-checking**
238:15
**WordCheck**
238:3,14,21,22
**words**

71:22 77:6,7 129:16
**work**
7:9 19:20,21 20:23 21:11 24:18
  24:19,19 26:12,15 27:10,11
  28:25 34:6 35:18 36:1 57:23
  58:11 59:17 75:21,22 79:10,18
  79:19,21 82:20 88:15 91:3
  95:7 98:6,10 152:1 186:10
  204:3
**work's**
28:19
**worked**
39:3 51:18
**working**
9:20 21:21 23:18 25:21 82:13
  101:23,24 123:22 133:20
  157:20,20 162:5 285:25
**world**
118:5 187:24 189:23
**WorldCheck**
236:20 238:2
**worldwide**
116:19 139:14
**worried**
154:15
**worth**
67:7 108:24 109:19 155:16
**wouldn't**
63:9,10 99:15,19,23 110:10
  116:9 117:5 136:17 139:1
  223:17
**Woven**
222:21,21 223:2,5,7 224:6,12
  224:13,16 227:7 231:24
**write**
10:15,15 214:6
**writing**
147:18,23 184:6 266:4
**written**
32:4 62:15 77:2 214:4,6
**wrong**
271:19
**wrote**
279:9 284:2 285:2

---

**X**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 350

**X**
3:1 291:12
**XDN**
229:12,13,14,19,21,23,23,25
230:4 231:25
**Xie**
110:23 128:7 172:17 173:16
**Xie's**
110:16 173:8

---
**Y**
---

**Yale**
10:11,14
**yeah**
13:6 14:10 33:22,22 95:7
126:16 136:1 163:2 164:15
187:16 198:4 204:7 219:15
250:16 254:14,14 265:3 273:5
279:11
**year**
25:3 103:7 140:15 164:9,12,17
164:20 165:1 179:5 242:25
266:13
**years**
7:14,14,14 8:5 10:1 11:17 14:16
14:18 26:9,10 37:11 70:9
82:17 112:14 115:16 137:11
142:7 182:15 184:10 206:23
235:15 236:15 237:13 238:5
245:20,22
**yesterday**
107:14
**York**
2:5,5

---
**Z**
---

---
**0**
---

**0050942**
267:20
**0050955**
268:16 269:7 270:6 271:22
274:6
**053074**
204:1 205:1

---
**1**
---

**1**
82:25 200:10 228:6,8 231:6,14
268:11 272:17
**1:44**
107:24 108:1,3
**10**
203:12,13
**10:06**
5:3 6:1,12
**10119**
2:5
**108**
3:6
**11**
3:15 7:14
**11:09**
52:19
**11:21**
52:22
**12**
7:14
**12:06**
82:24
**12:12**
83:4
**12:45**
107:5,23,24
**13**
26:9
**14**
26:8,9
**149316-63**
3:17
**149340**
250:17 251:17 258:18,21
**149345**
254:15
**149971-85**
3:19
**149972**
272:15
**15**
3:19 217:20 250:13 251:17
**16**
3:21 26:10
**161**

203:25
**168**
3:9 199:22,24 200:9
**169**
3:11 200:1,6 203:9
**17**
266:7
**170**
3:13 207:24,25 208:3,5 232:23
262:13
**171**
3:16 246:7,10,12 250:7
**172**
3:18 267:13,15,17,25 272:20,21
273:25 275:12 276:14
**173**
3:20 267:19,22 268:12,13
271:12 272:23 273:10,13,16
274:3
**174**
3:22 276:22,25 285:13 286:19
**175**
4:2 284:13,17,20 285:1 286:5
**19**
29:2 268:1,11 274:2,20 275:18
**1963**
7:11
**1983**
21:21
**199**
3:10
**1994**
22:25 24:7 25:13
**1997**
25:21
**19th**
274:11 275:8,25

---
**2**
---

**2**
3:24 4:4 83:5 162:11 185:17
203:10 227:20 231:6,15
246:19 273:13,15 286:4
**2.5**
251:2
**2.8**

254:25
**200**
3:12
**200,000**
181:6 182:19
**2000**
10:4 235:14 250:14
**2000s**
143:20
**2001**
10:4
**2002**
235:24
**2003**
240:8
**2004**
240:8
**2005**
193:13 240:12,13
**2005/2006**
190:25
**2006**
153:3 192:7 209:9 213:20 233:6
241:2,17 243:8 244:21 248:7
250:7,10,10 253:1 255:7
256:25 257:1,25
**2009**
112:15 242:11
**2010**
209:10 242:5
**2011**
241:20 242:1,21,23,24 246:15
268:1,11,22 274:2,5,7,9,11
275:8,18,25
**2012**
243:1 266:7
**2013**
1:15 5:2 6:1,9 291:19
**208**
3:15
**21**
22:25 209:24,25 242:23
**212)613-2013**
2:6
**21st**
25:13

**22nd**
2:10,16
**23**
201:1
**24**
244:23 274:5,7,9
**240**
108:14
**246**
3:17
**24th**
268:22 269:2,4
**26**
1:15 5:2 6:1
**267**
3:19,21
**26th**
6:8
**27**
250:10
**276**
3:24
**27th**
233:6 241:2 257:1
**28**
229:1
**284**
4:4
**28th**
291:19

---

**3**

**3**
162:16 200:9 232:5,13,20
237:15 240:17 284:19,25
**3.0**
254:25
**3:01**
162:10
**3:12-CV-01106-WHA**
1:7
**3:19**
162:15
**30(b)(6)**
1:13 3:9,11 18:23 31:6 39:16
42:22 59:11 102:9 168:25

175:23 191:18 192:18,22
198:25 199:23 200:2 201:7,17
201:24 202:22 203:10 208:8
**300,000**
110:11
**37**
200:20
**37th**
2:5

---

**4**

**4**
200:19 232:17 246:23 268:23
277:10,11 279:10
**4:22**
205:24
**4:53**
206:2
**415)986-5700**
2:11,17
**48**
3:17

---

**5**

**5**
200:14,19 276:14
**5,623,600**
244:19
**5:39**
232:12
**5:51**
232:18
**50**
2:10,16 6:10
**50,000**
109:5
**5000**
126:23,24 197:16
**5020**
196:5
**50958**
267:21
**53-58**
3:21

---

**6**

**6**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

3:12 200:19 208:17 213:20
262:14,18
**6:41**
261:20
**6:52**
261:23
**60**
108:16
**600**
233:21 241:23 242:14 243:8
250:3
**601**
19:14 21:11 22:6,23 36:20,23
37:7 47:8,10,12 48:16 50:5
51:3 56:16,21 83:10 84:10,19
85:13 86:1 87:24 88:5,6,20
89:3,10 90:4,22 91:11 92:16
93:5,9 94:20 95:18 96:11
97:14,18 98:5,14 153:15,17
154:8 220:2
**6438**
1:20 5:4 291:22

---

**7**

**7**
3:6,10 213:6 217:20 229:1
262:19 280:21 281:20 287:13
**7:41**
289:15
**7:48**
289:18 290:8,9
**70s**
21:23
**72**
274:1

---

**8**

**8**
200:15,18,25 202:13 206:10
208:7 232:20 284:1 285:12
**8/19/2011**
273:23
**800,000**
184:18
**80s**
21:23
**83**

21:20

---

**9**

**9**
203:11,12 242:5,6 255:16,17,18
**94**
23:21,25 25:4
**94024**
7:12
**94111**
2:10,16
**95**
22:17 23:5
**97**
9:12 23:16,17,20 26:8 191:19
**98**
9:12
**99**
9:12