# EXHIBIT 3
# PUBLIC VERSION

CONFIDENTIAL

Page 1

AEO CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

NETWORK PROTECTION SCIENCES,      )
LLC,                              )
                                  )
                Plaintiff,        )
                                  )
vs.                               ) No. 3:12-CV-01106-WHA
                                  )
FORTINET, INC.,                   )
                                  )
                Defendants.       )
                                  )


- CONFIDENTIAL ATTORNEYS EYES ONLY -



FEDERAL RULE 30(B)(6) DEPOSITION OF

FORTINET, INC.

DEPOSITION OF WILLIAM JEFFREY CRAWFORD

San Francisco, California

Tuesday, June 18, 2013



Reported by:  Peppina Rayna Harlow, CSR No. 7433
DEPOLINK JOB NO.: 16649


AEO

CONFIDENTIAL

Page 2

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4    NETWORK PROTECTION SCIENCES,    )
     LLC,                            )
5                                    )
              Plaintiff,             )
6                                    )
     vs.                             )  No. 3:12-CV-01106-WHA
7                                    )
     FORTINET, INC.,                 )
8                                    )
              Defendants.            )
9                                    )

10

11

12

13         FEDERAL RULE 30(B)(6) DEPOSITION OF FORTINET, INC.,

14         DEPOSITION OF WILLIAM JEFFREY CRAWFORD, taken at

15         Quinn Emanuel Urquhart & Sullivan, LLP, 50 California

16         Street San Francisco, California 94043 commencing at

17         10:39 a.m., on Tuesday, June 18, 2013, before Peppina

18         Rayna Harlow, CSR No. 7433, empowered to administer

19         oaths and affirmations pursuant to 2093(b) of

20         the Code of Civil Procedure, personally appeared

21

22

23

24

25

                              AEO

CONFIDENTIAL

```
 1   APPEARANCES:

 2

 3        FOR PLAINTIFF NETWORK SERVICES SCIENCES:

 4            GIBBONS, P.C.
              By:  JILL F KOPEIKIN, ESQ. (GCA)
 5            By:  CHRISTOPHER STRATE, ESQ.
              One Gateway Center
 6            Newark, NJ 07102-5310
              Tel. 973-596-4500  Fax. 973-596-0545
 7            email:   jkopeikin@gcalaw.com
                  cstrate@gibbonslaw.com
 8

 9
          FOR DEFENDANTS FORTINET, INC.:
10
              QUINN, EMANUEL, URQUHART & SULLIVAN
11            By:  ANDREW M. HOLMES, ESQ.
              50 California Street
12            22nd floor
              San Francisco, CA 94111
13            Tel. 415-875-6322   Fax. 415-875-6700
              e-mail:  drewholmes@quinnemanuel.com
14

15
          Also present:  Todd Nelson, Inhouse Counsel Fortinet
16

17

18

19

20

21

22

23

24

25
                         AEO
```

CONFIDENTIAL

Page 4

```
1                    I N D E X

2   WITNESS                              PAGE

3   WILLIAM JEFFREY CRAWFORD

4   Examination by Ms. Kopeikin               5

5            EXHIBITS FOR IDENTIFICATION

6   PLAINTIFF'S         DESCRIPTION

7   143    Notice                            87

8   144     FortiGate Proxy Splice Feature   166

9   145 Scanning SMB                   167

10  146 Table of contents              168

11  147 Table of contents              170

12  148 Web Filtering Override         171

13  149 FTPS Support                   179

14  150 ICAP Support                   180

15  151 FortiOS 2.3 Policy API         181

16  152 Whitepaper Virus Scanning Firewall  182

17  153 Marketing document             152
```

```
18       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

19                     PAGE

20               72, 74, 77, 83

21             INFORMATION REQUESTED

22                     PAGE

23                     106

24                     177

25
                       AEO
```

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

CONFIDENTIAL

Page 5

1              SAN FRANCISCO, CALIFORNIA

2         TUESDAY, JUNE 18, 2013, 10:39 a.m.

3

4

5              WILLIAM JEFFREY CRAWFORD,

6         a witness in the within-entitled matter, called

7         as a witness by the plaintiff, who, having been

8         duly sworn by the Certified Shorthand Reporter

9         to tell the truth, the whole truth, and nothing

10        but the truth, testified as follows:

11

12

13                      EXAMINATION

14   BY MS. KOPEIKIN:

15      Q.  Would you please state your name for the

16   record?

17      A.  My name is William Jeffrey Crawford.

18          MR. HOLMES:  Do you want to do appearances really

19   fast.

20          MS. KOPEIKIN:  Yes, we'll do that now.

21          MR. HOLMES:  Andrew Holmes for defendant

22   Fortinet, Inc.

23          MS. KOPEIKIN:  Are you representing the witness

24   for this deposition?

25          MR. HOLMES:  Yes.
                            AEO

CONFIDENTIAL

Page 6

1          MS. KOPEIKIN:  And to your left.

2          MR. HOLMES:  To my left is Todd Nelson who is the

3    VP of legal at Fortinet, the defendant in this case.

4          MS. KOPEIKIN:  Jill Kopeikin, GCA Law Partners,

5    representing Network Protection Services, the plaintiff.

6          To my right is Christopher Strate.

7          I will be taking the deposition this morning.

8                          EXAMINATION

9    BY MS. KOPEIKIN

10       Q.  Mr. Crawford, who is your current employer?

11       A.  It's Fortinet.

12       Q.  Fortinet?

13       A.  Yes.

14       Q.  I'm going to ask you to speak up just a little

15   bit.  You're soft-spoken and the court reporter is making

16   a written transcript of your testimony so she -- It's

17   very important that she hears you.

18       A.  Yes.

19       Q.  Do you understand then that your testimony today

20   is under penalty of perjury?

21       A.  Yes.

22       Q.  Okay.  Are you a US citizen?

23       A.  No.

24       Q.  Have you ever sat for deposition before?

25       A.  Yes.

                          AEO

CONFIDENTIAL

1      Q.   When?

2      A.   Time was about a year ago.

3      Q.   In what capacity?

4      A.   I was at that time -- it was as an expert

5   witness.

6      Q.   In what kind of case?

7      A.   It was a patent infringement case.

8      Q.   And the parties were?

9      A.   Fortinet and Trend Micro.

10     Q.   Trend?

11     A.   Trend Micro.

12     Q.   You testified on behalf of Fortinet?

13     A.   Yes.

14     Q.   And on what subject or subjects?

15     A.   It was regarding our firewall technologies.

16     Q.   What firewall technologies in particular?

17     A.   In particular it's -- we talk about our antivirus

18  capabilities, various proxy technologies, don't remember

19  all of it since it's a while ago.

20     Q.   When you say proxy technologies what are you

21  referring to?

22     A.   Some capabilities of our devices.

23     Q.   What capability?

24     A.   For doing filtering of our data.

25     Q.   What do you understand proxy technologies to

                              AEO

CONFIDENTIAL

Page 8

1   mean?

2        A.   Define it for me please.

3        Q.   Proxy technologies?

4        A.   Proxy technologies?  In -- in terms of a -- like

5   a computer-based proxy.

6        Q.   Whatever you mean, whatever you meant when you

7   said what you were testifying about proxy technologies?

8        A.   Okay.  Proxy technologies in regards to our

9   devices is -- it's related to a program that acts as an

10   intermediate between two points.

11        Q.   What kinds of points?

12        A.   One point would be, say, a client and the point

13   could be a server.

14        Q.   What do you mean by client?

15        A.   Client can be a computer, it could be a router.

16        Q.   Anything else?

17        A.   I can't think of more right now.

18        Q.   What proxy technologies does Fortinet offer at

19   this time?

20        A.   For which products?

21        Q.   Well, overall how many proxy technologies does

22   Fortinet offer?

23        A.   We have -- we have some for our FortiGate

24   products.  There's maybe some in some of our other

25   products.

AEO

CONFIDENTIAL

Page 9

1      Q.  What other products?

2      ████    ██████████████████

3      Q.  I'm sorry, ██████████?

4      A.  ██████████.

5      Q.  What is that product?

6      A.  ████████████████████████████████████

██  ████████████.

██  ████    ████████████████

██  ████    ████████████████████

██  ████    ██████████████████

11     A.  Yes, potentially external threats.

12     Q.  How long has Fortinet offered ████████?

13     A.  Several years I believe.

14     Q.  Two, three, can you estimate?

15     A.  I could only guess, probably maybe four years.

16     Q.  Okay.  This is a good time for me to talk to you

17  about some of the deposition protocols.  We don't want

18  you to guess.  If you have a basis for estimating, I'm

19  entitled to your best estimate, but nobody here wants you

20  to guess.  So, if you have a basis for saying, you know,

21  I've been here for five years, perhaps it was two, and

22  you're estimating, that's fine.  But let us know if you

23  truly don't know the answer.  Let us know that too so

24  we're not getting guesses.

25     A.  I don't know exactly where it was on the price

                          AEO

CONFIDENTIAL

1    list, no.

2        Q.  Okay.  Do you know the difference between an

3    estimate and a guess or your best recollection?

4        A.  It -- if I know that -- the date or if I know the

5    approximate time range I would tell you, that would be an

6    estimate.

7        Q.  All right.  And that instruction goes for

8    anything.  If I ask you any question you would really be

9    guessing to answer, please don't.  If you have a basis

10   for answering, and it's an estimate, let us know and give

11   your answer, okay?

12       A.  Okay.

13       Q.  Do you have any questions about the deposition

14   process?

15       A.  No.

16       Q.  How many times have you given deposition

17   testimony?

18       A.  Three times.

19       Q.  Okay.  The most recent was the depositions that

20   you were talking about in the case where you represented

21   Fortinet against Trend?

22       A.  That was the most recent, yes.

23       Q.  Where was that case venued?

24       A.  I don't remember the building, it was in San

25   Francisco.

                              AEO

CONFIDENTIAL

1    Q.  Was the case in a court in San Francisco?

2    A.  I don't know.

3    Q.  Who were the counsel that represented Fortinet?

4    A.  Internal counsel is Todd.  External is Marc

5    Bernstein I think is the only -- he was the lead I

6    think.

7    Q.  What firm?

8    A.  I don't know his firm.

9    Q.  And the patent dispute, was there one patent,

10   more than one patent?  I'm talking about the Trend case.

11   A.  I believe it was just one patent.

12   Q.  And it was related to firewall technology; is

13   that correct?

14   A.  Yes.

15   Q.  Did you ever give testimony at trial for that

16   case?

17   A.  For that case, no.

18   Q.  Did you give -- you gave a deposition, correct?

19   A.  Yes.

20   Q.  Did you do an expert report?

21   A.  Yes.

22   Q.  How long ago was that, the expert report?

23   A.  That's about the same time.

24   Q.  About a year ago?

25   A.  About a year ago, yes.

                              AEO

CONFIDENTIAL

Page 12

1      Q.   Is that case still pending?

2      A.   I do not believe so, no.

3      Q.   So was Fortinet the plaintiff or defendant?  So

4  did Fortinet bring the case against somebody else, or did

5  somebody bring it against Fortinet?

6      A.   I think Fortinet was the defendant.

7      Q.   What was the outcome of that case?

8      A.   I don't know.

9      Q.   Was it settled?

10     A.   I'm not sure.  You have to --

11     Q.   Did it go to trial?

12     A.   It did not go to trial as far as I know.

13     Q.   Do you know if there's a licensing agreement now

14  between Fortinet and Trend?

15     A.   I don't know.

16     Q.   The subject of the patent dispute, did it concern

17  any Fortinet technology, or was there an accused Fortinet

18  technology if you know?

19     A.   Yes.

20     Q.   What technology was that?

███   ███   ████████████████████████████████

███   ████████████████   ████████████████

███   ███   ████████   ██████████████████████████

███   ██████████████████

███   ███   █████████████████

AEO

CONFIDENTIAL

Page 13



19      A.  I'm trying to think of our other... that's all I

20   can recall at the moment.

21      Q.  Are you familiar with the term proxy?

22      A.  I've heard the term, yes.

23      Q.  Okay.  And do you use proxy technologies?

24   Correct?

25      A.  Yes.

                         AEO

CONFIDENTIAL

Page 14

1      Q.  Have you heard of the term transparent proxy

2  technology or technologies?

3      A.  I've heard the term, yes.

4      Q.  What does transparent proxy mean?

5      A.  A transparent proxy is a -- it's a -- usually a

6  program or -- yes, it's usually a program that can sit

7  between two points and two points don't know that there

8  is a proxy between them.  It's a set up for talking to

9  each other.

10      Q.  Does Fortinet offer any technologies or services

11  that includes a transparent proxy of the manner you just

12  described?

AEO

CONFIDENTIAL



Page 15

25    Q.   You said you've been deposed three times.
                          AEO

CONFIDENTIAL

Page 16

1      A.  Yes.

2      Q.  What was the time most -- closest in time to the

3  Trend case?  So I guess that would be the second time you

4  were deposed.

5      A.  The second time I was deposed was, well, probably

6  the -- year and a half ago.  Also for the same case as a

7  fact witness.

8      Q.  Concerning what subject or subjects?

9      A.  Same as we discussed before.

10     Q.  Firewall technology?

11     A.  Firewall technology.

12     Q.  And in what capacity were you a fact witness?  If

13  that wasn't -- if that question isn't clear, and I'm not

14  sure that question was so clear, you can ask me for

15  clarification.  Okay?

16     A.  Okay.  I'm not quite sure what you mean.

17     Q.  Yes.  What in your job, if anything, makes you

18  knowledgeable about the firewall products offered by

19  Fortinet?

20     A.  I've worked with them for many years.

21     Q.  Okay.  Let's back up and talk a little bit about

22  your job, okay?

23     A.  Okay.

24     Q.  Backing a little bit further than that,

25  Mr. Crawford, what is your post-high school educational

                           AEO

CONFIDENTIAL

1    background?

2         A.   I have my master's degree in Computer Science.

3         Q.   From where?

4         A.   University of Manitoba.

5         Q.   Are you a Canadian citizen?

6         A.   Yes.

7         Q.   Have you been asked to come to trial in this case

8    and testify?

9         A.   Yes.

10        Q.   About what?

AEO

CONFIDENTIAL

Page 18

8      Q.  Okay.  All right.  Let's go back to your

9   educational background if you would please.

10      A.  Okay.

11      Q.  Computer science degree, master's from Manitoba.

12   What year was that?

13      A.  The year 2000.

14      Q.  Do you have any other educational credentials

15   relating to -- I guess anything.  Educational

16   credentials?

17      A.  Well, I got my undergraduate degree from the same

18   university.

19      Q.  What discipline?

20      A.  Major in Science.

21      Q.  Any particular area of science?

22      A.  Computer science.

23      Q.  When was that that you were awarded your

24   undergraduate degree?

25      A.  I believe it was 1995.

                        AEO

CONFIDENTIAL

Page 19

1      Q.  Do you have any other educational background,

2  college or later?

3      A.  Just the university.

4      Q.  Pardon me?

5      A.  Just the university.

6      Q.  The things you've already talked about?

7      A.  Yes.

8      Q.  Okay.  And can you please describe your

9  employment history, again from the same time period, from

10 college going forward.

11     A.  How far back?

12     Q.  Starting with college.  If you worked at a Jack

13 in the Box or a something that's totally unrelated to

14 your work at Fortinet, you don't need to tell me, but

15 anything in the computer science area, I'd appreciate

16 that.

17     A.  I worked for a ticket publishing company for a

18 while.

19     Q.  What company was that?

20     A.  It's called Pollard Banknote.

21     Q.  Pod Hart?

22     A.  Pollard, Po-l-l-a-r-d.

23     Q.  And what was your job for Pollard Banknote?

24     A.  I was programming the game generation programs.

25     Q.  So when you say ticket publishing, you mean like
                              AEO

CONFIDENTIAL

1   lottery tickets or things like that?

2       A.   Yes.

3       Q.   How long were you with Pollard Banknote?

4       A.   About two years.

5       Q.   Was your job the same, the entire time generally?

6       A.   I think it changed at one point to a different

7   section, but I can't remember.

8       Q.   And what section?

9       A.   Well, there was another section for checking the

10  results of the games.

11      Q.   And in your work at Pollard Banknote did you have

12  any responsibilities that related to firewalls, servers,

13  or antivirus?

14      A.   No.

15      Q.   What year did you separate from Pollard

16  Banknote's employment?

17      A.   The year 2000.

18      Q.   What was your next job?

19      A.   I came to work at Fortinet.

20      Q.   You have been at Fortinet since 2000?

21      A.   Yes.

22      Q.   What was your first job there?

23      A.   I was a programmer.

24      Q.   Programmer?

25      A.   Yes.

                              AEO

CONFIDENTIAL

1      Q.  In what product or area?

2      A.  I worked on VoIP.

3      Q.  What did you do in the VoIP aside from

4  programming?  I mean was there any particular focus in

5  programming?

17     Q.  What group were you in when you were working with

18 that technology at Fortinet?

19     A.  Just programmers, it was very small then.

20     Q.  Who was your boss?

21     A.  At that time?

22     Q.  Yes.

23     A.  It was Michael Xie.

24     Q.  What was Michael Xie's title or role at that

25 time?

                        AEO

CONFIDENTIAL

Page 22

1      A.  He was CTO.

2      Q.  Is Michael Xie still the CTO?

3      A.  Yes.

4      Q.  To the best of your knowledge, has Michael Xie

5  been the CTO the entire time that you've been employed

6  with Fortinet?

7      A.  Yes.

8      Q.  How many employees were at Fortinet in 2000, if

9  you know?

10     A.  In 2000?

11     Q.  Yes.  When you joined.

12     A.  Just an estimate, but probably 15.

13     Q.  Okay.

14     A.  Maybe 20.

15     Q.  How many are there now?

16     A.  How many are there now?

17     Q.  Yes.

18     A.  You mean the entire company?

19     Q.  Yes.

20     A.  Or -- okay.  The entire company.  I think we --

21  around 1500 or so.  Maybe more.

22     Q.  That's fine.  Estimate was all I was looking for.

23         And when you said 15 or 20 employees when you

24  joined in 2000, was that total, or was that a particular

25  group that you were referring to?

                        AEO

CONFIDENTIAL

Page 23

1      A.  That was probably total I think.

2      Q.  And the group you were in, I think you said it

3  was just -- well, was there a name for it?  Or it's small

4  enough there really wasn't --

5      A.  Programmers.

6      Q.  Okay.  And how long were you a programmer in this

7  VoIP technology in Fortinet?

8      A.  I think I did that for about a year.

12      Q.  That's another thing I want to explain to you

13  about the deposition process.  Yeses or nos or inaudible

14  kinds of testimony --

15      A.  Yes.

16      Q.  Because then the court reporter, again -- when

17  you say uh-huh -- or I do anyway -- she can only take

18  that down, and we may miss what the true meaning is.

19      A.  Okay.

20      Q.  All right.  So you said there wasn't a name for

21  the VoIP technology, is that correct?

22      A.  Not that I can recall, no.

AEO

CONFIDENTIAL

Page 24

19      Q.  Can you list them, please, starting with the

20   earliest one.

21      A.  Oh, I have no idea.  It's a very long list.

22      Q.  Well, tell me the main ones.  Whether -- you

23   know, there might be a particular version, but I -- I

24   would expect there would be some main products.

25          Can you just list those?
                          AEO

CONFIDENTIAL

Page 25

1      A.  Certain main products?

2      Q.  Mm-hmm.

3      A.  Are you talking about at that time or --

4      Q.  From 2000 to the present.

5      A.  From 2000 to the present.

6      Q.  During your employment.

7      A.  I can only remember a few, ████████████

████ ████████████████████████████████████████████

9      Q.  Go ahead and list which -- the ones you remember.

10     A.  I remember a FortiGate 300.  A FortiGate 50.  A

11  FortiGate 3000.  FortiGate 5000.  Oh, that's actually a

12  chassis though.

13     Q.  What do you mean?

14     A.  It's a -- for a larger hardware device.  You put

15  cards into it.

16     Q.  Any others that you can remember?

17     A.  There's a FortiGate 500.  I can't remember them

18  all.

19     Q.  Okay.  And the numbers in the FortiGate series,

20  do those refer to a number of users or in old school

21  terms would have been seats or something else?

22     A.  No.

23     Q.  What -- what do the numbers mean, represent?

24     A.  I think they are -- I don't know exactly.  They

25  are kind of an arbitrary number chosen by the marketing.

                         AEO

CONFIDENTIAL

Page 26

1      Q.  What do you mean?

2      A.  I don't name the products so I don't know the

3  exact name, what the numbers mean.

4      Q.  Okay.  We'll come back to the FortiGate products,

5  but we're turning back to your work history.

25     Q.  Because -- let me restate that to make sure I
                                    AEO

CONFIDENTIAL

Page 27

1    understood.

2         A.   Okay.

3         Q.   FortiGate is a hardware device with the firewall

4    technology, correct?

5         A.   Yes.

14        Q.   I may have lost you there.  And I'm not a

15   technical person so I'm going to ask you to describe

16   things from time to time that probably seem very

17   simplistic to you.  Don't worry about offending me or

18   speaking down to me because I wouldn't in the least bit

19   be offended if you talk in simple terms.

AEO

CONFIDENTIAL

Page 28

1     Q.   Which ones?

2     A.   I think they're -- I recall one now is called the

3   FortiGateVoice. ████████████████████████████████

██   ████

██         ██████████████

6     Q.   And -- I'm sorry.  Go ahead.

7     A.   Sorry.

8     Q.   If I ever cut you off, I need you to finish your

9   sentence.  I don't mean to --

10    A.   Yes, I'm finished.

11    Q.   Going back to your employment for a minute.

12         After 2001, what was your next position within

13   Fortinet?

14    A.   In Fortinet I became a team leader, oh, sorry.

15   Next position I began working on our ████████████████

██       ██    ████████████████████████

██       ██    ████████████████████████

██       ██    ██████████████████████

██       ██    ████████████████████████████████

██       ██    ████████████████████████████████████

██       ██    ████████████████

██       ██    ████████████████████████  ██████████████████

██       ██████████

██       ██    ████████  ████████████████████████████  ██████████████

██       ██████

                    AEO

CONFIDENTIAL



Page 29

AEO

CONFIDENTIAL



Page 30

AEO

CONFIDENTIAL



Page 31

AEO

CONFIDENTIAL

Page 32



15        A.   May I get some water first.   Is it okay?

16             MS. KOPEIKIN:  Absolutely.   Do you need a refill?

17             MR. HOLMES:  I can do that.

AEO

CONFIDENTIAL

Page 33

7      Q.   Anything else?

8      A.   Not that I recall at the moment.

9      Q.   Okay.  I'm going to back you up and ask you to

10   define some of the terms you used so I'm sure we're on

11   the same page.

AEO

CONFIDENTIAL



Page 34

AEO

CONFIDENTIAL

Page 35

██ ██████

██    ██   █████████████████████████████

3        A.   Not that I know of.

4        Q.   And in 2001 when you were working on the

██ █████████████, what was your title?

6        A.   I believe I was still a Programmer.

7        Q.   To whom did you report?

8        A.   To Michael Xie.

9        Q.   How many people were in your group?

10       A.   Just me.

11            (Mr. Nelson exited deposition room)

12       Q.   MS. KOPEIKIN:  Okay.  How long did you work as a

13   programmer on the ████████████████?

14       A.   I believe it was six or seven years.  Maybe a bit

15   longer.

16       Q.   And did your title change during that time?

17       A.   I believe so, yes.

18       Q.   From what to what, Programmer to something

19   else?

20       A.   I was a Programmer.  Then the next step was a

21   Team Leader.

22       Q.   And after that?

23       A.   I became a project manager.  So do you want up to

24   the present, or just while I was --

25       Q.   Sure.  Why don't you go up to the present.

                          AEO

CONFIDENTIAL

Page 36

1        A.   Okay.  Up to the present.  Yes.

2             So I became project manager, then I became

3    director.  I was director in device research.  And I

4    changed to director of software management.  And I became

5    director of product management, and now I'm director -- a

6    senior director of project -- product management.

7        Q.   When did you -- were each of those steps a

8    promotion in your mind?

9        A.   Some of them were lateral.

10       Q.   Okay.  Lateral would have been -- well --

11       A.   Same -- same level, but just different title.

12       Q.   So, for example, from director of antivirus

13   research to director of software management.  That was a

14   lateral?

15       A.   Yes.

16       Q.   So, when you were promoted from programmer to

17   team leader, when was that?

18       A.   Probably 2002 time frame, I think.

19       Q.   And were you still in the antivirus -- working on

20   the antivirus?

21       A.   Yes.

22       Q.   Did you have people working under you at that

23   time?

24       A.   I think so, yes.

25       Q.   How many?

                              AEO

CONFIDENTIAL

Page 37

1      A.  I think it ranged up to maybe four or five.

2      Q.  At all times while working at Fortinet has

3    Michael Xie been your boss to whom you report?

4      A.  At all times?

5      Q.  Yes.

6      A.  No.

7      Q.  When have you reported to someone else?

8      A.  At one point I reported to -- at one point -- I

9    think that was when I became a director of software --

10   or, sorry, director of antivirus research.

11     Q.  And who did you report to at that time?

12     A.  I reported to the VP of Engineering.

13     Q.  Who was that?

14     A.  Hongwei Li.

15     Q.  Hongwei Li?

16     A.  Yes.

17     Q.  Is Mr. Li still employed by Fortinet?

18     A.  Yes.

19     Q.  In what capacity?

20     A.  He's VP of Engineering.

21     Q.  How long were you a team leader in the antivirus

22   group?

23     A.  Team Leader?  I guess maybe a year I guess.

24         (Mr. Nelson re-entered the deposition room).

25     Q.  MS. KOPEIKIN:  Was there any other -- that
                              AEO

CONFIDENTIAL

Page 38

1    antivirus group, did it have any other scope of duties or

2    was it pretty much dedicated to antivirus protection?

3         A.  No, our main focus at that time was on antivirus.

4    Yes.

5         Q.  You next became project manager, correct?

6         A.  After the Team Lead?

7         Q.  Yes.

8         A.  I became project manager, yes.

9         Q.  For what project?

10        A.  I became involved in some of the integration

11   projects into FortiGates.

12        Q.  What does that mean?

█████      ██████    █████████████████████████████████████

█████      ███████████████████████████████████████

15        Q.  Anything else?

16        A.  That one lasted kind of a longer span so I worked

17   on some other products too, our ████████████████████.

18        Q.  Which products?

19        A.  Our -- our ███████████████.

20        Q.  What does that mean?

21        A.  ████████████████████████████████████

█████   ████████████████████████████████████.

23        Q.  Does that have a name?

24        A.  It's called the FortiManager.

25        Q.  Has it always been called FortiManager, or has it

                              AEO

CONFIDENTIAL

1    ever had another name?

2        A.  I don't remember if it had another name before

3    that or not.  It might have been just FortiManager but --

4        Q.  During what period of time were you the project

5    manager for integration projects?

6        A.  During what time?

7        Q.  You started out, in what, in around 2003,

8    correct?

9        A.  Yes.  I think it was around 2003.

10        Q.  Until?

11        A.  And that lasted maybe a year or two.

12        Q.

AEO

CONFIDENTIAL



Page 40

1    remember.  It's a long time ago.

AEO

CONFIDENTIAL

Page 41



17          (Interruption in the proceedings, 11:34 a.m.)

18                    (Recess)

19          MS. KOPEIKIN:  All right.  Let's go back on the

20     record.

21                    (Record read)

23          MS. KOPEIKIN:  Can you ask it again?  And I would

24     like the question repeated in the record, so it's not

25     like break and then...

                         AEO

CONFIDENTIAL



CONFIDENTIAL



AEO

CONFIDENTIAL

Page 44



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 46



AEO

CONFIDENTIAL



CONFIDENTIAL

Page 48



8              (Interruption in the proceedings)

9          MR. HOLMES:  It will be over in a second.

10         MS. KOPEIKIN:  I know, I used to have an office

11    down on Embarcadero.  That means it's lunch time.

AEO

CONFIDENTIAL



Page 49

AEO

CONFIDENTIAL

Page 50



6     A.   I can give you as much as I can think of.

7     Q.   That's all I'm asking.

AEO

CONFIDENTIAL

Page 51



AEO

CONFIDENTIAL

Page 52

14    Q.  And in what form is that provided to the

15  customers?

16    A.  There is an administrative manual.

17    Q.  Is that provided to all customers?

18    A.  Yes.

19    Q.  In what form?

20    A.  It's available electronically.

21    Q.  On the website?

22    A.  Yes.

23    Q.  To public use or particular customers?

24    A.  I believe it's publicly available.

25    Q.  Publicly?

AEO

CONFIDENTIAL



Page 53

1     A.   I believe so, yes.

2     Q.   What is it called?

3     A.   I don't know the exact name.

4     Q.   All right.

AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 55



9      Q.  I'm going to ask you -- I know you're

10  soft-spoken.  She's sitting right next to you.

11      A.  I'll try to get a little closer.

12      Q.  Okay.

13          MR. HOLMES:  I just want to be able to hear too.

14          MS. KOPEIKIN:  All right.

21      Q.  How?

23      Q.  Such as?

25      Q.  Anything else?

                          AEO

CONFIDENTIAL

Page 56



3      Q.   Anything else?

5      Q.   Anything else?
6      A.   There may have been other things.  I can't
7   remember them all, so.

18           (Mr. Nelson exited the deposition room)
19      Q.   MS. KOPEIKIN:  Do you know when?

AEO

CONFIDENTIAL



Page 57

AEO

CONFIDENTIAL

Page 58



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 60



AEO

CONFIDENTIAL



Page 61

25   Q.  I can't hear.

AEO

CONFIDENTIAL

Page 62

1      A.  I don't know.

2      Q.  Who would know?

7      Q.  What steps did you take to collect information?

8          MR. HOLMES:  And to the extent she's asking for

9   any conversations between you and any counselors or

10  outside lawyers, that information is privileged but feel

11  free to answer otherwise.

12         THE WITNESS:  I'm sorry.  Can you repeat --

13  repeat your question?

14         MS. KOPEIKIN:  Could you read it back please

15                  (Record read, What steps did you take

16  to collect information)

18     A.

20     Q.  Anything else?

21     A.

23     Q.  Anything else?

24     A.  That's all I can recall.

25     Q.  What steps did you take to prepare for this
                        AEO

CONFIDENTIAL

Page 63

1    deposition?

2        A.   I had a meeting with -- with the lawyers for

3    several hours.

4        Q.   How many hours?

5        A.   Roughly, six or seven.

6        Q.   All in one sitting?

7        A.   Oh, there was also several conference calls as

8    well so.

9        Q.   How many?

10       A.   Let's put it at maybe 10 hours I could say.

11       Q.   Did you take any other steps to prepare to

12   testify at this deposition?

██      ██    ████████████████

14       Q.   Did you take any other steps to prepare for this

15   deposition?

16       A.   No.

██      ██    ██████████████████

██      ██    ████████████████████████████

██      ███████████████████████

██      ██    ██████████████████

██      ██   ██████████████████████████████

██      █████████

██      ██    █████████████████████████████████████

██      ████████████████████

██      ██    ██████████████████████
                          AEO

CONFIDENTIAL

Page 64

1     Q.  Anything else?

2     A.  That's -- that's all I recall.



11    Q.  Anything else?

13    Q.  List any others that you remember.

15    Q.  Anything else?

AEO

Page 65



AEO

CONFIDENTIAL



Page 66

13    A.    Okay.

17    Q.    Mm-hmm.

AEO

CONFIDENTIAL

Page 67



4      A.   What do you mean --

6      A.   Yes.

18     Q.   Okay.

19     A.   But.

20     Q.   I'm doing pretty well if I only asked you one

21   question twice, and I'll do my best not to.   But --

AEO

CONFIDENTIAL

Page 68

11     Q.  You identified something called FortiCarrier.

12  What was that?

13     A.  That was a product for ISPs.

14     Q.  Do you know if that product is still offered?

15     A.  I don't know.  If it's still being sold.

16     Q.  Do you know when that FortiCarrier product was

17  first offered?

18     A.  It's several -- several years ago, but I don't

19  remember the exact time, no.

20     Q.  Can you estimate?

21     A.  It was six -- six years ago maybe.

22     Q.  When was the FortiWiFi product first offered?

23     A.  FortiWiFi, I don't know exactly when.  Probably

24  around the same time.  Six or seven years ago maybe.

25     Q.  Has the FortiGate -- excuse me.  Has the

                              AEO

CONFIDENTIAL

Page 69



1    FortiWiFi process -- let me just start over.

4       A.  Sorry?  The --

AEO

CONFIDENTIAL

Page 70



AEO

CONFIDENTIAL

Page 71



20          (Interruption in the proceedings)

23          MR. HOLMES:  And I'm going to object on the

24   grounds of attorney/client privilege, and instruct him

25   not to answer.

AEO

CONFIDENTIAL

Page 72

1          To the extent that you were directed to look at

2     that from your attorneys.

3     Q.  MS. KOPEIKIN:  Well, first of all, do you feel

4     like you can answer that question?

5     A.  I don't believe I can answer.

6     Q.  So you're refusing to answer based on counsel's

7     instruction; is that correct?

8     A.  It's -- I was directed.

9     Q.  I just -- and I'm not challenging you.

10          Just for my record purposes, Drew, can we agree

11     that the witness, if you're instructing him, is not

12     answering based on that?

13          MR. HOLMES:  Yes.

14     Q.  Ms. KOPEIKIN:  Without referring to any --

15     A.  Sorry.  May I take a break to go to the washroom?

16          MS. KOPEIKIN:  Yes, absolutely.

17          THE WITNESS:  Okay.  Thank you.

18                    (Recess)

19              (Mr. Nelson not present)

20                 (Record read)

███      ██   ████████   ████████████████████

███   ██████████████████████████████████████

███   █████████████████████████████

███   ██   ███

███   ██   █████████████

                    AEO

CONFIDENTIAL

Page 73



14          (Mr. Nelson entered deposition room)

AEO



18          Do you mind, Drew?

AEO

CONFIDENTIAL

Page 75



16    A.   Yes.

AEO

CONFIDENTIAL



Page 76

21          MS. KOPEIKIN:  Okay.

24          I'd like to ask you questions about what you

25     looked at to prepare for the deposition so that's why I'm

                              AEO

CONFIDENTIAL

Page 77

1  asking.  So I'll ask that you get that, and I know you're

2  now taking a position, but my request stands.

3          MR. HOLMES:  Sure.  █████████████████████

   █  ████████████████      ████████████████████████

   █  ████████████████████████████████

6          MS. KOPEIKIN:  Okay.  Your position is clear, and

7  I just want mine not to be on the record too.  So we're

8  fine.  ████████████████████████████  ███████

   █  █████████████████████████

10     Q.  You said that you met with lawyers for six to

11  seven hours in preparation for your deposition.  Who were

12  you referring to?

13     A.  Mr. -- Drew and Todd.

14     Q.  Anyone else?

15     A.  And Jay.

16     Q.  Neukom?

17     A.  Yes.

18     Q.  And by Todd, you mean Mr. Roberts who's here

19  today?

20          MR. HOLMES:  Mr. Nelson.

21     A.  THE WITNESS:  Mr. Nelson.

22          MS. KOPEIKIN:  Oh, Nelson.  I'm sorry, I

23  apologize.

24     Q.  Anyone else?

25     A.  No.  Not that I recall.

                        AEO

CONFIDENTIAL

Page 78

1      Q.  Okay.  Was there anybody -- were all you,

2   Mr. Nelson, Mr. Holmes, and Mr. Neukom all physically

3   present for this meeting?

4      A.  That particular meeting, yes.

5      Q.  And when was that?

6      A.  Yesterday.

7      Q.  Did you review documents?

8      A.  Yes.

9      Q.  What documents?

10     A.  I believe that's privileged.

11     Q.  I don't believe it is.  Can you answer the

12  question?

13         MR. HOLMES:  You can answer the question.

14     A.  THE WITNESS:  Okay.  I looked at -- I looked at a

15  document something 30 (B) -- I don't know the exact name

16  of it.  But.

17     Q.  MS. KOPEIKIN:  Deposition notice maybe?

18     A.  That could be it.

19     Q.  Okay.  Anything else?

20     A.  I looked at document that had some claims stuff

21  on it.

22     Q.  Anything else?

AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 80



1    Q.  Who was it with?

2    A.  That was with Todd Nelson.

3    Q.  Anyone else?

4    A.  No.

5    Q.  No?

6    A.  No.

AEO

CONFIDENTIAL

Page 81

1      Q.   Okay.  When was the second call you had in

2    preparation, or that you used to prepare yourself for

3    this deposition?

4      A.   It was probably two, three months ago.

5      Q.   And who was this call with?

6      A.   It was with outside counsel and Todd Nelson.

7      Q.   I'm sorry.  Who was --

8      A.   Outside counsel.

9      Q.   Okay.  And who were you referring to as outside

10    counsel?

11      A.   I believe it was Jay, and I believe Drew may have

12    been on the call too.  Todd Nelson.  I can't remember

13    what the other name...

14      Q.   Is it somebody at Quinn Emanuel's office if you

15    know?

16      A.   I don't know for sure.

17      Q.   Was it somebody at Fortinet?

18      A.   No.

19           MS. KOPEIKIN:  Drew?

20           Well, it wasn't a privileged communication.  If

21    there was another person there who wasn't a lawyer, we're

22    entitled to ask him about it.

23           MR. HOLMES:  Well, you can ask him about it to

24    the extent he remembers it.

25           MS. KOPEIKIN:  Okay.
                              AEO

CONFIDENTIAL

Page 82

1      Q.  What did you discuss?

2          MR. HOLMES:  I'm not going to let him answer

3   that.  He just told you there were attorneys on the

4   line.

5          MS. KOPEIKIN:  Well, it doesn't necessarily mean

6   it was privileged.

7          MR. HOLMES:  Well, I'm instructing him not to

8   answer.

9      Q.  MS. KOPEIKIN:  There was another person who

10  participated in the call, correct?

11     A.  There was, yes.

12     Q.  Do you know who it was?

13     A.  I think they were also an outside counsel, but I

14  don't know their name.

15     Q.  Man or woman?

16     A.  I believe it was a man.

17     Q.  You don't know if it was with Quinn Emanuel's law

18  firm?

19     A.  I don't know for sure.

20     Q.  Why do you say that you think it was a lawyer?

21     A.  I don't know for sure.

22     Q.  Do you have any notes or diary that would reflect

23  who was on the call?

24     A.  No.

25     Q.  How long was the call?

                              AEO

CONFIDENTIAL

Page 83

1      A.  Perhaps an hour.

2      Q.  When did that call take place?

3      A.  I said before it was about three months ago.

4      Q.  Oh, sorry.  And without describing the content of

5  the conversation, generally were you discussing this

6  lawsuit?

7      A.  Yes.

██        ██          ████████████████████████████

██        ████████████████████████████████████████

██        ██████████████

██        ██    ██

██        ██    ██████████████████████████████

██        ██    ██████

14     Q.  Will you tell me what you talked about?

15         MR. HOLMES:  I'm going to instruct you not to

16  answer that.

17         MS. KOPEIKIN:  Well, if he wasn't given advice,

18  and he didn't ask for advice, how is that a privileged

19  communication?

20         MR. HOLMES:  It's -- it's either privileged or

21  it's protected under Attorney Work Product.  He's doing

22  work under our direction for this litigation.  He just

23  told you that. You're treading on pretty close to

24  attorney/client communications on a series of questions

25  now.  We've established there were at least two other

AEO

CONFIDENTIAL

Page 84

1   Quinn Emanuel lawyers on the call.  It's about the

2   litigation.  We established in-house counsel for Fortinet

3   is there so those privileged communications are

4   protected.

5           MS. KOPEIKIN:  Not if there's a third party

6   there.

7           MR. HOLMES:  He's testified he didn't know who it

8   is.

9           MS. KOPEIKIN:  Right.

10          MR. HOLMES:  And he's testified it was didn't

11  know who it is.

12          MS. KOPEIKIN:  I'm sorry.  Were you finished.

13          MR. HOLMES:  I'm done.

14     A.   MS. KOPEIKIN:  Okay.  He's didn't ask for advice,

15  he didn't get advice.  It's pretty unclear whether this

16  was a privileged communication.  So I understand that

17  you're instructing him not to answer, is that correct?

18          MR. HOLMES:  Yes.

19          MS. KOPEIKIN:  I will ask you to circle back and

20  determine whether there were nonlawyers or people who

21  were outside the privilege during that call.  If so, I am

22  entitled to ask him.  If not, then likely not.

23          But I am entitled to ask the questions about when

24  the conversation happened.  If it's on a privileged log,

25  I'm not entitled ask those questions.  And that's all I'm

                              AEO

CONFIDENTIAL

1   asking.

2          MR. HOLMES:  I think that's fair.

3          MS. KOPEIKIN:  I have not asked you to disclose

4   any privileged communications, and any suggestion by

5   counsel that I have is way off base because I don't want

6   you to disclose privileged or work product.  But I am

7   entitled to ask you those questions.  Okay?

8          For now, I understand that you're following

9   counsel's direction, and I will follow-up with him after

10  lunch.  Okay.

11      Q.  You had a final, third and final call in

12  preparation for this deposition.

13      A.  Mm-hmm.

14      Q.  With whom did you have such a call?

15      A.  I had a call with I think Drew was on the line.

16  And -- another -- the other person.  I can't remember who

17  it was.

18      Q.  Another lawyer.

19      A.  Yes.

20      Q.  Do you know it was a lawyer?

21      A.  Yes.  Will.  Will something.

22      Q.  Okay.  Will Cooper?

23      A.  Yes, Will Cooper.

24      Q.  The fact that he's not a lawyer --

25          MR. HOLMES:  Yes.  No, you can ask him.  Feel
                              AEO

CONFIDENTIAL

Page 86

1    free.

2        Q.   MS. KOPEIKIN:  Was it Will Cooper?

3        A.   It was Will Cooper?

4        Q.   When was this call?

5        A.   That was about a month ago.

6        Q.   How long was it?

7        A.   Roughly an hour.

8        Q.   And did you discuss in general this case?

9        A.   Yes.

10       Q.   Did anyone other than you, Drew Holmes, and Will

11   Cooper participate in the call?

12       A.   There is one other, but I can't remember his

13   name.

14       Q.   Do you know if it was a Quinn Emanuel lawyer?

15       A.   No.

16       Q.   Do you know if it was anyone associated with

17   Quinn, Emanuel?

18       A.   I don't know.

19       Q.   Do you know if he was a lawyer?

20       A.   I don't know.

21       MS. KOPEIKIN:  Okay.  Same question exists,

22   Mr. Holmes, if you were a participant in these calls you

23   can readily identify whether they were privileged, people

24   who were covered by privilege as in the nature of a

25   privileged log.  I'll ask you to look into that.  I would

                              AEO

CONFIDENTIAL

Page 87

1   hate to come back on something that is clearly

2   privileged.  But, if it's clearly not, then we're

3   entitled to know.  Okay?

4           MR. HOLMES:  Okay.

5           MS. KOPEIKIN:  All right.  I'm going to hand you

6   now, Mr. Crawford, what's been marked as Exhibit 143.

7   For the record it's entitled Notice of First Rule 30 (b)

8   (6) Deposition to Defendant Fortinet, Inc.

9           Let me know when you've had a chance just to look

10  at the document.  If I ask you specific questions I will

11  direct you to particular portions.

12    (Plaintiff's Exhibit 143 marked for identification)

13          MR. HOLMES:  Do you have a copy of that for me?

14          MS. KOPEIKIN:  Oh, sorry, certainly.

15          MR. HOLMES:  What exhibit is this?

16          MS. KOPEIKIN:  143.

17      Q.  If you want to read the entire thing you can, but

18  the only questions I have, number one, whether this looks

19  like the document, the (30) (B) something that you

20  reviewed in preparation for your deposition?

21      A.  This appears to be it.

22      Q.  All right.  I'll ask you to turn to the page with

23  the numeral 3 at the bottom entitled Topics.

24      A.  Mm-hmm.

25      Q.  Can you look at Topic No. 6?

AEO

CONFIDENTIAL

Page 88

1      A.  Yes.

2      Q.  "Design, Development, Structure, and Operation of

3   the Accused Products, including Related Documents."

4          Do you see that?

5      A.  I see that.

6      Q.  Is it your understanding that you were being

7   offered as a company representative as the Person Most

8   Knowledgeable concerning those subjects?

9      A.  Yes.

10     Q.  Okay.  Do you feel prepared to do that today?

11     A.  Yes.

12     Q.  Are there any other subjects listed under these

13  topics that you are here to testify as the Person Most

14  Knowledgeable on behalf of Fortinet today?

15     A.  No.

16     Q.  What do you understand to be the Accused

17  Products?

18     A.  I believe there was a -- a list of products.

19     Q.  If it will help, I'll refer to the definitions on

20  page No. 1.  There's a definition in paragraph A of the

21  Accused Products.

22     A.  Mm-hmm.

23     Q.  Do you see that?

24     A.  Yes, I see it.

25     Q.  There are -- there's a -- in that definition it

                              AEO

CONFIDENTIAL

Page 89

1   provides that the Accused Products shall mean all

2   products identified in NPS' infringement contentions

3   dated August 31, 2012.

4           Did you review that document to understand what

5   the Accused Products were?

6       A.  I don't know which is -- I don't know which

7   document that was.

8       Q.  The infringement contentions.  Do you know if you

9   reviewed that?

10      A.  I don't think I did.

11      Q.  A second thing that's identified --

12          MR. HOLMES:  Sorry, were you done?

13      A.  THE WITNESS:  I know I have, but I don't remember

14   the name of the document.

15      Q.  MS. KOPEIKIN:  Okay.  But you reviewed a

16   document?

17      A.  I reviewed a document.

18      Q.  Can you describe it?

19      A.  I had some claims in it.  It appeared to have

20   some claims.  It had a list of products in the back.

21      Q.  Okay.  Do you know what the date of that document

22   was?

23      A.  I don't recall.

24      Q.  Did you review the Fortinet Response to

25   Interrogatory No. 15 that's referenced in the definition

                              AEO

CONFIDENTIAL

1    of Accused Products?

2         A.  I don't know if it was part of that same document

3    or not, so.

4         Q.  Okay.  By family group, can you identify the

5    Accused Products?  I don't need you to define your

6    iterations under the family groups, but what are the

7    family groups that you understand follow under the

8    Accused Products?

9         A.  Well, from what I recall off the list, there's a

10   FortiGate family group, FortiWiFi, FortiAP.  That's all I

11   know.

12        Q.  What is FortiAP?

13        A.  FortiAP is our access point family.

14        Q.  I'm guessing that Drew's getting close to break

15   for lunch with you, but I have sort of a basic

16   question -- I mean I'll keep going...

17             MR. HOLMES:  No, we can keep going, that's fine,

18   before lunch.

19             MS. KOPEIKIN:  All right.

                                    AEO

CONFIDENTIAL



Page 91

AEO

CONFIDENTIAL



AEO



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 95



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 98



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL



Page 100

AEO

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



Page 103

AEO

CONFIDENTIAL



Page 104

AEO

CONFIDENTIAL

Page 105



17          (Mr. Nelson exited the deposition room).

25          MR. HOLMES:  Counsel, just in terms of a lunch
                         AEO

CONFIDENTIAL

Page 106

1  break, do you have -- is there a decent stopping point in

2  the next --

3          MS. KOPEIKIN:  Anytime it's convenient to --

4          Well, I always defer to the court reporter first

5  and witness next.

6          THE WITNESS:  I'm okay for lunch now.

7          MS. KOPEIKIN:  Let's do that.

8          MR. HOLMES:  So before we go off the record I

9  just want to do two things.

10          One is I want to -- we've been talking about a

11  lot of functionality of the Fortinet source code, so I

12  want to designate this transcript as highly confidential,

13  Confidential Attorneys Eyes Only I should say.

14          And, second, counsel I am going to look into the

15  your question for source code that you mentioned earlier.

16          MS. KOPEIKIN:  Thank you.

17          MR. HOLMES:  And I'll see what I can do to get

18  access to that today.

19          MS. KOPEIKIN:  Okay.  We're also looking for

20  configuration scripts which probably can be in language

21  not technically considered source code.  It may be in

22  scripting language so I don't want to be exclusive of

23  that.

24          And I think I also asked you try to confirm since

25  you were on those calls whether the two calls that he

                              AEO

CONFIDENTIAL

Page 107

1    referred to were -- in fact involved lawyers or had

2    somebody else on that may have a privilege.

3          So I'll ask you to check that as well.

4          MR. HOLMES:  I'm going to stand by my previous

5    objections on that, but if I remember anything else we'll

6    let you know.

7          MS. KOPEIKIN:  Understood.  All right.  We'll go

8    off the record now.

9           (Whereupon, a luncheon recess was taken)

10    Q.  MS. KOPEIKIN:  Okay.  Let's go back on the

11   record.  Do you understand that you're still under

12   oath?

13    A.  Yes.

14    Q.  Is there any reason you feel that you can't

15   testify truthfully to the best of your abilities.

16    A.  I have no reason.

17    Q.  Some people go out for martini lunches, make sure

18   you didn't, did you?

19    A.  No.

20    Q.  Okay.  We're going to go back to some more

21   substantive areas that we touched on before, but, before

22   I do, I want to go back.

23          You've been deposed three times, what was the

24   other time?

25    A.  The very first time was in another cases was

AEO

CONFIDENTIAL

1    Trend Micro.

2         Q.   Trend Micro?

3         A.   Yes.

4         Q.   And in what capacity did you testify, fact

5    witness or expert?

6         A.   Fact witness.

7         Q.   Was it regarding any particular product or

8    invention?

9         A.   If I recall, it was regarding our FortiGate

10   products.

11        Q.   What about them?

12        A.   ████████████████████████████████████

████  ████████████

████     ████  ████████████████████████████████

████  █████████████████████████████████████████

████     ████  ██████████████████████

████     ████  ██████████

████     ████  ████████████████████████████████

19        Q.   Was it a patent infringement lawsuit?

20        A.   Yes.

21        Q.   And were these depositions offered in separate

22   lawsuits or -- well, the first -- the last two, and most

23   recent two were in the same lawsuit, correct.  One as a

24   fact witness, the other one is an expert?

25        A.   Yes.

                              AEO

CONFIDENTIAL

Page 109

1      Q.   And the second one?

2      A.   That was a second suit.

3      Q.   And where was that going on?

4      A.   I had my deposition in San Francisco.

5      Q.   Do you know if that case was -- the court was in

6   San Francisco also?

7      A.   It was set in Washington.

8      Q.   DC?

9      A.   DC.

10     Q.   Did you do an expert report in that case?

11     A.   No.

12     Q.   Did you testify at trial?

13     A.   Yes.

14     Q.   When?

15     A.   I don't remember the exact date.

16     Q.   Was Fortinet the plaintiff or defendant?

17     A.   Defendant.

18     Q.   What was the outcome of the trial?

19     A.   I think we did not win, but I'm not sure.

20     Q.   Do you think that Fortinet lost --

21     A.   I think so, but I can't remember exactly.

22     Q.   Do you know when that case -- when the trial

23   was?

24     A.   No.  I don't remember the exact year.

25     Q.   Is it not -- is it going on in any capacity?
                              AEO

CONFIDENTIAL

Page 110

1        A.  It was 2003 or '04, sometime around there.

2        Q.  So it was completely over, no appeals or

3   something?

4        A.  I think it's over, yes.

5        Q.  The other cases regarding Trend Micro where you

6   gave a deposition, both as a facts and expert witness, is

7   that case completely over if you know?

8        A.  I believe so.

9        Q.  And you said your deposition was here in San

10  Francisco as well?

11       A.  Yes.

12       Q.  But you don't know whether that case was in a

13  courthouse here in San Francisco, or do you know?

14       A.  The deposition?

15       Q.  No, the case.

16       A.  The case?

17       Q.  Before a judge.

18       A.  Oh, I don't know if it was in a courthouse or --

AEO

CONFIDENTIAL



CONFIDENTIAL

Page 112



AEO

CONFIDENTIAL

Page 113



AEO

CONFIDENTIAL

Page 114



AEO

CONFIDENTIAL



CONFIDENTIAL

Page 116



AEO

CONFIDENTIAL

1        A.  (Nods head)



AEO

CONFIDENTIAL



Page 118

```
 8        Q.  Is there a resource information for the

 9    administrators that you provide them?

10        A.  Resource information?

11        Q.  On how to set things up.

12        A.  Yes, there's a user manual.

13        Q.  Is that available publicly on the website, or is

14    that something only customers get?

15        A.  It's available on the website.

16        Q.  Let's go back to the user?

17        A.  Okay.
```

AEO

CONFIDENTIAL



Page 119

AEO

CONFIDENTIAL

Page 120



18        Q.  I'm sorry.  I didn't understand that.  What do

19    you mean?

AEO

CONFIDENTIAL

Page 121



AEO

CONFIDENTIAL



CONFIDENTIAL



Page 123

AEO

CONFIDENTIAL



CONFIDENTIAL



Page 125

AEO

CONFIDENTIAL

Page 126



AEO

CONFIDENTIAL

Page 127



14          THE WITNESS:  Can I get some water please.

15          MS. KOPEIKIN:  Absolutely.  Yes.

16

AEO

CONFIDENTIAL

1    Q.   Okay.  So in the situation of --

2         I'm sorry, can you read that back.



AEO

DEPOLINK COURT REPORTING & LITIGATION SERVICES   (973) 353-9880

CONFIDENTIAL



AEO

CONFIDENTIAL



Page 130

AEO

CONFIDENTIAL



Page 131

8      Q.   Can you read the answer back please.

9

AEO

CONFIDENTIAL



CONFIDENTIAL

Page 133



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 135



AEO

CONFIDENTIAL



CONFIDENTIAL



Page 137

AEO

CONFIDENTIAL

Page 138



AEO



CONFIDENTIAL

Page 139

AEO

CONFIDENTIAL

Page 140



AEO

CONFIDENTIAL

Page 141



AEO

CONFIDENTIAL



Page 142

AEO

CONFIDENTIAL



Page 143

AEO

CONFIDENTIAL



AEO

CONFIDENTIAL



3        MR. HOLMES:  Just -- just because we've been a

4   little bit over an hour, are you feeling in terms of --

5        THE WITNESS:  Yes.  Do you mind if we had a

6   little break, bathroom break.

7        MR. HOLMES:  Is that all right with you?

8        MS. KOPEIKIN:  Yes.

9              (Recess)

AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 147



AEO

CONFIDENTIAL

Page 148



AEO

CONFIDENTIAL

Page 149



AEO

CONFIDENTIAL



AEO

CONFIDENTIAL

Page 151



AEO

CONFIDENTIAL

Page 152

███   ███   ████████████████████████
███   ███   ██████
███   ███   ████████████████████████   ██████████
███   ██████████
███   ███   █████   █████████████████████████
███   █████████████████████████████████████
███   ███   ████████████████████

8           (Plaintiff's Exhibit 153 marked for identification)

9      Q.  MS. KOPEIKIN:  I'm going to show you now some

10   documents, we're almost I just want you to help me

11   confirm what they are and that they are Fortinet

12   documents.  So I'll start with Exhibit 153.

13           Drew, your copy.

14           MR. HOLMES:  Thanks.

15           Does this have a Bates number on it?

16           MS. KOPEIKIN:  I don't believe so.  I think it's

17   just a printout from Fortinet's website.  I don't think

18   it's a production or --

19           MR. HOLMES:  We're on 153.

20           MS. KOPEIKIN:  Yes, I'll identify it for the

21   record.  It's a document downloaded from Fortinet's

22   website Fortinet.com.  It's entitled Fast and Secure

23   Performance with Consolidation.

24           And I'll let the witness, after he's had a chance

25   to look at the document, identify what it is, if he

                              AEO

CONFIDENTIAL

Page 153

1    knows.

2        Q.  You've had a chance to look at Exhibit No. 153,

3    Mr. Crawford.  Can you please identify it, what it is.

4        THE WITNESS:  I'm sorry what was your question?

5        Q.  MS. KOPEIKIN:  What is Exhibit 153?

6        A.  It appears to be a marketing document of some

7    sort.

8        Q.  Have you ever seen it?

9        A.  No.

10       Q.  Okay.  Are you familiar with any of the marketing

11   materials at Fortinet?

12       A.  I've seen some datasheets and things.

13       Q.  But Exhibit 153 is not one of the things that

14   you've seen, at least in its entirety?

15       A.  No.

16       Q.  I -- because you're the person designated about

17   Design, development, structure, and operations of the

18   products and related documentation, I do want to walk you

19   through Exhibit 153 and some of the other documents that

20   are Fortinet marketing materials in part to see -- you

21   may not know the entire document in this capacity, I

22   expect you to know some portions of it.

23       So I would like you to turn to the second page of

24   Exhibit 153.  And there's a timeline down at the bottom.

25   You may not have --

                              AEO

CONFIDENTIAL

Page 154

1          Well, first of all, have you seen a timeline of

2     this sort in your work at Fortinet?

3          A.  I've seen a similar timeline.

4          Q.  And is the timeline on Exhibit 153 the timeline

5     of the development of the Fortinet products or events in

6     Fortinet's existence I guess is the right word?

7          A.  It appears to be.  Some sort of timeline of

8     events.

9          Q.  Looking at a timeline on the second page of

10    Exhibit 153, there's a reference that says May 2002,

11    FortiGate/FortiOS 1.0, and it references a launch

12    INTEROP, do you see that?

13         A.  I see that.

14         Q.  Is this May 2002 time frame consistent with or

15    does it refresh your recollection about when FortiGate

16    product was launched?

17         A.  Yes, I think I mentioned.

18         Q.  I just want to make sure it's consistent with

19    your recollection.  Then there's -- above the timeline

20    for April 2003 there's a reference to FortiManager.  Is

21    that consistent with your recollection about when

22    FortiManager was launched as a product?

23         A.  Yes, it could be around that time.

24         Q.  Do you have any reason to believe that the April

25    2003 date for the launch of FortiManager is incorrect?

                              AEO

CONFIDENTIAL

Page 155

1      A.  Well, I didn't work on them that year at that

2   time.  It's probably right.

3      Q.  And on October 2004 there's reference it says

4   name WW -- which I assume to be worldwide -- UTM Leader.

5   Do you see that?

6      A.  I see that.

7      Q.  Is that a reference to Unified Threat

8   Management?

9      A.  The -- the acronym?

10      Q.  The UTM.

11      A.  The acronym that it's referencing, Unified Threat

12   Management.

13      Q.  There's a reference below the timeline being

14   second page of Exhibit 153 to a March 2004 product called

15   FortiClient?

16      A.  Yes.

17      Q.  Did you have any involvement in the development

18   of the FortiClient product?

19      A.  No.

20      Q.  Do you know what that product is?

21      A.  Yes.

22      Q.  What is it?

23      A.  ███████████████████████████████████.

24      Q.  Do you have any involvement with the FortiClient

25   now?

AEO

CONFIDENTIAL

Page 156

1      A.   Occasionally regarding specification documents,

2  and we help on occasion.

3      Q.   Then goes on -- at some point something that's

4  not on the timeline was the implementation of this █████

█  █████ that you referred to.  But that would appear in the

6  timeline sometime around 2005, correct?

7      A.   That was my estimate.

8      Q.   Okay.  And the May 2005 FortiOS entry about the

9  timeline, is that consistent with your general

10 recollection of when the FortiOS was updated to 3.0?

11     A.   It could have been around that time.

12     Q.   Do you have any reason to doubt that's -- the

13 correctness of that date?

14     A.   I have no reason to doubt it.

15     Q.   And again still on this timeline, it shows

16 January 2006 for the FortiWiFi program.  Is that

17 consistent with your understanding of when the FortiWiFi

18 program was launched?

19     A.   Yes, I think I mentioned it was around that time.

20 So.

21     Q.   And then this is a reference, again, below the

22 time line on Exhibit 153 to FortiWeb 2009 -- February

23 2009.  Is that the launch date of the FortiWeb product?

24     A.   I -- I'm assuming it's launch time, yes.

25     Q.   Going to the third page of Exhibit 153, and
                            AEO

CONFIDENTIAL

Page 157

1    October 2012 there's a reference to FortiOS 5.0.  Is that

2    consistent with your understanding about when FortiOS

3    was -- I guess the version 5.0 was released on or around

4    that time?

5        A.  Yes, I believe it was around that time.

6        Q.  There's a reference to one million units shipped

7    in September 2012.  What product or products is that

8    referring to?

9        A.  I don't know.

10       Q.  You don't know?

11       A.  I don't know what that's -- what that's referring

12   to.

13       Q.  Do you know how many units of FortiGate had been

14   shipped for the life of the product?

15       A.  No.

16       Q.  Okay.  Also on that same third page of Exhibit

17   153 there's a discussion about forward-looking market

18   leadership.  And it says that Fortinet is a Worldwide

19   leading provider of the UTM appliances, according to IDC

20   and Gartner.  Do you see that?

21       A.  I see that.

22       Q.  In the reference there by Fortinet to UTM

23   appliances, what do you know that to be a reference to?

24       A.  Could be referring to the FortiGate family of

25   products.

AEO

CONFIDENTIAL

1      Q.  Is that your understanding?

2      A.  I -- that's what I would understand it to be.

3      Q.  Okay.  Can you turn to the next page of Exhibit

4   153, please.  And there is a chart there that shows, you

5   know, the term "breaking point".  It's the bottom third

6   of the page.  And it shows on the far left hand column in

7   red FortiGate, or Fortinet/FortiGate, and the number

8   there is 559.  And then it goes across to the right and

9   the other references to Check Point, and then Juniper,

10   Crossbeam, Cisco Analyst, Cisco ASA, and then Palo Alto.

11          Do you see those?

12      A.  I see that.

13      Q.  And are those other references to other firewall

14   products competitive to FortiGate?

15      A.  There are references to products.  I don't know

16   if they are firewalls.

AEO

CONFIDENTIAL

Page 159



AEO

CONFIDENTIAL



CONFIDENTIAL



Page 161

AEO

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



Page 164

AEO

CONFIDENTIAL



Page 165

AEO

CONFIDENTIAL

Page 166

10      Q.  All right.  We'll come back to that because I

11  think we're talking past each other.  I understand what

12  you're saying, but.  There are some additional documents

13  I'd like to you look at too.

14          Next one is Exhibit 144.

15      (Plaintiff's Exhibit 144 marked for identification)

16      Q.  MS. KOPEIKIN:  Exhibit 144 and Fortinet produced

17  documents in this action.  It's FORT-NPS-165877 through

18  NPS-891.  I see my copy is double-sided.

19              (Discussion off the record)

20                  (Recess)

21      MS. KOPEIKIN:  Okay.  You should have before you

22  Exhibit 144.  I think I ID's it for the record, but, in

23  the event I did not, it's entitled ███████████████

███  ████████████.  It's a 15-page document, production

25  range FORT-NPS165877 through 165891.

                        AEO

CONFIDENTIAL

Page 167



1          Do you have that in front of you?

2     A.  I do.

16         First of all, is Jeff Crawford you?

17    A.  Yes.

18    Q.  So your first name, it's William, but you go by

19  Jeff?

20    A.  Yes.

AEO



CONFIDENTIAL

Page 168

3    Q.  Okay.  Let's go to Exhibit 145.

4    (Plaintiff's Exhibit 145 marked for identification)

5         MS. KOPEIKIN:  Document entitled ██████████

██████████, production numbers FORT-NPS-169221 through

7    169227.

8         Mr. Crawford, it shows you as the author, do you

9    see that?

10   A.  I see that.

11   Q.  Is Exhibit 145 a document created and used in the

12   business of Fortinet?

13   A.  I believe so.

14   Q.  Is it a document you created?

15   A.  Yes.  I think I might have created this one.

16   Q.  For what purpose?

AEO

CONFIDENTIAL

Page 169

1          (Plaintiff's Exhibit 146 marked for identification)

2          MS. KOPEIKIN:  All right.  Let's go to Exhibit

3    146.  And for the record it's entitled Table of Contents.

4    ███████████████████████████████████████ is

5    the first entry, and the production stamp numbers are

6    FORT-NPS-171094 through 171097.

7          Do you know what this document Exhibit 146 is,

8    Mr. Crawford?

9      A.  It appears to be a specification document.

10     Q.  Oh, I think you have the wrong document in front

11   of you.

12     A.  147.

13     Q.  146, 147 let's fix that.

14     A.  146.

15     Q.  Yes.  Again, it's entitled Table of Contents and

16   then the first entry is had ██████████████████████

██  ████████████████

18     A.  Your question was.

19     Q.  What is Exhibit 146?

20     A.  It appears to be a design document of some sort.

21     Q.  For what?

22     A.  It says here for █████████████████████████

██  ████████████████████

██    ██  ██████████████████

██    ██  ███████████████████████████████
                        AEO

CONFIDENTIAL

Page 170

1      Q.  Who is Cheng Gao?

2      A.  Maybe it was an engineer.

3      Q.  In what group or on what product?

4      A.  Could have been on the -- on the FortiGate

5   development, but I don't know for sure.

6      Q.  Did you ever work with Cheng Gao?

7      A.  I don't think so.

8      Q.  Is Exhibit 146 a document created in the ordinary

9   course of Fortinet business and used by Fortinet in its

10  business?

11     A.  Looks like a document created for -- by the

12  engineering team.

13        (Plaintiff's Exhibit 147 marked for identification)

14         MS. KOPEIKIN:  All right.  Let's goes to Exhibit

15  147.

16         Production stamp numbers are FORT-NPS 177735

17  through 177744, and at the top of the first page of

18  Exhibit 147 it says Table of Contents, ███████████████

19  is the first entry.

20     Q.  Is Exhibit 147 a document that was created in the

21  ordinary course of Fortinet's business and use in that

22  business, Mr. Crawford?

23     A.  It appears to be, yes.

24     Q.  What is ████████████████ as used in your own

25  147?

                              AEO

CONFIDENTIAL

Page 171

1   A.  And ████████████ in general or --

2   Q.  As used in Exhibit 147, what is that reference

3   to?

4   ██ ████████████████████████████

██ █████████████████████████████████

██ ████████████████████

██ ██ ████

██ ██ ████████████████████

██ ██████████████████████████

██ █████

11      (Plaintiff's Exhibit 148 marked for identification)

12   Q.  Okay.  Exhibit 148.  Okay.  Wait a second.  Can I

13   have 148 please.

14      Can't read my own writing.  For the record,

15   Exhibit 148 is entitled ██████████████████.

16   Production numbers FORT-NPS-176 -- excuse me, 178611

17   through 178620.  █████████████████

██ █████████████████████████████

██ █████

20      This document indicates on the first page that it

21   is a ████████████████.  What does that mean?

22   ██ ████████████████████████████

██ ████████████████████████

24   Q.  And the feature addressed in Exhibit 148 is a web

25   ██████████████████, correct?

AEO

CONFIDENTIAL

Page 172

1      A.  Appears to be.

2      Q.  Is Exhibit 148 a document created in the course

3 of Fortinet's business and use in that business?

4      A.  I believe so.

5      Q.  Did you have any role in creating Exhibit 148?

6      A.  I don't think so.



AEO

CONFIDENTIAL



CONFIDENTIAL



Page 174

AEO

CONFIDENTIAL



CONFIDENTIAL



Page 176

16          MS. KOPEIKIN:  Okay.  Drew, I'm going to ask that

17    his deposition from the Trend Micro case and also the

18    expert report be produced.

19          MR. HOLMES:  And I'll ask you put your document

20    request in writing to us, and we'll take a look at it.

21          MS. KOPEIKIN:  Okay.

AEO

CONFIDENTIAL



Page 177

AEO

CONFIDENTIAL



Page 178

-- can you read

16    his last answer back.

17          I'm going to use your word.

18

AEO

CONFIDENTIAL

Page 179

1    Q.  Have you ever done a patent search to determine

2    whether there were patents that the Fortinet devices

3    might infringe other than at the instruction of

4    counsel?



AEO

CONFIDENTIAL

Page 180

6        (Plaintiff's Exhibit 149 marked for identification)

7           MS. KOPEIKIN:  All right.  Let's go to Exhibit

8    149, please.  And for the record it's entitled ████

█    ████████████████████████████████, production number

10   FORT-NPS-178656 through 178662.

11      Q.  And is Exhibit 149 a document that you authored

12   in the course of your employment at Fortinet,

13   Mr. Crawford?

14      A.  It has my name on it, and it appears to be

15   something I had written.

16      Q.  Is that something -- is Exhibit 149 a document

17   you created in the ordinary course of Fortinet's

18   business?

19      A.  I believe so.

20       (Plaintiff's Exhibit 150 marked for identification)

21      Q.  Exhibit 150.  Would you turn to that please.

22   It's entitled ███████████████████████████████.

23   FORT-NPS-178663 through 178673.

24           Is Exhibit 150 a functional specification that

25   you have created in the ordinary course of your

                          AEO

CONFIDENTIAL

Page 181

1    employment with Fortinet?

2        A.   Looks like one of the ones I've authored.



14       (Plaintiff's Exhibit 151 marked for identification)

15       MS. KOPEIKIN:  All right.  Please turn to Exhibit

16   151.  It's entitled                              And

17   production numbers are FORT-NPS 164710 through 164715.

AEO

CONFIDENTIAL

Page 182



8    Q.   Okay.  And Exhibit 151,

13        Do you see that?

14    A.  I see that.

22    (Plaintiff's Exhibit 152 marked for identification)

23        MS. KOPEIKIN:  Let's go to Exhibit 152 entitled

24    .  And the production

25    number is FORT-NPS 169248 to 169250.

AEO

CONFIDENTIAL

Page 183

1      Q.  Have you ever seen this ████████████████

██     ███████ document before?

3      A.  It was very vague.  I think it maybe a very old

4   one.  I think I may have seen it.

5      Q.  In what context?

6      A.  I don't recall.

16     Q.  What is your current job title?

17     A.  My current job title?

18     Q.  Yes.

19     A.  It's Senior Director of Product Management.

20     Q.  How many people work under you?

21     A.  None.

22     Q.  None?

23     A.  None.

24     Q.  And you report to Michael Xie too?

25     A.  No.

AEO

CONFIDENTIAL

Page 184

1     Q.  Who do you report to?

2     A.  I report to Robert May.

3     Q.  What is his title?

4     A.  VP of Product Management.

5     Q.  When did you stop reporting to Michael Xie?

6     A.  2005, sometime around there.

7     Q.  And since you stopped reporting to Michael Xie

8  have you at all times reported to Robert May?

9     A.  No.

10    Q.  Who else did you report to before Robert May?

11    A.  I think I answered before I reported to Hongwei

12 Li.

13    Q.  When did you start reporting to Robert May?

14    A.  I believe it was 2009.

15    Q.  Other than Michael Xie and then Mr. Hongwei --

16    A.  Li.

17    Q.  -- Mr. Li, and then Mr. May, is there anyone else

18 you have reported to at Fortinet?

19    A.  I think that's it.

AEO

CONFIDENTIAL



Page 185

AEO

CONFIDENTIAL



Page 186

AEO

CONFIDENTIAL

██  ██  ████████

██  ██  ████

 3     Q.  Did you know Michael Xie before you started

 4   working at Fortinet?

 5     A.  Yes, I did.

 6     Q.  How?

 7     A.  My wife knew him.

 8     Q.  Your wife knew him?

 9     A.  Yes.

10     Q.  How?

11     A.  They went to the same university.

12     Q.  What university was that?

13     A.  University of Manitoba.

14     Q.  What's your wife's name?

15     A.  Katherine.

16     Q.  Does she work for Fortinet?

17     A.  Yes.

18     Q.  In what capacity?

19     A.  She's currently the VP of operations.

20     Q.  How long has she worked for Fortinet?

21     A.  Since 2000.

22     Q.  Is her last name also Crawford?

23     A.  Yes.

24     Q.  Did she work with Michael Xie before Fortinet?

25     A.  No.

                          AEO

CONFIDENTIAL

Page 188

1    Q.  So how long have you known Michael Xie?

2    A.  Probably from '99.  I can't remember if I met

3  him, but I probably knew him a little bit.



AEO

CONFIDENTIAL

Page 189



AEO

CONFIDENTIAL

Page 190



AEO

CONFIDENTIAL

Page 191

21       Q.   All right.  I'd like to you look back at Exhibit

22   143, please, the Notice of Deposition, first document you

23   looked at.  It's been a long time.

24            Please turn to the page number 3, back to the

25   Topics?

                              AEO

CONFIDENTIAL

Page 192

1          Okay.  On the design of the Accused Products.

2     Are there any aspects of design that you were asked to

3     testify about that we haven't covered today?

4          A.  Is this related to a particular section?

5          Q.  No, you're not in on -- on page No. 3.

6          A.  Page No. 3.

7          Q.  Topic No. 6.

8          A.  Yes.

9          Q.  Are there any aspects of the design that we have

10    not covered today that you are then prepared to testify

11    about.

12         A.  I'm prepare to -- I've prepared for the, design,

13    development structure, its operation of the Accused

14    Products.

15         Q.  Is there anything about the design that you

16    haven't testified about, that we haven't touched on

17    today?

18         A.  Well, I have knowledge of the design of the

19    product.

20         Q.  Okay.  Is there anything other than the general

21    areas we've talked about today?

22         A.  I don't know what the -- I don't quite follow

23    your question.

24         Q.  Okay.  Well, you prepared to testify today about

25    the design, development, structure, operation of Accused

                                AEO

CONFIDENTIAL

Page 193

1    Products?

2        A.  Yes.

3        Q.  And I'm just trying to make sure that you've had

4    a fair opportunity to testify about those subjects, that

5    I have at least touched upon them.

6        A.  Okay.

7        Q.  So with regard to the design of the Accused

8    Products, are there areas that you think that we haven't

9    covered with regard to the design that you are prepared

10   to testify about today?

11       A.  Well, I prepared in general.  You can ask the

12   questions of what you are interested in.  So I -- I know

13   lots of designs, but I'm not sure what you want -- want

14   to ask, so.

AEO

CONFIDENTIAL

Page 194

■ ████████████████   ███████████████████

■ ███████████████████████████████████████

■ ███████████████████

4            Is there anything at least to the high level with

5    regard to the design of those processes that we haven't

6    talked about today?

7        A.   I can't think of anything right now.

8        Q.   Okay.  Is there anything -- same question with

9    the development.  Is there anything concerning the

10   development of the Accused Products that you are prepared

11   to talk about that we haven't covered today?

12       A.   I can't think of any offhand.

13       Q.   Okay.  With regard to the structure of the

14   Accused Products, is there anything that you are prepared

15   to talk about today as the Person Most Knowledgeable that

16   we haven't covered at least as to high level?

17       A.   No, I don't know of anything in particular.

18       Q.   Okay.  With regard to the operation of the

19   Accused Products in terms of things that you are prepared

20   to talk about today, is there anything other than what

21   we've already covered?

22       A.   I've prepared -- I don't know if this is much

23   more to discuss about it.  If you had questions I could

24   try to answer.

25       Q.   Well, is there anything about the operation with

AEO

CONFIDENTIAL

1  regard to transparent proxy processes concerning the

2  Accused Products that we haven't discussed?

3      A.  I can't think of anything else right now.

9          MS. KOPEIKIN:  Why don't you go catch your

10  flight.

11          THE WITNESS:  Okay.  Thank you.

12          MS. KOPEIKIN:  Thank you for your cooperation.

13          THE WITNESS:  Thank you.

14      (Whereupon, the deposition concluded at 5:56 p.m.)

15                  --o0o--

16

17

18

19

20

21

22

23

24

25

                        AEO

CONFIDENTIAL

Page 196

1                        DECLARATION

2    I hereby declare under penalty of perjury that I have

3    read the foregoing transcript and certify that

4    (check one)

5         _____ I have no corrections.

6         _____ I have made corrections as reflected on the

7    attached Deponent's Correction Sheet and I now approve my

8    deposition as true and correct.

9

10        Dated:_____ at _____,

11                                        (City)

12   _____ .

13        (State)

14

15                   _____

16                   WILLIAM JEFFREY CRAWFORD

17

18

19

20

21

22

23

24

25
                            AEO

CONFIDENTIAL

Page 197

1                    CERTIFICATE OF REPORTER

2

3         I, PEPPINA HARLOW, Certified Shorthand Reporter,

4    license No. 7433, of the State of California, do hereby

5    certify:

6         That the witness in the foregoing proceedings

7    was present and was by me duly sworn as a witness in the

8    above-entitled action, and that this transcript is a true

9    record of the testimony and of the proceedings which took

10   place.

11

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   the 9th day of February, 2013.

14

15                    _____

16                    PEPPINA HARLOW, C.S.R. No. 7433

17

18

19

20

21

22

23

24

25

                              AEO

CONFIDENTIAL

Page 198

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AEO

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

Page 220



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

Page 238

