# EXHIBIT 5
# Redacted-Public Version

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

----------------------------------x
NETWORK PROTECTION SCIENCES,
LLC,

                        Plaintiff,

        vs.           Case No. 3:12-CV-01106-WHA


FORTINET, INC.,

                        Defendant.
----------------------------------x

                        August 5, 2013
                        9:36 a.m.


    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
        PURSUANT TO THE PROTECTIVE ORDER


        Deposition of CHRISTIAN B. HICKS, held at

the offices of Quinn, Emanuel, Urquhart &

Sullivan, LLP, 51 Madison Avenue, New York, New

York, before Roberta Caiola, a Shorthand

Reporter and Notary Public within and for the

State of New York.


                DEPOLINK COURT REPORTING
                    One Cape May Street
                Harrison, New Jersey  07029
        Phone:  (973) 353-9880    Fax:  (973) 353-9445
                    www.depolink.com

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 2

1    A P P E A R A N C E S:

2

     GIBBONS P.C.
3    Attorneys for The Plaintiff
          One Gateway Center
4         Newark, New Jersey  07102
     BY:   VINCENT McGREARY, ESQ.
5          vmcgreary@gibbonslaw.com

6

7    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
     Attorneys for the Defendant
8          50 California Street, 22nd Floor
           San Francisco, California  94111
9          (415) 986-5700
     BY:   WILLIAM COOPER, ESQ.
10         willcooper@quinnemanuel.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 3

1                             INDEX

2   Witness          Examination By              Page
    Christian
3   B. Hicks         Mr. McGreary                  4

4

5                     E X H I B I T S

6   Exhibit             Description             Page

7   Exhibit 192 Expert report of Christian B.    10
                Hicks
8   Exhibit 193 Defendant Fortinet, Inc.'s      126
                Identification of Preliminary
9               Claim Constructions Pursuant
                to Patent Local Rule 4-2
10  Exhibit 194 Document entitled "Exhibit      155
                Configuration Summary"
11  Exhibit 195 Document (retained by Mr.       155
                McGreary)

12

13  (Original exhibits retained by the Court
    Reporter to accompany the transcript, with the
14  exception of Exhibit 195 which was retained by
    Mr. McGreary)

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 4

1   CHRISTIAN B. HICKS, having been duly sworn by

2   the Notary Public, (Roberta Caiola), was

3   examined and testified as follows:

4   EXAMINATION BY MR. MCGREARY:

5        Q.     Good morning, Mr. Hicks.

6        A.     Good morning.

7        Q.     My name is Vincent McGreary and I

8   represent Network Protection Sciences in this

9   matter.

10              As I understand it you are a

11  retained expert witness for Fortinet, is that

12  right?

13       A.     That's correct.

14       Q.     How many times have you testified

15  as an expert witness?

16       A.     You mean in deposition or in trial

17  or in arbitration?

18       Q.     Why don't we take deposition first.

19       A.     Let me think.  I can give you a

20  vague number or I can go through my mind and try

21  to count it up, which would you prefer?

22       Q.     Why don't you give me your best

23  estimate?

24       A.     Half a dozen times.

25       Q.     So you're familiar with the process

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 5

1   of giving deposition testimony?

2          A.     I am.

3          Q.     You understand that you're under

4   oath?

5          A.     I do.

6          Q.     You understand that it's my

7   opportunity to ask you questions and you're

8   obliged to answer those questions as best you

9   can?

10         A.     Subject to certain limitations, I

11  understand that's generally the practice, yes.

12         Q.     What limitations do you understand

13  that there are in answering my questions as best

14  as you can?

15         A.     I understand there are certain

16  circumstances where I may be instructed not to

17  answer.

18         Q.     Other than those circumstances, you

19  understand that you are obliged to answer my

20  questions as best as you can answer them?

21         A.     Yes.

22         Q.     You also understand that I may ask

23  you questions that are of the yes or no formate;

24  you've seen those questions in a deposition,

25  right?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 6

1        A.      Yes.

2        Q.      If you can answer them yes or no

3    you will do that for me?

4        A.      Yes.  Let me say more precisely.

5    I'll provide the best answer I can, if it

6    happens to be a yes or no answer I'll make it

7    that.

8        Q.      So if it's a yes or no question,

9    what other type of answer would be better than

10   yes or no?

11       A.      If neither yes nor no most

12   precisely answers the question, then some other

13   answer is called for.

14       Q.      Well, you understand that if I ask

15   you a yes or no question Mr. Cooper here will

16   have an opportunity on cross-examination, or

17   trial on redirect, to ask you about any answer

18   that you gave if he thought that there was

19   another answer that was more precise.  You

20   understand that, right?

21       A.      I do understand that.

22       Q.      So you understand that as I ask you

23   questions today that are yes or no, or even

24   other types, that you shouldn't be trying to

25   slip in information into those answers unless

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

1   they are actually directed to the question.  You

2   understand that, right?

3         A.     I understand that.  I understand

4   that I should give the most precise answer that

5   I can.

6         Q.     To the question?

7         A.     To the question.

8         Q.     How many times have you testified

9   at trial?

10        A.     Well again, there's times and

11  there's trials.  I've testified I think in three

12  trials and an arbitration that I can think of

13  right now.  In two of those trials I testified

14  twice, once at a hearing and then once at trial.

15        Q.     How many times have you been

16  engaged as an expert for litigation purposes?

17        A.     I'm not sure if this is exactly

18  what you're asking, but I think it is so I'll

19  provide this answer, and let me know if it's not

20  what you're looking for.

21               I think I've worked on somewhere

22  between 100 and 200 different matters, most of

23  those involving litigation, or many of those

24  involving litigation or possible litigation.

25               MR. McGREARY:  Any chance we have

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 8

1    the exhibit number?

2              MR. COOPER:  I'm almost there I

3    think, if it's in the rough transcript

4    accurately; the internet is not moving very

5    fast.

6         Q.    So in your expert report which when

7    we an get exhibit number I'll mark and hand to

8    you so you will have it in front of you, I

9    believe you stated that you worked on more than

10   130 technical matters?

11        A.    That sounds right.

12        Q.    Are all those technical matters

13   with respect to technical litigation consulting?

14        A.    As a general matter yes, although

15   they don't all involve actual litigations.

16        Q.    The company that, according to your

17   expert report, that you are president of is

18   called Elysium Digital, LLC, is that right?

19        A.    It is.

20        Q.    Are you president or employed by

21   any other companies?

22        A.    No.  Let me think.  Am I president

23   or employed by any other companies.  I don't

24   believe I'm president of any other companies.

25   I'm a member of some other LLCs or small

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 9

1   corporations.

2        Q.     What other corporations are you a

3   member of?

4        A.     There's a company called EDIPP,

5   Elysium Digital IP Products I think is what it

6   stands for, which is a company that develops

7   certain kinds of products related to litigation

8   consulting.

9        Q.     Any other companies?

10       A.     There's a company called Secure

11  Licensing Systems, which relates to some prior

12  research and work that I did with a colleague of

13  mine, Peter Creath, on the licensing systems.

14       Q.     By "licensing systems" do you mean

15  licensing systems for digital media and those

16  types of things?

17       A.     For software and digital media.

18       Q.     Are you a member of any other

19  companies?

20       A.     I don't think so.  I can't think of

21  any others right now.

22       Q.     I believe you said you founded

23  Elysium in around 1997?

24       A.     That's correct.

25              MR. McGREARY:  Let's go off the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 10

1    record.

2                    (Off the record.)

3                    MR. McGREARY:  Let's mark

4    Exhibit 192.

5                    (Exhibit 192, Expert report of

6    Christian B. Hicks, marked for identification.)

7          Q.    Mr. Hicks, I've handed you what we

8    have marked as Exhibit 192.  Do you recognize

9    the document?

10         A.    Paging through it this appears to

11   be a copy of my non-infringement report in this

12   matter.

13         Q.    We may be referring back and forth

14   to this report for certain lines of questioning

15   so I'm going to leave it in front of you.  If at

16   any point to answer one of my questions you feel

17   like referencing your report would be helpful,

18   you can tell me that.

19         A.    I understand.

20         Q.    I want to direct your attention to

21   the "Background" section which is on page 2 of

22   your report?

23         A.    Yes.

24         Q.    In this section did you set forth

25   the background which you feel qualifies you to

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 11

1    render the opinions that are contained in this

2    report?

3          A.    I set forth some of it.  I think

4    there are other things that qualify me, but I

5    set forth what I thought were the most important

6    things.

7          Q.    Did you understand in preparing an

8    expert report that you should have listed all

9    the qualifications that would have qualified you

10   for the expertise to render the opinions in your

11   report?

12         A.    My understanding was that I needed

13   to set forth those qualifications that were

14   sufficient to show that I was a qualified

15   expert.

16         Q.    Do you expect to testify to

17   additional qualifications at trial that are not

18   contained in your report?

19         A.    I don't have any such plans right

20   now.

21         Q.    What was the understanding in

22   preparing this expert report for what it would

23   be used for in this litigation?

24         A.    Well, my understanding was that it

25   was a Rule 26 disclosure, so in that regard it

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 12

1    would serve to set forth my expected testimony

2    at trial.

3         Q.    Was it your understanding that you

4    were to set forth all of your expected testimony

5    at trial, and the bases for any opinions that

6    you gave in your report?

7              MR. COOPER:  I'll object to the

8    extent that this question is calling for

9    communications between the witness and counsel

10   at Quinn Emanuel, it's in violation of the

11   stipulation between the parties.  To the extent

12   that you can answer without divulging such

13   communications, you may do so.

14        Q.    So what Mr. Cooper is speaking

15   about is that we have a stipulation between the

16   parties that we would not inquire into

17   communications between counsel and expert

18   witnesses, so to the extent if you feel one of

19   my questions is directed to that, it's not, and

20   you can feel free to exclude those

21   communications?

22        A.    I understand.

23        Q.    So my question is you've testified

24   and prepared expert reports other than what's

25   marked as 192, correct?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 13

1      A.      Correct.

2      Q.      So you have an understanding of

3    what Rule 26 disclosures require of an expert

4    report in federal court, right?

5      A.      I have an expert's understanding,

6    not an attorney's understanding.

7      Q.      So your understanding -- it was

8    your understanding that you had to set forth all

9    of your opinions, and the bases thereof, that

10   you expected to testify to at trial?

11     A.      My understanding was that I would

12   do that, and in fact I did do that.  Whether or

13   not I have to do that -- whether or not I had to

14   do that I think is a legal question that's

15   slightly beyond any qualifications.  My

16   understanding is that was what I should do.

17     Q.      You didn't have an understanding

18   that you had to do it?

19     A.      I'm aware that sometimes people are

20   permitted to testify beyond the scopes of their

21   expert reports, and exactly when that is or is

22   not permissible is not something that I am an

23   expert on.

24     Q.      You did not exclude any opinions or

25   bases thereof that you expected to testify to at

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 14

1    trial?

2         A.      No.

3         Q.      What about for your qualifications.

4    Did you exclude purposely any qualifications

5    that you expected to give at trial that would

6    qualify you as an expert for the opinions that

7    you set forth in your expert report marked as

8    192?

9         A.      I didn't purposely exclude anything

10   that I expected to reference at trial.

11        Q.      Directing your attention to the

12   background again.  Is this the section of your

13   report where you set forth your qualifications

14   for giving the opinions you expressed in your

15   report?

16        A.      This is the section of the report

17   where I set forth some of my qualifications, and

18   those qualifications that I think sufficient to

19   show that I'm qualified as an expert to give

20   opinions in this report.

21        Q.      Is there any other section of your

22   report where you set forth qualifications that

23   you expect to testify to at trial?

24        A.      I don't believe so.

25        Q.      So you co-founded Elysium in 1997,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 15

1    is that correct?

2           A.      It is.

3           Q.      Who is your co-founder?

4           A.      Peter Creath.

5           Q.      Who is Mr. Creath?

6           A.      He is the vice president of Elysium

7    Digital and the other member of the LLC.

8           Q.      Between 1997 and to date, what

9    percentage of your income comes from your work

10   at Elysium?

11          A.      That's a little bit difficult to

12   say.  First of all it's a large number of years

13   and also I've been married for some of those

14   years, my wife works and we have investment

15   income as well.

16          Q.      So let me clarify the question.

17          A.      That would be great.  I can try

18   that one, but it's better if you do a different

19   one.

20          Q.      I want to exclude your wife's

21   income.  She does not work for Elysium, does

22   she?

23          A.      She does not.

24          Q.      I want you to include only work

25   with respect to technical matters, okay?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 16

1       A.      Okay.

2       Q.      I want you to exclude investment

3   income?

4       A.      Okay.

5       ████        ████████████████████████████████

████   ██████████████████████████████████████

████   █████████████████████████████

████      ████   █████████████████████   █████████████

████   █████████████████████████████████████

████   ███████████████████████████████████

████   ██████████████████████████████████████████████

████   ██████████████████████████████████████████████

████   ████████████████████████████

████      ████████████████████████████████████

████   ████████████████████████████████████████

████   █████████████████████████████████

████   ██████████████████████████████

████   █████████████████████████████

████   ████████████████

20      Q.      Would the same be true for last

21  year?

22      A.      I believe so.

████      ████   █████████████████████████████████

████   ████████████████

████      ████   ██████████████   ██████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 17

████  ███████████   ██████████████████████████

████  ████████████████████████████████

████  ██████████████

  4      Q.    Elysium is a litigation consulting

  5  company, isn't that right?

  6      A.    Yes.

████  ████   ██████████████████████

████  ██████████████████████████████

████  ██████████████

████   ████   ██████████████████

████  ████████████████████████████████████

████  █████████████████████████

 13      Q.    In your background you say you

 14  worked on more than 130 technical matters while

 15  at Elysium?

 16      A.    Yes.

████  ████   ██████████████████████

████  ████████████████████████

████  ████   █████████████   ████████████

████  ██████

 21      Q.    Did you list your matters anywhere

 22  in your report?

 23      A.    I did not.  It turns out also to be

 24  practically difficult because many of them are

 25  confidential.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 18

1          Q.      Did you list the firewall matters

2     in your report?

3          A.      No.

4          Q.      Were they confidential?

5          A.      Some of them.

6          Q.      Did you list the non-confidential

7     ones?

8          A.      No.

9          Q.      Did you exclude them because they

10    did not help qualify you as an expert in this

11    matter?

12         A.      The word exclude suggests a

13    deliberateness of decision.  I set down the

14    qualifications that I thought were necessary to

15    qualify me and then I stopped.  I don't remember

16    making an active decision to exclude providing

17    detail on the firewall matters.

18         ██      ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

██       ██     ████████████████████████   █

██████████████████████████████████████████████████████

██████████████████████████

25         Q.      You're not certain.  How about the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 19

1    broader category of data networking security.

2    Of the 130 litigation technical consulting

3    matters that you worked on, how many of them

4    were related to data networking security?

5          A.    Data networking security, by that

6    do you mean computer security in general?

7          Q.    Are you an expert in data

8    networking?

9          A.    Yes.

10         Q.    So I mean it in the scope of the

11   expertise that you understand data networking to

12   mean.

13         A.    Okay.  So applying what I consider

14   to be a reasonable definition of that term the

15   number would be higher, perhaps north of 40.

16   Again, I can't be certain.

17         Q.    What is your understanding of the

18   term data networking?

19         A.    It is the field of networking and

20   the data which travel those networks.

21         Q.    So which matter that you worked on

22   would you consider most closely aligned with the

23   work that you've done in this case?

24         A.    I'm afraid the first two things

25   that come to mind are confidential.  We have

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 20

1    permission to describe -- I have secure

2    permission to say the following.  ███████████

     ███████████████████████  Some of that work I think is

4    applicable here, is closely applicable here.

5          Q.     So I'm not going to be hearing from

6    you however at trial about these confidential

7    matters that you're not telling me about today,

8    am I?

9          A.     I don't suspect so.  Although the

10   confidentiality status of those things can

11   change if the parties go public.

12         Q.     You're aware that there is a

13   protective order in this case?

14         A.     I am.

15         Q.     Is it your feeling that your

16   confidentiality requirements still prohibit you

17   from testifying about those matters in this

18   case?

19         A.     They do.  As a general rule I don't

20   take that position, but the security on those

21   particular matters is high.  I would have to

22   seek a protective order and then consult with

23   the client.

24         Q.     Have you published any papers on

25   data networking?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 21

1       A.      I don't believe so.

2       Q.      Have you built any firewalls?

3       A.      Yes.

4       Q.      What firewalls have you built?

5       A.      I've built several firewalls in

6    connection with operations at the office or

7    other offices.

8       Q.      Well, go ahead and tell me.

9       A.      We have built firewalls at Elysium

10   on several occasions, I was involved in some of

11   those efforts over the years.  I built a

12   firewall for a nonprofit, having donated my time

13   on a nonprofit called Project 55, I remember

14   that.  I've probably built others, those are the

15   ones that come to mind.

16     ■      ▬▬▬▬▬▬▬▬▬▬

   ■   ▬▬▬▬▬▬▬▬▬

   ■      ■   ▬▬▬▬▬▬▬

   ■      ■   ▬▬▬▬▬▬▬▬▬

   ■   ▬▬▬▬

   ■      ■   ▬▬▬▬▬▬▬▬▬▬

   ■   ▬▬▬▬▬▬▬▬

   ■   ▬▬▬▬

   ■      ■   ▬▬▬▬▬▬▬▬▬▬

   ■   ▬▬▬▬▬▬▬▬

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 22

1        Q.     ████████████████████

████████████████     ████████████████████

████████████████████████████████

████████████████████

5        Q.     Was it a downloadable firewall that

6   only needed to be configured, or did you

7   actually build up the firewall from a Linux

8   distro?

9        A.     I built up the firewall from the

10  Linux distro.

11       Q.     What distro was it and what did you

12  have to do to build it?

13       A.     I don't remember which distro it

14  was.  In general, what I had to do was install

15  the proper packages, configure it was either IP

16  chains or IP tables properly, test it and deploy

17  it.

18       Q.     Did you have to write the source

19  code for the firewall?

20       A.     I did not.  I had to write the

21  rules.

22       Q.     You had to write the policy rules?

23       A.     Yes.

24       ████     ████████████████████

████████     ████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 23

█    ███████████████████████████████

2       A.     No.  One of those firewalls

3    actually required a kernel modification, I

4    remember working on that with someone.

5       Q.     With who?

6       A.     Paul Mattal, M A T T A L.

7       Q.     What did you do?

8       A.     We modified a line of kernel code

9    that was preventing it from recognizing the

10   Ethernet cards properly.

11      Q.     You said we.  Who did the

12   modification?

13      A.     We were both sitting at the

14   computer, I don't remember who was typing.

15      Q.     What else did you do on the

16   project?

17      A.     Again, the same thing.  Installed

18   the distribution, installed the proper packages,

19   write the rules.

20      Q.     Was that a packet filter firewall?

21      A.     Yes.

22      Q.     Did you publish any paper as a

23   result of your work on that firewall?

24      A.     No.  I'm referring back to my

25   previous answer listing of firewalls.  I've

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 24

1   written one, well heavily modified an SMTP

2   proxy.  I had forgotten that earlier.  I didn't

3   mean to interrupt you.

4            MR. McGREARY:  Can you read back

5   where I started to ask my question please.

6            (Question read.)

7        A.    No, I don't remember publishing any

8   paper.

9        Q.    Did you file any patent

10  applications?

11       A.    Not based on firewalls.

12       Q.    Have you done any -- have you ever

13  been a professor at any educational institution?

14       A.    Have I been a professor, meaning

15  have I had the title of professor?

16       Q.    Yes.

17       A.    No.

18       Q.    In 2012, what percentage of your

19  time did you spend working on data network

20  security?

21       A.    I don't know.

22       Q.    Less than half your time?

23       A.    Probably less than half.

24       Q.    Less than a quarter of your time?

25       A.    I'm not sure of that.  It might

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 25

1    have been north of a quarter.

2         Q.    What matters related to data

3    network security did you work on last year?

4         A.    ███████████████████████████

███  ████████████  ████████████████  ████████████

███  ████████████████████████████

███  ███████████████████████████████████████

███  ██████████████████████████████

9         Q.    What were the security measures

10   implicated?

11        A.    I'm sorry?

12        Q.    What were the security measures

13   implicated?

14        A.    ██████████████████████████

███  █████████████████████████████████████

███  █████████████████████████████████████

███  ████████████████  ██████████████████

███  ████████████

19        Q.    Did it have to do with designing or

20   researching a firewall?

21        A.    It did not have to do with

22   designing or researching a firewall.

23        Q.    How about in your St. Jude Medical

24   versus Volcano Corp. matter, what was the

25   subject matter of that case?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 26

1        A.      Heart catheterization machines, not

2    firewalls.

3        Q.      Are you an expert in heart

4    catheterization machines?

5        A.      I'm an expert in the computer that

6    the heart catheterization machine was built on

7    top of.

8        Q.      How about in TB Interactive Data

9    versus Sony Corp., what was the subject matter

10   in that case?

11       A.      It was operating systems and

12   responding to inserted media.

13       Q.      So what about operating systems and

14   responding to inserted media?

15       A.      The patents at issue there were on

16   mechanisms for having operating systems respond

17   in certain ways to inserted media.

18       Q.      By inserted media you mean a disk?

19       A.      Yes.

20       Q.      It could be a USB drive?

21       A.      It could be.  It was mostly about

22   optical disks.

23       Q.      Mostly about optical disks?

24       A.      Yes.

25       Q.      And there are patents related to

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 27

1    how an operating systems should respond to an

2    inserted optical disk?

3         A.    Yes.

4         Q.    It has nothing to do with

5    firewalls?

6         A.    It does not.

7         Q.    You say trial testimony in Optimus

8    versus Eric Stark and Synergetics, what was that

9    case about?

10        A.    ████████████████████████████

     ████████████████████████████████

     █████████████████████████████  ██████████

     █████████████████████████████████

     ████████████████████████████

15        Q.    Did it have anything to do with

16   firewalls?

17        A.    It did not.

18        Q.    ███████████████████████████

     ███████████████████████████████████

     █████████

21        A.    That was a departing employee case

22   where somebody left his job and there were

23   allegations of breach of fiduciary duty and

24   trade secret misappropriation.

25        Q.    Did these trade secret cases have

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 28

1   to do with the allegation that someone kept data

2   that was stored on a computer when they should

3   not have kept that data?

4        A.    Well, these trade secret

5   misappropriation cases, the different cases have

6   different alleged facts.  In some cases, as a

7   general rule it has to do with whether or not

8   people took things with them, but not always.

9        Q.    As I see in your background you

10  list computer forensics as some types of

11  disputes that you are involved in and that you

12  received training in data forensics from MTI in

13  2003, correct?

14       A.    Yes.

15       Q.    What does forensics mean?

16       A.    Computer forensics is the field of

17  recovering and analyzing data.

18       Q.    By recovering is a simple example

19  that someone tries to delete material from his

20  computer and so maybe file directories are no

21  longer kept, but there might be a way to

22  recovery the data anyway?

23       A.    That is an example of computer

24  forensics.

25       Q.    Another example might be where

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 29

1   someone takes a hard drive and smacks it with a

2   hammer because he' trying to destroy the data,

3   and you may specialize in being able to recover

4   that data?

5        A.      That is an example of computer

6   forensics.

7        Q.      How much of your time is spent on

8   the computer forensics aspects of your

9   expertise?

10       A.      It's hard to break out because the

11  work that we do frequently crosses over.  For

12  example, the Oracle Rimini Street case is

13  fundamentally about understanding how material

14  was downloaded, and proving how much was

15  downloaded.  That is a part computer science

16  task and in some sense it is a computer

17  forensics task.

18              We are reconstructing what happened

19  from log files.  It is also a mammoth computer

20  science task as the problem of understanding how

21  the machines work and managing the volume of log

22  data that were going through our computer

23  science problems as well.

24       Q.      So you can't give me an answer?

25       A.      I can't give you an answer off the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 30

1    top of my head.  I couldn't break it down case

2    by case, I would have to think about in the case

3    what's the breakdown.

4         Q.    You have an undergraduate degree,

5    is that right?

6         A.    That's correct.

7         Q.    Do you have any postgraduate

8    degree?

9         A.    No.  Only the forensic

10   certification.

11        Q.    How much time have you spent on

12   configuring firewalls?

13        A.    Hours of my life?

14        Q.    In your life, yes.

15        A.    I have no idea.

16        Q.    Less than 100?

17        A.    I really don't know whether it's

18   less than a hundred.  It could be more than a

19   hundred, I really don't know.

20        Q.    It's not in the thousands, right?

21        A.    It seems unlikely it's in the

22   thousands.

23        Q.    You don't recall any firewall

24   configurations other than the ones you testified

25   about?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 31

1        A.      Those are the ones I remember.

2        Q.      How much time have you spent doing

3    network design?

4        A.      I've done quite a bit of network

5    design, I couldn't tell you how many hours.

6        Q.      What do you understand network

7    design to be?

8        A.      It's the laying out of a network,

9    what machines are going to be where, which other

10   kinds of equipment like routers and firewalls

11   are going to be where.

12       Q.      How many networks have you

13   designed?

14       A.      At least three, maybe four or more.

15       Q.      What's the last network you

16   designed?

17       A.      We redesigned the company network

18   when we moved offices.

19       Q.      How many hosts are on your company

20   network?

21       ██        ███████████████

██  ██        █████████████████████

██  ██        ██████████

24       Q.      How many employees do you have?

25       A.      Somewhere between 40 and 50.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 32

1      ███        ████████████████████

██    ███        ██████

██    ███        ████████████████████████

██    ██████████

██    ███        ███████████████████████

██    █████████████████████████████████████

██    ███████ .

8              Q.      Did do you that network design

9      yourself?

10             A.      I did.  I worked with some other

11     people as well.

12             Q.      Who did you work with?

13             A.      Nahum Shalman, N A H U M, second

14     name is S H A L M A N, and Steve Schwartzberg

15     are the two main people I was working with.

16             Q.      Are they employees of Elysium?

17             A.      They are.

18             Q.      What is their job at Elysium?

19             A.      Nahum is the head of IT at Elysium,

20     Steve is another consultant who was also

21     pitching in on the network redesign.

22             Q.      The head of IT, it's the IT

23     administrator at Elysium, Nahum.

24             A.      Yes.

25             Q.      How long has he been the IT

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 33

1    administrator?

2         A.     Several years at least.

3         Q.     Who was the IT administrator before

4    him?

5         A.     I think it was actually Steve

6    Schwartzberg who became a consultant.

7         Q.     And before Steve?

8         A.     Before Steve I think it was

9    informal.  The company had -- then you're

10   getting back to when the company had fewer than

11   ten employees, it was more of people pitched in.

12   Paul Mattal did a lot of it back then and I did

13   a lot of it.  I still continue to be involved in

14   it.

15        Q.     Are the machines Unix machines in

16   Elysium?

17        A.     Elysium is a tough place from a

18   network design and computer security standpoint

19   because there are all different kinds of

20   machines because of the variety of our work.

21   Most machines are Linux machines, but we also

22   have Macs and Windows machines, and an amazing

23   number of other things, Sun boxes old, Sun

24   boxes, newer solaris boxes.

25        Q.     In your report at page 3, which is

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 34

1   on Exhibit 192 in front of you, there is set

2   forth a level of ordinary skill in the art, do

3   you see that?

4           A.    I see that.

5           Q.    And you tell us that that is the

6   level of ordinary skill in the art that

7   Mr. Cheswick opined to, correct?

8           A.    Yes.

9           Q.    You read Mr. Cheswick's report?

10          A.    I think I skimmed it, I don't think

11  I've read it in detail.  I think I just flipped

12  through it quickly.

13          Q.    Is that where you received the

14  description of the person of ordinary skill in

15  the art?

16          A.    I believe so.

17          Q.    Did you write this report?

18          A.    Yes.

19          Q.    So you typed in Mr. Cheswick's

20  description of the level of ordinary skill in

21  the art?

22          A.    I think so.  I typed the vast

23  majority of this report.  Some things I cut and

24  pasted from one source or another.

25          Q.    So you can't remember if you cut

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 35

1    and pasted this in or if you typed it in?

2         A.     I would expect that I cut and

3    pasted it, because I tried to cut and paste

4    larger blocks of text from other places, so I

5    would have probably cut and pasted it from

6    somewhere.

7         Q.     Did you do your own analysis of the

8    level of ordinary skill in the art?

9         A.     I don't think so.

10        Q.     Is there anywhere in your report

11   where you set forth your analysis of the level

12   of ordinary skill in the art?

13        A.     No.

14        Q.     Did you review Mr. Keromytis'

15   description of the level of ordinary skill in

16   the art?

17        A.     I think I did, yeah.

18        Q.     If the court were to reject

19   Mr. Cheswick's level of ordinary skill in the

20   art, is there any opinion you give in your

21   report where you form your own conclusion as to

22   the level of ordinary skill in the art?

23        A.     I'm sorry, I --

24        Q.     I'm going to withdraw the question.

25   The question is withdrawn.  Is there anywhere

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 36

1    anywhere in your report where you apply, where

2    necessary, a level of ordinary skill in the art

3    that is not Mr. Cheswick's?

4        A.    I don't think I do.

5        Q.    When were you engaged by Fortinet

6    and/or its counsel in this case?

7        A.    I don't remember.  Those sorts of

8    things have become really hard for me to

9    remember because I have twins who are 3-1/2, so

10   I lost my ability to remember those things

11   precisely a while ago.

12       Q.    Was it in 2013?

13       A.    I believe it was in 2013.

14       Q.    Around January of 2013?

15       A.    I really just don't know the

16   answer.  I could find out.

17   ████      ████████████████████████████████

████   ███████████████████████████████████

████      ████      █████████████████

████      ████      █████████████████

████      ████      ████████████████████████████

████      ██████████████

23       Q.    Have others worked on it other than

24   yourself?

25       A.    Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

1        Q.      Who else has worked on it?

2        A.      Matthew Meola, M E O L A, Paul

3   Mattal, Steve Schwartzberg, Charlie Kohl, K O H

4   L, and I think Jacob Walberg has also worked on

5   it.

6        Q.      Do you tell us in your report where

7   you are relying on their work as opposed to your

8   own?

9        A.      I don't cull that out in

10  particular.  Insofar as they did work that I

11  rely on the report, it's work that I directed

12  and looked at.

13       Q.      When did you begin to draft this

14  report?

15       A.      I started drafting this report

16  after the first Keromytis report.

17       Q.      How much money was earned by

18  Elysium in the drafting of this report?

19       A.      I don't know how that splits out.

20       Q.      How many hours did it take to draft

21  this report?

22       A.      I think I spent, I'll ballpark it,

23  my guess is somewhere between 20 and 30 hours,

24  that's just of my writing.

25       Q.      I'd like to direct your attention

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 38

1    to page 3 of your report?

2          A.     Yes.

3          Q.     You see the heading 1.3.1.5 on page

4    3 of Exhibit 192?

5          A.     Yes.

6          Q.     What was there that you deleted?

7          A.     I don't think I deleted anything

8    there.  I think that was just an extra carriage

9    return on the end of the previous one which

10   automatically created the new number.

11         Q.     Have you ever been qualified as an

12   expert in data networking security?

13         A.     I believe the answer is yes.

14         Q.     In which matter?

15         A.     I don't know whether this is listed

16   in my CV because it's older.  I think in 2003 I

17   testified in a case called Standler v RSA.  In

18   that case I testified about a variety of

19   computer security products and their use of the

20   SSL protocol.

21         Q.     Were any of them firewalls?

22         A.     I don't think any of them was a

23   firewall.

24         Q.     Have you ever been qualified as an

25   expert in firewalls?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 39

1          A.     Not that I recall.

2          Q.     Have you ever been qualified as an

3    expert in transparent application layer proxy

4    firewalls?

5          A.     Not that I can recall.

6          Q.     Do you consider yourself an

7    authority in the field in firewalls?

8          A.     I consider myself an expert in

9    computer science and computer security.  I don't

10   know whether I consider myself an authority in

11   the field, I'm not exactly sure what that means.

12         Q.     If I asked Mr. Cheswick, would he

13   recognize your name as an authority in the field

14   of data networking security?

15         A.     I don't know.  I presume not, but I

16   don't know.

17         Q.     Why do you presume not?

18         A.     It's my general tendency not to

19   presume that people will be aware of me or think

20   that I'm famous.

21         Q.     I would like to direct your

22   attention to page 2 of your report, heading 1.2

23   which is what's called the assignment section.

24   Do you see that?

25         A.     I do.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 40

1      Q.     I read the assignment section to be

2   that you were to investigate the correctness of

3   the expert infringement report of Mr. Keromytis,

4   is that right?

5      A.     Yes.

6      Q.     Did you have any other assignment

7   other than to look at the correctness of his

8   report?

9      A.     That and what springs from it,

10  which is insofar as the report reaches incorrect

11  conclusions to identify those; but all of that

12  falls under the correctness of the report.

13     Q.     Did you do a separate infringement

14  investigation of any FortiGate products?

15     A.     No.  The only infringement

16  investigations that I did related to looking at

17  it in the context of the Keromytis report.

18     Q.     Do you expect to give testimony on

19  how the claims that are asserted in this case

20  ought to be construed by the court?

21     A.     I don't have any plans to give such

22  testimony.

23     Q.     Looking back at Mr. Cheswick's

24  definition of the level of ordinary skill in the

25  art as set forth on page 3 of your report?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 41

1        A.      Yes.

2        Q.      Did you have that level of skill in

3    1994?

4        A.      In 1994?

5        Q.      Yes.

6        A.      No.

7        Q.      Did you have it in 1995?

8        A.      No.

9        Q.      1996?

10       A.      No.

11       Q.      1997?

12       A.      No.

13       Q.      1998?

14       A.      No.

15       Q.      1999?

16       A.      No.

17       Q.      2000?

18       A.      No.

19       Q.      2001?

20       A.      No.

21       Q.      2002?

22       A.      Yes, I think so.

23       Q.      Take a look at the discussion of

24   ordinary skill?

25       A.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 42

1      Q.      What skill did you obtain in 2002 I

2   believe you testified that allowed you to

3   conclude at that point you had achieved the

4   level of ordinary skill set forth in your

5   report?

6      A.      At that point I would have a

7   four-year computer science degree, plus

8   five years of industry experience.  I would

9   understand network topologies and routing,

10  router installation and configuration.  I was a

11  competent system administrator on Unix machines.

12          I was a competent C programmer,

13  able to write and debug programs that use

14  sockets, streams or other network connection and

15  input/output functions, and I was comfortable

16  making modest kernel source code changes,

17  rebuilding and reinstalling the modified kernel.

18      Q.      Other than the one time you

19  testified to doing a kernel modification with

20  Mr. Mattal, had you done any other kernel

21  modifications by 2002?

22      A.      Yes.

23      Q.      What were those?

24      A.      I don't remember, but I remember

25  downloading, modifying and installing kernel.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 43

1       Q.      So Mr. Cheswick sets forth industry
2   experience of five to seven years.  What
3   industry did you understand Mr. Cheswick to be
4   contemplating in setting forth the ordinary
5   level of skill in the art?
6       A.      Computer science or computer
7   engineering related industry.
8       Q.      You did not understand him to be
9   setting forth the industry experience related to
10  the subject matter of the '601 patent?
11      A.      I understood computer science or
12  computer engineering.
13      Q.      If Mr. Cheswick was contemplating
14  the subject matter of the '601 patent, would
15  that change whether or not you have or you could
16  conclude that you achieved the level of ordinary
17  skill by 2002?
18      A.      If Mr. Cheswick's definition
19  required that you work 100 percent of your time
20  in -- I'm sorry, let me back up and ask.  For
21  the purposes of this question what is the
22  definition of the area of the '601 patent?
23      Q.      So you read the '601 patent,
24  correct?
25      A.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 44

1        Q.      That's the definition.

2        A.      So I'll take that to mean network

3    security.  If the question is when did I have

4    five to seven years of experience where I was

5    spending 100 percent of my time in network

6    security it would not have been 2002, it would

7    have been sometime later based on how much of

8    the percentage would accumulate and exactly when

9    I don't know.

10               If the answer is when have you been

11   spending significant time in computer and data

12   security, that would have been true in 2002.

13       Q.      Do you consider your work at

14   Elysium industry experience as related to the

15   patent?

16       A.      Yes.

17       Q.      Your work in Elysium is litigation

18   technical matters, isn't that right?

19       A.      Yes.

20       Q.      So the industry is litigation,

21   isn't it?

22       A.      Well, again, if you parse it finer,

23   the work is frequently analyzing computer

24   security issues.

25       Q.      For litigation?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 45

1      A.     Yes.

2      Q.     So your calculation of when you

3   achieved a level of ordinary skill would

4   contemplate Mr. Cheswick counting on a

5   litigation expert?

6      A.     My definition says when you're

7   working with firewalls, computer security issues

8   on networks, the data that result from those and

9   how to analyze them to figure out what happened

10  on networks, then the definition of working in

11  the industry in the area of computer security

12  would include that.

13     Q.     You don't claim to have five years

14  of industry experience in data network security,

15  do you?

16     A.     Again, I do claim that for more

17  than five years I've worked in computer security

18  some of the time.

19     Q.     I understand that, but five years

20  of experience in data networking security, five

21  years of industry experience; your testimony is

22  that your litigation consulting is going to

23  satisfy the five to seven years of industry

24  experience for someone working in data network

25  security?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 46

1        A.        I'm not sure how else to answer the

2    question.  Whether or not that satisfies those

3    words, it depends on what people think those

4    words mean.

5        Q.        I want you to contemplate for a

6    moment a person who works full-time in the field

7    of data network security, okay?

8        A.        Okay.

9        Q.        How many hours do you consider

10   full-time to be?

11       A.        Being at the office -- typically

12   full-time means being at the office 40 hours a

13   week working productively some subset of that

14   for whatever it is, 48 weeks a year.

15       Q.        Roughly, how many hours is that in

16   a year?

17       A.        Well, let's see, 50 times 40 would

18   be 2,000, it would be somewhat less than that,

19   perhaps 1,500 hours a year.

20       Q.        For five years, five times 1,500?

21       A.        7,500.

22       Q.        7,500 hours.  Do you have

23   7,500 hours working on firewalls?

24       A.        Not on firewalls, no.

25       Q.        Do you have 7,500 hours working on

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 47

1  data networking?

2         A.      Maybe; I don't know.

3         Q.      So you have 7,500 hours in working

4  with data networking protocols?

5         A.      Working on all different aspects of

6  networking.

7         Q.      Would that aspect include plugging

8  in an Ethernet cable into a computer?

9         A.      No.

10        Q.      Do you know that you have

11  7,500 hours of data networking experience, the

12  broadest definition that you're contemplating?

13        A.      I don't.

14        Q.      So it's possible even as of today

15  if we accept that as the definition, that you're

16  not a person of ordinary skill in the art as set

17  forth in Mr. Cheswick's definition?

18        A.      It's possible that under those

19  particular rules I'm not.

20        Q.      There is a discussion in your

21  report starting in heading number 3 of "Legal

22  Principles"?

23        A.      Yes.

24        Q.      The understanding of legal

25  principles that you set forth here, is that your

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 48

1   understanding of the legal principles, or

2   were -- withdrawn.

3                Were these legal principles

4   provided to you?

5        A.    As a general matter, yes.

6        Q.    I want to direct your attention to

7   heading 3.5.  Have you worked on other patent

8   matters other than this one?

9        A.    Yes.

10        Q.    So this is not the first time you

11   heard these legal principles from some attorney,

12   is it?

13        A.    It's not.

14        Q.    Take a look at 3.5 and 3.6?

15        A.    Yes.

16        Q.    The first sentence under "Induced

17   Infringement", 3.5.1 reads, "I understand that

18   induced infringement requires a showing of

19   direct infringement of the asserted claim by a

20   single infringer," do you see that?

21        A.    I do.

22        Q.    Is that your understanding that you

23   wrote there based upon your other cases, or was

24   that an understanding that was provided to you

25   for this case?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 49

1        A.       That is an understanding that I

2    reached in discussions with counsel.

3        Q.       Do you understand that sitting here

4    today to be wrong?

5        A.       I don't.

6        Q.       Have you ever heard of the case

7    Akamai v. Limelight?

8        A.       I don't recall that case.

9        Q.       How about 3.6.1, is that your

10   understanding or an understanding that was given

11   to you in this case?

12       A.       Again, it's an understanding that I

13   reached in discussions on this case.

14       Q.       It wasn't one that you brought?

15       A.       That was not an understanding I

16   brought.

17       Q.       If that understanding is incorrect

18   and that there need not be a single direct

19   infringer, would it change any of the opinions

20   that you've set forth in your report?

21       A.       Let me take a quick look.  I don't

22   think it does.  To give you a more certain

23   answer I would have to read through this more

24   carefully, and I don't want to burn up your

25   clock if you don't want me to carry out that

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 50

1    exercise, so it's up to you.  Would you like me

2    to pursue that in detail now?

3         Q.     You see nothing right now that

4    would tell you?

5         A.     Flipping through it I don't see

6    anything that would be effective, but it's

7    pretty imprecise.  The proper answer to the

8    question is I don't know, I would have to look

9    more carefully.  Would you like me to?

10        Q.     Do you consider any text

11   authoritative in the field of firewalling?

12        A.     Yeah, there are a couple of books

13   that are big.

14        Q.     Can you name them for me?

15        A.     "Firewalls and Practical Internet

16   Security" by Cheswick and Bellovin is probably

17   the one that comes to mind as the big one.

18        Q.     That's the one you reference in

19   your book? Excuse me, withdrawn.  That is the

20   book you reference in your expert report?

21        A.     I think I do reference that.

22        Q.     There were two editions of that

23   book, isn't that right?

24        A.     I think that's right.

25        Q.     I believe in your report you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 51

1   reference the 1994 edition if I'm correct?

2        A.     I don't remember, I'll be honest

3   with you.

4        Q.     Let me direct you to page 10 of

5   your report?

6        A.     That looks like it's the 1994

7   edition.

8        Q.     Do you consider that edition to be

9   authoritative of the state-of-the-art of

10  firewall in 1994?

11       A.     No.  I'm sorry, authoritative given

12  the state-of-the-art in 1994, I'm not sure.

13       Q.     Did you read the book?

14       A.     I have read the book, at least

15  portions of the book over the years.  I didn't

16  reread it for this assignment.

17       Q.     So you can't tell me one way or the

18  other?

19       A.     I can't tell you if it was

20  authoritative as of 1994.

21       Q.     Other than reviewing Mr. Keromytis'

22  expert report, had you heard of Mr. Keromytis at

23  all?

24       A.     I don't think I had.

25       Q.     Have you read any of his published

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 52

1   papers?

2        A.     I don't think I have.

3        Q.     Do you know Mr. Keromytis to be

4   anything other than technically qualified to

5   give the opinions that he gave in his report?

6        A.     I'm not putting forth an opinion

7   one way or the other on that.

8        Q.     You don't have an opinion that he

9   is not technically qualified?

10       A.     I am not opining that he isn't.

11       Q.     Are you aware that Mr. Keromytis

12  coauthored a paper with Mr. Cheswick?

13       A.     I wasn't aware of that.

14       Q.     You didn't read it before drafting

15  your report?

16       A.     I did not.

17       Q.     Have you coauthored any papers with

18  Mr. Cheswick?

19       A.     I have not.

20       Q.     How about with Mr. Bellovin?

21       A.     No.

22       Q.     Do you recognize the name Steve

23  Bellovin?

24       A.     I do.

25       Q.     How do you recognize that name?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 53

1      A.     Because he's one of the most

2   foundational people in computer security.

3      Q.     If Mr. Cheswick had given an

4   assessment of Mr. Keromytis' credentials, do you

5   have any reason to disagree with that

6   assessment?

7      A.     I wouldn't have a view one way or

8   the other.

9      Q.     Do you know what the difference is

10  between an explicit proxy and a transparent

11  proxy?

12     A.     Yes.

13     Q.     What are the differences?

14     A.     An explicit proxy, the client

15  software is configured to instead of targeting

16  the server that it actually wants to reach, to

17  communicate with the proxy instead.  In a

18  transparent proxy the client software isn't

19  aware, if you will, that it's being proxied.

20     Q.     So in an explicit proxy the client

21  software would address the IP destination

22  address to the gateway running the proxy?

23     A.     Well, let's be precise.  In either

24  case the IP packets are going to be written to

25  send the packets to the proxy or else the proxy

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 54

1    wouldn't get them.  But in one case the software

2    had to be set up to talk to the proxy, and in

3    the other case the packets will flow to the

4    proxy by virtue of thinking that that's where

5    they're supposed to go anyway and get handed

6    there.

7         Q.    Do you know what the OSI data

8    networking model is?

9         A.    I do.

10        Q.    What is it?

11        A.    It is a series of levels at which

12   networking operates.

13        Q.    Can you tell me the levels?

14        A.    Not off the top of my head.

15        Q.    Have you ever studied the levels?

16        A.    Yes.

17        Q.    Aren't the levels of the OSI model

18   fairly common knowledge for an expert in data

19   networking?

20        A.    I'm not sure how to answer that

21   question.  I'm familiar with the levels, I work

22   with them all the time; but I can't reliably

23   recite all five of them to you right now.

24        Q.    Who is your IT administrator?

25        A.    Nahum Shalman.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 55

1      Q.      Could you recite them to you if you
2   asked him?
3      A.      I don't know.
4      Q.      You're in charge of hiring at
5   Elysium?
6      A.      No.
7      Q.      Who's in charge of hiring?
8      A.      Elizabeth Ridge.
9      Q.      Do you have any input on it?
10     A.      Yes.
11     Q.      Did you have input on hiring your
12   IT administrators?
13     A.      Yes.
14     Q.      If you were hiring someone in
15   charge of network security would you have input
16   on that?
17     A.      Yes.
18     Q.      Would you hire someone if they did
19   not know the layers of the OSI model?
20     A.      Maybe.
21     Q.      Would it cause you some concern if
22   they didn't know that?
23     A.      If they weren't able to recite the
24   names of it?
25     Q.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 56

1          A.      No, it would not cause me concern.

2          Q.      How about if they weren't able to

3   explain how the layers interacted with each

4   other?

5          A.      You should know what the layers

6   are, you should know what the point of it is.

7   I'm not big on memorization.

8          Q.      How about explaining how the layers

9   interoperate with each other?

10         A.      I'm not exactly sure what you mean

11  by that but yes, insofar as the question is what

12  are the layers and what is the difference

13  between them and how do they work, you should

14  know that.

15         Q.      Go ahead and explain those to me?

16         A.      The layers are an ever rising

17  levels of extraction.  At the lowest level it is

18  the hardware layer, the layer which packets are

19  transmitted at the interface level.  At the

20  highest level is the layer at which the

21  applications interact with them.

22                 Each layer builds on top of the

23  other, so each layer that's higher up provides

24  some sort of an encapsulation of the lower

25  layer, thereby providing it easier to use

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 57

1    abstraction to the layers above it.

2         Q.    Is that your full explanation of

3    it?

4         A.    That's my explanation.

5         Q.    In a transparent proxy, explain to

6    me how the packet leaving the local host is

7    addressed to and traverses the transparent proxy

8    to the remote host?

9         A.    That actually depends, there are

10   different mechanisms you can use.  A common one

11   is that the proxy is set up as the route for the

12   network in question that the packet is supposed

13   to travel to.  That means that it travels to the

14   proxy essentially as if the proxy were a router.

15        Q.    Explain to me the network

16   addressing at the physical layer?

17        A.    At the physical layer the packets

18   have Mac addresses which reflect the hardware

19   Mac address of the computer, and they address IP

20   addresses.  No, I'm sorry, it's just the Mac

21   addresses at that level, at the physical layer.

22        Q.    So tell me how the packet is

23   addressed at the physical layer to be directed

24   to the firewall and then traverse the firewall?

25        A.    So the packet is going to have

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 58

1   specified within it the IP address of its

2   destination, that IP address includes a network

3   that it's supposed to go to, and the network as

4   a whole has a sense based on routing tables for

5   which routers are responsible for routing

6   packets for particular networks.

7          Q.     What IP address does the packet

8   have?

9          A.     Destination IP address.

10         Q.     Of what host?

11         A.     Of its ultimate target.

12         Q.     The remote host?

13         A.     Yes.

14         Q.     So it has the device address of the

15   firewall?

16         A.     I'm sorry?

17         Q.     It has the Mac address of the

18   firewall?

19         A.     When it's initially sent it has the

20   Mac address of the work station.

21         Q.     How does it find the firewall?

22         A.     The packet enters the network and

23   each device in the network is aware of how the

24   network is routed, that's what's setting up the

25   network is.  Because this packet is say routed

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 59

1    to the internet as an example, the routers send

2    it to what they believe to be the route, the

3    internet, which is the firewall.

4         Q.    When you say sent what address do

5    they use?

6         A.    So the routers know what the other

7    routers are, so each of those takes the packet

8    and sends it onward on an interface to the next

9    step along the chain that gets it closer to the

10   network it's supposed to go to.

11        Q.    Using what addresses?

12        A.    Using the destination IP address.

13        Q.    Not the Mac addresses?

14        A.    Not the Mac addresses.

15        Q.    You discussed in your report a

16   concept called NAT, N A T, is that correct?

17        A.    Yes.

18        Q.    That's short for what?

19        A.    Network address translation.

20        Q.    Does your expertise fall into the

21   concepts of network address translation?

22        A.    I know what network address

23   translation is and how it works.

24        Q.    How deep would you say your

25   knowledge is?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 60

1        A.      I'm not sure how to answer that
2    question.
3        Q.      Are you an expert in network
4    address translation?
5        A.      I'm an expert in computer science
6    including networking, including NAT.
7        Q.      Do you consider you are a
8    consulting expert in NAT?
9        A.      I'm not sure whether or not you can
10   be an expert in every micro subfield; but yes, I
11   consider my expertise to include that.
12       Q.      When did NAT come into existence?
13       A.      I don't remember exactly.
14       Q.      Do you know who developed NAT?
15       A.      I don't.
16       Q.      Do you know what it was developed
17   for?
18       A.      Yes.  In general it was to address
19   the problem of having more hosts than one has
20   actual internet addressable IP addresses.
21       Q.      Who developed it?
22       A.      I don't remember.
23       Q.      Do you know if any industry
24   standards govern NAT?
25       A.      There's an RFC for it.  I believe

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 61

1    it's not actually a standard, not like an IEEE

2    standard or ITF standard.  In part, because the

3    NATing behavior of a particular party on the

4    internet does not necessarily affect others, so

5    there doesn't need to be a formal standard.

6         Q.    Do you know when NAT was first

7    implemented on a firewall?

8         A.    I have a sense it was in the mid to

9    late '90s, but I don't know exactly when.

10        Q.    Why do you have a sense of that?

11        A.    I think I've seen a paper on NAT

12   maybe around '96 or so.

13             MR. COOPER:  Vin, we've been going

14   for over an hour so if we can take a break?

15             MR. McGREARY:  Sure.  Let's go off

16   the record.  Take as long as you want.  I'm

17   probably going to use the whole 3-1/2.

18             (Short recess taken at 10:46 a.m.)

19             (Resumed at 10:57 a.m.)

20        Q.    Mr. Hicks, who contacted you about

21   being engaged for this matter?

22        A.    I don't remember.  I might have

23   been informed of it by one of my colleagues.  I

24   might not have been the initial point of

25   contact.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 62

1        Q.      Who might have been the colleague?

2        A.      It might have been Paul Mattal, I

3   don't remember.

4        Q.      Had you ever been engaged by

5   Fortinet for any other matters?

6        A.      I don't remember.  I don't think

7   so, but I can't be positive of that.  I don't

8   remember working on any matter for Fortinet

9   before.

10

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 63



8        A.     I think -- I'm not sure.  The

9   company has 45 employees or so.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 64



CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 65

███    ███        ████████████████████████

███  ████████████████████████████████████

███  ████████████

4            MR. COOPER:  I'm going to object to

5    this line of questioning and I'm actually going

6    to instruct you not to answer.  If you want to

7    discuss it off the record we can, but right now

8    my instruction is I don't see the relevance

9    here.

10           MR. McGREARY:  You don't have to go

11   on, I want to continue questioning him.  On our

12   next break we can talk about it that way we

13   don't burn time for the witness.

14       Q.    Are you familiar with the TCP/IP

15   protocol suite?

16       A.    Yes.

17       Q.    What is the TCP/IP protocol suite?

18       A.    The IP card is the internet

19   protocol addressing scheme by which packets can

20   be addressed to reach another computer.  The TCP

21   part is the transmission control protocol.  It

22   is a protocol that let's you take the ability to

23   send packets over an unreliable connection and

24   turn that into a reliable data stream between

25   two machines.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 66

1          Q.     What is the lowest protocol of the

2     TCP/IP suite?

3          A.     What is the lowest protocol?

4          Q.     The lowest level protocol of the

5     TCP/IP suite?

6          A.     There are two pieces to it and

7     they're doing different things, so I'm not sure

8     the question makes sense.  The IP part is

9     responsible for addressing.  The TCP part is

10    responsible for creating a channel, and they can

11    in fact be separated.  Other transmission

12    protocols can use IP and other addressing

13    protocols can be used with TCP.

14         Q.     Among the experts in data

15    networking security, isn't the TCP/IP suite

16    schema, a layered protocol schema?

17         A.     It in turn sits on top of other

18    layers.

19         Q.     So my question is would an expert

20    in data networking security consider the TCP/IP

21    suite to be a layered protocol suite?

22         A.     I don't know.  The question as

23    framed doesn't make sense to me.

24         Q.     So if I asked a data networking

25    expert what is the lowest layer in the TCP/IP

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 67

1    suite would that be answered, does that question

2    make sense?

3        A.    I don't think so.

4        Q.    You don't think it does, okay.

5    What does ARP stand for?

6        A.    ARP are tables within routers that

7    determine how packets are routed.

8        Q.    What do the initials ARP stand for?

9        A.    I don't remember.

10       Q.    What does ICNP stand for?

11       A.    ICNP is a kind of packet that is

12   used for certain very simple -- it's a protocol

13   for transmitting packets for carrying out very

14   simple tasks, notably the ping task.

15       Q.    What does ICNP stand for?

16       A.    I don't remember.

17       Q.    What does CIDR stand for?

18       A.    I don't know.

19       Q.    How many bits are in an IPV 4

20   address?

21       A.    4 blocks, each -- 32 bits.

22       Q.    You calculated that?

23       A.    I did.

24       Q.    Can you explain the TCP connection

25   setup?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 68

1       A.      Sure.   There's a handshaking phase

2    during which the two parties exchange certain

3    packets that help them become aware of each

4    other, and then a sliding window is established

5    which is a number of packets that are allowed to

6    be en route without yet having been reliably

7    received.

8               After that, the packets are

9    transmitted with sequence numbers and

10   individually acknowledged, where the maximum

11   number of packets that are allowed to be

12   unacknowledged are determined by the sliding

13   window.

14       Q.      So what is the first message sent

15   in a TCP open?

16       A.      I don't remember the format of the

17   first packets.

18       Q.      What is the return packet?

19       A.      I don't remember the

20   packet-for-packet protocol.

21       Q.      What is the concept of half open as

22   it relates to TCP?

23       A.      I don't remember.

24       Q.      What is the four-tuple that defines

25   a TCP message?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 69

1        A.      I don't know.

2        Q.      How is a TCP connection closed?

3        A.      Well, if it's formerly closed

4   usually one party or the other sends a closing

5   message.  It can be informally closed when one

6   party drops off for a period long enough for a

7   time out.

8        Q.      What is the closing message?

9        A.      It is a message that specifies that

10   the connection should be closed.

11        Q.      Does it have a name in the TCP

12   protocols?

13        A.      I don't remember the names.

14        Q.      What is the difference between UDP

15   and TCP?

16        A.      UDP is not a reliable transmission

17   protocol.  Under the UDP protocol the packets

18   are sent but there is no provision for requiring

19   acknowledgment, in particular there's no

20   provision for retransmitting packets that are

21   missing from a sequence.

22        Q.      Is there error correction in UDP?

23        A.      No, there's not.

24        Q.      What other networking

25   characteristics that you are aware of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 70

1    distinguish UDP from TCP, other than what you've

2    just identified?

3            A.    I think that's the big part, which

4    is that whereas TCP creates a sequence of

5    acknowledged and reliably transmitted packets,

6    UDP does not.

7            Q.    Can you explain?

8            A.    UDP is closer to just simply

9    addressing the packet and sending it.  In TCP

10   the packet is addressed and is given a sequence

11   number.  The recipient of the packet, CRC,

12   checks it, then checks to make sure whether it

13   has all the packets in the sequence and

14   acknowledges the ones that it receives.

15               If the sender notices that a

16   particular packet in the sequence has not been

17   acknowledged it retransmits it.

18           Q.    I want to ask you some questions

19   about network address translation, okay?

20           A.    Okay.

21           Q.    I forget if you told me you were an

22   expert on that?

23           A.    I said that my expertise includes

24   NAT.

25           Q.    I'm not sure I really understand

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 71

1   what that means.  I'm going to tell you that I'm

2   going to ask you on a stand in front of a jury

3   do you consider yourself an expert on NAT?  I'd

4   like to know what you're going to tell the jury?

5          A.     I will tell the jury I'm an expert

6   in computer science, including NAT.

7          Q.     Isn't computer science and NAT two

8   different concepts?

9          A.     No.  Computer science is a parent

10  field that includes computer science networking,

11  which includes NAT.

12         Q.     So are you telling me that you're

13  an expert in all of the fields that are

14  encompassed within computer science?

15         A.     Well, what I'm saying there is I'm

16  an expert in computer science, including in NAT.

17  I've been qualified as an expert in computer

18  science in federal court.

19         Q.     How about the subfield of NAT, have

20  you been qualified as an expert in the subfield

21  of NAT?

22         A.     No.

23         Q.     Do you consider yourself an expert

24  in the subfield of NAT?

25         A.     Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 72

1      Q.     So we talked earlier about when NAT

2  came into existence and you answered some of

3  those questions.

4             Did the concept of packet

5  forwarding exist before NAT?

6      A.     Yes.

7      Q.     So there's a difference between NAT

8  and packet forwarding?

9      A.     Yes.  NAT is something that can be

10 done with either forwarded packets or under

11 other circumstances as well.

12     Q.     If a packet is forwarded without

13 NAT what does that mean?

14     A.     It means that it is forwarded, but

15 the IP address of the originating computer

16 continues to be identified as the source IP

17 address in the packet.

18     Q.     Are there any changes to the packet

19 if the packet is forwarded?  Let me withdraw

20 that.

21             Are there any changes to a TCP/IP

22 packet if the packet is forwarded without NAT?

23     A.     No.

24     Q.     So before NAT, the concept of

25 packet forwarding would have entailed forwarding

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 73

1    a packet without doing any translation or

2    changes to the packet?

3          A.      Well, subject to one caveat, which

4    is that even if you're forwarding without NAT

5    you may apply filtering rules which will cause

6    you to drop some packets.

7          Q.      I want to talk about just

8    forwarding the packets.  Let's assume we're

9    before 1994 so NAT doesn't exist, or we'll

10   pretend NAT doesn't exist, and we're talking

11   about packet forwarding, that concept, as it

12   would have existed in 1994.

13         A.      And your excluding packet filter?

14         Q.      Yes.  I want to talk about a simple

15   router, it has no rules on it whatsoever other

16   than to route.  Such a device existed, correct?

17         A.      Yes.

18         Q.      So if the packet was forwarded

19   without packet filtering, that packet would go

20   from ingress to egress unchanged?

21         A.      Yes.  Essentially a copy of it is

22   made on the new interface.

23         Q.      Now I want to talk to you about

24   NAT.  NAT stands for network address

25   translation, correct?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 74

1      A.      Yes.

2      Q.      I think, as you described in your

3  report, the network address that's being

4  translated is the source address of the sending

5  host, correct?

6      A.      Source address or port.  I'm sorry,

7  the source address of the host, yes, and/or

8  port.

9      Q.      And/or port?

10      A.      Yes.

11      Q.      There's a concept called port

12  address translation as well?

13      A.      Yes.

14      Q.      Can you explain the difference?

15      A.      In network address translation the

16  source address of the packet is rewritten.

17  Typically, in modern devices also as part of

18  that the port is rewritten.  You can also do

19  port address translation in which you only

20  rewrite the port, but the business applications

21  of it are much smaller.

22      Q.      Are there any applications that you

23  are aware of that could not operate with packet

24  forwarding in 1994?

25      A.      You're talking about software

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 75

1    running on the work station behind the firewall

2    when you say applications?

3         Q.    We don't even have to have a

4    firewall in our scenario.  I'm talking about

5    applications that could run in a networked

6    environment in 1994, okay?

7         A.    Okay.

8         Q.    I think you identified some in your

9    report, didn't you?

10        A.    Yes.

11        Q.    What are some of those?

12        A.    FTP, Telnet.

13        Q.    FTP stands for file transfer

14   protocol?

15        A.    Correct.

16        Q.    Telnet doesn't stand for anything

17   other than Telnet?

18        A.    That's right.

19        Q.    Did you identify anything else?

20        A.    Gopher.  I think I identified HTTP

21   as well, so web browser.

22        Q.    What does HTTP stand for?

23        A.    Hypertext transfer protocol.

24        Q.    In 1994 these various names that

25   we're using, they're commonly referred to as

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 76

1    applications or services, correct?

2         A.    Well, those two things are not the

3    same.  Yes, there were applications that carried

4    out those functions.

5         Q.    So my question is if you have a

6    device that is only accomplishing packet

7    forwarding, were there any limitations on any of

8    the services we just identified in operating

9    with a packet forwarding device?

10        A.    If the question is could all of

11   those things operate on a network that included

12   packet forwarding, I think the answer is yes.

13        Q.    I want to ask you about NAT.

14        A.    Okay.

15        Q.    NAT, we're doing some translation

16   of the addressing of a packet, aren't we?

17        A.    Yes.

18        Q.    We're talking about TCP/IP packets,

19   okay?

20        A.    Okay.

21        Q.    Are there applications that will

22   not work through a NAT device?

23        A.    Of the subset that we talked about

24   or are there at all?

25        Q.    Let's start with the subset we

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 77

1    talked about.

2         A.    I think all of those -- well, FTP,

3    there is a form of FTP called active FTP, and in

4    active FTP when you connect to the server it

5    initiates a connection back to you.

6              Any kind of a firewall blocking

7    incoming connections prevents that, whether it's

8    a NAT firewall or not.  There is a form of FTP

9    called passive FTP which does not require a

10   connection back.

11        Q.    So that's one that would operate in

12   a simple packet forwarding pre-1994 that

13   wouldn't operate with NAT?

14        A.    Well, whether it would operate with

15   NAT, in practice scenarios involving NAT it

16   would probably prevent it from working.

17        Q.    There's something else about FTP

18   that complicates it in using it with NAT, isn't

19   there?

20        A.    That's the big thing I can think

21   of.

22        Q.    Isn't it true that in an FTP

23   connection the application data has embedded IT

24   addresses?

25        A.    The application data has embedded

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 78

1   IP addresses.  So the application level

2   protocol, is there an IP address, so yes and

3   that's why the active -- it was typically used

4   for active FTP.

5        Q.    I'm going to read a sentence to you

6   from Mr. Cheswick's book, the second edition,

7   "Many applications simply won't work through

8   NATs."  Do you agree with that?

9        A.    I'm sure it's true, yeah.

10       Q.    "The application data contains

11  embedded IP addresses (see, for example, the

12  description of FTP in section 3.4.2)."

13            Do you agree with that?

14       A.    Yes.  Wait, wait, step back.  I

15  agree that was true at the time the book was

16  written.

17       Q.    You believe that was only true in

18  1994?

19       A.    I think that currently NATs are now

20  so ubiquitous that there are relatively few

21  applications that exist now that intend for

22  people to connect client software to a server on

23  the internet that will not work through NAT.

24       Q.    I'm going to suggest to you that

25  I'm reading from a book copyrighted 2003.  I'm

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 79

1    going to let counsel look at it so he knows I'm

2    not misrepresenting that to you.

3                MR. COOPER:  Can this be an

4    exhibit?  Is there a reason why we can't make

5    this an exhibit?

6                MR. McGREARY:  There isn't.  It's

7    just subject to logistics, and I'll talk to you

8    about it off the record.

9                MR. COOPER:  What are you asking me

10   to do?

11               THE WITNESS:  You can show it to me

12   if you want to.

13               MR. COOPER:  I can have copies

14   made.  I would like to take a look at it and

15   consider this approach of using the book and

16   asking Christian to answer questions on some

17   verbal quote.

18               MR. McGREARY:  Let's go off the

19   record.

20               (Off the record at 11:19 a.m.)

21               (Resumed at 11:22 a.m.)

22        Q.     I want you to tell me if in your

23   expertise you agree or disagree with the

24   statements I'm about to say to you, okay?

25        A.     Okay.  The time frame for the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 80

1    questions is are these statements true today,

2    are they true in 2003, or are they true when?

3         Q.     I'll specify as I ask my question.

4    Is this statement true today, "Many applications

5    simply won't work through NATs"?

6         A.     Some applications won't work

7    through NATs, whether it qualifies as many I

8    don't know.  The vast majority of applications

9    intended to communicate with a server on the

10   internet will work through NATs.

11        Q.     What applications are you aware of

12   today that will not work through NATs?

13        A.     Well, in theory you could still use

14   active FTP, that won't work through a NAT, and

15   certainly there was a time when some kinds of

16   VPNs wouldn't work through NATs.  I can't think

17   of many because so many businesses use

18   NAT-based, and almost all homes use NAT-based

19   firewalls.

20        Q.     Tell me if you agree with this

21   statement with respect to NAT, "Incoming calls

22   to dynamic ports don't work very well either.

23   Most NAT boxes will let you route traffic to

24   specific static hosts and ports that can't cope

25   with arbitrary application protocols"?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 81

1        A.      That's a way of saying -- so yes,

2   that statement is generally true in that the

3   purpose of the NAT firewall in many case is to

4   prevent incoming connections, that is one of its

5   benefits, not exclusive to NAT, but when people

6   deploy a NAT firewall frequently part of what

7   they're doing is preventing incoming

8   connections, and then that means you have

9   prevented incoming connections, so tasks that

10  involve incoming connections are hampered.

11       Q.      The statement is true then?

12       A.      The statement is true subject to

13  certain conditions.  Yes, incoming connections

14  are hampered on NATs by design.

15       Q.      The statement isn't the incoming

16  connections.  It says incoming calls to dynamic

17  ports don't work very well either.  Is that

18  statement true?

19       A.      Yes, an incoming call to a dynamic

20  port is an incoming connections.

21       Q.      Understood.  There are other

22  incoming connections, correct?  There are other

23  incoming connections that are not?

24       A.      To a dynamic port.

25       Q.      Exactly.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 82

1         A.      Incoming connections to fixed ports

2    can be managed un-renounced, yes.

3         Q.      Does that make it different than a

4    box that is implementing simple IP forwarding

5    without NAT?

6         A.      Yes.

7         Q.      What about applications that

8    require encryption of application level data,

9    can a NAT box handle that?

10        A.      It depends.  In principle, yes.

11   For example, Skype can be used to do encrypted

12   phone calls and it can be run through a NAT.

13   You can encrypt your e-mail and send it through

14   a NAT.  It is possible to have some scenarios in

15   which you are encrypting in a manner which

16   becomes more difficult with a NAT.

17              In particular, if you are

18   encrypting the addressing information for

19   transmission to something beyond a firewall,

20   because since the packet has to be rewritten

21   that becomes more difficult if the data are

22   encrypted, or if there is encryption that

23   depends on the addressing information.

24        Q.      Does that problem apply to packet

25   forwarding as it existed in 1994?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 83

1          A.     It might.  There are some scenarios

2     in which that problem would be exacerbated by

3     NAT.

4          Q.     In packet forwarding is the

5     application mobile data addressing a need to be

6     rewritten?

7          A.     It does not.

8          Q.     So that part of it wouldn't be a

9     problem for packet forwarding in 1994, correct?

10         A.     I agree.

11         Q.     You have on page 8 a diagram?

12         A.     Yes.

13         Q.     Did you draw that diagram?

14         A.     Yes.

15         Q.     That was based on your own

16    understanding of what happens in this firewall

17    that you have shown here?

18         A.     Yes.

19         Q.     You showed two connections, a

20    connection 1 and connection 2, right?

21         A.     Yes.

22         Q.     Are those TCP/IP connections?

23         A.     Yes.

24         Q.     You have this diagram where you

25    show this arrow that kind of humps up and then

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 84

1    down and you write packets relayed between

2    connections, do you see that?

3          A.    I do.

4          Q.    Is it the packet that's relayed

5    between the connection?

6          A.    It's actually the data of the

7    packet.

8          Q.    That sounds kind of wrong, isn't

9    it?

10         A.    It's slightly more precise to say

11   the data of the packet.

12         Q.    It's actually precise to say the

13   data is what's relayed and imprecise to say the

14   packet is relayed, isn't it?

15         A.    In networking people talk about the

16   packet being relayed across connections.  It's

17   certainly more precise to say the data of the

18   packets are relayed.

19         Q.    Is the packet relayed?

20         A.    It's common parlance to say that it

21   is, but it's more precise to say that the data

22   are.

23         Q.    The data is relayed?

24         A.    The data are relayed.

25         Q.    The data are relayed.  Thank you.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 85

1    You want to be precise, right?

2         A.    I try.

3         Q.    Why do you have a hump there?

4         A.    Because that way I could fit the

5    text and make it clear that it was connected to

6    the arrow.

7         Q.    That's the only reason?

8         A.    Yeah.  Was it perceived as

9    nefarious somehow?

10        Q.    I just didn't know what it was.

11        A.    I couldn't fit packets relayed

12   between the connections inside the box without

13   also crowding up against the firewall and make

14   it unclear which was which.

15        Q.    I want to direct your attention to

16   4.3.  You tell us, "Another approach is for the

17   firewall not to create its own connections to

18   each computer, but simply to forward the packets

19   onward to their appropriate destinations,

20   examining them as appropriate."  Do you see that

21   sentence?

22        A.    I do.

23        Q.    If we use the definition of forward

24   to be that the packet is unchanged either in

25   addressing or any other way, does that sentence

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 86

1    make sense?

2         A.      First of all, I don't accept that

3    as the premise for what it means to forward, but

4    yes.  In other words, that's not what I meant.

5    But even so, you can have a scenario in which a

6    packet is taken from one interface and put on

7    another interface and retransmitted.

8         Q.      I understand that.  The question I

9    have is would that provide a firewall?

10        A.      If you examine the packets along

11   the way then you are performing some firewalling

12   functionality.

13        Q.      How is the packet examined if it's

14   simply forwarded, that's the part I'm not

15   understanding, one of the parts?

16        A.      I think the problem there is that

17   you've chosen a definition of forwarding which

18   is not the definition that I'm using here.

19        Q.      What examines the packet as

20   appropriate.  You just had a term saying

21   examining them is appropriate, what's

22   appropriate and what doesn't in your sentence

23   here?

24        A.      If it's a packet filtering firewall

25   you have software that examines the packets.  As

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

                                                    Page 87

1    appropriate means insofar as that is desired by

2    the system administrator.

3         Q.    Is that what you were talking about

4    here, packet filtering firewall?

5         A.    Yes.

6         Q.    Your next diagram --

7         A.    Let me back up to say packet

8    filtering is one of the options here.

9         Q.    You talked about two approaches?

10        A.    Yes.

11        Q.    I'm talking about the second

12   approach.  Are you talking about in your second

13   approach a packet filtering firewall?

14        A.    My answer is a packet filtering

15   firewall would be an example.

16        Q.    What is another example?

17        A.    Where you forward the packets on

18   but you don't filter them.

19        Q.    What is your definition of forward

20   in that scenario?

21        A.    Sending the packet onward without

22   creating a new connection.

23        Q.    Without creating a new TCP/IP

24   connection?

25        A.    Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 88

1        Q.      So it wouldn't matter whether or

2    not the packet is changed in any way, as long as

3    in your view -- withdrawn.

4                The only thing that is required to

5    use the term forwarding is that there is not a

6    second TCP/IP connection?

7        A.      If you send the packet onward

8    without a TCP/IP connection that is forwarding

9    the packet.

10       Q.      Now I want to point you to the

11   diagram.  By the way, what year are we talking

12   about for these approaches to a firewall that

13   you've talked about on page 8 and 9 of your

14   expert report, which is marked as 192?

15       A.      So these diagrams are very high

16   level and so they apply both in the '94 to '96

17   time frame, but they also apply today.

18       Q.      Let me look at this diagram that

19   you have referenced here on the top of page 9 of

20   your expert report, which we marked as I believe

21   192.

22                You show what I believe are two

23   hosts, a square box with the words packets

24   forwarded and firewall in the box and then an

25   arrow pointing back and forth between the two

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 89

1    hosts, right?

2         A.    Yes.

3         Q.    A very simple diagram, right?

4         A.    Yes.  The preceding diagram was

5    also not very complex.

6         Q.    I noticed that in the preceding

7    diagram however you have two boxes internal to

8    the bigger box labeled "Firewall," and I'm

9    assuming that's what denoted the connections, is

10   that correct?

11        A.    Yes.

12        Q.    You don't denote any connections in

13   the packet forwarded firewall?

14        A.    That's right.

15        Q.    So is it your testimony that in

16   this scenario there is no connections at the

17   firewall, no TCP/IP connections at the firewall?

18        A.    That's right.

19              MR. McGREARY:  Could you read the

20   question and answer back.

21              (Record road.)

22        Q.    What kind of firewall would

23   implement what you have diagrammed here?

24        A.    Any kind of forwarding-based

25   firewall, including a firewall based on NAT

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 90

1    forwarding.  There is no TCP/IP connection

2    initiated or terminated from the firewall as

3    part of a connection from a work station to a

4    server on the internet in that scenario.

5         Q.     Earlier I asked you what four-tuple

6    defined a NAT connection, do you remember that?

7         A.     Was it for NAT?  Anyway, I don't

8    remember the exact question.

9         Q.     You make an excellent point.  I

10   asked you what four-tuple defined a TCP/IP

11   connection, do you recall that?

12        A.     Yeah, I do.

13        Q.     Were you able to tell me?

14        A.     I was not.

15        Q.     I want you to assume that the

16   four-tuple that defines a TCP/IP connection

17   is -- you know what a four-tuple is, right?

18        A.     Yes.

19        Q.     What is it?

20        A.     It is a set of four items.

21        Q.     I want you to assume that the

22   four-tuple that defines a TCP connection is the

23   local host, local port, remote host, remote

24   port?

25        A.     Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 91

1         Q.      Do you understand that?

2         A.      Yes, I do.

3         Q.      By local host and remote host, I'm

4    talking about the address of the local host and

5    the remote host, do you understand that?

6         A.      I do.

7         Q.      The port is -- well you tell me

8    what you understand a port to me?

9         A.      A port is an abstraction that is

10   imagined as a large number of individual ports.

11   It's really just an abstraction, it's a number

12   that helps you split different connections from

13   each other.

14        Q.      Now assuming that those four-tuples

15   define a TCP connection, could you look at your

16   diagram on page 9?

17        A.      Yes.

18        Q.      Isn't it true that there is a TCP

19   connection between the local host, which I'll

20   call the one on the left, and what you labeled

21   the firewall, and then another TCP connection

22   between what you've labeled as firewall and the

23   remote host?

24        A.      Yes.

25                MR. McGREARY:  Let's take a break.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 92

1                    (Short break taken at 11:38 p.m.)

2                    (Resumed at 11:46 a.m.)

3        Q.     We've been talking about NAT,

4    network address translation, and things called

5    NAT devices and NAT boxes, right?

6        A.     Yes.

7        Q.     What actually on a device

8    accomplishes network address translation?

9        A.     It depends.  As a general rule it

10   is a part of the kernel that rewrites packets to

11   change their addresses.

12       Q.     By kernel you're talking about the

13   kernel of the operating system?

14       A.     Yes.

15       Q.     You said it was as a general rule?

16       A.     Yes.

17       Q.     Why do you say that's a general

18   rule?

19       A.     Because you can -- it's a little

20   bit of a terminology question.  ████████████████

███   ██████████████████████████████████████████████████

███   ████████████████████████████████████████    ██

███   ██████████████████████████████████████████

███   ██████████████████████████████████████████████

███   ███████████████████████████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 93

10      Q.      All I asked you is why it's a

11 general rule?

12      A.      I think you asked me why did I say

13 it is a general rule.  The answer is because

14 there are scenarios in which people use the term

15 NAT.  The thing that would be making sure that

16 the packet has a new address does not involve

17 rewriting the packet in the kernel.

18      Q.      In any event, in some piece of

19 software running somewhere that's rewriting the

20 packet address?

21      A.      Almost.  Not necessarily.  I'm

22 sorry this is a little complicated, I'm not

23 trying to make this complicated, it just is.

24      Q.      I do not find it complicated.

25      A.      If you look at the application

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 94

1    proxy scenario it receives a connection from the

2    workstation and then it has an outgoing

3    connection to the server.

4              Doing only that and then it does

5    something, whatever, in the proxy, that will

6    naturally result in the IP address of the

7    outgoing packet being the firewall's IP address,

8    because the firewall has the TCP connection to

9    the server.

10             In other words, the packet is not

11   actively rewritten in the scenario, it's just

12   that a new connection is created that happens to

13   have the IP address to the firewall.

14             If you were forwarding packets then

15   the packets are not -- there is no new

16   connection that is naturally creating an IP

17   address from the firewall and therefore the

18   packets have to be rewritten.

19        Q.     And that's done in the kernel?

20        A.     And that is done in the kernel.  It

21   is done either in kernel or a kernel module.

22        Q.     Whether or not the address is being

23   translated at the kernel or at the application

24   layer, there is some process somewhere that's

25   causing that address to be translated.  Somebody

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 95

1    has to program it in some fashion, right?

2         A.     Well, if you look at the

3    application proxy scenario there's no separate

4    step to make that happen.  In fact, a separate

5    step is required in order to make the opposite

6    happen.

7                Naturally you receive a connection,

8    you open a new connection to the server, you

9    take the data from the old connection and send

10   it to the new connection the IP address of the

11   firewall will be represented.

12        Q.     I understand.  When there's no

13   application layer proxy then there has to be a

14   separate instruction to do that transaction?

15        A.     Yes.

16        Q.     That's what you were calling the

17   general scenario?

18        A.     I don't remember, but that is a

19   common scenario.

20        Q.     You looked at your report -- in the

21   OS operating system, yes, for your report?

22        A.     Yes.

23        Q.     Which version?

24        A.     We looked at manuals for a number

25   of versions, I don't remember exactly which

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 96

1   ones. ███████████████████████████████████

2   █    ████

3        Q.     That was provided to you by

4   Fortinet?

5        A.     Yes.

6        Q.     You looked at a number of FortiGate

7   devices?

8        A.     Yes.  We examined I think two

9   devices and examined configuration files for

10  more.

11       Q.     ██████████████████████████████

██    ████████████████████████████████████████

██    ███████████████████████████████████████

██    ██████

██          ███    ███████████████    █████████████████

██    ██████████████████████████████████████████

██          ███    █████████████████

██    ███████████████████████████████████████████

██          ███    ████████████████████████

██          ███    ████████████████████████    ███

██    █████████████████████████████████████████████

██    ████████████████████████████████

██          ███    █████████████████████████████████

██    ██████████████████████████████████████

██    ██████████████████████████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 97

20        Q.     Now, in 1994 -- let's go back to

21    1993.  If I had a host running a Unix-based

22    operating system as it existed, no special

23    configuration, and it opened a TCP/IP packet and

24    it looked at the destination IP address, and

25    that destination IP address was not the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 98

1    destination IP address of that host, what would

2    that device do with that packet?

3         A.      Assuming nothing else, it would

4    discard it.

5         Q.      I want you to assume it had a

6    routing table?

7         A.      Okay.

8         Q.      Then what would it do?

9         A.      If it could route the packet based

10   on the interfaces it has and the routing table

11   it has, it would route the packet.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 99

23        Q.     When Mr. Cooper took the Cheswick

24   book out to make copies of it did you look at

25   it?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 100

1        A.      I did not.

2        Q.      Did he read you any portions of it?

3               MR. COOPER:  I'm going to object to

4    the question.

5               MR. McGREARY:  Withdrawn.

6        Q.      I believe you told me earlier today

7    that you did not anticipate giving any testimony

8    regarding the meaning of claims, is that right?

9        A.      Regarding claim construction, yes.

10       Q.      Do you draw a distinction between

11   claim construction and meaning of the claims?

12       A.      I consider claim construction to be

13   a question of what do specific claim terms mean.

14   Meaning of the claims is just a little bit

15   broader, so I just want to be clear about what

16   I'm saying I don't expect to testify about.

17               I do expect to testify about

18   whether or not the accused devices do certain

19   things that the claims say and that inherently

20   involves some discussion about what the words

21   mean.

22       Q.      I want to be clear because I'm not

23   so sure we're on the same page.  I want you to

24   turn to page 15.

25       A.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 101

1        Q.      5.3.4?

2        A.      I see that.

3        Q.      You write in the second sentence,

4    "Then, the limitation requires 'else dropping

5    the packet', which mean that if there is no

6    process assigned to the port number, the packet

7    must be dropped."  I read that right, correct?

8        A.      Yes.

9        Q.      You intend to testify with respect

10   to the meaning of "else dropping the packet" in

11   this context?

12       A.      Yes.

13       Q.      But you don't consider that claim

14   construction?

15       A.      I don't.  To me that's

16   interpreting -- that's simply reading the

17   language of the claim and applying it.

18       Q.      You say which means, right?

19       A.      Yes.  The language in the claim has

20   to mean something.

21       Q.      You further write, "This language

22   claims that the firewall, upon analyzing an

23   incoming packet, makes a decision with only two

24   choices."

25               So here you're explaining what the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 102

1   meaning of the scope of the claim is, isn't that

2   right?

3          A.     I'm not sure what else to tell you

4   other than it says what it says, and I plan to

5   testify to that.

6          Q.     In 5.3.5 you write, "Ordinarily, an

7   accused product does not escape infringement by

8   virtue of performing steps or including elements

9   in addition to those required for infringement,"

10  do you see that sentence?

11         A.     I do.

12         Q.     Is that your understanding or was

13  that given to you by someone?

14         A.     That is my understanding.

15         Q.     That is your understanding.  That

16  was given to you by counsel?

17         A.     It was not.

18         Q.     Are you a lawyer?

19         A.     I am not.

20         Q.     Are you an expert in opining as to

21  the law of claim construction?

22         A.     I am not.

23         Q.     Your next sentence is, "It can do

24  so, however, if a limitation of the claim is a

25  'negative limitation' - one that claims not

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 103

1    doing something or not including something," do

2    you see that?

3         A.    I do.

4         Q.    Is that your understanding?

5         A.    It is my understanding.

6         Q.    Was that given to you by counsel?

7              MR. COOPER:  Objection.  The same

8    objection that I've stated previously.

9              MR. McGREARY:  Let's address this

10   one objection on the record.  I think fairly

11   that if he's relying on a communication that you

12   gave him in his report it's open to inquiry, and

13   I'll let you make the call.  I think the

14   understanding has been communications between

15   counsel are privileged and I won't inquire into

16   them, but to the extent that he's actually

17   relying on it I think is fair game.

18              MR. COOPER:  Agreed.  If the

19   question is did you rely on a specific

20   communication from counsel for something in the

21   report, that's fair game.  If it's any other

22   communication between us and the witness that's

23   subject to the stipulation and my objection

24   would stand.

25              MR. McGREARY:  I agree.  I'll

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 104

1    rephrase.

2         Q.    So your statement, "If it can do

3    so, however, if a limitation of the claim is a

4    negative limitation - one that claims not doing

5    something or not including something."

6              Is that a statement that you relied

7    upon that was communicated to you by counsel?

8         A.    By counsel in this matter or

9    counsel ever?

10        Q.    Let's start with this matter.

11        A.    I don't think I relied on counsel

12   from this matter in order to write that text.

13        Q.    Was that communicated to you by

14   some other counsel in some other matter?

15        A.    Over the years I've done some

16   patent cases and this is an understanding that

17   I've developed.  I developed it through some

18   combination of reading materials and talking

19   with attorneys.

20        Q.    You don't consider yourself to be

21   an expert in patent claim construction, do you?

22        A.    I do not.

23        Q.    You're not a patent attorney?

24        A.    I am not.

25        Q.    Is it true also that 5.3.6 opines

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 105

1    as to your meaning that you ascribe to claims

2    10, 43 and 29?

3         A.     5.3.6 includes my understanding of

4    claims 10, 43 and 29.

5         Q.     And that understanding comes, at

6    least in part, from what you set forth in 5.3.5?

7         A.     It's related to it.

8         Q.     You've used the word forward packet

9    in your report throughout?

10        A.     Can you say that again, I just

11   didn't hear it.

12        Q.     You use the word forward packet in

13   your report throughout, is that correct?

14        A.     I use it in several places, yes.

15        Q.     Can you tell me the definition of

16   forward that you ascribe in this report?

17        A.     For a firewall it's transmitting a

18   packet without creating a new TCP connection.

19        Q.     It would not exclude if that packet

20   were changed in making a transmission?

21        A.     Correct.

22        Q.     Would your opinion change if the

23   understanding of forward packet were to include

24   only packets that were not changed in making the

25   transmission through the firewall?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 106

1          A.     It would affect some portions of

2     the report, I don't know if it would affect the

3     conclusions.

4          Q.     Do you set forth in your report any

5     alternative conclusions based upon a different

6     understanding of forward the packet?

7          A.     I would have to look at the

8     conclusions on a case-by-case basis.

24          Q.     You're familiar with the HTTP and

25     HTTPS protocol?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 107

1        A.       Yes.

2        Q.       Application layer protocol?

3        A.       Yes.

4        Q.       How about e-mail, is that an

5   application layer protocol?

6        A.       E-mail is not.  SMTP, which is the

7   protocol by which e-mail is transferred is one.

8   IMAP and POP are e-mail protocols by which

9   e-mail is retrieved.

10        Q.       Let's take them one at a time.  Is

11   SMTP an application layer protocol?

12        A.       Yes.

13        Q.       How about IMAP?

14        A.       Yes.

15        Q.       How about POP?

16        A.       Yes.

17        Q.       Are those the three most dominant

18   e-mail protocols in use today?

19        A.       Probably the exchange protocol is

20   also very big.

21        Q.       Is that an application layer

22   protocol?

23        A.       Yes.

24        Q.       Of the percentage of network

25   traffic, what percentage do you think is HTTP or

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 108

1    HTTPS?

2         A.    I don't know.  I also think it

3    depends on the time of day.

4         Q.    HTTP is the common web browsing

5    protocol, right?

6         A.    Yes.

7         Q.    You would agree that it's a large

8    percentage of the internet traffic?

9         A.    Is it on a

10   transaction-by-transaction basis, yes; but I

11   don't know how on a by volume basis.  For

12   example, during prime time hours Netflix

13   accounts for about 30 percent of all internet

14   usage, and that's streaming video, so it just

15   depends on exactly on what you mean.  I agree

16   that HTTP is a very common, very heavily used

17   protocol.

18        Q.    What streaming video protocol does

19   Netflix use?

20        A.    They are built on top of

21   Microsoft's Silverlight platform.  I actually

22   don't know what they are using.

23        Q.    Is that protocol an application

24   layer protocol?

25        A.    It almost certainly is, yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 109

1      Q.      How about VPN, virtual private

2  network.  Are those protocols application layer

3  protocols?

4      A.      Generally, yes.

5      Q.      Have I covered the common protocols

6  that are in use in network traffic today as you

7  understand it, are there other protocols that

8  are common that are in use today?

9      A.      In each case when there is an

10  application layer protocol there are also other

11  protocols in play below it in the layers.  I

12  guess I'll just agree, I think we have discussed

13  many of the most commonly used protocols that

14  are application layer protocols.

15      Q.      If I want to apply security to

16  those application layer protocols such as virus

17  scanning or web filtering, what type of firewall

18  device do I need to use?

19      A.      It depends.  If you want to filter

20  the application layer content the most effective

21  way to do it is to filter at the application

22  layer.

23      Q.      So I would use an application layer

24  firewall?

25      A.      That let's you do some kinds of

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 110

1   firewalling that are otherwise not possible.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 111

8         Q.      You disagree with that statement?

9         A.      I disagree with that statement.

10        Q.      Is that something you covered in

11   your report or is that based on your expertise?

12        A.      That's based on my expertise.  I

13   mean I discuss this subject in part of my

14   report, but when I was answering the question

15   just now it was just based on my expertise.

16        Q.      What are configuration files?

17        A.      Configuration files are files that

18   contain settings.

19        Q.      What do those settings do?

20        A.      It depends on what the

21   configuration file is for.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 112

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 113

7        Q.      Were you given any configuration

8    files from a company called Secured?

9        A.      I don't recall that.

10       Q.      Are you aware that Fortinet's

11   counsel is in possession of configuration files

12   from a Fortinet customer known as Secured?

13              MR. COOPER:  The same objection

14   that I made previously.  To the extent that it's

15   asking for communications between Quinn Emanuel

16   and yourself please do not answer it.

17       Q.      I'm asking for your awareness?

18       A.      I'm not aware of configuration

19   files from a company called Secured.

20       Q.      How about a company called EO

21   Johnson, did you look at configuration files for

22   a company called EO Johnson?

23       A.      I did not.

24       Q.      How about a company called BHI.

25   Did you look at configuration files for a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 114

1    company called BHI?

2           A.      I did not.

3           Q.      Did you look at any testimony from

4    Michael -- do you know who Michael Xie is?

5           A.      I do.

6           Q.      Who is he?

7           A.      He's a senior employee at Fortinet.

8    I think he may be one of the founders.

9           Q.      Did you look at any deposition

10   testimony from Michael Xie?

11          A.      I looked at some of it.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 115

13          Q.     About how long would it take you to

14     review say 3,000 configuration files?

15          A.     How long?

16          Q.     Yeah.

17          A.     How long are the files?

18          Q.     That's a good question.  What are

19     the possibilities; they can be pretty long?

20          A.      They can be or they can be

21     extremely short.  They can range from one line

22     or thousands of pages.

23          Q.     Let's assume they were ticked out

24     and it took them 300,000 pages for the 3,000

25     files; how long would it take to review that?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 116

1         A.      Does review involve reading every

2    line?

3         Q.      It involves determining whether the

4    configuration files would implement an

5    application layer features such as web

6    filtering, UTM or antivirus?

7         A.      It's hard for me to say.  You could

8    be looking at one of those files -- I apologize.

9    If those settings are either typically at the

10   front of the file or in a predictable location

11   within the file, then it might be quick.

12              If you know it's always roughly in

13   the middle it might be quick.  If you have to

14   read them line for line the whole thing it would

15   take longer.  If it's OCR-able then you could

16   OCR them and search them, that would help.

17        Q.      Getting them as a tiff is kind of a

18   pain?

19        A.      If they're OCR-able it's okay.

20        Q.      Does ACSII come -- you have to tiff

21   it out if you have an ACSII text, right.  If you

22   go to generate a printout of an -- strike that.

23              If you have an ACSII file is there

24   any reason to turn it into a tiff if you want to

25   do searching on it?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 117

1      A.     Now we're well into the realm of

2   how production works.  If you have to produce it

3   and it has to be Bates numbered and you think

4   that it might be used in deposition, individual

5   pages should be Bates numbered.

6      Q.     Just talking as an expert, as a

7   forensic computer data specialist that was

8   looking for a configuration file, would you

9   rather have it as ACSII native or as a tiff?

10     A.     If I'm supposed to analyze

11  something I would rather have it native.

12     Q.     What are you going to do to make a

13  native ACSII into a tiff?

14     A.     You run it through the discovery

15  program.

16     Q.     Did you do any eDiscovery stuff on

17  this case, other than your expert report?

18  Withdrawn.

19            Was Elysium providing litigation

20  support in this case to Fortinet?

21     A.     Let me say something which I think

22  is helpful as to what you're asking.  I don't

23  believe Elysium was involved in document

24  production, tiffing, those sorts of things on

25  this case.  I'm not aware of that involvement,

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 118

1    if there was any.

2          Q.    I'm going to hand you what has been

3    marked previously as Exhibit 1 in the case.  ▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆        ▆▆▆    ▆▆▆▆▆▆▆▆▆▆▆

8          Q.    You do hold some U.S. patents,

9    right?

10         A.    I do.

11         Q.    Have you licensed any of them?

12         A.    No.

13         Q.    Have they been monetized in any

14   way?

15         A.    No.

16         Q.    Does Elysium hold any --

17         A.    Let me back up.  I need to correct

18   both of those statements.  One of our -- at

19   least one of our patents was licensed many years

20   ago to a startup that Mr. Creath and I were

21   ourselves involved in that was providing a way

22   for individuals to sell their software using our

23   licensing system.

24                So there was a patent license on an

25   implementation of the patent, and so that would

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 119

1   have been a license that would have in theory

2   been monetized.

3          Q.     Other than that?

4          A.     No.

5          Q.     Does Elysium own any other patents,

6   other than the patents that have been issued

7   under your name?

8          A.     No.  There are some individuals at

9   Elysium who have their own patents that they are

10  inventors on.

11         Q.     Thank you.  I want to direct your

12  attention to claim 10.  Let me set this up a

13  little bit.

14                I've handed you what has been

15  marked as Exhibit 1, do you recognize it?

16         A.     I do.

17         Q.     What is it?

18         A.     It appears to be a copy of the '601

19  patent that's at issue in this case.

20         Q.     Also, I believe the re-exam

21  certificate is attached, am I right?

22         A.     I see that as well.

23         Q.     Do you know what a re-examination

24  is?

25         A.     I do.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 120

```
 1        Q.      What is your understanding of a
 2   re-examination?
 3        A.      The patent office re-examines the
 4   patents to determine whether or not it should
 5   remain issued, and enters into a discussion with
 6   the inventors and possibly other parties on that
 7   subject.
 8        Q.      You're not offering any opinion on
 9   the validity of this patent in this case, are
10   you?
11        A.      I am not.
12        ▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆
15        Q.      You are aware obviously that the
16   patent office confirmed the existing claims?
17        A.      I am.
18        Q.      And allowed additional claims?
19        A.      Yes.
20        ▆    ▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆
▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆▆
▆    ▆▆▆▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆   ▆▆▆▆▆▆▆▆
```

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 121

20        Q.     I'm just asking what your aware of.

21   Today I'm finding out what your testimony might

22   be to the jury, so if you could try to limit

23   your answers to the questions that I'm asking I

24   would appreciate it.  Okay?

25        A.     I understand.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 122

1        Q.      Let's look at claim 10 if you will?

2        A.      Yes.

3        Q.      You understand this claim to be

4    addressed to a gateway between a private network

5    and a potentially hostile network, correct?

6        A.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 123

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 124

1        A.      No.

2        Q.      Is that opinion that you've stated

3    here set forth in your report?

4        A.      Yes.

5        Q.      Are your complete reasons for

6    arriving at that opinion set forth in your

7    report?

8        A.      Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 125

18        A.    I do understand that he differs on

19    that in his opinion.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 126

10          A.      I need to look at his report again
11    carefully.
12          Q.      Before we do that, let me hand that
13    to you.
14                  MR. McGREARY:  Mark that.
15                  (Exhibit 193, Defendant Fortinet,
16    Inc.'s Identification of Preliminary Claim
17    Constructions Pursuant to Patent Local Rule 4-2,
18    marked for identification.)
19          Q.      Mr. Hicks, I've handed you what
20    we've marked as Exhibit 193.  Have you ever seen
21    that document before?
22          A.      I don't remember seeing this.  It's
23    possible that I've seen it, but I don't recall.
24          Q.      Did you use it at all or rely on it
25    in any way in preparing your report?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 127

1      A.      I don't believe I did.

2      Q.      You didn't have input to any of the

3  substance of that document, did you?

4              MR. COOPER:  I caution the witness

5  not to reveal any communications with counsel at

6  Quinn Emanuel.

7      A.      I don't recall making any

8  contributions to this document.

9      Q.      Are you familiar with the feature

10  of data leak prevention?

11      A.      Yes, generally.

12      Q.      What is data leak prevention

13  generally?

14      A.      The data leak problem generally is

15  the problem of essentially information escaping

16  from the secure network into the hostile

17  network, which you don't want to get out.  Data

18  leak prevention is generally products for

19  preventing that.

24      Q.      Did you analyze data leak

25  prevention in your report the all?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 128

1          A.      I don't believe I discussed that

2     specifically.

20          Q.      I may have asked you this before,

21     if I did I apologize.  Did you analyze any

22     differences between the various FortiOS

23     versions?

24          A.      I don't remember whether we look

25     at -- well, at some level yes, because at the

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 129

1    documentation level at least we looked at

2    different versions.  I don't remember whether we

3    did a comparison across code bases for code

4    level differences.

5         Q.    Did any of your opinions depend

6    upon which version of FortiOS may be running on

7    a Fortinet device with respect to

8    non-infringement?

9         A.    Let me take a look.  Flipping

10   through it, and this is also consistent with my

11   recollection because the original Keromytis

12   report was focused on ████████████ .

13               I generally looked at ███████████

14   ████████ , both in documentation citations and in

15   code, on the assumption that essentially if it

16   was okay for Dr. Keromytis, if the analysis

17   generalized there then it would generalize here.

18   It is possible that some of those products

19   behaved differently in different versions.

20        Q.    Do you have testimony to offer that

21   they do?

22        A.    I do not.

23        Q.    Do you understand that Fortinet

24   produced any code that Mr. Keromytis did not

25   analyze?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 130

1        A.      Yes.

2        Q.      What is the basis of your

3   understanding?

4        A.      The code that -- Elysium received a

5   set of code and we were told that it was the

6   same set of code that was made available to the

7   plaintiffs.  That set of code included code for

8   other versions of FortiOS.

9        Q.      Did you analyze it?

10       A.      I personally did not.  I don't know

11  whether or not my colleagues did.

12       Q.      Let's look at claim 19.

13       A.      Yes.

14       Q.      ████████████████████████████████████

███  ████████████████████████████████████████

███  ██████████████████████████████████████████

███  ████████████████████████████████████████

███  ██████████████████

19       A.      I do not opine that that's not

20  true.

21       Q.      In fact, you agree that it is true,

22  right?

23       A.      As far as I'm aware it's true, yes.

24         ████  ██████████████████████████████████

███  ██████████████████████████████

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 131

1        A.      Yes.

2        ■        ███████████████████████

■    ████████████████

4        A.      Yes.

5        ■        ██████████████████████

6        A.      Yes.

7        ■        █████████████████████

■    ████████████████████████████

■    ████████████████████████

■    ██████████████████████████████

■    ██████████████████████████

■    ████████████████████████

■    █████████

14       A.      I do dispute that, yes.

15       Q.      Does the basis of your dispute rely

16   upon the definition of forward that you have

17   discussed in your report?

18       A.      It's a combination of what forward

19   means and what the products do, as set forth in

20   my report.  My opinions on that are set forth in

21   the report if that's the question.

22       ■        ████████████████████████

■    ███████████████████████

■    ████████████████████████████

■    █████████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 132



4        A.      I don't dispute that.

5

12       A.      I don't dispute that the

13

15

21       A.      I don't dispute that the

22

24

DEPOLINK COURT REPORTING & LITIGATION SERVICES   (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 133



9       A.      I don't dispute that ▮

12      Q.      In your review of Fortinet

13   materials, ▮▮▮▮▮▮▮▮▮▮▮▮

16        ▮      ▮▮▮▮▮▮▮▮▮▮

23      A.      Yes.

24      Q.      Some of ▮▮▮▮▮▮▮ that we

25   discussed?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 134

1       A.      Yes.

2       Q.      ███████████████████?

3       A.      Yes.

4       Q.      ██?

5       A.      ████   █████████████████

███   ███████████████

7       Q.      I'd like to direct your attention

8   to claim 57 which is on the last page of

9   Exhibit 1?

10      A.      Yes.

11      Q.      So claim 57, it depends from claim

12  19; you see that, right?

13      A.      Yes.

14      Q.      Do you understand the concept of a

15  dependent claim?

16      A.      I do.

17      Q.      What is that concept, to your

18  understanding?

19      A.      That a device infringes the

20  dependent claim if it meets all of the

21  limitations of the independent claim, but also

22  the limitations imposed by the dependent claim.

23      Q.      So when we're talking about claim

24  57 we're talking about claim 19 again, and all

25  your points of dispute or non-dispute are a

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 135

1    matter of record, so we don't need to go over

2    that again, right?

3         A.    That's fair.

4         Q.    So this adds to the phrase, claim

5    19, "Wherein, at least one proxy process is

6    further adapted to perform a data sensitivity

7    check on the data with each packet while

8    transparently passing the data portion of each

9    packet."

10              Do you understand this limitation,

11   or do you have an understanding of this

12   limitation?

13        A.    I would say there's some ambiguity

14   because of the term data sensitivity check.  I

15   haven't spent a lot of time on this limitation.

16   I'm not sure, has data sensitivity check been

17   construed by the court?

18        Q.    Actually it hasn't, and Will will

19   correct me if I'm wrong.  I believe the parties

20   will agree that the data sensitivity check will

21   bear its ordinary meaning.

22              MR. COOPER:  I don't know if that's

23   true or not.

24        Q.    Do you have an understanding, and

25   I'll put on record that you haven't had an

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 136

1    opportunity to read the patent for purpose of

2    this question.

3              Do you have some understanding of

4    what a data sensitivity check is, just

5    generally?

6         A.    I could give it meaning.

7         Q.    Why don't you do that for me?

8         A.    Okay.  Would you like me to speak

9    out the meaning out loud?

10        Q.    Yes.

11        A.    You can imagine a world in which it

12   meant determining whether or not the data are

13   sensitive, as in restricted; but I don't know if

14   that's the meaning.

███    ███    ████████████████████

███    ████████████████████████████

███    ███████████████████████████████

███    ███████████████

███    ███    ████████████████████

███    ██████████████████████

21        Q.    You can read the word "is" out,

22   yes.  Maybe I'm being unfair to you.  Other than

23   the opinions you've already set forth in your

24   report with respect to claim 19, do you

25   anticipate giving any further testimony about

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 137

1   why claim 57 would not be infringed?

2           A.      I don't.

3           Q.      Okay.  We can stop there.

4                   MR. COOPER:  It's now 12:50 I

5   believe.

6                   MR. McGREARY:  So what do you have?

7                   MR. COOPER:  Let's go off the

8   record.

9                   (Off the record at 12:50 p.m.)

10                  (Resumed at 1:06 p.m.)

11          Q.      Mr. Hicks, let's switch gears a

12  little bit.  We were talking earlier that you

13  graduated from Princeton in 1997, is that right?

14          A.      That's right.

15          Q.      I saw on your CV that you did a

16  couple of summers at AT&T?

17          A.      That's right.

18          Q.      Can you tell me what your duties

19  were during the summers you spent at AT&T?

20          A.      I worked for AT&T Research.  I

21  worked on a number of different projects, a lot

22  of them related to the internet which was then

23  embarrassingly a relatively new force as

24  something that companies were paying attention

25  to.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 138

1        Q.      Who was your immediate supervisor

2   at AT&T?

3        A.      Her name was Wenling, that's W E N

4   L I N G, the last name is Shu, S H U.

5        Q.      I may have asked you this earlier

6   and if I did I apologize.  While you were there

7   you didn't have an opportunity to work with

8   Mr. Cheswick, did you?

9        A.      I did not.

10       Q.      If you could look at Exhibit 1

11  again.  Take a look at claim 19?

12       A.      Yes.

13       Q.      I believe you told me earlier that

14  you disagreed with Mr. Keromytis with respect to

15  what's been denoted as limitation A in claim 19,

16  "An operating system that cannot forward any

17  communication packet from the private network to

18  the potentially hostile network or from the

19  potentially hostile network to the private

20  network," do you see that?

21       A.      I do see that.

22       Q.      I may have asked you this and I

23  apologize if I did.  Is your points of

24  disagreement with Mr. Keromytis dependent only

25  upon the definition of forward, or is it

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 139

1    dependent upon the definition of forward and how

2    it's being applied by Mr. Keromytis in his

3    report?

4          A.    It's always dangerous when you

5    start to generalize something which you've

6    explained with some complexity.  I would say my

7    disagreement with Mr. Keromytis is in relation

8    to the terms modified and forward, and applying

9    those to the particular technology here.

10         Q.    If you were forced to adopt

11   Mr. Keromytis' understanding, at least as you

12   have read his report, would you be required to

13   change your opinion?

14         A.    Well, if I were required to adopt

15   all of his understandings for sure.  Which of

16   his understandings would I be required to adopt

17   in this hypothetical?

18         Q.    Is your report still in front of

19   you?

20         A.    It is.

21         Q.    I believe in your report you

22   analyzed certain ██████████████████

     ██ ████████████████, is that correct?

24         A.    Yes.

25       ███     ██████████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 140

7        Q.    Can you iterate the three for me as

8   you recall it?

9

21        A.    Some of my opinions reference that,

22   that fact, yes.

23

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 141

1        A.      Yes.

2        Q.      Had you had a chance to review Mr.

3    Keromytis' reply report before being deposed

4    today?

5        A.      Yes.

6        ███      ███████████████████████████

███    ███████████████████████████

███    ████████████████████████████████

███    ██████████████████████████

10       A.      I remember seeing a section like

11   that in his report.

12       Q.      Did you go back and look at the

13   Fortinet materials that he was referencing?

14       A.      I didn't go back and look at

15   materials, other than insofar as he quoted them

16   I think that I read the quotes.

17       ███      ██████████████████████

███    ████████████████████████████████

███    █████████████████████████████████

20       A.      No, I think that's very much

21   situation dependent.

22       ███      ████████████████████████

███    ████████████████████████████

███    ███████████████████████████

███    ██████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 142

14          A.      I have to look at exactly the

15    language again, I'm not trying to be difficult.

16    I remember that -- by the way, is it Mr. or Dr.

17    Keromytis?

18          Q.      It is Dr. Keromytis.

19          A.      Then I should have been more

20    consistent about that before.  I don't want to

21    misrepresent him or anything and I don't want to

22    be difficult because I know you're trying to

23    work with limited time.

24

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 143

██  ████████████████████████████████████

██  ████████████████████████  I haven't

3   looked at that closely, but I wouldn't be

4   surprised if that is true.

██      ██  ████████████████████████████

██  ████████████████████████████

██      ██  ████████████████

██      ██  ████████████████

██      ██  ██████

██     ██  ████████████████████

██     ██  ██████

██     ██  ██████████████████████

██  ██████████████████████████

██  ████████████████████████████████

██  ██████████

██     ██  ██████████████████████

██  ████████████████████████████

██  ████████████████████████  ████████

██  ██████

20          MR. COOPER:  We'll do that.

21          MR. McGREARY:  Why don't we note it

22  here and do the whole transcript.  ████████

██  ████████████████████████████

██  ████████████████████████████

██  ████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 144

1            MR. COOPER:  So we'll mark the

2    entire transcript highly confidential,

3    attorneys' eyes only pursuant to the protective

4    order.

5            MR. McGREARY:  The only thing I

6    would ask is we have motions that we're

7    preparing, so we may ask you to expeditiously

8    look at a possible re-designation.

9            MR. COOPER:  Understood.

10       Q.    Let me withdraw the question for a

11   moment.  I think you told us that security at

12   Elysium is very important, is that right?

13       A.    Yes.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 145

8            MR. COOPER:  I'm sorry to

9    interrupt.  Can we go off the record.

10               (Off the record)

11           MR. McGREARY:  The question is

12   withdrawn.

13       Q.    Can we agree on a definition for a

14   simple NAT device, that definition being a

15   device that only accomplishes network address

16   translation; is that an assumption you can make?

17       A.    Can I say it a little differently.

18   We're talking about a firewall that accomplishes

19   all of its transmissions using network address

20   translation and not using two sessions.

21       Q.    No.  I want to get firewall out of

22   our head for a second and I want to talk about a

23   network address translator as a standalone

24   device?

25       A.    Okay.  In practice, when you

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 146

1    network address, when you NAT, you are also

2    effectively carrying out a form of firewalling.

3         Q.    Is that understanding because

4    you're basically hiding the source addresses of

5    the host on the private network?

6         A.    Yes, and because somebody trying to

7    reach another box on the private network, all

8    they can try and do is send the packet to the

9    firewall.  If it isn't part of an existing

10   session that the NAT device is tracking it won't

11   know where to set it, and in practice you have

12   firewalled.

13        Q.    You say in practice you have

14   firewalled because in practice you have ended up

15   implementing some type of security?

16        A.    Yes.

17        Q.    In this case privacy of your source

18   address of your host on your private network?

19        A.    Well, the most important aspect of

20   that security is that you are blocking incoming

21   connections to the host behind the device.  That

22   is the single biggest security goal of firewall

23   protecting work stations.  There are more

24   complicated things, but that's the biggest,

25   probably most important thing that it does.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 147

1      Q.     You're blocking them because the

2   host off the private network doesn't know the

3   destination address, other than the NAT device?

4      A.     Even if it knows the destination

5   address, because you can guess them for example,

6   it does not know of an existing outgoing

7   connection into which it can inject its packets

8   to come back in.  Even if you have an outgoing

9   connection packets are flowing back.

10          The NAT device allows other packets

11   that are part of the same connection to come

12   back, but if there is a connection that comes in

13   that is not part of an outgoing connection, the

14   NAT device cannot and will not send them

15   anywhere, it does not know what to do with them.

16      Q.     Is that a product of NAT as it was

17   developed in 1993 to '94, or is that a fire

18   security that was added into network address

19   translation later on?

20      A.     It turns out you get it for free.

21      Q.     So would you agree with me then

22   that -- withdrawn.

23          When NAT was first developed, and

24   I'm using '93, '94 as a general time frame, its

25   impetus was to expand the address base in IPV 4.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 148

1    I think we covered that earlier today, right?

2         A.    Yes.

3         Q.    It's impetus was not secured, they

4    sort of got that for free?

5         A.    This question goes down to the

6    first guy who thought of NAT, which problem was

7    he trying to solve.  My understanding is he was

8    trying to solve the scarcity of ID problem and

9    got the security for free.  Very quickly of

10   course people realized the security benefit as

11   well.

12        Q.    I want you to imagine a NAT device

13   that has no other security features other than

14   network address translation as you have

15   explained it to me today?

16        A.    I understand.

17        Q.    Based upon your experience in

18   security, what percentage of gateways in what

19   would be considered in today's standards as a

20   secure network would implement that type of

21   security, do you have an opinion on that?

22        A.    Well, it depends on exactly what

23   you mean by secure area, let me offer some

24   points.  Virtually, the vast majority, virtually

25   all home networks fall under this category.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 149

1    They're sitting behind a device that does NAT

2    and nothing else.  It can be configured to do

3    other things, but almost every family has a wifi

4    router that does NAT and nothing else.

5              Many, many small offices do this.

6    I would say it is common to do that and little,

7    if anything else, until you get to organizations

8    large enough at least to have an IT staff.

9              Not universally true, people might

10   bring in an outsider to configure, people have

11   sophisticated firewalls at home.

12             Overwhelmingly, I would say at home

13   NAT-only devices are common in smaller offices,

14   NAT-only devices are common.  When you have on

15   board IT staff you are more likely to start

16   adding additional features to it.

17        Q.    As you add features to a firewall

18   you get more expansive, right?

19        A.    Generally, yes.

20        Q.    Generally yes, right?

21        A.    Yes.

22        Q.    So if the only security feature you

23   wanted was NAT, you would generally spend for a

24   box that only provided NAT, right?

25        A.    Usually that's true, additionally

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 150

1    for a different reason.  Usually the

2    organizations who can get along only with NAT

3    are also relatively small so they don't need

4    high capacity.  The other thing that expensive

5    firewalls gets you is speed.

6          ██        ████████████████████████

██    ██████████████████████████████████

██    ████████████████████████████████████

██    ██████████████████████████████████

██    ███████████████████████████████

11          A.        That depends on the policy.

██          ██        ████████████████████████

██    ████████████████████████

██          ██        ████████████████████████

██    ████████████████████████

██          ██        ██████████████████████

██    ████████

██          ██        ████████████  ██████████

██    ████████████████████████████

██    ████████████████  ██████████████████████

██    ████████████████████████████

██    ██████████████████████████████████

██    ████  ████████████████████████████

██    ██████████████████████████████

██    ████████████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 151

6        Q.     Are you familiar with the term

7  algorithm?

8        A.     Yes.

9        Q.     What is the computer science

10  definition of an algorithm?

11        A.     It's a series of steps performed by

12  software in computer science.

13        Q.     Computer science is a series of

14  steps performed by software?

15        A.     Yes.

16        Q.     Algorithm outside of computer

17  science, can I just generalize it to a series of

18  steps?

19        A.     Generally yes, I think.  Some

20  subfields would say something a little more

21  precise, but okay.

22        Q.     What are the ways to document an

23  algorithm?

24        A.     A computer science algorithm or a

25  general algorithm?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 152

1        Q.      Let's start with the computer

2   science algorithm.

3        A.      You can have the software itself,

4   you can have pseudo code, you can have a diagram

5   like a flow chart, you can describe it in pros.

6        Q.      Does anything else come to mind?

7        A.      That's what jumps to mind.

8

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 153

2        Q.    You have a section in your report
3   starting on page 6 that discusses prosecution
4   history estoppel?
5        A.    I do.
6        Q.    Did you write that section of your
7   report?
8        A.    I believe this text was -- I don't
9   remember this text, I mean the substance of this
10  was suggested to me in discussions; but I don't
11  remember whether I drafted this language myself
12  or not.
13       Q.    When you say suggested to you, do
14  you mean suggested to you by Fortinet's counsel?
15  I'm asking you only for the purposes of what
16  ended up being written into your report?
17       A.    Yes.
18       Q.    Did you have any communications
19  with a Dr. Carl (phonetic)?
20       A.    I don't believe I did.
21       Q.    The interactions you had with the
22  other folks at Elysium that gave inputs to you,
23  were they all oral, or were some of them via
24  e-mail or some other form of communication?
25       A.    I think they were oral only.  I

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 154

1   can't remember any e-mails, mostly I remember

2   meetings.

3        Q.    Did the other folks that gave

4   input, did they create any written work product

5   that was the result of their efforts?

6        A.    So written work products at all,

7   did they take any notes, I'm trying to figure

8   out?

9        Q.    I'm not really so interested in if

10  they took notes.  I'm more interested if they

11  created drafts of sections of your report or if

12  they did testing, the results of which you

13  looked at and relied upon.  Let's start with

14  that.

15            Did they do any testing of

16  anything, the data of which you relied upon in

17  formulating your opinions?

18       A.    Yes.  Colleagues of mine did the

19  work of looking at the configuration files.

20       Q.    Is there work product attached as

21  an exhibit to your report?

22       A.    Yes.  I believe there's an exhibit

23  with a table of the result of the configuration

24  analysis.  I think it's called Exhibit

25  Configuration Summary.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 155

1                    MR. McGREARY:  Would you mark one

2     of these.

3                    (Exhibit 194, Document entitled

4     "Exhibit Configuration Summary" marked for

5     identification.)

6          A.     Yes.

7          Q.     Who did the majority of the work on

8     that report?

9          A.     On this exhibit?

10         Q.     Yes.

11         A.     Paul Mattal.

12                    MR. McGREARY:  Mark this as well.

13                    (Exhibit 195, Document, marked for

14     identification.)

15                    MR. McGREARY:  Do you know what our

16     obligations are under the protective order in

17     showing the witness, he's already signed the

18     protective order, right?

19                    MR. COOPER:  Yes.

20                    MR. McGREARY:  There's some

21     third-party material that was stamped.

22                    MR. COOPER:  I do not know the

23     precise rules.

24                    THE WITNESS:  Should I not be

25     looking at this yet?

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 156

1                    MR. McGREARY:  You can look at it

2     as long as we're designated highly confidential,

3     attorneys' eyes only.

4          Q.    I'm showing you what was marked as

5     Exhibit 195.  Have you seen this document

6     before?

7          A.    No.  More precisely I don't

8     remember seeing it before.

9          Q.    Do you recognize what it is?

10          A.    It appears to be a firewall

11     configuration, or portion of it.

12          Q.    Can you on the first page tell what

13     the configuration is?

14          A.    I can pick some things out.

15          Q.    Why don't you try that.

16          A.    The top of the page is clearly in

17     the middle of some other block that ends with

18     the word "and," where the word "and" appears

19     right above the word config. ███████████████

███  ████████████████████████████████

███  ████████████████████████

███       ███████████████████████  ████

███  ██████████████████████████████████

███  ████████████████████████████████████████

███  ██████████████████

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 157

22      A.      Yes.

23      Q.      Why don't you give that back to me.

24              MR. McGREARY:  I don't have any

25      further questions for the witness at this time.

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 158

1   Obviously that's marked so you know how to

2   handle that.  I'm not going to leave this

3   exhibit with the court reporter, I'm going to

4   take Exhibit 195 with me and I'll scan it and

5   send it to you.

6               MR. COOPER:  Understood.

7               MR. McGREARY:  If you want to make

8   a copy of it now you can.

9               MR. COOPER:  Okay.

10              MR. McGREARY:  Why don't you do

11  that and then I'll take it with me.

12              MR. COOPER:  I don't have any

13  questions.

14              MR. McGREARY:  Thank you so much

15  Mr. Hicks.  Thank you for accommodating what was

16  kind of a crazy travel schedule.

17              (Time Noted:  1:38 p.m.)

18

19

20

21

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 159

1            C E R T I F I C A T E

2

3            I, Roberta Caiola, a Shorthand

4      Reporter and Notary Public within and

5      for the State of New York, do hereby

6      certify:

7

8            That the statements, colloquy

9      and testimony contained herein is a

10     true record of the proceedings in this

11     matter.

12

13           I further certify that I am

14     not related to any of the parties

15     involved in this proceeding, and that

16     I am in no way interested in the

17     outcome of this matter.

18

19

20           ---------------------------

21               ROBERTA CAIOLA

22

23

24

25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

| A |
|---|

**$150,000**
36:22
**a.m**
1:11 61:18,19 79:20,21 92:2
**ability**
36:10 65:22
**able**
29:3 42:13 55:23 56:2 90:13
**abstraction**
57:1 91:9,11
**accept**
47:15 86:2 106:16 123:16 126:4
126:5 131:23
**accepted**
123:25 124:12,16,19 125:1,16
132:10
**accepts**
124:9
**access**
25:16 112:23
**accessible**
153:1
**accommodating**
158:15
**accompany**
3:13
**accomplished**
93:7 122:23
**accomplishes**
92:8 145:15,18
**accomplishing**
76:6
**accounts**
108:13
**accumulate**
44:8
**accurately**
8:4
**accused**
100:18 102:7 121:10,13,16,18
**achieved**
42:3 43:16 45:3
**acknowledged**
68:10 70:5,17
**acknowledges**

70:14
**acknowledgment**
69:19
**ACSII**
115:11 116:20,21,23 117:9,13
**active**
18:16 63:10,15 77:3,4 78:3,4
80:14 152:22
**actively**
63:16 94:11
**actual**
8:15 17:12 60:20
**adapted**
132:8 135:6
**add**
149:17
**added**
147:18
**adding**
149:16
**addition**
102:9
**additional**
11:17 120:18 142:6 143:1
149:16
**additionally**
149:25
**address**
53:21,22 57:19,19 58:1,2,7,9,14
58:17,20 59:4,12,19,21,22
60:4,18 67:20 70:19 72:15,17
73:24 74:3,4,6,7,12,15,16,19
78:2 91:4 92:4,8 93:1,3,5,16
93:20 94:6,7,13,17,22,25
95:10 97:24,25 98:1 99:1,2
103:9 122:14,19 123:2,6,8,19
123:20 124:11,16 125:1 132:2
132:3 140:1 145:15,19,23
146:1,18 147:3,5,18,25 148:14
150:17,19
**address/destination**
124:18
**addressable**
60:20
**addressed**
57:7,23 65:20 70:10 122:4,20

**addresses**
57:18,20,21 59:11,13,14 60:20
77:24 78:1,11 92:11 146:4
**addressing**
57:16 65:19 66:9,12 70:9 76:16
82:18,23 83:5 85:25 143:13
**adds**
135:4
**adjustable**
97:6,7
**administrator**
32:23 33:1,3 42:11 54:24 87:2
132:13,16,22,25 133:10
**administrators**
55:12 133:14
**adopt**
139:10,14,16
**affect**
61:4 106:1,2
**afraid**
19:24
**ago**
36:11 118:20
**agree**
78:8,13,15 79:23 80:20 83:10
103:25 108:7,15 109:12
110:23 111:4 130:21 133:13
135:20 141:17 145:13 147:21
**Agreed**
103:18
**ahead**
21:8 56:15
**Akamai**
49:7
**Alex**
64:23
**algorithm**
151:7,10,16,23,24,25 152:2
**aligned**
19:22
**allegation**
27:10 28:1
**allegations**
27:23
**alleged**
28:6

allow
92:25
allowed
42:2 68:5,11 120:18
allowing
97:15
allows
147:10
altering
110:24
alternative
106:5
amazing
33:22
ambiguity
135:13
analysis
35:7,11 106:9 129:16 154:24
analyze
45:9 117:10 127:24 128:21
   129:25 130:9
analyzed
96:1 130:15 139:22 140:3
   144:16
analyzing
28:17 44:23 101:22
and/or
36:6 74:7,9
answer
5:8,17,19,20 6:2,5,6,9,13,17,19
   7:4,19 10:16 12:12 23:25
   29:24,25 36:16 38:13 44:10
   46:1 49:23 50:7 54:20 60:1
   65:6 76:12 79:16 87:14 89:20
   93:13 113:16 126:1 144:25
answered
67:1 72:2
answering
5:13 111:14
answers
6:12,25 121:23
anticipate
100:7 136:25
antivirus
116:6
anybody

96:20
anyway
28:22 54:5 90:7
apart
150:24
apologize
116:8 128:21 138:6,23 157:3
apparatus
130:15
appears
10:10 119:18 156:10,18
apples-to-apples
144:18
applicable
20:4,4
application
39:3 77:23,25 78:1,10 80:25
   82:8 83:5 92:24 93:8,25 94:23
   95:3,13 107:2,5,11,21 108:23
   109:2,10,14,16,20,21,23 110:5
   110:17,22 116:5 118:6 128:5
   128:10,11,16,19 133:18,21
   134:6 136:17 142:7
applications
24:10 56:21 74:20,22 75:2,5
   76:1,3,21 78:7,21 80:4,6,8,11
   82:7
applied
139:2 157:12
applies
126:7
apply
36:1 73:5 82:24 88:16,17
   109:15 126:6 142:6
applying
16:15 19:13 101:17 139:8
appreciate
121:24
approach
79:15 85:16 87:12,13
approaches
87:9 88:12
appropriate
85:19,20 86:20,21,22 87:1
   112:14
appropriately

96:18
approximately
143:5
arbitrary
80:25
arbitration
4:17 7:12
area
43:22 45:11 148:23
ARP
67:5,6,8
arrangement
144:23
arriving
124:6
arrow
83:25 85:6 88:25
art
34:2,6,15,21 35:8,12,16,20,22
   36:2 40:25 43:5 47:16
articulated
136:16
ASCII
115:8
ascribe
105:1,16
asked
39:12 55:2 66:24 90:5,10 93:10
   93:12 120:12 122:24 128:20
   138:5,22
asking
7:18 79:9,16 113:15,17 117:22
   121:20,23 153:15
asks
142:10
aspect
47:7 146:19
aspects
29:8 47:5
asserted
40:19 48:19
assessment
53:4,6
assigned
101:6
assignment

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

39:23 40:1,6 51:16
**associated**
125:7
**assume**
73:8 90:15,21 98:5,16,19
115:23 136:19
**assuming**
89:9 91:14 98:3 115:1
**assumption**
98:14 129:15 145:16
**AT&T**
137:16,19,20 138:2
**attached**
119:21 154:20
**attention**
10:20 14:11 37:25 39:22 48:6
85:15 119:12 134:7 137:24
**attorney**
48:11 104:23
**attorney's**
13:6
**attorneys**
1:13 2:3,7 104:19 144:3 156:3
**Audio/video**
134:2
**August**
1:10
**authoritative**
50:11 51:9,11,20
**authority**
39:7,10,13
**automatically**
38:10
**available**
130:6
**Avenue**
1:18
**aware**
13:19 20:12 39:19 52:11,13
53:19 58:23 68:3 69:25 74:23
80:11 113:10,18 114:17
117:25 120:12,15 121:12,15
121:20 130:23
**awareness**
113:17

## B

**B**
1:16 3:3,5,7 4:1 10:6
**back**
10:13 23:24 24:4 33:10,12
40:23 43:20 64:14 77:5,10
78:14 87:7 88:25 89:20 97:20
118:17 140:2 141:12,14
143:23 147:8,9,12 157:23
**background**
10:21,25 14:12 17:13 28:9
**ballpark**
37:22
**base**
111:5 124:19 147:25 150:10
**based**
21:24 24:11 44:7 48:23 58:4
83:15 89:25 98:9 106:5 111:11
111:12,15 140:16 148:17
150:23
**bases**
12:5 13:9,25 129:3
**basically**
146:4
**basis**
106:8 108:10,11 130:2 131:15
**Bates**
117:3,5
**bear**
135:21
**behalf**
64:15
**behaved**
129:19
**behavior**
61:3
**believe**
8:9,24 9:22 14:24 16:22,25 17:3
17:10 21:1 34:16 36:13 38:13
42:2 50:25 59:2 60:25 63:6
78:17 88:20,22 98:24 100:6
117:23 118:7 119:20 124:20
124:23 125:5,10 127:1,23
128:1,17,18 135:19 137:5
138:13 139:21 153:8,20
154:22

**Bellovin**
50:16 52:20,23
**benefit**
148:10
**benefits**
81:5
**best**
4:22 5:8,13,20 6:5
**better**
6:9 15:18
**beyond**
13:15,20 82:19 143:2
**BHI**
113:24 114:1
**big**
50:13,17 56:7 70:3 77:20
107:20
**bigger**
89:8
**biggest**
146:22,24
**bit**
15:11 31:4 92:20 100:14 119:13
137:12
**bits**
67:19,21
**block**
156:17
**blocking**
77:6 146:20 147:1
**blocks**
35:4 67:21
**board**
149:15
**book**
50:19,20,23 51:13,14,15 78:6
78:15,25 79:15 99:24
**books**
50:12
**bound**
123:23 125:15,21 126:7
**box**
82:4,9 85:12 88:23,24 89:8
146:7 149:24
**boxes**
33:23,24,24 80:23 89:7 92:5

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 163

**breach**
27:23
**break**
29:10 30:1 61:14 65:12 91:25
  92:1
**breakdown**
30:3
**bring**
149:10 152:25
**broader**
19:1 100:15
**broadest**
47:12
**brought**
49:14,16
**browser**
75:21
**browsing**
108:4
**build**
22:7,12
**builds**
56:22
**built**
21:2,4,5,9,11,14,17 22:9,25
  26:6 108:20
**burn**
49:24 65:13
**business**
74:20
**businesses**
80:17

---

C

**C**
2:1 42:12 159:1,1
**cable**
47:8
**Caiola**
1:19 4:2 159:3,21
**calculated**
67:22
**calculation**
45:2
**California**
1:1 2:8,8 113:3,5

**call**
81:19 91:20 103:13
**called**
6:13 8:18 9:4,10 21:13 38:17
  39:23 59:16 74:11 77:3,9 92:4
  113:8,19,20,22,24 114:1
  154:24
**calling**
12:8 95:16
**calls**
80:21 81:16 82:12
**capability**
143:13
**capable**
136:16
**capacity**
150:4
**Cape**
1:23
**card**
65:18
**cards**
23:10
**careful**
121:2
**carefully**
49:24 50:9 62:23 64:1 126:1,11
**Carl**
153:19
**carriage**
38:8
**carried**
76:3
**carry**
49:25
**carrying**
67:13 146:2
**case**
1:6 19:23 20:13,18 25:25 26:10
  27:9,10,11,19,21 29:12 30:1,2
  30:2 36:6 38:17,18 40:19
  48:25 49:6,8,11,13 53:24 54:1
  54:3 81:3 92:25 109:9 117:17
  117:20,25 118:3 119:19 120:9
  121:3 143:15 146:17
**case-by-case**

106:8
**cases**
27:25 28:5,5,6 48:23 104:16
**category**
16:18 19:1 148:25
**catheterization**
26:1,4,6
**cause**
55:21 56:1 73:5 132:17,23
  133:18
**causes**
132:13 133:10
**causing**
94:25
**caution**
127:4
**caveat**
73:3
**center**
2:3 25:5
**certain**
5:10,15 9:7 10:14 18:24,25
  19:16 26:17 49:22 67:12 68:2
  81:13 100:18 114:14 133:17
  139:22
**certainly**
80:15 84:17 108:25 128:10
**certificate**
119:21
**certification**
30:10
**certify**
159:6,13
**chain**
59:9
**chains**
22:16
**chance**
7:25 141:2
**change**
20:11 43:15 49:19 92:11 105:22
  126:8 139:13
**changed**
88:2 105:20,24
**changes**
42:16 72:18,21 73:2

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**changing**
106:11,18
**channel**
66:10
**characteristics**
69:25
**charge**
55:4,7,15
**Charlie**
37:3
**chart**
152:5
**check**
135:7,14,16,20 136:4
**checks**
70:12,12
**Cheswick**
34:7 39:12 43:1,3,13 45:4 50:16
   52:12,18 53:3 99:23 138:8
**Cheswick's**
34:9,19 35:19 36:3 40:23 43:18
   47:17 78:6
**choices**
101:24
**chosen**
86:17
**Christian**
1:16 3:2,7 4:1 10:6 79:16
**CIDR**
67:17
**circumstances**
5:16,18 72:11
**citations**
129:14
**claim**
3:9 45:13,16 48:19 100:9,11,12
   100:13 101:13,17,19 102:1,21
   102:24 104:3,21 119:12 122:1
   122:3 126:8,16 130:12 134:8
   134:11,11,15,20,21,22,23,24
   135:4 136:24 137:1 138:11,15
**claims**
40:19 100:8,11,14,19 101:22
   102:25 104:4 105:1,4 120:16
   120:18
**clarify**

**15:16**
**clear**
85:5 100:15,22
**clearly**
156:16
**client**
20:23 53:14,18,20 78:22
**clock**
49:25
**close**
121:7
**closed**
69:2,3,5,10
**closely**
19:22 20:4 143:3
**closer**
59:9 70:8
**closing**
69:4,8
**co-founded**
14:25
**co-founder**
15:3
**coauthored**
52:12,17
**code**
22:19 23:1,8 42:16 96:1 129:3,3
   129:15,24 130:4,5,6,7,7 152:4
**colleague**
9:12 62:1
**colleagues**
61:23 130:11 154:18
**colloquy**
159:8
**combination**
104:18 131:18
**combined**
16:15
**come**
19:25 21:15 60:12 116:20
   140:17 147:8,11 152:6
**comes**
15:9 16:6,19 17:8 50:17 98:25
   105:5 147:12
**comfortable**
42:15

**common**
54:18 57:10 84:20 95:19 108:4
   108:16 109:5,8 123:13 142:4
   149:6,13,14
**commonly**
75:25 109:13
**communicate**
53:17 80:9 124:17
**communicated**
104:7,13
**communicating**
131:10
**communication**
103:11,20,22 122:15 123:6
   124:11,25 125:2,9 132:18
   133:4,5,7,7 138:17 153:24
**communications**
12:9,13,17,21 103:14 113:15
   122:17 127:5 131:24 132:9
   142:9 153:18
**companies**
8:21,23,24 9:9,19 137:24
**company**
8:16 9:4,6,10 17:5 27:18 31:17
   31:19,22 33:9,10 63:9 113:8
   113:19,20,22,24 114:1 143:18
**comparison**
129:3 144:18
**competent**
42:11,12
**complete**
124:5
**complex**
89:5
**complexity**
139:6
**complicated**
93:22,23,24 146:24
**complicates**
77:18
**computer**
19:6 23:14 26:5 28:2,10,16,20
   28:23 29:5,8,15,16,19,22
   33:18 38:19 39:9,9 42:7 43:6,6
   43:11,12 44:11,23 45:7,11,17
   47:8 53:2 57:19 60:5 65:20

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

71:6,7,9,10,14,16,17 72:15
85:18 93:1 117:7 151:9,12,13
151:16,24 152:1
**concept**
59:16 68:21 72:4,24 73:11
74:11 134:14,17
**concepts**
59:21 71:8
**concern**
55:21 56:1
**conclude**
42:3 43:16
**conclusion**
35:21
**conclusions**
40:11 106:3,5,8
**conditions**
81:13
**confidential**
1:13 17:25 18:4 19:25 20:6
143:17,25 144:2 156:2
**confidentiality**
20:10,16
**config**
156:19,23
**configuration**
3:10 42:10 96:9 97:2,23 98:17
99:11 110:24 111:16,17,21,22
112:1,13,20,24 113:7,11,18,21
113:25 115:5,7,8,14 116:4
117:8 123:14 140:23 141:9,18
142:13 150:8 152:13,21
154:19,23,25 155:4 156:11,13
**configurations**
30:24 150:6 157:20
**configure**
22:15 96:11,13 111:5 133:14,17
149:10 150:10
**configured**
22:6 53:15 99:12 122:9,14
123:15 125:6 132:6 144:14
145:3 149:2
**configures**
96:21 152:9
**configuring**
30:12

**confirmed**
120:16
**connect**
77:4 78:22
**connected**
85:5
**connection**
21:6 42:14 65:23 67:24 69:2,10
77:5,10,23 83:20,20 84:5
87:22,24 88:6,8 90:1,3,6,11,16
90:22 91:15,19,21 94:1,3,8,12
94:16 95:7,8,9,10 105:18
147:7,9,11,12,13
**connections**
21:23 77:7 81:4,8,9,10,13,16,20
81:22,23 82:1 83:19,22 84:2
84:16 85:12,17 89:9,12,16,17
91:12 146:21
**consider**
19:13,22 39:6,8,10 44:13 46:9
50:10 51:8 60:7,11 66:20 71:3
71:23 79:15 93:6 98:12 100:12
101:13 104:20
**considered**
122:8 148:19
**consistent**
129:10 142:20
**constraints**
16:16
**construct**
132:13,16,22,25 133:10
**construction**
100:9,11,12 101:14 102:21
104:21
**Constructions**
3:9 126:17
**construed**
40:20 135:17
**consult**
20:22
**consultant**
32:20 33:6
**consulting**
8:13 9:8 17:4,9,11 19:2 45:22
60:8
**contact**

61:25
**contacted**
61:20
**contain**
111:18,25,25
**contained**
11:1,18 159:9
**contains**
78:10
**contemplate**
45:4 46:5
**contemplating**
43:4,13 47:12
**content**
109:20
**contents**
106:12,18
**context**
40:17 101:11
**continue**
33:13 65:11
**continues**
72:16
**contributions**
127:8
**control**
65:21
**Cooper**
2:9 6:15 8:2 12:7,14 61:13 65:4
79:3,9,13 99:23 100:3 103:7
103:18 113:13 127:4 135:22
137:4,7 143:20 144:1,9 145:8
155:19,22 158:6,9,12
**cope**
80:24
**copies**
79:13 99:24
**copy**
10:11 73:21 119:18 158:8
**copyrighted**
78:25
**Corp**
25:24 26:9
**corporations**
9:1,2
**correct**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

4:13 9:24 12:25 13:1 15:1
28:13 30:6 34:7 43:24 51:1
59:16 73:16,25 74:5 75:15
76:1 81:22 83:9 89:10 96:22
97:5,16 98:23 101:7 105:13,21
118:17 122:5 130:25 135:19
139:23
**correction**
69:22
**correctly**
140:20
**correctness**
40:2,7,12
**counsel**
12:9,17 36:6 49:2 79:1 102:16
103:6,15,20 104:7,8,9,11,14
113:11 127:5 153:14
**count**
4:21
**counting**
45:4
**couple**
50:12 137:16
**course**
148:10
**court**
1:1,22 3:13 13:4 35:18 40:20
71:18 135:17 158:3
**covered**
109:5 111:10 148:1
**crazy**
158:16
**CRC**
70:11
**create**
85:17 154:4
**created**
38:10 94:12 154:11
**creates**
70:4
**Creath**
9:13 15:4,5 118:20
**creating**
66:10 87:22,23 94:16 105:18
**credentials**
53:4

**cross-examination**
6:16
**crosses**
29:11
**crowding**
85:13
**cull**
37:9
**Current**
64:25
**currently**
63:16 65:2 78:19
**customer**
113:12 123:3,10
**customers**
25:17 114:14,22 118:5 142:11
142:11
**cut**
34:23,25 35:2,3,5
**CV**
38:16 137:15

---

**D**

**dangerous**
139:4
**data**
19:1,4,5,7,11,18,20 20:25 24:19
25:2 26:8 28:1,3,12,17,22 29:2
29:4,22 38:12 39:14 44:11
45:8,14,20,24 46:7 47:1,4,11
54:7,18 65:24 66:14,20,24
77:23,25 78:10 82:8,21 83:5
84:6,11,13,17,21,23,24,25
95:9 111:25 112:12 115:9
117:7 125:7 127:10,12,14,17
127:21,24 128:3 130:16 132:9
132:10 133:1,2,5 135:6,7,8,14
135:16,20 136:4,12 152:14,16
154:16
**database**
112:1,2,4,8 115:10
**date**
15:8
**day**
108:3
**debug**

42:13
**decision**
18:13,16 101:23
**deep**
59:24
**default**
96:16 97:2 112:24 139:22,25
140:5,10,11,12,14,17,23 141:9
142:13 144:15
**Defendant**
1:9 2:7 3:8 126:15
**define**
91:15
**defined**
90:6,10
**defines**
68:24 90:16,22
**defining**
157:5,10
**definition**
19:14 40:24 43:18,22 44:1 45:6
45:10 47:12,15,17 85:23 86:17
86:18 87:19 105:15 126:4
131:16 138:25 139:1 140:18
145:13,14 151:10
**DeFranco**
64:23
**degree**
30:4,8 42:7
**delete**
28:19
**deleted**
38:6,7
**deliberateness**
18:13
**denote**
89:12
**denoted**
89:9 138:15
**deny**
97:12,12,13,16,17 98:17 99:18
**departing**
27:21
**depend**
129:5 150:13
**dependent**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

134:15,20,22 138:24 139:1
141:21
**depends**
46:3 57:9 82:10,23 92:9 96:15
108:3,15 109:19 111:20
134:11 148:22 150:11
**deploy**
22:16 81:6
**deployed**
115:9
**DEPOLINK**
1:22
**deposed**
141:3
**deposition**
1:16 4:16,18 5:1,24 64:13 114:9
114:12,19 117:4 143:17
**describe**
20:1 152:5
**described**
74:2
**describing**
133:17
**description**
3:6 34:14,20 35:15 78:12
121:13
**design**
31:3,5,7 32:8 33:18 81:14
**designated**
156:2
**designed**
31:13,16
**designing**
25:19,22
**desirability**
114:13
**desired**
87:1
**destination**
53:21 58:2,9 59:12 97:24,25
98:1 122:19 123:19,24 124:18
124:25 125:1,16 132:2,19
147:3,4 150:19,20
**destinations**
85:19
**destroy**

29:2
**detail**
18:17 34:11 50:2
**determination**
140:16
**determine**
67:7 112:14 120:4 123:22
124:15 125:14 143:23 157:19
**determined**
68:12
**determining**
116:3 136:12
**developed**
60:14,16,21 104:17,17 147:17
147:23
**develops**
9:6
**device**
58:14,23 73:16 76:6,9,22 92:7
96:12,13,22 98:2,13 99:2,5,17
106:16 109:18 110:17,24
111:6 113:5 115:9 121:15,16
122:19 123:8,12,16,19,22
124:9 125:14,23 128:4,13,14
129:7 132:3,16 134:19 140:10
140:11,13 141:18 145:14,15
145:24 146:10,21 147:3,10,14
148:12 149:1 157:21
**devices**
74:17 92:5 96:7,9 97:12 98:22
100:18 106:10 110:3 114:15
114:23 115:6 120:22,24,25
121:9,13 122:7 123:1 128:17
130:15,24 131:2 132:6 136:16
140:17,24 141:23 149:13,14
150:7 151:1 152:8
**diagram**
83:11,13,24 87:6 88:11,18 89:3
89:4,7 91:16 152:4
**diagrammed**
89:23
**diagrams**
88:15
**difference**
53:9 56:12 69:14 72:7 74:14
125:20,23

**differences**
53:13 128:22 129:4
**different**
7:22 15:18 28:5,6 33:19 47:5
57:10 66:7 71:8 82:3 91:12
106:5 121:4 128:8 129:2,19
137:21 150:1
**differently**
129:19 145:17
**differs**
125:12,18
**difficult**
15:11 17:24 82:16,21 142:15,22
**digital**
8:18 9:5,15,17 15:7
**direct**
10:20 37:25 39:21 48:6,19
49:18 51:4 85:15 119:11 134:7
**directed**
7:1 12:19 37:11 57:23 128:12
**Directing**
14:11
**directly**
122:15 123:2,7 152:25
**directories**
28:20
**disagree**
53:5 79:23 111:2,3,8,9
**disagreed**
138:14
**disagreement**
138:24 139:7
**discard**
98:4 99:7
**disclosure**
11:25
**disclosures**
13:3
**discount**
114:24
**discouraged**
141:8
**discovery**
117:14
**discuss**
65:7 111:13 143:18

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

discussed
59:15 109:12 114:13 128:1
   131:17 133:19,25 141:7
discusses
153:3
discussion
16:10 41:23 47:20 100:20 120:5
discussions
49:2,13 153:10
disk
26:18 27:2
disks
26:22,23
dispute
130:14 131:7,14,15,22 132:4,5
   132:12,15,21,24 133:9 134:25
disputes
28:11
distinction
100:10
distinguish
70:1
distribution
21:25 23:18
DISTRICT
1:1,1
distro
22:8,10,11,13
DIVISION
1:2
divulging
12:12
document
3:10,11 10:9 117:23 126:21
   127:3,8 151:22 155:3,13 156:5
   156:21 157:14
documentation
129:1,14 133:16 141:8 142:25
doing
31:2 36:18 42:19 66:7 73:1
   76:15 81:7 94:4 103:1 104:4
   128:7,9 157:5
dominant
107:17
donated
21:12

download
25:15
downloadable
22:5
downloaded
29:14,15
downloading
25:7 42:25
dozen
4:24 63:25 64:3 65:1
Dr
121:8 129:16 142:16,18 153:19
draft
37:13,20
drafted
153:11
drafting
37:15,18 52:14
drafts
154:11
draw
83:13 100:10
drive
26:20 27:12 29:1
driver
99:12,14
drop
73:6 124:21
dropped
101:7
dropping
101:4,10
drops
69:6
duly
4:1
duties
137:18
duty
27:23
dynamic
80:22 81:16,19,24

─────── E ───────

E
2:1,1 3:5 37:2 138:3 159:1,1

e-mail
82:13 107:4,6,7,8,9,18 110:9
   133:24 153:24
e-mails
154:1
earlier
16:17 24:2 72:1 90:5 100:6
   137:12 138:5,13 148:1
earned
36:17 37:17
easier
56:25
Ed
64:23
EDIPP
9:4
eDiscovery
117:16
edition
51:1,7,8 78:6
editions
50:22
educational
24:13
effective
50:6 109:20
effectively
146:2
efforts
21:11 154:5
egress
73:20 106:11
either
22:15 53:23 72:10 80:22 81:17
   85:24 92:25,25 94:21 116:9
   123:16 131:24 152:19 157:9
elements
102:8
Elizabeth
55:8
Elysium
8:18 9:5,23 14:25 15:6,10,21
   16:7,12,13,14,15,19 17:4,15
   21:9 22:25 32:3,6,16,18,19,23
   33:16,17 36:19,20 37:18 44:14
   44:17 55:5 62:14,15 63:4,5,20

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

117:19,23 118:16 119:5,9
130:4 143:6,24 144:12 153:22
**Elysium's**
31:22
**Emanuel**
1:17 2:7 12:10 62:10,13 63:2,10
63:15,19 64:15,17,25 113:15
127:6
**embarrassingly**
137:23
**embedded**
77:23,25 78:11
**employ**
143:1,10
**employed**
8:20,23
**employee**
27:21 114:7
**employees**
31:24 32:16 33:11 63:9
**en**
68:6
**enabled**
128:18
**encapsulate**
123:8
**encapsulated**
123:18 132:1
**encapsulating**
122:18
**encapsulation**
56:24
**encompassed**
71:14
**encouraging**
142:25
**encrypt**
82:13
**encrypted**
82:11,22
**encrypting**
82:15,18
**encryption**
82:8,22
**ended**
146:14 153:16

**ends**
156:17
**engage**
97:19
**engaged**
7:16 36:5 61:21 62:4
**engineering**
43:7,12
**entailed**
72:25
**enters**
58:22 120:5
**entire**
144:2
**entirely**
32:5
**entitled**
3:10 155:3
**environment**
75:6
**EO**
113:20,22
**equipment**
31:10
**Eric**
27:8
**error**
69:22 136:20
**Erwine**
64:24
**escape**
102:7
**escaping**
127:15
**ESQ**
2:4,9
**essentially**
57:14 73:21 127:15 129:15
**establish**
124:10,24
**established**
68:4 125:3
**estimate**
4:23
**estimated**
114:22

**estoppel**
153:4
**Ethernet**
23:10 47:8 99:12
**event**
93:18
**exacerbated**
83:2
**exact**
18:18,22 90:8
**exactly**
7:17 13:21 22:2,3 39:11 44:8
56:10 60:13 61:9 81:25 95:25
96:23 108:15 121:18 142:14
148:22
**Examination**
3:2 4:4
**examine**
86:10
**examined**
4:3 86:13 96:8,9
**examines**
86:19,25
**examining**
85:20 86:21
**example**
28:18,23,25 29:5,12 59:1 78:11
82:11 87:15,16 92:23 108:12
112:7 142:4 147:5 156:23
**excellent**
90:9
**exception**
3:14
**exceptions**
120:23
**exchange**
68:2 107:19
**exchanges**
130:16
**exclude**
12:20 13:24 14:4,9 15:20 16:2
18:9,12,16 105:19
**excluding**
73:13
**exclusion**
142:2

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 170

exclusive
81:5
excuse
50:19 133:1
execute
130:24 132:6
exercise
50:1
exhibit
3:6,7,8,10,10,11,14 8:1,7 10:4,5
10:8 34:1 38:4 79:4,5 118:3
119:15 126:15,20 134:9
138:10 154:21,22,24 155:3,4,9
155:13 156:5 158:3,4
exhibits
3:13
exist
72:5 73:9,10 78:21
existed
73:12,16 82:25 97:22
existence
60:12 72:2
existing
120:16 146:9 147:6
exists
98:13
expand
147:25
expansive
149:18
expect
11:16 14:23 35:2 40:18 100:16
100:17
expected
12:1,4 13:10,25 14:5,10
expeditiously
144:7
expensive
150:4
experience
42:8 43:2,9 44:4,14 45:14,20,21
45:24 47:11 148:17
expert
3:7 4:11,15 7:16 8:6,17 10:5
11:8,15,22 12:17,24 13:3,21
13:23 14:6,7,19 18:10 19:7

26:3,5 38:12,25 39:3,8 40:3
45:5 50:20 51:22 54:18 60:3,5
60:8,10 66:19,25 70:22 71:3,5
71:13,16,17,20,23 88:14,20
102:20 104:21 117:6,17
expert's
13:5
expertise
11:10 19:11 29:9 59:20 60:11
70:23 79:23 111:11,12,15
157:18
experts
66:14
explain
56:3,15 57:5,15 67:24 70:7
74:14
explained
139:6 148:15
explaining
56:8 101:25
explanation
57:2,4
explicit
53:10,14,20 106:19
expressed
14:14
extent
12:8,11,18 103:16 113:14
extra
38:8
extraction
56:17
extremely
115:21
eyes
1:13 144:3 156:3

F
F
159:1
fact
13:12 66:11 95:4 123:11 130:21
140:22 142:10
facts
28:6
fair

103:17,21 135:3
fairly
54:18 103:10
fall
59:20 148:25
falls
40:12
familiar
4:25 54:21 65:14 106:24 127:9
151:6
family
149:3
famous
39:20
far
130:23
fashion
95:1
fast
8:5
favor
157:1
Fax
1:24
feature
127:9 128:18 145:5 149:22
features
21:19 92:23,24 110:6,21 114:14
116:5 148:13 149:16,17 151:2
federal
13:4 71:18
feel
10:16,25 12:18,20
feeling
20:15
fewer
33:10
fiduciary
27:23
field
19:19 28:16 39:7,11,13 46:6
50:11 71:10
fields
71:13
figure
45:9 154:7

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**file**
24:9 28:20 75:13 111:21 115:5
   116:10,11,23 117:8
**files**
29:19 96:9 111:16,17,22,25
   112:13,21,24 113:8,11,19,21
   113:25 115:6,7,14,17,25 116:4
   116:8 154:19
**filter**
23:20 73:13 87:18 109:19,21
**filtering**
21:21 73:5,19 86:24 87:4,8,13
   87:14 109:17 110:10,11 116:6
**find**
36:16 58:21 93:24 106:9 152:21
**finding**
121:21
**finer**
44:22
**fire**
147:17
**firewall**
18:1,17 21:12,16,17,18,20,21
   22:5,7,9,19,24 23:1,20,23
   25:20,22 30:23 38:23 51:10
   57:24,24 58:15,18,21 59:3
   61:7 75:1,4 77:6,8 81:3,6
   82:19 83:16 85:13,17 86:9,24
   87:4,13,15 88:12,24 89:8,13
   89:17,17,22,25,25 90:2 91:21
   91:22 93:3,5 94:8,13,17 95:11
   101:22 105:17,25 106:13,14
   106:15 109:17,24 111:23
   112:15,18 144:22 145:18,21
   146:9,22 149:17 156:10
   157:19
**firewall's**
94:7
**firewalled**
146:12,14
**firewalling**
50:11 86:11 110:1 146:2
**firewalls**
17:18 18:21 21:2,4,5,9 23:2,25
   24:11 26:2 27:5,16 30:12
   31:10 38:21,25 39:4,7 45:7

46:23,24 50:15 80:19 149:11
   150:5
**first**
4:18 15:12 19:24 37:16 48:10
   48:16 61:6 68:14,17 86:2
   124:10 125:2,9 132:8 133:3,7
   147:23 148:6 156:12
**fit**
85:4,11
**five**
42:8 43:2 44:4 45:13,17,19,20
   45:23 46:20,20 54:23 62:17
**fixed**
82:1
**flexibility**
141:24
**flipped**
34:11
**Flipping**
50:5 129:9
**Floor**
2:8
**flow**
54:3 152:5
**flowing**
147:9
**fluctuated**
121:14
**focused**
121:6 129:12
**folks**
153:22 154:3
**following**
20:2
**follows**
4:3
**force**
137:23
**forced**
139:10
**forensic**
30:9 117:7
**forensics**
28:10,12,15,16,24 29:6,8,17
**forget**
70:21

**forgotten**
24:2
**form**
35:21 77:3,8 106:22 146:2
   153:24
**formal**
61:5
**format**
68:16 115:5,11
**formate**
5:23
**former**
64:25
**formerly**
69:3
**formulating**
154:17
**forth**
10:13,24 11:3,5,13 12:1,4 13:8
   14:7,13,17,22 34:2 35:11
   40:25 42:4 43:1,4,9 47:17,25
   49:20 52:6 88:25 105:6 106:4
   124:3,6 131:19,20 136:23
**FortiGate**
40:14 96:6,11,15 97:12 98:13
   99:2,5 106:10,16 110:3 127:21
   128:4 136:16 139:23 140:17
   152:8
**Fortinet**
1:7 3:8 4:11 36:5 62:5,8 92:23
   96:4,21,24 99:17 110:2,6,16
   110:20,23 111:5,23,24 112:21
   112:23 113:2,12 114:7,14,15
   114:23 115:6 117:20 120:12
   120:22,24 122:7,20 123:1,5,9
   123:12,16,20,22 124:9 125:13
   125:23 126:15 127:20 128:13
   128:14,17 129:7,23 130:14,24
   131:2 132:5 133:12,13,16
   140:24,25 141:7,8,13,18,22
   142:10 144:15,19 150:7
**Fortinet's**
113:10 118:5 153:14
**FortiOS**
98:12,14 120:20 121:1,5,7,11
   121:17 122:8 127:22 128:13

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

128:15,22 129:6,12,13 130:8
131:5
**forward**
85:18,23 86:3 87:17,19 105:8
105:12,16,23 106:6 131:9,16
131:18 138:16,25 139:1,8
140:12
**forwarded**
72:10,12,14,19,22 73:18 86:14
88:24 89:13
**forwarding**
72:5,8,25,25 73:4,8,11 74:24
76:7,9,12 77:12 82:4,25 83:4,9
86:17 88:5,8 90:1 92:22,23
93:9 94:14 97:2,3 140:19
142:3,8 143:2 144:23 145:6
**forwarding-based**
89:24
**foundational**
53:2
**founded**
9:22
**founders**
114:8
**four**
31:14 90:20
**four-tuple**
68:24 90:5,10,16,17,22
**four-tuples**
91:14
**four-year**
42:7
**frame**
79:25 88:17 147:24
**framed**
66:23
**framework**
27:14
**Francisco**
1:2 2:8
**free**
12:20 147:20 148:4,9
**frequently**
29:11 44:23 81:6
**front**
8:8 10:15 34:1 71:2 116:10

139:18
**FTC**
20:3
**FTP**
75:12,13 77:2,3,3,4,8,9,17,22
78:4,12 80:14
**full**
57:2
**full-time**
46:6,10,12
**function**
136:17
**functionality**
86:12 110:3
**functions**
42:15 76:4 114:23
**fundamentally**
29:13
**further**
101:21 135:6 136:25 157:14,25
159:13

---

## G

**G**
138:4
**game**
103:17,21
**gateway**
2:3 53:22 122:4,20 123:5,9,20
130:16 131:22 132:3 140:25
**gateways**
122:9,11 143:10 144:14 145:3
148:18
**gears**
137:11
**general**
8:14 19:6 20:19 21:22 22:14
28:7 39:18 48:5 60:18 92:9,15
92:17 93:11,13 95:17 110:19
147:24 151:25
**generalize**
129:17 139:5 151:17
**generalized**
129:17
**generally**
5:11 81:2 109:4 127:11,13,14

127:18 129:13 136:5 140:20
149:19,20,23 151:19
**generate**
112:24 116:22
**getting**
33:10 116:17
**GIBBONS**
2:2
**give**
4:19,22 7:4 14:5,19 29:24,25
35:20 40:18,21 49:22 52:5
136:6 157:23
**given**
49:10 51:11 53:3 70:10 102:13
102:16 103:6 112:20 113:7
136:15
**gives**
133:13
**giving**
5:1 14:14 100:7 136:25
**go**
4:20 9:25 20:11 21:8 54:5 56:15
58:3 59:10 61:15 65:10 73:19
79:18 97:20 116:22 135:1
137:7 141:12,14 143:23 145:9
**goal**
146:22
**goes**
96:24 148:5
**going**
10:15 20:5 29:22 31:9,11 35:24
45:22 53:24 57:25 61:13,17
65:4,5 71:1,2,4 78:5,24 79:1
100:3 117:12 118:2 143:18
151:3 157:14 158:2,3
**good**
4:5,6 112:17 115:18
**Gopher**
75:20
**govern**
60:24
**graduated**
137:13
**great**
15:17
**guess**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

22:2 37:23 109:12 147:5
**Gundlach**
27:19
**guy**
148:6

---

**H**

**H**
3:5 32:13,14 37:3 138:4
**half**
4:24 24:22,23 63:25 64:3 65:1
68:21
**hammer**
29:2
**hampered**
81:10,14
**hand**
8:7 118:2 126:12
**handed**
10:7 54:5 119:14 126:19
**handle**
82:9 158:2
**handshaking**
68:1
**happen**
95:4,6 97:15 113:4 132:14,23
133:11
**happened**
29:18 45:9
**happens**
6:6 83:16 94:12 113:6
**hard**
27:12 29:1,10 36:8 114:25
116:7 144:17
**hardware**
56:18 57:18 122:18 123:19
132:2
**Harrison**
1:23
**hat**
22:3
**head**
30:1 32:19,22 54:14 145:22
**heading**
38:3 39:22 47:21 48:7
**hear**

105:11
**heard**
48:11 49:6 51:22
**hearing**
7:14 20:5
**heart**
26:1,3,6
**heavily**
24:1 108:16
**held**
1:16
**help**
18:10 68:3 116:16
**helpful**
10:17 117:22
**helps**
91:12 144:20
**hey**
143:23
**Hicks**
1:16 3:3,7 4:1,5 10:6,7 61:20
126:19 137:11 158:15
**hiding**
146:4
**high**
20:21 88:15 150:4
**higher**
19:15 56:23
**highest**
56:20
**highly**
1:13 144:2 156:2
**hire**
55:18
**hiring**
55:4,7,11,14
**history**
153:4
**hold**
118:8,16
**home**
148:25 149:11,12
**homes**
80:18
**honest**
51:2

**host**
57:6,8 58:10,12 74:5,7 90:23,23
91:3,3,4,5,19,23 97:21 98:1
106:17 122:15,17 123:2,4,7
146:5,18,21 147:2
**hostile**
122:5,12,16 123:17 127:16
130:18 131:11,12,25 138:18
138:19 143:14 145:4
**hosts**
31:19 60:19 80:24 88:23 89:1
123:6 143:5,12,14 144:21
145:1,4
**hour**
61:14
**hours**
30:13 31:5 37:20,23 46:9,12,15
46:19,22,23,25 47:3,11 108:12
**HTTP**
75:20,22 106:24 107:25 108:4
108:16 133:22
**HTTPS**
106:25 108:1
**hump**
85:3
**humps**
83:25
**hundred**
30:18,19 31:21
**Hypertext**
75:23
**hypothetical**
139:17

---

**I**

**ICNP**
67:10,11,15
**ID**
148:8
**idea**
30:15
**identification**
3:8 10:6 126:16,18 155:5,14
**identified**
70:2 72:16 75:8,20 76:8
**identify**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

40:11 75:19 150:25 151:3,5
**IEEE**
61:1
**imagine**
136:11 142:5 148:12
**imagined**
91:10
**IMAP**
107:8,13
**immediate**
138:1
**impetus**
147:25 148:3
**implement**
89:23 110:16 116:4 118:5
  128:15 148:20
**implementation**
118:25
**implemented**
61:7 134:5
**implementing**
82:4 123:3 128:3,5,13,15
  136:17 146:15
**implicated**
25:8,10,13
**important**
11:5 144:12 146:19,25
**imposed**
134:22
**imprecise**
50:7 84:13
**imprecision**
121:17
**include**
15:24 45:12 47:7 60:11 92:21
  105:23 131:2
**included**
76:11 130:7
**includes**
58:2 70:23 71:10,11 105:3
  133:16
**including**
60:6,6 71:6,16 89:25 102:8
  103:1 104:5
**income**
15:9,15,21 16:3,6,11,18 17:8

**incoming**
21:23 77:7 80:21 81:4,7,9,10,13
  81:15,16,19,20,22,23 82:1
  99:1 101:23 141:24 146:20
**incorrect**
40:10 49:17
**independent**
134:21
**INDEX**
3:1
**individual**
91:10 117:4
**individually**
68:10
**individuals**
118:22 119:8
**induced**
48:16,18
**industry**
42:8 43:1,3,7,9 44:14,20 45:11
  45:14,21,23 60:23
**informal**
33:9
**informally**
69:5
**information**
6:25 82:18,23 127:15 150:9
**informed**
61:23
**infringed**
137:1
**infringement**
40:3,13,15 48:17,18,19 102:7,9
**infringer**
48:20 49:19
**infringes**
134:19
**ingress**
73:20 106:11
**inherently**
100:19
**initial**
61:24 132:10
**initially**
58:19
**initials**

**67:8**
**initiate**
132:8
**initiated**
90:2
**initiates**
77:5
**initiation**
132:18
**inject**
147:7
**input**
55:9,11,15 127:2 154:4
**input/output**
42:15
**inputs**
150:12 153:22
**inquire**
12:16 103:15
**inquiry**
103:12
**inserted**
26:12,14,17,18 27:2
**inside**
85:12 112:2
**insofar**
37:10 40:10 56:11 87:1 141:15
**install**
22:14
**installation**
42:10
**installed**
23:17,18 97:1
**installing**
42:25
**instance**
112:1,3,4,8,10
**institution**
24:13
**instruct**
65:6
**instructed**
5:16
**instruction**
65:8 95:14
**instructions**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

133:14
**intend**
78:21 101:9
**intended**
80:9
**interact**
56:21
**interacted**
56:3 64:20
**interactions**
153:21
**Interactive**
26:8
**interested**
154:9,10 159:16
**interface**
56:19 59:8 73:22 86:6,7 96:25
  141:25 152:10
**interfaces**
98:10
**internal**
89:7
**internet**
8:4 50:15 59:1,3 60:20 61:4
  65:18 78:23 80:10 90:4 108:8
  108:13 123:6 137:22 143:14
  144:22 145:1 152:10
**interoperate**
56:9
**interpreting**
101:16
**interrupt**
24:3 145:9
**intervention**
132:20
**invariables**
112:11
**inventors**
119:10 120:6
**investigate**
40:2
**investigation**
40:14
**investigations**
40:16
**investment**

15:14 16:2
**involve**
8:15 17:12 81:10 93:16 116:1
**involved**
17:18 21:10 28:11 33:13 63:13
  63:14,16,18 117:23 118:21
  159:15
**involvement**
117:25
**involves**
100:20 116:3
**involving**
7:23,24 77:15
**IP**
9:5 22:15,16 53:21,24 57:19
  58:1,2,7,9 59:12 60:20 65:18
  66:8,12 72:15,16 78:1,2,11
  82:4 93:1 94:6,7,13,16 95:10
  97:24,25 98:1,25 99:1
**IPV**
67:19 147:25
**issue**
25:6 26:15 119:19
**issued**
119:6 120:5
**issues**
44:24 45:7 140:4,4
**items**
27:14 90:20
**iterate**
140:7
**ITF**
61:2

_____
J
_____

**Jacob**
37:4
**January**
36:14
**Jeffrey**
27:19
**Jersey**
1:23 2:4
**job**
27:22 32:18
**Johnson**

113:21,22
**Jude**
25:23
**jumps**
152:7
**jury**
71:2,4,5 121:22

_____
K
_____

**K**
37:3
**kept**
28:1,3,21 115:6 143:17
**kernel**
23:3,8 42:16,17,19,20,25 92:10
  92:12,13 93:17 94:19,20,21,21
  94:23 112:9 131:7 152:11,15
  152:17,20,23 153:1
**Keromytis**
35:14 37:16 40:3,17 51:21,22
  52:3,11 53:4 121:8 125:12
  126:4,6 129:11,16,24 138:14
  138:24 139:2,7,11 141:3,7
  142:17,18
**kind**
67:11 77:6 83:25 84:8 89:22,24
  110:5 116:17 142:7 158:16
**kinds**
9:7 31:10 33:19 80:15 109:25
**know**
7:19 24:21 30:17,19 36:15
  37:19 38:15 39:10,15,16 44:9
  47:2,10 50:8 52:3 53:9 54:7
  55:3,19,22 56:5,6,14 59:6,22
  60:14,16,23 61:6,9 62:22
  64:18 66:22 67:18 69:1 71:4
  80:8 85:10 90:17 99:10,16,19
  99:20,22 106:2 108:2,11,22
  113:4,6 114:4 116:12 119:23
  127:20 130:10 135:22 136:13
  142:22 146:11 147:2,6,15
  150:22 151:1 155:15,22 158:1
**knowing**
157:13
**knowledge**
54:18 59:25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 176

known
113:12
knows
79:1 147:4
Kohl
37:3

———————————

**L**

L
23:6 32:14 37:2,4 138:4
labeled
89:8 91:20,22
language
101:17,19,21 142:15 153:11
large
15:12 91:10 108:7 144:21 149:8
larger
35:4
late
61:9
law
102:21
lawyer
102:18
lawyers
64:17,18
layer
39:3 56:18,18,20,22,23,25
   57:16,17,21,23 66:25 94:24
   95:13 99:14 107:2,5,11,21
   108:24 109:2,10,14,16,20,22
   109:23 110:5,17,22 116:5
   118:6 128:5,10,11,16 133:18
   133:21 134:6
layered
66:16,21
layers
55:19 56:3,5,8,12,16 57:1 66:18
   109:11
laying
31:8
leak
127:10,12,14,18,21,24 128:3
leave
10:15 142:12 158:2
leaving

57:6 141:17
left
27:22 91:20
legal
13:14 47:21,24 48:1,3,11
let's
9:25 10:3 46:17 53:23 61:15
   65:22 73:8 76:25 79:18 91:25
   97:20 103:9 104:10 107:10
   109:25 111:22 115:23 122:1
   130:12 137:7,11 152:1 154:13
level
34:2,6,20 35:8,11,15,19,22 36:2
   40:24 41:2 42:4 43:5,16 45:3
   56:17,19,20 57:21 66:4 78:1
   82:8 88:16 92:24 128:19,25
   129:1,4
levels
54:11,13,15,17,21 56:17
license
118:24 119:1
licensed
118:11,19
licensing
9:11,13,14,15 118:23
life
30:13,14
Limelight
49:7
limit
121:22
limitation
101:4 102:24,25 104:3,4 126:9
   135:10,12,15 138:15
limitations
5:10,12 76:7 134:21,22
limited
142:23
line
23:8 65:5 115:21 116:2,14,14
lines
10:14
Linux
21:24,25 22:7,10 33:21
Linux-based
21:18

list
17:21 18:1,6 28:10 121:18
listed
11:8 38:15
listing
23:25
litigation
7:16,23,24,24 8:13 9:7 11:23
   17:4,8,11,12 19:2 44:17,20,25
   45:5,22 117:19
litigations
8:15
little
15:11 16:25 92:19 93:22 100:14
   114:25 119:13 137:12 145:17
   149:6 151:20
LLC
1:4 8:18 15:7 16:11
LLCs
8:25
LLP
1:18 2:7
loading
113:6
local
3:9 57:6 90:23,23 91:3,4,19
   126:17
located
124:22 125:4
location
32:6 116:10
locations
32:4
log
25:17,18 29:19,21
logistics
79:7
long
32:25 61:16 69:6 88:2 115:13
   115:15,17,19,25 156:2
longer
28:11 116:15
look
40:7 41:23 48:14 49:21 50:8
   79:1,14 88:18 91:15 93:25
   95:2 99:8,24 106:7 112:14,18

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

112:21 113:21,25 114:3,9,12
121:4 122:1 125:25 126:10
128:24 129:9 130:12 138:10
138:11 141:12,14 142:14
144:8 156:1
**looked**
37:12 95:20,24 96:6 97:24
114:11 121:8 129:1,13 140:3,5
140:9 141:23 143:3 150:7
151:2 154:13
**looking**
7:20 40:16,23 116:8 117:8
121:1 154:19 155:25
**looks**
51:6
**lost**
36:10
**lot**
25:4 33:12,13 121:6 135:15
137:21
**loud**
136:9
**lower**
56:24
**lowest**
56:17 66:1,3,4,25

---

**M**

**M**
23:6 32:13,14 37:2
**Mac**
57:18,19,20 58:17,20 59:13,14
**machine**
26:6
**machines**
26:1,4 29:21 31:9 33:15,15,20
33:21,21,22 42:11 65:25
**Macs**
33:22
**Madison**
1:18
**mail**
156:24
**main**
32:15
**majority**

16:17 17:8 34:23 80:8 148:24
155:7
**making**
18:16 42:16 93:15 105:20,24
127:7
**mammoth**
29:19
**managed**
82:2
**management**
110:14
**managing**
29:21
**manner**
82:15
**manuals**
95:24 110:7
**manufactured**
113:5
**mark**
8:7 10:3 126:14 144:1 155:1,12
**marked**
10:6,8 12:25 14:7 88:14,20
118:3 119:15 126:18,20 155:4
155:13 156:4 158:1
**married**
15:13
**matches**
122:19 132:2
**matching**
123:19
**material**
28:19 29:13 155:21 157:17
**materials**
25:7 104:18 133:13 141:13,15
**Mattal**
23:6 33:12 37:3 42:20 62:2
155:11
**matter**
4:9 8:14 10:12 18:11 19:21 25:4
25:24,25 26:9 36:18 38:14
43:10,14 48:5 61:21 62:8
63:10,16,19 64:7,10,12,19,25
88:1 104:8,10,12,14 121:10
125:21 135:1 159:11,17
**matters**

7:22 8:10,12 15:25 16:5 17:14
17:17,21 18:1,17,20 19:3 20:7
20:17,21 25:2 44:18 48:8 62:5
62:12 63:1 65:1
**Matthew**
37:2
**maximum**
68:10
**McGREARY**
2:4 3:3,11,14 4:4,7 7:25 9:25
10:3 24:4 61:15 65:10 79:6,18
89:19 91:25 100:5 103:9,25
126:14 137:6 143:21 144:5
145:11 155:1,12,15,20 156:1
157:24 158:7,10,14
**mean**
4:16 9:14 19:6,10,12 24:3 26:18
28:15 44:2 46:4 56:10 64:20
72:13 96:18,20 97:13,17
100:13,21 101:5,20 108:15
111:13 148:23 152:18 153:9
153:14
**meaning**
24:14 100:8,11,14 101:10 102:1
105:1 135:21 136:6,9,14,15
152:19
**means**
39:11 46:12 57:13 71:1 72:14
81:8 86:3 87:1 97:18 101:18
131:19
**meant**
86:4 96:19 128:12 136:12
**measures**
25:8,9,12 143:1
**mechanisms**
25:14 26:16 57:10
**media**
9:15,17 26:12,14,17,18
**Medical**
25:23
**meetings**
154:2
**meets**
134:20
**member**
8:25 9:3,18 15:7 16:11

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**memorization**
56:7
**memory**
152:25
**Meola**
37:2
**message**
68:14,25 69:5,8,9
**Michael**
114:4,4,10,21
**micro**
60:10
**Microsoft's**
108:21
**mid**
61:8
**middle**
116:13 156:17
**military**
27:13,14
**mind**
4:20 19:25 21:15 50:17 152:6,7
**mine**
9:13 154:18
**misappropriation**
27:11,24 28:5
**misrepresent**
142:21
**misrepresenting**
79:2
**missing**
69:21
**mobile**
83:5
**model**
54:8,17 55:19
**modern**
74:17
**modest**
42:16
**modification**
23:3,12 42:19
**modifications**
42:21
**modified**
23:8 24:1 42:17 131:8 139:8

**modify**
110:25 111:6
**modifying**
42:25
**module**
94:21 112:9,10 152:20,23
**moment**
46:6 144:11
**monetized**
118:13 119:2
**money**
36:17 37:17
**morning**
4:5,6
**motions**
144:6
**move**
125:7
**moved**
31:18
**moving**
8:4
**MR2**
129:13
**MR3**
96:2 121:7 129:14
**MTI**
28:12

---

**N**

**N**
2:1 32:13,14 59:16 138:3,4
**Nahum**
32:13,19,23 54:25
**name**
4:7 32:14 39:13 50:14 52:22,25
69:11 119:7 138:3,4
**names**
55:24 69:13 75:24
**NAT**
59:16 60:6,8,12,14,24 61:6,11
70:24 71:3,6,7,11,16,19,21,24
72:1,5,7,9,13,22,24 73:4,9,10
73:24,24 76:13,15,22 77:8,13
77:15,15,18 78:23 80:14,21,23
81:3,5,6 82:5,9,12,14,16 83:3

89:25 90:6,7 92:3,5,5,21 93:7
93:15 96:12,16,22 97:11
140:19,24 142:2,3,8,13 143:2
144:24 145:6,14 146:1,10
147:3,10,14,16,23 148:6,12
149:1,4,23,24 150:2
**NAT-based**
80:18,18 97:3
**NAT-only**
149:13,14
**NATing**
61:3 141:24
**native**
117:9,11,13
**NATs**
78:8,19 80:5,7,10,12,16 81:14
**naturally**
94:6,16 95:7
**navigates**
96:25
**necessarily**
61:4 93:21
**necessary**
18:14 36:2
**need**
49:18 61:5 83:5 99:20 109:18
110:17 118:17 126:10 135:1
143:24 150:3,9
**needed**
11:12 22:6
**nefarious**
85:9
**negative**
102:25 104:4
**neither**
6:11
**Netflix**
108:12,19
**network**
1:3 4:8 24:19 25:3 31:3,4,6,8,15
31:17,20,22 32:5,8,21 33:18
42:9,14 44:2,5 45:14,24 46:7
55:15 57:12,15 58:2,3,22,23
58:24,25 59:10,19,21,22 60:3
70:19 73:24 74:3,15 76:11
92:4,8 107:24 109:2,6 122:4,5

DEPOLINK COURT REPORTING & LITIGATION SERVICES  (973) 353-9880

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

122:16 123:4,5,17,17 127:16
127:17 130:17,18 131:10,11
131:12,13,25,25 138:17,18,19
138:20 140:1 141:19 143:6,10
143:14 145:5,15,19,23 146:1,5
146:7,18 147:2,18 148:14,20
**networked**
32:1 75:5
**networking**
19:1,4,5,8,11,18,19 20:25 38:12
39:14 45:20 47:1,4,6,11 54:8
54:12,19 60:6 66:15,20,24
69:24 71:10 84:15
**networks**
19:20 31:12 45:8,10 58:6
122:12,12 148:25
**new**
1:18,18,21,23 2:4 38:10 73:22
87:22,23 93:16 94:12,15 95:8
95:10 105:18 137:23 159:5
**Newark**
2:4
**newer**
33:24
**non-confidential**
18:6
**non-dispute**
134:25
**non-infringement**
10:11 129:8
**nonprofit**
21:12,13
**north**
19:15 25:1
**NORTHERN**
1:1
**notably**
67:14
**Notary**
1:20 4:2 159:4
**note**
143:21
**Noted**
158:17
**notes**
154:7,10

**notice**
110:6
**noticed**
89:6
**notices**
70:15
**number**
4:20 8:1,7 15:12 18:18,22 19:15
33:23 38:10 47:21 64:2 68:5
68:11 70:11 91:10,11 95:24
96:6 101:6 123:24 124:12,16
124:18 125:1,16 137:21
144:21
**numbered**
117:3,5
**numbers**
68:9 157:2

---

## O

**O**
37:2,3
**oath**
5:4
**object**
12:7 65:4 100:3
**objection**
103:7,8,10,23 113:13
**obligations**
155:16
**obliged**
5:8,19
**obtain**
42:1
**obvious**
115:2
**obviously**
120:15 158:1
**occasions**
21:10
**OCR**
116:16
**OCR-able**
116:15,19
**offer**
118:4 129:20 148:23
**offering**

120:8
**office**
21:6 46:11,12 120:3,16
**offices**
1:17 21:7 31:18 149:5,13
**oftentimes**
111:24
**okay**
15:25 16:1,4 19:13 46:7,8 67:4
70:19,20 75:6,7 76:14,19,20
79:24,25 98:7,18,21 116:19
121:24 129:16 136:8 137:3
145:25 151:21 158:9
**old**
33:23 95:9
**older**
38:16
**once**
7:14,14 115:9 123:15
**ones**
18:7 21:15 30:24 31:1 70:14
96:1
**onward**
59:8 85:19 87:21 88:7
**open**
68:15,21 95:8 103:12
**opened**
97:23
**operate**
74:23 76:11 77:11,13,14 96:12
157:11
**operates**
54:12 125:24
**operating**
26:11,13,16 27:1 76:8 92:13
95:21 97:22 110:25 111:6
120:21 130:25 131:3,5,8,9
132:10 138:16 152:11
**operations**
21:6
**opine**
130:19
**opined**
34:7
**opines**
104:25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 180

opining
 52:10 102:20
opinion
 35:20 52:6,8 105:22 120:8
  124:2,6 125:12,13,19 126:8
  139:13 140:15 148:21
opinions
 11:1,10 12:5 13:9,24 14:6,14,20
  49:19 52:5 129:5 131:20
  136:23 140:21 154:17
opportunity
 5:7 6:16 136:1 138:7
opposed
 37:7 93:8
opposite
 95:5
optical
 26:22,23 27:2
Optimus
 27:7
options
 87:8 156:22 157:11
Oracle
 25:5,5,7,17 29:12
oral
 153:23,25
order
 1:14 20:13,22 95:5 96:11
  104:12 144:4 152:21 155:16
  155:18
ordinarily
 102:6 115:6
ordinary
 34:2,6,14,20 35:8,12,15,19,22
  36:2 40:24 41:24 42:4 43:4,16
  45:3 47:16 135:21
organizations
 149:7 150:2
original
 3:13 93:1 129:11
originating
 72:15
OS
 95:21
OSI
 54:7,17 55:19

ought
 40:20
outbound
 141:25
outcome
 159:17
outgoing
 93:2,4,6 94:2,7 147:6,8,13
outside
 121:3 151:16
outsider
 149:10
Overwhelmingly
 149:12
ownership
 16:15

P

P
 2:1,1
P.C
 2:2
p.m
 92:1 137:9,10 158:17
packages
 22:15 23:18
packet
 21:21 23:20 57:6,12,22,25 58:7
  58:22,25 59:7 67:11 68:18
  70:9,10,11,16 72:4,8,12,17,18
  72:19,22,22,25 73:1,2,11,13
  73:18,19,19 74:16,23 76:6,9
  76:12,16 77:12 82:20,24 83:4
  83:9 84:4,7,11,14,16,19 85:24
  86:6,13,19,24 87:4,7,13,14,21
  88:2,7,9 89:13 92:22 93:2,4,6
  93:8,16,17,20 94:7,10 97:19
  97:23 98:2,9,11,25 99:1,6,7,13
  99:21 101:5,6,10,23 105:8,12
  105:18,19,23 106:6,10,12,17
  106:18 112:6 123:25 124:10
  124:13,17,19,21 125:2,8,17
  131:24 132:1,10,19 135:7,9
  138:17 141:25 144:23 145:6
  146:8 150:15 151:3
packet-for-packet

68:20
packets
 53:24,25 54:3 56:18 57:17 58:6
  65:19,23 67:7,13 68:3,5,8,11
  68:17 69:17,20 70:5,13 72:10
  73:6,8 76:18 84:1,18 85:11,18
  86:10,25 87:17 88:23 92:10
  94:14,15,18 97:13 105:24
  122:15,18 123:2,7,18 131:10
  133:3,6 140:12 147:7,9,10
page
 3:2,6 10:21 33:25 38:1,3 39:22
  40:25 51:4 83:11 88:13,19
  91:16 100:23,24 134:8 153:3
  156:12,16
pages
 115:22,24 117:5
Paging
 10:10
pain
 116:18
Pak
 64:24
paper
 23:22 24:8 52:12 61:11
papers
 20:24 52:1,17
parameters
 110:24
parent
 71:9
parlance
 84:20
parse
 44:22
part
 29:15 61:2 65:21 66:8,9 70:3
  74:17 81:6 83:8 86:14 90:3
  92:10 105:6 111:13 140:15
  146:9 147:11,13
particular
 20:21 21:25 37:10 47:19 58:6
  61:3 69:19 70:16 82:17 99:21
  112:15,16,19 139:9 157:20
parties
 12:11,16 20:11 68:2 120:6

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

135:19 159:14
**partners**
25:18
**parts**
86:15
**party**
61:3 69:4,6
**pass**
99:14 133:2,5
**passed**
133:1
**passing**
135:8
**passive**
77:9
**paste**
35:3
**pasted**
34:24 35:1,3,5
**patent**
3:9 24:9 43:10,14,22,23 44:15
    48:7 64:6,9,12 104:16,21,23
    118:24,25 119:19 120:3,9,13
    120:16 126:17 136:1
**patents**
26:15,25 118:8,19 119:5,6,9
    120:4
**path**
122:17
**Paul**
23:6 33:12 37:2 62:2 155:11
**paying**
137:24
**people**
13:19 25:15,16 28:8 32:6,11,15
    33:11 39:19 46:3 53:2 78:22
    81:5 84:15 92:20 93:14 142:25
    148:10 149:9,10
**perceived**
85:8
**percent**
43:19 44:5 108:13
**percentage**
15:9 16:6 24:18 44:8 107:24,25
    108:8 114:22 118:5 148:18
**perform**

135:6
**performed**
151:11,14
**performing**
86:11 102:8
**period**
17:2 69:6
**permissible**
13:22
**permission**
20:1,2 96:13,22 97:4,9,11,14
    99:21 106:19,23 124:22 125:3
    140:18
**permit**
112:5
**permitted**
13:20 124:17
**permitting**
106:19
**person**
34:14 46:6 47:16
**personally**
62:14 63:4 130:10
**Peter**
9:13 15:4
**phase**
68:1
**phone**
1:24 82:12
**phonetic**
153:19
**phrase**
135:4
**phrased**
96:23 128:7
**physical**
57:16,17,21,23 99:13
**pick**
156:14
**piece**
93:18
**pieces**
66:6
**ping**
67:14
**pitched**

33:11
**pitching**
32:21
**place**
33:17 112:14,17 133:20 157:20
**places**
35:4 105:14
**Plaintiff**
1:5 2:3
**plaintiffs**
130:7
**plan**
102:4
**plans**
11:19 40:21
**platform**
108:21
**play**
109:11
**please**
24:5 113:16
**plugging**
47:7
**plus**
42:7
**point**
10:16 42:3,6 56:6 61:24 88:10
    90:9 121:15
**pointing**
88:25
**points**
134:25 138:23 148:24
**policies**
111:4,23 112:11,16,19 133:15
    152:22,23,24 157:19
**policy**
21:22 22:22 97:15 112:5 132:13
    132:17,22,25 133:10 140:10
    142:12,13 144:15 150:6,8,10
    150:11,13 152:9,10 156:20
    157:4,7
**POP**
107:8,15
**port**
74:6,8,9,11,18,19,20 81:20,24
    90:23,24 91:7,8,9 101:6

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

123:23,24 124:12,16,18 125:1
125:15,16,22 126:7 150:19,20
150:24 156:24,25 157:2
**portafilter**
112:9
**portion**
133:3,5 135:8 143:17 156:11,21
**portions**
51:15 100:2 106:1
**ports**
80:22,24 81:17 82:1 91:10
157:11
**position**
20:20
**positive**
17:1 62:7
**possession**
113:11
**possibilities**
115:19 150:21
**possible**
7:24 17:1 47:14,18 62:24,25
82:14 98:22 110:1 121:2,19
126:23 129:18 144:8
**possibly**
120:6
**postgraduate**
30:7
**potentially**
122:5,11,16 123:17 130:17
131:11,12,25 138:18,19
**Practical**
50:15
**practically**
17:24
**practice**
5:11 77:15 145:25 146:11,13,14
**pre-1994**
77:12
**preceding**
89:4,6
**precise**
6:19 7:4 16:9 53:23 64:2 84:10
84:12,17,21 85:1 151:21
155:23
**precisely**

6:4,12 36:11 112:22 126:2
156:7
**predictable**
116:10
**prefer**
4:21
**Preliminary**
3:8 126:16
**premise**
86:3
**prepared**
12:24
**preparing**
11:7,22 126:25 144:7
**present**
110:12
**president**
8:17,20,22,24 15:6
**Presumably**
113:2
**presume**
39:15,17,19 156:19
**pretend**
73:10
**pretty**
50:7 115:19
**prevent**
77:16 81:4
**prevented**
21:22 81:9
**preventing**
23:9 81:7 127:19
**prevention**
127:10,12,18,21,25 128:4
**prevents**
77:7
**previous**
23:25 38:9 156:21
**previously**
103:8 113:14 118:3
**prime**
108:12
**Princeton**
137:13
**principle**
82:10

**principles**
47:22,25 48:1,3,11
**printout**
116:22
**prior**
9:11 131:10
**privacy**
146:17
**private**
109:1 122:4,12 123:4,16 130:17
131:12,24 138:17,19 146:5,7
146:18 147:2
**privileged**
103:15
**probably**
17:19 21:14 24:23 35:5 50:16
61:17 77:16 107:19 146:25
**problem**
29:20 60:19 82:24 83:2,9 86:16
127:14,15 148:6,8
**problems**
29:23
**proceeding**
159:15
**proceedings**
159:10
**process**
4:25 94:24 101:6 110:20 123:23
125:15,21 126:7 132:7,7 135:5
140:14
**processing**
131:23
**produce**
117:2
**produced**
129:24
**product**
102:7 127:21 147:16 154:4,20
**production**
117:2,24
**productively**
46:13
**products**
9:5,7 38:19 40:14 96:16 111:24
127:18 129:18 131:19 139:23
144:19 154:6

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 183

**professor**
24:13,14,15
**program**
95:1 117:15
**programmer**
42:12
**programs**
42:13
**prohibit**
20:16
**project**
21:13,16 23:16
**projects**
137:21
**promiscuous**
99:12
**propagated**
152:14,16
**proper**
22:15 23:18 50:7
**properly**
22:16 23:10
**pros**
152:5
**prosecution**
153:3
**protecting**
146:23
**Protection**
1:3 4:8
**protective**
1:14 20:13,22 144:3 155:16,18
**protocol**
38:20 65:15,17,19,21,22 66:1,3
  66:4,16,21 67:12 68:20 69:17
  69:17 75:14,23 78:2 106:25
  107:2,5,7,11,19,22 108:5,17
  108:18,23,24 109:10 156:24
**protocols**
47:4 66:12,13 69:12 80:25
  107:8,18 109:2,3,5,7,11,13,14
  109:16
**provide**
6:5 7:19 86:9 141:23
**provided**
48:4,24 96:3 132:1 149:24

**provides**
56:23 110:2 127:20
**providing**
18:16 56:25 117:19 118:21
  130:16
**proving**
29:14
**provision**
69:18,20
**provisionable**
27:13
**proxied**
53:19
**proxies**
110:18 133:18,22,24
**proxy**
24:2 39:3 53:10,11,14,17,18,20
  53:22,25,25 54:2,4 57:5,7,11
  57:14,14 92:24 93:8 94:1,5
  95:3,13 110:22 123:23 125:14
  128:5,10,11,16,19 132:7,7
  134:6 135:5 136:18 140:14
**pseudo**
152:4
**public**
1:20 4:2 20:11 159:4
**publish**
23:22
**published**
20:24 51:25
**publishing**
24:7
**purpose**
81:3 136:1
**purposely**
14:4,9
**purposes**
7:16 43:21 153:15
**pursuant**
1:14 3:9 126:17 144:3
**pursue**
50:2
**push**
152:23
**put**
86:6 111:5 135:25 150:9

**putting**
52:6

---

### Q

**qualification**
16:9
**qualifications**
11:9,13,17 13:15 14:3,4,13,17
  14:18,22 18:14
**qualified**
11:9,14 14:19 38:11,24 39:2
  52:4,9 71:17,20
**qualifies**
10:25 80:7
**qualify**
11:4 14:6 18:10,15
**quarter**
24:24 25:1
**question**
6:8,12,15 7:1,6,7 12:8,23 13:14
  15:16 16:16 24:5,6 35:24,25
  43:21 44:3 46:2 50:8 54:21
  56:11 57:12 60:2 66:8,19,22
  67:1 76:5,10 80:3 86:8 89:20
  90:8 92:20 100:4,13 103:19
  111:14 115:18 126:1 128:8,12
  131:21 136:2 140:3 144:10
  145:1,11 148:5
**questionable**
115:3
**questioning**
10:14 65:5,11
**questions**
5:7,8,13,20,23,24 6:23 10:16
  12:19 70:18 72:3 79:16 80:1
  121:23 157:15,25 158:13
**quick**
49:21 116:11,13
**quickly**
34:12 148:9
**Quinn**
1:17 2:7 12:10 62:10,13 63:2,10
  63:15,19 64:15,17,25 113:15
  127:6
**quite**
31:4 144:25

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 184

quote
79:17
quoted
141:15
quotes
141:16

_____
R
_____
R
2:1 159:1
range
115:21
re-designation
144:8
re-exam
119:20
re-examination
119:23 120:2,13
re-examines
120:3
re-queries
152:20
reach
53:16 65:20 144:22 145:1,4
  146:7
reached
49:2,13
reaches
40:10
read
24:4,6 34:9,11 40:1 43:23 49:23
  51:13,14,25 52:14 78:5 89:19
  100:2 101:7 114:16,18 116:14
  136:1,19,21 139:12 141:16
  157:1,8,18
reading
78:25 101:16 104:18 116:1
  125:21
reads
48:17
realized
148:10
really
16:12 30:17,19 36:8,15 70:25
  91:11 96:20 154:9 157:13
realm

117:1
reason
53:5 79:4 85:7 114:24 116:24
  150:1
reasonable
19:14
reasons
124:5
rebuilding
42:17
recall
30:23 39:1,5 49:8 90:11 113:9
  126:23 127:7 140:8,9 157:16
receive
95:7 99:13
received
28:12 34:13 68:7 130:4 133:3,6
receives
70:14 94:1
recess
61:18
recipient
70:11
recite
54:23 55:1,23
recognize
10:8 39:13 52:22,25 119:15
  156:9
recognized
150:15
recognizing
23:9
recollection
129:11
reconstructing
29:18
record
10:1,2 61:16 65:7 79:8,19,20
  89:21 103:10 135:1,25 137:8,9
  145:9,10 159:10
recover
29:3
recovering
28:17,18
recovery
28:22

red
22:2
redesign
32:21
redesigned
31:17
redirect
6:17
reference
14:10 50:18,20,21 51:1 112:10
  140:21
referenced
88:19 112:5,8 114:18,20 152:15
  152:17 157:6
referencing
10:17 124:19 141:13
referred
75:25
referring
10:13 23:24
reflect
57:18
refuse
97:18
regard
11:25
regarding
100:8,9
reinstalling
42:17
reject
35:18
relate
140:1
related
9:7 18:21 19:4 25:2 26:25 40:16
  43:7,9 44:14 63:2 64:24 105:7
  137:22 159:14
relates
9:11 68:22
relating
25:14
relation
139:7
relatively
78:20 137:23 150:3

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**relayed**
84:1,4,13,14,16,18,19,23,24,25
  85:11
**relevance**
65:8
**reliable**
65:24 69:16
**reliably**
54:22 68:6 70:5
**relied**
104:6,11 154:13,16
**rely**
37:11 103:19 126:24 131:15
  142:7
**relying**
37:7 103:11,17
**remain**
120:5
**remember**
18:15 21:13 22:2,3,13 23:4,14
  24:7 31:1 34:25 36:7,9,10
  42:24,24 51:2 60:13,22 61:22
  62:3,6,8 64:14 65:2 67:9,16
  68:16,19,23 69:13 90:6,8
  95:18,25 110:8 114:16,18
  126:22 128:24 129:2 141:10
  142:16 153:9,11 154:1,1 156:8
**remote**
57:8 58:12 90:23,23 91:3,5,23
  106:17 123:6,7
**render**
11:1,10
**rephrase**
104:1
**reply**
141:3
**report**
3:7 8:6,17 10:5,11,14,17,22
  11:2,8,11,18,22 12:6 13:4 14:7
  14:13,15,16,20,22 17:22 18:2
  33:25 34:9,17,23 35:10,21
  36:1 37:6,11,14,15,16,18,21
  38:1 39:22 40:3,8,10,12,17,25
  42:5 47:21 49:20 50:20,25
  51:5,22 52:5,15 59:15 74:3
  75:9 88:14,20 95:20,21 103:12

103:21 105:9,13,16 106:2,4
111:11,14 117:17 124:3,7
125:25 126:10,25 127:25
129:12 131:17,20,21 136:24
139:3,12,18,21 141:3,6,11
144:16 153:2,7,16 154:11,21
155:8
**reporter**
1:20 3:13 158:3 159:4
**REPORTING**
1:22
**reports**
12:24 13:21
**represent**
4:8
**represented**
93:2,3,6 95:11
**require**
13:3 77:9 82:8 106:22,22 128:4
  128:6,9
**required**
23:3 43:19 88:4 95:5 102:9
  139:12,14,16 150:8
**requirements**
20:16
**requires**
48:18 101:4
**requiring**
69:18
**reread**
51:16
**research**
9:12 137:20
**researching**
25:20,22
**respect**
8:13 15:25 16:5 80:21 101:9
  125:13 126:8 129:7 136:24
  138:14
**respective**
125:8
**respond**
26:16 27:1
**responding**
26:12,14
**responsibilities**

121:3
**responsible**
58:5 66:9,10
**restarted**
152:20
**restricted**
136:13
**result**
23:23 45:8 94:6 154:5,23
**results**
154:12
**Resumed**
61:19 79:21 92:2 137:10
**retained**
3:11,13,14 4:11 64:15
**retransmits**
70:17
**retransmitted**
86:7
**retransmitting**
69:20
**retrieved**
107:9
**return**
38:9 68:18
**reveal**
127:5
**review**
35:14 115:14,25 116:1 133:12
  141:2
**reviewed**
110:7
**reviewing**
51:21
**rewrite**
74:20
**rewrites**
92:10
**rewriting**
93:17,19
**rewritten**
74:16,18 82:20 83:6 94:11,18
**RFC**
60:25
**Richard**
64:23

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**Ridge**
55:8
**right**
4:12 5:25 6:20 7:2,13 8:11,18
9:21 11:19 13:4 17:5,10 30:5
30:20 40:4 44:18 50:3,23,24
54:23 63:10 65:7 75:18 83:20
85:1 89:1,3,14,18 90:17 92:5
95:1 100:8 101:7,18 102:2
108:5 110:18 116:21 118:9
119:21 121:14 123:12 130:22
134:12 135:2 137:13,14,17
140:1 143:6 144:12 148:1
149:18,20,24 155:18 156:19
157:15
**Rimini**
25:5,6 29:12
**rising**
56:16
**road**
89:21
**Roberta**
1:19 4:2 159:3,21
**rough**
8:3
**roughly**
46:15 116:12
**route**
57:11 59:2 68:6 73:16 80:23
98:9,11 99:15,21
**routed**
58:24,25 67:7
**router**
42:10 57:14 73:15 149:4
**routers**
31:10 58:5 59:1,6,7 67:6
**routing**
42:9 58:4,5 98:6,10,20 99:8,15
**RSA**
38:17
**Rudis**
64:23
**rule**
3:9 11:25 13:3 20:19 28:7 92:9
92:15,18 93:11,13 97:4 106:19
106:22 110:19 111:5 124:19

124:22 125:3 126:17 150:9
151:4 152:9
**rules**
22:21,22 23:19 47:19 73:5,15
96:22 150:21 155:23
**run**
75:5 82:12 112:25 117:14 121:1
121:11 122:8
**running**
53:22 75:1 93:19 97:21 98:13
121:16 129:6
**runs**
112:23 120:21

_____

S

**s**
2:1 3:5,8 32:14 126:16 138:4
**San**
1:2 2:8
**satisfies**
46:2
**satisfy**
45:23
**saw**
110:21 137:15
**saying**
71:15 81:1 86:20 100:16
**says**
45:6 81:16 102:4,4 121:15
142:24
**scan**
158:4
**scanning**
109:17 110:8
**scarcity**
148:8
**scenario**
75:4 86:5 87:20 89:16 90:4 93:9
94:1,11 95:3,17,19 99:3 142:4
**scenarios**
77:15 82:14 83:1 93:14 96:21
**schedule**
158:16
**schema**
66:16,16
**scheme**

65:19
**Schwartzberg**
32:14 33:6 37:3
**science**
29:15,20,23 39:9 42:7 43:6,11
60:5 71:6,7,9,10,14,16,18
151:9,12,13,17,24 152:2
**Sciences**
1:3 4:8
**scope**
19:10 102:1
**scopes**
13:20
**script**
112:23,25
**Sean**
64:24
**search**
116:16
**searching**
27:13 116:25
**second**
32:13 78:6 87:11,12 88:6 101:3
124:24 125:9 132:18 133:4,6
145:22
**secret**
27:11,24,25 28:4
**section**
10:21,24 14:12,16,21 39:23
40:1 78:12 141:10 153:2,6
**sections**
133:17 154:11
**secure**
9:10 20:1 127:16 130:16 148:20
148:23
**secured**
113:8,12,19 148:3
**security**
19:1,4,5,6 20:20 21:19 24:20
25:3,8,9,12 33:18 38:12,19
39:9,14 44:3,6,12,24 45:7,11
45:14,17,20,25 46:7 50:16
53:2 55:15 66:15,20 109:15
110:6 118:6 141:19 142:6,12
143:1,19 144:11 145:5 146:15
146:20,22 147:18 148:9,10,13

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

148:18,21 149:22
**see**
28:9 34:3,4 38:3 39:24 46:17
48:20 50:3,5 65:8 78:11 84:2
85:20 101:2 102:10 103:2
112:18 119:22 134:12 138:20
138:21 141:6 144:20 156:23
**seeing**
115:1 126:22 141:10 156:8
157:16
**seek**
20:22
**seen**
5:24 61:11 114:17,19 126:20,23
156:5 157:15
**sell**
118:22
**send**
53:25 59:1 65:23 82:13 88:7
95:9 106:10,17 146:8 147:14
158:5
**sender**
70:15
**sending**
70:9 74:4 87:21 93:1
**sends**
59:8 69:4
**senior**
114:7
**sense**
29:16 58:4 61:8,10 66:8,23 67:2
86:1
**sensitive**
136:13 157:10
**sensitivity**
135:6,14,16,20 136:4
**sent**
58:19 59:4 68:14 69:18
**sentence**
48:16 78:5 85:21,25 86:22
101:3 102:10,23
**separate**
40:13 95:3,4,14
**separated**
66:11
**sequence**

68:9 69:21 70:4,10,13,16
**series**
54:11 151:11,13,17 157:5,10
**serve**
12:1
**server**
53:16 77:4 78:22 80:9 90:4 94:3
94:9 95:8
**servers**
25:7
**service**
142:7
**services**
76:1,8 118:6 157:6,8,10,12
**serving**
123:24 125:15
**session**
124:11,25 125:2 132:9,18 133:4
133:5,7,8 146:10
**sessions**
125:9 145:20
**set**
10:24 11:3,5,13 12:1,4 13:8
14:7,13,17,22 18:13 34:1
35:11 40:25 42:4 47:16,25
49:20 54:2 57:11 90:20 99:15
99:16 105:6 106:4 112:15,18
119:12 123:11 124:3,6 130:5,6
130:7 131:19,20 136:23
140:12,13 146:11
**sets**
43:1 156:22,24
**setting**
43:4,9 58:24 140:11
**settings**
111:18,19 112:2 116:9 139:22
139:25 140:5 152:13
**setup**
67:25
**seven**
43:2 44:4 45:23
**Shalman**
32:13 54:25
**shareholder**
16:13
**ship**

96:16
**short**
59:18 61:18 92:1 115:21
**Shorthand**
1:19 159:3
**show**
11:14 14:19 79:11 83:25 88:22
**showed**
83:19
**showing**
48:18 155:17 156:4
**shown**
83:17
**Shu**
138:4
**signed**
155:17
**significant**
44:11
**Silverlight**
108:21
**simple**
28:18 67:12,14 73:14 77:12
82:4 89:3 145:14 156:23
**simply**
70:8 78:7 80:5 85:18 86:14
101:16 141:24
**single**
48:20 49:18 146:22
**sit**
62:22
**site**
32:6
**sits**
66:17
**sitting**
23:13 49:3 126:3 149:1
**situation**
136:18 141:21
**situations**
92:21,22
**skill**
34:2,6,14,20 35:8,12,15,19,22
36:2 40:24 41:2,24 42:1,4 43:5
43:17 45:3 47:16
**skimmed**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

34:10

**Skype**
82:11

**sliding**
68:4,12

**slightly**
13:15 84:10

**slip**
6:25

**smacks**
29:1

**small**
8:25 149:5 150:3

**smaller**
74:21 149:13

**SMTP**
24:1 107:6,11 156:23

**sockets**
42:14

**software**
9:17 53:15,18,21 54:1 74:25
78:22 86:25 93:19 118:22
121:5 151:12,14 152:3

**solaris**
33:24

**solve**
148:7,8

**somebody**
27:22 94:25 96:24 142:5 146:6

**somewhat**
46:18

**Sony**
26:9

**sophisticated**
149:11

**sorry**
25:11 35:23 43:20 51:11 57:20
58:16 64:8 74:6 93:22 112:8
145:8

**sort**
27:12 56:24 148:4

**sorts**
25:16 36:7 117:24

**sound**
96:24

**sounds**

8:11 84:8

**source**
22:18 23:1 34:24 42:16 72:16
74:4,6,7,16 124:11,12,15,16
132:9,20 146:4,17 150:16,19

**space**
152:25

**speak**
136:8 150:10

**speaking**
12:14

**special**
97:22

**specialist**
117:7

**specialize**
29:3

**specific**
80:24 100:13 103:19 142:7

**specifically**
99:11 128:2

**specified**
58:1

**specifies**
69:9

**specify**
80:3 150:14

**speed**
150:5

**spend**
24:19 149:23

**spending**
44:5,11

**spent**
25:4 29:7 30:11 31:2 37:22
135:15 137:19

**Spitballing**
63:25

**split**
91:12

**splits**
37:19

**springs**
40:9

**square**
88:23

**SSL**
38:20

**St**
25:23

**staff**
149:8,15

**stake**
16:12

**stamped**
155:21

**stand**
67:5,8,10,15,17 71:2 75:16,22
103:24

**standalone**
145:23

**standard**
61:1,2,2,5

**standards**
60:24 148:19

**Standler**
38:17

**standpoint**
33:18 141:19

**stands**
9:6 73:24 75:13

**Stark**
27:8

**start**
76:25 104:10 139:5 149:15
152:1 154:13

**started**
24:5 37:15 112:10 156:20

**starting**
47:21 153:3

**startup**
118:20

**state**
1:21 140:19 159:5

**state-of-the-art**
51:9,12

**stated**
8:9 103:8 124:2

**statement**
80:4,21 81:2,11,12,15,18 104:2
104:6 111:8,9

**statements**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

79:24 80:1 118:18 159:8
**STATES**
1:1
**static**
80:24
**station**
58:20 75:1 90:3 131:23
**stations**
146:23
**status**
20:10
**step**
59:9 78:14 95:4,5
**steps**
102:8 151:11,14,18
**Steve**
32:14,20 33:5,7,8 37:3 52:22
**stipulation**
12:11,15 103:23
**stop**
137:3
**stopped**
18:15
**store**
112:11
**stored**
28:2 112:2 115:9
**stream**
65:24
**streaming**
108:14,18 134:2
**streams**
42:14
**Street**
1:23 2:8 25:5 29:12
**Street's**
25:6
**strike**
116:22
**structures**
112:12 152:14,17
**studied**
54:15
**stuff**
117:16
**subfield**

60:10 71:19,20,24
**subfields**
151:20
**subject**
5:10 25:25 26:9 43:10,14 73:3
   79:7 81:12 103:23 111:13
   120:7 151:4
**subsequent**
125:8
**subset**
46:13 76:23,25
**substance**
127:3 153:9
**sufficient**
11:14 14:18
**suggest**
78:24
**suggested**
142:24 153:10,13,14
**suggests**
18:12 142:11
**suite**
65:15,17 66:2,5,15,21,21 67:1
**Sullivan**
1:18 2:7
**Summary**
3:10 154:25 155:4
**summers**
137:16,19
**Sun**
33:23,23
**supervisor**
138:1
**support**
117:20
**supposed**
25:15,16 54:5 57:12 58:3 59:10
   117:10 136:19
**sure**
7:17 17:19 24:25 39:11 46:1
   51:12 54:20 56:10 60:1,9
   61:15 62:16 63:8 66:7 68:1
   70:12,25 78:9 93:15 99:16
   100:23 102:3 128:6,9 135:16
   139:15
**surprised**

143:4
**suspect**
20:9
**switch**
137:11
**sworn**
4:1
**Synergetics**
27:8
**system**
27:13 42:11 87:2 92:13 95:21
   97:1,22 110:25 111:6 118:23
   120:21 123:4 130:25 131:3,5,8
   131:9 132:11 138:16 152:11
**systems**
9:11,13,14,15 26:11,13,16 27:1

---
**T**

**T**
3:5 23:6,6 59:16 159:1,1
**table**
98:6,10,20 99:9,15 154:23
**tables**
22:16 58:4 67:6
**take**
4:18 20:20 37:20 41:23 44:2
   48:14 49:21 61:14,16 64:14
   65:22 79:14 91:25 95:9 107:10
   115:13,25 116:15 129:9
   133:20 138:11 154:7 158:4,11
**taken**
61:18 86:6 92:1
**takes**
29:1 59:7
**talk**
54:2 65:12 73:7,14,23 79:7
   84:15 145:22
**talked**
72:1 76:23 77:1 87:9 88:13
**talking**
73:10 74:25 75:4 76:18 87:3,11
   87:12 88:11 91:4 92:3,12
   104:18 117:6 134:23,24
   137:12 145:18
**target**
58:11

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

targeting
53:15
task
29:16,17,20 67:14
tasks
67:14 81:9
TB
26:8
TCP
65:20 66:9,13 67:24 68:15,22
    68:25 69:2,11,15 70:1,4,9
    90:22 91:15,18,21 94:8 105:18
TCP/IP
65:14,17 66:2,5,15,20,25 72:21
    76:18 83:22 87:23 88:6,8
    89:17 90:1,10,16 97:23 123:18
    123:25 124:10,12 125:2,8,16
technical
8:10,12,13 15:25 16:5 17:14,17
    18:20 19:2 44:18
technically
52:4,9
technology
139:9
tell
10:18 21:8 31:5 34:5 37:6 50:4
    51:17,19 54:13 57:22 71:1,4,5
    79:22 80:20 85:16 90:13 91:7
    102:3 105:15 137:18 156:12
telling
20:7 71:12
Telnet
75:12,16,17
ten
18:23 33:11 62:19
tendency
39:18
term
19:14,18 86:20 88:5 92:21
    93:14 135:14 151:6
terminated
90:2
terminology
92:20
terms
100:13 139:8

test
22:16
tested
99:11
testified
4:3,14 7:8,11,13 12:23 30:24
    38:17,18 42:2,19 114:21
testify
11:16 13:10,20,25 14:23 64:4,6
    64:9 100:16,17 101:9 102:5
testifying
20:17 64:14
testimony
5:1 12:1,4 27:7 40:18,22 45:21
    64:13 89:15 100:7 114:3,10,13
    114:24 115:1 118:4 121:21
    129:20 136:25 159:9
testing
154:12,15
text
35:4 50:10 85:5 104:12 115:11
    116:21 153:8,9
Thank
84:25 119:11 158:14,15
theory
80:13 119:1
thereof
13:9,25
thing
23:17 77:20 88:4 93:15 116:14
    144:5 146:25 150:4
things
9:16 11:4,6 19:24 20:10 28:8
    33:23 34:23 36:8,10 66:7 76:2
    76:11 92:4 100:19 117:24
    133:19,22 142:2 146:24 149:3
    156:14
think
4:19 7:11,12,18,21 8:3,22 9:5
    9:20,20 11:3 13:14 14:18
    16:17 18:19,23 20:3 30:2 33:5
    33:8 34:10,10,11,22 35:9,17
    36:4,21 37:4,22 38:7,8,16,22
    39:19 41:22 46:3 49:22 50:21
    50:24 51:24 52:2 61:11 62:6
    62:20,23 63:8,9,17 64:1 67:3,4

70:3 74:2 75:8,20 76:12 77:2
77:20 78:19 80:16 86:16 93:12
96:1,8,18 103:10,13,17 104:11
106:21,21 107:25 108:2
109:12 110:20 114:8 117:3,21
120:23 121:6 140:5,15 141:16
141:20 142:24 144:11 148:1
150:20 151:19 153:25 154:24
thinking
54:4
third-party
155:21
thought
6:18 11:5 18:14 96:19 148:6
thousands
30:20,22 115:22
threat
110:13
three
7:11 31:14 107:17 140:6,7
ticked
115:23
tiff
116:17,20,24 117:9,13
tiffing
117:24
time
17:2 21:12 22:4 24:19,22,24
    25:4 29:7 30:11 31:2 42:18
    43:19 44:5,11 45:18 48:10
    54:22 65:13 69:7 78:15 79:25
    80:15 88:17 107:10 108:3,12
    135:15 142:23 147:24 157:25
    158:17
times
4:14,24 7:8,10,15 46:17,20
title
24:15
today
6:23 17:7 20:7 47:14 49:4 63:2
    80:1,4,12 88:17 98:13 100:6
    107:18 109:6,8 120:24 121:21
    126:3 141:4 148:1,15
today's
148:19
told

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

70:21 100:6 130:5 138:13
144:11
**top**
26:7 30:1 54:14 56:22 66:17
88:19 108:20 156:16
**topologies**
42:9
**tough**
33:17
**tracking**
146:10
**trade**
27:11,24,25 28:4
**traffic**
80:23 107:25 108:8 109:6
150:24,25
**training**
28:12
**transaction**
95:14
**transaction-by-transaction**
108:10
**transcript**
3:13 8:3 143:22 144:2
**transfer**
75:13,23 156:24
**transferred**
107:7
**translated**
74:4 94:23,25
**translation**
59:19,21,23 60:4 70:19 73:1,25
74:12,15,19 76:15 92:4,8
140:1 145:16,20 147:19
148:14
**translator**
145:23
**transmission**
65:21 66:11 69:16 82:19 105:20
105:25
**transmissions**
145:19
**transmitted**
56:19 68:9 70:5
**transmitting**
67:13 105:17

**transparent**
39:3 53:10,18 57:5,7 132:17
**transparently**
125:7 132:8 133:1,2 135:8
**travel**
19:20 57:13 158:16
**travels**
57:13
**traverse**
57:24 140:24
**traverses**
57:7
**traversing**
106:12,14
**trial**
4:16 6:17 7:9,14 11:17 12:2,5
13:10 14:1,5,10,23 20:6 27:7
64:4
**trials**
7:11,12,13
**tried**
35:3
**tries**
28:19
**true**
16:20,23 44:12 77:22 78:9,15
78:17 80:1,2,2,4 81:2,11,12,18
91:18 96:12 104:25 130:20,21
130:23 135:23 143:4 149:9,25
159:10
**Trust**
27:18
**try**
4:20 15:17 85:2 121:22 146:8
156:15
**trying**
6:24 16:8 29:2 93:23 142:15,22
146:6 148:7,8 154:7
**turn**
65:24 66:17 100:24 110:17,21
116:24
**turned**
96:16 97:2,3
**turns**
17:23 96:25 147:20
**twice**

7:14
**twins**
36:9
**two**
7:13 19:24 32:15 50:22 65:25
66:6 68:2 71:7 76:2 83:19
87:9 88:22,25 89:7 96:8
101:23 140:4 145:20
**type**
6:9 21:17 109:17 146:15 148:20
150:25 157:17
**typed**
34:19,22 35:1
**types**
6:24 9:16 28:10
**typically**
46:11 74:17 78:3 116:9
**typing**
23:14

### U

**U**
32:13 138:4
**U.S**
118:8
**ubiquitous**
78:20
**UDP**
69:14,16,17,22 70:1,6,8
**ultimate**
58:11
**un-renounced**
82:2
**unacknowledged**
68:12
**unchanged**
73:20 85:24
**unclear**
85:14
**undergraduate**
30:4
**understand**
4:10 5:3,6,11,12,15,19,22 6:14
6:20,21,22 7:2,3,3 10:19 11:7
12:22 19:11 31:6 42:9 43:3,8
45:19 48:17 49:3 70:25 86:8

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

91:1,5,8 95:12 109:7 121:10
121:25 122:3,22 125:11,18,20
125:22 126:6 129:23 134:14
135:10 139:25 145:6 148:16
157:3
**understanding**
11:12,21,24 12:3 13:2,5,6,7,8
13:11,16,17 17:11 19:17 29:13
29:20 47:24 48:1,22,24 49:1
49:10,10,12,15,17 83:16 86:15
102:12,14,15 103:4,5,14
104:16 105:3,5,23 106:6 120:1
130:3 134:18 135:11,24 136:3
139:11 146:3 148:7
**understandings**
139:15,16
**understood**
43:11 81:21 144:9 158:6
**undesirable**
141:19
**undisputed**
133:20
**unfair**
136:22
**unified**
110:13
**UNITED**
1:1
**universally**
149:9
**Unix**
33:15 42:11
**Unix-based**
97:21
**unreliable**
65:23
**upwards**
99:14
**Urquhart**
1:17 2:7
**usage**
108:14
**USB**
26:20
**use**
38:19 42:13 56:25 57:10 59:5

61:17 66:12 80:13,17,18 85:23
88:5 92:20 93:14 105:12,14
107:18 108:19 109:6,8,18,23
110:19,21 126:24
**user**
96:25 152:9
**users**
141:8
**usually**
69:4 149:25 150:1,16
**UTM**
114:23 116:6
**UTN**
110:13

---
**V**
---
**v**
25:5 38:17 49:7
**vague**
4:20
**validity**
120:9
**variables**
152:14
**variety**
33:20 38:18
**various**
25:14 75:24 128:22
**vast**
16:17 17:7 34:22 80:8 148:24
**verbal**
79:17
**version**
95:23 121:8,11 129:6
**versions**
95:25 121:4 128:23 129:2,19
130:8
**versus**
25:24 26:9 27:8,19
**vice**
15:6
**video**
108:14,18
**view**
53:7 88:3 115:3
**Vin**

61:13
**Vincent**
2:4 4:7
**violation**
12:10
**virtual**
109:1
**virtually**
16:8,18 148:24,24
**virtue**
54:4 102:8
**virus**
109:16 110:8
**vmcgreary@gibbonslaw.com**
2:5
**Volcano**
25:24
**volume**
29:21 108:11
**VPN**
109:1 134:4,5
**VPNs**
80:16
**vs**
1:6

---
**W**
---
**W**
138:3
**wait**
78:14,14
**Walberg**
37:4
**want**
10:20 15:20,24 16:2 46:5 48:6
49:24,25 61:16 64:1 65:6,11
70:18 73:7,14,23 76:13 79:12
79:22 85:1,15 88:10 90:15,21
98:5,12,16,19 100:15,22,23
109:15,19 116:24 119:11
127:17 142:6,20,21 145:21,22
148:12 158:7
**wanted**
149:23
**wants**
53:16

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

Page 193

**wasn't**
49:14 52:13
**way**
28:21 51:17 52:7 53:7 65:12
81:1 85:4,25 86:11 88:2,11
109:21 113:1 115:4 118:14,21
123:15 126:25 128:8,14
142:16 143:22 151:3 152:22
152:24 159:16
**ways**
26:17 151:22
**we'll**
73:9 143:20 144:1
**we're**
73:8,10 75:25 76:15,18 100:23
117:1 134:23,24 144:6 145:18
156:2
**we've**
61:13 92:3 126:20
**web**
75:21 108:4 109:17 110:10,11
116:5
**website**
25:17
**week**
46:13
**weeks**
46:14
**Wenling**
138:3
**weren't**
55:23 56:2
**West**
27:19
**whatsoever**
73:15
**wife**
15:14
**wife's**
15:20
**wifi**
149:3
**willcooper@quinnemanuel.c...**
2:10
**WILLIAM**
2:9

**window**
68:4,13
**Windows**
33:22
**withdraw**
35:24 72:19 144:10
**withdrawn**
35:25 48:2 50:19 88:3 100:5
117:18 126:4 145:2,12 147:22
**witness**
3:2 4:11,15 12:9 65:13 79:11
103:22 127:4 155:17,24
157:25
**witnesses**
12:18
**word**
18:12 96:17 105:8,12 136:20,21
156:18,18,19
**words**
46:3,4 86:4 88:23 94:10 100:20
128:7
**work**
9:12 15:9,21,24 16:7,12,14
19:23 20:3,3 23:23 25:3 29:11
29:21 32:3,6,12 33:20 36:18
37:7,10,11 43:19 44:13,17,23
54:21 56:13 58:20 75:1 76:22
78:7,23 80:5,6,10,12,14,16,22
81:17 90:3 138:7 142:23
146:23 154:4,6,19,20 155:7
**worked**
7:21 8:9 17:1,14 18:20 19:3,21
32:10 36:23 37:1,4 45:17 48:7
62:12 65:2 137:20,21
**working**
23:4 24:19 32:15 45:7,10,24
46:13,23,25 47:3,5 62:8 63:1
64:17 77:16
**works**
15:14 46:6 59:23 117:2
**workstation**
94:2
**world**
136:11
**wouldn't**
53:7 54:1 77:13 80:16 83:8 88:1

115:3 143:3
**write**
22:18,20,22,25 23:19 34:17
42:13 84:1 101:3,21 102:6
104:12 153:6
**writing**
37:24
**written**
24:1 53:24 78:16 152:10,12
153:16 154:4,6
**wrong**
49:4 63:12 84:8 135:19
**wrote**
48:23
**www.depolink.com**
1:24

**X**

**x**
1:3,9 3:5
**Xie**
114:4,10,21

**Y**

**yeah**
35:17 50:12 78:9 85:8 90:12
110:11,20 115:16
**year**
16:6,21,23 25:3 46:14,16,19
88:11
**years**
15:12,14 21:11 33:2 42:8 43:2
44:4 45:13,17,19,21,23 46:20
51:15 104:15 118:19
**York**
1:18,19,21 159:5

**Z**

**0**

**07029**
1:23
**07102**
2:4

**1**

**1**

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

83:20 118:3 119:15 134:9
138:10
**1,500**
46:19,20
**1.2**
39:22
**1.3.1.5**
38:3
**1:06**
137:10
**1:38**
158:17
**10**
3:7 17:20 18:19 51:4 105:2,4
119:12 122:1
**10:46**
61:18
**10:57**
61:19
**100**
7:22 30:16 43:19 44:5 143:5,8
143:13
**11:19**
79:20
**11:22**
79:21
**11:38**
92:1
**11:46**
92:2
**12:50**
137:4,9
**126**
3:8
**130**
8:10 17:14,17 18:20 19:2
**140**
36:21
**15**
62:21,24,25 100:24
**155**
3:10,11
**19**
130:12 134:12,24 135:5 136:24
138:11,15
**192**

3:7 10:4,5,8 12:25 14:8 34:1
38:4 88:14,21
**193**
3:8 126:15,20
**194**
3:10 155:3
**195**
3:11,14 155:13 156:5 158:4
**1993**
97:21 147:17
**1994**
41:3,4 51:1,6,10,12,20 73:9,12
74:24 75:6,24 78:18 82:25
83:9 97:20
**1995**
41:7
**1996**
41:9
**1997**
9:23 14:25 15:8 16:24 17:7
41:11 137:13
**1998**
41:13
**1999**
41:15

---

**2**

**2**
10:21 39:22 83:20
**2,000**
46:18
**20**
37:23
**200**
7:22
**2000**
41:17
**2001**
41:19
**2002**
41:21 42:1,21 43:17 44:6,12
**2003**
28:13 38:16 78:25 80:2
**2012**
24:18
**2013**

1:10 36:12,13,14
**22nd**
2:8
**25**
156:25
**26**
11:25 13:3
**29**
105:2,4

---

**3**

**3**
33:25 38:1,4 40:25 47:21
**3-1/2**
36:9 61:17
**3,000**
115:14,24
**3.4.2**
78:12
**3.5**
48:7,14
**3.5.1**
48:17
**3.6**
48:14
**3.6.1**
49:9
**3:12-CV-01106-WHA**
1:6
**30**
37:23 108:13
**300,000**
115:24
**32**
67:21
**353-9445**
1:24
**353-9880**
1:24

---

**4**

**4**
3:3 67:19,21 147:25
**4-2**
3:9 126:17
**4.0**
96:1

CONFIDENTIAL * FOR ATTORNEYS' EYES ONLY * CONFIDENTIAL

**4.3**
85:16
**40**
19:15 31:25 46:12,17 121:7
**40MR2**
129:12
**415**
2:9
**43**
105:2,4
**45**
63:9
**48**
46:14

---

**5**

**5**
1:10
**5.3.4**
101:1
**5.3.5**
102:6 105:6
**5.3.6**
104:25 105:3
**50**
2:8 31:25 46:17
**51**
1:18
**55**
21:13,16
**57**
134:8,11,24 137:1

---

**6**

**6**
153:3
**601**
43:10,14,22,23 119:18

---

**7**

**7,500**
46:21,22,23,25 47:3,11

---

**8**

**8**
83:11 88:13

---

**9**

**9**
88:13,19 91:16
**9:36**
1:11
**90s**
61:9
**93**
147:24
**94**
88:16 147:17,24
**94111**
2:8
**96**
61:12 88:16
**973**
1:24,24
**986-5700**
2:9