MICHAEL CUKOR (NY Bar No. 3935889)
GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Tel: (212) 613-2013
Fax: (212) 554-9658
Email: mcukor@gibblonslaw.com

VINCENT E. MCGEARY
(NJ Bar No. 041681991)
GIBBONS P.C.
One Gateway Center
Newark, NJ 10119-3701
Tel: (973) 596-4837
Fax: (973) 639-6477
Email: vmcgeary@gibblonslaw.com

JILL F. KOPEIKIN (CA Bar No. 160792)
VALERIE M. WAGNER (CA Bar No. 173146)
GCA LAW PARTNERS LLP
2570 W. El Camino Real, Suite 510
Mountain View, CA 94040
Tel: (650) 428-3900
Fax: (650) 428-3901
Email: jkopeikin@gcalaw.com
Email: vwagner@gcalaw.com

DAVID R. OWENS (CA Bar No. 180829)
BRUNO TARABICHI (CA Bar No. 215129)
OWENS TARABICHI LLP
111 N. Market St., Suite 730
San Jose, California 95113
Tel: (408) 298-8200
Fax: (408) 521-2203
Email: dowens@owenstarabichi.com
Email: btarabichi@owenstarabichi.com

Attorneys for Plaintiff
Network Protection Sciences, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

NETWORK PROTECTION SCIENCES, LLC,

Plaintiff,

vs.

FORTINET, INC.,

Defendant.

Case No. 3:12-cv-01106-WHA

**PLAINTIFF NETWORK PROTECTION SCIENCES, LLC'S OPPOSITION TO FORTINET, INC.'S MOTION TO STRIKE EXPERT REPORT AND EXCLUDE TESTIMONY OF JOHN JAROSZ**

Hearing Date: September 26, 2013
Hearing Time: 8:00 a.m.
Judge: Hon. William H. Alsup

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 1

A. Reasonable Royalty for Patent Infringement ........ 1

B. Expert Testimony as to a Reasonable Royalty ........ 2

III. ANALYSIS ........ 3

A. Jarosz conducted a proper apportionment analysis in determining the base for the reasonable royalty calculation. ........ 4

1. *Mr. Jarosz correctly calculated a reasonable royalty using the apportionment method.* ........ 5

2. *Mr. Jarosz's analysis is further supported by the Trend Micro and Brandywine license agreements, which show Fortinet viewed its actual products as the smallest unit, as well as Fortinet testimony that the company did not consider FortiOS to be a separate product or entity.* ........ 6

3. *Defendant's argument that Mr. Jarosz misunderstood Mr. Xie's testimony about the scope of the patent is irrelevant.* ........ 7

B. Jarosz Properly Determined the Royalty Rate ........ 8

1. *Mr. Jarosz properly calculated a 4% reasonable royalty rate based on multiple sources, including past Fortinet licensing agreements and the Georgia Pacific factors, and did not copy his 4% figure from the 2006 Trend Micro licensing agreement..* ........ 8

2. *Mr. Jarosz properly considered the analogous 2006 Trend Micro agreement in his analysis since that agreement relates to the same field and technology as the '601 patent.* ........ 9

3. *Defendant's suggestion of a 1.08% reasonable royalty rate is improper since it is based on faulty reasoning and ad hoc calculations.* ........ 11

4. *Defendant's argument that the '601 patent is valueless is without merit since Mr. Jarosz adequately considered the prior patent transactions.* ........ 12

C. Jarosz Properly Determined the Date for the Hypothetical Negotiation ........ 13

IV. CONCLUSION ........ 16

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ActiveVideo Networks v. Verizon Communications*, 694 F.3d 1312 (Fed. Cir. 2012)........................ 11

*Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009)........................ 4

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)........................ 2, 3

*Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1586 (Fed. Cir. 1988)........................ 14

*Garretson v. Clark*, 111 U.S. 120 (1884)........................ 4

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)........................ 2

*Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983)........................ 2

*Implicit Networks, Inc. v. F5 Networks, Inc.*, C-10-3365 SI and C-10-4234 SI, 2013 WL 1007250 (N.D. Cal. Mar. 13, 2013)........................ 3

*Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003), *rev'd on other grounds*, 545 U.S. 193 (2005) 14

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2001)........................ 2

*Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645 RS, 2013 U.S. Dist. LEXIS 100790 (N.D. Cal. Jul. 18, 2013)........................ 11, 15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012)........................ 1, 4, 10, 11

*Limited Partnership v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010)........................ 3

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)........................ 2, 4, 5, 7

*Micro Chem., Inc. v. Lextron, Inc.* 317 F.3d 1387 (Fed. Cir. 2003)........................ 2

*Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111 (N.D. Cal. 2011) .......... 15

*Oracle Am., Inc. v. Google Inc.*, 2012 U.S. Dist. LEXIS 33619 (Mar. 13, 2012) .......... 15

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) .......... 3, 15

*Sickle v. Heublein, Inc.* 716 F.2d 1550 (Fed. Cir. 1983) .......... 2, 13

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689 (1933) .......... 13

*Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011) .......... 13

*Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008) .......... 3

*TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895 (Fed. Cir. 1986) .......... 13

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .......... 3, 10, 11

*Wagner v. Cnty. of Maricopa*, 673 F.3d 977 (9th Cir. 2012) .......... 3

*WI-LAN, Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:10-CV-00521-LED (E.D. Tex. Jun. 28, 2013) .......... 4

**Statutes**

35 U.S.C. § 284 .......... 1, 2, 15

35 U.S.C. § 121 .......... 15

**Rules**

Fed. R. Evid. 702 .......... 2

37 C.F.R. § 1.141 .......... 15

Manual Patent Examination Procedures § 802 .......... 15

# I. INTRODUCTION

In its motion to strike the expert testimony of Network Protection Sciences, LLC's (NPS) expert John Jarosz, Defendant incorrectly asserts that Mr. Jarosz failed to do the proper apportionment analysis required by the Federal Circuit. Mr. Jarosz did, in fact, perform the proper analysis; Defendant simply disagrees with his conclusion. Defendant also misrepresents Mr. Jarosz's calculation of a 4% reasonable royalty, incorrectly asserting that he merely copied this figure from a Fortinet-Trend Micro license agreement in 2006. Similarly, Defendant wrongly claims that Mr. Jarosz failed to consider prior transactions of the patent at issue when he did do so. Finally, Defendant attempts to dismiss Mr. Jarosz's determination that 2002 was a reasonable hypothetical negotiation date simply because it disagrees with his analysis.[1]

Mr. Jarosz's expert report correctly performed an apportionment analysis to determine the royalty base and utilized multiple sources, not simply the Trend Micro agreement, to determine a reasonable royalty rate. Defendant's arguments to the contrary stem from its disagreement with Mr. Jarosz's conclusions. However, Defendant will have ample opportunity to rebut Mr. Jarosz's analysis at trial. His expert opinion is therefore admissible, despite Defendant's claims to the contrary.

# II. LEGAL STANDARD

## A. Reasonable Royalty for Patent Infringement

Federal law states that upon finding for the claimant in a patent infringement case, the court shall award "…in no event less than a reasonable royalty for the use made of the invention…." 35 U.S.C. 284; *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). A reasonable royalty "may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and

[1] NPS objects to this motion for improperly circumventing the Court's standing pre-trial order on motions in limine. Fortinet has submitted this motion in order to avoid the Court's recommendation that motions in limine should not exceed five and that motions in limine are limited to seven pages. In addition to this motion to strike, Fortinet has submitted five additional motions in limine for the pre-trial conference. NPS requests that the Court deny this motion on the grounds that Fortinet has improperly tried to circumvent this Court's standing order. To the extent that the Court is willing to permit Fortinet present this motion, NPS submits that Fortinet's motion should be limited to the arguments presented in the first 7 pages.

defendant." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of an arms-length transaction between the patentee and the infringer at the time the infringement began. *See Sickle v. Heublein, Inc*. 716 F.2d 1550, 1561, 219 U.S.P.Q. 377, 385 (Fed. Cir. 1983). The reasonable royalty rate stemming from a hypothetical negotiation is often determined by assessing factors such as those set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Basically, a reasonable royalty consists of two numbers: a base (market value of the infringing product) times the rate (percentage). *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d 1301, 1339 (Fed. Cir. 2009). In a simple case, the base is just the total market value of the infringing product. *See, e.g., id.* at 1336. However, when the infringement is based upon a component or feature of a larger product, further analysis is required, as discussed in more detail below.

**B. Expert Testimony as to a Reasonable Royalty**

Courts "may receive expert testimony as an aid to the determination of damages or what royalty would be reasonable under the circumstances." 35 U.S.C. 284. Courts consistently uphold experts' use of a hypothetical negotiation and Georgia-Pacific factors for estimating a reasonable royalty. *See, e.g. Micro Chem., Inc. v. Lextron, Inc*. 317 F.3d 1387, 1393 (Fed. Cir. 2003); *Interactive Pictures Corp. v. Infinite Pictures, Inc*., 274 F.3d 1371, 1384 (Fed. Cir. 2001).

Rule 702 of the Federal Rules of Evidence states that a witness qualified as an expert may testify in the form of opinion or otherwise if: "(a) the expert's scientific, technical or specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. While unqualified witnesses can be excluded from testifying, generally, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 596 (1993).

The decision whether to admit expert testimony is "within the discretion of the trial court." *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008). The Rule 702 inquiry into the reliability of an expert's testimony is flexible and must be tied to the particular facts of a case. *Id.*; *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (excluding expert testimony because expert's theories were based on flawed methodologies and insufficiently applied to the facts).

*Daubert* lists factors for the court to consider when exercising its gate-keeping function, including, but not limited to: "(1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential error rate, and (4) whether it is generally accepted in the scientific community." *Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 989 (9th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94) (internal quotations omitted)).

Nevertheless, "expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Accordingly, relevant evidence should be debated at trial, not excluded. *Id.* at 564; *see also Implicit Networks, Inc. v. F5 Networks, Inc.*, C-10-3365 SI and C-10-4234 SI 2013 WL 1007250 (N.D. Cal. Mar. 13, 2013) (finding in a patent infringement case that the "deficiencies" in an expert's testimony "go to the weight a jury might give [the expert's] conclusions and not their admissibility.").

So long as the facts the expert relies upon have "a sufficient nexus to the relevant market, the parties, and the alleged infringement," it is irrelevant to admissibility if the expert could have used different facts because the accused infringer "[can] present contrary evidence, cross-examine the expert, and obtain a 'careful burden of proof'." *Limited Partnership v. Microsoft Corp.*, 598 F.3d 831, 856, 2010 U.S. App. LEXIS 5010 (Fed. Cir. 2010), aff'd, 131 S. Ct. 2238, 2011 U.S. LEXIS 4376 (2011).

## III. ANALYSIS

Defendant argues that Mr. Jarosz failed to properly apportion the royalty base. Additionally, Defendant contends that he did not properly calculate a reasonable royalty rate by

copying a 4% rate from the 2006 Trend Micro agreement. Finally, Defendant argues that Mr. Jarosz did not consider the supposed low value of the '601 patent.

All these arguments are without merit.[2] Mr. Jarosz properly conducted an apportionment analysis by finding the smallest salable patent-practicing unit. He also properly calculated a reasonable royalty rate by examining various information sources, and did not simply copy his royalty rate from the Trend Micro agreement. Finally, Mr. Jarosz did not ignore the supposed low value of the patent at issue, but considered such facts and found them unpersuasive.

**A. Jarosz conducted a proper apportionment analysis in determining the base for the reasonable royalty calculation.**

NPS expert John Jarosz properly performed an apportionment analysis in his expert report, contrary to Defendant's assertions. If the alleged infringing product is but a component or portion of a larger, multi-component product, a reasonable royalty must be based on the "smallest salable patent-practicing unit." *LaserDynamics*, 694 F.3d at 66 (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). Such an apportionment analysis is required to avoid the "considerable risk that the patentee will be improperly compensated for non-infringing components" of a multi-component product. *Id.* Apportionment is most easily applied in those cases where the accused product can be easily identified as a separate, salable product relative to the larger product of which it is a part.

A narrow exception to this general rule regarding apportionment is the so-called "entire market value rule." The entire market value rule applies where a patented feature in a multi-feature product "constitutes the basis for consumer demand." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *see also Garretson v. Clark*, 111 U.S. 120, 121 (1884). In such situations, "a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *LaserDynamics*, 694 F.3d at 67. In fact, the entire

[2] Defendant attempts to further criticize Mr. Jarosz by stating that a Texas court recently struck Mr. Jarosz's testimony due to a supposed failure to perform an apportionment analysis. *See* Def.'s Mot. to Strike at 11-12. However, the court did not bar Mr. Jarosz from testifying, but rather permitted him to amend his report. *WI-LAN Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:10-CV-00521-LED, at *7-8 (E.D. Tex. Jun. 28, 2013).

market value of the entire product may still be used provided that the rate properly accounts for the proportion of the base represented by the infringing component or feature. *Lucent*, 580 F.3d at 1339.

*1. Mr. Jarosz correctly calculated a reasonable royalty using the apportionment method.*

Mr. Jarosz correctly performed the apportionment analysis required by the Federal Circuit by first ascertaining the smallest salable patent-practicing unit, and then analyzing the proportion of product value derived from the allegedly infringing technology. In this case, Mr. Jarosz correctly calculated a reasonable royalty based on individual Fortinet products that utilize the FortiOS operating system. ECF 251-2, Expert Report of John Jarosz, at 36. These products constitute the "smallest salable patent-practicing unit." *Id*. at 34-35. Indeed, Fortinet officers testified in sworn depositions that "the smallest salable unit that incorporates the technology at issue is an accused Fortinet hardware product" or an accused virtual machine. *Id*. Mr. Jarosz, therefore, appropriately used the actual product as the relevant unit for apportionment purposes. Although FortiOS by itself infringes the patent at issue, *id*. at 10-11, FortiOS is not the smallest salable unit that incorporates the patented technology. Fortinet explicitly stated that it did not sell FortiOS separately from products that run FortiOS, such as FortiGate. *Id*. at 35. FortiOS is not a stand-alone product, and, from the company's perspective, FortiOS and products like FortiGate "are one and the same." *Id*. Since FortiOS has not generated any revenue by itself, *id*., it cannot be the smallest salable patent-practicing unit. Rather, that distinction belongs to products that utilize FortiOS.

Indeed, the Federal Circuit has contemplated a situation similar to the instant case. In Lucent, the court stated that "[t]here is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature," as long as the proportion of the product represented by the infringing feature is taken into account. *Lucent*, 580 F.3d at 1339. Here, it is undisputed that there is no established market value for FortiOS or any application layer services code used in FortiOS. *See* ECF 251-2 at 35. Defendant does not contend otherwise in its motion. Therefore, Mr. Jarosz

permissibly used the market value for the entirety of each Fortinet product that infringes, such as FortiGate, but taking into account the proportion of the product represented by the allegedly infringing technology. Mr. Jarosz's conclusion of a 4% royalty rate, *id*. at 77, indicates that he did not blindly use the entire product market value to calculate a reasonable royalty rate. In his analysis, Mr. Jarosz concludes that a 12.4% royalty rate would be reasonable if such a rate was calculated based solely on the benefit Fortinet received from using the allegedly infringing technology in its products. *Id*. at 61-64. However, Mr. Jarosz does not ultimately conclude that 12.4% is a reasonable royalty rate, but proceeds to analyze other factors before making his final determination, including all fifteen of the Georgia Pacific factors. *Id*. at 65-77. For example, in his analysis of the thirteenth *Georgia Pacific* factor, Mr. Jarosz notes that a reasonable royalty rate would be lower than 12.4% due to the presence of non-infringing elements in the product. *Id.* at 76. After this thorough analysis, Mr. Jarosz concludes that 4% is a reasonable royalty rate. Had he simply used the market value of each Fortinet product in its entirety without considering the proportion of such products represented by the allegedly infringing features, Mr. Jarosz would have arrived at a royalty rate at or close to 12.4%, rather than 4%.

2. *Mr. Jarosz's analysis is further supported by the Trend Micro and Brandywine license agreements, which show Fortinet viewed its actual products as the smallest unit, as well as Fortinet testimony that the company did not consider FortiOS to be a separate product or entity.*

Mr. Jarosz's apportionment analysis is further bolstered by his examination of the 2006 Trend Micro and 2012 Brandywine license agreements. ECF 251-2 at 48-56. These agreements support Mr. Jarosz's conclusion that Fortinet viewed its actual products as the smallest salable unit, rather than a specific constituent element such as the FortiOS alone. For example, the Trend Micro agreement required Fortinet to pay royalty payments on products such as FortiGate. *Id*. at 51-52. Similarly, the Brandywine agreement stipulated that Fortinet agreed to pay royalty on total product sales. *Id*. at 56. While this agreement involved different products than the ones at issue in this case, it is nonetheless significant because it indicates that Fortinet viewed its potential royalty base to be built on its products themselves, not a specific constituent element

such as FortiOS alone.

Defendant argues that Mr. Jarosz improperly relied on the Trend Micro agreement in calculating the royalty base, *see* Def.'s Mot. to Strike, at 8-9, but Defendant misconstrues Mr. Jarosz's report. The report merely uses the Trend Micro agreement as supporting evidence that Fortinet viewed its actual products as the smallest unit, providing Mr. Jarosz the basis to correctly use these products as the royalty base. The agreement "highlight[s] how sophisticated parties routinely enter into license agreements that base the value of the patented inventions as a percentage of the commercial products' sales price." *Lucent*, 580 F.3d at 1339. Mr. Jarosz's use of the Trend Micro agreement is therefore permissible to ascertain how Fortinet viewed its own products. The presence of an International Trade Commission (ITC) exclusion order in the Trend Micro negotiations is irrelevant to this analysis. *See* Def.'s Mot. to Strike, at 8-9.

Even if Defendant is correct that the ITC exclusion order influenced the Trend Micro agreement, and it is not, such an argument is relevant to the weight of evidence to be considered by the trier of fact, rather than the admissibility of evidence in the first instance. At trial, Defendant will have ample opportunity to attempt to convince the trier of fact that the Trend Micro agreement should be given limited or no weight.

Additionally, it is worth noting that Defendant does not take issue with Mr. Jarosz's use of the Brandywine agreement. That agreement, like the Trend Micro agreement, shows that Fortinet viewed its products as the smallest salable unit.

3. *Defendant's argument that Mr. Jarosz misunderstood Mr. Xie's testimony about the scope of the patent is irrelevant.*

Defendant's additional argument that Mr. Jarosz's analysis is incorrectly based on a misunderstanding about the scope of the patent is irrelevant. Defendant argues that Mr. Jarosz misstates Mr. Xie's testimony by asserting that application layer proxies, rather than application layer processes, made Fortinet products competitive in the marketplace. Def.'s Mot. to Strike, at 10. Whether proxies or processes enable Fortinet products to be successful is irrelevant to Mr. Jarosz's apportionment analysis. As stated above, Mr. Jarosz properly relied on Fortinet testimony that the smallest salable patent-practicing unit was the relevant Fortinet product, such

as FortiGate, rather than FortiOS alone. *See* ECF 251-2 at 35. Mr. Jarosz's report emphasizes its reliance on Fortinet's assertion that the smallest salable unit that incorporates the technology in question is "an accused Fortinet product" or an "accused virtual machine." ECF 251-2 at 34-35. Accordingly, the scope of the patent does not impact what constitutes the smallest salable patent-practicing unit and, Mr. Jarosz correctly performed the requisite apportionment analysis.

**B. Jarosz Properly Determined the Royalty Rate**

Defendant argues that Mr. Jarosz improperly calculated a 4% royalty rate by copying this number from the 2006 Trend Micro agreement. Defendant attempts to substitute its own 1.08% royalty rate, despite failing to cite any evidence showing that this figure is appropriate. Defendant also argues that Mr. Jarosz ignored the supposed low value of the patent at issue in performing his reasonable royalty analysis.

These arguments are unsupported by the facts. Mr. Jarosz calculated a 4% royalty rate by analyzing various information sources, including, but not limited to, the Trend Micro agreement. Additionally, Mr. Jarosz did consider the prior transactions of the '601 patent, but did not find them useful or reliable, in his expert opinion.

1. *Mr. Jarosz properly calculated a 4% reasonable royalty rate based on multiple sources, including past Fortinet licensing agreements and the Georgia Pacific factors, and did not copy his 4% figure from the 2006 Trend Micro licensing agreement.*

NPS expert John Jarosz properly derived a reasonable royalty rate of 4% based on past Fortinet agreements, an income value economic analysis, and the Georgia Pacific factors. Mr. Jarosz used a variety of information sources to calculate his 4% figure. In his report, he explicitly applied ***three different valuation methodologies*** to determine a reasonable royalty rate. ECF 251-2 at 43-44. He analyzed the various transactions involving the patent at issue, prior Fortinet licensing agreements, and estimates of the value Fortinet received by using the patented technology. *Id*. at 44-65. After this quantitative analysis, Mr. Jarosz ***analyzed each of the fifteen Georgia Pacific factors*** qualitatively. *Id*. at 66-76. He then concluded that 4% would be a reasonable royalty rate. *Id*. at 77.

Defendant selectively focuses on one aspect of Mr. Jarosz's analysis—his consideration of the 2006 Trend Micro licensing agreement—in order to argue that his 4% royalty rate was merely copied from the 4% rate in that license. Def.'s Mot. to Strike, at 12-13. Not only does Defendant ignore the remainder of Mr. Jarosz's detailed analysis, but Defendant is also incorrect as a factual matter. Mr. Jarosz's 4% royalty rate calculation is not the same as the 4% figure mentioned in the Trend Micro agreement. After Mr. Jarosz analyzes the Trend Micro license, *see* ECF 251-2 at 48-54, he then considers more than 20 pages of additional information, *id*. at 54-76, including an income valuation analysis and the Georgia Pacific factors, before arriving at a 4% royalty rate. *Id*. at 77. Mr. Jarosz's report does not explicitly or implicitly conclude that the 4% royalty rate in the Trend Micro agreement is the exclusive basis for his conclusion that an overall 4% royalty rate is reasonable here.

Furthermore, Mr. Jarosz's deposition testimony makes clear that he did not simply copy the 4% figure from the Trend Micro agreement. Mr. Jarosz stated that he "looked at a number of things to arrive at an ultimate royalty rate." Declaration of David R. Owens in Support of Plaintiff Network Protection Sciences, LLC's Opposition to Fortinet, Inc.'s Motion to Strike Expert Report and Exclude Testimony of John Jarosz, Ex. 1, Dep. of John Jarosz ("Jarosz Dep."), Aug. 7, 2013, at 64:17-18. He also stated that he did not rely exclusively on the Trend Micro agreement in his analysis. *Id*. at 65:7-11. Rather, Mr. Jarosz considered other information, including transactions, sales activity, income information, the ability for Fortinet to "design around" the technology represented in the '601 patent, and the Georgia Pacific factors. *Id*. at 65:13-18. Therefore, Defendant is selectively reading Mr. Jarosz's report, and ignoring his deposition testimony, by claiming that he "cherry pick[ed]" his 4% royalty rate from the Trend Micro agreement. See Def.'s Mot. to Strike, at 13.

2. *Mr. Jarosz properly considered the analogous 2006 Trend Micro agreement in his analysis since that agreement relates to the same field and technology as the '601 patent.*

Mr. Jarosz properly considered the Trend Micro license in his analysis since that license involves the same field and technology as the instant case. In patent infringement cases, "there

must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). Merely "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. By contrast, "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *Id.*

The Trend Micro agreement is comparable and relevant because it involved the license of a patent "related to a core functionality of Fortinet's products," as does the '601 patent at issue. ECF 251-2 at 53. In other words, the Trend Micro license involved the same licensee (Fortinet), the same field, and similar technology as the instant case. Id. While the patent in that license is different from the one here, the technology is comparable or analogous. Due to these similarities, Mr. Jarosz was entitled to use that license as part of his reasonable royalty analysis.

Defendant argues that the Trend Micro agreement was a separate license that was entered into after the ITC issued an exclusion order banning importation of Fortinet products. Def.'s Mot. to Strike, at 13. Defendant further contends that the Trend Micro license is not analogous because Fortinet was a more mature company in the Trend Micro negotiations, while Fortinet would have been a nascent company with the supposed ability to design around any '601 patent infringement in 2002. *Id.* at 14-15. However, Defendant has presented no evidence illustrating that Fortinet did, in fact, have available design alternatives, much less that these hypothetical alternatives were feasible. The fact that the Trend Micro agreement is a separate license does not automatically mean it is not germane or relevant. An expert can consider the royalty rates in a prior license as long as there is a "basis in fact" to do so. *See Uniloc*, 632 F.3d at 1317. Here, Mr. Jarosz had ample factual basis to find the Trend Micro agreement analogous. He relied on the expert opinion of Dr. Keromytis that the technology involved in the Trend Micro agreement was comparable or analogous to the technology in this case. ECF 251-2 at 53. Furthermore, some of the same Fortinet products at issue here were licensed in the Trend Micro agreement. Id. This is not a case in which a party relied "on various licenses in the same general . . . field

without proving a relationship to the patented technology or the accused infringing products." *LaserDynamics*, 694 F.3d at 79. Rather, Mr. Jarosz considered an agreement related to comparable technology that actually licensed some of the same products. In a recent, similar case in this district, a court accepted expert testimony comparing licenses dealing with the same technology. In *Interwoven, Inc. v. Vertical Computer Systems*, the court held that an expert's usage of other licensing agreements that "were entered [into] during the same time period and deal[ing] with the technology using the patents-in-suit" was permissible. *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645 RS, 2013 U.S. Dist. LEXIS 100790, at *37 (N.D. Cal. Jul. 18, 2013). Defendant may disagree with Mr. Jarosz regarding the comparability of the Trend Micro license, but, as the *Interwoven* court noted, "any concern as to the degree of comparability between an existing and hypothetical license may be addressed through cross-examination." *Id*. at *38 (citing *ActiveVideo Networks v. Verizon Communications*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). At trial, Defendant is free to present its own evidence to rebut Mr. Jarosz's analysis. Defendant may not, however, attempt to strike Mr. Jarosz's analysis before trial given the ample factual basis for associating the royalty rates in the Trend Micro license with a hypothetical negotiation. *See Uniloc*, 632 F.3d at 1317.

3. *Defendant's suggestion of a 1.08% reasonable royalty rate is improper since it is based on faulty reasoning and ad hoc calculations*.

Defendant's suggestion that a reasonable royalty rate should be 1.08%, rather than 4%, is based on faulty reasoning and ad hoc calculations. Def.'s Mot. to Strike, at 14. First, Defendant is laboring under the misapprehension that Mr. Jarosz "cherry pick[ed]" his 4% figure from the Trend Micro agreement. Id. at 13. As stated above, this assumption is simply inaccurate. Second, even if the 4% royalty rate was culled directly from the Trend Micro agreement, Defendant improperly engages in speculative calculations by assuming that an applicable royalty rate should be proportionally based on a product sales/revenue ratio. Again, Defendant will have ample opportunity at trial to attempt to convince the trier of fact to believe its calculations instead of Mr. Jarosz's calculations. Defendant is simply arguing in its motion that Mr. Jarosz's analysis

should be given little or no weight; its 1.08% figure is not an argument that Mr. Jarosz's report or testimony should be inadmissible.

4. *Defendant's argument that the '601 patent is valueless is without merit since Mr. Jarosz adequately considered the prior patent transactions.*

Defendant's valuation of the market value of the '601 patent is without merit. Not only does it utilize outrageous data to arrive at its conclusion (such as a one dollar assignment of the patent from the inventor to his own company), *see* Def's Mot. to Strike at 2, but even if Defendant's unfounded calculations *did* have merit, Defendant still fails to take into consideration that market value alone does not dictate a reasonable royalty rate.

Defendant criticizes Mr. Jarosz's failure to consider "important real world evidence" regarding the value of the '601 patent. Def's Mot. to Strike at 5. Based on the chart Defendant provides, it is presumably referring to data such as the 1998 Milkyway assignment, the 2002 SLM Network acquisition, the 2004 Bevertec purchase, the 2006 Mount Hamilton acquisition, and the 2010 NPS acquisition. However, Mr. Jarosz considers each of these "transactions" in his report, and concludes that, "with the exception of the transaction between Bevertec and Mount Hamilton, these agreements are not arms-length transactions between unrelated parties and, therefore, are of **limited probative value** here. As the transaction between Bevertec and Mount Hamilton does not reflect the value of the technology to participants in the UTM marketplace, it also provides limited guidance here." ECF 251-2 at 47 (emphasis added). Mr. Jarosz further explained that the Bevertec and Mount Hamilton transaction provided limited guidance because "it was out of bankruptcy." Jarosz Dep. at 39:10.

The Jarosz Report demonstrates that Mr. Jarosz *did* in fact consider this data; however, in his expert opinion, the data deserved less weight than Defendants would like. The fact that the Defendants are unhappy regarding the weight given to these transactions by Mr. Jarosz does not mean that Mr. Jarosz ignored them. It is worth noting that even under the valuation theory that Defendant advances, Mr. Jarosz's opinion is still meritorious. The United States Supreme Court has held that "the absence of market value [of a patent] does not mean that the offender shall go

quit of liability." *Sinclair Refining Co. v. Jenkins Petroleum Process Co*., *289 U.S. 689, 698, 53 S. Ct. 736, 739* (1933). Instead, "[t]he law will make the best appraisal that it can, summoning to its service whatever aids it can command." *Id.* The Court further explained that, "a patent is a thing unique. There can be no contemporaneous sales to express the market value of an invention that derives from its novelty its patentable quality." *Id.* at 697. Moreover, in *Spectralytics, Inc. v. Cordis Corp.*, the court held that a relatively low-dollar past transaction did not preclude a jury from applying a relatively substantial reasonable royalty rate because, "the weight given to [the transaction is] a task for the jury, and a reasonable jury could have chosen to give very little weight to this evidence." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011).

Given the fact that Mr. Jarosz considered the data Defendant presented and found it to be of limited probative value, and he properly calculated the royalty rate based on the "book of wisdom" of available data, Defendant's disagreement with Mr. Jarosz goes to the weight of his testimony and not its admissibility.

**C. Jarosz Properly Determined the Date for the Hypothetical Negotiation**

Defendant contends that Mr. Jarosz used the wrong hypothetical negotiation date in his analysis. However, in actuality, Mr. Jarosz provides strong economic support for the date he selects, and any disagreement about the exact date is a factual issue to be determined at trial.

Mr. Jarosz exercises sound economic reasoning in ascertaining the hypothetical negotiation date in his reasonable royalty calculation, and he applies it in accordance with the law. Therefore, his testimony is admissible.

Reasonable royalties are calculated based on an artificial re-creation of a hypothetical negotiation. *See, e.g., TWM Mfg. Co., Inc. v. Dura Corp*., 789 F.2d 895, 898-99, 229 U.S.P.Q. 525, 526-27 (Fed. Cir. 1986). The hypothetical negotiation aims to determine what a willing licensor and willing licensee would have agreed to in an arm's length transaction when the infringement first began. *See, e.g, Sickle v. Heublein, Inc*., 716 F.2d 1550, 1561, 219 U.S.P.Q. 377, 385 (Fed. Cir. 1983). However, the hypothetical negotiation determination involves the use of "the book of wisdom," which "permits and often requires a court to look to events and facts

that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575, 7 U.S.P.Q.2d 1606, 1613 (Fed. Cir. 1988).

In this case, Mr. Jarosz uses May 2002 as the date of hypothetical negotiation because it is the date of the first commercial sale of a product containing FortiOS. ECF 251-2 at 31. While the Defendant may factually disagree with Mr. Jarosz's analysis of the time the infringement first occurred, that is not a valid legal reason for excluding Mr. Jarosz's testimony.

First, in *Integra Lifesciences I, Ltd. v. Merck KGaA*, the "record [was] not clear on the hypothetical negotiation date" because the evidence presented at trial supported that the proper date could have either been sometime in 1994 or 1995. *Integra Lifesciences I, Ltd. v. Merck KGaA*, rev'd on other grounds, 331 F.3d 860 at 870; 2003 U.S. App. LEXIS 27796 (2006). Therefore, the court ruled that the case should be remanded to the trial court to "clarify the proper timing of the reasonable royalty calculus." *Id.*

The *Integra* ruling supports admitting competing evidence regarding the hypothetical negotiation date so that the court may weigh it and make a proper determination. The *Integra* court notes that pinning down a hypothetical date is "an exercise in approximation," and only requires the analysis be based on "sound economic and factual predicates." *Id.* Mr. Jarosz states that using the May 2002 date makes "sound economic sense" because it is the date when the parties "first recognize the need for a license negotiation." ECF 251-2 at 31.

It is also worth noting that while Defendant criticizes Mr. Jarosz's choice of May 2002 as the proper date of hypothetical negotiation; it fails to offer evidence of a date that it deems more appropriate and whether a different date would impact the outcome of the calculations. Mr. Kearl's report appears to advocate for an earlier hypothetical negotiation date. Def's Mot. to Strike, Ex. 4 at 22. However, Mr. Kearl does not specify what that date would be, the necessary design-around alternative, what it would cost, whether it would be acceptable to customers, or whether it could have been implemented in the time between this mysterious "earlier date" and the date of first sale.

Defendant seems to purport that a different hypothetical negotiation date would impact

Mr. Jarosz's calculations, however, Mr. Jarosz states in his deposition, "I'm not sure how much the result would change if the date was different from May 2002. Particularly in light of the book of wisdom." Jarosz Dep. at 26:18-21.

Moreover, Defendant relies on *Oracle Am., Inc. v. Google Inc.* in its argument that an improper hypothetical negotiation date can warrant exclusion of Expert Testimony. Def.'s Mot. to Strike at 26. However, in *Oracle,* there were twelve stated issues that contributed to the exclusion of the Expert Testimony, most notably, a lack of record support for the expert's opinion. *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1112-1118 (N.D. Cal. 2011).

Furthermore, despite Defendant's claim to the contrary, Mr. Jarosz properly applies the hypothetical negotiation date to all of the infringing products because all of the accused products infringe at least one claim of the patented technology. Jarosz Report at 10-11. The reasonable royalty statute states that the patentee is awarded "a reasonable royalty for the use made of the ***invention*** by the infringer." 35 U.S.C. 284 (emphasis added). Under the United States Patent and Trademark Office guidelines, it is presumed, "that each issued patent contains only one independent and distinct invention." Manual of Patent Examining Procedures § 802; *see* 35 U.S.C. 121, 37 C.F.R. 1.141. Based on this guideline, "if each patent covers only one invention, then each claim represents merely different shades of the same invention and it is reasonable to require—in the hypothetical negotiation—that the infringer license the ***entire*** patent." Judicial Order - *Oracle Am., Inc. v. Google Inc.*, 2012 U.S. Dist. LEXIS 33619 at 21 (emphasis added) (March 13, 2012, Order stating that the Expert Witness was not required to apportion damages on a claim-by-claim basis).

Given that Mr. Jarosz properly supports his calculation of May 2002 as the hypothetical negotiation date, and he properly applies the date to apportion the damages, his testimony is admissible. If Defendant wishes to disagree with Mr. Jarosz's factual analysis, it may do so "by cross examination, contrary evidence, and attention to the burden of proof, ***not exclusion***." *Interwoven, Inc. v. Vertical Computer Systems*, 2013 U.S. Dist. LEXIS 100790, 11 (N.D. Cal. 2013) (citing *Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010)) (*emphasis added).

## IV. CONCLUSION

Mr. Jarosz's testimony is admissible and Defendant's motion to Strike should be denied. Mr. Jarosz properly apportioned his reasonable royalty analysis based on the smallest salable patent-practicing unit; Mr. Jarosz properly considered analogous licenses and all of the available data in the "book of wisdom" when calculating his reasonable royalty rate; and Mr. Jarosz provided sound economic support for his determination of a hypothetical negotiation date.

First, Mr. Jarosz determined the smallest salable patent-practicing unit based in large part on Fortinet's own admission that its hardware is the smallest salable unit that incorporates the accused technology. Not only that, but Defendant failed to identify any other unit that Mr. Jarosz could have used instead, which suggests that indeed Mr. Jarosz used the appropriate unit.

Secondly, Mr. Jarosz thoroughly considered all of the available data when calculating the reasonable royalty rate. He took other license agreements (such as Trend Micro) into consideration, and he also went the extra mile in analyzing every Georgia-Pacific factor, even though he was not required to do so. He calculated the benefit to Fortinet to be at 12.4%, but then further apportioned his analysis based on the data to arrive at a 4% royalty rate.

Finally, Mr. Jarosz exercised sound economic judgment in ascertaining a hypothetical negotiation date and he provided testimony that a different date was unlikely to change the calculations. Furthermore, Defendant could not articulate a more appropriate date or an argument as to how an alternative would have impacted the calculations.

Given that Mr. Jarosz properly based his analysis in accordance with the law, his testimony is admissible and its weight should be determined in court. Therefore, Defendant's motion should be denied.

Dated: September 5, 2013

Respectfully submitted,

OWENS TARABICHI LLP

By /s/ David R. Owens
David R. Owens
Bruno W. Tarabichi
Attorneys for Plaintiff
Network Protection Sciences, LLC